1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5   FEDERAL TRADE COMMISSION,              )
                                           )
6                      Plaintiff,          ) Case No.
                                           ) ED CV 18-2104-SJO
7          vs.                             )
                                           ) **Volume 3**
8   JASON CARDIFF, ET AL.,                 ) **(Pages 304 - 396)**
                                           )
9                      Defendants.         )
    _____)

10

11

12

13                REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                 ORDER TO SHOW CAUSE RE: CONTEMPT

15                   WEDNESDAY, JULY 31, 2019

16                          9:02 A.M.

17                    LOS ANGELES, CALIFORNIA

18

19

20

21

22   _____

23            MAREA WOOLRICH, CSR 12698, CCRR
          FEDERAL OFFICIAL COURT REPORTER
          350 WEST FIRST STREET, SUITE 4311
24         LOS ANGELES, CALIFORNIA 90012
             mareawoolrich@aol.com

25

**UNITED STATES DISTRICT COURT**

```
 1                        APPEARANCES OF COUNSEL:

 2

 3

        FOR THE PLAINTIFF:
 4
            FEDERAL TRADE COMMISSION
 5          BY:  ELIZABETH JONES SANGER
            JAMES A. PRUNTY
 6          EDWIN RODRIGUEZ
            600 Pennsylvania Avenue NW
 7          Washington, DC 20580
            (202) 326-2757
 8

 9

        FOR THE RECEIVER ROBB EVANS & ASSOCIATES, LLC:
10
            FRANDZEL, ROBINS, BLOOM & CSAT, LC
11          BY:  MICHAEL G. FLETCHER
            1000 Wilshire Boulevard, 19th Floor
12          Los Angeles, CA 90017
            (323) 852-1000
13

14

        FOR THE DEFENDANTS:
15
            THURMAN LEGAL
16          BY:  MICHAEL A. THURMAN
            1055 East Colorado Blvd., 5th Floor
17          Pasadena, CA 91106
            (626) 399-6205
18
            LAW OFFICES OF JAMES D. WHITE
19          BY:  JAMES D. WHITE
            P.O. Box 367
20          113 Quarter Horse Drive
            Bellevue, ID 83313
21          (949) 697-9236

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1            APPEARANCES OF COUNSEL CONTINUED:

2

3    FOR THE OBJECTOR JACQUES POUJADE:

4        VENABLE LLP
         BY:  ROGER COLAIZZI
5        600 Massachusetts Avenue, NW
         Washington, DC 20001
6        (202) 344-4000

7        VENABLE LLP
         BY:  ARI N. ROTHMAN
8        2049 Century Park East, Suite 2300
         Los Angeles, CA 90067
9        (310) 229-9900

10       LITIGATION & BUSINESS LAW GROUP, INC.
         BY:  MICHAEL W. KINNEY
11       41690 Ivy Street, Suite C
         Murrieta, California 92562
12       (951) 296-9910

13

14

15

16

17

18

19

20

21

22

23

24

25

1          LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 31, 2019

2                          9:02 A.M.

3                           -oOo-

4

5          THE CLERK:  Calling Item No. 1, ED CV 18-2104,

6   Federal Trade Commission versus Jason Cardiff, et al.

7          Counsel, state your appearances, please.

8          MS. SANGER:  Elizabeth Sanger, Federal Trade

9   Commission.

10         MR. RODRIGUEZ:  Edwin Rodriguez, Federal Trade

11  Commission.

12         MR. FLETCHER:  Good morning, Your Honor.  Mike

13  Fletcher of Frandzel Robins on behalf of the receiver, Rob

14  Evans & Associates.

15         MR. WHITE:  Good morning, Your Honor.  James White

16  on behalf of the Cardiffs.

17         MR. THURMAN:  Good morning, Your Honor.  Michael

18  Thurman on behalf of the Cardiffs.

19         MR. COLAIZZI:  Good morning, Your Honor.  Roger

20  Colaizzi with Venable on behalf of Jacques Poujade.

21         MR. ROTHMAN:  Good morning, Your Honor.  Ari Rothman

22  from Venable also on behalf of Jacques Poujade.

23         MR. KINNEY:  Your Honor, Michael Kinney on behalf of

24  Jacques Poujade.

25         THE COURT:  Okay.  We are back on the record, and

```
 1    all counsel are present.  The parties are present.

 2              Is the government ready to present argument?

 3              MS. SANGER:  Yes, Your Honor.

 4              THE COURT:  Ms. Sanger.

 5              So in reference to your argument, what I'm -- I'd

 6    like to hear from both sides is argument and support from the

 7    record regarding the allegation that the Cardiffs and

 8    Mr. Poujade violated the provisions of orders issued by the

 9    Court, first by failing to disclose assets held by certain of

10    the Canadian companies and then also allegations of violations

11    concerning the transferring and dissipating of funds in those

12    accounts.

13              MR. THURMAN:  Your Honor, I apologize for

14    interrupting.  One issue we took up at the end of the day on

15    Tuesday that I wanted to report back to the Court or have the

16    receiver report back to the Court was the status -- the current

17    status of the funds in the TD Canada account.  I think we've

18    got that resolved.  And so I think it's an important issue to

19    the case.  And since it relates to an evidentiary issue or a

20    factual matter, it makes sense to address it right before we

21    start argument.

22              THE COURT:  Has it been resolved or not?

23              MR. FLETCHER:  It's been resolved, Your Honor --

24    Mike Fletcher on behalf of the receiver -- in the sense that I

25    gathered the underlying information.  I've circulated it to all
```

```
 1    counsel.  I've let them know that, as far as the receiver has

 2    been able to determine, there's $11,130.68 Canadian in the

 3    Clover Cannastrip account at TD Bank which roughly equates to

 4    about $6,900.

 5              As far as the receiver is able to determine, it's

 6    frozen, but, of course, it's in a foreign jurisdiction.  I've

 7    made requests of all parties to facilitate the receiver

 8    repatriating that money.  The Cardiffs have agreed, and I

 9    haven't had a response from the Poujade side.

10              MR. COLAIZZI:  Your Honor, Roger Colaizzi.  We have

11    not gotten the information we requested with respect to what

12    Mr. Fletcher says.  I mean, he stated what he -- everything

13    that he told us, but we had asked for the representations made

14    by the receiver to the TD Bank.  We were unable to get that

15    information from the bank, and he's refused to provide those

16    communications which caused the bank to freeze the funds.  So

17    we have no idea what he said to the bank.  That's what we had

18    asked for, and he claimed a privilege.

19              THE COURT:  Okay.  Let's proceed with argument.

20              MR. THURMAN:  Your Honor, may I add one final piece

21    to that?  The receiver --

22              THE COURT:  That's such a small amount.  There's a

23    lot at stake in this case.

24              MR. THURMAN:  That's true.  And if that amount is

25    not --
```

```
 1              THE COURT:  And $6,900 is a very small number.

 2              MR. THURMAN:  If that amount is not at issue, then

 3   I'm not concerned about it.  If it is, I wanted to present one

 4   more part of the receiver's report.  And that was simply that

 5   he advised that the Cardiffs want to cooperate to turn over the

 6   money to the receiver.  That is fine.  But they don't have

 7   access to it.  Poujade now does.

 8              THE COURT:  Let's go into argument.

 9              And then I'd like to hear also from the FTC

10   regarding the appropriate remedy in the case.

11              MS. SANGER:  If I may, Your Honor.  The FTC has laid

12   out the clear and convincing evidence necessary to prove the

13   Cardiffs and Jacques Poujade's contempt in our papers.  I will

14   keep my comments as brief as possible to address the Court's

15   request regarding the failure to disclose the assets, the

16   dissipation of assets, and the requested or suggested remedies,

17   and then reserve my right to respond to arguments of opposing

18   counsel or to respond to additional questions from the Court.

19              I have a few slides that I'll put up just to aid in

20   my discussion.  But before I put those on the screen, the big

21   picture here is that the Cardiffs and Jacques Poujade have

22   violated the orders in multiple ways starting with the failure

23   to disclose the assets and the Cardiffs' involvement with the

24   cannabis film strip businesses on their financial disclosures

25   which were first turned over to the FTC on October 25th.  And
```

1   these financial disclosures or a redacted version of them have

2   been appended to the Connor Sands declaration in support of our

3   order for a motion to show cause.

4          After submitting those financial disclosures, the

5   receiver discovered information that the Cardiffs had committed

6   an immediate contempt of the temporary restraining order by

7   going to the banks and attempting to withdraw funds in

8   violation of the asset freeze.  And when the Court extended the

9   TRO, the Court specifically ordered them to replenish those

10  funds.

11         When they stood before the Court on November 7th,

12  those funds still had not been returned to the receiver, and

13  the Court once again ordered them to return those funds.  There

14  was extensive discussion on November 7th about the seriousness

15  of the FTC's allegations as well as questioning from the Court

16  to the Cardiffs about their ability to understand the order and

17  to comply with it and make all reasonable efforts to comply

18  going forward.

19         Yet, even after that hearing, even after standing in

20  front of the Court that day, on every successive day since

21  standing in front of the Court, the Cardiffs continued to fail

22  to disclose their connection to these assets and this cannabis

23  film strip business.  And it was only over the weekend before

24  this hearing that we received updated financial disclosures

25  that for the first time listed Clover Cannastrip Thin Film

Technologies and their connection to the business as well as the Clover Cannastrip TD Canada account.

Now, simply put, the Cardiffs were aided in violating the Court's asset freeze by Jacques Poujade who has participated with them in obscuring these assets and concealing them and keeping them beyond the receiver's reach. They have taken steps since the preliminary injunction was entered to attempt to hide their involvement -- the Cardiffs' involvement with the cannabis film strip venture and to replace their names with Jacques Poujade's name. But that doesn't change the fact of the ongoing involvement with the venture or the benefit of the use of those cannabis film strip funds.

In these proceedings alone, we have seen $4 million Canadian flowing through their cannabis film strip businesses just between early September and early November 2018, all before the preliminary injunction was entered. The money needs to be replenished, and it is clear through these proceedings that nothing short of sanctions will gain their compliance.

In addition to replenishing the unreported assets of the cannabis film strip business, we urge the Court to impose the following purge conditions: Turn over the machines. These are the machines used in the film strip making process and packaging process and are of significant value.

THE COURT: Where are the machines today?

MS. SANGER: Your Honor, we are aware through the

1    declaration of Kevin Phillips that at least as of late

2    July there were some machines in the Cathedral City lab of

3    Pharmastrip.

4            In addition to turning over the machines, we are

5    requesting turning over the bank account records, statements,

6    wire records, signature cards, and account documents for the

7    Pharmastrip Corp. account, any Clover Cannastrip account, any

8    TPI account, and the Alphatech account that was mentioned in

9    yesterday's testimony as well as bank records for any other

10   company under the direct or indirect control of the contempt

11   defendants that is involved in the cannabis film strip venture.

12           We are also asking for the contempt defendants to

13   turn over all communications between Jason Cardiff, Eunjung

14   Cardiff, and Jacques Poujade, including e-mails and chat

15   transcripts from the various messaging applications on their

16   phones referenced by Jason Cardiff in his testimony which

17   include at the very least WhatsApp, Signal, and potentially

18   others, for example, Telegram, as well as communications that

19   are responsive to the FTC's outstanding document requests and

20   subpoena to Jacques Poujade about the cannabis film strip

21   business.

22           And finally, Your Honor, we are requesting a purge

23   condition of dismissing the Canadian lawsuit that was filed on

24   Friday which impedes on this Court's exclusive jurisdiction

25   over the assets that was first expressed in the Court's

1  temporary restraining order entered on October 10th.

2         Now, I just want to quickly summarize some of these

3  actions, and I've prepared a few slides.

4         To address the Court's question about the

5  undisclosed assets and the dissipation of the assets that have

6  been the subject of these proceedings, I'd like to start with

7  the September 2018 investments into Clover Cannastrip.

8         And here you see two large investments, one from

9  XIB Financial, one from FSD Pharma in the amount of $500,000

10 and $1.5 million.  And I'll just make a note at the beginning

11 here that these reference Canadian dollars unless otherwise

12 noted.

13        We've had testimony from the contempt defendants

14 about Jason Cardiff's involvement in raising this money through

15 meetings with Haywood Securities and interactions with that

16 securities firm.  We know that Mr. Cardiff attended a meeting

17 with FSD Pharma on August 31st, and it was just a week later

18 that FSD Pharma signed the subscription agreement for

19 $1.5 million and the money was deposited with Irwin Lowy and

20 subsequently deposited in the Clover Cannastrip account, this

21 time minus the fees charged by Irwin Lowy.

22        From the Clover Cannastrip account, $1.2 million was

23 transferred to Sui & Company's trust account and an additional

24 $360,000 was transferred to the account of Jacques Poujade's

25 brother, Richard Poujade.

1              Now, according to the Poujades, the money then moved

2    from the Sui account and Richard Poujade to the Pharmastrip

3    Corp. account.  But I will note for the Court that we have yet

4    to see the bank records confirming these transactions.

5              What we do know is that from Pharmastrip to

6    Alphatech, from November of 2018 starting the day after the

7    preliminary injunction was entered, through the end of May of

8    this year, $490,000 U.S. was transferred from Pharmastrip Corp

9    to Alphatech.  We also know that the Alphatech account was used

10   to pay for the personal expenses of the Cardiffs as well as the

11   ongoing expenses of their cannabis film strip business.

12             Now, these first two investments in September came

13   in before the TRO was entered and, in fact, were sitting in the

14   TD Canada account for which the Cardiffs are the only

15   signatories and remain the only signatories before the TRO was

16   entered.

17             On October 10th the TRO was entered.  On

18   October 12th the Cardiffs had notice.  Also on October 12th

19   Jason Cardiff spoke by phone, he called Jacques Poujade and

20   talked to him for ten minutes, two and a half hours after

21   having been served with the TRO and apparently told him he was

22   too busy to talk and didn't inform him of the TRO.  The FTC

23   finds that story to be incredible.

24             On October 16th, four days after the Cardiffs had

25   notice of the TRO, the money flowed from TD Canada to Sui.  And

1    on October 18th, $360,000 flowed from TD Canada to Richard

2    Poujade.

3              Now, I want to address the funds that were raised

4    and reported as a funding round that closed on November 5th,

5    just a few days before the preliminary injunction hearing.

6              According to the securities filings that have been

7    filed with the British Columbia Securities Commission as well

8    as the U.S. Securities and Exchange Commission, we have come to

9    understand that there are 73 unique investors who collectively

10   invested an additional $2.02 million Canadian into the cannabis

11   film strip venture.

12             These funds were deposited again in the Irwin Lowy

13   account.  But given the date after the Cardiffs had notice of

14   the TRO, after Mr. Poujade presumably also had notice of the

15   TRO, this time the funds bypassed the Clover Cannastrip

16   account, and they went straight to the account of Sui &

17   Company.

18             And once again, the evidence in the record suggests

19   that the money flowed from Sui to Pharmastrip.  And the bank

20   records that we are able to confirm show that the money flowed

21   from Pharmastrip to Alphatech.  And, again, that money was used

22   to pay for the Cardiffs' personal business -- personal and

23   business expenses.

24             I'll take just a moment to orient the Court with

25   Jason Cardiff's state of mind around the days that he learned

1    about the TRO and around the days that he learned about the

2    preliminary injunction.  And these are just excerpts.  You'll

3    see the source cited below at Docket 134-16.  These are records

4    from the T-Mobile phone records associated with the Cardiffs'

5    phone numbers.

6            And, again, this is just a sample, but I wanted to

7    highlight for the Court just a few of these phone calls.  The

8    first on October 16th is 18 calls to TD Bank in Canada, the

9    same bank where the Clover Cannastrip account was about to lose

10   $1.2 million to Sui & Company.

11           He also talked to Erwin Sui despite the fact that

12   we've had testimony from the Cardiffs and Mr. Poujade that the

13   Cardiffs no longer had anything to do with the finances or the

14   management or control of the company.

15           He also spoke to the Glaser Weil law firm,

16   presumably trying to figure out how they were going to pay the

17   retainer that Glaser Weil had requested.  And I'll just direct

18   the Court's attention to the deposition transcript of

19   Adam Pines representing Glaser Weil is in stark contrast to the

20   testimony that we heard from Jason Cardiff.

21           Mr. Pines was forthcoming at his deposition.  He did

22   not refuse to answer questions.  He provided documents in

23   advance when requested.  And his testimony is that Mr. Cardiff

24   was referencing sources of money in Canada that he could

25   potentially use to pay Glaser Weil's retainer including a

**UNITED STATES DISTRICT COURT**

1    $2 million pending deal that had not yet gone through.

2         On October 18th, which is the day that the money

3    flowed from the TD Canada account to Richard Poujade, we see

4    multiple calls again to Erwin Sui, multiple calls to TD Bank.

5    In fact, in the days surrounding the transfer of money,

6    Jason Cardiff called TD Bank 41 times.

7         Now, we also see on this same slide phone calls with

8    some of the individuals who were listed on the FTC's slide

9    demonstrating outgoing wires from the Clover Cannastrip account

10   in the days before the TRO was entered, outgoing wires that

11   Jason Cardiff admits he made.

12        THE COURT:  Just moving back to the Adam Pines and

13   the Glaser Weil law firm, so included in the declaration of

14   Connor Sands is an exhibit, and this exhibit includes a

15   declaration -- I'm sorry -- it looks like an e-mail from

16   Mr. Shapiro to Fred Heather.  The subject is "Redwood

17   Scientific TROs signed by Judge Otero, privileged

18   attorney-client communication."

19        And then there's a reference here October 16th,

20   2018, 2:00 p.m.  "Read this in the car and missed that TRO was

21   attached.  Having now received it, I don't think this is a

22   close question.  The suggested transfer of funds would violate

23   the order, in my opinion, and we are now on actual notice of

24   the order and therefore bound by it."

25        And then down further, it's a reference, "I am not

1    an expert, but this is very much -- but I very much doubt this

2    is permissible.  It appears to be a blatant effort to get

3    around a court-ordered receivership."  So that's from Attorney

4    Robert Shapiro.

5              MS. SANGER:  Yes, Your Honor.  You'll see at the top

6    of the document which is the record at Docket No. 138-8,

7    page 20, Robert Shapiro writes "agree" at the very top there.

8    And so this analysis, which was provided by the general counsel

9    of the Glaser Weil firm, was circulated between the two lawyers

10   who were consulting with Mr. Cardiff about potentially bringing

11   him on as a client, and their own corporate counsel and all by

12   the end of this e-mail chain were in agreement that they could

13   not touch these funds.  And, in fact, Mr. Cardiff did not bring

14   the Glaser Weil law firm on to represent him in this matter.

15             THE COURT:  No.  He retained Mr. White.

16             MS. SANGER:  Yes, that's right, Your Honor.

17   Mr. White was retained not immediately after the TRO was

18   entered but subsequently by the Cardiffs.

19             Now, it's also true that around this time the

20   Cardiffs had, in fact, obtained counsel.  About a week after

21   this e-mail chain occurred, we received several communications

22   from Jeff Richardson of MSK Law Firm.  Mr. Richardson indicated

23   that he was only going to be involved for the purposes of

24   discussing a potential settlement.  And, in fact, when

25   Mr. Cardiff was addressing the Court on November 7th at the

1    preliminary injunction hearing, he did mention Mr. Richardson's

2    name when questioned whether he was represented by counsel.

3            And after receiving the financial disclosure

4    documents from the Cardiffs which the FTC believed to be

5    incomplete, we communicated that to Mr. Richardson, and he

6    committed to working with his clients to update those forms and

7    provide more fulsome responses.

8            However, even in the succeeding weeks, what we

9    continued to receive from the Cardiffs were gross

10   misrepresentations of certain assets as well as the continued

11   concealment of the bank accounts for which they had just signed

12   documents in Canada in late September or early October.

13           Just going back and closing out with the phone call

14   records here, I want to take the Court to November 7th, 2018.

15   This is the day of the preliminary injunction hearing.  We'll

16   start again with five phone calls with Erwin Sui of Sui &

17   Company.

18           Now, on November 7th, according to all the testimony

19   we've heard even from the Cardiffs and Mr. Poujade during these

20   proceedings and through their declarations, this is long after

21   the Cardiffs had resigned as directors, had sold back their

22   stock shares, and had stepped away from the business.

23           This is also one day after Jason Cardiff was

24   supposedly offered a job by Jacques Poujade's brother to work

25   for Pharmastrip, a company he described as a startup in Toronto

1    but which didn't have a physical presence there, a company that

2    also bears the name Pharmastrip which Jason Cardiff used as

3    early as July 1st, 2018, in an exclusive distributor reseller

4    agreement with Oregon Thin Film Distribution.

5            He also spoke to Mr. Poujade.  He also spoke to

6    Mr. Kinney.  He also spoke to Ralph Olson who is a board member

7    now of Clover Cannastrip or now renamed True Pharmastrip, Inc.,

8    as well as many other legal professionals that you can see

9    here.

10            And on November 8th, which is the day after this

11   hearing and the day when the preliminary injunction was

12   formally entered, we see first five contacts with the Consulate

13   General of Ireland, which has been the subject of some

14   discussion during these proceedings.

15            We see a phone call with Mark McGinnis from Haywood

16   Securities, the same Haywood Securities that thought that the

17   Cardiffs were so toxic that they demanded that they step away

18   from the cannabis film strip business.  We see phone calls to

19   movers, to banks, to credit card companies, and again to

20   Mr. Olson who continues to serve on the TPI board today.

21            I have just one more set of slides to share with the

22   Court.  The FTC has argued in its papers that this cannabis

23   film strip business is merely a continuation of the Redwood

24   Scientific common enterprise, that we are dealing with the same

25   control people, some of the same employees, that in the early

1    days of the business before the receiver took over the business

2    premises that, in fact, the cannabis film strip business was

3    also run out of the same business location in Upland,

4    California, that funds were commingled, that services provided

5    to the company were for various entities for which Mr. Cardiff

6    had a hard time recalling which entity paid which lawyer, which

7    entity paid which vendor, who had contracted for which services

8    as they were getting ready to set up this cannabis film strip

9    business.

10            And, in fact, the timeline in 2018 is quite stark.

11   We've put on the record e-mails from April and May between

12   Jason Cardiff and business associates discussing the

13   opportunity to get involved with using his existing oral thin

14   film business to market CBD or THC strips.  This is months

15   before he and Mr. Poujade supposedly spoke for the first time

16   in June of 2018 about the idea of promoting strips containing

17   cannabis byproducts.  These e-mails were going back and forth

18   with Jason Cardiff at his Redwood Scientific e-mail address.

19            Then on June 25th there's a charge on Ms. Cardiff's

20   credit card for GoDaddy.com, the same day that Pharmastrip.com

21   was registered with GoDaddy.

22            On July 1st Mr. Cardiff signed an exclusive product

23   reseller agreement as the president of a company called

24   Pharmastrip.  The exclusive product reseller agreement covered

25   the sale of CBD strips and required that reseller to use a

1    certain URL and certain marketing materials provided to him by

2    Pharmastrip in the marketing of those film strips, those CBD

3    film strips.

4         On July 31st, Mr. Cardiff registered Clover

5    Cannastrip in Canada, and he listed himself, his wife, and

6    Jacques Poujade as the three original directors.

7         On August 31st Mr. Cardiff opened the Clover

8    Cannastrip TD account, and his testimony is that he was the

9    only signatory at the time the account was opened.

10         Also on August 31st, Mr. Cardiff met with FSD

11    Pharma.  Just a week later, FSD Pharma signed a subscription

12    agreement bearing Mr. Cardiff's name as the contact person.

13    And when we asked FSD Pharma to turn over the records they had

14    related to this business opportunity, they gave us an investor

15    presentation listing Mr. Cardiff as president and CEO.

16         The investor presentation also discussed the

17    extensive relationship between Redwood Scientific and Clover

18    Cannastrip and used that as an advantage, a selling point for

19    why these potential investors should invest so that they could

20    capitalize on the experience already gained by the Cardiffs in

21    their existing film strip venture at Redwood Scientific.

22         On October 1st, we've put in the record that

23    Mr. Cardiff signed a business liability insurance application

24    for a company called Clover Cannastrip Thin Film Technologies

25    and listing the Redwood Scientific address in Upland,

1    California.  This application also listed CloverStrip.com as

2    the website associated with this business despite testimony

3    from the Cardiffs and Mr. Poujade that CloverStrips had nothing

4    to do with this totally new, totally different business venture

5    that they were embarking on.

6           On October 3rd Mr. Cardiff signed a scope of work

7    agreement with FX Web Media for a project called Pharmastrip.

8    The idea was to market and sell CBD and THC film strips.  And,

9    in fact, if you look at the items from this agreement, many of

10   them have been implemented today.  At the same time that Jason

11   Cardiff has been in constant contact with Ty Sherrell who is

12   the principal of FX Web Media.

13          Now, we have a document dated October 4th signed by

14   Mr. and Mrs. Cardiff as president and manager respectively of

15   Clover Cannastrip Thin Film Technologies, a document that was

16   held at TD Bank.  We've received testimony from the Cardiffs

17   that the document was actually signed sometime in late

18   September.  But nevertheless, before this TRO was entered, the

19   Cardiffs were both listing themselves as control people over

20   Clover Cannastrip with their bank in Canada at TD Bank.

21          Now, between October 4th and October 9th, as we've

22   discussed previously, Mr. Cardiff made a number of wires out of

23   this TD Canada account to pay for various expenses.  And his

24   testimony is that some of those expenses were for individuals

25   or vendors associated with Redwood Scientific, that some were

1    personal expenses, and that some were in furtherance of the

2    cannabis film strip business venture.  Again, the commingling

3    of these funds and the multiple purposes for which they were

4    used shows the Cardiffs' control over these funds as well as

5    their benefit from these funds.

6            Now, we didn't get a chance to discuss this letter

7    during these proceedings, but there is extensive briefing about

8    the October 8th letter signed by Mr. Cardiff as president and

9    CEO of Pharmastrip listing the Redwood Scientific address and

10   requesting from the U.S. Consulate in Shanghai that they grant

11   a temporary work visa for a Chinese national presumably to come

12   and help them set up the machines or troubleshoot the machines

13   that are now being used in service of the ongoing cannabis film

14   strip venture.

15           On October 10th we have Mr. Cardiff's signature on a

16   Clover Cannabis Distribution agreement listing the same BC

17   incorporation number as the Clover Cannastrip BC incorporation

18   number.  Now, Mr. Poujade takes issue with the slight

19   difference in spelling of these names, but the business purpose

20   is clear.  It's to market and sell CBD and THC film strips and

21   this -- and the businesses associated with the same BC

22   incorporation number and the same control person, Mr. Cardiff.

23           I'll just highlight here a few of the excerpts from

24   the phone logs that are particularly striking.  From

25   October 12th, 2018, through May 7, 2019, Mr. Cardiff logged 268

1    phone calls with Mr. Sherrell of FX Web Media speaking for at

2    least 1,109 minutes.  And at the same time that they were

3    speaking to each other extensively, a Pharmastrip website was

4    developed, corporate promotion videos were filmed, and

5    packaging was developed per the specs in the scope of work

6    agreement.

7              Also, between October and May, Mr. Cardiff logged 44

8    calls and talked for at least 226 minutes with Julie Green who

9    was a Redwood Scientific employee who identifies herself as an

10   Alphatech employee and who has been identified by others as the

11   lab manager for Pharmastrip.

12             We've already covered Mr. Cardiff's 41 phone calls

13   with TD Bank in the days surrounding the near draining of that

14   account.

15             October 16th is when Mr. Cardiff told Glaser Weil

16   that he, one, had money in a Canadian trust account; two, was

17   owed $200,000 by a Canadian company in his father's name; and,

18   three, had a $2 million deal pending in Canada which lines up

19   perfectly with the deal that, in fact, closed just two weeks

20   later.

21             We obtained official records from the U.S. Consulate

22   in Shanghai showing that, in fact, on October 21st a Chinese

23   national did appear at the consulate in Shanghai requesting a

24   temporary work visa and that on his application he listed

25   Mr. Cardiff as the contact for Pharmastrip, the business he was

1    hoping to visit in the United States.

2              On October 23rd the Dissolved.com e-mail domain was

3    registered.  And we've put into evidence examples of

4    Mr. Cardiff using this e-mail address.  And Mr. Cardiff earlier

5    testified in this hearing that both he and Mr. Poujade have

6    used this e-mail address or this e-mail domain to communicate

7    about the cannabis film strip business, yet we have yet to see

8    any e-mail communications produced from either Mr. Poujade

9    pursuant to our April 10th subpoena or the Cardiffs pursuant to

10   our February document requests that detail any of these

11   communications that Mr. Cardiff testified occurred.

12             And, finally, on our 2018 timeline, we have the

13   conversations between Mr. Cardiff and Yuan Yang which extend

14   into 2019.  Dr. Yang is the chief chemist for Pharmastrip.  And

15   he spoke with Mr. Cardiff over the course of 92 phone calls, at

16   least 238 minutes, and sent numerous texts, 123 text messages

17   between them as the Pharmastrip lab was getting up and running

18   in Cathedral City.

19             So beginning as early as April, when

20   Redwood Scientific was before this Court in a separate

21   proceeding for their failure to comply with the Commission's

22   civil investigative demand, the Cardiffs were already making

23   plans for a new wing of their oral film strip business, just

24   another product.

25             They had a stop smoking product.  They had a weight

1    loss product.  They had sexual performance products.  And as

2    Mrs. Cardiff testified yesterday, they had a sleep aid, a

3    melatonin product.  CBD strips were just the next product to be

4    rolled out in this continuing venture.

5            We are talking about oral film strips.  We are

6    talking about the Cardiffs' four- to five-year experience in

7    this industry.  We have seen Mr. Cardiff's ongoing involvement.

8    We've seen the handwritten notes of both Mr. Cardiff and

9    Mrs. Cardiff that were recorded in the notebooks recovered at

10   the Redwood Scientific business premises brainstorming flavor

11   names, brainstorming how they were going to finance this

12   business, and brainstorming the business plan.

13           And all we've seen since the TRO and the PI is that

14   the Cardiffs' names have conveniently disappeared from the

15   official documents related to the business while the business

16   has continued to run as planned.

17           And that concludes my formal presentation and my

18   prepared slides.  I'll be happy at this time or later in the

19   hearing to address additional questions from the Court.

20           THE COURT:  Mr. Thurman?

21           MR. THURMAN:  Thank you, Your Honor.

22           MR. FLETCHER:  Your Honor, if the Court would

23   entertain a few remarks from the receiver, I'll be happy to --

24           THE COURT:  Keep it brief, please.

25           MR. FLETCHER:  Thank you, Your Honor.

1          May it please the Court.  Michael Fletcher on behalf

2   of the receiver, Robb Evans & Associates.  There are several

3   facts that I believe are key to what's gone on here that are

4   beyond dispute.

5          The receiver personally served Jason Cardiff on

6   Friday, October 12th, at his office with the temporary

7   restraining order, sat with him and discussed it in detail.

8   They got on the telephone with one of Mr. Cardiff's lawyers who

9   was present for that discussion.

10          It is beyond dispute that at 12:55 on that Friday,

11  October 12th, Jason Cardiff placed a telephone call to

12  Jacques Poujade and they spoke for ten minutes.  A dispute

13  about what was said, we'll come back to that.

14          It is beyond dispute that on Sunday, October 14th,

15  Jason Cardiff called Jacques Poujade at 7:40 in the evening,

16  and they spoke for another seven minutes.  It is beyond dispute

17  that the very next day, Monday, October 15th, Jason Cardiff

18  showed up at Arizona Bank & Trust and tried to take $150,000 of

19  receivership assets.

20          Now, the receiver stopped most of that from

21  happening.  But it is beyond dispute that $40,000 was attempted

22  to be wired to Sui & Company in British Columbia.  It is also

23  beyond dispute that Jacques Poujade testified yesterday that

24  Sui & Company were his lawyers, not Jason Cardiff's lawyers.

25          It is beyond dispute that the very next day,

**UNITED STATES DISTRICT COURT**

1    Tuesday, October 16, Jason Cardiff and Jacques Poujade sat side

2    by side with the infamous fob and transferred $1.2 million out

3    of the TD Canada account to Sui & Company.

4          It is beyond dispute that two days later on

5    October 16th, which I believe should be a Thursday, Jacques

6    Poujade and Jason Cardiff sat side by side and moved $360,000

7    out of the TD Canada account to Jacques Poujade's brother,

8    Richard Poujade.

9          It is beyond dispute that Richard Poujade has

10   engaged in a series of transactions recirculating that money

11   back into California to Jacques Poujade and his company

12   Alphatech and that the Alphatech money was used, in part, to

13   defray substantial living expenses, lavish one might say, of

14   the Cardiffs and to operate the film strip business here.

15         It is further beyond dispute from the testimony of

16   Jason Cardiff and Jacques Poujade that the goal of this

17   endeavor was to run this business here in California.

18         The credibility of Jason Cardiff and Jacques Poujade

19   is critical to things that cannot be objectively verified in

20   this case.  I don't believe Mr. Cardiff has any credibility in

21   light of what he's already done.

22         Mr. Poujade would have the Court believe that

23   in a call on the very day Jason Cardiff was served with a

24   restraining order and explained an asset freeze and an

25   injunction, that Mr. Cardiff called him and spoke for

1    ten minutes for the avowed purpose of telling him that

2    Mr. Cardiff could not talk to him.  That is incredible on its

3    face.

4           Mr. Poujade would also have this Court believe that

5    that Sunday Mr. Cardiff made another phone call to him for

6    seven minutes, again for the avowed purpose, according to

7    Mr. Poujade, of telling Mr. Poujade that Jason Cardiff couldn't

8    talk to him.  Again, that's incredible.

9           These two sat for 17 minutes according to

10   Mr. Poujade's own phone records before these asset transfers

11   commenced the very next day.  The failed transfers at Arizona

12   Bank & Trust, the attempted transfer at Sui & Company of

13   $40,000, the very next day the accomplished transfer of

14   $1.2 million out of TD Canada to Sui & Company, and two days

15   later $360,000 to Mr. Poujade's brother.

16          I don't intend to invade the province of the Court

17   in making credibility determinations other than to note the

18   story that has been told about this is incredible and should be

19   given no weight whatsoever.

20          We also have the testimony of Mr. Poujade who

21   several times on Monday made the comment that the money at

22   TD Canada, quote, "wasn't his money," end quote, shouldn't have

23   gone there.  Yet he had no problem sending 360,000 of what was

24   not his money to his brother, again impairing his credibility.

25          Finally, Your Honor, if we step back just a bit, the

1   contempt defendants want the Court to get down in the corporate

2   weeds, this resolution, that resolution, this filing, this

3   resignation, this, that, and whatever.  However, to believe

4   that entire story, all of which comes from the Cardiffs and

5   Poujade, without virtually any substantiation other than a

6   filing in the British Columbia corporate records on

7   November 16th, you have to believe that Mr. Poujade is

8   something other than how he presented himself.

9           I took detailed notes as Mr. Poujade's counsel took

10  him through his impressive business and financial records

11  starting as a chartered accountant in Canada through any number

12  of executive positions here in the United States at banks,

13  running his own financial institutions.

14          To believe Mr. Poujade, you have to believe that his

15  lawyers in Canada closed a transaction, sent $1,560,000

16  Canadian into a TD Canada account, and he didn't know about it.

17  You have to believe that he didn't know he wasn't a signatory

18  on the account.  And you have to believe that he didn't know

19  that money was flowing out of that account.  None of that is

20  credible.

21          That is not the actions of a highly sophisticated

22  financial executive.  It is, however, consistent with the

23  actions of someone who, "What, me worry?  It's not my company.

24  It's Jason's company.  What, me worry?  It's not my money.

25  It's Jason's money," which, frankly, is a more compelling

333

1   description of what happened than Mr. Poujade suddenly losing

2   his entire professional life's work and sophistication.

3          The bank believes that these two got together, made

4   decisions immediately on Friday, October 12th, on how to thwart

5   this Court's orders.  And over the next couple of days they

6   embarked on a joint plan to obfuscate, not to disclose, and to

7   move money so it couldn't be found.  This Court's orders are

8   fairly simple and straightforward.

9          Now, the receiver is neutral and agnostic about the

10  ultimate disposition of the assets that come into this

11  receivership estate.  That's for this Court to determine.  The

12  contempt defendants decided to usurp all of that.  They decided

13  to usurp the process.  They decided not to follow this Court's

14  order to disclose all of this.  They decided not to turn over

15  these assets so that this Court would not have the ability to

16  make the determinations that need to be made in a case like a

17  receivership of what happens to the receivership assets.

18         These contempt decision -- defendants made all of

19  this go away, and they now need to replenish it out of whatever

20  source.  Bring it back from Canada, don't bring it back from

21  Canada, take it out of Mr. Poujade's pocket, it doesn't matter.

22  It needs to come back, what we know is $4 million Canadian and

23  a bunch of machines, all of which was intended for operations

24  in California.

25         Thank you, Your Honor.

```
1              THE COURT:  Thank you.

2              Mr. Thurman?

3              MR. THURMAN:  Thank you, Your Honor.

4              Your Honor, I'd like to take us back to the original

5    temporary restraining order and the preliminary injunction.

6    The purpose, as I understand, of such orders is twofold, in

7    effect.  One is to secure the defendants' assets derived from

8    violations of the Federal Trade Act or the Federal Trade

9    Commission Act.  The other is to secure assets for a potential

10   judgment that might be levied.  And the government has a unique

11   power here that most civil defendants don't have.  It's the

12   equivalent of an attachment.

13             And I'm not here to debate the correctness of that

14   or whether Congress ever intended for that to be provided to

15   the FTC because higher courts have addressed those issues, and

16   I imagine they will continue to address them in the future.

17             But obviously the clear and convincing standard is

18   critical that the FTC meet.  It cannot rely on mere inferences,

19   mere speculation, on making assumptions or presumptions about

20   the contents of conversations that it has no testimony, no

21   direct evidence to provide information about that.  So in that

22   context, following the receiver's lead, I believe there are a

23   number of undisputed facts that are important for the Court to

24   consider.

25             First, it's undisputed that no funds from
```

1    Jason Cardiff or from Eunjung Cardiff or from any of the

2    Redwood defendants that are the subject of this lawsuit, no

3    funds went into the Clover Cannastrip, TPI, Pharmastrip, or

4    Alphatech accounts.  So there is no evidence that any funds

5    were transferred there.

6            And, in fact, the government's demonstrative

7    evidence indicates that the only sources of those funds were

8    two fund raises done by independent investors.  There's a

9    dispute over how many shareholders there are.  But it was

10   raised by what I understand to be a credible investment bank in

11   Canada, credible lawyers in Canada.  That's the source of this

12   money that we are talking about.

13           Whether or not the Court at the outset of this case

14   would have included such a company or such funds in this --

15           THE COURT:  I'm sorry.  We just lost Mr. Colaizzi.

16   I'm not sure what happened.

17           MR. ROTHMAN:  He had to step out for a moment, but

18   I'll cover for him.

19           THE COURT:  What do you mean he had to step out?

20           MR. ROTHMAN:  He just told me he had to step out to

21   use the restroom.

22           THE COURT:  Well, then we'll wait.  He needs to ask

23   permission of the Court before he leaves.  He's representing a

24   client here.

25           MR. ROTHMAN:  Understood, Your Honor.

```
 1                (Pause in proceedings.)

 2                THE COURT:  Mr. Colaizzi, if you need an emergency

 3      bathroom break, just simply request it from the Court.

 4                MR. COLAIZZI:  I apologize, Your Honor.

 5                THE COURT:  Thank you.

 6                MR. THURMAN:  May I proceed, Your Honor?

 7                THE COURT:  Yes.

 8                MR. THURMAN:  Thank you.

 9                So the FTC and the receiver offered no evidence,

10      submitted no evidence reflecting any transfer from any of the

11      Cardiffs or from -- or any assets that derive from any alleged

12      victims of the conduct that's the subject of this action to

13      Clover Cannastrip to any of those accounts that we are talking

14      about.  And sometimes I've referred to those as the OSC

15      entities in my papers, and I may refer to them there if it

16      pleases the Court.

17                The evidence is that the Clover Cannastrip and the

18      OSC companies were capitalized by the Canadian stock offering

19      that was done with contributions from third-party investors

20      through an investment bank in Canada, and that's undisputed.

21      The company in Canada, we've heard testimony as few as below a

22      hundred and as many as 156 shareholders.  It has an independent

23      board of directors including former U.S. Congressman Dana

24      Rohrabacher.

25                We've received that testimony from Mr. Sui's
```

1   declaration provided to the Court by Mr. Poujade's attorneys,

2   from Mr. Poujade's declarations, testimony from Mr. Poujade.

3   And so that's undisputed evidence.

4          It's undisputed that Jason Cardiff was not an owner

5   of Clover Cannastrip or TPI at the time that the TRO was

6   issued.  We have seen a stock certificate that was canceled.

7   It has been undisputed that that cancellation took place at the

8   end of August 2018.

9          Mr. Cardiff testified.  Mr. Poujade testified.

10  Mr. Sui's declaration confirms that Mr. Cardiff transferred his

11  shares back to the company on August 29, 2018.  Mr. Diaz also

12  provided a declaration confirming that Mr. Cardiff had no

13  involvement in TPI or with Industrial Corp., TPI's

14  manufacturing arm, since the TRO was issued.  That's

15  undisputed.

16         The Court has received the director's resolution

17  accepting the return of the Cardiffs' shares.  The Court has

18  received the share purchase agreement that was executed between

19  the Cardiffs and TPI.  And the Court has received the canceled

20  Cardiffs' certificate of ownership which was returned to the

21  company.  There's been no evidence submitted by the FTC or by

22  the receiver contradicting that evidence.

23         It's also undisputed that Mr. and Mrs. Cardiff

24  resigned as directors of Clover Cannabis and TPI on October 8,

25  2018.  Mrs. Cardiff testified yesterday that she signed the

1    resignation as a director on October 8th, that she also watched

2    her husband sign that same resignation -- or a similar

3    resignation form on October 8th.  There's no dispute that they

4    resigned on that date as directors of Clover Cannastrip or --

5    which is now known as TPI.

6         That's also confirmed by Mr. Poujade's testimony, by

7    Mr. Sui's declaration confirming their resignation as of that

8    date, and it's also confirmed by Exhibit 4 to Mr. Poujade's

9    declaration which is the shareholder's resignation --

10   shareholder's resolutions accepting the resignation of Mr. and

11   Mrs. Cardiff.  No evidence has been submitted by the FTC or the

12   receiver contradicting that.

13        It's undisputed that Mr. Cardiff delivered the TD

14   Canada remote access device, which has been called a key fob or

15   a fob, that allowed transactions to be conducted outside of

16   Canada in the Clover Cannastrip TPI account.  The testimony

17   from Mr. Cardiff was that he delivered that fob on about

18   October 8 or October 9.  And I believe Mr. Poujade's testimony

19   was that he received it on the end of the day on October 9 and

20   that he has had possession of that fob ever since that time.

21   So Mr. Cardiff had no ability to make any transactions outside

22   of Canada without that fob which he has not had in his

23   possession at any time.

24        It's undisputed that Mr. Cardiff could not make any

25   transactions or access that account unless he was actually

1    physically in Canada or if he had that fob, which he did not

2    have.

3         It's also undisputed based on Mr. Cardiff's

4    declarations, Mrs. Cardiff's declaration, and even, I believe,

5    the passports in the Court's possession reflect no travel

6    outside of the U.S. after September, late September of 2018.

7    So there's been no ability by Mr. Cardiff to conduct any

8    transactions in that account for either Mr. or Mrs. Cardiff to

9    conduct any transactions with respect to the TD Canada account.

10         It's undisputed that Mrs. Cardiff had absolutely no

11    involvement with any transactions relating to this account

12    other than signing a form in -- on about September 19 or

13    September 20 in a Nova Scotia bank branch that listed her as a

14    manager and was -- apparently subsequently a date was added in

15    sometime in early October.

16         But apart from that one step, there's been no

17    evidence that Mrs. Cardiff directed or was involved in or was

18    aware of any transactions relating to that account.

19         Finally and extremely significantly to this

20    proceeding, it's undisputed that the Cardiffs do not have any

21    ability to control the transfer of any Clover Cannastrip, TPI,

22    Pharmastrip, or Alphatech accounts or assets at this time.  It

23    would at this stage be impossible for the Cardiffs to return

24    any funds that pass through the Clover Cannastrip TPI account

25    or any other OSC entity accounts because there's been an

1    absolute lack of any showing that they have any control over

2    those accounts.

3            And, meanwhile, it has been established by

4    Mr. Poujade's declaration, by his brother's declaration, by the

5    Cardiffs' declarations, by Mr. Sui's declaration, by Mr. Diaz's

6    declaration that the Poujades have no control or they are not

7    directors, they are not shareholders, they are not officers of

8    any of the OSC entities.  So they have no ability at this point

9    to return any assets.

10           And even if we take into account the receiver's

11   report this morning regarding the small amount of assets

12   sitting in the TD Canada account at this time, that account is

13   apparently frozen.  So they have no ability to return those

14   assets even if they are still signatories on that account at

15   this point.  So it's undisputed that they are not in a position

16   to restore funds that were transferred in or out of that

17   account in October 2018.

18           That's significant in a contempt proceeding, of

19   course, because inability to return assets is a complete

20   defense to a civil contempt action.  Even the case cited by the

21   FTC, *Affordable Media*, makes clear that the concept behind a

22   civil contempt is that the defendant walks into jail with the

23   keys in his or her own pocket and can release himself or

24   herself simply by taking the action that's required by the

25   Court.

1          And the best example of that in this case was on

2    Monday night, Mr. Cardiff went to jail.  On Tuesday morning,

3    his passport was returned to Mr. Fletcher, and he was

4    immediately released by the Court.  That's the principle behind

5    civil contempt is that -- the whole concept behind civil

6    contempt is that the Court is using contempt power in order to

7    coerce compliance with the Court order.

8          But if the defendant has no ability to comply, then

9    the only purpose of any punishment would be punishment which is

10   not an allowable reason or justification for use of the civil

11   contempt power.  And I would cite the Court to *International*

12   *Union v. Bagwell*, 512 U.S. 821, pages 828 and 829, a 1993

13   Supreme Court decision.

14         The Cardiffs have done everything they can in order

15   to try and comply with the order, at least since my involvement

16   in this case.  And the problem is they now have run out of

17   options in terms of additional steps they can take to comply.

18   We provided numerous documents.  We provided numerous financial

19   statements.  We provided numerous reports to the receiver and

20   to the FTC.  We are willing to continue to cooperate in any way

21   the Cardiffs can with any aspect of this.

22         But their problem is they are out of -- they are not

23   in a position to control any assets that are the subject of

24   this dispute.  And as a result, exercising a civil contempt

25   sanction against them would not be effective, would not have

1    any effect, and should not be taken.

2            One last item I'd like to bring to the Court's

3    attention and renew my concerns about it is simply reaching

4    some kind of an agreement, and perhaps the Court -- perhaps my

5    only remedy would be to seek to modify the preliminary -- the

6    restraining order, but that is the way the order is written.

7    The receiver has the ability to conduct extensive discovery as

8    well as issue copies of the order to obtain extensive

9    documents.

10            But none of those documents have been provided to

11    the Cardiffs or their counsel other than as attachments to the

12    motion that's currently going on, perhaps in previous motions.

13    And the concern is that the receiver should be subject to the

14    same rules that all the other parties are in civil discovery.

15            They should be required to give notice when they

16    issue a subpoena or issue -- use the power granted in the order

17    to obtain documents.  They should be required to provide copies

18    of those documents the same as any other party is in this

19    litigation.

20            And so I'd ask the Court to either provide

21    instruction, or, alternatively, as I said, we can take steps to

22    try and move for a modification of the order.  But the goal is

23    to simply have this be full -- a full and fair process to

24    everyone, including the Cardiffs.

25            THE COURT:  Yes.  Thank you.

```
 1              MR. THURMAN:  Thank you.

 2              MR. ROTHMAN:  Your Honor, may we take a brief recess

 3    to consult with our client?  Our client would like to speak

 4    with us for just five minutes at most.

 5              THE COURT:  Request denied.

 6              MR. COLAIZZI:  The Court's indulgence, Your Honor.

 7              THE COURT:  If you need a short recess to set up,

 8    that's fine.

 9              MR. COLAIZZI:  Thank you, Your Honor.

10              THE COURT:  Do you need --

11              MR. COLAIZZI:  I would.  It's not coming up on my

12    screen.

13              THE COURT:  Then we'll take that recess.  We'll take

14    a ten-minute recess.

15              MR. COLAIZZI:  Thank you, Your Honor.

16              (At 10:08 a.m. a brief recess was taken.)

17              THE COURT:  We are back on the record.  I believe

18    everyone is set up.

19              And, Mr. Colaizzi, you can continue with argument.

20              MR. COLAIZZI:  Thank you, Your Honor.  My apologies

21    to the Court for the technical difficulties.

22              Your Honor, I want to start at the beginning here

23    just to focus on the relief -- as you suggested, the relief the

24    FTC is seeking.  Here's what they are seeking of Mr. Poujade:

25    That he be ordered to appear personally and show cause why he
```

```
 1   should not be held in contempt and sanctioned with a daily fine
 2   until he replenishes the receivership estate for $490,000.
 3   That's what they are asking for.  Not 4 million, not
 4   everything, not all assets.  This is what this hearing is
 5   about, $490,000.
 6        They asked -- they have a discovery dispute, which
 7   it should not be the subject of a contempt, and we have
 8   produced documents to the FTC.  The document requests
 9   themselves require the production of every piece of information
10   that the company has, every piece that the three companies
11   have, every e-mail, every shred of paper.  And they are seeking
12   we go beyond what the company has and provide information that
13   the company doesn't have, which is all copies of wires received
14   by people and so forth.
15        As to the accounting, again, the accounting was
16   requested of True Pharmastrip, Inc.  The company has given an
17   accounting and made notice with the Court that the accountings
18   were provided -- letters were provided to the FTC and the
19   receiver which shows every penny that came into any of the
20   three companies and every penny that went out to the three
21   companies and where it went.  So they have that information.
22        They also have all the bank records of True
23   Pharmastrip, Inc., formerly known as Clover Cannastrip Thin
24   Film Technologies, Inc.  They also have all the bank records
25   about the strip.  They have all the information from Mr. Sui
```

1    with respect to what was sent to him and back.

2            So they have enough to know where everything is and

3    where everything went.  So they are not lacking information.

4    And you can see from the first chart that they put up, they

5    show where the money went and how it went.

6            And they have the detailed information about every

7    penny that went out of Alphatech and particularly the detailed

8    information about what monies were loaned to Mr. Cardiff.  And

9    as I go -- I'm going to go through each of these individually,

10   Your Honor.  But what they are asking for is that 490- be

11   replenished, that they want additional documentation, but they

12   shouldn't be entitled to every piece of everything that the

13   companies have, and they want a full accounting on the Clover

14   Cannastrip funds.

15           And they have all the bank records for Clover

16   Cannastrip.  So they have that.  I guess they want us to do the

17   accounting for them but we've provided for not only Clover

18   Cannastrip funds but for Pharmastrip, Inc. -- sorry --

19   Pharmastrip Corp. and also for Alphatech.  So they have -- they

20   can't complain they don't know what happened once it got to

21   Pharmastrip or what happened once it got to Alphatech and so

22   forth.

23           Looking at the temporary restraining order,

24   Your Honor, and I start with -- this is Docket 29.  I start

25   with that because that's what was in place.  I'm looking at the

definition of asset.  An asset means a legal or equitable

interest in, a right to, or a claim to any property wherever

located and by whomever held.  So there has to be a legal or

equitable interest in or some kind of claim made by the

Cardiffs or any of their companies in order for it to be an

asset by definition of the order that the FTC sought and got.

A definition of receivership property -- and this is

critical as we go through each of the three -- means any

assets, wherever located, that are:  One, owned, controlled or

held by or for the benefit of the receivership entities, Jason

Cardiff or Eunjung Cardiff, in whole or in part.

There's no dispute by any of the testimony here that

the Cardiffs or any of the other defendants or anyone in

relationship to them owned, controlled, or that the assets are

held by the assets of True Pharmastrip, Inc., Pharmastrip

Corp., or Alphastrip are being held for the benefit of any of

the receivership defendants.

Second, in the actual or constructive possession of

the receivership entities.  I'm going to refer to all of them,

the individuals, as the receivership entities.  That's not the

case here.  They are not in actual or constructive possession

of any of those assets.  In fact, all the documentation filed

with all the government entities in Canada, in the U.S., shows

otherwise.

Owned, controlled, or held by or in the actual or

constructive possession of or otherwise held for the benefit of

any corporation, partnership, trust or other entity directly or

indirectly owned or controlled by the receivership entities or

this family -- the individuals or the family trusts, these two

trusts that are indicated.

          Again, that does not cover into the definition

of receivership properties.  So there's nothing held by

Jacques Poujade or any of the three entities, TPI, Pharmastrip,

or Alphatech.

          The next definition that's relevant, Your Honor, is

asset freeze.  So asset freeze, Your Honor, it talks about

assets, which we've defined earlier in the order.  And it talks

about anybody who has actual notice of the order.

          So it's the receivership entities, the individuals,

and anyone who is in active concert or participation with them

who receive actual notice of the order.  They are restrained

from transferring, liquidating, converting, encumbering,

pledging, loaning, selling, concealing, dissipating,

dispersing, assigning, relinquishing, spending, withdrawing,

granting a lien or security interest or other interest in or

otherwise disposing of any assets that are -- and assets is the

capital A defined by the order -- one, owned or controlled

directly or indirectly by any defendant -- that's not the case

here -- including but not limited to those for which any

defendant is a signatory on an account.

1          So there's testimony that the Cardiffs are

2   signatories on the TDI account.  But it's not -- it's not

3   subject to -- it's not an asset.  It's not a receivership

4   asset.  And the language here reflects that it has to be an

5   asset within which they have a right or an interest or a claim

6   or anything else, number one.

7          Number two, it has to be that Mr. Poujade had actual

8   notice of the order.  I'm going to get to the phone calls in a

9   minute, Your Honor.  But actual notice of the order -- we heard

10  what Mr. Poujade said.  But Mr. Cardiff telling him that --

11  even if he told him that I got a TRO by the FTC, and my assets

12  are frozen or seized and that I can't open a bank account is

13  not actual notice of the order.  Actual notice of the order is

14  to be served with the order.  That's the definition of actual

15  notice of the order.

16          THE COURT:  What authority are you relying on?

17          MR. COLAIZZI:  Your Honor, I'll pull that up in a

18  moment.  I'll have that to the Court in a minute.  But actual

19  notice is not that there is an order.  For an entity --

20          THE COURT:  Provide the authority, please.  Not at

21  this time, but continue your argument.

22          MR. COLAIZZI:  Okay.  In order to have actual notice

23  and to be in contempt, you have to know what you are precluded

24  from doing.  And in order to know what you are precluded from

25  doing, you have to read the order.  And until you get to a part

```
1    in the order that says you can't transfer the money out of an

2    account for which they claim an interest, you can't know that

3    you are in violation.  So to have actual notice, particularly

4    of the part --

5              THE COURT:  Mr. Colaizzi, I understand the argument.

6    I understand that -- the argument that Mr. Poujade had not been

7    served personally with the order, did not have the order in

8    front of him, did not have the words in front of him.  I

9    understand the argument.  I'm looking for the authority.  So

10   maybe you can move on to another issue.

11             MR. COLAIZZI:  Okay.  So, again, we go through 2, 3,

12   and 4.  None of these apply.  Not held for -- not held in part

13   or in whole for the benefit of any defendant, not in the actual

14   or constructive possession of any defendant, not owned or

15   controlled in the actual or constructive possession of or

16   otherwise held for the benefit of any corporation, partnership,

17   asset protection trust, or any entity that is directly or

18   indirectly owned, managed or controlled by any defendant.

19             So this is -- the asset freeze part of this order is

20   what has to be known and understood by Mr. Poujade and also by

21   Mr. Cardiff.  The idea that they got together to try to violate

22   an order that Mr. Poujade never read and didn't know there was

23   a violation of, I think the FTC and the receiver -- I'm sorry.

24   The FTC said Mr. Cardiff didn't understand the order and the

25   Court walked him through the order.  I wasn't at the hearing.
```

**UNITED STATES DISTRICT COURT**

1    I'm just relying on what the FTC said.

2          So there was a point of Mr. -- while he obviously

3    got a copy of the order and had the ability to have it

4    explained to him and the receiver testified that the receiver

5    explained to him, it presumes that knowledge for Mr. Cardiff is

6    somehow imputed to Mr. Poujade.  And so that's why that's an

7    important aspect.

8          The only place you see this idea of a signatory on

9    an account is in the asset freeze as to what is frozen.  Being

10   a signatory on an account does not mean that you -- that it's

11   receivership property.  All it means is you are a signatory on

12   an account.  If a company knows that they are not supposed to

13   move any assets on which a defendant like Mr. Cardiff is a

14   signatory on an account, then they have to wait until -- until

15   it's determined that he doesn't have any claim to the assets.

16         It doesn't mean it becomes receivership property,

17   because, if you go back and look at the receivership property

18   definition, being a signatory on an account does not make the

19   funds in that account receivership property.  The only aspect

20   of the receivership -- of the signatory ability is that, if you

21   know about the order, then you have to wait to see if it has to

22   be transferred.

23         And if it was disclosed early on that -- that the

24   Cardiffs were signatories to that account, then presumably the

25   FTC would have given notice and that then Mr. Poujade would

1    have had actual notice of what he should and shouldn't do and

2    would have had counsel to help him with that.  So, again, being

3    a signatory does not make anything receivership property.

4            So if we go back and think about what has been

5    argued here today, Your Honor, notwithstanding the FTC's

6    interest in saying that you should order more than they asked

7    for in the -- in their order to show cause, which is the

8    $490,000, you heard the receiver's counsel say he wants all the

9    money from all the companies no matter where it is even though

10   there's no dispute that the Cardiffs have no relationship to

11   those entities or signatory authority even, much less control

12   or a right or a claim to any of those assets, he wants

13   equipment, he wants all sorts of things.  That's not what's

14   before the Court.  What's before the Court is $490,000.

15           So if you look at the innuendo, this offer,

16   Your Honor, what the FTC is basically saying is all these

17   things that happened prior to the TRO is evidence that

18   Mr. Poujade and the Cardiffs were scheming to keep everything

19   from the FTC as if they somehow knew that there was a TRO

20   coming and they had to quickly hide everything.

21           So that means back in August when the shares were

22   canceled that -- or when there are board resolutions or when

23   the -- when the directorships were relinquished, all of that

24   was somehow in anticipation of knowing what happened.  What you

25   end up with, Your Honor, is this idea of revisionist history.

 1            What is not credible, what is not believable is that

 2    all these things happened in advance in anticipation of an

 3    asset freeze.  It just doesn't make sense.  How could people

 4    know that?  Why would they go through that process?

 5            The explanation is very clear why they went through

 6    that process.  It's because an equity firm raising capital said

 7    we've done our due diligence on Mr. Cardiff, and we cannot have

 8    him on the board.  We cannot have him be a shareholder.  We

 9    cannot have him in a control position.  And as a result of

10    that, he relinquishes shares.  As a result of that, he and his

11    wife step down as directors.

12            And this company continued to raise money and

13    continued to add to their board of directors, five directors.

14    Mr. Poujade has less than 9 percent of the stock.  There are

15    165 shareholders.  There's 52 million shares.  And so this is

16    not -- this is not a collusion between Mr. Poujade and

17    Mr. Cardiff in anticipation of something that nobody saw coming

18    to try to hide something.

19            And when you look at the documents, which are

20    undisputed, these documents reflect the cancellation of

21    the shares.  And here's a director's resolution signed by

22    Jason Cardiff, signed by Jacques Poujade, signed by Eunjung

23    Cardiff to relinquish the receivership.

24            Here was the share purchase agreement, and here is

25    the share certificate.  And that certificate was canceled.  Let

1    me pull this up.  That certificate was canceled and filed.  And

2    so these are things that happened before there was any order,

3    not because there was an anticipation of an order.  What this

4    shows is exactly what Haywood Security says, we can't raise

5    money and bring investors into a company where the Cardiffs are

6    shareholders, directors, or otherwise have control.

7            We go to the Cardiffs' resignation.  Here it is,

8    signed on October 8th.  There's no dispute about when this was

9    signed.  There's no dispute that it's a resignation.  Like the

10   other documents, there's no dispute about the authenticity of

11   these documents, nor that they were filed through the proper

12   structure of corporate governance.

13           Here's the shareholder's resolution showing the

14   state of directorships and how additional directors were added.

15   And you see it starting on October 9th where you see -- where

16   you see how others became directors.  You have a change of --

17   notice of change of directors filed with the BC registry.

18           The argument by the FTC is, well, this is dated

19   November 16th which is after the order and it's effective on

20   October 8th.  That October 8th is the day that the certificates

21   were signed by the Cardiffs relinquishing their directorships.

22   It's consistent with the board resolution.  It was filed with

23   the BC registry.

24           Mr. Sui, who took care of that, provided it -- and

25   he goes into detail in his declaration as to why it took until

1    November 16th to file that.  And the idea that he would -- he

2    would risk his legal license by somehow backdating a document

3    he's going to file with the government in order to help

4    Mr. Poujade and Mr. Cardiff complete a scheme to bypass assets,

5    that's what's not credible.

6         And so all of these things that are undisputed that

7    happened is -- it's not our burden to show clear and convincing

8    evidence that it happened.  But it's not -- it's undisputed.

9    And the idea that the FTC and the receiver have presented clear

10   and convincing evidence that Mr. Cardiff is still somehow in

11   control despite these documents is innuendo.

12        It's revisionist history.  It's to get the result

13   that they want.  And they are saying forget about all these

14   things that companies did, that lawyers did to help dupe the

15   Court.  That's not what happened.  What happened is these

16   things actually happened before the TRO issued.

17        And when we talk about the phone calls,

18   Your Honor -- and, again, I'm jumping to the 12th.  The first

19   argument made by the FTC yesterday was do you expect the Court

20   to believe that Mr. Cardiff called you back four times in

21   response to a request for a callback?  And then, when it was

22   pointed out these are just dropped calls, that argument

23   disappeared.

24        So they are looking at data and saying, hey, here's

25   what happened on this day to the Court.  And then, when it's

1    pointed out that they are wrong, they don't talk about it, they
2    don't acknowledge it.
3            If you look at the FTC's phone records, they say
4    there were two calls on that day, and they focus on the second
5    call, what they call the second call which is the 12:55 call.
6    And in their phone records, there are two things that happen.
7    One is they didn't provide all the calls that were made on
8    the 12th as if nothing else happened on the 12th between
9    Mr. Cardiff and Mr. Poujade.  And they submit that to the
10   Court.  And they say here's the call that proves that
11   Mr. Poujade has actual notice.
12           And then they -- and then they say we didn't -- he
13   must have told him about the order, and he must have told them,
14   you know, I can't -- I can't transfer assets, I'm not allowed
15   to have a bank account is what all the testimony was as to bank
16   accounts, that I can't have a bank account.  That's why he
17   asked Mr. Poujade if he could have a loan.
18           But what they are saying is they must have talked
19   about the TRO, they must have.  They couldn't be still talking
20   about business.  And when you look at the exact timing of the
21   call, the last one ends at the same time the receiver says he
22   walked in the door to serve this TRO.  Well, that makes sense
23   that he'd have to get off the call.
24           And then he calls back.  And you heard Mr. Poujade
25   say, yeah, I had a whole laundry list we were going through

1    that morning, and I still wanted to go through that list of

2    things that needed to be done that were outstanding as they are

3    going forward with respect to Mr. Cardiff continuing to have a

4    role, not a controlling role, not a shareholder role, not a

5    director role, but some role and ultimately as a consultant.

6    Okay?  So he went from an employee to a consultant.

7              So that's what they are saying about the phone

8    records.  Make a supposition that a conversation happened that

9    didn't -- that is contradicted by sworn testimony, and you

10   shouldn't believe Mr. Poujade because we don't believe

11   Mr. Poujade.  And we don't believe Mr. Poujade because these

12   calls are not plausible to us.  That's what -- that's what

13   Mr. Fletcher says.  This isn't plausible that he would call

14   back four times.  He's not making that argument now, but now

15   he's saying something else is not plausible.  It's not

16   plausible that they didn't talk about this.

17             If you -- if you go to the transfers and we look at

18   the transfers that happened, what Mr. Poujade testified to --

19   you see the money coming in, the 500 and the 1,340.  That money

20   didn't go to TD Bank account when it came in.  That money went

21   to a lawyer named Irwin Lowy.  That's what Mr. Poujade

22   testified about yesterday.  Irwin Lowy was concerned because he

23   had previously represented Haywood, that he shouldn't continue

24   to be a lawyer.  And so he sent the money to TD Bank.

25             Mr. Poujade explained why they switched from --

1    additional reason why they switched from Irwin Lowy to

2    Erwin Sui and how the two factions at Haywood Securities fight

3    over who gets credit for a deal, and the one faction that uses

4    Erwin Sui suggested use Erwin Sui.  And that's what happened.

5           And on October 16th, Mr. Poujade testified that,

6    after he had been told numerous times the founders' deal is

7    going to close, the founders' deal being the deal with Haywood

8    that allows -- at 1 cent it would allow all the other deals to

9    close that was pending and pending and pending.  It's going to

10   close.  It's going to close.  Finally he started shipping the

11   money back.

12          And as soon as the first wire went, he said shortly

13   right after that on the same day, they called him and said it

14   closed.  So he -- sending the money back because two reasons.

15   One, he didn't want to hold it anymore because he had found out

16   a few days before that Mr. Cardiff was transferring funds.  He

17   said he -- that's what he testified to.  I found out he was

18   transferring funds.  I got the fob.  I took control over the

19   checking account.  And I sent the money back because I don't

20   want it to be spent.

21          And then on the 18th, after the first deal closed,

22   he said all the conditions precedent were met, and he knew the

23   money was going to go to start Pharmastrip so they would have a

24   bank account.  So rather than doing two wire transfers, he did

25   one.  His credibility is intact because he had gone through the

1    right procedures in order to make that happen.  He took the
2    money out of that bank account because he didn't want it to be
3    spent.  He did not know about these other transfers.
4         And the other thing is all these things where it
5    says beneficiary in detail, that is not available to -- was not
6    available to Mr. Poujade at the time.  He didn't know that some
7    of these went to Mr. Cardiff on Mr. Cardiff's behalf.  He just
8    knew that they -- that they were being made at all.  And so he
9    stopped it.  Later it came to light what these -- where this
10   money went.  And that, that's had to be dealt with.
11        So, again, these are the closing dates on the round
12   one financing on November 5 on the 20 cent financing, and then
13   number -- 1 cent round had to be done first before a 20 cent
14   round could be done.
15        And then you have these things being -- you have
16   control issues here, Your Honor.  And when you look at what was
17   filed with the SEC and the British Columbia Securities
18   Commission's filings, you see what the company represented as
19   who the controllers were.  And you can -- you can see under
20   Clover Cannastrip Thin Film Technologies Corp., there's
21   Jacques Poujade as CEO.  And you can see on this document that
22   Mr. Cardiff is not listed anywhere.
23        And when you look at the share cancellation, the
24   resignations, the shareholder's resolutions, the securities
25   filings, all made by counsel on behalf of TPI, then Clover

1    Cannastrip Thin Film Technologies, Inc., all of it is

2    consistent with exactly what the evidence is in this case, and

3    that is that the Cardiffs cannot be in a control position.

4    They can't be a shareholder.  They can't be a director.  They

5    can't be in a control position.  Otherwise the funds were not

6    going to come in at all.

7            And you heard Mr. Poujade testify yesterday that he

8    was either going to walk away or Mr. Cardiff was going to have

9    to step down.  And when Mr. Cardiff testified, yeah, I was

10   hoping to convince Mr. Poujade that I could still be a

11   director, the answer was no.  Mr. Poujade testified it was very

12   uncomfortable.  They got -- they got into an argument multiple

13   times.  And the end result is you're out or we can't go

14   forward.

15           And he was out.  And he signed his relinquishment of

16   directorships, as did his wife, before the TRO was issued.  So

17   there is no clear and convincing evidence that they are somehow

18   in control of the corporation.

19           So the FTC has taken the position that Mr. Poujade

20   should have known not to transfer anything, that there

21   shouldn't have been a loan to Mr. Poujade for -- for the money

22   that was being provided to him in connection with the loan to

23   pay expenses.

24           Two times, Your Honor, the FTC was asked, we are

25   making this loan.  We are continuing to do this.  If you think

1    there is a problem here, tell us, and we will stop.  He asked

2    Mr. Prunty that question.

3            And here's the -- here's the declaration,

4    Your Honor.  And Mr. -- I'm looking at the right side of the

5    page on the screen, Your Honor.  And that's Document 148-3.

6    And here it is exactly what was said.  And that's -- it's an

7    e-mail.  "If you believe that the action of Mr. Picciano and

8    Alphatech Holdings, LLC, have in any way violated the terms of

9    the injunction, please let me know immediately and we can

10   discuss it.  In particular, if you contend that the unsecured

11   loan by Alphatech to Jason Cardiff or further advances by

12   Alphatech to Mr. Cardiff under the loan agreement are

13   prohibited by the injunction, I would like to know.  Neither

14   Mr. Picciano or Alphatech Holdings, LLC, are interested in

15   taking any action which the Federal Trade Commission contends

16   is in violation of the injunction.  Thank you."

17           And Mr. Prunty writes back and says, "The language

18   in the cover letter is pretty standard for everyone.  So you

19   shouldn't read too much into it."  He doesn't say, yeah, it's

20   in violation, stop doing it.  Every time you give money to him,

21   it's a continued violation of the TRO.  They don't say that.

22           In the deposition of Mr. Picciano, Mr. Kinney asks

23   the same thing of Ms. Sanger.  If you think we should stop, let

24   me know, and we will stop doing it.  She doesn't respond to

25   him.  And this was laid out in our papers, Your Honor.  The FTC

1    has not even addressed it.  They haven't denied it.  They

2    haven't said, no, we actually thought it was, but we didn't

3    want to say so or we didn't think it was.

4              So there -- there was a constant communication by

5    Mr. Kinney and the FTC.  Tell me what we are doing wrong, and

6    we'll stop.  And they never communicated that until,

7    Your Honor, we, Venable, got involved, and we -- the night we

8    got involved, we sent them an e-mail and said, hey, we are

9    involved in this case.  We'd like to set up a meeting with you.

10             The next day Ms. Sanger sent an e-mail saying we

11   think there's a violation of the order, and she laid out what

12   she refused -- the FTC refused to lay out for Mr. Kinney and

13   that Mr. Prunty said don't read anything into this, it's just a

14   cover letter.  And we, of course, sought a meeting to try to

15   resolve it, and we met with them immediately.  That's how we

16   operate.

17             So I don't understand why the FTC is standing here

18   taking the position that every loan payment to -- on behalf of

19   the Cardiffs is somehow a violation when they were specifically

20   asked about it and they didn't say it was.  I think that's --

21   that is inconsistent with the FTC's position today.  And it

22   deals with trying to put information and evidence and innuendo

23   to wrap around what they want to say is now a violation of the

24   order.

25             So the last thing, Your Honor, is that, as a result

1    of all this and as we get to this month, Mr. Cardiff was

2    terminated as a consultant of Pharmastrip, Inc. -- Pharmastrip

3    Corp.  I'm sorry.  And that's -- that was done for a number of

4    reasons, Your Honor, but mostly because of this case and

5    because of the allegations here.

6            If you look at what Mr. Cardiff was asked to do as a

7    consultant in order to try to deal with the marketing side of

8    things, how to get things in place, picking flavors for these

9    strips, helping to determine what would be -- what's the demand

10   in the marketplace, coming up with graphics and things like

11   that which the companies believed he was good at, that's what

12   was done, and dealing with other issues that come up as he's

13   helping out.  Not as a control person, not as a shareholder,

14   and not as a director.

15           He was -- he was offered a job at $10,000 a month;

16   right?  And the FTC has even taken the position that the --

17   Alphatech could not use that money to provide to Mr. White as

18   a -- instead of paying it to Mr. Cardiff.

19           And there's nothing in the order that prohibits

20   Mr. Cardiff from getting a job.  And there's nothing that

21   Alphatech is doing or TPI or Pharmastrip Corp. for that matter

22   that is in violation of the order.  TPI is a manufacturing

23   company.  They were set up to manufacture.  They were never set

24   up to sell to consumers.

25           They never needed insurance that Ms. Sanger said

1    that Mr. Cardiff went and got, that Ms. Sanger said this is

2    just Redwood under a different name.  Redwood is a public

3    company.  It cannot be in the business of manufacturing.

4            Mr. Poujade went through the details of what's

5    required for each step of the process if somebody wants to be

6    in the chain that delivers THC to consumers, what licensing is

7    involved.  All of that was handled by Mr. Poujade to make sure

8    that they are following the rules.

9            And if we look, Your Honor, at what the real

10   undisputed facts are that are material to this case -- and I'll

11   refer to Docket 164-1 and page 6 of 19, which start -- it's

12   undisputed that "Pharmastrip is a Canadian corporation that has

13   made multiple private" -- "public offerings pursuant to the

14   security laws of British Columbia and the United States

15   validating its legitimacy as an independent company," with

16   references to the exhibits.

17           It's undisputed that "True Pharmastrip's money came

18   from third-party investors unrelated to the Cardiffs," nothing

19   to do with them.

20           It's undisputed that "Jacques Poujade, who owns less

21   than 9 percent of True Pharmastrip's issued stock, is only one

22   of five directors on True Pharmastrip's board, and cannot take

23   unilateral material actions on the company's behalf because the

24   board must vote on any such actions."

25           It's undisputed that "Pharmastrip is a Canadian

1   corporation and wholly owned subsidiary of True Pharmastrip,

2   and Richard Poujade is and has always been its sole director

3   and officer and the only person controlling the company."

4         Mr. Poujade asked for the bank records of

5   Pharmastrip.  It's Pharmastrip's decision whether they want to

6   provide the documentation of what was provided to the FTC

7   showing where every penny went in and out.  It's up to them.

8   FTC knows who counsel is for Pharmastrip in Canada.  They could

9   have gone directly to Pharmastrip.  They chose not to.

10         Your Honor, the Cardiffs have never been signers on

11   the Pharmastrip bank account, never been signers on the

12   Alphatech bank account, never had control, ownership interest

13   in, nothing as it relates to Alphatech and Pharmastrip.  I

14   talked about Mr. Cardiff's duty as a consultant for

15   Pharmastrip.  And this undisputed fact is supported by

16   documentation, this reference there.

17         And so when you get to the bottom line -- and this

18   is not, hey, this is what we think it ought to be based upon

19   what we've seen.  This is what actually is all done prior --

20   all done -- except for the consultancy, all done prior to any

21   TRO, Your Honor.

22         So Mr. Poujade believes that he came up with

23   Pharmastrip products and the idea of manufacturing THC-infused

24   oral strips.  And he explained on the stand and it's also in

25   his declaration of how he came to that idea.  And the idea was

1    to manufacture these in places where there's an -- where an

2    entity that he creates has the license to manufacture, not

3    driving around the country with a machine in a back of a truck,

4    but to follow the rules and the law.

5        And the thing that attracted him to this was his

6    understanding that Canada was about to permit this

7    manufacturing.  And then they wouldn't distribute it.  They

8    would sell it to a distributor.  He understands what the laws

9    are, and he's following the laws.

10        He talks about in his declaration why Pharmastrip,

11    TPI, is different from Redwood, different from what Mr. Cardiff

12    was doing.

13        And we start talking about a lot of the evidence

14    that the FTC says is before the Court that -- from which the

15    Court should believe that there's an inference that it must be

16    some conspiracy or collusion or coordination to do something

17    other than what the company is doing.  There is a change in the

18    name.  And if you look at the change in the name, you know

19    that it's -- whether it's the same number, it's a different

20    company.

21        The idea that Mr. Cardiff was ever president of the

22    company, he said, no, I was never president.  Mr. Poujade said

23    he was never president.  The testimony in this case is neither

24    were ever president or manager of the company.

25        The evidence is that things that happen that caused

1   Mr. Poujade to take steps is not because Mr. Cardiff is in

2   control of the company.  It's to protect the companies, to

3   protect the investors who invested in this company, invested on

4   the basis that Mr. Cardiff, Mrs. Cardiff, any of their entities

5   are not shareholders, directors, or in a control position.

6   Nobody testifies that there was any capital invested by the

7   Cardiffs.

8           Your Honor, the other things that the FTC asked for

9   today, they are asking this Court to order relief against

10  Canadian assets of Canadian companies and Canadian citizens.

11  Those Canadian companies are not before the Court.  The order

12  is not enforceable in Canada.  There's a process and procedure

13  the FTC must go through in order to have a TRO be followed --

14  to have a Canadian company or bank subject to an order by this

15  Court.  The FTC is well aware of the process.

16          That process that they must go through is equivalent

17  to taking an order and having it go into a different state and

18  saying I need to have this enforced in the state and start an

19  action and you apply to have the order enforced, and oftentimes

20  it's a final judgment.  But it can also be done with a

21  preliminary injunction or an attempt with a preliminary

22  injunction.

23          The receiver and the FTC chose not to do that.

24  Instead, they went to Canada, and they convinced the FTC -- I'm

25  sorry -- convinced the bank that the bank should freeze the

```
 1    assets.
 2              In fact, Your Honor, there are a couple of things
 3    that have taken place here.  First of all, we asked the
 4    receiver for information -- the receiver's attorney for
 5    information about what happened at the TD Bank, that we
 6    understood that the assets were frozen and we don't know how
 7    because the bank won't tell us, and we want to know what
 8    communications the receivers had with the bank in order to take
 9    action against a company in Canada that doesn't -- has not
10    been -- hasn't gone through the right process.
11              And Mr. Fletcher has taken the position, as you can
12    see in this document on the screen, that the request for that
13    information improperly seeks investigation materials from the
14    receiver and will not be honored.  We asked only for
15    communications between the receiver and the bank.
16              What Mr. Fletcher said today, Your Honor, is that
17    the bank believes that Mr. Poujade and Mr. Cardiff got together
18    to thwart the Court's order and that the bank froze the account
19    as a result.  That's information that we didn't get.  That can
20    only happen with the communication by the receiver and the
21    bank.
22              So the process requires that they go through the --
23    that the receiver and the FTC go through the proper channels to
24    raise that with the Court, and then the companies can come in
25    and get due process.  That didn't happen, Your Honor.
```

1          The receiver also admits that Mr. Poujade has

2    control of the TD account.  Now, that's not true today because

3    the account has been frozen based upon what the receiver said

4    to the TD Bank.  If you look at the -- on this document on the

5    screen, it says -- the paragraph -- the smallest paragraph, the

6    second one says, "The Cardiffs want to 'cooperate' to turn over

7    that money," being what's the $11,430.68 Canadian, "to the

8    receiver."  That is fine, but they don't have access to it.

9    Poujade now does.

10          So on the one hand, the FTC is saying that Poujade

11    doesn't have access to that account because the Cardiffs are

12    still signers.  But now the receiver says no, Poujade has

13    access to that.  The reality is, Your Honor, the only access

14    that Mr. Poujade has is to see what's on the screen right now,

15    that there is -- this is what's in the account.

16          This happens to be -- let me be clear about my

17    representation.  They can see this activity, Your Honor, but

18    they cannot do anything.  They can't touch it.  They can't

19    change it.  They can't do anything right now because the -- the

20    bank froze it.  They won't tell them why.  The bank won't tell

21    Mr. Poujade why.  But they froze it.  And then they also, as

22    you can see, Your Honor, have charged the company with a

23    receiver fee of $620.

24          So when you take all this information together,

25    they -- the FTC and the receiver are arguing on the one hand

1    things that they think will be clear and convincing evidence

2    that Mr. Poujade is not in control, that really the Cardiffs

3    are in control, that they have some kind of ownership right

4    when they don't.  The documents reflect otherwise.  That there

5    are phone calls that happened and that the FTC and receiver say

6    this is what happened in the phone calls and you should believe

7    what we have to say.

8          When Mr. Cardiff was on the stand, I don't remember

9    the FTC asking him what was said in that phone call.  They had

10   scheduled the deposition of Mr. Poujade just prior to -- the

11   deposition was to occur prior to filing the order to show

12   cause.  They canceled that deposition.  They moved it.  They

13   said, well, they wanted to have more documents, they wanted to

14   have more information before they took it.  They didn't ask

15   Mr. Poujade.  They could have asked him anything they wanted.

16         They put a list of people that Mr. Cardiff called on

17   the screen today, and they said this is what you should -- the

18   Court should take as what these calls mean and what was

19   discussed in those calls.  But number one, that's not clear and

20   convincing evidence.  And number two, it's what they think

21   happened in the calls, and it's not because they went and asked

22   these people or got declarations or depositions.  It's

23   supposition.  It's this is what must have happened for it to

24   fit our story.

25         He says -- Ms. Sanger said Mr. Poujade has assisted

1    concealing the assets.  He has taken steps to attempt to hide

2    the Cardiffs' involvement and replace their names with his own

3    name.  And they say that doesn't serve the situation.

4          What they are saying is that all these documents

5    filed by lawyers with public companies should be disregarded,

6    that what must have happened is just to change Mr. Cardiff's

7    name with his name and not even addressing the fact that they

8    were twice asked if you want us to stop loaning him money, you

9    just let us know.

10          What was very interesting is on the October 12th,

11    they say Mr. Cardiff presumably told Mr. Poujade that there was

12    a TRO and that he can't transfer any money out of that account.

13    That's not what happened.  It's a presumption.  They

14    acknowledge it's a presumption on their part.  And it's not

15    clear and convincing evidence which is required.

16          They say that Mr. Cardiff had five calls with

17    Erwin Sui & Company and that it must have been because he was

18    still running and controlling TPI.  But you heard the testimony

19    today or yesterday that -- when Mr. Cardiff testified I think

20    it was that that -- what he called Edwin Sui & Company about

21    is he was trying to send money from the Arizona account because

22    it was suggested that he use Erwin Sui.  And that's what he

23    was doing.  It had nothing to do with Mr. Poujade.  But now

24    they are taking the position it did have something to do with

25    Mr. Poujade which is not the case.

1           Same thing with Ralph Olson, the calls with

2    Mr. McGinnis, none of that has -- it's what -- it's not clear

3    and convincing evidence of what those calls are about.  It's

4    supposition of what those calls are about.  They could have

5    gotten evidence about what those calls are about.

6           THE COURT:  Mr. Colaizzi.  I think you made that

7    point over and over.

8           MR. COLAIZZI:  All right.  There was a claim here

9    about liability insurance, and there was a document that was

10   put on the screen that Mr. Cardiff got liability insurance for

11   Clover Cannabis Company, not Clover Cannastrip Film

12   Technologies, Inc., but Clover Cannabis.  And there was a

13   response to that by Mr. Poujade in a declaration, and he said

14   we don't have any liability insurance.  We don't need any

15   liability insurance.  We are not -- we are not -- we are not

16   selling anything.  We are not -- we don't have any interaction

17   with consumers.  And that's not for us.

18           And every -- every document that the FTC submitted

19   to this Court that said Clover Cannabis with the presumption

20   that because it said Clover Cannabis, it must mean Clover

21   Cannastrip.  And there were -- there were letters.  There

22   were -- there was packaging.  There was all sorts of things

23   that were sent.

24           The response by Jacques Poujade is that's not us.

25   We don't engage in that conduct.  We don't sell to consumers.

1    We don't need retail packaging.  We don't -- we are not selling

2    retail packaging.  We only manufacture.

3            The FTC also puts out that the number of calls that

4    Mr. Cardiff had with FX Media, Ty Sherrell of FX Media, and

5    that he had a bunch of calls with Julie Green.  Number one,

6    that's easily explainable as part of what his duties were at

7    the time those calls were made.  FX Media is the marketing arm.

8    And the manufacturer is going to have to market to distributors

9    who then would have to have a license to distribute it.  And

10   then that would go to the retailers and then the dispensaries,

11   each one of which each step of the way have to have a license.

12   So that can be explained there.  They don't have any -- they

13   have not produced clear and convincing evidence that what those

14   calls were about is what they say those calls were about.

15           The fact that Mr. Cardiff made representations to

16   Glaser Weil about what access to money he had doesn't mean that

17   he had access to that money.  It's what he said to them.  And

18   the evidence is he didn't have access to that money, that all

19   the hard evidence that are documents filed in connection with

20   the companies before the TRO issued shows that he didn't have

21   access to that money.  But that -- and so it can't be clear and

22   convincing evidence.

23           THE COURT:  So he misstated or lied to his lawyers?

24           MR. COLAIZZI:  I don't know what Mr. Cardiff did.  I

25   wasn't part of the conversation.  I have no idea what he said

1    to them.  This is what the FTC is arguing.  And if that's what

2    he said to them, we know it's not true.  Everybody in this

3    courtroom has testified that he didn't have -- that they didn't

4    have control.

5              THE COURT:  You mentioned in your argument the fact

6    that Mr. Cardiff made representations to Glaser Weil about

7    access to money doesn't mean that he had access to money.  So

8    you misstated your argument.  You are not --

9              MR. COLAIZZI:  What I'm saying -- I'm taking what

10   the FTC said, Your Honor --

11             THE COURT:  I understand.

12             MR. COLAIZZI:  -- as their argument that shows that

13   he has control and the fact that they say that he said that or

14   that somebody at Glaser Weil says that he said that doesn't

15   mean that he has access to that money or whatever he may have

16   represented.

17             THE COURT:  So your point is, even assuming he said

18   it, it doesn't mean he has access?

19             MR. COLAIZZI:  Right.  And it's not proof that he

20   has control, that these assets are receivership assets.  And I

21   go all the way back to the beginning, Your Honor.  Receivership

22   property is clearly defined.  None of the Cardiffs have a

23   right, claim, legal or equitable interest in the property.  And

24   the fact that they are signatories does not make it so.  It's

25   not part of the definition.

1          I'm just hitting the -- I'm almost done, Your Honor.

2          THE COURT:  Maybe you should focus on issues

3  involving your client.

4          MR. COLAIZZI:  Well, Your Honor, I'm happy to answer

5  questions the Court has.  I think these are issues that involve

6  the client in the sense that the FTC is saying it proves that

7  they are in some kind of collusion or something.  I'd love to

8  be able to address what questions the Court has with respect to

9  those issues.

10          THE COURT:  Have you concluded?

11          MR. COLAIZZI:  No, Your Honor.  Just a couple more

12  things.

13          Just to go back to the calls for a minute, the

14  testimony was not that Mr. Cardiff on the 14th, which is a

15  Sunday, didn't want to talk to him or would not talk to

16  Mr. Poujade.  It's -- and Mr. Poujade testified that he didn't

17  talk -- didn't want to talk about whatever the issue is that

18  was bothering him, that Mr. Poujade said he believed it to be

19  some marital issue having gone through -- or heard about and

20  listened to Mr. Cardiff in the past in that situation, said he

21  was acting the same way.

22          So it's not that Mr. Cardiff called Mr. Poujade just

23  to tell him he didn't want to talk to him for seven minutes.

24  It's that he didn't -- when Mr. Poujade inquired, he didn't

25  want to talk about the issue that was bothering him.

1          Your Honor, each of the issues facing Mr. Poujade on

2    this -- before the Court today, and again, there are three of

3    them, one is -- I apologize, Your Honor.

4          One is that he be held in contempt until he

5    replenishes $490,000 which they claim he helped dissipate back

6    into Alphatech and make available to the receiver.

7          Two, that he provide an accounting of Clover

8    Cannastrip funds which has been provided.

9          And three, that he produce all documents requested

10   by the FTC.

11         We haven't heard any testimony and it's largely gone

12   unnoticed in any arguments or documents or any kind of evidence

13   as to what the failings are in terms of producing documents.

14   And they haven't focused on that at all in this hearing.

15         But we do know, Your Honor, that -- and the FTC

16   admits that they've asked for every piece of information that

17   the companies have.  They've acknowledged that that's how broad

18   it is.

19         So it's really -- I think that's a discovery dispute

20   which we, of course, tried to resolve, but it doesn't appear to

21   be resolvable without having a -- some kind of discussion about

22   how it could get resolved.  And typically that would be a

23   motion to compel responses to a subpoena which, you know, they

24   obviously didn't do.

25         So those are the three things, relief that they've

1    requested, Your Honor.  They have not requested in their order

2    to show cause anything else that -- and they've asked for a lot

3    today with respect to that.

4                THE COURT:  Thank you.

5                Ms. Sanger?

6                MS. SANGER:  Your Honor, I would like to respond but

7    request just a five to ten-minute bathroom break.

8                THE COURT:  Yes.  We'll take a short recess.  Ten

9    minutes.

10               (At 11:23 a.m. a brief recess was taken.)

11               THE COURT:  Have you concluded?

12               MR. COLAIZZI:  Yes, Your Honor.  I wanted -- the

13   Court asked for a cite to a case.  I wanted to give the Court

14   the cases.

15               THE COURT:  You can do that later.

16               MR. COLAIZZI:  Okay.

17               THE COURT:  One moment, Ms. Sanger.

18               So please respond.  In reference to the arguments

19   that have been presented so far, I'd like you to comment and

20   cover the issue of remedy.  Mr. Thurman, I think, has

21   accurately stated that the sanction here is one that can be

22   imposed by the Court is -- cannot be punitive.  It has to be

23   coercive.  And assuming that the Cardiffs were involved in

24   violating the Court orders by transferring funds outside of

25   assets -- outside of accounts where there were assets in, they

1    have no ability today to return that.

2         And then also Mr. Colaizzi's argument that assuming

3    in the conversation that took place between Mr. Poujade and

4    Mr. Cardiff I believe on the 12th, assuming that they discussed

5    the issue of the asset freeze, is that sufficient notice to

6    bind Mr. Poujade.

7         MS. SANGER:  Your Honor, I'll address those

8    questions first, and I have a few other responses if it pleases

9    the Court.

10        First, as regards remedy, I do want to make clear --

11   I laid out some of the purge conditions in my earlier

12   presentation.  I want to make clear that the coercive sanctions

13   we are requesting do vary depending on the contempt defendant.

14        And we are requesting today, just so that it's

15   clear, that Mr. Cardiff be coercively incarcerated until he

16   comes into compliance.  But we are proposing monetary fines for

17   Mr. Poujade in a high enough amount to accomplish coercing his

18   compliance.

19        THE COURT:  Yes.  But that's the point.  Mr. Thurman

20   has presented the argument that Mr. Cardiff, Mrs. Cardiff, they

21   do not have the ability to return any of the funds that were

22   transferred out.

23        MS. SANGER:  Yes, Your Honor.  This argument is very

24   reminiscent of another issue that was before the Court when we

25   initially filed our TRO papers.  We presented evidence that the

1    Cardiffs had taken great steps to put their assets in an

2    asset-protection trust called a Bridge Trust that was designed

3    to shield their assets from potential creditors when they

4    received notice of a lawsuit.  And this type of Bridge Trust or

5    asset-protection scheme is put in place to allow defendants to

6    argue impossibility of compliance with a Court's order.

7            Here we have a slightly different situation.  We

8    have claims that the money is in Canada outside their reach or

9    in bank accounts for which they don't have full access or under

10   the control of Canadian corporate entities with boards

11   constituted of both U.S. and Canadian residents.

12           I have a few comments about this impossibility

13   defense.  First of all, it's quite premature in the proceedings

14   to determine that they can't possibly comply.  We have

15   currently testimony from them and the arguments of their

16   lawyers.  But as we have seen this week, coercive incarceration

17   has been an effective way to gain Mr. Cardiff's compliance with

18   other aspects of this order.  And by imposing the sanctions,

19   that's really when the rubber hits the road.

20           In *FTC v. Affordable Media*, which is a case from the

21   Ninth Circuit, the Court was faced with this -- with the same

22   issue.  And the district court affirmed the -- the circuit

23   court affirmed the district court's findings that the

24   contemnors had not satisfied their burden of proving

25   impossibility of complying with repatriation orders despite

1    their allegations that these trust provisions had prevented the

2    trustee from helping in repatriating their assets.

3            The Court said there that "domestic courts will have

4    to be especially chary of accepting defendant's assertions that

5    repatriation or other compliance is impossible" and noted that

6    the burden on the defendant of proving impossibility will be

7    especially high.

8            It is the defendants' burden to prove that they

9    cannot comply.  We have assertions today, but we are lacking in

10   proof to support that burden that this isn't something they

11   could accomplish if putting their heads together with

12   Mr. Poujade to bring these assets back.

13           I also just want to point out that to the extent

14   that this relates to the issue that Mr. Thurman also raised

15   earlier of which assets are properly deemed Cardiff assets or

16   properly within the receivership estate or properly deemed

17   frozen, he made an argument that some of the assets at issue

18   here -- or made a big deal about the fact that some of the

19   assets at issue here were not transferred from other Cardiff

20   personal accounts into the Clover Cannastrip account.

21           I just do want to remind the Court that tracing of

22   assets is not required at the TRO stage, and this Court has

23   already made a determination about whether the assets are

24   properly within the receivership entity when the Court decided

25   to enter the asset freeze as defined in the order and that

1    allowing defendants to argue that assets that have been

2    transferred away from their control would produce an absurd

3    result of immunity for these defendants and reward them for the

4    behavior of transferring assets outside of their control.  I

5    think we need some time to test whether coercive sanctions can

6    work to gain their compliance in turning over these assets.

7           Now, to address the second question of the Court

8    regarding the October 12th phone call, if you assume that

9    Mr. Poujade was given actual notice of the asset freeze while

10   on that phone call, does that -- does that satisfy the

11   burden -- or does that satisfy the requirement that he had

12   notice for purposes of finding him in contempt.  And I do have

13   some case law that I would like to bring to the Court's

14   attention.

15          We have cited this in our reply brief on page 2, and

16   I'll just pull that up quickly.  For the Court's reference, I'm

17   referencing Docket No. 157, ECF page 5.  And Footnote 2 is

18   where we provided some support here.  "Actual notice of an

19   injunction may be established by circumstantial evidence."  And

20   we have plenty here.  And the cite is to *NLRB v. Sequoia*

21   *District Counsel of Carpenters*.

22          And a further citation that "Plaintiffs are not

23   required to adduce direct evidence that the contemnor had

24   actual notice of the Court's orders because such proof is often

25   unavailable."  And in this proceeding, I would just say that

1    much of our interaction with Mr. Poujade through his counsel

2    has resulted in evidence being unavailable to us.

3             Now, I do want to address a few other points raised

4    by Mr. Poujade's counsel, if I may.  To the extent that

5    Mr. Poujade's counsel wants to characterize the FTC's request

6    as simply a request for $490,000 to be replenished to the

7    receivership estate, I would first refer the Court and

8    Mr. Poujade's counsel back to some of the other sections of the

9    FTC's filings in this -- in these proceedings.  And I'll start

10   by throwing up on the display here a different part of our

11   brief in our motion for an order to show cause.  I'm

12   referencing --

13             THE COURT:  It's not up on the screen.

14             MS. SANGER:  No, it's not.  If you'll just give me

15   one moment here to try to figure out -- well, instead -- in

16   lieu of being able to put something up on the screen, with the

17   docket citation 134-2, page 23, lines 11 to 15, the FTC noted

18   in its moving papers that while $490,000 U.S. was siphoned into

19   the Alphatech account for the Cardiffs' use and while we had

20   information regarding those records at that time, the remainder

21   of the $4 million Canadian that was acquired by Clover

22   Cannastrip in September through November of that year remains

23   unaccounted for, presumably in the Pharmastrip bank account.

24             And the issue here is that at the time we brought

25   this motion, much of the money remained unaccounted for, and

1    only throughout these proceedings has more information come to

2    light, information that was already in the possession of

3    Mr. Poujade at the time we made this request.

4            If the Court will just indulge me one more second, I

5    would like to use the equipment, if possible, because I have a

6    few other things I'd like to flash up here.  Oh, I see.  My

7    computer is frozen.  That's what it is.  I'm going to try one

8    more time.

9            THE COURT:  Let's proceed if you are not able to --

10           MS. SANGER:  Okay.  Yes, Your Honor.

11           Mr. Poujade's counsel referenced ledgers that were

12   provided to the FTC on Friday night, the weekend before these

13   proceedings -- or these hearings kicked off.  They are simply

14   not a reliable representation of the accounting that's needed

15   to fully account for the $4 million that we've been able to

16   identify flowing through that account.  Nor have we seen

17   records, for example, from the new Bank of America account for

18   Alphatech, and we still have yet to see the bank records for

19   the Pharmastrip account despite multiple requests.

20           I'm going to skip over Mr. Poujade's counsel's

21   interpretation of this Court's order and leave that to the

22   Court.  But I think that under the clear and unambiguous

23   wording of the order for which the asset freeze is quite broad,

24   there's no question that any of these funds were properly

25   frozen.

```
 1            Mr. Poujade -- I do want to go back to the notice
 2   point.  In addition to the circumstantial evidence around the
 3   phone call, I think we can also look at Mr. Poujade's actions
 4   since that date.
 5            He says he agreed to give the Cardiffs a loan.
 6   However you characterize it, money has been flowing with his
 7   facilitation to the Cardiffs ever since they learned their
 8   assets were frozen.  And his participation, not just through
 9   this sham loan but also in creating this incredible story for
10   the Court, evidences his knowledge that they were not able to
11   access their own funds.
12            Mr. Poujade's counsel's argument, I can track it if
13   you accept the representations of the Cardiffs and Mr. Poujade,
14   but they are simply not credible.  And one of the things that
15   we've learned through Mr. Poujade's testimony is that certain
16   events were memorialized at times other than when the events
17   actually occurred.  And this is quite relevant to these
18   proceedings given all the stories about when the Cardiffs were
19   told they had to resign versus when papers were actually filed
20   with official government offices.
21            Now, in the record at Docket 134-18, page 1, we've
22   included an e-mail between Haywood Securities and FSD Pharma.
23   Mark McGinnis, who we referenced earlier when we were talking
24   about the phone calls that Jason Cardiff had made, is writing
25   to Anthony Durkacz who is the D of FSD.
```

384

1          And this e-mail chain is about setting up that

2   August 31st investor presentation meeting.  And in the words of

3   Haywood, who has not submitted a declaration, who has not shown

4   up to testify in court, this is the best we can know from their

5   perspective about how they felt about Jason Cardiff's

6   involvement in the cannabis film strip project.

7          And I'll just read from the final e-mail setting up

8   the meeting on August 31st from Mark McGinnis to FSD Pharma.

9   "This is going to be a blast."  So contrary to Mr. Poujade's

10  testimony that the Cardiffs were toxic, contrary to

11  Mr. Cardiff's testimony that they had to resign, Haywood

12  Securities was very much looking forward to having the Cardiffs

13  on board and having them raise money for this cannabis film

14  strip venture.

15          I want to address -- I don't want to spend a

16  lot of time on this.  I don't like to bring back and forth

17  between lawyers before the Court.  But I do feel I need

18  to address the representations made about whether the FTC

19  informed Mr. Poujade's counsel at any time of our opinion that

20  Mr. Poujade was violating the order.

21          Mr. Poujade's counsel put an e-mail on the screen

22  dated March 22nd.  This was an e-mail before we deposed

23  Mr. Picciano at a time we were attempting to depose Mr. Poujade

24  but he was unavailable due to health reasons.  This is before

25  we had seen the TD Bank records.  It was before we were able to

1    put together the whole story about the route the money took

2    from Cardiff-controlled accounts back into their own pockets.

3            I think it's bad faith the way they've represented

4    it to the Court.  And what remains is that it's not our job to

5    read the order for them with the knowledge that they have, the

6    factual knowledge gained from their clients, to let them know

7    whether their clients are in compliance or not.  The entire

8    time they were keeping us in the dark, they could have been

9    advising their client to quickly come into compliance and avoid

10   these proceedings.

11           Now, the statement that Redwood is a public company

12   and, therefore, they can't break the law as a defense to some

13   of the -- some of the allegations we've made about the way the

14   money was moving and Redwood's involvement, well, that's why we

15   are in front of the Court to begin with.  That's why we came to

16   this Court in October of 2018.

17           It doesn't matter whether Redwood is a public

18   company or not.  The people running Redwood were violating the

19   law and, according to the FTC in our filings, in our complaint,

20   to the count of 16 federal court -- federal law violations.

21           I'll just briefly say that despite Mr. Poujade's

22   counsel's representation that there are undisputed facts and

23   then by pointing to certain things like the October 8th

24   resignation letters, the FTC certainly does dispute the

25   authenticity of those October 8th resignation letters.  They

1   were signed and submitted with the Cardiffs' declarations.  We

2   believe they have no credibility.  And we believe that the

3   other dates that are in front of this Court that are verifiable

4   through independent sources like the November 16th filing tell

5   a different story.

6           Furthermore, even if you accept the representation

7   that the Cardiffs resigned on October 8th, even if that is

8   taken as fact, that is not dispositive of their control over

9   the cannabis film strip venture.

10          I also just want to briefly respond to a few points

11  made by Mr. Thurman on the Cardiffs' behalf.

12          Mr. Thurman talked about clear and convincing

13  evidence, and he talked about the lack of evidence in the

14  record or certain arguments that were made on either side.  I

15  want to point the Court to the FTC's reply in support of these

16  contempt proceedings.

17          This is at Docket 157, page 17, lines 1 through 6

18  where we cite the case *FTC v. Cleverlink Trading Limited* for

19  the proposition that "Documents or objective evidence may

20  contradict a witness's story, or the story itself may be so

21  internally inconsistent or implausible on its face that a

22  reasonable fact finder would not credit it."

23          And that's exactly what we have before us here

24  today.  The Court does need to weigh the credibility of the

25  people telling the story.  And the Court has had ample

```
 1    opportunity over these past two days to judge the credibility

 2    of the Cardiffs and Mr. Poujade for the Court's own judgment.

 3           Again, Mr. Thurman also argued that certain facts

 4    were undisputed, for example, the August 29th stock share

 5    sellback.  We've pointed out to the Court that this is an

 6    undated document.  And, again, I would not agree with the

 7    characterization that that fact is not in dispute.

 8           I also want to address Mr. Thurman's comments about

 9    Mrs. Cardiff's involvement in the scheme and downplaying the

10    role that she had in the film strip business and as a control

11    person.

12           Mrs. Cardiff's involvement with the TD Bank account

13    is particularly perplexing in light of this narrative.

14    Mr. Cardiff testified that he opened the account on

15    August 31st, that he was a signatory, and that money was able

16    to flow through this -- flow into this account without problem.

17           Why did Mrs. Cardiff then put her name on the

18    account in late September when they were on vacation in Canada?

19    What was the business purpose?  And if there was no business

20    purpose, what was the personal purpose for putting her name

21    there?

22           She continued to conceal these assets.  She

23    continued to dissipate these assets through the Alphatech

24    expenses.  And so while her role may not be as involved as

25    Mr. Cardiff's role, there's certainly contempt here.
```

388

1              I also want to address Mr. Thurman's reference to

2    the financial disclosures that were provided to the FTC over

3    the weekend.  These are represented as updated financial

4    disclosures.  And we have had a chance to review them.  Most of

5    the information is the same as the information we've been

6    receiving from the Cardiffs since October.

7              One significant change is that they are no longer

8    handwritten.  They've been typed up now.  But many of the

9    attachments to the financial disclosures are attachments we've

10   already seen, some of which contain mischaracterizations about

11   specific Cardiff assets.  And to the extent that they've

12   reported new information, it's information about the assets and

13   corporations revealed by the FTC and the receiver throughout

14   these proceedings.

15             And with that, I'll leave the rest of my notes in

16   case there are further follow-ups.

17             THE COURT:  Okay.  That concludes argument of

18   counsel.  Please have a seat.  So the --

19             Yes, sir?

20             MR. COLAIZZI:  May we provide the case to the Court?

21             THE COURT:  Not at this time.  You'll have an

22   opportunity.

23             So the Court has provided the parties full ample

24   opportunity to offer pleadings in the case, offer evidence in

25   support of the respective claims, and then offer the defendants

```
1    an opportunity to state their positions under oath here in open

2    court.

3            And I would say of the 16 years I've been on the

4    federal court, I've never presided over a matter where the

5    fraud committed by the defendants was so clear, the deception

6    so extreme.  I'm astounded.

7            There is one portion of Mr. Cardiff's testimony that

8    I do accept as true, and that is his testimony which went

9    unrefuted that Mr. White informed him that, after the Court

10   issued an order requiring him to transfer to the receiver all

11   passports, thereafter Mr. Cardiff received an additional

12   passport from it looks like the Republic of Ireland or Ireland,

13   and Mr. White advised him that it was not necessary for him to

14   return that passport to the receiver.

15           If that's the case, Mr. White should not be

16   practicing in federal court, at least in this district.  That

17   would be a violation of his duties as an officer of the court

18   and ethical duties.  So I'm a bit astounded when I heard that

19   claim that went unrefuted.  But I do believe Mr. Cardiff's

20   testimony under oath that that's what occurred.

21           I would also offer that Mr. Thurman's participation

22   in this case is really a breath of fresh air.  But for --

23   Mr. Thurman, I believe that if you had been involved in this

24   case from the beginning, we would not be here today, because I

25   think that your ethical duties and your knowledge of ethical
```

UNITED STATES DISTRICT COURT

1    duties owed to clients and the Court is pretty clear.  I do not

2    share that same view of Mr. White.

3          I've heard carefully from the Cardiffs.  Their

4    stories are totally unbelievable.  It's pretty clear to the

5    Court that they've lied, that they worked in concert with each

6    other and with others to avoid, violate the conditions of the

7    orders of the Court.

8          The Court is convinced based on all of the evidence

9    that has been offered here that the -- that there was a

10   conference or a call that took place October 12th of --

11   October 12th wherein the asset freeze issued by this Court and

12   the order issued by the Court was discussed between and amongst

13   the parties.

14         The Court is convinced that all of the parties

15   participating in today's hearing, including Mr. Poujade, was

16   aware of the asset freeze at that time.

17         Mr. Poujade, I find that you are totally

18   unbelievable.  You lied to this Court.  You perpetrated fraud

19   on this Court.  You did that in conjunction with the Cardiffs.

20   You created a paper trail perpetuating the fraud on the Court.

21   It's unbelievable considering the positions that you hold as a

22   financial officer.

23         But I guess money is everything and greed is

24   everything.  And in the pursuit of your greed, you have

25   advanced the interest of the Cardiffs to the detriment of the

1    public, government agencies, the receiver, and the Court.

2            So the Court -- what I have concerns about is the

3    requested remedy of the government, and the requested remedy of

4    the government is for the Court to incarcerate the Cardiffs

5    until the monies that were unlawfully transferred out are

6    repaid or placed back in the hands of the receiver.

7            And I'm not sure that the Cardiffs have the ability

8    to do that in light of other entities possibly now having

9    access to those funds.  It would seem to me because of the

10   egregious nature of this case, that the government should

11   consider or should have considered pursuing a criminal

12   contempt.  I am convinced that if this matter were brought

13   before a jury, the jury would return a verdict of conviction as

14   to all defendants in this case.

15           I would -- I would suggest that the FTC seriously

16   consult with the office of the U.S. Attorney and bring this

17   matter to the attention of the federal authorities, criminal

18   section of the U.S. Attorney.  This is outrageous,

19   unbelievable.

20           And the Cardiffs continue to flaunt the direction of

21   the Court, the orders of the Court.  And I guess at the end of

22   the day, they've done it for a particular purpose, and that is

23   because of the lucrative business that they are in.

24           So what the Court is going to do is the Court is

25   going to require the FTC to prepare findings of fact and

1    conclusions of law.  The Court is going to require the FTC to

2    specify in detail each of the assets that the Cardiffs failed

3    to disclose and the evidence to support that.

4            The Court is going to require the FTC to provide

5    evidence that the Cardiffs controlled the particular assets

6    referenced at the time the TRO was issued and also that -- the

7    evidence to support the government's claim that the Cardiffs

8    transferred in violation of the Court's order those assets to

9    other entities beyond the control of the Court.

10           There is a request by the government for the

11   machines, the thin strip dissolvable machines apparently

12   ordered from China, to be placed in the hands of the receiver.

13   That order is going to issue today.  That's to be accomplished.

14           In reference to Mr. Poujade, the Court is going to

15   require the government to provide the Court with findings of

16   fact and conclusions of law concerning his testimony and the

17   misstatements he made in court, lies perpetrated by

18   Mr. Poujade, false testimony provided to the Court.  And at the

19   conclusion and a review of all that, the Court will adopt

20   certain and may exclude others.

21           So the parties are to -- I want to make sure,

22   Mrs. Cardiff, we -- I heard from Mr. Cardiff involving --

23   concerning the conversations or discussions he had with the

24   Republic of Ireland and whether he had any passports.  I want

25   to make sure that you don't have any passports that were issued

```
 1    by Ireland or any other foreign entity.

 2              MRS. CARDIFF:  I do not.

 3              THE COURT:  You do not.

 4              The government -- how long will it take the

 5    government to prepare the findings of fact and conclusions of

 6    law?  I will take an opportunity to review the cases that will

 7    be cited in reference to the remedy that is offered by the

 8    government.

 9              I would -- I would state at this time that the Court

10    would conclude that the Cardiffs, at least at this time, have

11    failed to establish that there's an impossibility to return the

12    assets that they have taken.

13              And how much time will it take for the government to

14    offer that?  And we are going to have another session here.

15              MS. SANGER:  Your Honor, assuming that we can get

16    fairly quick access to the transcript to prepare these

17    findings, I would propose potentially next Tuesday or

18    Wednesday.

19              THE COURT:  So the order of the Court would be that

20    the proposed finding of fact and conclusions of law are to be

21    filed with the Court on or about -- and let me have a date for

22    next week.  Let's make it by Wednesday or Thursday of next

23    week.

24              THE CLERK:  Thursday would be August 8th.

25              THE COURT:  August 8th on or before by 12:00 and
```

```
1    obviously served on the parties here, the defendants and

2    Mr. Poujade -- or counsel for Mr. Poujade.

3            And the defendants and counsel for Mr. Poujade will

4    have an opportunity to respond to those proposed findings of

5    fact and conclusions of law five days thereafter.

6            May I have a date?

7            THE CLERK:  August 13th.

8            THE COURT:  I would conclude that it would be

9    inappropriate to impose a nonmonetary sanction involving

10   Mr. Poujade.  If there's a sanction imposed, it would be

11   monetary only.

12           And we need another date for hearing.  And when the

13   parties return, the Cardiffs -- and I haven't made a decision.

14   I'm keeping an open mind.  But the Cardiffs should be prepared

15   to surrender themselves on that date.

16           THE CLERK:  Monday, August 19th.

17           THE COURT:  Anything further?

18           THE CLERK:  9:00?

19           THE COURT:  I would inquire of Ms. Sanger.  Did the

20   government, did the FTC consider criminal contempt?  Because

21   this is a criminal contempt case.

22           MS. SANGER:  Your Honor, we do agree that the

23   conduct is particularly egregious, and we appreciate the

24   Court's comments on the record today encouraging us to reach

25   out to our law enforcement partners at the U.S. Attorney
```

```
 1    General's office -- or at the U.S. Attorney's office.  Excuse
 2    me.
 3               THE COURT:  The defendants in this case have been
 4    very clever and very devious and have structured transfers of
 5    monies and placed the Court in a position where, if there's
 6    truly an impossibility of performance, the sanction that can be
 7    imposed by the Court is a sanction that would not ever deter
 8    this conduct going forward and would allow the Cardiffs to
 9    continue to perpetuate fraud.
10               So I'm -- I would highly, again, recommend to the
11    United States Attorney's Office that they take a close look at
12    this case.  Thank you.
13               MS. SANGER:  Your Honor, one question before we
14    conclude.  Do we have the Court's permission to include in our
15    proposed findings of fact and conclusions of law vis-a-vis
16    Mr. Poujade arguments and proposed remedy regarding the
17    Canadian lawsuit that was filed on Friday?
18               THE COURT:  I certainly would consider it.
19               And, again, just to make clear, my comments
20    involving Mr. White, Mr. Thurman, they have nothing to do with
21    your representation here.  I truly believe that we would not be
22    here today if you had been on the case.  Thank you.
23               (At 12:11 p.m. the proceedings adjourned.)
24
25
```

UNITED STATES DISTRICT COURT

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15                    DATED THIS  4TH  DAY OF AUGUST, 2019.

16

17

18                    /S/ MAREA WOOLRICH
                      _____
19                    MAREA WOOLRICH, CSR NO. 12698, CCRR
                      FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**