1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5    FEDERAL TRADE COMMISSION,              )
                                            )
6                       Plaintiff,          )
                                            )
7         vs.                               )        Case No.
                                            )   CV 18-2104 SJO (PLAx)
8    JASON CARDIFF, et al.,                 )
                                            )        Volume 1
9                       Defendants.         )      (Pages 1 - 156)
     _____)

10

11             REPORTER'S TRANSCRIPT OF PROCEEDINGS
                ORDER TO SHOW CAUSE RE: CONTEMPT
12                  MONDAY, JULY 29, 2019
                         2:03 P.M.
13                LOS ANGELES, CALIFORNIA

14

15

16

17

18

19

20

21

22   _____

23        MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
             FEDERAL OFFICIAL COURT REPORTER
24           350 WEST 1ST STREET, ROOM 4455
             LOS ANGELES, CALIFORNIA  90012
25                  (213) 894-2305

```
 1                       APPEARANCES OF COUNSEL:

 2


 3     FOR THE PLAINTIFF:

 4         FEDERAL TRADE COMMISSION
           BY:  ELIZABETH JONES SANGER
 5         BY:  JAMES A. PRUNTY
           BY:  EDWIN RODRIGUEZ
 6              Attorneys at Law
           600 Pennsylvania Avenue NW
 7         Washington, DC  20580
           (202) 326-2757
 8

 9

       FOR THE DEFENDANTS JASON CARDIFF and EUNJUNG CARDIFF:
10
           THURMAN LEGAL
11         BY:  MICHAEL A. THURMAN
                Attorney at Law
12         1055 East Colorado Boulevard, Fifth Floor
           Pasadena, California  91106
13         (626) 399-6205

14         LAW OFFICES OF JAMES D. WHITE
           BY:  JAMES D. WHITE
15              Attorney at Law
           113 Quarter Horse Drive
16         P.O. Box 367
           Bellevue, Idaho  83313
17         (949) 697-9236

18

19     FOR THE RECEIVER ROBB EVANS & ASSOCIATES, LLC:

20         FRANDZEL, ROBINS, BLOOM & CSAT, LC
           BY:  MICHAEL G. FLETCHER
21              Attorney at Law
           1000 Wilshire Boulevard, 19th Floor
22         Los Angeles, California  90017
           (323) 852-1000
23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1    APPEARANCES OF COUNSEL, CONTINUED:

 2

 3    FOR THE OBJECTOR JACQUES POUJADE:

 4        VENABLE, LLP
          BY:  ROGER A. COLAIZZI
 5             Attorney at Law
          600 Massachusetts Avenue NW
 6        Washington, DC  20001
          (202) 344-4000
 7
          VENABLE, LLP
 8        BY:  ARI N. ROTHMAN
               Attorney at Law
 9        2049 Century Park East, Suite 2300
          Los Angeles, California  90067
10        (310) 229-9900

11        LITIGATION AND BUSINESS LAW GROUP
          BY:  MICHAEL KINNEY
12             Attorney at Law
          41707 Winchester Road, Suite 205
13        Temecula, California  92590
          (951) 296-9910

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **INDEX OF WITNESSES**

2

3   DEFENDANTS' WITNESSES                                            PAGE

4   Cardiff, Jason

5      Direct Examination by Declaration
       Cross-Examination by Ms. Sanger              17
6      Redirect Examination by Mr. Thurman      102
       Cross-Examination by Mr. Fletcher       111

7

8

9   POUJADE, Jacques Bertrand

     Direct Examination by Declaration
10     Cross-Examination by Mr. Prunty        116

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 1 - | Statement from HSBC U.K. | 112 | 114 |

**UNITED STATES DISTRICT COURT**

1                    MONDAY, JULY 29, 2019; 2:03 P.M.

2                    LOS ANGELES, CALIFORNIA

3                            -oOo-

4            THE COURTROOM DEPUTY:  Calling Item No. 5,

5    ED CV 18-2104, Federal Trade Commission vs. Jason Cardiff,

6    et al.

7            Counsel, state your appearances, please.

8            MS. SANGER:  Elizabeth Sanger, Federal Trade

9    Commission.

10           MR. RODRIGUEZ:  Edwin Rodriguez, Federal Trade

11   Commission.

12           MR. PRUNTY:  James Prunty, Federal Trade Commission.

13           MR. FLETCHER:  Good afternoon, Your Honor.

14   Mike Fletcher, Frandzel Robins, appearing on behalf of the

15   receiver Robb Evans & Associates.

16           THE COURT:  Good afternoon.

17           MR. THURMAN:  Good afternoon, Your Honor.

18   Michael Thurman on behalf of defendants Eunjung and

19   Jason Cardiff.

20           MR. WHITE:  Good afternoon, Your Honor.  James White

21   on behalf of the Cardiffs.

22           MR. ROTHMAN:  Good afternoon, Your Honor.

23   Ari Rothman on behalf of third-party Jacques Poujade.

24           MR. COLAIZZI:  Your Honor, Roger Colaizzi with

25   Venable on behalf of non-party Jacques Poujade.

1          MR. KINNEY:  Good afternoon, Your Honor.

2   Michael Kinney of the Litigation and Business Law Group on

3   behalf of Jacques Poujade.

4          THE COURT:  Okay.  Who will be arguing on behalf of

5   the Federal Trade Commission?

6          MS. SANGER:  I will, Your Honor.

7          THE COURT:  And then who will be arguing on behalf

8   of Jason Cardiff?

9          MR. THURMAN:  I will, Your Honor.

10          THE COURT:  And that also includes Mrs. Cardiff

11   also?

12          MR. THURMAN:  That's correct.

13          THE COURT:  And then who will be arguing on behalf

14   of Mr. Poujade?

15          MR. COLAIZZI:  Roger Colaizzi, Your Honor.

16          THE COURT:  Okay.  So I think we all recognize this

17   is a serious matter.  And the Court has reviewed various

18   documents and pleadings in preparation for today's proceeding.

19          I have -- let's see.  I'll put this aside for right

20   now.

21          There are various items and documents that the Court

22   will receive into evidence.

23          So we have -- the Court has read and considered the

24   memorandum in support of the motion offered by the FTC.  The

25   Court is going to receive into evidence the declaration of the

```
1    FTC's investigator Sallie Schools and the exhibits attached

2    thereto.  The Court will receive, also, the declaration of Lead

3    Investigator Connor Sands and the exhibits attached thereto.

4         And the Court will also receive the declaration

5    offered by the plaintiffs, declaration by Connor Sands offered

6    by the plaintiffs in the reply memorandum, along with the

7    exhibits and declarations attached thereto, including the

8    deposition of Glaser, Weil, Fink & Howard, the declaration of

9    Danielle Walker, the declaration of Corina Grodek, and the

10   declaration of Cathedral City Police Officer Kevin Phillips.

11        I also have pleadings offered by the Cardiffs.  And

12   let me put the objections aside.  So we have the -- Mr. White's

13   pleading on behalf of the Cardiffs entitled "Defendants'

14   Memorandum in Opposition to Motion for Order to Show Cause."

15   The Court will receive the declaration of Jason Cardiff, the

16   exhibits attached thereto, and the declaration of

17   Eunjung Cardiff and the exhibit attached thereto, which is one

18   exhibit, Exhibit A.

19        The Court has also reviewed the declaration and the

20   memorandum of points and authorities in response to the order

21   to show cause offered by non-party objector Mr. Poujade.  And

22   the Court will receive the exhibits attached thereto, along

23   with the declaration of Mr. Poujade and the exhibits attached

24   to his declaration.

25        The Court has also reviewed the objections -- the
```

1    objections by Mr. Poujade to the declarations of Connor Sands,

2    Danielle Walker, Grodek, and Officer Phillips and then the

3    objections of Mr. Poujade to Connor Sands' declaration and

4    receiver's second affidavit and the plaintiff's response to the

5    evidentiary objections.

6           So there should be some backdrop provided here for

7    purposes of making sure we have a clear, concise record in

8    light of the consequences that the FTC is seeking here.

9           So to provide some backdrop here for purposes of the

10   record and for purposes of assisting the parties, back on

11   October 3rd of 2018, the FTC filed the instant Complaint

12   alleging violations of numerous federal consumer statutes,

13   consumer protection statutes.

14          The Complaint alleges that the named defendants are

15   an interrelated group of corporations and individuals engaged

16   in marketing and sale of dissolvable film strips advertising

17   for various purposes, including smoking cessation, weight loss,

18   and male sexual performance.

19          In the Complaint, the FTC has alleged that the

20   defendants, individuals and business entities and companies,

21   made false and unsubstantiated claims regarding the efficacy of

22   the products.  The FTC also alleges that the defendants engaged

23   in unauthorized shipments and charged monies not -- they were

24   not entitled to and engaged in abusive telemarketing practices

25   and then made unsubstantiated claims regarding earnings for a

1    multi-level marketing scheme.

2         So on the date that the Complaint was filed, the

3    plaintiff moved for an ex parte application for a TRO,

4    including asset freeze and appointment of a temporary receiver.

5         On the 10th of October, the Court granted the FTC's

6    application and entered a temporary restraining order.  And

7    then upon agreement of all the parties, the Court continued the

8    TRO until a hearing could be held on whether an injunction

9    should issue or not.

10        And then we moved forward.  And the Court held a

11   hearing on November 7th, after which it issued an injunction

12   enjoining the defendants specifically from making

13   representations prohibited by Section V of the FTC Act,

14   processing unauthorized charges, making representations

15   prohibited by the telemarketing sales rule, releasing customer

16   information, destroying or otherwise making unavailable

17   documents relevant to the litigation.

18        And the injunction also provided for an asset

19   freeze, freezing all assets owned or controlled by defendants

20   and ordered each to disclose any additional assets and to

21   repatriate any assets held in any foreign jurisdictions.

22        The Court also ordered the defendants to surrender

23   all domestic and foreign passports, which was accomplished.

24        And finally, the injunction appointed Robb Evans &

25   Associates as receiver and also provided the receiver with

1    immediate access to defendants' business properties and ordered

2    the receiver to provide a detailed report on the defendants'

3    business practices and also financial issues and activities

4    related to the defendants' business practices.

5         And the receiver was also charged with managing the

6    defendants' businesses and then assessing whether they had --

7    they operated lawfully and to also determine profitability.

8         So the FTC -- I'm sorry -- the present order to show

9    cause was brought pursuant to a motion that was filed by the

10   FTC back on June 17th, 2019.  It's an Order to Show Cause re:

11   Contempt concerning the defendants Eunjung and Jason Cardiff

12   and then third-party Jacques Poujade.  And the Court granted

13   the motion and ordered the Cardiffs and Mr. Poujade to show

14   cause why they should not be held in contempt of Court.

15        In terms of the elements that have to be established

16   here, the FTC must show that there was a Court order and must

17   show by clear and convincing evidence that there was a failure

18   to comply with that order.

19        And so the orders at issue in the proceedings today

20   include the temporary restraining order issued back on

21   October 10th of 2018 and the injunction issued October 24th,

22   2018.  Both of the orders included an asset freeze, which in

23   particular forbade any of the defendants, officers, agents,

24   employees, attorneys, and all other persons in active concert

25   or participation with any of them who received actual notice of

1    the order, whether acting directly or indirectly, from

2    transferring, liquidating, dissipating, or otherwise disposing

3    of assets owned or controlled, directly or indirectly, by the

4    defendants.

5        And then the parties were required to provide

6    complete, truthful, comprehensive sworn statements identifying

7    accounts and assets of the defendants as well as the balance or

8    value of any of those accounts or assets.

9        So in the matter before the Court today, the FTC

10   claims that the Cardiffs and Mr. Poujade have violated the

11   provisions of the orders imposed by this Court by failing to

12   disclose assets held by certain Canadian companies

13   controlled -- the FTC claims controlled by the defendants at

14   the time the TRO was issued.  And the FTC claims that the

15   defendants transferred those funds in violation of the Court's

16   orders, ultimately dissipating those funds.

17       And the Cardiffs, as would be expected, have argued

18   that they did not control the Canadian entities at the time

19   that the assets -- at the time of the TRO and the other orders

20   issued by the Court and, therefore, were beyond the scope of

21   the Court's asset freeze.

22       They also make other arguments which we'll cover in

23   a little bit more detail.

24       So the relevant entities at issue include a company

25   identified as Clover Cannabis Thin Film Technologies.  It

1   appears to be a company that is incorporated under the laws of

2   Columbia, British Columbia.  And it looks like it was

3   incorporated based on the declarations and all of the exhibits

4   attached thereto, including, and in particular, the declaration

5   of Connor Sands that it was incorporated on or about July 31st,

6   2018.

7           And the evidence offered to the Court clearly

8   establishes that the company listed three directors --

9   Jason Cardiff, Eunjung Cardiff, and Jacques Poujade -- as

10  directors.  And the documents also establish that the company

11  was ordered -- was organized for the purpose of manufacturing

12  and marketing CBD oral thin film strips.

13          The other -- the other entity at issue includes

14  Pharmastrip.  This appears to be -- well, I should say it's

15  been established that Pharmastrip is a Toronto-based company

16  incorporated by Mr. Poujade's brother, Richard Poujade, and

17  that was accomplished -- incorporation was accomplished back in

18  September of 2018.  I believe the date is the 19th.

19          And then we have Alphatech Holdings which was

20  registered by Mr. Poujade's -- Jacques Poujade's accountant,

21  Peter Picciano or Picciano.  And it looks like it was

22  registered on the 6th of November, 2018.  And those are the

23  companies at issue here.

24          So the FTC has, through the declarations of its

25  investigators and supported by various documents and exhibits,

1    established a money trail here in support of its claim that the

2    Cardiffs have violated the orders issued by the Court.

3                So I have certain questions here that I intend to

4    ask the parties -- or counsel, at least.  And the question is:

5    How do you -- how does the FTC wish to proceed in reference to

6    the declarations of the Cardiffs that have been received into

7    evidence?  And then the question is:  How does -- how do the

8    Cardiffs wish to proceed in reference to the declarations

9    received in support of the FTC's motion?

10               So let me start with the FTC first.

11               MS. SANGER:  Thank you, Your Honor.

12               THE COURT:  I'm sorry.  Where's Mr. -- where's

13   Mr. Cardiff?

14               Oh, there he is.  Okay.

15               MS. SANGER:  Elizabeth Sanger for the FTC.

16               To address Your Honor's question regarding the

17   declarations submitted by the Cardiffs, I'll start with the

18   declaration submitted by Mr. and Mrs. Cardiff.  And we can then

19   address the declarations submitted by Mr. Poujade, if the Court

20   desires.

21               Throughout the course of this litigation, the FTC

22   has made numerous attempts to gain testimony from the Cardiffs,

23   including at sworn depositions taken in March of this year.

24   Um, we've also submitted interrogatories and document requests

25   to the Cardiffs.  And in response to those discovery requests,

1  the Cardiffs asserted their Fifth Amendment right against

2  self-incrimination.

3       Both before and after asserting the Fifth Amendment

4  at their depositions, the Cardiffs did submit declarations to

5  this Court, first in reference to their motion for the return

6  of their passports and for living expenses and attorneys' fees

7  and then in opposition to the FTC's motion for an order to show

8  cause.

9       And simply put, the Cardiffs can't have this both

10  ways.  They can't use the Fifth Amendment as a sword and a

11  shield.

12       We have argued to the Court that the Court should

13  disregard the testimony in the Cardiffs' declarations because

14  they already had an opportunity to provide answers to the FTC's

15  questions through numerous discovery attempts.  But if the

16  Court decides to admit the testimony of their declarations

17  today --

18       THE COURT:  Well, I certainly agree they can't have

19  it both ways.  So they have -- Mr. Jason Cardiff has offered a

20  declaration executed on July 8th, 2019.  It would be a date

21  after -- he filed a declaration after he asserted his Fifth

22  Amendment rights in certain discovery proceedings.

23       MS. SANGER:  That's right, Your Honor.  And so by

24  submitting that declaration, the Court could take the view that

25  he has waived his Fifth Amendment right.  And if the Court does

```
 1   accept his declaration, we would request the opportunity to

 2   cross-examine Mr. Cardiff today.

 3            THE COURT:  The Court has accepted his declaration.

 4            Mr. Cardiff, would you come forward, please, so we

 5   can swear you in.

 6            THE COURTROOM DEPUTY:  Please raise your right hand.

 7            Do you solemnly swear that the testimony you shall

 8   give in the cause now before this Court shall be the truth, the

 9   whole truth, and nothing but the truth, so help you God?

10            THE WITNESS:  I do.

11            THE COURTROOM DEPUTY:  Please be seated.

12            THE COURT:  And the Court has some questions of

13   Mr. Cardiff also.

14            MS. SANGER:  Your Honor, would you like us to --

15            THE COURT:  I'd like you to proceed.

16            MS. SANGER:  Okay.

17            (Pause in the proceedings.)

18            THE COURT:  Sorry.  We have a complication.

19            MR. THURMAN:  Your Honor, can I approach the

20   witness?  I'll return to my seat.  I just wanted to give him --

21            THE COURT:  Pardon?

22            MR. THURMAN:  I just wanted to give him water.

23            THE COURT:  The clerk will provide water.

24            MR. THURMAN:  Thank you very much.

25            THE COURTROOM DEPUTY:  Your Honor, I'm going to have
```

| | |
|---|---|
| 1 | to call someone. |
| 2 | THE COURT:  Let's have -- let's have Mr. Cardiff |
| 3 | take a seat in the jury box.  And let's swear him in.  And then |
| 4 | you can please call. |
| 5 | THE COURTROOM DEPUTY:  He's already been sworn. |
| 6 | THE COURT:  Your witness. |
| 7 | **JASON CARDIFF,** |
| 8 | **A DEFENDANT HEREIN, WAS SWORN AND TESTIFIED AS FOLLOWS:** |
| 9 | **CROSS-EXAMINATION** |
| 10 | BY MS. SANGER: |
| 11 | Q.    Mr. Cardiff, you received notice of this Court's |
| 12 | temporary restraining order in this matter on October 12th, |
| 13 | 2018; is that correct? |
| 14 | A.    Yes. |
| 15 | Q.    And you sat with the receiver and the receiver's |
| 16 | attorney discussing the terms of the order in your office on |
| 17 | October 12th? |
| 18 | A.    I -- I wouldn't call it a discussion, but we sat for |
| 19 | a small amount of time, yes. |
| 20 | Q.    And during this time that you sat with the receiver, |
| 21 | isn't it true that Redwood Scientific's attorney Tracy Green |
| 22 | was also participating in the conversation by phone? |
| 23 | A.    No.  She was on the phone for a little while during |
| 24 | that time. |
| 25 | Q.    So she was on the phone for part of this |

1   conversation?

2        A.    Yes.

3        Q.    And in this conversation, you were informed by the

4   receiver that your assets had been frozen?

5        A.    Yes.

6        Q.    And that the business Redwood Scientific was placed

7   under receivership?

8        A.    Yes.

9        Q.    And you understood what it meant that your assets

10  were frozen?

11       A.    I didn't fully understand, no.

12       Q.    What part of it was confusing for you?

13       A.    It was all a bit confusing.  It was quite

14  overwhelming at the time.

15       Q.    Did you understand that you would no longer have

16  access to your bank accounts?

17       A.    Uh, yes.

18       Q.    And did you understand that you would no longer have

19  access to bank accounts for which you were a signatory?

20       A.    No.

21       Q.    You didn't understand that to be part of the asset

22  freeze?

23       A.    I didn't fully understand the asset freeze at that

24  time.

25       Q.    Did you review the temporary restraining order?

1   A. Um, no.  Not completely, I did not.

2   Q. So a Federal Court order had been entered against

3 you, but you didn't review the entire order?

4   A. Not at that time.  I did not that day, no.

5   Q. Did you review it the next day?

6   A. I reviewed it in the next week and read it

7 completely.

8   Q. So after being told that your assets were frozen,

9 you took your time reviewing the Federal Court order that had

10 been ordered against you?

11   A. Regarding the asset freeze, no.  Regarding the

12 lawsuit, I reviewed that, yes.

13   Q. And after you were informed by the receiver that

14 your assets had been frozen, you spoke with Mr. Poujade on the

15 phone that day?

16   A. I don't recall.

17   THE COURT:  Are you saying you don't remember one

18 way or the other, or are you saying you did not?

19   THE WITNESS:  I'm saying I don't know if I spoke to

20 him that day.

21   Q. (BY MS. SANGER:)  Now, this -- this was an important

22 day in your life, you've told us before?

23   A. Correct.

24   Q. And you don't remember if you spoke to a close

25 friend that day?

1    A.    I don't remember, no.

2    Q.    A close friend who was also the chief financial

3    officer of Redwood Scientific?

4    A.    I do not remember who I spoke to that day.

5    Q.    So you don't remember speaking to Mr. Poujade for

6    ten minutes?

7    A.    I do not.

8    Q.    On November 7th, this Court held a hearing on the

9    preliminary injunction that was ultimately entered on

10   November 8th.  You remember attending the hearing?

11   A.    I do.

12   Q.    And at the hearing, you told the judge that you

13   understood the order; is that right?

14   A.    Yes, I did.

15   Q.    And in your declaration that you submitted in

16   support of your request for the return of your passports, you

17   also wrote that you remain mindful of the Court's instruction

18   that you make all reasonable efforts to comply with the orders;

19   isn't that right?

20   A.    I don't remember what I wrote in that declaration.

21   Q.    But you did write the declaration?

22   A.    I did, yes.

23   Q.    And do you remain mindful of the Court's admonition

24   to make all reasonable efforts to comply?

25   A.    Yes, I do.

```
1        Q.    And were you remaining mindful of that admonition

2   back in March when you submitted the declaration?

3        A.    I believe I was.

4        Q.    Mr. Cardiff, you went to Toronto on August 30th of

5   2018; is that right?

6        A.    I -- I can't recall exactly when I went to Toronto.

7        Q.    Did you go to Toronto in late August to meet with

8   Haywood Securities?

9        A.    I believe that was the date, yes, around that time.

10        Q.    And the purpose of your visit was to tell Haywood

11   Securities that you were stepping away from the Clover

12   Cannastrip business?

13        A.    That was one of the topics of discussion, yes.

14        Q.    What were the other topics?

15        A.    Um, the cannabis business in general.

16        Q.    So you were informing Haywood Securities that you

17   were stepping away from the business, but you were also

18   discussing the business with them?

19        A.    Their concern was that because of the FTC CID, it

20   would be very difficult for them to be a part of any capital

21   fundraising for the new venture if I was too close to the

22   company.

23        Q.    And that's a message that they conveyed to you

24   directly or to Mr. Poujade?

25        A.    Well, they conveyed it to me.  I don't know who else
```

**UNITED STATES DISTRICT COURT**

1    they conveyed it to.

2        Q.    When was the first time you heard that message from

3    Haywood Securities?  Was it before or after -- before or during

4    this trip?

5        A.    It started before.

6        Q.    So after they told you that they were concerned

7    about your involvement with the business, you went up to

8    Toronto to meet with them personally?

9        A.    They were concerned with me being too close to the

10   business as in a control person because their challenge was

11   having me clear their level of compliance with the current FTC

12   CID that was in place.

13       Q.    And when you're referencing the current FTC CID in

14   place, you're referencing the CID that was a subject of the

15   first lawsuit that brought the FTC and you into this courtroom

16   in front of this judge; is that right?

17       A.    Yes.

18       Q.    And so the concern was that, based on that lawsuit

19   which alleged that Redwood Scientific had failed to comply with

20   the FTC's CID, that it was too toxic to have you involved with

21   Clover Cannastrip?

22       A.    I -- I don't understand the question, I'm sorry.

23       Q.    So it was due to this lawsuit or just due to the

24   fact that there was a CID?  What was it that Haywood Securities

25   was concerned about?

**UNITED STATES DISTRICT COURT**

```
 1         A.    I think they were concerned about the FTC in

 2   general.

 3         Q.    So you met with them on August 30th.  You discussed

 4   that you would be stepping away from the business?

 5         A.    Yes.  That was my second meeting with them in

 6   person.  I'd been there before to meet with them as well prior

 7   to August 30th.  I believe I was there prior to August 30th

 8   also.

 9         Q.    In this earlier visit, were you also informing them

10   that you intended to step away from the business?

11         A.    It hadn't come up yet.

12         Q.    So August 30th was the first time that you met with

13   Haywood Securities to discuss stepping away from the business?

14         A.    The possibility of it, yes.

15         Q.    Oh.  It was just a possibility.

16         A.    Yes.

17         Q.    So you hadn't agreed to step away from the business

18   at that time?

19         A.    I don't really recall.  It was basically -- I said I

20   need to go back and talk about it and think about what to do.

21   They had made it really clear, it would be very difficult for

22   them to get involved in raising capital for the new company if

23   I was to -- if I was an officer, shareholder, director, they

24   were making it -- they were saying it's going to be very hard

25   for us to do our job.
```

1      Q.    So --

2      A.    Which would then make the venture impossible to get

3  started.

4      Q.    So at the end of this trip when you left Toronto,

5  just so that I'm clear, the status was that you may step away

6  or that you were stepping away?

7      A.    It was undecided.

8      Q.    Okay.  So you had not informed them that you were

9  stepping away?

10      A.    I may have informed them that it's a strong

11  possibility, but it was up in the air.

12      Q.    So you met with Haywood Securities on August 30th --

13  on August 30th, 2018.  The next day, on August 31st, you went

14  to TD Bank to sign up for a bank account in the name of Clover

15  Cannastrip; is that right?

16      A.    Yes.

17      Q.    And was your wife, Eunjung Cardiff, with you when

18  you signed up for that bank account?

19      A.    No, she was not.

20      Q.    So it was just you?

21      A.    Yes, it was.

22      Q.    Now, Mr. Poujade had said that he sent you to the

23  bank with his driver's license and passport so that you could

24  put his name on the account.  Is that right?

25      A.    Uh, I know I had his identification, but I believe

1    he had to be there in person to be added to the account.

2        Q.    So before the trip, were you expecting to add

3    Mr. Poujade's name to the account?

4        A.    Yes.

5        Q.    And he had given you his identification documents

6    for that purpose?

7        A.    Yes.

8        Q.    So you thought you could just go to the bank with

9    Mr. Poujade's identification documents and that they would

10   agree to open an account in his name?

11       A.    Uh, they would agree to add him as a signer, yes.

12       Q.    But you weren't able to add Mr. Poujade as a signer

13   that day?

14       A.    Correct.

15       Q.    But when you left the bank on August 31st, there

16   were two signers on the account; isn't that right?

17       A.    No, it's not.

18       Q.    So who were the signers on the account when you left

19   the bank that day?

20       A.    Just myself.

21       Q.    Mr. Cardiff, are you able to see a screen in front

22   of you?

23       A.    Yes, I can see it.

24       Q.    Okay.  So flashing up on the screen in just a moment

25   is an image of the signature card that was entered in the

```
 1   receiver's second affidavit of the Cardiffs' noncompliance with

 2   the Court's orders.  Can you see the image in front of you?

 3        A.    Yes, I see it.

 4              THE COURT:  Is there an exhibit number on it that

 5   could better identify the document for the record?

 6              MS. SANGER:  Your Honor, this is entered into the

 7   record, ECF Docket 144-1.

 8              THE COURT:  Thank you.

 9              MR. THURMAN:  Your Honor, for the record, I think an

10   objection has been made to this -- to this document on the

11   grounds of lack of foundation.  I think --

12              THE COURT:  Your objection is noted.

13              MR. THURMAN:  Thank you.

14        Q.    (BY MS. SANGER:)  Mr. Cardiff, do you recognize this

15   signature card?

16        A.    No, I do not necessarily recognize it.

17        Q.    You'll see here we have highlighted the business

18   name Clover Cannastrip Thin Film Technologies?

19        A.    Yes.

20        Q.    That's the name of the business entity for which you

21   registered a bank account on August 31st at TD Canada?

22        A.    Yes.

23        Q.    And you'll see here the names Eunjung Cardiff and

24   Jason Cardiff?

25        A.    Yes.
```

1      Q.    And next to those names you see signatures?

2      A.    Yes.

3      Q.    Do you recognize your signature next to your name?

4      A.    Yes.

5      Q.    And your wife's signature next to her name?

6      A.    Yes.

7      Q.    And so you were both signers on the account?

8      A.    We were not both signers on the account on

9  August 30th.

10      Q.    When did you sign this card?

11      A.    This card was signed in mid to late September in

12  Nova Scotia when I was present with my wife at a TD branch.

13      Q.    So when you left the bank on August 31st, you were

14  the sole signatory of the Clover Cannastrip account?

15      A.    Yes, I was.

16      Q.    When you returned to the U.S., did you inform

17  Mr. Poujade that you were not able to put his name on the

18  account?

19      A.    I believe we talked about it, yes.

20      Q.    When?

21      A.    I don't recall.

22      Q.    When did you give Mr. Poujade's identification

23  documents back to him?

24      A.    I left them with the bank.

25      Q.    You left Mr. Poujade's driver's license and passport

1　at the bank?

2　　　A.　Yes, because those identification documents were

3　required to open the account regardless, as he was a listed

4　director.

5　　　Q.　Okay.　So maybe I'm getting confused here.　Did you

6　have his passport and his driver's license?

7　　　A.　No.　Photocopies.

8　　　Q.　Okay.　So for demonstration purposes here, we've

9　pulled some information also from the docket, Docket 144-1, as

10　well as Docket 134-12.　This is a compilation of information

11　from the bank records retrieved by the receiver as well as the

12　bank statements.

13　　　　　So Mr. Cardiff, I'd like to just draw your attention

14　here to the date chart on the screen in front of you.

15　　　　　So you've testified that the account was opened on

16　August 31st?

17　　　A.　Yes.

18　　　Q.　There's a deposit into the account of 500,000

19　Canadian dollars on September 10th from Irwin Lowy.　Was this

20　the 500,000 dollar investment by XIB Financial in Clover

21　Cannastrip?

22　　　A.　I'm not sure, but I believe so.

23　　　Q.　And the deposit on September 13th also from

24　Irwin Lowy in the amount of 1.34 million Canadian dollars, was

25　this the investment from FSD Pharma minus the fees taken out by

```
 1    the broker?

 2         A.    I'm not sure again, but I believe so.

 3         Q.    And then if you'll view the image below the chart,

 4    these are excerpts from bank documents retrieved by the

 5    receiver.  You and your wife both executed a document signed

 6    October 4th with this bank?

 7         A.    No, we did not.

 8         Q.    Is that your signature on the excerpt there?

 9         A.    It is.

10         Q.    And is that your wife's signature?

11         A.    I believe so.

12         Q.    And the date above her signature is what?

13         A.    The date is October 4th.  However, that's not the

14    date that we signed this document.

15         Q.    When did you sign the document?

16         A.    I can't give you the exact day, but it was

17    mid-September when I was in Nova Scotia.

18         Q.    And did you put this date on the document?

19         A.    No, I did not.

20         Q.    Did your wife put this date on the document?

21         A.    No, she did not.

22         Q.    Do you have any explanation for why it's dated

23    October 4th?

24         A.    I do not.

25                I -- I do vaguely believe that the Nova Scotia
```

**UNITED STATES DISTRICT COURT**

```
 1   branch said that the branch that opened the account in Toronto

 2   would have to finalize all the paperwork and they would send

 3   everything to Toronto, but that would just be a guess.

 4             THE COURT:  Okay.  Well, the Court will strike that

 5   testimony as a guess.

 6        Q.   (BY MS. SANGER:)  So on -- or in or around sometime

 7   in mid to late September, you and your wife were in

 8   Nova Scotia.  And you went to the bank, and you both signed

 9   this document at the bank?

10        A.   Correct.

11        Q.   And it lists you here as the president of Clover

12   Cannastrip Thin Film Technologies.  So you were the president

13   of Clover Cannastrip Thin Film Technologies?

14        A.   I don't believe so.

15        Q.   But you're listed as the president on this bank

16   document?

17        A.   Yes.

18        Q.   That bears your signature?

19        A.   Yes.

20             THE COURT:  What document -- Mr. Cardiff, are you

21   saying you were not the president or you don't know one way or

22   the other?

23             THE WITNESS:  I don't know one way or the other.

24             THE COURT:  You may have been the president?

25             THE WITNESS:  I don't think I was.  Um, it was never
```

```
 1    decided who was an officer and what position anybody had.  Um,
 2    I -- I don't even know why it says manager.
 3               THE COURT:  You don't know one way or the other?
 4               THE WITNESS:  I do not.
 5               THE COURT:  Okay.
 6         Q.    (BY MS. SANGER:)  So is it fair to say there was a
 7    lack of formality, then, around the director, manager positions
 8    at Clover Cannastrip?
 9         A.    No.
10         Q.    So there were formal positions?
11         A.    No.  There -- it would be -- it's not fair to say
12    there was a lack of formality around it.
13         Q.    But you weren't sure if you were the president of
14    the organization?
15         A.    No, I was not.  I was not sure.
16         Q.    Now, there were a series of transfers out of this
17    account in early October.  And we've read in Mr. Poujade's
18    declaration that you were the person responsible for these
19    transfers.  Is that correct?
20         A.    Yes.
21         Q.    And once again, I will refer your attention to the
22    chart in front of you.  This is a demonstrative representation
23    of Docket 144-1.  This is information just summarizing in a
24    more readable form of the wires that were detailed in records
25    retrieved by the receiver.
```

1          So this transfer on September 19th of 50,000

2   Canadian dollars to Aavishkar, that was your transfer?

3       A.   Yes, it was.

4       Q.   And Aavishkar is the same company that produced the

5   oral film strips that are the subject of the FTC's Complaint in

6   this litigation?

7       A.   It's one of the dealers, yes.

8       Q.   And in fact, you did purchase TBX-FREE oral film

9   strips from Aavishkar?

10      A.   Yes.

11      Q.   And you purchased Eupepsia Thin oral film strips

12   from Aavishkar?

13      A.   Yes.

14      Q.   And you purchased Prolongz oral film strips from

15   Aavishkar?

16      A.   No.

17      Q.   You didn't?

18      A.   No.

19      Q.   Did you purchase Clover strips from Aavishkar?

20      A.   It was a CBD strip.  But yes, it was CloverStrip is

21   what we named it.

22      Q.   So you purchased a CBD strip from Aavishkar and you

23   named it CloverStrip?

24      A.   Yes.

25      Q.   And when you say you, are you talking about Redwood

```
 1    Scientific?
 2         A.    No, not necessarily Redwood.
 3         Q.    So who called it CloverStrip?
 4         A.    It was just a branded name that we came up with.
 5         Q.    Who's "we"?
 6         A.    Um, me, myself.
 7         Q.    You called them CloverStrips?
 8         A.    We came up with the name CloverStrip of what to call
 9    them, yeah.  I think it was batted around as to what would be a
10    good name, yeah.
11         Q.    And batted around between you and who else?
12         A.    People in the office, just people.
13         Q.    Are you --
14         A.    I don't have anyone specific.
15         Q.    Are you including your wife in the "we"?
16         A.    Yes.
17         Q.    Julie Green?
18         A.    Not that I recall.
19         Q.    Do you recall Julie Green having a role in selling
20    CloverStrips at Redwood Scientific?
21         A.    Not -- no, not in selling.
22         Q.    Was she involved in some way in the marketing or
23    distribution of CloverStrips?
24         A.    She was not.
25         Q.    So when you said not in selling, was there something
```

1  that she was involved in?

2      A.    She was involved in -- if an order would come in,

3  she would take the order from a salesperson.  If a salesperson

4  had an order, she would take an order.

5      Q.    So Ms. Green served in an administrative role?

6      A.    More administrative, yeah.  Yes.

7      Q.    Was Jacques Poujade involved in the marketing or

8  sales of CloverStrips?

9      A.    No.  Not that I recall.

10     Q.    So would it surprise you if he had signed off on an

11 invoice for the purchase of CloverStrips from Aavishkar?

12     A.    It would -- I wouldn't -- I -- I don't know.  I

13 mean, yes, I guess.  Yes.

14     Q.    Now, let's turn to some of the other transactions

15 listed on the slide here, 12,000 U.S. dollars to Grants Law

16 Firm.  And there was a note in the wire records, "IP work for

17 Clover trademark."

18          Was this for the trademark of CloverStrips?

19     A.    It was general IP work for CloverStrips, yes.

20     Q.    And so Grants Law Firm was hired by which entity?

21     A.    Uh, I don't know who was on his retainer.

22     Q.    So you don't know who entered into the agreement

23 with Grants Law Firm for this IP work?

24     A.    I do not.

25     Q.    So it could have been Redwood Scientific?

1    A.    I don't recall.

2    Q.    Or it could have been Clover Cannastrip?

3    A.    Once again, I don't recall.

4    Q.    Are there other entities for which it could have

5    been other than Clover Cannastrip and Redwood Scientific?

6    A.    Could have been myself personally, could have been

7    my name, could have been one of the other named defendants.  I

8    don't recall.

9    Q.    October 2nd, there's a $5,155.21 U.S. dollars

10    transfer to Benjamin England & Associates.  Benjamin England is

11    a law firm that provided FDA counsel to Redwood Scientific; is

12    that right?

13    A.    Yes.

14    Q.    And they advised you on issues related to FDA

15    marketing or FDA regulations in the marketing of TBX-FREE?

16    A.    Yes.

17    Q.    And Eupepsia Thin?

18    A.    Not marketing but yes.

19    Q.    What aspect of Eupepsia Thin did they advise you

20    about?

21    A.    Labeling and the drug directory code.

22    Q.    And did they also advise you on labeling issues

23    relating to Prolongz?

24    A.    Yes.

25    Q.    Were they providing services with CloverStrips as

1  well?

2      A.    Yes.

3      Q.    To Redwood Scientific?

4      A.    Um, it wasn't to -- necessarily to Redwood

5  Scientific.  But I believe they did get a national drug

6  directory code based off of the other work that they had done.

7      Q.    And this national drug code directory number that

8  you're referencing, did they help you obtain the one for

9  CloverStrips?

10     A.    I believe so.  Yes.

11     Q.    HW Fisher & Company, 575 Great British pounds on

12  October 3rd.

13            Now, about a year ago, you were sitting for a

14  debtor's examination in a separate litigation.  Do you remember

15  sitting for that debtor's exam?

16     A.    Yes.

17     Q.    And do you remember testifying in that debtor's exam

18  that HW Fisher & Company was the entity that managed your

19  personal asset protection trust?

20     A.    Uh, I don't exactly recall, no.

21     Q.    Did HW Fisher & Company manage your personal asset

22  protection trust?

23     A.    Um, not a trust, no.

24     Q.    Did they manage some aspect of your personal

25  financial affairs?

1       A.    Years ago, yes.

2       Q.    So they -- they helped you with personal financial

3  issues years ago?

4       A.    Yes, and business.

5       Q.    And then you were paying them in October of 2018?

6       A.    What's the question?

7       Q.    You were paying them in October of 2018?

8       A.    Paying for -- sorry.  I don't understand the

9  question.

10      Q.    What were you paying them for on October 3rd?

11      A.    Uh, they were looking into research for cannabis

12  expansion in Europe.

13      Q.    On behalf of who?

14      A.    It wasn't clear on behalf of anybody.

15      Q.    So HW Fisher --

16      A.    On behalf of -- sorry.  Excuse me.  On behalf of

17  myself, I asked them to do the research.

18      Q.    On behalf of yourself.  Okay.

19            And, Mr. Cardiff, the court reporter's only able to

20  record one of us talking at a time.  I'll try my best not to

21  interrupt you, and I'll ask for the same courtesy.

22            So this October 3rd, 2018, expense, this was on

23  behalf of you personally?

24      A.    No.  It was on behalf of me asking them to do the

25  research.

1     Q.    To expand your cannabis film strip venture outside

2  of the United States?

3     A.    The possibilities of expansion.

4     Q.    Okay.  Um, on October 4th, there's a $24,000 U.S.

5  payment to FX Web Media.  Isn't it true that on October 3rd you

6  signed a contract with FX Web Media for a project called

7  Pharmastrip?

8     A.    I don't recall the date.

9     Q.    Do you remember signing a contract with FX Web Media

10 for a project called Pharmastrip?

11    A.    I don't know if I signed it, but I -- I may have.

12    Q.    Have you reviewed the record for this contempt

13 proceeding?

14    A.    Yes.

15    Q.    And do you remember seeing a signed contract by you

16 with FX Web Media dated October 3rd?

17    A.    I -- I don't.

18    Q.    Is there any reason to doubt that you would have

19 signed that contract on October 3rd?

20    A.    I don't remember the date, but I -- I don't know the

21 date.

22    Q.    But you do remember signing a contract with FX Web

23 Media for a project called Pharmastrip?

24    A.    I believe so.  Yes.

25    Q.    There's a $6,000 transfer to Jacques Poujade on

1    October 4th.  You made this transfer as well?

2        A.    Yes.

3        Q.    And what was that transfer for?

4        A.    That was a transfer for work that was being done,

5    his -- compensation for work being done.

6        Q.    On behalf of who?

7        A.    On behalf of Clover Cannastrip.

8        Q.    And then on October 9th, there's a 40,000 U.S.

9    dollar transfer to Intel Property.  Intel Property is an entity

10   owned by you and your wife?

11       A.    I -- not too sure.  I believe it's just owned by me,

12   but it might be me and my wife, yes.

13       Q.    So you're one of the owners of Intel Property?

14       A.    Yes.

15       Q.    And you transferred $40,000 to Intel Property,

16   another entity that you own, on October 9th.

17            On October 10th, isn't it true that Intel Property

18   transferred over $15,000 to pay one of your AMEX credit card

19   bills?

20       A.    I don't know.  I don't recall that.

21       Q.    Do you remember using Intel Property funds to pay

22   your AMEX bill?

23       A.    I do not.

24       Q.    I'll make a note for the record that Docket 121 at

25   page 54 shows an October 10th payment of over $15,000 to AMEX

1  from Intel Property, and this is contained within the analysis

2  of the receiver's forensic accountant.

3          So in light of that information, does that help jog

4  your memory about whether you paid your AMEX bill from the

5  Intel Property account?

6      A.    It does not.  I do not recall that.

7      Q.    And then these two transfers to Shanghai Aligned

8  Machinery on October 9th, these are two separate deposits for

9  film strip manufacturing machines?

10     A.    Yes.

11     Q.    And the invoices for these machines were made out to

12 a company called Haffelgad Switzerland; isn't that right?

13     A.    There were multiple invoices.

14     Q.    Okay.  Do you remember invoices for Haffelgad

15 Switzerland?

16     A.    Yes.  I believe so.

17     Q.    And you are listed as the contact person for

18 Haffelgad Switzerland?

19     A.    Yes.

20     Q.    There was also an invoice to Redwood Scientific; is

21 that right?

22     A.    I don't know that.

23     Q.    You don't remember an invoice listing you as the

24 contact person for Redwood Scientific from Shanghai Aligned

25 Machinery?

1    A.    I do not.

2    Q.    You said there were multiple invoices.  Can you tell

3    me any other entity to which these invoices were addressed,

4    other than the two that we've just discussed?

5    A.    I believe Pharmastrip.

6    Q.    And any other entity other than Pharmastrip?

7    A.    No.

8    Q.    And were you also listed as the contact person on

9    the Pharmastrip invoice?

10    A.    I'm not sure.

11    Q.    And Carl Ranno Law, this is a $7,250 transfer on

12    October 9th, 2018.  This was the attorney who did SEC work for

13    Redwood Scientific?

14    A.    Correct.

15    Q.    So all of these payments from October 2nd, 2018,

16    through October 9th, 2018, you authorized and made all of these

17    transfers?

18    A.    Yes.

19    Q.    And on October 9th, you and your wife remained the

20    only signatories on this account?

21    A.    We did.

22    Q.    And you're still the only signatories on the account

23    today?

24    A.    Yes, we are.

25    Q.    And at any time in the history of this TD Canada

**UNITED STATES DISTRICT COURT**

1    account, were there any other signatories?

2         A.    No.

3         Q.    So when you learned of the asset freeze on

4    October 12th, you were a signatory of the TD Canada account.

5    Did you take any steps to secure the funds in the Clover

6    Cannastrip bank account to prevent their dissipation?

7         A.    I did not.

8         Q.    And did you report the account to the FTC?

9         A.    No.

10        Q.    And did you report the account to the receiver?

11        A.    I did not.

12        Q.    But you were aware of the asset freeze which applied

13   to you and accounts under your control?

14        A.    I was aware of that, but I had given up control of

15   this account by that time.

16        Q.    You were still a signatory.

17        A.    I was a signatory.  However, I had transferred my

18   control, digital key fob to do wires on the pass codes to

19   Mr. Poujade by that time.

20        Q.    So you say that you transferred the fob to

21   Mr. Poujade on October 9th after these October 9th transfers

22   took place?

23        A.    I believe it was the 9th or the 10th, yes.

24        Q.    But it's also your testimony that four and six days

25   after you learned of the TRO, on October 16th and on

1   October 18th, these two transfers out that are listed on the

2   bottom of the chart here, that you assisted Mr. Poujade in

3   making those transfers, didn't you?

4       A.   I wouldn't say I assisted, no.  I was available for

5   technical support because it's a very difficult system to

6   manage.

7       Q.   Well, I'm reading from your declaration here.  "On

8   October 9th, 2018, I delivered the remote access device and

9   pass code directly to Mr. Poujade.  After October 9th, 2018,

10  after I had delivered the remote access device and pass codes

11  to Mr. Poujade, I assisted him in making additional bank

12  transactions."

13          So that's not accurate?  You didn't assist him?

14      A.   I believe my definition of assistance is I was there

15  if he had questions about how to do it.

16      Q.   So you were present when these transfers out of the

17  account took place?

18      A.   I can't even say that I was present.

19      Q.   You're not sure if you were there or not?

20      A.   I was -- I was around and available if there were

21  questions, yes, but I can't say that I was even present.

22      Q.   You were aware that the transfers were taking place?

23      A.   Um, I believe so.  Yeah.

24      Q.   And you did nothing to stop Mr. Poujade from moving

25  $1.2 million out of an account for which you were a signatory

1    while you were under an asset freeze?

2        A.    I -- no, I did not.

3        Q.    And then two days later when he sent $360,000 to his

4    brother, according to this story, you didn't stop him from

5    doing that either?

6        A.    I did not.

7        Q.    But you were around in case he needed help doing it?

8        A.    Correct.

9        Q.    And under your definition of assisting, you weren't

10   participating in the transfer?

11       A.    Correct.

12       Q.    Now, that $1.2 million transfer on October 16th was

13   a transfer to a Canadian law firm trust account in the name of

14   Sui & Company.  Isn't it true that just the day before on

15   October 15th, you had from Arizona attempted to wire $40,000 of

16   your personal asset protection limited partnership funds to

17   that very same trust account?

18       A.    Yes.

19       Q.    And they didn't make it into the trust account

20   because you were thwarted by the asset freeze?

21       A.    Correct.

22       Q.    But Sui was the intended destination?

23       A.    Yes.

24       Q.    So you were attempting on October 15th to send

25   personal asset protection funds to Sui & Company in Canada?

```
 1          A.    I was, yes.
 2          Q.    And you listed on the detail there that this was for
 3   legal fees?
 4          A.    Correct.
 5          Q.    But Sui & Company is a law firm representing Clover
 6   Cannastrip?
 7          A.    Correct.
 8          Q.    So you were attempting to send your personal frozen
 9   funds to Sui & Company to pay for Clover Cannastrip legal work?
10          A.    No.  I was sending it there for myself because the
11   account wasn't frozen.  So at the direction of Robert Shapiro,
12   he told me if the account's not frozen, send me as much money
13   as you can and send some money to another legal trust account
14   in case you need it to send to me later, which is what I did.
15   And I've apologized to this Court for that behavior because
16   that was wrong.  I shouldn't have done it and I did it.
17          Q.    Now, when you say Robert Shapiro, you're talking
18   about the attorney Robert Shapiro?
19          A.    Yes.
20          Q.    And your testimony is that this attorney instructed
21   you to send money in an account that you were a signatory for
22   to his law firm's trust account?
23          A.    Yes.  And that's where I got all of his wire details
24   and his trust account details that are on those same pieces of
25   paper.  And that's also where my same telephone, T-Mobile
```

1  records show all the phone calls to him that day about those

2  wires.

3      Q.    You're referencing the T-Mobile records that have

4  been entered by the FTC in support of this motion?

5      A.    Yes.

6      Q.    So those are, indeed, your phone records?

7      A.    Yes.

8            THE COURT:  And just for clarification, when you say

9  that the attorney instructed you to send money into the

10 account, you're referring specifically to Mr. Shapiro making --

11 giving you that directive?

12           THE WITNESS:  Yes.

13           THE COURT:  Thank you.

14     Q.    (BY MS. SANGER:)  And was it Mr. Shapiro who told

15 you to send the $40,000 to the Sui & Company account as well?

16     A.    Yes, it was his suggestion.  Yes.

17     Q.    And did you discuss with Mr. Shapiro the terms of

18 the asset freeze, or did you provide him a copy of the order

19 spelling out the terms of the asset freeze?

20     A.    I did not provide him with the order.  He was aware

21 of the asset freeze.

22     Q.    Now, you were attempting to hire Glaser Weil to

23 represent you in this lawsuit around that time; isn't that

24 right?

25     A.    Yes.

1      Q.    You were talking with Mr. Shapiro and another lawyer

2   at that firm, Adam Pines?

3      A.    Yes.  Correct.

4      Q.    And on October 16th, in the context of those

5   discussions with Glaser Weil about bringing them on to

6   represent you, you were discussing sources of funds from which

7   you could pay a retainer; isn't that right?

8      A.    Yes.

9      Q.    And you told the Glaser Weil law firm that you

10  had -- you had funds available to you in a Canadian law firm's

11  trust account?

12     A.    I did not.  No.

13     Q.    So the testimony of Mr. Pines is incorrect?

14     A.    I don't -- I can't speak to his testimony.

15     Q.    But your testimony today is that you did not tell

16  Glaser Weil that you had access to funds in a Canadian trust

17  account?

18     A.    I did not.

19     Q.    And did you tell Glaser Weil that you had $200,000

20  available in a Canadian company listed in the name of your

21  father?

22     A.    No.

23     Q.    And did you tell Glaser Weil that you had a

24  $2 million business deal pending in Canada?

25     A.    I -- I did not.

1    Q.    So, Mr. Cardiff, your testimony is at odds with the

2   testimony -- the sworn testimony of Glaser Weil taken at

3   deposition.  They referenced these three specific pots of money

4   that were the subject of discussion for how you could pay them

5   to bring them on to represent you.

6         If you weren't offering them money available in a

7   Canadian trust account and you weren't offering them money in a

8   Canadian company in your father's name and you weren't offering

9   them money from a pending $2 million business deal, how was it

10  that you were proposing to pay them?

11   A.    Out of the Arizona Bank & Trust account.  That was

12  the only money available to pay them.

13   Q.    But weren't you already aware that that account was

14  frozen when you attempted to transfer the money the day before

15  this conversation took place?

16   A.    No.  That account wasn't frozen then.

17   Q.    So you didn't learn on October 15th that the

18  $100,000 attempted transfer didn't go through?

19   A.    I learned later that day that it didn't go through.

20   Q.    You learned later on October 15th?

21   A.    Yeah.  It wasn't -- it wasn't frozen yet.  It wasn't

22  frozen yet, which is why his suggestion was to access those

23  funds for legal defense.

24   Q.    But you did learn by the end of the day on

25  October 15th that the funds were frozen?

**UNITED STATES DISTRICT COURT**

1        A.    Yes.

2        Q.    And then you spoke to Glaser Weil again on

3   October 16th?

4        A.    I don't recall if I spoke to them on the 16th.

5        Q.    Would it surprise you to know that Glaser Weil

6   produced records recounting conversations with you that took

7   place on October 16th?

8        A.    It would not.

9        Q.    And so on October 16th, as you were still trying to

10   figure out a way to bring them on and you were already aware

11   that your Arizona Bank & Trust account was frozen, you were not

12   discussing the $200,000 in a company in your dad's name, a

13   pending $2 million deal, or money waiting for you in a Canadian

14   trust account?

15        A.    I was not.  No.

16        Q.    Now, ultimately two weeks later in early November,

17   just a few days before the preliminary injunction hearing in

18   this courtroom, a $2 million deal did go through for Clover

19   Cannastrip; isn't that right?

20        A.    No.  It's not right.

21        Q.    Didn't Clover Cannastrip report to the British

22   Columbia Securities Commission that there was a fundraising

23   move on November 5th for $2.02 million?

24        A.    I don't know.  I can't speak to that.

25        Q.    But you're sure that it didn't go through, so you

1    can speak to that?

2         A.    Not that I know of.  It didn't go through that I

3    know of.

4         Q.    So you actually have no idea whether a $2 million

5    deal went through?  That's your testimony?

6         A.    That is correct.

7         Q.    So your testimony is you have no knowledge of Clover

8    Cannastrip reporting $2.02 million raised from 73 unique

9    investors to the British Columbia Securities Commission?

10        A.    I don't know what the amount was, and that is my

11   testimony.  I'm not sure.

12        Q.    Were you involved in raising that money?

13        A.    No.

14        Q.    But you did go on investment pitches to raise money

15   for Clover Cannastrip; isn't that right?

16        A.    No.  Not pitches, no.

17        Q.    Did you pitch Clover Cannastrip as an investment to

18   FSD Pharma?

19        A.    No.

20        Q.    You didn't sit down with FSD Pharma on August 31st

21   and pitch them on the investment opportunity of Clover

22   Cannastrip?

23        A.    I met with them, but I did not pitch them on the

24   investment.  No.

25        Q.    Did you discuss Clover Cannastrip with FSD Pharma on

1    August 31st, 2018?

2         A.    Yes.

3         Q.    Did you discuss the investment opportunity in Clover

4    Cannastrip that day?

5         A.    No.

6         Q.    Did you provide them with subscription documents if

7    they wanted to subscribe to Clover Cannastrip?

8         A.    No, I did not.

9         Q.    Isn't it true that when FSD Pharma signed the

10   subscription agreement with Clover Cannastrip on September 6th,

11   2018, that your name was listed in the contact name field of

12   the subscription agreement?

13        A.    I don't know whose name was listed.  I can't speak

14   to the subscription agreements.

15        Q.    You haven't seen them?

16        A.    No.

17        Q.    And you didn't review the subscription agreements

18   that were attached to the papers filed in this proceeding?

19        A.    I don't believe so.

20        Q.    Would it surprise you to learn that your name is

21   listed in the contact name field?

22        A.    Yes.

23        Q.    But you were involved in setting up Clover

24   Cannastrip, weren't you?

25        A.    In the begin -- yes.  Yes.

1      Q.    And in September, you were director of Clover

2  Cannastrip, weren't you?

3      A.    Yes.  Yes.

4      Q.    And also in September, you were a signatory of

5  Clover Cannastrip's bank account?

6      A.    Yes.

7      Q.    And on August 31st, you met with FSD who ended up

8  signing the subscription agreement on behalf of Clover

9  Cannastrip.  You met with them on behalf of Clover Cannastrip?

10     A.    Yes.

11     Q.    But it would surprise you that your name was listed

12 as the contact person?

13     A.    Yes.

14     Q.    So I want to take you back to August before FSD

15 signed the -- the subscription agreement.  You testified that

16 Haywood Securities told you it was going to be necessary for

17 you to step away from the business.

18          Um, when that was communicated to you, given that

19 you had been involved in incorporating the business and laying

20 the business plans, doing some of this research that we

21 discussed related to these wire transfers in early October, um,

22 you -- your testimony is that you just agreed to step away with

23 no fight?

24     A.    Yes.

25     Q.    But this was going to be the next big film strip

**UNITED STATES DISTRICT COURT**

1   venture for Redwood and for your film strip business, wasn't

2   it?

3        A.   No.  It was not going to be for Redwood.  It was

4   very separate from Redwood.  But it was made very clear that it

5   would be impossible to raise capital without my distance from

6   the company.  And without the capital, there was no machinery.

7   And without the machinery, there's no ability to produce THC

8   oral thin film strips.  Very different from Redwood that never

9   manufactured anything.

10       Q.   But there was capital in the company, wasn't there?

11  Weren't there two large infusions of cash into the company in

12  early September?

13       A.   I -- I -- I don't -- what's the question?

14       Q.   There was capital in the company as of September of

15  2018, wasn't there?

16       A.   I believe so.

17       Q.   A $500,000 transfer in on September 10th and a

18  $1.34 million transfer in on September 13th?

19       A.   Yes.

20       Q.   And at this time, you were a director of the

21  organization?

22       A.   Yes.

23       Q.   So having your name as a director was not a barrier

24  to these investments coming in?

25       A.   I don't know.

54

```
 1          Q.    Well, did the investments come in?

 2          A.    I -- I believe so.

 3          Q.    Are you contesting these bank records?

 4          A.    I'm not.

 5          Q.    So the investments came in?

 6          A.    I -- I can't speak to that.  I don't know.

 7          Q.    You were one of only two signatories on the account

 8   at that time.  And you're not sure if the money came in?

 9          A.    The money came in.

10          Q.    So you're not sure if the money was connected to the

11   investments.  Is that what you're saying?

12          A.    Yes.

13          Q.    So when Haywood Securities asked you in August to

14   step away, did you submit a notice of resignation to Haywood to

15   allay their concerns?

16          A.    I don't think so.  No.

17          Q.    So you didn't submit a resignation notice to them in

18   August of 2018?

19          A.    No.

20          Q.    Did you submit a resignation notice to them in

21   September of 2018?

22          A.    No.  Not that I know of.

23          Q.    Did you submit a resignation notice to Haywood in

24   October of 2018?

25          A.    No.
```

1    Q.   So as far as Haywood knew, you hadn't resigned from

2    the company?

3    A.   I believe that -- I don't know what Haywood knew at

4    that time.

5    Q.   But it was important that you separated yourself

6    from the company so that they would invest and help you gain

7    other investments?

8    A.   Correct.

9    Q.   But you can't remember if you ever communicated to

10   them that you resigned from the company?

11   A.   I don't believe I resigned from the company at that

12   time.  I -- I believe their major concern at that time was that

13   I wasn't a shareholder.

14   Q.   So at the time that Haywood made its investment in

15   Clover Cannastrip, do you recall when that was?

16   A.   I do not.

17   Q.   Was it sometime in October of 2018?

18   A.   I do not believe Haywood ever made an investment,

19   but I don't know.

20   Q.   So this idea that Haywood wouldn't raise money for

21   Clover Cannastrip and wouldn't finalize its investment in

22   Clover Cannastrip until they were assured that you would step

23   away from the business, this is a concept you're unfamiliar

24   with?

25   A.   No, it's not.

1      Q.    Okay.  So then I'm just getting a little bit

2  confused.

3            You communicated to them or you didn't communicate

4  to them that you had resigned your directorship?  Or you're

5  saying this was not important to them?

6      A.    What was important to them originally and initially

7  was that I wasn't a shareholder because that was their first --

8  that was the first issue that they raised, was you need to step

9  away, not be a shareholder.  It's going to be difficult for us

10  to raise capital for the company if you're a shareholder.

11      Q.    But they were able to successfully help you raise

12  this first $2 million in September?

13      A.    Haywood raised this money.  I don't know exactly

14  when but yes.

15      Q.    So we've taken a look at these corporation filings

16  that are available on the British Columbia corporations

17  website.  And there's a filing from November 16th.  The filing

18  is in regards to a notice of change of directors.  Are you

19  familiar with this filing?

20      A.    No, I'm not.

21      Q.    So you were not involved in the November 16th filing

22  regarding a change of directors at Clover Cannastrip?

23      A.    With the British Columbia's office, is that what you

24  mean?  I don't understand the question.

25      Q.    Uh-huh.  Did you ever notify -- was it you who

```
 1    notified the British Columbia corporations filings office that

 2    you were no longer a director of Clover Cannastrip?

 3         A.    No, it was not.

 4         Q.    So you're not familiar with the notice that was

 5    filed on November 16th?

 6         A.    I -- once again, what notice?  I don't understand.

 7         Q.    Okay.  So you're not familiar with the notice from

 8    November 16th that was filed with that agency?

 9         A.    I'm not.

10         Q.    Other than by going to the British Columbia

11    corporations filings -- or the British Columbia's corporations

12    office website, was there any other way that potential

13    investors could get information, public information, publicly

14    available information about Clover Cannastrip?

15         A.    I don't know.

16         Q.    Mr. Cardiff, on October 2nd, you signed

17    incorporation documents for an Irish entity called Haffelgad

18    Switzerland; is that right?

19         A.    I don't know the date exactly, but I believe it was

20    around then.

21         Q.    And this entity, you used this as part of your

22    cannabis business?

23         A.    What -- no.  It was -- the idea was to have a

24    different manufacturing entity so that people, competitors in

25    the marketplace wouldn't be aware of the location of where
```

1    machinery is manufactured.

2        Q.    A different manufacturer -- or different

3    manufacturing entity for which business?

4        A.    Um, it would -- Clover -- Clover Cannastrip.

5        Q.    So Haffelgad Switzerland was a companion entity to

6    Clover Cannastrip?

7        A.    I don't know.  I don't understand.

8        Q.    You incorporated it in order to aid the business

9    efforts of Clover Cannastrip?

10        A.    No.

11        Q.    Didn't you just testify that the purpose of forming

12    this Irish entity was so that your competitors wouldn't know

13    where your manufacturing equipment was made?

14        A.    Yes.

15        Q.    And the manufacturing that we're referring to here

16    is the manufacturing that Clover Cannastrip was going to engage

17    in?

18        A.    No.  It was of the names of the equipment.  On the

19    manufacturing equipment, not the manufacturing of the strips

20    but on the actual equipment itself.

21        Q.    So some type of label on the machine?  Or can you

22    help me understand better what you're describing here?

23        A.    Yeah.  It would be the labels on the machinery

24    themselves.

25        Q.    And you wanted those labels to say "Haffelgad

 1   Switzerland"?

 2        A.    Yes.

 3        Q.    But who was using the machines?

 4        A.    Clover Cannastrip's, their machines.

 5        Q.    Okay.  So the -- the machines were going to have a

 6   label that said "Haffelgad Switzerland"?

 7        A.    Yes.

 8        Q.    And the machines were being used for Clover

 9   Cannastrip?

10        A.    Yes.

11        Q.    So that's the connection between Haffelgad and

12   Clover Cannastrip?

13        A.    I -- I -- I don't know what the connection would be

14   other than that's what's on the machines.

15        Q.    Did you use Haffelgad Switzerland for anything else

16   other than putting labels on these machines that were going to

17   be used by Clover Cannastrip?

18        A.    No.

19        Q.    You didn't report Haffelgad Switzerland on your

20   financial disclosure documents, did you?

21        A.    Yes, I did.

22        Q.    When?

23        A.    In the last few weeks with Michael Thurman, my new

24   counsel.

25        Q.    In the last few weeks?

1        A.    Yes.

2        Q.    When were they provided to the FTC?

3        A.    I -- I don't know.  I believe in the last few days.

4        Q.    Like yesterday, for example?

5        A.    I -- I don't know.

6        Q.    You did not report them to the FTC in October of

7    2018?

8        A.    No, I did not.

9        Q.    And you did not report Haffelgad Switzerland to the

10   FTC in November of 2018 either?

11       A.    No, I did not.

12       Q.    Now, Haffelgad Switzerland, that name appeared on a

13   number of invoices for machines coming from Shanghai Aligned.

14   Most of those invoices were dated in early October listing you

15   as the contact person.  But there was also an invoice listing

16   Haffelgad Switzerland from January of 2019; isn't that right?

17       A.    I -- I don't know.

18       Q.    So you don't remember receiving that invoice on

19   behalf of the company Haffelgad Switzerland?

20       A.    No.

21       Q.    Would it surprise you to learn that there was an

22   invoice to Haffelgad Switzerland from Shanghai Aligned from

23   January of this year?

24       A.    Yes.

25       Q.    That would surprise you.  Why?

```
 1          A.    I don't know of it.

 2          Q.    But you still control Haffelgad Switzerland to this

 3   day?

 4          A.    Yes.

 5          Q.    Now, in July of last year, you told Danielle Cadiz,

 6   otherwise known as Danielle Walker, who was Redwood

 7   Scientific's operations manager that you had already placed

 8   deposits on three machines; isn't that right?

 9          A.    I don't recall that.

10          Q.    Did you review the copy of the transcript that

11   Ms. Walker submitted to the FTC that was attached to these

12   filings, a transcript of the WhatsApp conversation between you

13   and Ms. Walker?

14          A.    Yes.

15          Q.    And did you see in that transcript the reference

16   from July 22nd, 2018 -- this is you writing here -- "Great.  We

17   are ready to close in Canada.  And we closed with actual mutual

18   fund last week.  We have deposits on three machines"?  Did you

19   write that?

20          A.    Uh, I -- if it's on there, I -- I would have.  I

21   believe, yeah.

22          Q.    So in July --

23          A.    Yes.

24          Q.    -- of 2018, you had made deposits on three machines

25   already?
```

1      A.    No, not by then.

2      Q.    But you told Ms. Walker that you had?

3      A.    Yes.

4      Q.    Ms. Walker was an employee of Redwood Scientific at

5   that point, or was she working with you in a consulting

6   position?

7      A.    I believe she was just consulting.

8      Q.    And so she was still carrying out work on behalf of

9   Redwood Scientific at that time.  Is that fair to say?

10      A.    Yeah.  Basic work, yes.

11      Q.    And you were okay with her understanding that you

12   had ordered three machines when you had not?

13      A.    I don't -- I can't speak to the context of the

14   WhatsApp text message and what was happening at that time.

15      Q.    Why?  Because you don't remember?

16      A.    Correct.

17      Q.    Now, you also asked Ms. Walker to put together

18   materials for potential investors; is that right?

19      A.    I -- I don't know.

20      Q.    In the transcript -- and I'm reading from an entry

21   on August 12th, 2018 -- you write to Ms. Walker, "Great.  We

22   need an all-in-one package.  One, PDF offering; two, PDF dec

23   Redwood; three, PDF dec cannabis; four, PDF cannabis

24   projections; five, PDF of company that wrote about us, pat

25   includes; six, link corp. video; seventh, link DocuSign

```
 1    offering."
 2              Were these investor materials that you asked her to
 3    put together?
 4        A.    I -- I don't recall.
 5        Q.    PDF offering, that doesn't refer to investment
 6    materials?
 7        A.    I -- once again, I don't recall.
 8        Q.    How else were you planning on having money come into
 9    the company if you weren't raising funds from potential
10    investors?
11        A.    Which company?  I'm sorry.
12        Q.    Well, here, when you're writing to Ms. Cadiz or
13    Ms. Walker, you reference both Redwood and cannabis products.
14    So I can't say.  Maybe you can help us understand.
15        A.    I -- I can't.  I don't recall.
16        Q.    Well, in July, were you raising money for both
17    Redwood and for Clover Cannastrip?
18        A.    I do not believe we were raising money for Clover
19    Cannastrip in July.
20        Q.    But you were raising money for Redwood Scientific in
21    July?
22        A.    Yes, we were.
23        Q.    And you also raised money for Clover Cannastrip, but
24    you just can't remember when?
25        A.    I do not believe we were raising money for Clover
```

1    Cannastrip in July.

2        Q.    How about in August when you wrote this message to

3    her?

4        A.    I -- I -- sometime in August, I believe the bankers

5    were working on Clover Cannastrip.

6        Q.    Who were you referring to when you say "the

7    bankers"?

8        A.    Haywood capital.

9        Q.    And it says here "cannabis projections."  Would that

10   be related to Clover Cannastrip?

11       A.    I don't know.  I don't recall.

12       Q.    Would it be related to any other entity that you had

13   involvement with in August of 2018?

14       A.    I -- I still don't know.

15       Q.    You're unsure of the entities that you were involved

16   in in August 2018 which would be related to cannabis?

17       A.    No.  I'm unsure as to over a year ago one line of a

18   text message and knowing exactly what it was all about.

19       Q.    So which businesses were involved in cannabis in

20   August of 2018?

21       A.    Involved how?

22       Q.    Of the entities that you were in control of, which

23   ones were involved in marketing or developing plans to market

24   cannabis products?

25       A.    I had no businesses that were going to be marketing

1   cannabis products.

2        Q.   Wasn't Clover Cannastrip going to market cannabis

3   products?

4        A.   Clover Cannastrip was going to co-brand so that it

5   could make products for distributors but not market them.

6        Q.   What type of products?

7        A.   THC strips.

8        Q.   And THC is a byproduct of cannabis?

9        A.   THC is a byproduct of the marijuana plant, yes.

10       Q.   Now, you also wrote in a declaration submitted to

11  this Court that you have performed work for Pharmastrip as a

12  consultant since December of 2018; is that correct?

13       A.   Yes.

14       Q.   And you have described your duties in this

15  declaration.  Can you briefly summarize for me your duties as a

16  consultant for Pharmastrip?

17       A.   Um, sure.  Worked on manufacturing, worked with

18  distributors, I've worked with flavor profiles, um, general

19  communications with individuals.

20       Q.   Which individuals?

21       A.   Uh, Mr. Poujade, their chief chemist, different

22  distributors.

23       Q.   Did you produce to the FTC any communications

24  between you and Mr. Poujade?

25       A.   No.  I -- I don't -- I don't believe so.

1      Q.    Did you communicate with Mr. Poujade using e-mail?

2      A.    Perhaps.  Very rarely.

3      Q.    Which e-mail address did you use when you were

4    communicating with Mr. Poujade?

5      A.    I used Jason@dislvs.com or KaiCardiff@yahoo.com.

6      Q.    So the first e-mail address you gave us -- I'm just

7    going to say Dissolves.com for the ease of the transcription

8    here.  Who else had e-mail addresses at Dissolves.com?

9      A.    I don't know.

10      Q.    Did you e-mail Mr. Poujade at the Dissolves.com

11    e-mail address?

12      A.    Oh, yes.  Sorry.  Mr. Poujade, yes.

13      Q.    Julie Green?

14      A.    I believe she had Dissolves, yes.

15      Q.    Dr. Yuan Yang?

16      A.    I think he has Dissolves also, I'm not sure.

17      Q.    Corina Grodek?

18      A.    No, not that I know of.

19      Q.    Any others that you can remember?

20      A.    I think I -- no.  Not that I can recall, but I'm --

21    I'm sure there are a few others but --

22      Q.    Does your wife have an @Dissolves.com e-mail

23    address?

24      A.    No.

25      Q.    So in addition to e-mailing occasionally with

1    Mr. Poujade, you communicated with him using other

2    communication methods like phone calls?

3         A.    Yes.

4         Q.    Did you meet with him in person as well?

5         A.    Yes.

6         Q.    Did those meetings take place at the Cathedral City

7    lab?

8         A.    Uh, yes.

9         Q.    Did you also have meetings with Mr. Poujade at his

10   office in Aliso Viejo?

11        A.    Yes.

12        Q.    And mainly, where did you meet with Mr. Poujade?

13        A.    Uh, we would meet at his office or -- you know, his

14   office mainly.

15        Q.    In Aliso Viejo?

16        A.    Yes.

17        Q.    And have you ever used text messaging to communicate

18   with Mr. Poujade?

19        A.    Sometimes.

20        Q.    Do you communicate with Mr. Poujade using any other

21   electronic forms of communication from your cell phone?

22        A.    Um, WhatsApp sometimes or some of the other apps,

23   Signal, WhatsApp.

24        Q.    Telegram?

25        A.    No.

68

1    Q.    So Signal, that's an end-to-end encrypted chat app?

2    A.    I -- I believe so.

3    Q.    And WhatsApp is also an end-to-end encrypted chat

4    app?

5    A.    Yeah.  Yes.

6    Q.    And you've communicated Mr. Poujade on both

7    platforms?

8    A.    I think mainly WhatsApp.  I don't know if Signal or

9    not but WhatsApp.

10    Q.    Did you produce any communications to the FTC from

11    your WhatsApp conversations with Mr. Poujade?

12    A.    No.

13    Q.    And did you produce to the FTC any communications

14    with Mr. Poujade using the app Signal?

15    A.    No.

16    Q.    You also spent time communicating with Ty Sherrell

17    of FX Web Media; isn't that right?

18    A.    Yes.

19    Q.    And Mr. Sherrell was responsible for helping launch

20    the DissolveResponsibly.com website; is that right?

21    A.    Yes.

22    Q.    And this is Pharmastrip's website?

23    A.    I believe it belongs to Pharmastrip, yes.

24    Q.    And did you communicate with Mr. Sherrell about the

25    content of this website?

**UNITED STATES DISTRICT COURT**

1    A.    Yes.

2    Q.    And, in fact, the FTC was able to recover some

3  handwritten notes from your desk that were collected on

4  October 12th that relate to many of the features that are

5  currently on the Dissolve.com -- DissolveResponsibly.com

6  website; is that right?

7    A.    I don't know.

8    Q.    Did you review the website capture of

9  DissolveResponsibly.com attached to the FTC's papers for these

10  contempt proceedings?

11    A.    I believe so.  Yes.

12    Q.    And do you remember reviewing aspects of that

13  website related to various flavors of the THC strip products?

14    A.    I -- I don't understand the question.  I'm sorry.

15    Q.    When you reviewed the capture of the website

16  DissolveResponsibly.com, there were multiple products

17  advertised on the website; is that right?

18    A.    No.  Advertised, meaning for sale?

19    Q.    Multiple products featured on the website.

20    A.    Yes.

21    Q.    And you came up with some of the names for those

22  products?

23    A.    Um, I wouldn't say I came up with those names, no.

24    Q.    But you were taking handwritten notes on some of the

25  names of those products?

1      A.   Yes.

2      Q.   And the same question with the flavors, did you take

3   notes regarding some of the flavors of these film strip

4   products that are now featured on the DissolveResponsibly.com

5   website?

6      A.   Yes.

7      Q.   Now, Mr. Cardiff, when you were running Redwood

8   Scientific, isn't it true that you used legal entity -- that

9   you've created legal entities sometimes using other people's

10   names?

11      A.   No.

12      Q.   So you didn't ask Ms. Walker to form legal entities

13   like LLCs or corporations for you where you listed someone's

14   name other than your own as the entity owner?

15      A.   No.

16      Q.   Or the entity registered agent?

17      A.   No.

18      Q.   So you don't remember instructing Ms. Walker in June

19   of 2018 to create an entity and to list someone named

20   Damon Gellar on the entity formation documents?

21      A.   I do remember that, but that was his entity.

22      Q.   So why didn't Mr. Gellar instruct Ms. Walker to form

23   the entity or why didn't he form it himself?

24      A.   Because he told me he didn't know how.

25      Q.   So you were just helping him?  You were just helping

1    him?

2         A.    We were going to work on a project together.

3         Q.    Didn't you also use your father's name on several

4    entities that you registered?

5         A.    Um, I don't -- several?

6         Q.    Did you use your father's name on an entity called

7    True & Honesty that was registered in Wyoming?

8         A.    Yes, I did.  That was for him.

9         Q.    But your father doesn't remember anything about that

10   entity, does he?

11        A.    My father's 90 years old and has a lot of trouble

12   with memory.

13        Q.    This entity was set up in 2018?

14        A.    Yes, it was.

15        Q.    And your 90-year-old father in 2018 was looking to

16   incorporate a business entity?

17        A.    He was looking for something to do from home.

18        Q.    But he didn't have any idea what True & Honesty was

19   supposed to do, did he?

20        A.    No, it never got off the ground.

21        Q.    And wasn't it your personal cell phone number that

22   was listed on some of the documents used to apply for merchant

23   account applications in his name?

24        A.    I can't speak to that.  I don't know.

25        Q.    Would it surprise you to learn that your personal

```
 1    cell phone number was listed on documents applying for merchant

 2    accounts in your father's name?

 3         A.    So he -- he applied for merchant accounts in my name

 4    with my cell phone?  I don't understand the question.

 5         Q.    Well, let me ask you a different question, then.

 6               Did you apply for merchant accounts in your father's

 7    name?

 8         A.    No.

 9         Q.    In the name of True & Honesty?

10         A.    No.

11         Q.    Did you instruct anyone else to do so?

12         A.    I -- I don't recall.

13         Q.    Did you ask Julie Green to do that?

14         A.    I -- I don't recall.

15         Q.    Did you apply for a bank account in your father's

16    name?

17         A.    I believe we got a bank account for that entity,

18    yes.

19         Q.    And that was something that you were responsible

20    for?

21         A.    What do you mean?

22         Q.    Well, you just said "we."  Are you including

23    yourself in that?

24         A.    Yes.  I believe I helped him with that, yes.

25         Q.    Was anyone else involved?
```

**UNITED STATES DISTRICT COURT**

1      A.    No.  Not that I -- not that I recall.

2      Q.    And your father was unaware of this bank account;

3  isn't that right?

4      A.    I -- I don't know.

5      Q.    You attended his deposition; isn't that right?

6      A.    I -- I don't -- I don't know.

7      Q.    You don't know if you attended your father's

8  deposition?

9      A.    I -- no, I don't know if he remembers that bank

10  account or not.  It never had any activity that I know of.

11      Q.    Do you remember me discussing the bank account with

12  your father at his deposition?

13      A.    I vaguely remember that, yes.

14      Q.    But you don't remember him saying that he didn't

15  know anything about it?

16      A.    No, I don't.

17      Q.    Would it surprise you to learn that he knows nothing

18  about it?

19      A.    No.

20      Q.    Now, you say that you started speaking with

21  Mr. Poujade about manufacturing film strips that contained

22  cannabis byproducts in June of 2018; is that right?

23      A.    I don't know if I started speaking to him or he

24  started speaking to me.  Um, I -- I think he approached me with

25  the subject first.

1      Q.    And in your declaration submitted in support of your

2  opposition to the FTC's contempt motion, you say, "Beginning in

3  about June 2018, Jacques Poujade, a long-time friend and former

4  business associate, and I began to have discussions about the

5  possibility of using my experience."  And I'm -- I'm just

6  reading this back to you to jog your memory on the date June

7  2018.  That -- that sounds correct to you?

8      A.    I -- I believe it's around then.

9      Q.    So you were speaking with Mr. Poujade initially in

10  June of 2018, but you had actually been e-mailing with other

11  business associates as early as April and May of 2018 about

12  infusing cannabis byproducts on film strips, hadn't you?

13      A.    I had been approached by many people because of the

14  oral thin film space we were in about the idea.

15      Q.    So it wasn't an original idea of Mr. Poujade?

16      A.    What wasn't an original idea?

17      Q.    Cannabis film strips.

18      A.    Uh, I don't -- I don't know if it was original or

19  not.

20      Q.    Well, you had been speaking about the idea to other

21  people before he came to you; isn't that right?

22      A.    Well, other people had been speaking to me.  We were

23  getting calls about it quite frequently.

24      Q.    Before June of 2018?

25      A.    Yes.

1      Q.    Now, Mr. Poujade has also stated in a declaration

2  that he came up with the name Pharmastrip in August of 2018.

3  But you were using the name Pharmastrip as early as July of

4  2018, weren't you?

5      A.    Uh, I don't exactly know when we started using that

6  name.

7      Q.    Didn't you sign an exclusive reseller agreement with

8  a company called Oregon Thin Film Distribution as president of

9  Pharmastrip on July 1st of 2018?

10     A.    I don't -- I don't know.

11     Q.    Would it surprise you to know that we've obtained an

12 exclusive reseller agreement between you and Oregon Thin Film

13 Distribution that was executed on July 1st of 2018 as president

14 of Pharmastrip?

15     A.    It would not.

16     Q.    So you were using the name Pharmastrip before August

17 of 2018?

18     A.    I can't say that I was using the name Pharmastrip

19 for -- at any time before -- anywhere around that time.  I -- I

20 don't know -- I can't even speak to that distribution agreement

21 that you're speaking of.

22     Q.    This was a distribution agreement that we also found

23 another copy in the Redwood Scientific files at the immediate

24 access of the Redwood business on October 12th.

25         So is it your testimony that you don't remember

1   using this name or -- or that you can't remember when it was

2   that you first used the name?  I'm just trying to understand --

3       A.   It's my testimony that I don't remember when we

4   started using the name, and I don't remember when exactly the

5   name came to be.

6       Q.   Did you purchase the domain Pharmastrip.com on

7   June 25th of 2018?

8       A.   I -- I don't believe I did.  No.

9       Q.   Did your wife purchase the domain Pharmastrip.com on

10  June 25th?

11      A.   No.

12      Q.   So it's just a coincidence that your wife's credit

13  card was charged by GoDaddy.com on the same day that that

14  domain was registered by GoDaddy.com?

15      A.   I have -- I can't -- I -- I have -- I don't know.

16      Q.   Did you register the domain Pharmastrip.com?

17      A.   I don't even know how to register a domain, so the

18  answer is no.

19      Q.   Did you purchase the domain Pharmastrip.com?

20      A.   No.

21      Q.   So you were fielding questions from business

22  associates, potential investors in April or May of 2018.  You

23  began discussing cannabis film strips with Mr. Poujade in June.

24  You registered Clover Cannastrip on July 31st.  We have these

25  records of conversations between you and Ms. Walker discussing

1    various needs for promoting the Clover Cannastrip business or

2    at least getting materials compiled.  You've testified that you

3    took handwritten notes on flavors and product ideas that now

4    appear on the DissolveResponsibly.com website.  And you've also

5    testified that you worked as a consultant for Pharmastrip

6    beginning in December of 2018.

7              It seems like a significant amount of time to me

8    that you've invested in this business.  But it is your

9    testimony today that in August of 2018, when Haywood Securities

10   expressed some concern about your involvement in the business,

11   that you just decided to walk away?

12        A.    No.  That's not my testimony.  I didn't decide to

13   walk away.  I decided I would distance myself as a shareholder,

14   and eventually I distanced myself even as a director.  That's

15   my testimony.

16        Q.    So you continued to conduct business on behalf of

17   Clover Cannastrip until when?

18        A.    I continued to help the company as best I could, um,

19   until I -- you know, just recently.

20        Q.    Like how recently?

21        A.    This last month.

22        Q.    So you've been involved with Clover Cannastrip

23   continuously since it was first formed in July of 2018 through

24   just a few weeks ago?

25        A.    I was with Pharmastrip.  And, I mean, I would say I

**UNITED STATES DISTRICT COURT**

1   stepped way back as a non-officer shareholder/director and

2   helped the company as best I could to see it, you know, get on

3   its feet and move forward to see what can become of it.  But --

4   that would be my testimony.

5         Q.    Now, you also submitted a declaration to this Court

6   when you were seeking the return of your passport attaching a

7   letter signed by Richard Poujade who, according to the letter,

8   is the president and CEO of Pharmastrip.  And you told this

9   Court that you had been offered a job by Pharmastrip, you

10  needed your passport back so you could report to your job in

11  Toronto.  Is that right?

12        A.    Yes.

13        Q.    And at the time that this letter was purportedly

14  written, there was no office for Pharmastrip in Toronto, was

15  there?

16        A.    There actually was a virtual office that would

17  convert into a permanent office.  All I had to do was show up,

18  and it would automatically convert from a virtual status into

19  an office suite status.

20              THE COURT:  With that, we're going to take a short

21  recess.  Please return in ten minutes, and we'll start again at

22  five to the hour.

23              (Break taken.)

24              THE COURT:  We're back on the record.  Let's

25  continue.

**UNITED STATES DISTRICT COURT**

1              THE COURTROOM DEPUTY:  Please be seated.

2              THE COURT:  So I just want to make sure that

3     everyone understands, because of what's at issue here, I'm

4     going to give both sides an opportunity to conduct full and

5     complete examination of all of the witnesses.

6         Q.    (BY MS. SANGER:)  Mr. Cardiff, I'd like to just

7     return to a topic of conversation before we took the break,

8     just to make sure that the record is clear.  In your

9     submissions and response to these contempt proceedings, did you

10    submit a declaration on behalf of Haywood Securities?

11        A.    No.  I don't believe I did.

12        Q.    And so the only thing we know -- the only way that

13    we know anything about your conversations with Haywood is from

14    your own recollection; is that right?

15        A.    I don't know.

16        Q.    Or from the recollection of Mr. Poujade who has also

17    made some characterizations about conversations with Haywood?

18        A.    I believe so.

19        Q.    Mr. Cardiff, you're familiar with a company called

20    Alphatech Holdings; is that right?

21        A.    Yes.

22        Q.    And Alphatech Holdings had a bank account at

23    U.S. Bank.  This bank account was used to pay for your

24    expenses; is that right?

25        A.    Yes.

**UNITED STATES DISTRICT COURT**

1    Q.    Now, I'm just putting up on the screen here for ease

2  of conversation an excerpt from the declaration of

3  Connor Sands.  This excerpt was part of the FTC's reply in

4  support of the contempt motion.  This is Table 3 from

5  Mr. Sands' declaration.  And it depicts information pulled from

6  the Alphatech bank accounts listing Cardiff personal expenses

7  paid by Alphatech between November of 2018 and May of 2019.

8         And Mr. Sands wrote in his declaration that these

9  expenses were identified by Peter Picciano who's the signatory

10  of the account and also identified by you in a submission you

11  made to the FTC in response to our request for more explanation

12  about who had been paying your car leases earlier this year.

13         So is it true that the Alphatech bank account paid

14  for charges from your Barclays card?

15    A.    Yes.

16    Q.    And that the Alphatech bank account paid charges for

17  your car leases?

18    A.    Yes.

19    Q.    And the car leases in question here, there's a lease

20  for a Bentley; is that right?

21    A.    Yes.

22    Q.    And a lease for a Porsche?

23    A.    Yes.

24    Q.    And a lease for a Range Rover?

25    A.    Yes.

1    Q.    Did the Alphatech bank account pay for any other car

2    leases?

3    A.    No.  Not that I know of.

4    Q.    And did the Alphatech bank account also pay for your

5    AMEX bills?

6    A.    Yes.

7    Q.    And the Alphatech bank account paid for monthly

8    payments at Claremont Manor; is that right?

9    A.    Yes.

10    Q.    Claremont Manor is where your father lives?

11    A.    That's right.

12    Q.    Mr. Cardiff, as I scroll through this table, are

13    there any expenses here that you don't recognize as expenses

14    that were made on your behalf?  Let's take the screen that's in

15    front of you now which shows expenses from November 13th, 2018,

16    through November 21st, 2018.

17    A.    Yes.

18    Q.    There are expenses here that you don't recognize?

19    A.    No, no.  I recognize them.  I apologize.  I

20    recognize these expenses.

21    Q.    So these are expenses for you personally or for your

22    family expenses?

23    A.    Yes.

24    Q.    And did you review this table when you were

25    reviewing the filings in advance of this hearing?

1        A.    I -- I've seen this table several times.  I don't

2   believe I reviewed it in advance of the hearing.

3        Q.    Did anything jump out at you from this table that

4   seemed like an incorrect recording of expenses made on your

5   behalf from the Alphatech account?

6        A.    No, not necessarily, other than they're constantly

7   referencing a Lamborghini payment, which is not mine.

8             THE COURT:  Before you continue --

9             THE WITNESS:  Yes.

10            THE COURT:  -- how were your bills paid from

11  Alpha -- from the Alphatech account?

12            THE WITNESS:  The Alphatech would pay the bills

13  either online or by writing a check.

14            THE COURT:  So you would send the bill to someone at

15  Alphatech?

16            THE WITNESS:  If it was a check, we would -- we

17  would tell them what the bill was and get a check --

18            THE COURT:  Let's put that -- the exhibit back up,

19  please.

20            THE WITNESS:  Yes.

21            THE COURT:  And please only testify as to what you

22  did, if you did anything.

23            So there's a bill here for 1217 for a Porsche.  Do

24  you see it?

25            THE WITNESS:  Yes, sir.

1          THE COURT:  In the sum of $1,566.71.

2          THE WITNESS:  Yes, I see it.

3          THE COURT:  How was that bill paid by Alphatech?

4          THE WITNESS:  I did not pay that bill.  My wife paid

5    it.

6          THE COURT:  How was that done?  How was that

7    accomplished?  Was there a checkbook, a debit card?  How was

8    that done?

9          THE WITNESS:  Either electronically online or over

10   the phone.

11         THE COURT:  So all of the bills that are reflected

12   in this exhibit, did you pay any of them?

13         THE WITNESS:  I believe I paid the Claremont Manor

14   bill.

15         THE COURT:  And then, again, that was done through

16   what mechanism?

17         THE WITNESS:  With a check.

18         THE COURT:  And did your wife pay with a check?

19         THE WITNESS:  She would pay either online or over

20   the phone.

21         MS. SANGER:  Your Honor, if I may put another

22   demonstrative up on the screen here that dovetails with the

23   Court's question.  I do have a few questions about some of the

24   checks that were written from the Alphatech account.

25         THE COURT:  Yes.

 1        Q.    (BY MS. SANGER:)  Mr. Cardiff, on the screen before

 2   you -- and we can enlarge it if you need me to -- is an excerpt

 3   from Docket No. 157-1.  This begins -- this excerpt begins on

 4   page 118.

 5              I'm going to rotate the image.  Are you able to read

 6   the image on the screen in front of you?

 7        A.    Yes, ma'am.  Yes.

 8        Q.    Okay.  So "Paid to the Order of," and it says

 9   Francisco Castro, $600.  Is this your handwriting?

10        A.    Yes, it is.

11        Q.    And so you had possession of the Alphatech checkbook

12   when you wrote this check?

13        A.    No.  Just this check.

14        Q.    Just this single check?

15        A.    Um, yes.  I may have had one or two that needed to

16   be paid, so I was given these checks and I told them what the

17   amounts would be.

18        Q.    You were given blank checks from the Alphatech

19   account?

20        A.    Well, just to fill in the amount.  As long as the

21   amount was correct, yes.

22        Q.    Who gave you the blank checks?

23        A.    I believe it was Peter Picciano.

24        Q.    Peter Picciano handed these blank checks to you?

25        A.    I believe so, but I don't fully recall but I'm

1   pretty sure it was.

2       Q.    It wasn't Mr. Poujade who handed you the blank

3   checks?

4       A.    I don't believe it ever was, but it may have been

5   but I don't think so.  I think it was Peter Picciano.

6           THE COURT:  You don't know one way or the other?

7           THE WITNESS:  I would say -- I would say this, I

8   don't remember Mr. Poujade ever handing me any blank checks.  I

9   do remember Peter Picciano handing me these checks when I

10  needed to pay a bill.

11      Q.    (BY MS. SANGER:)  So Mr. Picciano would hand you a

12  blank check -- Mr. Picciano has testified at deposition that he

13  didn't know when these checks were going out what the amounts

14  would be or what they would pay for.  Does that comport with

15  your recollection of how you came to obtain these checks?

16      A.    I -- I would tell him what the amounts were and who

17  they were for, yes.

18      Q.    And how did you communicate that information to

19  Mr. Picciano?

20      A.    In person.

21      Q.    So you would tell Mr. Picciano, "I need $600 for

22  Francisco Castro" and he would hand you a blank check?

23      A.    I would tell him I needed $600.  I need to write a

24  check for $600 against my loan.  And he would hand me a check.

25  And then he would tell me to bring it back with who the payee

1    was.

2       Q.    So he didn't write the check even though he was the

3    one in the possession -- in possession of the checks when you

4    told him the amount and the recipient, the intended recipient?

5       A.    That's correct.

6       Q.    He let you write that information on the check?

7       A.    Yes.

8       Q.    But it's your testimony that you never had

9    possession of the Alphatech checkbook?

10      A.    No.  Never.

11      Q.    So this process of going and meeting with

12   Mr. Picciano in person, telling him how much money you needed

13   for a particular expense, this was something you did.  Is this

14   something that your wife also did from time to time?

15      A.    No.

16            THE COURT:  Is that your signature on the check?

17            THE WITNESS:  No, sir.

18            THE COURT:  That's not?

19            THE WITNESS:  No, sir.

20      Q.    (BY MS. SANGER:)  Is this Mr. Picciano's signature?

21      A.    I do not know.  I do not know.

22      Q.    We have testimony from Mr. Picciano identifying this

23   as his signature.

24            So he would hand you the blank check.  Was his

25   signature already on the check at the time that he gave it to

1    you?

2        A.    Yes.

3        Q.    So a blank, signed check was what you received from

4    Mr. Picciano?

5        A.    Yes.

6        Q.    And Mr. Picciano has testified that he wouldn't know

7    the amount or the recipient of the expense until the account

8    statement came in at the end of the month.  Does that sound

9    like that was the process that you went through with him for

10   making these expenses?

11       A.    No.

12       Q.    So Mr. Picciano testified incorrectly?

13       A.    I -- I don't know what he recalls or testified to or

14   how he reconciled everything at the end of the month.  But I

15   would let him know what the amounts were, um, and he would get

16   me the checks.

17       Q.    And then after he gave you the blank check with his

18   signature on it, what was your interaction with Mr. Picciano

19   regarding the expense after that point?

20       A.    Uh, I'd turn back in the stub that was below the

21   check.

22       Q.    What information was on the stub?

23       A.    The payee and amount.

24       Q.    But that's not reflected on the image we're looking

25   at here?

```
 1        A.    No, it's not.

 2        Q.    And was this information that you also wrote by

 3   hand?

 4        A.    Yes.

 5        Q.    On this second page, which is page 119 of the same

 6   Docket 157-1, is this also your handwriting?

 7        A.    It looks like my handwriting, with the exception of

 8   the memo section.  That is not my handwriting.

 9        Q.    The "Paid to the Order of" section is your

10   handwriting?

11        A.    Yes.

12        Q.    Let's take a look at the check that appears on the

13   bottom of page 120.  This is Check No. 3110.  Do you recognize

14   the handwriting on this check?

15        A.    Yes, I do.

16        Q.    Whose handwriting is it?

17        A.    It looks like my handwriting and my wife's

18   handwriting.

19        Q.    So your wife also participated in writing these

20   checks from the Alphatech account?

21        A.    I wrote this check.  I don't know -- the memo

22   section looks like my wife's handwriting, as well as the date.

23   But that's my handwriting writing the check.

24        Q.    And so did she add her notations before or after you

25   wrote your portion of the check?
```

1        A.    I don't know.

2        Q.    On page 121, is this your handwriting as well on the

3    Alphatech Holdings check?

4        A.    I'm on page 132 -- or my screen didn't change.

5        Q.    Do you see two checks in front of you made out to

6    John Ford?

7        A.    Yes.  I got it.  Yes.

8        Q.    Okay.  And on the bottom check to John Ford, this is

9    Check No. 3111.  Is that your handwriting?

10       A.    Yes, it is.

11       Q.    Let's move to the next page, page 122.  There are

12   two checks here made out to Claremont Manor.  Do you see those

13   checks?

14       A.    Yes.

15       Q.    Do you recognize the handwriting?

16       A.    Uh, looks -- looks like my wife's handwriting.

17       Q.    Did your wife typically write out checks to

18   Claremont Manor?

19       A.    Yes, she did.

20       Q.    Do you have any reason to believe this is not your

21   wife's handwriting?

22       A.    No, I do not.

23       Q.    This is page 123, also of Docket 157-1.  Two checks

24   again to Claremont Manor.

25            Do you recognize the handwriting in the top check,

1   Check No. 3108 from the Alphatech Holdings account?

2      A.   It looks like a combination of my handwriting and

3  someone else's handwriting.

4      Q.   Which parts do you think look like your handwriting?

5      A.   "Claremont Manor."

6      Q.   Who else's handwriting appears on this check?

7      A.   I -- I don't know.  I don't recognize the memo

8  section.

9      Q.   You don't recognize the handwriting in the memo

10  section?

11      A.   No, I don't.

12      Q.   Moving to page 124, looking at the memo section of

13  the Alphatech Holdings account, Check 3068, looking at the memo

14  section which has been highlighted here, do you recognize that

15  as your wife's handwriting?

16      A.   Looks similar, yes.

17      Q.   So it's not your handwriting, is it?

18      A.   No.  It does not look like my handwriting.

19      Q.   Would anyone besides you or your wife be writing

20  checks from the Alphatech Holdings account to Claremont Manor?

21      A.   No, there would not.

22      Q.   So isn't it true that your wife was also given blank

23  checks for the Alphatech Holdings account?

24      A.   Yeah.  It's possible I may have given her one, yes,

25  to make a payment, yes.  Definitely.

1      Q.    So your testimony is that your wife obtained these

2   blank checks from you?

3      A.    Yes.

4      Q.    That she filled them out?

5      A.    It's -- yes, it's very possible.  Yes.

6      Q.    Mr. Cardiff, in the declaration that you submitted

7   to this Court, you wrote, "But for the generosity of a good

8   friend who has been willing to loan us some funds, we would be

9   all but destitute.  Thus far, I have borrowed funds from a

10  friend to pay for living expenses and some small portion of

11  attorneys' fees and costs.  But I cannot continue to expect to

12  rely on the charity of a close family friend to survive."

13         Do you remember writing that?

14     A.    Yes, I do.

15     Q.    And earlier we reviewed a chart that showed some of

16  the expenses that were paid on your behalf by the Alphatech

17  Holdings account.  I'll represent to you that that chart

18  doesn't contain any payments to your attorney at the time,

19  Mr. Jim White, but you did testify that this loan from a friend

20  went to pay some small portion of attorneys' fees.

21         So how were your attorneys' fees paid?

22     A.    I'm sorry.  I'm -- I'm -- I don't understand.  The

23  question again?

24     Q.    So I'll represent to you that there's no record in

25  the Alphatech Holdings bank account records of payment to your

1    attorney.  So I'm asking you:  What was the source of payment

2    to your attorney?

3        A.    So the Alphatech payments are against the loan that

4    was given to me from Alphatech.  So the payments for counsel, I

5    believe, have come from Mr. Poujade personally.

6        Q.    So your attorney Jim White was paid personally by

7    Mr. Poujade?

8        A.    I can't speak to the source of funds.  I don't know.

9        Q.    So you hired an attorney, but you don't know the

10   source of funds you used to pay him?

11       A.    I -- I didn't have any funds to pay him.

12       Q.    So who took care of paying your attorney?

13       A.    Mr. Poujade helped with paying my attorney.

14       Q.    So you went to Mr. Poujade and you said, "Here's the

15   name of my attorney, I need you to pay him."  And you have no

16   idea from what source the payment was made?

17       A.    That -- I went to Mr. Poujade and said I need to get

18   counsel here.  I need some help on getting counsel.  And from

19   that point forward, he helped with paying the attorneys' fees.

20   I don't know the source.

21       Q.    Have you taken any steps, since turning over your

22   passports to the receiver in November of 2018, to replace your

23   U.S. passport?

24       A.    No, I have not.

25       Q.    Have you taken any steps, since turning over your

1    passports to the receiver in November 2018, to replace your

2    Irish passport?

3         A.    I have not taken those steps.

4         Q.    So you've done nothing to try to replace it?

5         A.    I -- I have not done anything, no.

6         Q.    Did you report your Irish passport lost or stolen to

7    the Irish consulate?

8         A.    The Irish Consulate reported it stolen.

9         Q.    They did?

10        A.    Yes.

11        Q.    The Irish Consulate reported that your passport --

12        A.    I'm sorry.  Lost.  Excuse me.  Lost.  Not stolen.  I

13   apologize.

14        Q.    The Irish Consulate reported to whom that your

15   passport had been lost?

16        A.    I don't know.

17        Q.    How do you know that the Irish Consulate did this?

18        A.    They contacted me early on after the November

19   hearing.

20        Q.    The Irish Consulate reached out to you after the

21   hearing in November --

22        A.    Yes.

23        Q.    -- to inform you that your Irish passport had been

24   lost?

25        A.    No.  To ask me if I knew its location.  And I said I

1   do not, it's with the receiver.

2        Q.    So the Irish Consulate, unprompted by you, reached

3   out to you at some point last year after the November hearing

4   to ask you if you knew where your passport was?

5        A.    No.  They reached out to me to ask if I needed

6   support from the Irish Consulate, to which I said no.

7        Q.    The Irish Consulate contacted you in November of

8   2018?

9        A.    I think it was November -- no, December -- December

10  or January.  Maybe it was -- it was December -- right around

11  December, January.

12       Q.    Unprompted by you is your testimony?

13       A.    Yes.

14       Q.    The Irish Consulate reached out to you.  They said,

15  "Do you need assistance?  Do you know where your passport is?"

16       A.    They said, "We have legal assistance available in

17  some situations if you need help."  And I went through the

18  situation with them, and they said, "We" -- "We don't have any

19  assistance available for your situation."

20       Q.    Prior to November of 2018, had the Irish Consulate

21  ever reached out to you in the past asking if you needed help

22  resolving any legal issues?

23       A.    No.  But they had reached out many times in the

24  past.

25       Q.    So the Irish Consulate just calls you on a regular

```
 1   basis?
 2        A.    No, because our daughter also has Irish citizenship.
 3   So I've got a very familiar relationship with them.
 4        Q.    So they reached out to you to see if you needed help
 5   with your daughter's passport?
 6        A.    No.  Oh, yes, they have.  Yes, they have.
 7        Q.    Proactively?
 8        A.    Yes.  No, no, no.  Not proactively, no.
 9        Q.    But just so I understand, you did not contact the
10   Irish Consulate after the preliminary injunction hearing here
11   in November?
12        A.    They contacted me, I contacted them, they contacted
13   me.
14        Q.    Who made the first contact?
15        A.    I believe they did.
16        Q.    So they reached out to you --
17        A.    Yes.
18        Q.    -- after you appeared in this court in November?
19        A.    Yes.
20        Q.    Wanting to know if you needed any assistance?
21        A.    Legal aid.
22        Q.    Legal aid.
23              So other than these conversations that were
24   instigated by the Irish Consulate, have you taken any other
25   steps to replace your Irish passport since you turned it over
```

1   to the receiver?

2       A.    They sent me a replacement passport.

3       Q.    So you have an Irish passport in your possession

4   currently?

5       A.    I do.  And I made counsel aware of it.  And counsel

6   told me, "Just park it, don't use it, you're not allowed to

7   travel."

8             I said, "I understand."

9       Q.    When did this conversation take place?

10      A.    Um, as soon as we -- I had counsel, which was

11  Mr. White.

12      Q.    So your testimony today is that you informed your

13  lawyer, Mr. White, that you were in possession of a currently

14  valid Irish passport and he told you just to hang on to it?

15      A.    Yes.  He said, "You have an order from the Court not

16  to travel or" -- "and you should just park that.  Just don't

17  touch it.  Don't use it.  You're not allowed to use it."

18            I said, "I understand.  I just want you to know that

19  they" -- "they sent me one."

20            MS. SANGER:  Your Honor, if I --

21            THE WITNESS:  I have never used it.

22            MS. SANGER:  Your Honor, if I can just request one

23  minute to confer with co-counsel.

24            THE COURT:  Yes.

25            (Pause in the proceedings.)

```
 1          MS. SANGER:  Your Honor, I'll just make one
 2   clarification for the record.  In case it's not clear, the
 3   Table -- Table No. 3 of the Sands declaration that we were
 4   earlier referring to listing Cardiff expenses paid out of the
 5   Alphatech account is -- can be found at Docket 157-1, page 11
 6   of 141 pages.
 7          And other than that, I just have one more line of
 8   questioning for Mr. Cardiff.
 9          THE WITNESS:  Can I correct my statement on
10   something important?
11      Q.   (BY MS. SANGER:)  Sure.
12      A.   I did have -- we did actually have lots of
13   interaction with them with our daughter's passport about four
14   months ago because it's expired.  So we did have a lot of
15   interaction with the Irish Consulate regarding the renewal of
16   our daughter's passport.
17      Q.   So about four months ago, you renewed your
18   daughter's Irish passport?
19      A.   No.  It didn't get renewed.
20      Q.   You didn't renew your daughter's --
21      A.   We tried to get it renewed, and we had to send a
22   bunch of documents over there because she's a minor.  And they
23   are -- they were not able to complete the renewal process.
24      Q.   And at the time that you were engaging in this
25   attempt to renew your daughter's passport, did you also submit
```

```
 1    any documentation regarding your own passport?

 2         A.    I don't believe I did.

 3               THE COURT:  Wait.  You don't remember one way or the

 4    other, or you're saying you did not?

 5               THE WITNESS:  I'm sorry.  I -- I don't remember one

 6    way -- I don't think I did, no.

 7               THE COURT:  You don't know?

 8               THE WITNESS:  I don't know.  I don't know.

 9         Q.    (BY MS. SANGER:)  But at the end of the day, you did

10    end up with a new Irish passport?

11         A.    Yes.

12         Q.    And you haven't turned that over to the receiver?

13         A.    I have not.

14               THE COURT:  That's a forthwith order today.

15               MR. THURMAN:  Thank you, Your Honor.

16               MR. FLETCHER:  Thank you, Your Honor.

17               THE COURT:  Who has custody of that passport?

18    Mr. White?

19               MR. WHITE:  I do not, Your Honor.

20               THE COURT:  Who has custody of the passport?

21               MR. WHITE:  I do not, sir.  I do not know.

22               THE COURT:  Who has custody of the passport?

23               THE WITNESS:  We have custody of it.

24               THE COURT:  Who's "we," sir?

25               THE WITNESS:  My wife and I.
```

```
1              THE COURT:  Where is it?

2              THE WITNESS:  It's in our home, in our -- in a desk

3    drawer.

4              THE COURT:  You may continue.

5        Q.   (BY MS. SANGER:)  So since the TRO was entered, you

6    haven't taken any steps to turn over the Clover Cannastrip

7    funds in the TD Bank account to the receiver; is that right?

8        A.   That is correct.

9        Q.   And you haven't taken any other steps to repatriate

10   any other money held in foreign bank accounts for which you're

11   a signatory?

12       A.   No.  That -- that is incorrect.  I -- I've taken a

13   lot of steps to repatriate $1350 in Australia.  However, once

14   again, I haven't used that account in so long, they want me to

15   go to Australia to close the account or transfer the money

16   because I can't do it from here.

17       Q.   And other than this account in Australia, have you

18   taken any other steps to repatriate any funds in accounts for

19   which you're a signatory?

20       A.   I -- I -- I believe I -- we have worked to make sure

21   everything's repatriated, yes.

22       Q.   Can you explain some of the steps that you have

23   taken towards that work that you just described?

24       A.   Um, we made a large -- you know, making a list of

25   bank accounts that I was a signatory on or have access to,
```

1    making sure that they're either in the hands of the receiver,

2    they're either closed, they have no money in them, or there's

3    no access to any money to make sure that it's all with the

4    receivership.

5        Q.   Have you taken any steps to repatriate funds in the

6    People United For Christians account at TD Bank in Canada?

7        A.   Yes, I have.

8        Q.   And have you repatriated those funds and turned them

9    over to the receiver?

10       A.   Those funds require that I go, once again, to Canada

11   to wire those money -- there's no way to wire unless you go

12   in-branch in Canada.

13       Q.   So there's money in a People United For Christians

14   account at TD Canada for which you're a signatory?

15       A.   Yes.  I believe there's $2800 or $3200 in that

16   account.

17       Q.   And you haven't successfully turned it over to the

18   receiver?

19       A.   No, I have not.

20       Q.   Other than the bank accounts that you reported on

21   the financial disclosures that were submitted to the FTC

22   yesterday, are there any other foreign bank accounts for which

23   you are a signatory?

24       A.   No, not that -- not that I know of.

25       Q.   And have you taken any steps to repatriate funds

```
 1    from accounts in the name of Pharmastrip, which is a subsidiary

 2    of Clover Cannastrip?

 3         A.   I don't have the ability to do that.

 4         Q.   So you've taken no steps?

 5         A.   I've -- I don't -- I have not taken any steps

 6    because I don't have the ability to do so.

 7              MS. SANGER:  All right.  Your Honor, that concludes

 8    my questioning for now.  I just request that if a new issue

 9    comes up for which the FTC feels a strong need to respond, that

10    we reserve our rights to do a short redirect with Mr. Cardiff

11    later.

12              THE COURT:  Yes.

13              Mr. -- who's going to the conduct examination?

14    Mr. Thurman?

15              MR. THURMAN:  Yes, Mr. Thurman.  Thank you,

16    Your Honor.

17              THE COURT:  And I'd like you to clarify -- clear up

18    the issue regarding the passport.  There was a clear order back

19    on November 12th, 2018, that Mr. Cardiff was to turn over all

20    foreign and domestic passports.

21              MR. THURMAN:  Yes.  We'll make sure that gets done

22    tomorrow morning, if we're returning here.  And if we aren't

23    returning here, we'll make sure it's delivered to --

24              THE COURT:  You'll be returning here.

25              MR. THURMAN:  Thank you.  And we'll make sure that
```

```
 1   happens.
 2              THE COURT:  I'd like you to clarify why it wasn't
 3   turned over prior to today.  That needs to be clarified with
 4   your witness.
 5              MR. THURMAN:  And I -- I believe the witness
 6   addressed it.
 7              THE COURT:  I think it needs more clarification.
 8              MR. THURMAN:  Okay.
 9                      REDIRECT EXAMINATION
10   BY MR. THURMAN:
11      Q.   Mr. Cardiff, so if you can explain the circumstances
12   under which, um, you made the decision to retain the passport
13   rather than provide it to the receiver.  And this is the
14   replacement passport that Ireland apparently sent to you.
15      A.   Yes.  So I would not travel, of course, without the
16   Court's permission.  We had turned over Irish and U.S.
17   passports.  And -- and months later, they sent another Irish
18   passport to which I knew I can't use.  So we parked it in a
19   drawer.
20              Hence, the -- our request for our return for
21   passports just last month, um, knowing that it's -- you know,
22   it's useless.  It can't be used without the Court's permission
23   and Your Honor's permission.
24              THE COURT:  Sir, what part of the order did you not
25   understand?  The order required you to surrender all domestic
```

1   and foreign passports to the receiver on or before

2   November 12th, 2018.

3           THE WITNESS:  We -- we did that, Your Honor.

4           THE COURT:  You currently have a passport in your

5   possession.

6           THE WITNESS:  They sent me another one.

7           THE COURT:  I understand that.  What part of

8   "surrender" do you not understand?

9           THE WITNESS:  I -- I apologize.  It's my -- my

10  error.

11          THE COURT:  When did you receive the passport?

12          THE WITNESS:  I believe it was March, around March.

13          THE COURT:  Of --

14          THE WITNESS:  Of 2019.

15          THE COURT:  And you've had the passport in your

16  possession since March of 2019?

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Did you ever inform the receiver?

19          THE WITNESS:  I do not believe we informed the

20  receiver of this, Your Honor.

21          THE COURT:  And you've kept it since then?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  And the first time you disclosed it was

24  today?

25          THE WITNESS:  Yes, Your Honor.

1          THE COURT:  And you did this based on the advice of

2     counsel, Mr. White?

3          THE WITNESS:  I -- yes.  I -- they -- the

4     conversation was that it was a travel order and that I cannot

5     travel, you cannot use it, you shouldn't --

6          THE COURT:  You did not return it to -- or surrender

7     it to the receiver based on advice of counsel.  That's your

8     testimony?

9          THE WITNESS:  No, no, no.  No, it was --

10         THE COURT:  Explain your testimony, sir.

11         THE WITNESS:  My testimony is you cannot use it, you

12    should -- you cannot use it.  You've turned over your

13    passports.  There is an order that if you need your passports

14    or you need to travel, we have to ask the Court.

15         THE COURT:  You didn't understand the word

16    "surrender"?

17         THE WITNESS:  I did understand it, Your Honor.

18         THE COURT:  And why didn't you turn it over?

19         THE WITNESS:  We turned -- I -- my error.  My error.

20         THE COURT:  Enough -- enough is enough.

21         Continue.

22         MR. THURMAN:  Thank you, Your Honor.

23     Q.   (BY MR. THURMAN:)  At the conclusion of counsel's

24    examination, she asked you about your ability to repatriate the

25    Pharmastrip's funds.  Why do you not have the ability to

1   repatriate the Pharmastrip's funds?

2        A.    I -- I'm not -- I'm not -- I'm not in control of

3   those funds or I can't direct those funds.

4        Q.    Are you an officer, director, or shareholder of

5   Pharmastrip?

6        A.    No.

7        Q.    Are you a signatory on any Pharmastrip account?

8        A.    No.  I never have been a signatory on a Pharmastrip

9   account.

10       Q.    Same question with respect to Alphatech.  Do you

11  have any ability to restore to the receivership any funds that

12  are in the Alphatech accounts?

13       A.    No, I -- no, I do not.

14       Q.    Are you a shareholder, officer, or director of

15  Alphatech?

16       A.    No, I'm not.

17       Q.    Have you ever been one?

18       A.    No.

19       Q.    Have you ever been a signatory on any Alphatech

20  account?

21       A.    No.  No, I have not.  Never.

22       Q.    And finally, with respect to Clover Cannastrip,

23  which I understand is now known as TPI, do you have any ability

24  to repatriate any TPI funds?

25       A.    No, I do not.

```
 1          Q.    You are a signatory or you were a signatory -- as
 2    you understand it, I think the way you testified, you are a
 3    signatory on the TPI account.  Do you know the status of that
 4    account?
 5          A.    I -- I do not.
 6          Q.    Is that account frozen, to the best of your
 7    knowledge?
 8          A.    I -- I believe that account is -- is -- I think it's
 9    frozen, yes.
10              MR. THURMAN:  Your Honor, we've been inquiring of
11    the receiver to get the status on various accounts, including
12    the TPI, TD Canada account.  And I'm hoping that for the
13    purposes of this hearing, we could just get that issue squared
14    away.
15              Is the TPI Canada TD account currently frozen by the
16    receiver?
17              THE COURT:  Please continue with the questioning of
18    the witness.
19              MR. THURMAN:  Thank you.
20          Q.    (BY MR. THURMAN:)  After you transferred the --
21    well, you described a process by which you could issue funds on
22    the TPI account after you became a signatory; is that correct?
23          A.    Yes.
24          Q.    And can you describe that process?  How could you
25    transfer funds from the TPI account?
```

UNITED STATES DISTRICT COURT

1        A.     Um, you could -- online, through their online

2   banking portal.

3        Q.     And could you simply log in, or did you need any

4   special device?

5        A.     They -- they require a security token with a

6   security code on the token that -- that has to be used to -- to

7   make that transfer.

8        Q.     During what period of time did you have that token

9   in your possession?

10       A.     Uh, I had -- I had it -- I don't remember exactly

11  when they mailed it to me.  But I relinquished the token around

12  October 9th and gave that -- gave the token and banking

13  credentials to Mr. Poujade.

14       Q.     Is that October 9th, 2018?

15       A.     Yeah.  Yes.

16       Q.     Had you ever had the token in your possession since

17  that time?

18       A.     No.

19       Q.     Was there any other way to withdraw funds from the

20  TPI account?

21       A.     Yes.

22       Q.     And how?

23       A.     In person.

24       Q.     And have you been to Canada to any TD Bank branch

25  since September 2018?

1      A.    No, I have not.

2      Q.    Have you traveled abroad from the United States to

3   any country since September of 2018?

4      A.    No, I have not.

5      Q.    Did you invest any funds in TPI or Clover

6   Cannastrip?

7      A.    No, I did not.

8      Q.    Were any funds that came from any of the Cardiff

9   entities that are the subject of this lawsuit, the Redwood, the

10  various entities that are corporate defendants in this lawsuit,

11  did any funds from any of those entities go to the Clover

12  Cannastrip account?

13     A.    No, they did not.

14     Q.    Did your wife deposit any money to any Clover

15  Cannastrip accounts?

16     A.    No, she did not.

17     Q.    Um, were any payments that were ever received from

18  any consumers that are the subject of the allegations of this

19  lawsuit, did any of those payments ever go into the Clover

20  Cannastrip account?

21     A.    No, they did not.

22     Q.    To the best of your knowledge, what was the subject

23  of the -- or -- I'm sorry.  What was the source of the funds

24  that funded the Clover Cannastrip accounts, the account that

25  you were a signatory on?

1      A.    Uh, it was investors, investment -- investors

2    from -- from Canada mainly, Canadian investors.

3      Q.    These were investors that were -- that were drawn by

4    the efforts of Haywood Investments' advisors, the Haywood

5    investment bankers?

6      A.    Yeah.  Yes, they were.

7      Q.    So Clover Cannastrip, TPI was capital -- capitalized

8    entirely with investor funds; is that correct?

9      A.    Yes, to the best of my knowledge.

10     Q.    Okay.  At the time the temporary restraining order

11   was issued in this case or -- on October 10, were you an owner

12   or shareholder of Clover Cannastrip?

13     A.    No, I was not.

14     Q.    When did you tender your shares back to Clover

15   Cannastrip?

16     A.    I believe it was in August, late -- late

17   August/early September.

18     Q.    Okay.  And that's -- that's the subject of

19   documentation and testimony from Mr. Poujade; is that correct?

20     A.    I -- I believe so.

21     Q.    As well as from Mr. Sui; is that correct?

22     A.    Yes.

23     Q.    And when did you resign as a director of Clover

24   Cannastrip?

25     A.    I -- I believe it was October 8th, may have been

```
 1    October 9th.  October 8th, I believe, was the date of my
 2    resignation.
 3         Q.    And did your wife resign on that same day as a
 4    director of Clover Cannastrip?
 5         A.    Yes, I believe it was the same day.
 6         Q.    Okay.  And you attached a copy of a resignation
 7    letter to your declaration; is that correct?
 8         A.    Yes.
 9         Q.    Did Eunjung Cardiff, your wife, have any involvement
10    with any Clover Cannastrip transactions?
11         A.    As -- no, she did not.  As in wires or payments?
12    No, she did not.
13         Q.    She did not cause any payments to be made or any
14    wires to be made from the Clover Cannastrip account at any
15    time?
16         A.    No, she did not.
17               MR. THURMAN:  That's all I have, Your Honor.
18               THE COURT:  Additional questions?
19               MR. THURMAN:  Absolutely.
20               THE COURT:  Do you have additional questions?
21               MR. THURMAN:  No, no.
22               THE COURT:  Thank you.
23               Government?
24               MS. SANGER:  No additional questions at this time,
25    Your Honor.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Thank you.

2          THE WITNESS:  Thank you, Your Honor.

3          MR. FLETCHER:  Your Honor, the receiver would have a

4   few questions.

5          THE COURT:  Questions?  Yeah, go ahead.

6                      **CROSS-EXAMINATION**

7   BY MR. FLETCHER:

8      Q.    Good afternoon, Mr. Cardiff.

9          MR. FLETCHER:  May I inquire, Your Honor?

10         THE COURT:  Please.

11     Q.    (BY MR. FLETCHER:)  I'm Mike Fletcher, the

12  receiver's counsel, Mr. Cardiff.

13         If I understood your testimony, you've told the

14  Court that in or about March of this year, 2019, you received a

15  replacement Irish passport; is that correct?

16     A.    I -- I believe that's when it was.  I believe so.

17     Q.    And if I understood your testimony correctly, you

18  didn't ask the Irish to replace your passport; is that correct?

19     A.    I didn't -- yes, that's correct.  Yes.

20     Q.    Okay.  You have a credit card from HSBC U.K., do you

21  not?

22     A.    Yes.

23         MR. FLETCHER:  Your Honor, I have receiver's

24  impeachment Exhibit No. 1.  I have hard copies.  I don't have

25  an electronic form.

```
 1              THE COURT:  Share it with counsel first.

 2              MR. FLETCHER:  Yes, Your Honor.

 3              THE COURT:  And let's get it identified for the

 4   record.

 5              THE COURTROOM DEPUTY:  Your Honor, can I give it to

 6   him?

 7              THE COURT:  Yes.

 8              We need this marked as -- identified.

 9              THE COURTROOM DEPUTY:  Exhibit 1.

10              THE COURT:  Receiver's Exhibit No. 1.

11              MR. FLETCHER:  Receiver's Exhibit No. 1, Your Honor.

12              (Receiver's Exhibit 1 for identification.)

13              THE COURT:  Thank you.

14        Q.    (BY MR. FLETCHER:)  Mr. Cardiff, take a minute or so

15   and take a look at what's now been marked for identification as

16   Receiver's Exhibit No. 1.  It's a statement from HSBC U.K.  The

17   address line, Mr. Jason Edward Thomas Cardiff, 700 West 25th

18   Street, Upland, California.  Do you see the address?

19        A.    Yes.

20        Q.    I have redacted, pursuant to Court order, the

21   account number, but it ends in 5402.  Do you see that?

22        A.    Yes.

23        Q.    Does this appear to you to be a statement on your

24   HSBC U.K. credit card?

25        A.    Yes.
```

1        Q.    And on the first page of Receiver's 1, there is a

2   date of 12 April 2019.  Do you see that?

3        A.    Yes.

4        Q.    Which typically is the closing date.  Do you see

5   that?

6        A.    Yes.

7        Q.    Will you look at page 2 of Receiver's 1?

8   Specifically, there is an entry received by us, meaning HSBC

9   U.K., 15 March '19.  Transaction date 14 March '19.  Do you see

10  that entry?

11       A.    Yes.

12       Q.    Would you read the entry into the record, please?

13       A.    "Passport online Dublin, Ireland.  105 Euro at an

14  exchange rate of 11680, 8989, Mastercard exchange rate."

15       Q.    There is another entry two entries below that,

16  28 March '19 with a transaction date of 27 March '19.  Do you

17  see that?

18       A.    I'm -- yes, I see that as well.

19       Q.    Will you read that entry into the record, please?

20       A.    "Passport online, Dublin, Ireland.  4275, 50 Euro,

21  Mastercard exchange rate."

22       Q.    Isn't it true that your Irish passport didn't just

23  fall out of the sky like manna from heaven, you applied for it?

24       A.    I did not necessarily apply for it.  I don't know if

25  this is mine or my daughter's either.

1    Q.   Well, there's two entries.

2    A.   I -- I don't know what these entries reference.

3    Q.   But it's your testimony that the Irish just randomly

4  sent you a passport out of the blue with no prompting by you.

5    A.   I did not prompt them, correct.

6    Q.   You just pay the Irish passport office randomly?

7    A.   No.  No.  It was over the phone.

8         MR. FLETCHER:  I have no further questions,

9  Your Honor.

10        THE COURT:  Mr. Thurman, do you have any questions?

11        MR. THURMAN:  No, Your Honor, thank you.

12        THE COURT:  Thank you.

13        THE WITNESS:  Thank you, Your Honor.

14        THE COURT:  Exhibit 1, any objection to the receipt

15  of Exhibit -- Receiver's Exhibit 1?

16        MR. FLETCHER:  My apologies, Your Honor.  I move

17  Receiver's Exhibit 1 into evidence.

18        MR. THURMAN:  No objection, Your Honor.

19        THE COURT:  Received.

20        (Receiver's Exhibit 1 received into evidence.)

21        THE COURT:  Any additional witnesses?  Do you wish

22  to question Mrs. Cardiff?

23        MS. SANGER:  Your Honor, we'd like a chance to

24  question Mrs. Cardiff as well as Mr. Poujade but would propose

25  to the Court perhaps to continue with Mr. Poujade next.

1          THE COURT:  Okay.  The declaration of Mr. Poujade

2    has been received.  So will Mr. Poujade come to the witness

3    stand, please.

4          Mr. Poujade, please --

5          MR. COLAIZZI:  Your Honor, will we be able to finish

6    Mr. Poujade today, sir?

7          THE COURT:  Hopefully, yes.

8          MR. COLAIZZI:  Thank you.

9          THE COURTROOM DEPUTY:  Stand here for me, please.

10   Raise your right hand.

11         Do you solemnly swear that the testimony you shall

12   give in the cause now before this Court shall be the truth, the

13   whole truth, and nothing but the truth, so help you God?

14         THE WITNESS:  I will.

15         THE COURTROOM DEPUTY:  Please be seated.

16         Please state and spell your full name for the

17   record.

18         THE WITNESS:  Yes.  My name is Jacques Poujade.

19   Jacques Bertrand Poujade, excuse me.  And it's J-a-c-q-u-e-s,

20   B-e-r-t-r-a-n-d, and the surname is P-o-u-j-a-d-e.

21         THE COURTROOM DEPUTY:  Thank you.

22         MR. PRUNTY:  Your Honor, may I inquire?

23         THE COURT:  Yes, please.

24   ///

25   ///

1

2                          **JACQUES BERTRAND POUJADE,**

3           **A WITNESS HEREIN, WAS SWORN AND TESTIFIED AS FOLLOWS:**

4                            **CROSS-EXAMINATION**

5    BY MR. PRUNTY:

6         Q.    Mr. Poujade, good afternoon.  My name is Jim Prunty.

7    I'm with the Federal Trade Commission.  I'd like to ask you a

8    few questions.

9         A.    Yes.

10        Q.    You've testified a couple of times in this case

11   through declaration that you -- you graduated with a master's

12   degree from McGill University; is that right?

13        A.    I did, sir.

14        Q.    In public accountancy?

15        A.    I did.

16        Q.    Okay.  And you are -- or were a licensed chartered

17   accountant?

18        A.    That's correct.

19        Q.    Are you still?

20        A.    No, I didn't continue my license.

21        Q.    And you worked for a time as an analyst and

22   assistant to the president at Bank of Boston, Canada; is that

23   right?

24        A.    Yes.  His name is Jim Shoniker.

25        Q.    Okay.  You've worked for First Allegiance Financial

1   Group as a CEO and a chief financial officer?

2       A.    Well, a lot happened between Bank of Boston Canada

3   and First Allegiance.  But I can confirm I was CEO of First

4   Allegiance Financial Corp.

5       Q.    Okay.  Have you worked in and around the banking

6   industry for 30 years?

7       A.    I have.

8       Q.    Okay.  And you've known and worked with

9   Jason Cardiff for over 20 years; is that right?

10      A.    Not continuously, no.  That's incorrect.

11      Q.    Okay.  Have you known him for 20 years?

12      A.    He -- yes, he started -- he worked for me in 1998,

13  originally.  But I was only there -- I left the bank in

14  December '99.  And that's when our relationship ended.

15      Q.    Okay.  And you've stated previously in a declaration

16  that you consider him a very good friend?

17      A.    He is a good friend.

18      Q.    That's still the case?

19      A.    Yes.  That's still the case.

20      Q.    Okay.  And you served for a time as chief financial

21  officer and on the board of directors for Redwood Scientific

22  Technologies?

23      A.    For a short time in 2015, he asked me -- it may have

24  been 2014 -- he asked me to help him -- he had been approached

25  by investment bankers and he wanted to bring Redwood public.

**UNITED STATES DISTRICT COURT**

 1   So I worked for a short period of time on that project.

 2       Q.    So you served as a chief financial officer and as a

 3   director on the board of directors for Redwood Scientific

 4   Technologies?

 5       A.    Just during that time.

 6             And the statement as to me being CFO in 2018 is

 7   incorrect.  That's -- that's unsupported by facts.  That was --

 8   I was never -- I never held that position.

 9       Q.    And you did work with Jason Cardiff at Redwood

10   Scientific Technologies, didn't you?

11       A.    No.  I was -- I was a consultant.

12             So I had a -- I was a managing partner of my

13   mortgage banking entity during that whole time.  And I acted as

14   a consultant to him to help him get his books and records and

15   systems in place for this planned IPO.  And that was only -- it

16   was -- it was 2014, and we had a disagreement.  And he had

17   stopped paying me.  So I stopped working for him.

18       Q.    Okay.  And is it your testimony today that you don't

19   have any kind of specialization in the marketing of sublingual

20   thin film strips.  Would that be a fair statement?

21       A.    Do I have a specialization?

22       Q.    Do you market thin film strips?  Is that what you do

23   for a living?

24       A.    No.  I manufacture them.

25       Q.    Did you do that with Redwood Scientific

1   Technologies?

2       A.   Manufacture them?  No.

3       Q.   Did you market them?

4       A.   I didn't personally, no.

5       Q.   Did you -- did you have any special information or

6   knowledge concerning the creation or marketing in 2016, 2015,

7   2014 of thin film strips?

8       A.   Not the marketing, no.

9       Q.   And your specialization is numbers, isn't it?

10      A.   It's corporate structure, organization, financial

11  budgets, auditing, but not marketing.

12      Q.   Okay.  And isn't it true that the Secretary of

13  State's office in California still lists you as the chief

14  financial officer and a director with the board of directors

15  for Redwood Scientific Technologies?

16      A.   So Michael Kinney brought that to my attention

17  recently, but I had no participation in that filing.  And that

18  is an un- -- unsubstantiated claim.

19      Q.   So it is not true that on the California Secretary

20  of State chart -- excuse me -- website, you do not appear as

21  chief financial officer?  Is that your testimony?

22      A.   My testimony is that just came to my knowledge.

23      Q.   So it is true?

24      A.   I have no -- no, it's not true.  If you're saying

25  whether or not I'm CFO, no, that's not true.

```
 1        Q.    Did you ever do anything to try and remove your

 2   name?

 3        A.    My attorney Michael Kinney just brought it to my

 4   attention when the exhibit was filed.

 5        Q.    And you didn't have a conversation with Mr. Cardiff

 6   about removing your name?

 7        A.    Yeah.  It went something like this, like, "Are you

 8   kidding me?"

 9        Q.    You previously testified in your declarations that

10   you participated in a Redwood contract in the year 2018 and

11   that you came onto the board briefly so as to approve the

12   Canadian contract.  Do you recall that?

13        A.    There was no Canadian contract.

14        Q.    So it wasn't your testimony earlier?

15        A.    No.  That's a mischaracterization.  I was -- there

16   was no contract.  I was asked if I could help Jason in his

17   efforts with raising funds in Canada.  And I traveled to Canada

18   with him in July.  There was no contract.

19        Q.    So you testified in your declaration you briefly

20   came back onto the Redwood board in 2018, and then you

21   immediately resigned.  Do you recall that testimony?

22        A.    So Haywood wanted to structure the transaction in a

23   specific manner.  Jason asked me to present that to the Board.

24   And that's what's in evidence.

25        Q.    So are we talking about Redwood Scientific
```

1    Technologies?  Because that's what I'm talking about.

2         A.    Yes.

3         Q.    Okay.  So you're talking about Haywood Securities

4    raising money for Redwood?

5         A.    No.  Raising money for a venture in Canada related

6    to putting THC on strips.  And Haywood wanted to engineer the

7    transaction in a certain manner.  But once they did their due

8    diligence and the matter of the FTC came into question --

9         Q.    Mr. Poujade, I'm still asking you about Redwood

10   Scientific Technologies.  What are you talking about?

11        A.    I'm trying to answer your question.

12        Q.    You're talking about Redwood Scientific Technologies

13   in 2018 in the summer.  Now I'm talking about your declaration

14   testimony in this case.

15        A.    Yes.

16        Q.    Okay.  And you stated that you came briefly onto the

17   board and then resigned again.  You don't remember that

18   statement.  Is that it?

19        A.    Yes, I did resign.

20        Q.    Okay.  So you've also stated that you are the only

21   officer or manager for Clover Cannastrip from its inception; is

22   that correct?

23        A.    That would be a miscategorization of my testimony.

24        Q.    Okay.  So tell me who else has been a manager for

25   Cannastrip or an officer for Cannastrip since the beginning of

1    that.

2        A.    When the company was originally incorporated, the

3    three incorporators were Jason, Eunjung, and myself.  We

4    were --

5        Q.    Are you talking about managers and officers now?

6        A.    They were not officers and managers.  They were

7    directors -- or Jason was the director.  Eunjung was not -- or

8    no, excuse me, she was.  They were directors.

9        Q.    So you have stated that you are and have always been

10   the only officer or manager for Clover Cannastrip from its

11   inception; is that right?

12       A.    Yes.  Yes.

13       Q.    Okay.  And you've also stated that Mr. Cardiff

14   incorporated Clover Cannastrip on July 31st in British

15   Columbia.  Is that accurate?

16       A.    Yes.

17       Q.    Okay.  And you've already testified now about who

18   the directors were.

19            To your knowledge, did Jason Cardiff or anyone else

20   ever represent to anyone that he was an officer or a manager

21   for Clover Cannastrip?

22       A.    It has come to my knowledge through the filings.

23       Q.    And is today the first time you ever learned that --

24   through the filings, okay.  So these filings are the first

25   opportunity you had to see those bank records at TD Canada

 1   showing that Ms. Eunjung Cardiff was a manager and that

 2   Mr. Jason Cardiff was the president of Clover Cannastrip?

 3        A.    That's correct.

 4        Q.    Okay.  And I gather from what you're saying is that

 5   you didn't know about this.  Did you approve of it?

 6        A.    Once I found out?

 7        Q.    Yes.

 8        A.    Or prior to finding out?

 9        Q.    No.  Did you approve of it?

10        A.    No.

11        Q.    Okay.  And you've testified in your declarations

12   that very shortly after incorporating this company, you learned

13   that investors were very concerned that Mr. Cardiff not be

14   involved in the lease with regard to Clover Cannastrip.  Do you

15   recall that testimony?

16        A.    That he not be -- that he not be a shareholder

17   originally, yes.

18        Q.    Okay.  Paragraph 13 of your May 28th declaration,

19   you state that he could have no direct or indirect control of

20   the company or say in the finances, operation, or any aspect of

21   the company.  Do you recall saying that?

22        A.    That became the position, yes.

23        Q.    Okay.  And these were investors communicating this

24   to you?

25        A.    This was Haywood communicating.

```
 1        Q.    In your testimony on May 28th, you indicated that
 2   these were -- these were investors that were communicating to
 3   you these concerns.
 4        A.    It was specifically the investors were coming from
 5   Haywood.
 6        Q.    Okay.  So it was both, it was Haywood and the
 7   investors?
 8        A.    It was -- Haywood was driving the financial
 9   transaction.
10        Q.    Did you speak to any investors who were
11   communicating this?
12        A.    That communicated the concern?
13        Q.    Yes.
14        A.    Not initially, no.  It was all through Haywood.
15   Haywood had a tight control on their books.
16        Q.    And you would have gotten -- did you get some
17   correspondence from them that specifically let you know that --
18   that, absolutely, they would not do business with your company
19   if Jason Cardiff was connected with it?
20        A.    It was all by telephone.  They would never put that
21   in writing.
22        Q.    Okay.
23        A.    And I had the choice to walk away.  We had the
24   choice to walk away.  So the company wasn't worth anything at
25   that time when that decision was made.
```

UNITED STATES DISTRICT COURT

1      Q.    And so in response to all of this, on August 30th of

2    2018, you sent Mr. Cardiff up to Toronto to meet with Haywood

3    Securities, didn't you?

4      A.    He went to -- yes.  He went to a meeting with them,

5    and he told them that he was no longer an owner.  They

6    subsequently told him that it had to be no connection with the

7    company.  A single -- not a single penny had been raised at

8    that time.  So the decision was to either move forward with

9    Pharmastrip or to walk away, and they chose to walk away.

10     Q.    So let me ask you this.  Why is it that sending

11   Jason Cardiff up to the -- to meet with the company -- the

12   securities brokers was going to accomplish this purpose?  Would

13   a simple affidavit indicating he was not involved could have

14   been sent?  Did you consider doing that?

15     A.    Sending an affidavit?  No.

16     Q.    How about the stock surrender?  You indicated he

17   surrendered his stocks two days earlier.  Did you offer to send

18   that?

19     A.    No.  Because Erwin Sui, who was the attorney that we

20   were using in Canada, was significantly behind.  And there was

21   corporate organization matters that had to be completed, and

22   it -- he was behind schedule.  But not a single penny was going

23   to be raised by Haywood unless and until that happened.

24           So Jason went up, presented his case, and they said,

25   "We would really like you to resign as a director."

1          And he said, "I have to talk to Jacques about that."

2     Q.    Now, you appended exhibits to your July 11th

3 declaration, pages 2 through 4, that included August 29th,

4 2018, Directors' Resolution and Share Purchase Agreement

5 showing that Clover Cannastrip had received back all shares

6 owned by Jason Cardiff.

7          Do you recall that?

8     A.    It's not in front of me but --

9     Q.    Do the dates sound right?

10    A.    Yes.

11    Q.    It's -- the date on the document is August 29th.

12         And you didn't send those documents to Haywood?

13    A.    No.  Jason wanted to save the relationship with

14 Haywood, and he thought a face-to-face meeting would be best.

15    Q.    When you say "save the relationship," what do you

16 mean?

17    A.    He still wanted to have a role in the company.  And

18 I said, "Go talk to them because right now, we're" -- "we're

19 walking away."

20    Q.    Okay.  And, in fact, on September 6th, FSD Pharma

21 did invest money, didn't it?

22    A.    Okay.  There are some legal distinctions that you're

23 skipping over.  Right?  There was no formal closing on

24 FSD Pharma or XIB until October on the part of the company.

25 The fact that they wired the company -- the money did not mean

1    that it was legally ours.

2         Q.    So you don't object to the notion that September 6th

3    is the date of the closing on the FSD --

4         A.    I do object.  It wasn't closed.

5         Q.    Okay.  But you gave us a signed agreement.  And the

6    date is September 6th.  Is there any argument about that?

7         A.    Well, I don't have the agreement in front of me, so

8    I can't verify the date of when the agreement was signed.

9         Q.    Okay.

10        A.    But I -- from the TD Bank records, I can tell you

11   the money was received.  But that does not -- in itself does

12   not constitute that we had the legal right to the money.  And

13   in fact, Erwin Lowy, who received the money from FDS, never

14   should have sent it to us because the closing had not taken

15   place.

16             We still had the Haywood founders closing that had

17   to take place on -- and that took place -- I don't have it in

18   front of me.  But that, I believe, took place on October 10th.

19   And that came in at a penny.  I couldn't have a 20 cents

20   financing round close prior to -- 20 cents financing round

21   close prior to the penny round.

22        Q.    But there's no serious dispute that this money was

23   in the TD Bank account?

24        A.    Whether it was in the TD Bank or Erwin Lowy's bank

25   account, it doesn't matter.  It wasn't my money.  It wasn't the

 1   company's money, excuse me.

 2           So there's some legal distinctions that you're

 3   skipping over.

 4       Q.   Isn't it true that Mr. Cardiff also made a

 5   presentation to FSD Pharma on the 31st of August?

 6       A.   I don't know what presentation you're speaking to.

 7   I know there was a meeting, but I wasn't present at the

 8   meeting.

 9       Q.   But --

10       A.   And I can tell you that the original Haywood

11   presentation was wrong.  They had the wrong company name on it.

12   They had the wrong capital structure.  Haywood was so anxious

13   to close this transaction that they were tripping over

14   themselves.

15           I -- we, me, as the CEO, never approved that

16   presentation.  In fact, it had the wrong company name, it had a

17   CBD product, it had the wrong capital structure, and it -- it

18   had nothing to do with what -- what Pharmastrip Corp. was

19   doing.

20       Q.   And yet it was successful in raising 1.5 million,

21   wasn't it?

22           THE COURT:  I didn't hear a response.

23           THE WITNESS:  It, um -- it was successful in

24   raising -- the subscription documents don't reflect the company

25   name that that presentation reflects.  So that's a problem.

**UNITED STATES DISTRICT COURT**

1    Q.    (BY MR. PRUNTY:)  And the -- and the investment with

2    FSD Pharma lists Jason Cardiff --

3    A.    As to --

4    Q.    -- as the contact; isn't that right?

5          THE COURT:  One moment.  One person at a time.

6    Q.    (BY MR. PRUNTY:)  Sorry.

7    A.    As to whether it was successful or not, it's

8    problematic.  And that's why I can't categorize it as

9    successful.

10   Q.    You got the money?

11   A.    But the presentation was not in the company's name.

12   Q.    You know that Jason Cardiff has used both Clover

13   Cannabis thin film as well as Clover Cannastrip thin film

14   before, using the same PC registry number?

15   A.    No, I'm not aware of that.

16   Q.    And there are distribution -- Pharmastrip

17   distribution records showing that Jason Cardiff employed the BC

18   registry number for both.  Would that surprise you?

19   A.    At this point, sir, nothing surprises me.

20   Q.    Haywood finished the first seed funding, according

21   to your testimony, on October 16th, 2018; isn't that right?

22   A.    The actual -- so -- okay.  You're using different

23   words to describe different things.  You used "founders," now

24   you're using --

25         THE COURT:  Sir, listen to the question.  If you

1    can't answer the question, just inform the Court that you're

2    not able to answer the question.

3              THE WITNESS:  Thank you, sir.

4              I don't know what you're referencing by "seed."

5        Q.    (BY MR. PRUNTY:)  Okay.  I'm referencing your

6    declaration where you use the word "seed funding" and the date

7    October 16th, 2018.

8        A.    That was the -- that was the Haywood -- I don't have

9    the -- the document in front of me, so I'm hesitating.

10       Q.    As of that date, had Jason Cardiff been officially

11   taken off the corporate registry for Clover Cannastrip in

12   British Columbia?

13       A.    I believe so.

14       Q.    Okay.  I'm going to represent to you that in the

15   record there is a -- an update of Clover Cannastrip dated

16   November 16th, one month later, 2018.  Does that ring a bell?

17       A.    The -- as to when the registry was updated?  I don't

18   know.

19       Q.    Yes.  Okay.

20       A.    Was that submitted into evidence?

21       Q.    It was.

22       A.    Okay.

23       Q.    And, in fact, it's part of --

24             THE COURT:  It's a question-answer format.  You get

25   to ask the questions, the witness will respond to the

1    questions.  So please follow the format.

2            THE WITNESS:  Thank you, sir.

3        Q.    (BY MR. PRUNTY:)  And Mr. Cardiff wasn't taken off

4    the corporate registry with BC until November 16th; isn't that

5    right?

6        A.    He resigned on October 8th.

7        Q.    And you didn't file anything with the BC registry

8    until November 16th?

9        A.    Erwin Sui, our Canadian attorney, did the filing.

10       Q.    On October 12th of 2018, the Cardiffs were served

11   with a temporary restraining order issued by this case -- by

12   this Court.  Do you remember that?

13       A.    Well, from what's been submitted in evidence, yes.

14       Q.    Okay.  On October 12th of 2018, you were still a

15   very good friend of Mr. Cardiff's, weren't you?

16       A.    We were working -- yes.

17       Q.    You were working closely?

18       A.    I was running lenders -- or excuse me -- LendPlus.

19   He was running Redwood.  And we had this project that we were

20   working on.

21       Q.    And, in fact, Jason Cardiff called you at 12:55 p.m.

22   on October 12th of 2018 and spoke with you about ten minutes.

23   Do you recall that?

24       A.    I'd spoken to him earlier that morning, like at

25   7:30, on the project.

1        Q.    And the time -- the time that he called you, there

2   were -- there was a receiver that had just taken over his

3   premises and they had just frozen his funds.  Do you recall

4   that conversation?

5        A.    We did not talk about that.

6        Q.    So as the former CFO and a very good friend of

7   Mr. Cardiff, this subject of federal officers in his business

8   facility and an asset freeze order just never came up.  Is that

9   your testimony?

10       A.    He said he could not talk to me right now.

11       Q.    But over the course of the next several days, you

12  did talk to him, didn't you?

13       A.    I talked to him briefly two days later and then

14  didn't talk to him for a while after that.

15       Q.    And as a result of these conversations, you learned

16  that his assets were, in fact, frozen and that he couldn't have

17  bank accounts in his name?

18       A.    No.  That's not true.

19       Q.    Was that your testimony in your May 28th

20  declaration, that you learned in October that Mr. Cardiff's

21  assets were frozen and that he couldn't have bank accounts in

22  his own name?

23       A.    It would have been late October or November, I

24  believe.  So in November -- I never heard about frozen assets

25  but that he could not have a bank account in his name.

1      Q.    So you knew that he couldn't be a signer on a bank

2   account?

3      A.    Yes.

4      Q.    Okay.  And you knew that Mr. Cardiff was a signer on

5   the TD Canada account that he set up for Clover Cannastrip?

6      A.    Yes.

7      Q.    Okay.  And on October 16th, you testified that you

8   were in the same room with Jason Cardiff while you transferred

9   a million dollars to -- $1.2 million to Sui Trust.  Do you

10  recall that?

11     A.    If that's my testimony.

12     Q.    Okay.  And are you -- are you telling the Court that

13  you at that point did not know that there was an order freezing

14  funds and that Mr. Cardiff couldn't have accounts as a

15  signatory?

16     A.    That's correct.

17     Q.    So even in the same room with Mr. Cardiff, that

18  subject has never came up?

19     A.    That's correct.

20     Q.    And it didn't come up until when?

21     A.    I don't recall when it came up.  All I found out was

22  in late October, beginning of November, he could not have a

23  bank account.  So I arranged to make a loan to him.

24     Q.    Let's talk about the meetings that you had in person

25  with Jason Cardiff on October 16th and then again on

1    October 18th.  Is it your testimony today that even though you

2    were transferring funds, the subject of his asset freeze never

3    came up?

4         A.    That's correct.

5         Q.    Okay.  And it never came up that he couldn't be on

6    the account for TD Canada.  Is that your testimony?

7         A.    That's correct.

8         Q.    Okay.

9         A.    So October 16th is the same day --

10            THE COURT:  Sir, there's no question pending.

11            THE WITNESS:  Okay.

12            THE COURT:  It's in your best interest just to

13    answer the questions that are being posed.

14            THE WITNESS:  Thank you.

15         Q.    (BY MR. PRUNTY:)  You've also indicated in your

16    July 11th declaration that you were not aware until very

17    recently, until July 2nd, that you were never a signatory on

18    the TD Bank account for Clover Cannastrip.  Do you recall that

19    testimony?

20         A.    Yes.

21         Q.    Okay.  And can you tell me why you're so surprised

22    that you were not a signatory on that account?

23         A.    Because I had provided Jason with copies of my

24    passport and my driver's license to bring to open the account.

25         Q.    So your testimony is that somebody with 35 years of

```
 1    banking and finance experience thought that somebody could add

 2    your name to a corporate account with copies of identification?

 3         A.    I do that all the time.  Here in California, I open

 4    bank accounts in exactly that manner.

 5         Q.    Did you ask Mr. Cardiff whether that could be done?

 6    He testified today that he knew he couldn't do that.

 7         A.    I did not ask him if he could -- if that could be

 8    done or not, but it has been my experience here in California

 9    and I have done it.

10         Q.    Okay.

11         A.    And --

12         Q.    Your testimony in your declarations was that you

13    actually gave your passport and your driver's license to

14    Mr. Cardiff, the originals?

15         A.    That's incorrect.

16         Q.    Excuse me?

17         A.    That's incorrect.

18         Q.    Okay.  Is that -- do you recall that testimony?

19         A.    I gave him copies of my passport and my driver's

20    license.

21         Q.    Okay.  So it was incorrect in your declaration when

22    you stated to the Court that "I gave Jason Cardiff my passport

23    and my driver's license to go to Canada"?

24         A.    It should have said "copies."

25         Q.    Now, True Pharmastrip, Inc., is a name change for
```

```
 1    Clover Cannastrip Thin Film Technologies; is that right?

 2         A.    Yes.

 3         Q.    And that was made in March of 2019?

 4         A.    Yes.

 5         Q.    Okay.  So when we're talking about a CloverStrip

 6    bank account at TD Canada, we're talking about the only bank

 7    account associated with Clover Cannastrip; is that right?

 8         A.    Yes.

 9         Q.    So there's not a bank account in the name of True

10    Pharmastrip?

11         A.    That's correct.

12         Q.    In your July 11th declaration, you point out that

13    you discovered for the first time in October of 2018 that there

14    were certain irregularities regarding transfers made by

15    Jason Cardiff before October 9th.  Do you remember that?

16         A.    If it's in my declaration.

17               THE COURT:  Do you --

18               THE WITNESS:  Yes.

19               THE COURT:  Do you know what's in your declaration,

20    sir?  I assume you wrote it.

21               THE WITNESS:  I did, but I don't have it in front of

22    me, Your Honor.

23               THE COURT:  You don't recall this part of your

24    declaration?

25               THE WITNESS:  If you could repeat the question.
```

1    Q.    (BY MR. PRUNTY:)  You indicated in your July 11th

2    declaration --

3    A.    Excuse me, Your Honor.

4    Q.    -- paragraph 29 --

5    A.    I'm assuming you're reading verbatim.

6    Q.    I'm not.  I can pull up the declaration if that

7    would assist you.

8    A.    Thank you.

9          MR. PRUNTY:  Thank you, Your Honor.

10   Q.    (BY MR. PRUNTY:)  Mr. Poujade, I'm putting up on the

11   screen now the errata version of your July declaration

12   submitted with this Court, paragraph 29.

13   A.    Thank you.

14   Q.    And can you see it?

15   A.    Yes, sir.

16   Q.    Okay.  I call to your attention paragraph 29.  "In

17   early October 2018, I noticed a significant amount of money in

18   the TPI account and I questioned Jason Cardiff about it.  I

19   learned for the first time that Jason Cardiff had obtained a

20   fob from TD Canada bank a few days earlier to be used to make

21   wire transfers."  Do you recall that?

22   A.    I do, yes.  That's correct.

23   Q.    And you go on, "After his resignation, Jason and I

24   met to" hand -- "handle the turnover of all control items,

25   including banking pass codes, temporary checks, or other items

1    in his possession.

2              "I believed from my conversation with Jason Cardiff

3    that all of the payments he made from the TPI account between

4    October 2nd, 2018, and October 9, 2018, were for TPI business

5    purposes, including all of the large payments made on

6    October 9th, 2018, which he told me were for machinery that had

7    been ordered by TPI.

8              "The first time I learned the truth about the

9    transactions was on July 3rd, 2019, when I saw the most recent

10   brief filed by the receiver."

11             Could you explain what you mean by you were -- you,

12   for the first time, learned the truth about these transactions?

13        A.    The transactions were miscategorized in our general

14   ledger because they were described differently from what they

15   were actually for.  And when you provided the information in

16   your brief, that's when I knew what those payments were for.

17        Q.    And were those payments that had anything to do with

18   Clover Cannastrip?

19        A.    The -- there was a bigger issue.  This still wasn't

20   our money because we had still not closed on either FSD Pharma

21   or XIB.  So there was -- or legally, that was not our money.

22        Q.    So you were sitting in the courtroom earlier when my

23   colleague displayed a $40,000 deposit from the TD Canada

24   account to the Jason Cardiff controlled Intel Property.  Do you

25   recall that?

 1     A.    Yes.

 2     Q.    Okay.  Is that one of those transactions that was

 3   improperly cataloged?

 4     A.    Yes.

 5     Q.    Okay.  And was it -- did you consider that a

 6   personal transaction?

 7     A.    I -- I didn't know what that -- who that company

 8   was.  It was the first time I had seen that company.

 9     Q.    Could you answer the question, please?

10     A.    Can you re-ask it?

11     Q.    Sure.

12           So was the Intel Property's transfer a personal

13   transaction that was not approved by you?

14     A.    Yes, it was not approved by me.

15     Q.    Okay.  You agree that it was a personal transaction?

16     A.    At the -- when I first saw it, I didn't know who

17   Intel Property was.  So I couldn't tell you if it was a

18   personal transaction or not a personal transaction.

19     Q.    Well, you would have asked Mr. Cardiff.  Did you ask

20   Mr. Cardiff?

21     A.    Subsequently, yes.

22     Q.    And what did you learn?

23     A.    That it was a company under his control.

24     Q.    Okay.  Now, despite the transactions that you've

25   described that you learned about in October of 2018,

1    Mr. Cardiff and Eunjung Cardiff remained the sole signatories

2    on that TD bank account, didn't they?

3        A.    Ask the question again.

4        Q.    Sure.

5            Despite what you've indicated to me about what you

6    discovered in early October 2018, Ms. Cardiff and Mr. Cardiff

7    remained the sole signatories on that TD bank account?

8        A.    I didn't discover that until you filed your brief,

9    and that was not in October '18.

10       Q.    And you described yourself previously as the chief

11   executive officer for Clover Cannastrip; is that correct?

12       A.    Yes.

13       Q.    Okay.  Now, you testified in your declarations that

14   your brother's company Pharmastrip wired $100,000 to your

15   Alphatech account.  Do you recall that?

16       A.    Yes.

17       Q.    Okay.  And that wire would have happened

18   November 8th of 2018.  Do you recall that?

19       A.    Yes.

20       Q.    Okay.  But it wasn't until January 2nd, 2019, that

21   there was a promissory note that recorded that transaction;

22   isn't that true?

23       A.    But its effective date was November 1st.

24       Q.    So the -- the date of the promissory note was

25   January 2nd.  Do you recall that?

1        A.    Which promissory note?

2        Q.    There's only one.  You appended it to your

3    declaration as Exhibit 4 on your May 28th declaration.  Do you

4    recall describing a $100,000 loan from Richard Poujade's

5    company Pharmastrip to your company Alphatech?

6        A.    Yes.

7        Q.    Okay.  And the date of that document, the promissory

8    note is January 2nd?

9        A.    I don't recall.  I don't have the note in front of

10   me.

11       Q.    Okay.  But there was your testimony and it was

12   recent.

13       A.    That the note was recent?

14       Q.    Your testimony was recent.  The declaration that you

15   signed --

16       A.    Yes.

17       Q.    -- describing that transaction was recent.  You have

18   no recollection of it?

19       A.    I have a recollection, yes.

20       Q.    Are you sure you recollect what happened on

21   October 12th, October 16th, October 18th?  You seem very sure

22   of that.

23       A.    Yes.

24       Q.    Okay.  But you're not -- now you're not sure of

25   these dates either?

1      A.    No, I'm sure there was a note.

2      Q.    Okay.  And you're just not sure what date it was?

3      A.    Correct.

4      Q.    Okay.  So would you accept my offer that it's

5  January 2nd of 2019?

6      A.    So I know the note was produced to document the

7  balance sheet in our financial condition as of 12-31.

8           MR. PRUNTY:  Objection.  Nonresponsive.

9           THE COURT:  Ask the question again.

10          Listen carefully to the question.

11          THE WITNESS:  I will.

12     Q.    (BY MR. PRUNTY:)  I'm asking you to recollect

13  whether there was a promissory note from Pharmastrip to

14  Alphatech January 2nd, 2018, recording a $100,000 loan?

15     A.    Yes.

16     Q.    Okay.  And this loan was to capitalize Alphatech; is

17  that right?

18     A.    Yes.

19     Q.    And yet the money for that loan came November 8th,

20  2018, not in January.  Do you recall that?

21     A.    There were several loans made to Alphatech.

22     Q.    I'm asking about the very first $100,000 transfer

23  from Pharmastrip to Alphatech.  Do you recall stating that it

24  was November 8th, 2018?  It's in the bank records.

25     A.    Yes.

1      Q.    Okay.  And yet your brother's company Pharmastrip

2   wired an additional $390,000 to Alphatech, didn't it?

3      A.    Over what period of time?

4      Q.    Until -- until the end of May.

5      A.    Yes.

6      Q.    Okay.  And the only promissory note that you have

7   ever produced to the Federal Trade Commission or to the Court

8   is this one note dated January 2nd?

9      A.    There's a note for each transaction, sir, I assure

10  you.

11     Q.    I want you to answer the question.

12           The only note that you have produced to this Court

13  or the Federal Trade Commission in response to the subpoena is

14  the January 2nd promissory note; is that correct?

15     A.    Mr. -- my attorney Mr. Kinney has all the notes.

16     Q.    I'd like you to answer the question.

17     A.    Whatever he produced to the Court or to you is what

18  he produced.

19     Q.    So is it your testimony you don't know what you

20  produced?

21     A.    He -- he produced -- if you're telling me he

22  produced one note, he produced one note.  What I'm speaking to

23  is the existence -- existence of the documented notes.

24     Q.    So there are more documented notes?

25     A.    Yes.

1    Q.    They exist?

2    A.    Yes.

3    Q.    Where are they kept?

4    A.    I believe Mr. Kinney has them.

5    Q.    Okay.  And you've also not provided in response to

6    the subpoena that you received April 10th from the Federal

7    Trade Commission any documents memorializing the special

8    financial arrangements between Alphatech and Pharmastrip; isn't

9    that right?

10    A.    There is -- there's the note.

11    Q.    That one note.  Is that the sum and substance of it?

12    A.    There are other notes, but they obviously weren't

13    submitted.

14    Q.    Are there any other documents memorializing the

15    relationship between Pharmastrip and Alphatech other than

16    promissory notes?

17    A.    I don't believe so.

18    Q.    Okay.  Now, are you aware that -- well, you've heard

19    testimony that Jason and Eunjung Cardiff are on the TD Canada

20    bank account.  And you saw the slide that shows on October 4th,

21    2018, the bank received information that Mr. Cardiff was

22    president and Eunjung Cardiff was manager.  Was that true for

23    Clover Cannastrip?

24    A.    They were never officers.

25    Q.    So Jason Cardiff lied to you.  Is that your

1    testimony?

2        A.    He was never an officer.

3        Q.    And yet you continued to lend him money, didn't you?

4        A.    Again, I was not aware of that document until your

5    filing of your brief.

6        Q.    And your brother indicated in a telephone

7    conversation with the FTC May 28th -- excuse me -- April 25th

8    that he was introduced to Mr. Cardiff through a headhunting

9    firm.  Do you recall reading that in the declarations?

10        A.    Yes.

11        Q.    Okay.  Is that the truth?

12        A.    Yes.

13        Q.    That is the truth?

14        A.    Yes.

15        Q.    Okay.  So that's how Jason Cardiff met

16    Richard Poujade?

17        A.    Richard had a headhunter, a mutual friend, that was

18    looking to get into the strip business.  And that's when they

19    were first introduced.

20        Q.    So your previous testimony in your first declaration

21    to this Court, May 28th, 2019, you indicate that you introduced

22    your brother to Jason Cardiff.

23        A.    That came after.

24        Q.    That came after what?

25        A.    After my brother told me that he had a headhunter

 1    looking for somebody with that specialization.

 2         Q.    And it just happens that it was a friend of yours,

 3    one of your best friends.  Is that your testimony?

 4         A.    Yes.

 5         Q.    Really?

 6         A.    Yes.

 7               THE COURT:  That's argumentative.  Just ask --

 8         Q.    (BY MR. PRUNTY:)  Sorry.

 9               So I want to make sure I understand it.  So your --

10    your brother hired a headhunting firm and the headhunting firm

11    referred Jason Cardiff after -- out of any number of thousands

12    of people to him and then you made the introduction.  Is that

13    your testimony?

14         A.    Sorry.  It wasn't a headhunting firm.  It was a

15    headhunter.

16         Q.    Okay.

17         A.    When I shared with Richard that I knew someone, that

18    person called him.  I don't even remember the headhunter's

19    name.

20         Q.    You don't remember the headhunter's name?

21         A.    No, because I wasn't -- I wasn't involved.  This

22    was -- this was early in the project.  My -- my brother wanted

23    to get in the cannabis space.  He received a top-secret

24    clearance with Revenue Canada to review the tax legislation on

25    the cannabis legislation.  And he saw an opportunity.

**UNITED STATES DISTRICT COURT**

1          Q.    But you didn't know this headhunter.  You'd never

2    met this headhunter before?

3          A.    I can't even remember his name.

4          Q.    Your brother -- excuse me.  Richard Poujade entered

5    a declaration in this case indicating -- acknowledging that

6    Jason has been working with him as a consultant for many

7    months.  And do you agree that Jason has worked with your

8    brother's company Pharmastrip since December?

9          A.    Yes.

10         Q.    Okay.  So when did you first discuss filing a

11   lawsuit in Ontario for a declaratory action against

12   Jason Cardiff?

13         A.    When -- when I first discussed it with whom?

14         Q.    Did -- did you discuss it with an attorney?  Did you

15   discuss it with a Board?  When did you discuss this?

16              MR. COLAIZZI:  Your Honor, if I could just direct

17   the witness, to the extent he's had discussions with counsel,

18   that he not disclose attorney-client privileged information.

19              THE COURT:  Ask your question, please.

20              MR. PRUNTY:  Thank you.

21         Q.    (BY MR. PRUNTY:)  Are you aware of a lawsuit filed

22   in Ontario, Canada, by Clover Cannastrip, your company,

23   Richard Poujade's company Pharmastrip against Jason Cardiff,

24   the defendant in this case?

25         A.    Yes.

**UNITED STATES DISTRICT COURT**

1      Q.   Okay.  And who did you talk to at Clover Cannastrip

2   about that?

3      A.   I talked to the Board.

4      Q.   Okay.  Did you advise the Board that there was a

5   preliminary injunction in this case that had been provided to

6   you that bars lawsuits against Jason Cardiff?

7      A.   No.

8      Q.   You did not?

9      A.   (No audible response.)

10      Q.   Did you consult with attorneys here before you did

11   that?

12           MR. COLAIZZI:  He can answer yes or no, Your Honor.

13   Beyond that, no.

14      Q.   (BY MR. PRUNTY:)  I'm only interested in yes or no

15   questions.  Did you -- did you have discussions with attorneys

16   about filing that lawsuit?

17      A.   Yes.

18      Q.   Okay.  And when was that?

19      A.   The last -- the last three weeks.

20      Q.   In the last three weeks?

21      A.   Yes.

22      Q.   Was it about the same time as the Commission -- the

23   Federal Trade Commission filed this contempt action?

24      A.   It was unrelated.

25      Q.   Was it about the same time in June?

```
 1        A.    I don't recall.

 2        Q.    So is it your testimony this lawsuit is not in

 3   response to this contempt filing?

 4        A.    Correct.

 5        Q.    Okay.  Was this contempt filing discussed with the

 6   Board before they agreed to do this?

 7              MR. COLAIZZI:  Your Honor, I'm going to object to

 8   the extent that counsel may have been involved in those

 9   conversations.  So I direct the witness not to answer to the

10   extent it involves communications with counsel and the Board.

11              THE COURT:  Are you objecting to the question?

12              Ask the question again.

13              MR. PRUNTY:  Yes.

14        Q.    (BY MR. PRUNTY:)  Was this discussed -- was the

15   subject of this contempt filing raised or discussed with the

16   Board before the Board agreed to this?

17              MR. COLAIZZI:  Object to the form, Your Honor, to

18   the extent it involves attorney-client privileged information.

19              THE COURT:  What is your objection?

20              MR. COLAIZZI:  He can answer the question if it

21   doesn't involve an attorney giving the Board advice.

22   Otherwise, I'm directing him not to answer.

23              THE COURT:  I don't think there was an attorney

24   present.  But maybe clarify.

25              MR. COLAIZZI:  I don't know.  I don't know.
```

```
 1        Q.    (BY MR. PRUNTY:)  Okay.  Did you -- did you talk to

 2   the Board alone as a board member with the other Clover

 3   Cannastrip board?

 4        A.    The communications came directly from the attorney.

 5        Q.    And who was the attorney?

 6        A.    Erwin Sui.

 7        Q.    Erwin Sui.

 8              And did you advise -- well, Erwin Sui is aware of

 9   this preliminary injunction, are they not?

10        A.    I don't know.

11        Q.    You never discussed it with them?

12              MR. COLAIZZI:  Objection, Your Honor.

13              THE COURT:  That could be answered yes or no.

14        Q.    (BY MR. PRUNTY:)  You answered the question?

15        A.    Yes.

16        Q.    Okay.  He did.

17              Did you discuss it -- not what they said, but did

18   you discuss this Ontario lawsuit with any of the attorneys

19   present in the room today?

20        A.    With -- with -- with my attorneys.

21        Q.    And you did it prior to filing this case in Ontario?

22        A.    Yes.

23              THE COURT:  How much additional do you have?

24              MR. PRUNTY:  I'm almost done, Your Honor.

25        Q.    (BY MR. PRUNTY:)  Did you discuss filing this
```

1    lawsuit with your brother Richard?

2        A.    The attorneys dealt directly with Richard.

3        Q.    So you didn't talk to Richard about this?

4        A.    No.

5        Q.    Okay.  Specifically, which directors at Clover

6    Cannastrip participated in this discussion?

7        A.    Former U.S. Congressman Dana Rohrabacher.

8        Q.    Okay.

9        A.    Ralph Olsen and Antoine Drescher.  And I abstained

10   from the vote.  And it's clearly written in the resolution as

11   to my abstaining.

12       Q.    And is there documentation of this board vote?

13       A.    There is.

14       Q.    Okay.  Did anybody oppose it?

15       A.    No.

16           MR. PRUNTY:  I have no further questions.  Thank

17   you, Your Honor.

18           THE COURT:  Are you able to conclude by 6:00?

19           MR. COLAIZZI:  I don't -- I don't think so,

20   Your Honor.

21           THE COURT:  Okay.  Then we're going to resume

22   tomorrow at 8:30.

23           There is an issue to be addressed and that is the

24   issue regarding the Irish passport that's in the possession of

25   Mr. Cardiff.

1           On November 12th, 2018, the Court made it clear that

2    Mr. Cardiff -- the Cardiffs were to surrender all domestic and

3    foreign passports to the receiver, and that was to be

4    accomplished on or before November 12th, 2018 --

5           Please feel free to step down.

6           THE WITNESS:  Thank you, sir.

7           THE COURT:  Apparently that was not done, which

8    appears to be a clear violation of the Court's order.

9           The Court has some concern that Mr. Cardiff is

10   attempting to remove himself from the jurisdiction of the

11   Court.

12          The receiver has offered Receiver Exhibit 1, which

13   is a credit card account in the name of Mr. Cardiff.  The

14   credit card account appears to reflect that in March of 2019,

15   Mr. Cardiff paid online a transaction fee for a passport issued

16   by the Irish authorities.

17          So who wishes to be heard regarding that?

18          MR. THURMAN:  Your Honor --

19          THE COURT:  Let me start with the FTC first.

20          MR. THURMAN:  Thank you.

21          MS. SANGER:  Your Honor, given the serious nature of

22   this contempt and the risk that Mr. Cardiff could use this

23   passport to leave the jurisdiction, I would recommend to the

24   Court that he be coercively incarcerated until the passport is

25   turned over to the receiver.

1              THE COURT:  Mr. Thurman?

2              MR. THURMAN:  Thank you, Your Honor.

3              We would ask that the Court give Mr. Cardiff until

4    tomorrow morning to provide the passport to Mr. Fletcher.  If

5    necessary, we can drive out and get the passport right now, go

6    home with Mr. Cardiff, obtain the passport, and secure

7    possession of it and deliver it to Mr. -- Mr. Fletcher as soon

8    as possible.

9              It's -- he is -- Mr. Cardiff obviously has not

10   utilized it, at least that's his testimony.  There's been no

11   evidence presented that he's used the passport.

12             He's also advised that he was making arrangements in

13   connection with a passport related to his daughter, and he's

14   not sure if that's what these charges are related to.

15             And so for those reasons, we'd ask the Court's

16   leniency to give us a couple of hours even to secure the

17   passport, return it to the receiver, and -- and resolve any

18   contempt.

19             THE COURT:  I'm not -- I simply do not understand

20   why there could be any confusion on the part of Mr. Cardiff.

21   It's -- the order is clear.  He's to turn over, surrender all

22   passports.  He apparently secured a passport somehow from Irish

23   authorities and failed to turn that over to the receiver.

24   It's -- it's a bit of a mystery.  And the first time that was

25   disclosed was in the hearing today.

1          He indicated that his decision may have been based

2     on certain advice of counsel.  But I just don't understand how

3     there could be any confusion here.

4          Was this the first time you heard about the

5     passport, Mr. Thurman?

6          MR. THURMAN:  I think I've -- I've heard about the

7     passport.  I've been involved in this two weeks and urged that

8     it be returned immediately.

9          THE COURT:  Let's get the marshals up.

10          The Court has significant concern that Mr. Cardiff

11     is attempting to flee the jurisdiction of the Court.  He'll be

12     placed in custody.

13          We'll resume the hearing tomorrow.

14          Mr. Cardiff, you're to remain in the courtroom.

15          MR. THURMAN:  Thank you, Your Honor.

16          THE COURT:  Okay.  We're adjourned.  We'll resume

17     tomorrow at 8:30.

18          MR. COLAIZZI:  Your Honor, may we speak with our

19     client over the evening, since we didn't have an opportunity to

20     start any cross-examination?

21          THE COURT:  Certainly.  Yes.

22          MR. COLAIZZI:  Thank you, Your Honor.

23          (Pause in the proceedings.)

24          THE COURT:  And let's go back on the record.

25          And just for clarity of the record, the Court finds

1   beyond any reasonable doubt that Mr. Cardiff has violated at

2   least one portion of the Court's prior order and that is

3   failing to surrender his passport to the -- to the receiver.

4           And the Court finds Mr. Cardiff to be in violation

5   of the orders issued by this Court.  And the Court would place

6   him in custody based on a civil contempt finding and also based

7   on the Court's concern that he may be attempting to flee the

8   jurisdiction of the Court.

9           (Proceedings adjourned at 5:45 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6          I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17                    DATED THIS 4TH DAY OF AUGUST, 2019.

18

19

20                    /S/ MYRA L. PONCE
                    _____
21                    MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                        FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**