UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CRIMINAL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCR 23-00021 JGB** | Date | June 13, 2024 |
| Title | ***United States of America v. Jason Edward Thomas Cardiff*** | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Government: | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    Order (1) DENYING Defendant's Motion to Dismiss the Indictment (Dkt. Nos. 45, 52) (IN CHAMBERS)**

Before the Court is a motion to dismiss the indictment ("Motion," or "MTD," Dkt. No. 45) filed by Defendant Jason Edward Thomas Cardiff ("Defendant," or "Cardiff"). The Court held a hearing on the Motion on June 3, 2024. The Court now issues this Order setting forth the reasons for the denial.

## I.    PROCEDURAL BACKGROUND

Defendant Cardiff is charged with three crimes: access device fraud under 18 U.S.C. § 1029(a)(5), aggravated identity theft under 18 U.S.C. § 1028A(a)(1), and witness tampering under 18 U.S.C. § 1512(b)(2)(B). ("Indictment," Dkt. No. 1.) Cardiff also faces criminal forfeiture. (Id.)

On April 8, 2024, Defendant moved to dismiss the indictment, or, in the alternative, to suppress evidence. (Motion.) Defendant filed in support of his Motion two declarations—one by Defendant himself ("Cardiff Decl.," Dkt. No. 45-1) and one by attorney Stephen G. Larson ("Larson Decl.," Dkt. No. 45-2)—as well as 90 exhibits (Dkt. Nos. 45-3–45-7). On April 22, 2024, the Government opposed the Motion. ("Opposition," Dkt. No. 61.) The Government filed in support of its Opposition five exhibits. (Dkt. Nos. 61-1–61-5.) On May 8, 2024, Defendant replied. ("Reply," Dkt. No. 69.) Defendant filed in support of his Reply a second

declaration of attorney Stephen Larson ("Second Larson Decl." or "SLD," Dkt. No. 69-1) and
an additional exhibit ("Ex. A to SLD," Dkt. No. 69-2).

The Court held a hearing on the Motion on June 3, 2024, at which the parties presented
oral argument.

## II.    FACTS

Defendant Jason Cardiff served as Chairman of the Board of Directors, CEO, and
President of Redwood Scientific Technologies, Inc. ("Redwood"), a Delaware corporation with
its corporate headquarters in Upland, California, which "sold various products to consumers,
including thin film strips marketed as homeopathic remedies causing weight loss, male sexual
enhancement, and smoking cessation." ("Indictment," Dkt. No. 1.) The Indictment charges
Cardiff with three crimes related to the operation of his business: access device fraud under 18
U.S.C. § 1029(a)(5), aggravated identity theft under 18 U.S.C. § 1028A(a)(1), and two counts of
witness tampering under 18 U.S.C. § 1512(b)(2)(B). (See id.)

In his Motion, Defendant argues that the Department of Justice ("DOJ"), the United
States Postal Investigation Service ("USPIS"), the Federal Trade Commission ("FTC"), and
the United States Attorney's Office ("USAO") violated his constitutional rights by conducting a
joint FTC civil action and criminal investigation in bad faith. (See Motion.) Defendant further
argues that the Government failed to preserve potentially exculpatory evidence, engaged in fraud
on the court, and prejudiced Defendant's right to prepare a defense due to its pre-Indictment
delay. (See id.) The following facts are relevant to Defendant's contentions.

### A. The Civil Investigation and FTC Action

On August 11, 2017, the FTC served a Civil Investigative Demand ("CID") to Redwood,
directing it to Jason Cardiff as Redwood's President and CEO. See FTC v. Redwood, Case No.
2:17-cv-07921 (C.D. Cal. 2017), Dkt. No. 1 (petition for order enforcing the CID after Redwood's
failure to comply). The CID was issued in furtherance of an FTC investigation to determine
whether Redwood's advertising and marketing of two products—TBX-FREE and Eupepsia
Thin—violated Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45, 52, by making false or
unsubstantiated representations. See id. On January 25, 2018, Redwood was ordered to comply
with the CID on or before February 9, 2018. Id., Dkt. No. 17. Redwood again failed to comply,
and on March 20, 2018, the court issued an Order to Show Cause. See id., Dkt. Nos. 17, 20, 22.
In or around June 2018, Redwood produced a subset of the requested documents to the FTC.
(See Opposition at 1–2.)

On October 10, 2018—over a year after serving the CID on Redwood—the FTC filed an
action against various defendants, including Cardiff, his wife, Eunjung Cardiff, Redwood, and
several other companies with which the Cardiffs were affiliated. See FTC v. Cardiff, et al., Case
No. 5:18-cv-02104-DMG-PLA (C.D. Cal. 2018) (hereinafter cited as "FTC v. Cardiff" and
referred to as "FTC Action"), Dkt. No. 1; (Def. Ex. 11.) That same day, the FTC filed an ex

parte application for a temporary restraining order and order to show cause why a preliminary
injunction should not issue, as well as an order waiving the requirement that defendants be
noticed of the pending motions.  FTC v. Cardiff, Dkt. No. 5.  In its application, the FTC also
requested the appointment of a temporary receiver over the corporate defendants and the
Cardiffs' assets, arguing that "[a] neutral receiver would prevent further harm to consumers and
would locate and secure assets and records without disrupting any legitimate business activity"
and "also help assess the extent of the fraud, trace its proceeds, prepare an accounting, and make
an independent report of Defendants' activities to the Court." Id. at 50.  The FTC requested
immediate access to the corporate defendants' business premises "to allow the receiver and the
FTC to quickly and efficiently locate assets Defendants have wrongfully taken from consumers,
identify possible additional defendants, and locate and secure documents pertaining to
Defendants' business." Id. at 52.  The FTC specifically requested that Robb Evans LLC be
appointed as a temporary receiver, touting Robb Evans's "extensive experience . . . serving as a
receiver in government law enforcement actions." FTC v. Cardiff, Dkt. No. 31.

On October 10, 2018, the Court granted the FTC's request for a temporary restraining
order and adopted the proposed order submitted by the FTC, which appointed Robb Evans LLC
as Receiver and permitted the FTC and the Receiver "immediate access" to Defendant's
business premises. FTC v. Cardiff, Dkt. No. 29; (Def. Ex. 13.)  The order specifically "directed
and authorized" the Receiver to "cooperate with reasonable requests for information or
assistance from any state or federal civil or criminal law enforcement agency." FTC v. Cardiff,
Dkt. No. 29, at 19, 25.  It also "directed and authorized" the Receiver to "[a]llow Plaintiffs'
representatives, agents, and assistants, as well as Defendants and their representatives reasonable
access to all Documents in the possession, custody, or control of the Receivership Entities" and
"[a]llow Plaintiffs' representatives, agents, and assistants, as well as Defendants' representatives
and Defendants themselves, reasonable access to the premises of the Receivership Entities, or
any other premises where the Receivership Entities conduct business." Id. at 19, 24–25.

The instant Motion concerns the propriety of the Receiver's conduct in complying with
requests made by the FTC, the USPIS, the USAO, and the DOJ during the pendency of the FTC
Action.  Directly below is a summary of the conduct Defendant contends demonstrates the
improper relationship between the Receiver and these government entities.

- On October 18, 2018, the Receiver granted a request by the USPIS that they be
  permitted to enter the Redwood offices and "inspect the locations photocopy
  and/or photograph items, and image computers." (Def. Ex. 16 at 1.)  Two Postal
  Inspectors and two USPIS computer analysis then conducted a search of the
  Redwood offices and obtained evidence.[1]  (Id.)

---

[1] In September 2019, the court in the FTC Action approved the joint motion filed by the
parties and entered a stipulated protective order prohibiting public disclosure of confidential,
proprietary, or private information unless otherwise required or authorized by law.  (Def. Ex. 27.)
The joint motion for protective order did not reference that the Receiver had previously allowed

**CRIMINAL MINUTES—
                                              GENERAL**                    Initials of Deputy Clerk mg

- On or about November 30, 2018, the Receiver halted payments on Redwood's Google Suite account.  (Motion at 9 (citing Def. Exs. 14, 65 and explaining that the Receiver's bills cease recording payments to Google for maintenance of the account from this date forward).)
- On May 17, 2019, the Receiver provided the Cardiffs' passport information to the USPIS.  (Opposition at 10 (citing Def. Ex. 23, at 2).)
- A "few weeks before" May 15, 2020, the Receiver spoke with DOJ attorney J. Matt Williams concerning the DOJ investigation into the Cardiffs and their businesses and agreed to "provide interview notes/summaries for any potential witnesses [the Receiver] interviewed in connection with the immediate access and the initiation of the Receivership."  (Def. Ex. 38, at 1.)
- On May 26, 2020, the Receiver signed and returned the DOJ's May 15, 2020 "waiver of the attorney client/work product privilege for the Receivership entities" and provided the DOJ with handwritten notes taken by the Receiver regarding Redwood and its employees.  (Def. Ex. 39.)
- On June 19, 2020, upon learning that Defendant Cardiff inquired about a rental property in Manhattan, the Receiver notified the USPIS and the DOJ about the inquiry.  (Def. Ex. 40.)  Counsel for the Receiver later notified the DOJ that a supplemental receiver report filed in the FTC Action concerned Cardiff "and materially altered bank account statements submitted by email to a New York City real estate broker."  (Def. Ex. 45.)
- On June 22, 2020, the Receiver provided consent to the DOJ to obtain Redwood's Customer Relationship Management ("CRM") data directly, so the Receiver could be "cut[] out as the middle man."  (Def. Ex. 42.)
- On June 23, 2020, at the request of the DOJ, the Receiver signed a "Stored Communications Act Consent" granting the Government access to any Receivership Entity third-party stored data.  (Def. Ex. 42, at 1, 4–5.)
- On August 18, 2020, the Receiver agreed to send 308 gigabytes of information stored on Redwood's Google Drive to the DOJ.  (Def. Ex. 61.)
- On August 26, 2020, the Receiver agreed to send a copy of Redwood's QuickBooks data to the DOJ.  (Def. Ex. 63, at 1.)
- Throughout the pendency of the FTC Action, the Receiver did not include in its applications requesting fees for its work any reference to assisting with the criminal investigation.  (See Def. Exs. 14, 16, 19, 65, 71.)
- On April 20, 2021, the Receiver responded to a question posed by the DOJ and stated that the Receiver was "not able to locate" electronic audit logs on Redwood's Google Suite account.  (Def. Ex. 74.)
- Also on April 20, 2021, the Receiver informed the USPIS and the DOJ that "the company decided not to log in and renew [Redwood's Google Suite] account to avoid alerting [Cardiff] of any interest in the data."  (Def. Ex. 75.)

the USPIS to conduct a search of Redwood's offices and obtain documents from that search. (See id.)

**CRIMINAL MINUTES— GENERAL**
Initials of Deputy Clerk mg

- On July 6, 2021, the Receiver provided consent to the USPIS to review items and documents stored in a self-storage unit, as well as a Redwood laptop. (Def. Ex. 80.) The Receiver also provided a copy of a photo of the storage unit. (Def. Ex. 79.)
- On September 14, 2022, the Receiver submitted a request for an order permitting destruction of data related to Defendant Cardiff and Redwood's business operations because the Receiver was prohibited by the permanent injunction from returning such documents to Cardiff. (Def. Ex. 85, at 3:20–22 (requesting that the Receiver be "authorized to immediately destroy the remaining records and computers of the Defendants and/or Receivership Entities in the Receiver's possession, which records contain consumer information").)

Although the FTC Action was civil in nature, multiple references to a potential criminal investigation were made during the pendency of that action. On July 27, 2019, during a contempt hearing related to Cardiff's conduct, the court recommended on the record that the FTC refer the matter to the United States Attorney's Office for criminal investigation. (Dkt. No. 13-3 at 391:15–19 ("I would suggest that the FTC seriously consult with the office of the U.S. Attorney and bring this matter to the attention of the federal authorities, criminal section of the U.S. Attorney. This is outrageous, unbelievable."). On March 28, 2019, during the deposition of Defendant Cardiff's wife, the Cardiffs' counsel explained that he believed the FTC would refer the matter for criminal investigation and prosecution: "I am concerned that given what I see on your website and given the history of how the FTC has pursued civil matters . . . at some point in time, and I don't know when, but they get flipped over for potential criminal prosecution." (Gov. Ex. 3 at 17.) When the Cardiffs' counsel asked if the FTC had communicated with anyone with "prosecutorial authority regarding the case," the FTC responded that ". . . from time to time we share information with Government agencies, and those communications with Government agencies may be civil or criminal and are confidential, and we can't disclose them." (Id. at 18–19.) Counsel then said the response "tells me what I needed to know. And that is, in essence, there is quite often a pattern of practice where the FTC civil flips information to criminal." (Id. at 19.) Counsel instructed Defendant Cardiff's wife to invoke her Fifth Amendment privilege, which she did. (Id. at 22.) The next day, counsel incorporated the preceding criminal referral conversation into Defendant Cardiff's deposition and Defendant Cardiff "invoke[d] [his] Fifth Amendment privilege" for every question asked of him during the deposition. (See Gov. Ex. 2.)

On October 9, 2020, the court granted summary judgment in favor of the FTC on 16 claims. FTC v. Cardiff, Dkt. No. 511. On September 3, 2021, the FTC filed a proposed permanent injunction which included provisions requiring that Cardiff destroy customer information in his possession and prohibiting the Receiver from returning customer information to Cardiff. Id., Dkt. No. 651; (see Def. Ex. 82, at 3, 30–31, 61.)

On March 1, 2022, the court entered a permanent injunction against Cardiff, his wife, and all their related companies prohibiting their fraudulent conduct. Id., Dkt. Nos. 705–06. The permanent injunction entered by the court adopted the FTC's request that the Cardiffs, as well

**CRIMINAL MINUTES—GENERAL**

as "their officers, agents, employees, and all other persons in active concert or participation with
any of them," destroy customer information relating to the business.  See id.; (see Def. Ex. 52, at
28–29.)

## B. Contact Between the FTC, the USPIS, the DOJ, and the Receiver During the Civil Investigation and FTC Action

Central to Defendant's arguments is the contact between the FTC, the United States
Postal Investigation Service ("USPIS"), the DOJ, and the court-appointed Receiver during the
pendency of the FTC Action but before the filing of the Indictment.  (See generally Motion.)
Defendant specifically alleges that the "Indictment is the result of a years-long, clandestine, and
joint criminal investigation of Cardiff" by the FTC, the USPIS, the DOJ, the United States
Attorney's Office, and the Receiver, which, "with the Government clearly at the helm, . . .
abused their power and manipulated the civil court system to illegally build this criminal case
against Cardiff."  (Motion at 1.)  In his Motion, Defendant sets forth an extensive chronology of
the Government's communications during the civil and criminal investigative efforts.  (See
Motion at 4–23.)  Above, the Court summarizes the Receiver's conduct during the FTC
Action—that is, key actions taken by the Receiver in its official capacity which Defendant argues
were improper.  Below, the Court describes key communications between various government
actors and the Receiver to provide context for how the government actors shared information
internally and with the Receiver during the civil and criminal investigations.

The story begins on July 17, 2018, when a USPIS Postal Inspector and an FTC attorney
first conversed about the FTC's then-ongoing investigation of certain companies centered in
Upland, California (Redwood); in a follow-up letter, the FTC attorney noted that the FTC
expected to hear from the USPIS "regarding [its] interest in pursuing this matter further with
us." (Def. Ex. 2, at 2.)  On July 24, 2018, USPIS requested from the FTC information related to
Cardiff and Redwood via a "Request for Non-public Materials and Certification of Intent to
Maintain Confidentiality and to Restrict Use to Law Enforcement Purposes" pursuant to 16
C.F.R. § 4.11(c).  (Def. Ex. 3.)  The "law enforcement purpose" listed for the request is to
"[a]ssist FTC staff in investigation of advertising and marketing practice for thin film strip
products."  (Id.)  The FTC granted this request on August 3, 2018.  (Def. Ex. 5.)  A little over a
week later, the FTC attorney arranged a phone call with the USPIS Postal Inspector and another
FTC attorney for August 20, 2018.  (Def. Ex. 7.)

In early September 2018, the FTC attorney and the Postal Inspector planned some sort of
reconnaissance of the Redwood business premises in Upland, which would include sending
USPIS associates to drive by the Redwood premises and the Cardiffs' home.  (Def. Exs. 8, 9.)
On October 5, 2018, the Postal Inspector conducted surveillance of the Redwood offices and the
Cardiffs' home.  (Def. Ex. 10 at 1.)  She walked into the building in which the offices were located
but was unable to enter the Redwood offices.  (Id.)  She returned to the premises on October 10,
2018 and observed a car that matched the description of that belonging to Cardiff's wife but was
again unable to enter the Redwood offices.  (Id. at 2.)

**CRIMINAL MINUTES—
GENERAL**                    Initials of Deputy Clerk mg

The FTC filed the FTC Action five days later. (Def. Ex. 11.) As referenced above, the
FTC applied for and was granted an ex parte temporary restraining order which appointed their
preferred Receiver, Robb Evans LLC. While the TRO was pending, the FTC attorney updated
the Postal Inspector that there was "[n]o word from the Court yet, so our earliest date at this
point will be Friday, October 12, 2018." (Def. Ex. 12.) On October 10, 2018, the FTC attorney
notified the Postal Inspector that the TRO was approved and informed her that the "immediate
access" would occur on October 12, 2018. (Def. Ex. 15.) He also reminded her that they had
planned to meet at the Upland Police Department. (Id.)

On October 18, 2018, the Postal Inspector requested that the Receiver permit her to
return to the Redwood offices and allow USPIS inspectors and computer analysts to "enter the
premises to inspect the locations, photocopy and/or photograph items, and image computers."
(Def. Ex. 16 at 1.) On October 22, 2018, two Postal Inspectors conducted a search of the
Redwood offices alongside two USPIS forensic computer analysts. (Id.) In a December 17, 2018
email, an FTC attorney stated that the USPIS was "very helpful, as it has been on a number of
recent FTC cases, so thank you very much." (Def. Ex. 18.)

The FTC made several additional requests of the USPIS from April to July 2019. On
April 4, 2019, an FTC attorney asked the Postal Inspectors to investigate a letter Cardiff
purportedly sent to "the US consulate in Shanghai requesting permission for a Chinese factory
engineer to come to the US to install a machine that makes . . . CBD strips." (Def. Ex. 20 at 1.)
On April 29, 2019, the FTC attorney asked if the USPIS had an ally who could assist with an
investigation into Canadian companies related to Cardiff, and the USPIS agreed to assist. (Def.
Exs. 21, 22.) On May 17, 2019, the FTC attorney asked the USPIS to assist in implementing a
passport watch for Cardiff, and when the USPIS asked for the Cardiffs' passport information, the
FTC attorney responded that "[t]he receiver will send it to you momentarily." (Id.) (Def. Ex.
23.) On June 14, 2019, the USPIS conducted surveillance of an address of a company related to
Cardiff that the FTC asked them to surveil to assist with a motion for contempt which the FTC
planned to file in the FTC Action. (Def. Ex. 24.) In July 2019, the FTC attorney left a voicemail
with the USPIS inquiring about whether they could help the FTC with an alleged witness
intimidation incident. (Def. Ex. 25.)

Communications between the FTC and the DOJ began in October 2019. On October 22,
2019, the FTC referred the Cardiff matter to the DOJ via a criminal referral document. (Def. Ex.
28.) On November 6, 2019, the DOJ submitted to the FTC a "Request for Non-public Materials
and Certification of Intent to Maintain Confidentiality and to Restrict Use to Law Enforcement
Purposes" pursuant to 16 C.F.R. § 4.11(c) requesting information related to Cardiff and
Redwood. (Def. Ex. 29.) The FTC granted that request on November 8, 2019. (Def. Ex. 30.) In
December 2019, a DOJ attorney requested deposition transcripts from the FTC Action, which
the FTC provided. (Def. Ex. 31.)

In early 2020, the FTC transferred to the DOJ multiple terabytes of data concerning
Redwood and/or Cardiff. (See Def. Exs. 32, 33.) In March 2020, the FTC granted DOJ
attorneys access to the "FTC's Redwood databases" on Relativity. (Def. Ex. 35.) The FTC also

**CRIMINAL MINUTES—
GENERAL**    Initials of Deputy Clerk mg

appears to have provided work product to the DOJ, including information about key people related to Redwood's operations, (see Def. Ex. 34), and a list of potentially cooperative individuals, (see Def. Ex. 36).  In May 2020, a DOJ attorney sent a calendar invite to another DOJ attorney, an FTC attorney, and an FTC investigator for a weekly meeting.  (Def. Ex. 37.)  In May 2020, a DOJ attorney requested and secured from the Receiver a signed waiver of the attorney client privilege and work product privilege for the Receivership entities and handwritten notes taken by the Receiver concerning Redwood.  (Def. Exs. 38, 39.)  In June 2020, the DOJ requested consent from the Receiver to obtain Redwood's CRM data.  (See Def. Ex. 42.)  The DOJ also obtained from the Receiver a signed "Stored Communications Act Consent," which allowed the Government to access third-party stored data for the Receivership entities.  (Id.)  The Receiver informed the DOJ that Cardiff inquired about a rental property in Manhattan, and that the Receiver filed a supplemental report in the FTC Action about altered bank account statements submitted by Cardiff.  (Def. Exs. 40, 45.)

The FTC and the DOJ continued to share information throughout summer 2020.  During that time, the DOJ and the FTC discussed preservation letters sent by the FTC, (see Def. Ex. 44), a production made by Cardiff's co-defendant in the FTC Action (and supplied that production to the DOJ), (see Def. Ex. 47), information about the identities of individuals associated with businesses related to Cardiff, (see Def. Ex. 50), and the proposed final judgment filed by the FTC, along with a note that it kept the Receiver in place, (see Def. Ex. 52).  The FTC also provided a complete export of the FTC's Redwood Relativity data (1.06 TB), (Def. Ex. 60), and an additional 20 gigabytes of data.  In August 2020, the Receiver provided information stored on Redwood's Google Docs/Drive and a copy of Redwood's QuickBooks data to the DOJ.  (Def. Ex. 61.)

Contact between the FTC and the DOJ continued throughout 2020 and into early 2021, with DOJ attorneys asking specific questions about Redwood's operations, including its merchant processor website approvals, (see Def. Ex. 66), order system, (see Def. Ex. 72), and other specific documents, (see Def. Ex. 67).

In April 2021, a DOJ attorney asked the Receiver whether it had access to electronic audit logs hosted on Redwood's Google Suite account, and the Receiver responded that they were not able to locate them.  (Def. Exs. 73, 74.)  The Receiver explained that "the company decided not to log in and renew [Redwood's Google Suite] account to avoid alerting [Cardiff] of any interest in the data."  (Def. Ex. 75.)  The DOJ attorney then asked if the FTC downloaded audit logs from the Google Suite Account, and the FTC responded that they did not.[2]  (Def. Ex. 74.)  On June 30, 2021, the FTC emailed DOJ attorneys to inform them that the Cardiffs' passports would be returned in short order.  (Def. Ex. 78.)  On July 6, 2021, a USPIS Postal Inspector and another USPIS analyst reviewed documents stored by the Receiver in a storage unit—a search to which the Receiver consented.  (Def. Exs. 79, 80.)

---

[2] On April 30, 2021, Google confirmed that Redwood's Google Suite data was destroyed. (Def. Ex. 76.)

**CRIMINAL MINUTES— GENERAL** Initials of Deputy Clerk mg

As a general matter, it appears the FTC sent filings made in the FTC Action to the DOJ. (See Motion at 21 (citing Def. Ex. 83).)  Defendant contends that the permanent injunction proposed by the FTC—which included the provisions referenced above requiring that Cardiff destroy customer data and the Receiver be prohibited from providing customer data to Cardiff— was sent by the FTC to the Government on September 9, 2021.[3]  (See id.)  The FTC forwarded to the DOJ the Receiver's request and flagged the provision that would permit the Receiver to destroy records related to Cardiff and Redwood because the Receiver was barred by the permanent injunction from returning those documents to Cardiff.  (Def. Ex. 87 ("FYI see para 7 of proposed order").)  The FTC later forwarded the signed order to the DOJ.  (Def. Ex. 89.)

## C. The Criminal Investigation and Indictment

Because the Court provides above a lengthy discussion of the contact between the various government entities during the pendency of the FTC Action, this section of the order provides additional detail about the criminal investigation from the issuance of the first known grand jury subpoenas to the filing of the Indictment.  As explained above, both before and after the matter was referred to the DOJ in late 2019, the DOJ had consistent contact with the FTC, which indisputably shared documents and information concerning Defendant and his company, Redwood, with the DOJ.  (See Motion at 4–22.)  On August 11, 2020, the United States Attorney's Office issued grand jury subpoenas in the criminal investigation.  (Def. Exs. 53–59.)  On November 19, 2020, USPIS issued a grand jury subpoena to Google seeking Google Suite records for domains associated with Cardiff and Redwood.  (Def. Ex. 76.)  In March 2022, the USAO presented its case against Defendant Cardiff to the Grand Jury, which resulted in his being indicted.  (Indictment.)

On January 23, 2023, an Indictment was filed against Defendant Cardiff in the Central District of California.  (Id.)  As referenced above, the Indictment charges Cardiff with three crimes: access device fraud under 18 U.S.C. § 1029(a)(5), aggravated identity theft under 18 U.S.C. § 1028A(a)(1), and two counts of witness tampering under 18 U.S.C. § 1512(b)(2)(B). (See id.)  The crimes alleged in the Indictment concern Cardiff's conduct as the Chairman of the Board of Directors, CEO, and President of Redwood, a Delaware corporation with its corporate headquarters in Upland, California, which "sold various products to consumers, including thin film strips marketed as homeopathic remedies causing weight loss, male sexual enhancement, and smoking cessation."  (Id.)  The Indictment alleges that from January 2018 through May 2018, Defendant Cardiff ordered his employees to participate in a scheme through which one-time single-purchase customers were placed on periodic continuity sales plans without their authorization or consent.  (Id.)  The scheme defrauded consumers out of hundreds of thousands of dollars.  (Id.)  During this scheme, Defendant ordered the destruction of documents Redwood had been ordered to produce as part of the FTC Action.  (Id.)

---

[3] The document cited by Defendant in support of this proposition indicates that Defendant is correct, and the Government does not dispute this fact in its Opposition.

**CRIMINAL MINUTES— GENERAL**            Initials of Deputy Clerk mg

From December 27, 2023 through March 22, 2024, the DOJ produced to Defendant
voluminous discovery material—over 17.8 million pages—including 308 gigabytes of material
from Redwood's Google Account. (Opposition at 5 (citing "Gov. Ex. 1," Dkt. No. 61-1); accord
Motion at 19 n.6, 30 n.10.) The DOJ also produced over 10 terabytes of forensic images of
Defendant's electronic devices. (Gov. Ex. 1.)

## III.   LEGAL STANDARD

### A. Dismissal of an Indictment or Suppression of Evidence on Due Process Grounds

Pursuant to Federal Rule of Criminal Procedure 12(b)(1), "[a] party may raise by pretrial
motion any defense, objection, or request that the court can determine without a trial on the
merits." "District courts have occasionally suppressed evidence or dismissed indictments on
due process grounds where the government made affirmative misrepresentations or conducted a
civil investigation solely for purposes of advancing a criminal case." United States v. Stringer,
535 F.3d 929, 937 (9th Cir. 2008).

Generally, the Government may conduct parallel civil and criminal investigations without
violating a criminal defendant's Due Process rights. See id. at 937. However, parallel
investigations may result in "such unfairness and want of consideration for justice" to
independently invalidate a conviction. United States v. Kordel, 397 U.S. 1, 11 (1970). In Kordel,
the Supreme Court identified five such circumstances: (1) "the Government has brought a civil
action solely to obtain evidence for its criminal prosecution," (2) the Government "has failed to
advise the defendant in its civil proceeding that it contemplates his criminal prosecution," (3)
"the defendant is without counsel," (4) the defendant "reasonably fears prejudice from adverse
pretrial publicity or other unfair injury," or (5) there are "any other special circumstances that
might suggest the unconstitutionality or even the impropriety of this criminal prosecution." Id.
at 11–12. In Stringer, the Ninth Circuit explained that the central inquiry in evaluating whether
parallel investigations violate Due Process is whether the government acted in bad faith. See
Stringer, 535 F.3d at 836–37. Given this high bar, "[c]ourts only find bad faith 'where the
government made affirmative misrepresentations or conducted a civil investigation solely for the
purposes of advancing a criminal case,' or where the Government has otherwise engaged in some
form of fraud, trickery, or deceit." United States v. Ogbazion, 2016 WL 6070365, at *3 (S.D.
Ohio Oct. 17, 2016) (citing Stringer, 535 F.3d at 937–41).

### B. Preservation of Exculpatory Evidence

The Government's failure to disclose or preserve material exculpatory evidence violates
the Due Process Clause of the Fourteenth Amendment, regardless of whether the Government
acted in good or bad faith. Arizona v. Youngblood, 488 U.S. 51, 57 (1988). Evidence is
exculpatory if it tends to prove the defendant's innocence. United States v. Bruce, 984 F.3d 884,
895 (9th Cir. 2021). Material exculpatory evidence is that which, if preserved and admitted at
trial, "would have created a reasonable probability of" exoneration, see id. at 898, not that which
merely "'could have' exculpated the defendant," United States v. Drake, 543 F.3d 1080, 1090

(9th Cir. 2008) (emphasis in original).  In California v. Trombetta, the Supreme Court instructed that material exculpatory evidence must "possess an exculpatory value that was apparent before the evidence was destroyed" and be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  467 U.S. 479, 489 (1984); accord United States v. Labbad, 2014 WL 12866922, at *3 (C.D. Cal. Apr. 21, 2014); see also United States v. Del Toro-Barboza, 673 F.3d 1136, 1149 (9th Cir. 2012) (finding that evidence was only potentially exculpatory, not material and exculpatory, because its exculpatory nature was not apparent).

The Government's failure to preserve *potentially* exculpatory evidence, however, is a Due Process violation only if done in bad faith.  United States v. Robertson, 895 F.3d 1206, 1211 (9th Cir. 2018).  Potentially exculpatory evidence is that which "could have been subjected to tests, the results of which might have exonerated the defendant."  Youngblood, 488 U.S. at 57.  "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith."  United States v. Zaragoza-Moreira, 780 F.3d 971, 977 (9th Cir. 2015).  Importantly, even where the Government acted with bad faith in destroying exculpatory evidence, a Due Process violation has not occurred unless the destroyed evidence is unobtainable by other reasonably available means.  See Trombetta, 467 U.S. at 489.

## C. Fraud on the Court

The term "fraud on the court" is read narrowly to "embrace[] only that species of fraud which does or attempts to, defile the [C]ourt itself, or is a fraud perpetrated by officers of the [C]ourt so that the judicial machinery cannot perform in the usual manners its impartial task of adjudging cases that are presented for adjudication."  Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003); In re Intermagnetics America, Inc., 926 F.2d 912, 916 (9th Cir. 1991) (same).  "Fraud on the court requires a 'grave miscarriage of justice' . . . and a fraud that is aimed at the court."  Id. (quoting United States v. Beggerly, 524 U.S. 38, 47 (1998)).

To show fraud on the court, Defendant must demonstrate, "by clear and convincing evidence, an effort by the government to prevent the judicial process from functioning in the usual manner.  [Defendant] must show more than perjury or nondisclosure of evidence, unless that perjury or nondisclosure was so fundamental that it undermined the workings of the adversary process itself."  United States v. Est. of Stonehill, 660 F.3d 415, 445 (9th Cir. 2011).  In conducting this analysis, courts consider whether the "fraud prevents the opposing party from fully and fairly presenting his case" or "involve[d] an unconscionable plan or scheme which is designed to improperly influence the court in its decision."  United States v. Sierra Pac. Indus., 100 F. Supp. 3d 948, 955 (internal citations and quotations omitted).

//
//
//

**CRIMINAL MINUTES—
GENERAL**                    Initials of Deputy Clerk mg

## D. Pre-Indictment Delay

Statutes of limitations are "the primary guarantee against bringing overly stale criminal charges." United States v. Marion, 404 U.S. 307, 322–23 (1971) (citation omitted). Such statutes "are made for the repose and protection of those who may (during the limitation) have lost their means of defense." Id. at 322 (quoting United States v. Ewell, 383 U.S. 116, 122 (1966) and St. Louis Public Sch. v. Walker, 76 U.S. 282, 288 (1869)). The Due Process Clause of the Fifth Amendment also "has a limited role to play in protecting against oppressive pre-accusation delay." Evans v. Santoro, 2023 WL 3325946, at *5 (C.D. Cal. Mar. 31, 2023). "[D]ue [P]rocess would require dismissal of criminal charges if it were shown that the pre-charging delay 'caused substantial prejudice to [the defendants] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.'" Id. at *5 (quoting Marion, 404 U.S. at 324).

"In order to succeed on his claim that he was denied due process because of pre-indictment delay, [a defendant] must satisfy both prongs of a two-part test. First, he must prove actual, non-speculative prejudice from the delay." United States v. Corona-Verbera, 509 F.3d 1105, 1112 (9th Cir. 2007) (internal quotation marks and citation omitted). "In order to establish actual prejudice, [the defendant has] to show definite, non-speculative proof that demonstrate[s] how the loss of a witness and/or evidence was prejudicial to his case." United States v. Doe, 149 F.3d 945, 948 (9th Cir.), cert. denied, 525 U.S. 988 (1998) (cleaned up). "[E]stablishing prejudice is a heavy burden that is rarely met." Corona-Verbera, 509 F.3d at 1112 (internal quotation marks and citation omitted); accord United States v. Sherlock, 962 F.2d 1349, 1354 (9th Cir. 1989). "[T]he mere absence of records is not enough to establish actual prejudice." Corona-Verbera, 509 F.3d at 1113.

"The second prong of the test applies only if [a defendant] has demonstrated actual prejudice." Id. Under this prong, "the length of the delay is weighed against the reasons for the delay, and [the defendant] must show that the delay offends those fundamental conceptions of justice which lie at the base of our civil and political institutions." Id. (internal quotation marks and citation omitted); see also United States v. Lovasco, 431 U.S. 783, 790 (1977).

## IV.    DISCUSSION

Defendant argues that the Indictment should be dismissed, in whole or in part, or alternatively, that certain evidence should be suppressed. Defendant contends as follows: (1) the Government violated his Due Process and Fourth Amendment rights by conducting a joint civil action and criminal action in bad faith; (2) the Government violated his Due Process rights by failing to preserve potentially exculpatory evidence; (3) the Government engaged in fraud on the court by utilizing the Receiver inappropriately, omitting material facts from record in the FTC Action, and failing to inform the court of the significance of its destruction of evidence orders; and, (4) the Government's pre-Indictment delay prejudiced Defendant's right to prepare a defense and secure a fair trial. (See Motion.) The Court addresses each argument in turn, and, for the reasons set out below, concludes that all of Defendant's arguments are unavailing.

**A. Joint Civil Action and Criminal Investigation**

Defendant argues that the Indictment must be dismissed because the Government acted in bad faith in conducting a joint investigation against him. He presents two theories of bad faith: first, that the Government improperly utilized the FTC Action to build a criminal case against him, and second, that the Government deceived him into thinking that the investigation was only civil in nature.

**1. The Relationship Between the FTC Action and Criminal Case**

In his Motion, Defendant attempts to paint a picture of a deceptive, inextricably intertwined joint criminal and civil investigation conducted by the Government in knowing violation of Defendant's rights and the Receiver's ethical obligations with one clear goal. (See generally Motion.) In its Opposition, the Government does not dispute that the FTC, USPIS, DOJ, USAO, and Receiver communicated about the FTC Action, the civil investigation, and the criminal investigation, but contends that these actions were not improper and do not demonstrate bad faith. (See generally Opposition.) The Court agrees with the Government.

According to Defendant, the inception of the criminal investigation is the date the FTC first contacted the USPIS concerning Redwood and Cardiff: July 2018. (Motion at 24.) Defendant points out that this first contact occurred "many months before the FTC Action was initiated," (id. at 24), which is true, but does not demonstrate bad faith. Although the FTC Action began after the FTC first contacted the USPIS, the civil *investigation* predates the FTC Action, and began well before the FTC reached out to the USPIS. The FTC issued a CID to Redwood, and served that CID on Defendant Cardiff, in August 2017—a full year before the first contact between FTC and the USPIS.[4] (See Def. Ex. 3.) The fact that the civil investigation predates the criminal investigation "tends to negate any likelihood that the government began the civil investigation in bad faith." Stringer, 535 F.3d at 939.

Moreover, the final disposition of the FTC Action makes plain that the FTC did not bring its investigation solely to obtain evidence for a subsequent criminal prosecution. The FTC aggressively litigated a civil action against Defendant and obtained judgment against him. The FTC secured summary judgment against Cardiff and the other defendants in that case on 16 different claims. See FTC Action, Dkt. No. 511. The FTC also secured a permanent injunction against Defendant, his wife, and their companies prohibiting them from continuing the conduct found fraudulent by the Court. Id., Dkt. Nos. 705, 706. The fact that the FTC brought a

---

[4] In his Reply, Defendant contends that the civil investigation did not predate the criminal investigation because the CID was issued to Redwood, not Cardiff. (Reply at 9–10.) By Defendant's logic, the USPIS's search of the Redwood offices could not be construed as part of a criminal investigation *into Cardiff* because the USPIS did not search Cardiff's personal residence. Yet Defendant urges the Court to view all investigation into Redwood as investigation into him personally. The Court will not allow Defendant to draw a self-serving distinction otherwise unsupported by the evidence.

**CRIMINAL MINUTES—
GENERAL**    Initials of Deputy Clerk mg

successful action against Defendant further demonstrates a lack of bad faith on part of the Government. <u>United States v. Unruh</u>, 855 F.2d 1363, 1374 (9th Cir. 1987) ("There was no evidence of bad faith on the part of the prosecution in bringing the civil proceeding. The civil investigation culminated in at least one civil suit on behalf of the United States.").

Defendant argues that even though the FTC was successful in its civil action against him, "it does not mean that [the FTC Action] was not brought to aid in the development of the criminal case." (Reply at 10.) Instead, Defendant urges that the Court find bad faith based on the Government's dealings with the Receiver. True, the Receiver complied with many Government requests to search physical property, produce documents and records, and otherwise provide information, beginning with the USPIS's request to search the Redwood offices shortly after the appointment of the Receiver. But contrary to Defendant's argument, these facts do not demonstrate "that the Government ran a covert criminal investigation under the guise of the FTC Action."[5] (Reply at 10.)

First, the Receiver was appointed by the Court in a normal and proper course and served a legitimate purpose in the FTC Action. The court appointed the Receiver in conjunction with its issuance of a temporary restraining order, and only upon finding sufficient evidence that the Defendant and his companies had violated the FTC Act. See <u>FTC v. Cardiff</u>, Dkt. No. 3. The court explicitly found "good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers – including monetary restitution, rescission, or disgorgement – will occur from the sale, transfer, destruction or other disposition or concealment by Defendants of their assets or records, unless Defendants are immediately restrained and enjoined by order of this Court." <u>Id.</u> at 3–4. The court further found that "[g]ood cause exists for freezing the assets of all Defendants, appointing a temporary receiver over the Receivership Entities and over the assets of Jason Cardiff and Eunjung Cardiff, permitting Plaintiff and the Receiver immediate access to the Defendants' business premises, and permitting Plaintiff and the Receiver to take expedited discovery." <u>Id.</u> at 4. Accordingly, the record does not indicate that the FTC sought the appointment of the Receiver to ensure that the USPIS could search the Redwood offices or that the Government could be covertly supplied

---

[5] Defendant also argues that the Government knew from experience that the Receiver "would assist [] in its criminal investigation," and describes Robb Evans LLC as a "known ally of the FTC and DOJ" because "[t]he company boasted about repeated nominations by both entities." (<u>See</u> Motion at 7 n.4 (collecting cases in which Robb Evans LLC was appointed as a receiver); Reply at 10.) Defendant asks the Court to conclude that "the Government knew [Robb Evans] would provide them unfettered access and information about Cardiff outside the bounds of subpoenas, court orders, and the United States Constitution" based only on (1) the fact that the FTC and the DOJ had worked with Robb Evans in other receiverships and (2) Robb Evans's conduct in the FTC Action. (<u>See</u> Motion at 2, 7 n.4.) The Court has no reason to conclude that Robb Evans's repeated appointments demonstrate anything other than its qualifications and successful track record. And for the reasons set out below, the Court does not find the Receiver's conduct in the FTC Action unusual or extreme, and such conduct does not indicate it had an improper relationship with the Government.

**CRIMINAL MINUTES—GENERAL**                    Initials of Deputy Clerk mg

information useful in building its criminal case against Defendant.  The appointment of the
Receiver served a clear and legitimate purpose in the FTC Action: to ensure that Defendant and
his co-defendant wife could not continue their fraudulent behavior through their businesses
during the pendency of the FTC Action.  Because there was a legitimate purpose in appointing a
Receiver in the FTC Action, there is little likelihood that the Government sought that
appointment in bad faith.  See Stringer, 535 F.3d at 939 (explaining that the fact a civil
investigation predates that of a criminal investigation negates the likelihood that the Government
began the civil investigation in bad faith).

       Defendant further contends that the Receiver's compliance with the Government's
requests demonstrates improper collaboration.  Not so.  In the order appointing the Receiver, the
court made clear that the Receiver was expected to allow reasonable access to Redwood's
premises and documents:

> [The Receiver is directed and authorized to . . . ] [a]llow Plaintiffs'
> representatives, agents, and assistants, as well as Defendants' representatives and
> Defendants themselves, reasonable access to the premises of the Receivership
> Entities, or any other premises where the Receivership Entities conduct business.
> The purpose of this access shall be to inspect and copy any and all books, records,
> Documents, accounts, and other property owned by, or in the possession of, the
> Receivership Entities or their agents.  The Receiver shall have the discretion to
> determine the time, manner, and reasonable conditions of such access; . . .

> Allow Plaintiffs' representatives, agents, and assistants, as well as Defendants and
> their representatives reasonable access to all Documents in the possession,
> custody, or control of the Receivership Entities; [and], . . .

> Cooperate with reasonable requests for information or assistance from any state or
> federal civil or criminal law enforcement agency.

FTC v. Cardiff, Dkt. No. 29 at 19, 24–25.

       Defendant acknowledges that the court granted broad authority to the Receiver but insists
that the relevant order merely instructed the Receiver "[c]ooperate with *reasonable* requests for
information or assistance from any state or federal civil or criminal law enforcement agency,"
(emphasis added), and many of the Government's requests of the Receiver were not
"reasonable."  (See Motion at 25; Reply at 7.)  Defendant specifically identifies the following
"unreasonable" requests, all of which purportedly demonstrate the "intimate collaboration
between the Government, the FTC, and the Receiver": "(1) [waiving] the receivership entities'
attorney-client and work-product privileges and provid[ing] handwritten notes taken by the
Receiver regarding Redwood and its employees; (2) sign[ing] a 'Stored Communications Act
Consent,' granting the Government access to any Receivership Entity third-party stored data; (3)
send[ing] the Government 308 gigabytes of information stored on Google Docs regarding
Redwood and Cardiff; and (4) send[ing] a copy of Redwood's QuickBooks data to the

**CRIMINAL MINUTES—
GENERAL**

Government." (Motion at 25–26 (citing Def. Exs. 39, 42, 61, 63).) Defendant also finds unreasonable that the Receiver told the Government that Cardiff applied for a rental property in Manhattan. (Id. (citing Def. Ex. 40).) The Court disagrees. The foregoing actions comport with the court order in the FTC Action and evidence nothing more than the Receiver discharging its obligations to allow reasonable access to the Receivership entities' premises and documents. Nor does the Court find the Receiver's consent to the USPIS's search of Redwood's premises in the days after the Receiver's appointment to be so patently unreasonable as to give rise to an inference of bad faith. True, the USPIS unsuccessfully attempted to gain access to the Redwood offices before the appointment of the Receiver, and once the Receiver was appointed and gave consent, was then able to conduct what was by all accounts a thorough search. But the Receiver had the authority to permit that search. And as explained above, the Court cannot conclude that the Receiver was appointed *in order to* allow USPIS to conduct such a search—a fact which would cut toward a finding of bad faith—because there were other plainly legitimate reasons for the FTC to request, and the court to approve, the Receiver's appointment.

The key question is whether these facts demonstrate bad faith or otherwise present "such unfairness and want of consideration for justice" to independently invalidate a conviction. Kordel, 397 U.S. at 11; Stringer, 535 F.3d at 937. That standard is not easily met, and Defendant fails to meet it here. Though Defendant contends that the Receiver complied with unreasonable requests and implores the Court to agree, he offers no legal authority supporting this characterization. This Court finds no reason to agree with Defendant's position given the broad authority granted to the Receiver by the court in the FTC Action and the obvious legitimacy of that proceeding.

### 2. Affirmative Misrepresentations

Defendant separately argues that the Government deceived him during the FTC Action and caused him to believe the investigation was exclusively civil in nature. (Motion at 27–28; Reply at 10–11.) Defendant maintains that the Government's deception lies in its failure to reveal—and, indeed, in its efforts to conceal—that it was conducting a criminal investigation and that the Receiver was involved. (Motion at 27–28; Reply at 10–11.) In sum, Defendant argues that the Government was obliged to provide him notice of the criminal investigation and did not, and as a result, the Indictment must be dismissed. The Court disagrees.

In Stringer, the Ninth Circuit explained that "government agents [need] not disclose the possibility or existence of a criminal investigation, so long as they made no affirmative misrepresentations." 535 F.3d at 940. It is the Defendant who must demonstrate, through clear and convincing evidence, that the Government made such affirmative misrepresentations. See United States v. Bridges, 344 F.3d 1010, 1020 (9th Cir. 2003). In Stringer, the Ninth Circuit found no affirmative misrepresentation where an SEC attorney did not directly answer a question about another agency's involvement and instead directed counsel to an SEC form which warned that the civil investigation could lead to criminal charges against the defendants. 535 F.3d at 940–41. Nor did the SEC affirmatively mislead the defendants by declining to direct their counsel to a specific U.S. Attorney's Office when asked which office might be involved in a potential criminal

investigation. Id. Stringer also held that that an SEC attorney's request to court reporters to not reference the AUSA in the presence of the defendants' attorneys did not amount to an affirmative misrepresentation. Id. at 941. The Ninth Circuit explained that although the request "indicates an intent to prevent disclosure to defendants of the *actual* criminal investigation, the *possibility* of criminal investigation should have been well known to both the defendants and their counsel."[6] Id. (emphasis added).

Here, Defendant and his counsel were aware of Defendant's potential criminal liability, and the Government made no affirmative misrepresentation that Defendant was not under criminal investigation. Defendant invoked his Fifth Amendment right against self-incrimination during his deposition in the FTC Action. (See Gov. Ex. 2.) Defendant's counsel indicated on the record during a deposition that he believed the FTC would refer the matter for criminal investigation, and when he asked if the FTC communicated with anyone with "prosecutorial authority regarding the case," the FTC attorney responded, "from time to time we share information with Government agencies, and those communications with Government agencies may be civil or criminal and are confidential, and we can't disclose them." (Gov. Ex. 3 at 17–19.) Defendant's counsel said the FTC's response "tells me what I needed to know . . . in essence, there is quite often a pattern of practice where the FTC civil flips information to criminal." (Id. at 19.) These statements, and Defendant's invocation of his Fifth Amendment right during his deposition in the civil matter, demonstrate not only that the Government did not affirmatively mislead Defendant into thinking he would not be subject to a criminal investigation, but also that Defendant understood the FTC was likely "flip[ping] information to" the Government. (See id. at 19; Gov. Ex. 2 (Defendant repeatedly invoking Fifth Amendment privilege at FTC Action deposition)); see United States v. Rakow, 2006 WL 8445911, at *15 (C.D. Cal. July 3, 2006), aff'd, 286 Fed. Appx. 452 (9th Cir. 2008) ("While there is no evidence that defendants were explicitly told they were the subjects of a criminal investigation before they testified, there is evidence that they knew of, and had begun to plan for, such a possibility.").

---

[6] The Court offers brief commentary on the utility of United States v. Scrushy, 366 F. Supp. 2d 1134, 1141 (N.D. Ala. 2005), the case Defendant cites for the proposition that the Government was required to inform him of the criminal investigation. (See Motion at 24, 27; Reply at 9.) Scrushy is a non-binding case from the Northern District of Alabama. Scrushy employs a strict construction of what constitutes a permissible parallel investigation: "To be parallel, by definition, the separate investigations should be like the side-by-side train tracks that never intersect." 366 F. Supp. 2d at 1139. As demonstrated by Stringer, however, the rule is not so strict in the Ninth Circuit. Moreover, the facts of Scrushy are more extreme than those at issue here. In Scrushy, the SEC failed to advise the defendant of an ongoing criminal investigation, moved a deposition date to accommodate a USAO request, and changed the location of a deposition to establish a specific criminal venue, again after conferring with the USAO. See id. at 1139–40. The investigations in Scrushy were "merged" and "commingled" such that the civil investigation was proceeding at the direction of the USAO. See id. Scrushy is inapplicable here. Accordingly, the Court follows Stringer, not Scrushy.

**CRIMINAL MINUTES—GENERAL**    Initials of Deputy Clerk mg

Moreover, during a contempt hearing on July 29, 2019, the court in the FTC Action "suggest[ed] that the FTC seriously consult with the office of the U.S. Attorney and bring this matter to the attention of the federal authorities, criminal section of the U.S. Attorney." FTC v. Cardiff, Dkt. No. 13-3 at 391.  And the August 8, 2017 FTC CID to Redwood, which was served on Defendant, specifically states: "We may disclose the information in response to a valid request from . . . criminal federal law enforcement agencies for their official law enforcement purposes." FTC v. Redwood, Dkt. No. 1-2.  As portended by the CID, the USPIS and the DOJ later executed requests from the FTC for the material it collected through the CID.  (Motion at 4, 12 (citing Def. Exs. 3, 29).)  Surely Defendant and his counsel were aware during the FTC Action that a criminal investigation was imminent, if not already underway.

Defendant can point to no affirmative misrepresentations which might cut against the evidence demonstrating he understood the risk of criminal investigation.  All he can identify are instances in which the Government, much like the SEC in Stringer, took steps to "prevent disclosure to [Defendant] of the *actual* criminal investigation," but did not mislead Defendant about "the *possibility of* criminal investigation."  535 F.3d at 941 (emphasis added).  The conduct Defendant identifies—that the Government sought to keep its contact with the Receiver confidential, (Reply at 10–11), and allowed the Receiver not to renew Redwood's Google Suite account to avoid "alerting" Defendant of "any interest in the data"[7], (Def. Ex. 75)—concerns the scope and existence of the actual investigation, not the mere possibility of an investigation.  Accordingly, the Court concludes that the record here does not present "such unfairness and want of consideration for justice" to require dismissal of the Indictment.  Kordel, 397 U.S. 1, 11 (1970).

## B. Failure to Preserve Exculpatory Evidence

Defendant next contends that the Indictment is subject to dismissal due to the Government's failure to prevent the Receiver from destroying various records in connection with its obligations in the FTC Action.  (Motion at 28–32.)  The Court disagrees.

Defendant identifies a myriad of Redwood records which he contends "would potentially and actually refute the Government's criminal allegations against him."  (Motion at 30.)  According to Defendant, these records—Google Suite audit logs, "sales call recordings, Nest Cam recordings, staff meeting handwritten logbooks, customer sale log sheets, handwritten notes, and data reports of customer charges and rebills"—"were destroyed with the

---

[7] Notably, this decision was the Receiver's, not the Government's.  (Def. Ex. 75 *("[T]he company* decided not to log in and renew the account to avoid alerting Jason Cardiff (Cardiff) of any interest in the data.")* (emphasis added).)  Contrary to Defendant's characterization, it is unclear whether the Receiver decided not to renew Redwood's Google Suite account to avoid alerting Defendant that a criminal investigation was underway.  Instead, it appears that the Receiver's concern was that Cardiff would discover "any interest"—whether that interest was the Receiver's, the FTC's, or any other entity's—in the specific data stored in that account.  (See id.)

**CRIMINAL MINUTES—
GENERAL**                              Initials of Deputy Clerk mg

government's consent and notice." (Motion at 29, 30.) To be clear, Defendant does not (and cannot) allege that the Government destroyed these documents. Instead, Defendant argues that the Government failed to preserve these documents by (1) allowing the Receiver to decline to renew Redwood's Google Suite account, which resulted in the destruction of data on that account, and (2) failing to object or otherwise alert the court in the FTC Action of the potentially exculpatory nature of the documents the Receiver had requested approval from the court to destroy. (See id. at 30 (citing Def. Exs. 85, 87, 88).)

In his declaration, Defendant asserts that these records would show that he did not engage in the conduct described in the Indictment. Although Defendant does not offer specific descriptions of the documents he alleges were destroyed by the Receiver (i.e., dates of creation, specific content, keywords), he identifies general categories of documents which, if preserved, would have demonstrated that Redwood customers were given the option to either make a one-time purchase or participate in monthly rebilling, that protocols were put in place to ensure that rebilling only occurred with customer consent, and that he gave clear instructions to Redwood's employees concerning the need for express consent before charging customer credit cards. (See Motion at 30–31 (citing Cardiff Decl. ¶¶ 10–13).) In addition, the Google Suite audit logs would have shown that emails and documents were not deleted by Redwood employees, thereby corroborating that Defendant did not order the destruction of any evidence. (Id. at 31.) In essence, Defendant contends that Redwood's everyday business records would exonerate him, and the Government knowingly failed to preserve those records.

At the outset, the Court concludes that the records were not material exculpatory evidence, but were, at most, potentially exculpatory. All the Court has in the way of evidence supporting Defendant's assertion that the documents would have "potentially and actually refute[d] the Government's criminal allegations against him," (Motion at 30), is Defendant's own declaration, in which he swears to the existence of these documents and their contents. (See generally Cardiff Decl.) But Defendant's declaration lacks detail which might indicate that his statements have veracity. Moreover, as the Government points out, and Defendant concedes, the Government has made voluminous productions of over 17.8 million pages of documents and 308 gigabytes of data from the Redwood Google account, as well as 10 terabytes of forensic images of electronic devices associated with Redwood. (Opposition at 5, 13–14; Motion at 30, 31 n.10.) Those productions appear to include all documents collected by the Receiver from the Redwood Google account before the account was closed.[8] (See Def. Ex. 61; Opposition at 11–12.) Defendant identifies seven broad categories of records which were purportedly exonerative—all of which were created as part and parcel of "the daily operations of Redwood," (Motion at 30)— yet he cannot point to a single document among the Government's vast productions which

---

[8] In correspondence with the FTC, the Receiver stated that it had "a forensic image of the data contained in Google Suites." (Def. Ex. 4.) The Government requested that the Receiver provide it with "Google Docs as well as any other documents that may be contained in the cloud storage such as Google Drive," (Def. Ex. 61), and the Receiver made a production of such documents to the Government, (see Opposition at 12–13).

**CRIMINAL MINUTES—
GENERAL**    Initials of Deputy Clerk mg

corroborates his assertion.  This fact indicates that the records Defendant identifies may not have
been as exculpatory nor as prevalent as he claims.

Defendant argues that the Government knew the apparent exculpatory value of the
evidence at the time it was destroyed because it had access to the evidence and the evidence "on
its face . . . rebuts the Indictment's allegations."  (Reply at 3–4.)  But Defendant goes on to
contradict that position: "Given the nature of the Indictment's allegations, it is obvious on its
face that the destroyed evidence, which documented Redwood's nonfraudulent business
practices and included recordings of communications between Redwood employees and with
customers, were *potentially* exculpatory."  (Reply at 4 (emphasis added).)  The Court agrees that
the Government was aware that Redwood's daily business records were potentially exculpatory,
as these documents would reflect Redwood's auto billing practices and policies, demonstrate
employees' interactions with customers concerning billing, and evidence Defendant's conduct
with respect to billing—all facts relevant to the conduct alleged in the Indictment.  However, the
exculpatory nature of Redwood's business records was not facially obvious or apparent to the
Government at the time the Receiver destroyed them.  Their exculpatory nature could only be
deduced upon a substantive record-by-record review.  In other words, they "could have been
subjected to tests, the results of which might have exonerated the defendant."  Youngblood, 488
U.S. at 57.  Indeed, the contents of these records could just as easily contribute to the
Government's prosecution instead of Cardiff's defense.  Accordingly, the Court finds that the
records' exculpatory nature was not apparent to the Government at the time of their destruction,
and, therefore, the records were not material exculpatory evidence.  See Del Toro-Barboza, 673
F.3d at 1149 (box in which cash found, and cash itself, not material exculpatory evidence, because
they required testing for fingerprints to discern exculpatory value).

Because the Court concludes that the records were only potentially exculpatory,
Defendant must demonstrate that the Government acted in bad faith in failing to preserve them.
Zaragoza-Moreira, 780 F.3d at 978–79.  The bad faith requirement flows from the Supreme
Court's concern that "[w]henever potentially exculpatory evidence is permanently lost, courts
face the treacherous task of divining the import of materials whose contents are unknown and,
very often, disputed."  Id. at 57–58 (quoting Trombetta, 467 U.S. at 486).  "[R]equiring a
defendant to show bad faith on the part of the police both limits the extent of the police's
obligation to preserve evidence to reasonable bounds and confines it to that class of cases where
the interests of justice most clearly require it, i.e., those cases in which the police themselves by
their conduct indicate that the evidence could form a basis for exonerating the defendant."  Id. at
58.

"The presence or absence of bad faith turns on the government's knowledge of the
apparent exculpatory value of the evidence at the time it was lost or destroyed, because without
knowledge of the potential usefulness of the evidence, the evidence could not have been
destroyed in bad faith."  Id. at 977.  As explained above, the Court cannot conclude that the
exculpatory nature of Redwood's business records was apparent at the time the Government
learned of the Receiver's plan to destroy those records.  Moreover, the records were destroyed in
the normal course of the FTC Action, and for a legitimate reason—Defendant was found to have

**CRIMINAL MINUTES—
GENERAL**    Initials of Deputy Clerk mg

violated various laws, and the court in that action concluded he should not have access to the
information of the customers he defrauded. The Receiver then clarified with the court that it be
permitted to destroy records containing such information rather than return them to Defendant,
and the court approved that request. Nothing about that sequence of events smacks of bad faith.
See United States v. Guerrero-Hidrogo, 710 Fed. Appx. 774, 775 (9th Cir. 2018) ("[T]he
Government's routine overwrite of the [surveillance] video every sixty days was not a product of
official animus or of a conscious effort to suppress exculpatory evidence.") Plus, the
Government had reason to believe it had preserved the documents stored on Redwood's Google
Suite account because the Receiver had taken a forensic image of the data contained in that
account and had produced to the Government all "Google Docs as well as any other documents
that may be contained in the cloud storage such as Google Drive." (Def. Exs. 14, 61.) The
Government has since produced those documents, and many more, to Defendant.[9] Accordingly,
the Court has "no evidence before it that would allow it to infer an intent by government agents
to suppress evidence with potentially exculpatory value." United States v. Lopez-Rocha, 322 F.
Supp. 3d 1040, 1049 (S.D. Cal. 2018). Defendant has failed to establish a Due Process violation.

## C. Fraud on the Court

        Defendant argues that the Indictment must be dismissed because the Government
committed fraud on the court in the FTC Action. (Motion at 32–37.) Specifically, Defendant
alleges that the following Government conduct constitutes fraud on the court: (1) working with
the FTC to "procure" a Receiver to allow the USPIS to search Redwood's premises and
furtively collect additional evidence without engaging with the normal procedures for subpoenas
and warrants, while representing to the court that the Receiver should be appointed to protect
Redwood's assets; (2) allowing the court to enter a protective order after documents had already
been provided to the Government by the Receiver; (3) allowing the court to approve requests for
the destruction of documents despite knowing the documents had exculpatory value in the
ongoing criminal investigation; and, (4) "co-opting" the Receiver and urging the Receiver to
violate its fiduciary duties to further the criminal investigation, without informing the court of the
Government's ongoing contact with the Receiver. (See id.) Essentially, Defendant takes issue
with the Government's relationship with the Receiver, and, most crucially, the fact that the court
in the FTC Action was unaware of that relationship.

---

        [9] Although the Court need not reach the issue because it concludes on other grounds that
Defendant has failed to establish a Due Process violation, Defendant's argument fails for an
additional reason: it appears that much, if not all, of the destroyed evidence is obtainable by other
reasonably available means, namely, a thorough search of the Government's productions. See
Trombetta, 467 U.S. at 489. Defendant asserts that "simply turning over a mountain of evidence
and directing Cardiff to dig through it for exculpatory evidence" is insufficient, but Defendant
here is not looking for a needle in the "proverbial haystack." (See Reply at 6.) Defendant claims
he is looking for myriad documents in multiple broad categories of document, not one (or even a
few) smoking gun documents. The Court is not convinced that the evidence Defendant
describes in his motion is unavailable to him.

**CRIMINAL MINUTES—
GENERAL**    Initials of Deputy Clerk mg

The Government's conduct does not rise to the level of fraud on the court. Fraud on the court is a narrow category of fraud "which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manners its impartial task of adjudging cases that are presented for adjudication." Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003). Generally, fraud on the court cases concern misrepresentations which "[go] to the central issue in the case." United States v. Est. of Stonehill, 660 F.3d at 452. As such, where "the government's misrepresentations were relatively few and were largely tangential to the fundamental question" at issue in a proceeding, there is no fraud on the court. Id. Importantly, fraud on the court requires some form of intent. See Abatti v. Commissioner, 859 F.2d 115, 118 (9th Cir. 1988) (fraud on the court requires "an unconscionable plan or scheme to improperly influence the court in its decision").

Here, Defendant exaggerates the facts which purportedly demonstrate the Government's intent to defraud the court. Defendant contends that the Government "knowingly deprived the [c]ourt of the opportunity to meaningfully review the Receiver's activities," and insinuates that if the court had such an opportunity, it would not have (1) entered a protective order which did not apply to the documents already shared by the Receiver with the Government, (2) approved the destruction of documents containing consumer information, or, perhaps, (3) even appointed the Receiver in the first place. (See Motion at 32–37.) Defendant's description of the role of the Receiver in the criminal investigation ignores the role of the Receiver in the ongoing FTC Action, where it served a necessary and legitimate purpose. As explained above, the court in the FTC Action found good cause to appoint the Receiver, granted the Receiver broad authority over the assets at issue, and oversaw the Receiver's actions in protecting, preserving, and administering those assets. The FTC Action resulted in a judgment against Defendant for multiple violations of federal law. Given those facts, Defendant's position is mere conjecture. There is no reason to believe that the court would not have acted in the same manner if notified of the Government's criminal investigation and the role of the Receiver in providing information to the Government. Nor is there sufficient evidence to conclude that the Government decided not to inform the court in the FTC Action about its criminal investigation because it feared that the court would halt or hinder its efforts or relationship with the Receiver. Similarly, the Court is unconvinced that the FTC's decision to request the Receiver be appointed was at all contingent on the utility of the Receiver in the criminal investigation.

In sum, the omissions alleged here do not "[go] to the central issue in the case"; they were instead "few and were largely tangential to the fundamental question" of whether Defendant and his companies violated various federal laws protecting consumers. See United States v. Est. of Stonehill, 660 F.3d at 452. Accordingly, Defendant has not demonstrated by clear and convincing evidence that the Government's conduct improperly influenced the court in the FTC Action.

//
//
//
//

CRIMINAL MINUTES—GENERAL

Initials of Deputy Clerk mg

**D. Pre-Indictment Delay**

Finally, Defendant contends that the Government severely prejudiced him by waiting until January 2023 to obtain the Indictment, despite learning of the facts contained in the Indictment in February 2018.  (Motion at 38.)  Again, the Court disagrees.

To succeed on his claim that he was denied Due Process due to pre-Indictment delay, Defendant must (1) "prove actual, non-speculative prejudice from the delay," and, once he has satisfied that prong, then (2) demonstrate that reasons for the delay are insufficient such that "the delay offends those fundamental conceptions of justice which lie at the base of our civil and political institutions."  Corona-Verbera, 509 F.3d 1105, 1112.  With respect to the first prong, Defendant must "prove that he suffered actual, non-speculative prejudice from the delay, meaning proof that demonstrates exactly how the loss of evidence or witnesses was prejudicial."  United States v. Barken, 412 F.3d 1131, 1134 (9th Cir. 2005).  Defendant alleges that he has suffered actual prejudice because in 2021 and 2022 the Government allowed potentially exculpatory evidence to be destroyed by the Receiver, and in 2022, the Receiver (Brick Kane and Robb Evans) passed away and thus cannot testify about their knowledge or conduct.  (Motion at 38; Reply at 12.)  The Court finds that the deaths of the Receiver individuals may constitute actual prejudice.  See United States v. Mills, 641 F.2d 785, 788 (9th Cir. 1981).  Had the Government pursued the Indictment earlier, Defendant could have questioned the Receiver individuals about their understanding of Defendant's businesses and their practices—testimony which could have been helpful in his defense.  However, for the reasons above, the Court is not persuaded that Defendant was prejudiced by any destruction of documents prior to the initiation of the criminal case against him.  Defendant has access to ample discovery produced by the Government, and it is unclear that the destruction he alleges would not have occurred had the Indictment been sought at an earlier date.

Assuming actual prejudice, the Court now balances the reasons for the Government's delay against its reasons for it to determine if the delay offends fundamental notions of justice.  See Sherlock, 962 F.2d at 1353–54.  In its Opposition, the Government explains that it did not have sufficient facts to obtain an Indictment in February 2018, as the factual predicates of the FTC Action and the instant criminal case differ, as do the relevant burdens of proof.  (Opposition at 23.)  Moreover, the Government interviewed "more than 35 witnesses, including victims of the alleged credit card fraud scheme, during the height of the COVID-19 pandemic, and collected and reviewed voluminous documents and other materials"—all of which took significant time.  (Id. at 24.)  Importantly, "the record does not show that the government's delay was undertaken solely to gain tactical advantage over the accused."  Sherlock, 962 F.2d at 1354 (internal quotation omitted).  For example, Defendant does not allege that the Government believed the Receiver individuals were likely to pass away if the Government could delay the inception of the criminal matter.  Instead, the record here demonstrates that "the ongoing investigation was a legitimate reason for the delay," not any ulterior motive on part of the Government.  See id. at 1355.  Accordingly, the Court finds the pre-Indictment delay does not offend traditional notions of justice, and Defendant's Fifth Amendment Due Process right was thus not violated.

**CRIMINAL MINUTES—GENERAL**

Initials of Deputy Clerk mg

## V.    CONCLUSION

For the foregoing reasons, the Court **DENIES** the Motion.

**IT IS SO ORDERED.**