# EXHIBIT D

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3        EASTERN DIVISION-RIVERSIDE

4              - - -

5     HONORABLE JESUS G. BERNAL, DISTRICT JUDGE PRESIDING

6              - - -

7  UNITED STATES OF AMERICA,          )
                                      )
8              Plaintiff,   )
                                      )
9         vs.              )   No. EDCR 23-21-JGB
                                      )
10 JASON EDWARD THOMAS CARDIFF,       )
                                      )
11             Defendant.   )
   _____)

12

13

       REPORTER'S TRANSCRIPT OF MOTION PROCEEDINGS

14
              Riverside, California

15
              Monday, June 3, 2024

16
               2:32 p.m.

17

18

19

20

21

22        PHYLLIS A. PRESTON, CSR, FCRR
           Federal Official Court Reporter
23          United States District Court
             3470 Twelfth Street
24         Riverside, California 92501
              stenojag@aol.com

25

```
1    APPEARANCES:

2

3    For the Plaintiff:

4                         OFFICE OF THE UNITED STATES ATTORNEY
                          BY:  VALERIE MAKAREWICZ
5                         Assistant United States Attorney
                          312 North Spring Street, Suite 1100
6                         Los Angeles, California 90012

7

8                         US DEPARTMENT OF JUSTICE
                          Consumer Protection Branch
                          BY:  MANU SEBASTIAN
9                         450 5th Street NW, Suite 6400
                          Washington, DC 20001

10

11

12   For the Defendant:

13                        LARSON LLP
                          BY:  STEPHEN LARSON
                               HILARY POTASHNER
14                             JONATHAN GERSHON
                          555 South Flower Street, 30th Floor
15                        Los Angeles, California 90071

16

17                        THE COCHELL LAW FIRM PC
                          BY:  STEPHEN COCHELL
                          5850 San Felipe, Suite 500
18                        Houston, Texas 77057

19

20

21

22

23

24

25
```

```
 1              MONDAY, JUNE 3, 2024; RIVERSIDE, CALIFORNIA

 2                              -o0o-

 3              THE CLERK:  Calling Item 4 on the calendar, Case No.       02:32

 4    EDCR 23-21-JGB, United States of America v. Jason Edward Thomas

 5    Cardiff.                                                            02:32

 6              Counsel, please make your appearances.

 7              MS. MAKAREWICZ:  Good afternoon, Your Honor.

 8    Assistant United States Valerie Makarewicz on behalf of the

 9    Government.

10              MR. SEBASTIAN:  Good afternoon, Your Honor.  Manu         02:32

11    Sebastian from the Consumer Protection Branch at DOJ.

12              THE COURT:  Good afternoon.

13              MS. POTASHNER:  Good afternoon, Your Honor.  Hilary

14    Potashner on behalf of Mr. Cardiff.

15              MR. LARSON:  Good afternoon, Your Honor.  Stephen         02:32

16    Larson also on behalf of Mr. Cardiff.  Your Honor, we also have

17    Stephen Cochell, who is Mr. Cardiff's civil attorney in the FTC

18    case; Jonathan Gershon from our office; and my daughter, Mary

19    Larson, who is interning with us this summer.

20              THE COURT:  Good afternoon to you all.                    02:33

21              The matter is on calendar on a motion made by the

22    defendant for dismissal of the Indictment on several grounds,

23    specifically the following grounds.  So it's alleged in the

24    motion that Mr. Cardiff's due process and Fourth Amendment

25    rights were violated when the Government undertook a joint         02:33
```

1    civil and criminal investigation in bad faith and through

2    primarily the receiver that was appointed in the civil case

3    engaged in some conduct that would violate Mr. Cardiff's Fourth

4    Amendment and due process rights.  So there's a second ground

5    for failing to preserve potentially exculpatory evidence.                02:34

6    Also, there's an allegation that there was fraud on the Court

7    committed in the civil action and that there was pre-Indictment

8    delay to the extent that it would prejudice the defendant in

9    the criminal action.

10           So let's focus first, if we can, on the second ground          02:34

11   that I mentioned, which is failing to preserve potentially

12   exculpatory evidence.

13           So Ms. Potashner?

14           MS. POTASHNER:  Thank you, Your Honor.

15           THE COURT:  So is it your position, then, that the             02:34

16   evidence we're talking about is potentially exculpatory, not

17   actually exculpatory?  As you know, there's a difference in the

18   law as to how those two things are treated.  So are you

19   alleging that the evidence is definitely exculpatory so that

20   bad faith is not an issue or are you saying that there were            02:35

21   potentially exculpatory evidence that was destroyed which would

22   require a finding of bad faith in order for the Indictment to

23   be dismissed?

24           MS. POTASHNER:  Your Honor, I believe that the Court

25   has before it actually exculpatory evidence.  I do think that          02:35

```
 1  we could meet the standard of bad faith, but I don't think that

 2  Your Honor needs to go to that standard because I believe that

 3  it's actually exculpatory information.  The reason I say that

 4  is there is evidence before Your Honor which is in the form of

 5  a declaration under oath from Mr. Cardiff explaining exactly      02:35

 6  what evidence was destroyed that he does not have access to

 7  anymore and exactly why that evidence would be exculpatory.

 8          Conversely, the Government has proffered no evidence

 9  to rebut that.  There is no contrary declaration submitted by

10  the Government, no information undermining that assertion that   02:35

11  was made under oath.  So I believe that it's actual exculpatory

12  evidence.  I do note that the Government calls itself serving,

13  but that is not evidence.  That's an adjective and that's, you

14  know -- that adjective has little meaning in this context.

15          Mr. Cardiff is in the best position to explain what     02:36

16  evidence was there and what evidence is no longer there and why

17  it would be exculpatory.  Absent any contrary evidence

18  proffered by the Government, by declaration or otherwise,

19  there -- it's just -- it's not a fact in dispute.

20          THE COURT:  Okay.  So the evidence that we're talking    02:36

21  about is -- at least a subset of that is the documents that

22  were presumably destroyed at the receiver's direction, which

23  were involved in the Google Suite or the computer imaging of

24  the computers that were seized or copied from the premises of

25  Redwood, correct?                                                02:36
```

1          MS. POTASHNER:  That's partially the list.  That is

2   correct but not in total.

3          THE COURT:  Right.  So it's a subset of at least that

4   information, correct?

5          MS. POTASHNER:  Yes, Your Honor.                    02:37

6          THE COURT:  And so -- and the Government provides

7   evidence that -- you know, substantially large amounts of

8   documents were produced as a result of that imaging of that

9   computer that was either seized or copied at the Redwood

10  premises.  Why wouldn't you be able to point me to a specific   02:37

11  document that was produced by the Government that would be the

12  sort of document that's exculpatory in nature that you feel

13  there would be more of that was destroyed?

14         MS. POTASHNER:  Well, Your Honor, I understand the

15  Court's question, but if I could back up a little bit to talk   02:37

16  about the evidence we're talking about because then I think I

17  could answer that question more clearly.

18         The information that I think was electronically

19  stored at some point and then destroyed was literally video

20  images of customer phone calls, video and audio images of      02:38

21  customer phone calls and audio image -- audio recordings of

22  those same calls.  So those -- those are now gone.  There would

23  be no -- no calls that I could point to in the Government's

24  documentation that would substitute for those or demonstrate

25  why those -- those audio and video recordings would be         02:38

1   exculpatory.  They just -- they don't exist.

2          THE COURT:  So those recordings of customer calls are

3   not part of what the Government produced in the civil action or

4   in this action.  Is that what you're saying?

5          MS. POTASHNER:  Correct.  They're not -- they're in          02:38

6   whole cloth not there or that we could not find them.  The

7   Government did offer a range of 13.5 million pages in order for

8   us to search for them.  We did our due diligence.  We searched

9   and searched and searched.  They are not there.  Unless the

10  Government can point to a recording that somehow we've missed,    02:39

11  they don't exist, and so they are now gone.

12         The second set of documents which are not there are

13  documents that were physical notebooks, that were handwritten

14  notebooks, notebooks that contained the records and information

15  that were -- that was written down by employees and also by      02:39

16  Mr. Cardiff himself.

17         THE COURT:  So are you talking about the staff

18  meeting handwritten logbooks or the customer sales log sheets

19  or the handwritten notes?

20         MS. POTASHNER:  All three, Your Honor.                     02:39

21         THE COURT:  Okay.

22         MS. POTASHNER:  And so those documents wouldn't have

23  been electronically maintained in any computer system, so,

24  therefore, a copy of them wouldn't have made their way to the

25  Government.  They were in the possession of the receiver.  The    02:39

```
 1   receiver took possession of Redwood and in taking possession of
 2   Redwood took possession of all the documents.  There is
 3   absolutely no evidence that we could point to that would be
 4   like those -- those documents.  And that's why we can't --
 5            THE COURT:  Do you have an idea what volume of           02:40
 6   documents we're talking about in those three categories?
 7            MS. POTASHNER:  If I may, Your Honor, speak to
 8   Mr. Cardiff?
 9            THE COURT:  You may.
10            (Counsel and Defendant Cardiff confer.)               02:40
11            MS. POTASHNER:  Your Honor, there would be about 150
12   to 200 notebooks.
13            THE COURT:  Okay.  Were any of these actually
14   authored by Mr. Cardiff?
15            MS. POTASHNER:  Yes, Your Honor.                      02:41
16            THE COURT:  Okay.  So let's have the Government
17   respond to those arguments at this time.  Mr. Sebastian?
18            MR. SEBASTIAN:  Yes, Your Honor.  So in terms of the
19   material that you just named, including the video recordings,
20   handwritten notebooks, our understanding is that when the FTC   02:41
21   and the receiver went in with the immediate access, there was
22   material that was scanned, including handwritten notebooks.
23   That material that the FTC collected was turned over to us, and
24   we, in turn, turned it over to the defense.
25            In terms of video recordings and of the phone calls,   02:41
```

1    our understanding -- so the defense included this letter from

2    Google showing that Google Suite's data was deleted and that

3    this letter is a confirmation of that deletion, but we believe

4    that's a misstatement because the statement states that the

5    Government destroyed the data, and then Google confirmed that    02:42

6    that data was destroyed.  But, in fact, the letter reports that

7    Google did not have material associated with three domains.  33

8    other domains were located --

9         THE COURT:  Go back a few words and tell me that

10    again.    02:42

11         MR. SEBASTIAN:  Sure.  So the subpoena returned from

12    Google confirms that 33 accounts were still in the Google

13    account back when the return came in, and then three domains

14    were not included.  And only those three domains were missing.

15    So Google doesn't confirm that it was destroyed, just that the    02:42

16    material wasn't there.

17         Now, internal Redwood emails from March 2018 indicate

18    that certain domains, like Redwood Sci, were never even

19    included in the Google Suites account, and the defendant is

20    familiar with that.  These are his own documents, and these are    02:42

21    his IT staff discussing that material when that material was

22    supposed to be turned over to the FTC.  Not only that, the

23    defendant is saying under oath that he had recorded phone calls

24    of what his employees were saying to consumers, but he was

25    compelled by the district court to turn over all of that    02:43

1    material, and that material was not produced.  So it was

2    responsive to the CID, and it was --

3            THE COURT:  That was before the receiver was

4    appointed, I presume?

5            MR. SEBASTIAN:  That's correct.  And so if this                02:43

6    material existed, it should have been turned over back in 2018.

7            THE COURT:  How does that affect the analysis here,

8    though?  Is it relevant to whether or not the Government had

9    it?

10           MR. SEBASTIAN:  Well, there's a question as to its            02:43

11   actual existence.  So if it existed in 2017, it should have

12   been turned over in response to the CID.  And it wasn't turned

13   over at that time as defense to the civil allegations.

14           THE COURT:  So you're using that fact to argue that

15   those documents do not, in fact, exist because if they did,         02:43

16   they would have been turned over?

17           MR. SEBASTIAN:  So the Government can't for sure say

18   whether or not something existed or not.  What we can say is

19   whether or not it was turned over.  And we don't see that

20   material within the items that were turned over.  And the           02:43

21   evidence that's shown in terms of --

22           THE COURT:  So when the receiver took over and went

23   through Redwood, they found a lot of documents that had not

24   been turned over, correct?

25           MR. SEBASTIAN:  They did.  They found material that           02:44

1    wasn't turned over.  They found material --

2         THE COURT:  That was part of the civil -- the

3    district court problem with Mr. Cardiff, the fact that he was

4    not complying with the request to turn over documents to the

5    FTC?                                                            02:44

6         MR. SEBASTIAN:  That's correct.  That's part of our

7    charge conduct, Your Honor, because there's evidence that he

8    was destroying material that was related to the CID and the

9    order that was compelling him to produce this material.

10        THE COURT:  So as to the category of documents which    02:44

11   you believe were in your production, I think we talked about

12   the logbooks; is that correct?

13        MR. SEBASTIAN:  So everything that was turned over to

14   us by the FTC and the receiver has been produced to the

15   defendant.                                                    02:44

16        THE COURT:  Right.  I understand that.  But what

17   categories in the categories that we just talked about do you

18   believe are included in that production?

19        MR. SEBASTIAN:  So in our response, we pointed out

20   that there were notes that were collected, notes that were    02:45

21   scanned, books that were scanned.

22        THE COURT:  Right.

23        MR. SEBASTIAN:  Those were turned over.

24        THE COURT:  And did you review those notes for

25   potentially exculpatory value --                              02:45

```
 1              MR. SEBASTIAN:  So --

 2              THE COURT:  -- with regard to this motion?

 3              MR. SEBASTIAN:  -- the Government did review some of

 4    this material and has turned over all of that material.

 5              THE COURT:  I'm not saying whether you turned it over    02:45

 6    or not.  I take it for granted that you did turn it over.  I'm

 7    saying do any of that material in your view contain exculpatory

 8    evidence?

 9              MR. SEBASTIAN:  So the material that I personally

10    viewed I do not believe had exculpatory evidence within it.       02:45

11              THE COURT:  And those include the notes that we've

12    been talking about, the handwritten notes, correct?

13              MR. SEBASTIAN:  That's correct.

14              THE COURT:  So your argument is basically saying that

15    those documents may yet exist at Google and might be obtainable    02:45

16    by the defendant, at least some of them, except for three

17    categories?

18              MR. SEBASTIAN:  Some material can.  There's three

19    domains that Google say are not there.  But I don't know

20    what -- this response came in 2021.                                02:45

21              THE COURT:  Right.

22              MR. SEBASTIAN:  So I don't know if it's still there.

23              THE COURT:  Right.

24              MR. SEBASTIAN:  And the Government was under no

25    obligation to issue search warrants to seize all of that data.    02:46
```

1          THE COURT:  Okay.  Do you have any other responses

2     that you haven't told me about?

3          MR. SEBASTIAN:  So in terms here with the exculpatory

4     evidence, the Government -- or the defendant has failed to meet

5     his burden.  He fails to show the Government's knowledge that          02:46

6     any of this material was exculpatory, and he ignores the fact

7     that not only did the Government collect and preserve the

8     material that it received, but it turned all that over.

9          THE COURT:  Well, let's stop there, though.  He has a

10    declaration in which he says "these documents existed" and          02:46

11    "they were exculpatory" and "they were taken by the

12    Government."  If that is true, any knowledge of such documents

13    would be imputed to the Government because the Government took

14    them.

15         MR. SEBASTIAN:  And if the material was there, the          02:46

16    Government turned it over if the Government took it.

17         THE COURT:  So you're saying everything the

18    Government took --

19         MR. SEBASTIAN:  We turned over everything.

20         THE COURT:  So there was nothing that the receiver          02:46

21    obtained post-receivership which was not turned over and was

22    destroyed?

23         MR. SEBASTIAN:  There is a difference there.

24         THE COURT:  Okay.

25         MR. SEBASTIAN:  So the receiver is not the          02:47

```
 1   Government.  The receiver is --

 2            THE COURT:  I understand that.

 3            MR. SEBASTIAN:  -- a Court-appointed agent.  We --

 4   the Government, the DOJ postal, received information from the

 5   receiver and turned that over.  Now, I can clarify that point        02:47

 6   in that the material turned over to the DOJ occurred in 2018

 7   through 2020.  Right?  The order to destroy that data was

 8   anything remaining within the receiver's custody.  But our

 9   understanding is everything that the FTC and the receiver

10   collected was turned over to us when we issued our request.          02:47

11            THE COURT:  So that phrase, "anything remaining in

12   the receiver's custody," you take that to mean that those would

13   be materials that were already turned over to you?

14            MR. SEBASTIAN:  So a second set of data, right?  So

15   if there's two sets of data --                                       02:47

16            THE COURT:  Who received data?

17            MR. SEBASTIAN:  -- the receiver collected one set and

18   the Court ordered the receiver to destroy its set.  But DOJ was

19   not ordered to destroy that data.  So whatever DOJ collected

20   was turned over.  Now, I can't --                                    02:48

21            THE COURT:  What do you make of the argument that

22   since there was at least the possibility of a criminal

23   prosecution coming, that the Government should have intervened,

24   somehow objected to the destruction of the evidence by the

25   receiver?                                                            02:48
```

 1        MR. SEBASTIAN:  So the defendant was on notice that a

 2   criminal -- that information could be turned over to the

 3   Government.  It was on the defendant to either plead the Fifth

 4   and not turn over that documentation at that time --

 5        THE COURT:  No, but I'm talking about when -- when                    02:48

 6   the receiver was apparently ordered to destroy the remaining

 7   evidence, why didn't the Government say *okay, wait, hold on a*

 8   *minute.  There might be exculpatory evidence there* or *why don't*

 9   *you just not order the receiver to destroy evidence and turn*

10   *everything to us?*                                                        02:48

11        MR. SEBASTIAN:  So I think there's difficulty in

12   saying that, Your Honor, because that's -- first, you're

13   saying -- let me actually ask you this question.  So are you

14   asking why we didn't ask the receiver not to destroy or why we

15   didn't inform the Court?                                                   02:49

16        THE COURT:  Ask the Court to order the receiver not

17   to destroy it.

18        MR. SEBASTIAN:  So we received copies of information,

19   and so our understanding is that material relevant to the

20   investigation was turned over and we were going to produce that           02:49

21   material in the criminal investigation.  The civil was its own

22   investigation, and the material that we collected was separate.

23   So whatever occurred in that civil case, that was its own case,

24   whereas we had our criminal investigation, which was completely

25   separate, collected copies of material, retained those                    02:49

```
 1   copies --
 2           THE COURT:  By the time the receiver destroyed the
 3   allegedly exculpatory evidence, there was an active criminal
 4   investigation?
 5           MR. SEBASTIAN:  Yes.                                      02:49
 6           THE COURT:  Okay.  So why didn't the Government again
 7   ask the Court not to order the receiver to destroy potentially
 8   exculpatory evidence?  Was the criminal division aware that
 9   there was such an order?
10           MR. SEBASTIAN:  Could you give me one second, Your       02:49
11   Honor?
12           THE COURT:  Yes.
13               (Government counsel confer.)
14           MR. SEBASTIAN:  Your Honor, the Government's -- the
15   DOJ's criminal investigation was separate from the civil        02:50
16   investigation, and so our understanding is the criminal
17   investigation collected the material relevant to its charged
18   conduct, collected all of the material relevant to it.  That
19   material was turned over.  The material that the receiver was
20   ordered to be destroyed was material relevant to the civil      02:50
21   investigation.  Completely separate, two different parties.
22   None of it was --
23           THE COURT:  There was a large overlap between the
24   civil investigation and the -- with the criminal investigation,
25   that it's still the alleged defrauding of potential customers,  02:51
```

```
 1  correct?
 2         MR. SEBASTIAN:  Well, it's two different things.  So
 3  the civil investigation was looking to the defendant's false
 4  advertising and claims made to consumers.  The criminal
 5  investigation is analyzing a small portion of it.  It's a          02:51
 6  four-month -- the charged conduct is four months of credit card
 7  fraud where consumers were being charged without their consent,
 8  and the defendant was going through old orders and just putting
 9  through credit card charges.  And then the next part of the
10  criminal investigation is based on the document destruction and   02:51
11  witness tampering associated with the CID.  They're two
12  separate and distinct investigations, and they were looking at
13  two different things.
14         THE COURT:  Well, I mean, I think there's some
15  overlap in relevance between -- as to some documents may be       02:51
16  relevant to both investigations.  It seems that that's
17  potentially the case.
18         But in any event, we still haven't -- so your answer
19  to the question of why didn't the Government ask the Court to
20  not direct the receiver to destroy documents was because there    02:52
21  were two separate investigations, and the civil investigation
22  did not feel that that was appropriate because it was
23  concluded, the civil investigation was concluded, and did -- to
24  the extent that it was a separate criminal investigation, did
25  the people conducting the criminal investigation, were they       02:52
```

```
 1   aware that there was an order to destroy the documents by the
 2   receiver?
 3            MR. SEBASTIAN:  So the criminal team was aware of the
 4   order.  That order was forwarded to it by the FTC.
 5            THE COURT:  Okay.                                        02:52
 6            MR. SEBASTIAN:  But that was a completely different
 7   case, and the civil components acted separately from the
 8   criminal components.
 9            THE COURT:  I understand.  So let's go on to the next
10   issue, which is --                                              02:52
11            Do you want to respond to that?
12            MS. POTASHNER:  Your Honor, may I just point out one
13   thing?  Because I think it will get to the meat of the matter
14   in terms of --
15            THE COURT:  Yes.                                        02:53
16            MS. POTASHNER:  -- what Your Honor was asking.  If
17   the Court were to look at Exhibit 87, that's actually an email.
18            THE COURT:  An email between who?
19            MS. POTASHNER:  This looks better on TV than in real
20   life.  So if I could describe what it is for Your Honor.  That   02:53
21   email is an email that is dated September 14th, 2022, from the
22   FTC to DOJ, and it's advising -- it is advising DOJ that the
23   receiver is requesting permission to destroy the evidence.  And
24   it's specifically flagging in that email the destruction of
25   evidence subparagraph.  And so the FTC is expressly saying to    02:53
```

1  DOJ, "we just want to flag this for you that this is

2  happening."  I would take issue with it being completely

3  separate, and I'm sure Your Honor is going to want to go into

4  that a little bit later.  But just in terms of what the DOJ

5  knew, the DOJ knew of that request before it was ordered.  It          02:54

6  wasn't a completely separate situation where the DOJ learned

7  about it after the fact.  And so I just want to make sure that

8  the record is quite clear that the FTC gave DOJ advanced notice

9  of that request by the receiver before it was ever ordered by

10  the Court.                                                             02:54

11      THE COURT:  Understood.  And what's your response to

12  the argument by the Government here, that whatever was

13  remaining with the receiver was just a duplicate of material

14  that was already produced, and, therefore, there was nothing

15  new -- well, whatever was destroyed was already produced in the       02:54

16  hands of the defendant?

17      MS. POTASHNER:  Your Honor, I keep -- in my brain I

18  keep -- I keep hearing the phrase *you know, we're the*

19  *Government, just trust us*, and the Government is just saying

20  that *it's our understanding, it's our belief, it's our* -- but       02:54

21  there is no evidence to that fact, that the entire receiver's

22  file was copied and given to the Government.  There's just no

23  evidence of that.  There's no declaration in real time saying

24  it.  There's just -- there's no information that the Government

25  has put before Your Honor in anticipation of this motion to           02:55

```
1    actually prove that fact.  And we --

2              THE COURT:  So let's go to that point.

3              Mr. Sebastian, it would have been easy for you to

4    contact the receiver and get a declaration in saying well,

5    whatever I destroyed had already been produced.  It was just a      02:55

6    copy of the material that was already existing in the hands of

7    the Government.  I didn't see any such declaration in your

8    opposition.

9              MR. SEBASTIAN:  Your Honor, I don't think the

10   Government had an obligation to go seek out as much evidence as     02:55

11   it could to find something exculpatory.  Right?

12             THE COURT:  Not even after -- well, I mean, I guess

13   you couldn't do it after the reply and the declaration by the

14   defendant that there was actually exculpatory evidence in the

15   description of that.                                                02:56

16             MR. SEBASTIAN:  So the receivership currently is

17   defunct and so -- but there is possibility to speak with

18   someone at the receivership entity itself.  But just to clarify

19   before, Your Honor, I didn't say that we never received notice

20   of the destruction.                                                02:56

21             THE COURT:  I --

22             MR. SEBASTIAN:  We were notified.  We received the

23   email.

24             THE COURT:  Yeah, I understand that.

25             MR. SEBASTIAN:  We didn't feel that we had a duty to     02:56
```

1    go and try to preserve all of the evidence.  In fact, there was

2    so much material sitting there, where would we even store that?

3    The Government doesn't have the obligation to go there and take

4    boxes of material and store it anywhere.  The reason for the

5    destruction was because Mr. Cardiff didn't pick up the material     02:56

6    and the receivership was wasting money storing that.

7         THE COURT:  He was not allowed to have it, so it had

8    to be destroyed.

9         MR. SEBASTIAN:  So he wasn't allowed to have consumer

10   data, right?  It's not all data.  It's just consumer data that     02:56

11   he wasn't permitted to have.  So he went and collected 37 boxes

12   of other material, right?

13        So -- and another couple of notes, when we're talking

14   about the Nest Cam footage, for example, there's 14,000

15   still-frame images of Nest Cam footage, but there was no video     02:57

16   within that material.  There was one 25-minute video taken

17   December 2016 of a -- of one room where they were packaging

18   material, but there were no other videos.  So the fact that

19   that one video from 2016 existed and that there were 14,000

20   screenshots of images that came from the cameras but no actual     02:57

21   video goes back to our point where the Nest Camera footage,

22   there was only a ten-day subscription that was paid for.  So

23   that material wouldn't have been sitting on the Google account

24   in October of 2018 when these calls and the charge conduct

25   occurred January through May of 2018.  And the defense is          02:57

1    arguing that this material could have been downloaded and saved

2    to the Google account.  But we believe that that's contrary to

3    the facts because if the 14,000 picture images are there, then

4    the video should have been there if they existed.

5            THE COURT:  Okay.  Understood.  All right.  Let's now    02:58

6    go to the second point, which is the overlap and presumably

7    joint criminal and civil investigations which the defendant

8    argues violated his Fourth Amendment and due process rights.

9            So as the parties are well aware, this required --

10   requires, in essence, a finding of bad faith.  The fact that    02:58

11   there were concurrent civil and criminal investigations that's

12   done by itself highlight any bad faith or any impropriety on

13   behalf of the Government.  Also, the Government makes the

14   argument that, in fact, there was -- the civil investigation

15   was not a pretext to obtain incriminating evidence.  Since the   02:58

16   civil investigation was protracted, the Government actually

17   obtained summary judgment on 16 of the claims, so it cannot be

18   really a pretext.  And they cite some case law that says that

19   when there is sort of a pursuit of the civil investigation and

20   civil action to judgment, it's very rare to find bad faith       02:59

21   since there was an independent reason to continue with that

22   action apart from obtaining any evidence which would

23   potentially be relevant to the criminal matter.

24           So how do you address that, Ms. Potashner?

25           MS. POTASHNER:  Your Honor, I don't think that the       02:59

1   conclusion that there was a -- there was a finding in favor of

2   the Government in the civil case obviates this entire issue.  I

3   think that when you look at *Kordel*, *Kordel* lists a number of

4   different ways and examples that the Court should look to to

5   determine whether there's bad faith.  We agree that there can

6   be simultaneous investigations on the civil and criminal side;

7   however, this is not just merely a simultaneous investigation.

8   When you look at the *Kordel* case, it really distills down to --

9   and I have the different examples that it gives.  One example

10  is conducting a covert criminal investigation under the guise

11  of a civil action.  That's one of the examples that there would

12  be bad faith.  Another is engaging in deceit or affirmative

13  misrepresentation regarding the true purpose of the

14  investigation.  And here I believe we have that, even if we set

15  aside the first -- the first *Kordel* factor based on the fact

16  that there was ultimately a finding in favor of the Government

17  on the civil side.  But we do have affirmative

18  misrepresentations here.

19          We also have that Mr. Cardiff was not represented at

20  the start of the civil case.  That is another factor that

21  *Kordel* tells us to look at.  And most importantly, I think, is

22  the catchall factor, which is whether or not the Government

23  engaged in conduct that qualifies as special circumstances that

24  might suggest the unconstitutionality or impropriety of the

25  criminal prosecution.  I think that's exactly what we have here

03:00

03:00

03:00

03:00

03:01

1    because I think when the Court reviews *Kordel*, what the Court

2    will find is that *Kordel* is looking at whether or not the

3    Government has gained an unfair advantage by the jockeying of,

4    you know, the criminal and the civil investigation unbeknownst

5    to the defendant.  And that's the question here.  Did the                03:01

6    Government in this particular case obtain an unfair advantage?

7    The answer is yes, it did.  The answer is, you know, first, the

8    Government says *well, you know, the CID case came first, the*

9    *criminal* -- and so that came first before the criminal

10   investigation, but when you scratch the surface, that's not               03:01

11   actually true.  The CID case was not against Mr. Cardiff.  It

12   was against Redwood.  And so really the criminal investigation

13   started.

14          And what we know from the specific facts here is that

15   the USPIS agent went to Redwood, Mr. Cardiff's place of               03:02

16   business, and tried to obtain access to it.  And that happened

17   in the summer of 2018.  She tried multiple times.  She then

18   started -- and I can go back, and I think it's probably worth

19   doing -- the coordination that occurred well before the civil

20   case was ever filed.  And so we have USPIS and the FTC              03:02

21   conducting a joint investigation before there's ever even a

22   civil case.

23          The civil case is then filed in October of 2018, and

24   Mr. Cardiff has no counsel.  The Government selects within days

25   of that filing a receiver that has worked closely with the          03:02

1   Government, FTC, and DOJ in promoting criminal investigations.

2   That's -- that's the person that was selected by the Government

3   and put forward to the Court and the Court accepted because the

4   Court really didn't have the full information of what was going

5   on behind the scenes.  When the receiver was suggested to the          03:03

6   Court and approved by the Court, the Court wasn't told *oh,*

7   *there's also a criminal investigation happening here.  Oh,*

8   *there's already been coordination between the USPIS agent and*

9   *the FTC.*  None of that information was surfaced for the Court.

10  So the Court, of course, presumably took it at face value.            03:03

11  This is a receiver.  It's an appropriate receiver who's going

12  to be doing appropriate work.

13         Then, the Government started immediately with this

14  receiver that was known to the Government and orchestrated a

15  warrantless search within days of the receiver being appointed.       03:03

16  This is outside the scope of what the receiver was appointed as

17  a Court-appointed receiver to do.  This was something that was

18  behind the scenes secretly done by the Government.

19         THE COURT:  Didn't the civil Court allow the receiver

20  to take sort of immediate access or have immediate access to          03:04

21  the business and its premises?

22         MS. POTASHNER:  Of course, Your Honor.  And the Court

23  went further to say --

24         THE COURT:  So how was it outside what the receiver

25  was supposed to do?                                                   03:04

1          MS. POTASHNER:  Because the -- because, Your Honor,

2    the receiver was permitted to take actions in order to protect

3    the business and to -- and to make sure that the assets weren't

4    dissipated.  That was the goal of the receiver and that's why

5    the receiver was appointed.  The receiver was also granted        03:04

6    permission to work with -- to --

7          THE COURT:  Accommodate or consider any reasonable

8    request by law enforcement agents.

9          MS. POTASHNER:  And I think that the key word there

10   is "reasonable," Your Honor.  Reasonable to what end?              03:04

11   Reasonable to the end of the stated purpose of the receiver.

12   That's not what happened here.  What happened here -- although

13   the Government tries to recast it as USPIS was there just to

14   keep the peace while the receiver took possession of the

15   business, common sense dictates that's not true.  There was       03:05

16   local law enforcement there for keeping the peace.  USPIS was

17   there because they had already planned for USPIS to have a

18   complete warrantless search.  And those were conversations that

19   predated the filing of the civil case, conversations that

20   predated the request for the receiver, and conversations that     03:05

21   were effected and resulted in an extensive warrantless search

22   of the premise outside of the knowledge of the Court, outside

23   the knowledge of Mr. Cardiff, who was unrepresented at that

24   time.  That's the second -- that's the second example of the

25   unfair advantage.                                                 03:05

1          This is not an ordinary, simultaneous, or parallel

2    prosecution on the civil side and criminal side.  This is

3    highly orchestrated.  And the Government's attempt to recast it

4    just cannot be accepted by this Court.  When you look at the

5    number, and we stopped counting at 710, but 710 communications          03:06

6    between the civil and criminal side with the Government.  710.

7    If you put that in a two-year period, that would be literally a

8    daily communication.  And all we had was the written

9    communication.  We didn't have the telephone calls; we didn't

10    have the Zooms; we didn't have the Teams; we didn't have          03:06

11    anything that wasn't provided to us in discovery.

12          So it's fair to say that that is probably a limited

13    subset of the amount of coordination happening.  And we see the

14    coordination right at the beginning.  That's an unfair

15    advantage.  The Government was using the civil case in order to          03:06

16    circumvent the Fourth Amendment and in order to disregard

17    Mr. Cardiff's constitutional rights in order to get in there.

18    That was not the role of the receiver; that was not why the

19    receiver was appointed by the Court; and that certainly was not

20    the stated reason or one of the stated reasons that the          03:07

21    Government was seeking a receiver in the first place.  This was

22    all kind of a covert operation behind the scenes.  That is an

23    unfair advantage.

24          THE COURT:  Let me hear from the Government.

25          MR. SEBASTIAN:  Sir, Your Honor, I think the Ninth          03:07

1    Circuit in the *Stringer* case is really on point here.  As the

2    Government has stated before, August 2017 a CID was issued.

3    The defendant keeps going on about a civil action that occurred

4    in 2018, but there is no need for a civil action to actually

5    have started.  It has to be that a civil investigation predated    03:07

6    the criminal investigation and a civil investigation predated,

7    if we go off of this 2018 date, over a year before.  So the

8    FTC, because of consumer complaints, is looking at the

9    defendant, sends him a CID, and requests information.

10           This -- under *Stringer*, the fact that the FTC    03:07

11   investigation predates the criminal investigation negates the

12   likelihood of any bad faith.  And under Unruh, no bad faith

13   exists if the civil investigation culminates in a civil

14   lawsuit.  Not only did this culminate in a civil lawsuit, the

15   FTC won a summary judgment on 16 different counts.  So this    03:08

16   was -- the receiver is now put into place because of

17   misconduct.  And this entire argument that the -- there's an

18   unfair advantage because of secrecy is ridiculous because a

19   grand jury investigation is secret.  *Stringer* clearly says that

20   whether an investigation is overt or covert depends on the    03:08

21   Government's discretion.  And most investigations are covert

22   because defendants, like this defendant, will destroy documents

23   when the Government is looking into them, just like what

24   occurred here.

25           So these arguments -- the argument that he's not    03:08

1    represented at the start of the civil case: incorrect.  Tracy

2    Green represents Cardiff and Redwood for the August 2017 CID.

3    Her web page clearly states that she represents defendants for

4    white-collar defense.

5            This entire argument regarding USPIS being involved,    03:09

6    there was six postal agents, two local law enforcement.  They

7    came in to assist the receiver in taking over a location.  It's

8    two different locations on two separate sides of a parking lot

9    with two different buildings.  So two law enforcement is not

10   enough one-on-one to go to a company with 25 employees and the    03:09

11   defendant.  So they split up law enforcement to go in and

12   ensure access.

13           When we talk about a warrantless search, that's also

14   ridiculous because the receiver in October writes an entire

15   report.  When the receiver walks into the location, he finds an    03:09

16   entire storage room full of mailing -- mailing papers.  These

17   papers indicate that the defendant is sending letters from a

18   master prophet to the elderly.  And the receiver then reports

19   that there's $1.5 million in donations collected.  And so for

20   the receiver to see this material and then allow postal to come    03:10

21   in and take pictures is not ridiculous.  It's something within

22   the receiver's purview because the receiver is put into place

23   because the defendant is committing misconduct.  And when he

24   walks into the location, sees the misconduct, he allows postal

25   to then come back at a different time and collect the material    03:10

1    that's relevant.

2           THE COURT:  What do you make of the voluminous or

3    repeated communications between the civil CID people and the

4    criminal investigation people --

5           MR. SEBASTIAN:  Sure.                                    03:10

6           THE COURT:  -- over a period of time?

7           MR. SEBASTIAN:  So there's 710 communications that

8    the Government was not obligated to disclose that we

9    voluntarily turned over.  In all of these communications, there

10   is not one instance of misconduct or showing the intertwining   03:10

11   under *Scrushy*.  The defendant uses *Scrushy* as their main case.

12   In *Scrushy* the SEC not only set the dates and times and

13   locations of depositions, they were also heavily involved.

14   Here the FTC conducted their own, and the Government

15   interviewed over 35 witnesses completely separate from the FTC.  03:11

16   The FTC was not at any of the interviews and was not involved.

17   And DOJ was not involved in any of the FTC interviews.

18   Completely separate.

19           Communications between the two agencies are actually

20   typical.  And under *Stringer*, it says that the agencies can go  03:11

21   back and forth and communicate.  That organization or

22   communication is not something that shows bad faith.  Bad faith

23   is an affirmative misrepresentation which involves trickery.

24   And during the defendant's deposition, his attorney clearly

25   asked the FTC attorney whether or not they were talking to       03:11

```
 1   prosecutorial authority.  And the FTC attorney states, "From

 2   time to time we share information with Government agencies, and

 3   those communications with Government agencies may be civil or

 4   criminal and are confidential, and we cannot disclose them."

 5              THE COURT:  All right, then.  Very well.                    03:11

 6              I'll have you get the last word, Ms. Potashner.

 7              MS. POTASHNER:  Thank you, Your Honor.  The one thing

 8   that I wanted to point out is that the Government just

 9   indicated that the receiver in his due diligence went in after

10   the receivership was -- was approved by the Court and went in    03:12

11   and saw materials that caused him concern and brought in the

12   U.S. Postal.  That is just not correct.  There is an indication

13   now, just to remind the Court --

14              THE COURT:  The U.S. Postal Service people were there

15   before the receiver saw that material.                             03:12

16              MS. POTASHNER:  That is true.  And there's also an

17   indication on September 26th where the FTC is emailing U.S.

18   Postal assessing her availability, the postal agent's

19   availability regarding access and entering Redwood.  So it is

20   not correct that the -- that the receiver was surprised by what    03:12

21   he saw and then it made sense to bring in U.S. Postal after

22   that.  That is just -- that is -- that is a reversal of the

23   order that things happened here.  The -- there was a plan by

24   FTC and U.S. Postal to get in and search that property, and the

25   receiver was a vehicle for that search that was used by the        03:13
```

1    Government, plain and simple based on the evidence and the

2    communications.

3            And I appreciate that the Government, you know, says

4    that the Government didn't have to provide this information to

5    us.  I appreciate the Government providing that information,    03:13

6    but it doesn't undermine the truth of the matter, which is that

7    the civil case was used as a vehicle to do this criminal

8    investigation.

9            And I do think it is important that the CID case that

10   the Government is relying on was not a case against             03:13

11   Mr. Cardiff.  It wasn't.  It was a case against Redwood.  I

12   understand it's related, but it was not a case against

13   Mr. Cardiff.  And Mr. Cardiff was not represented at the front

14   end of the civil case.  That's on the docket.  The Court can

15   take judicial notice of when a -- when the lawyer came into     03:13

16   that case.

17           THE COURT:  Thank you.

18           Thank you, counsel.  The matter stands submitted.  I

19   expect to issue a ruling by the end of the week.

20                   (Proceedings concluded.)                       03:14

21                          -o0o-

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4            I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME

5    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

6    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

7    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

8    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

9    STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

10   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

11   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

12   THE UNITED STATES.

13

14

15                    DATED THIS 2ND DAY OF OCTOBER, 2024

16

17

18            /s/ PHYLLIS A. PRESTON

19            _____

20            PHYLLIS A. PRESTON, CSR No. 8701, FCRR

21            FEDERAL OFFICIAL COURT REPORTER

22

23

24

25
```