# EXHIBIT B

Stephen R. Cochell
Cochell Law Firm P.C.
5850 San Felipe Ste 500
Houston Texas 77057
(346)800-3500
srcochell@gmail.com
Admitted Pro Hac Vice

Allan Grant (SBN#213658)
Grant's Law Firm
17351 Greentree Drive
Riverside, California 92503-6762
Telephone (888)937-7555
Facsimile  (866)858-6637

Attorneys for Defendant
Jason Edward Thomas Cardiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Case No.:  5:23-CR-00021-JGB |
| Plaintiff, | |
| vs. | |
| JASON EDWARD THOMAS CARDIFF, | |
| Defendant. | |

## DECLARATION OF STEPHEN R. COCHELL IN SUPPORT JASON CARDIFF'S MOTION TO DISMISS BASED ON DOUBLE JEOPARDY

I, Stephen R. Cochell, declare as follows:

1.      I am a partner and owner of Cochell Law Firm, P.C., attorneys of record for Defendant Jason Edward Thomas Cardiff.  I have personal knowledge

1

of the facts set forth herein. If called as a witness, I could and would competently testify to the matters stated herein. I make this declaration based in support of Defendant Jason Cardiff's Motion to Dismiss Based on Double Jeopardy and state the following:

2.      A true and correct copy of the Complaint from Civil Case 18-2104, C.D. Cal is attached as Exhibit 1.

3.      A true and correct copy of the Ex Parte TRO and Appointment of Receiver is attached as Exhibit 2A

4.      A true and correct copy of the Preliminary Injunction as to the Cardiffs is attached as Exhibit 2.

5.      A true and correct copy of the Report of the Receiver October 10, 2018 through October 31, 2018 is attached as Exhibit 3.

6.      A true and correct copy of the Order on Summary Judgment is attached as Exhibit 4.

7.      A true and correct copy of the Default Judgment as to Corporate Defendants is attached as Exhibit 5

8.      A true and correct copy of the Final Judgment and Permanent Injunction as to Cardiffs is attached as Exhibit 6.

9.      A true and correct copy of the transcript of Senate Report 93-151, 98th Congress, 1st session is attached as Exhibit 7 (regarding sworn testimony by FTC Commissioners, Philip Elman, Mary Gardner Jones and FTC Chairman Caspar Weinberger.

10.      A true and correct copy of the article by David M. FitzGerald, "The Genesis of Consumer Protection Remedies Under Section 13(b) of the FTC Act" September 23, 2004) referred to as the "FitzGerald Article" is attached as Exhibit 8.

11.      A true and correct copy of the Transcript of Argument before the

2

Supreme Court in *AMG Capital Management LLC v. FTC*, 593 U.S. 67 (2021)  is attached as Exhibit 9.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 29th day of November, 2024, at Houston, Texas.

/s/ Stephen R. Cochell
Stephen R. Cochell

# EXHIBIT 1

ALDEN F. ABBOTT
General Counsel
ELIZABETH JONES SANGER (WI 1080449)
esanger@ftc.gov; (202) 326-2757
JAMES A. PRUNTY (OR 84128)
jprunty@ftc.gov; (202) 326-2438
EDWIN RODRIGUEZ (DC 446457)
erodriguez@ftc.gov; (202) 326-3147
SHIRA D. MODELL (DC 358757)
smodell@ftc.gov; (202) 326-3116
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Fax: (202) 326-3259

STACY PROCTER (Local Counsel) (CA 221078)
sprocter@ftc.gov
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380
ATTORNEYS FOR PLAINTIFF

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | **FILED UNDER SEAL** |
| Plaintiff, | Case No. EDCV18-2104 -JGB(KKx) |
| v. | **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |
| JASON CARDIFF, individually and as an owner, officer, director, or member of REDWOOD SCIENTIFIC TECHNOLOGIES, INC., a | |

LODGED
CLERK, U.S. DISTRICT COURT

OCT - 3 2018

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

California corporation;
REDWOOD SCIENTIFIC
TECHNOLOGIES, Inc., a
Nevada corporation;
REDWOOD SCIENTIFIC
TECHNOLOGIES, Inc., a
Delaware corporation;
IDENTIFY, LLC, a Wyoming
limited liability company;
ADVANCED MEN'S
INSTITUTE PROLONGZ
LLC, d/b/a AMI, a California
limited liability company; and
RUN AWAY PRODUCTS,
LLC, a New York limited
liability company; and
both general and limited
partner of
CAROLS PLACE LIMITED
PARTNERSHIP, an Arizona
limited liability partnership;

**EUNJUNG CARDIFF**, a/k/a
Eunjung Lee, a/k/a Eunjung
No, individually and as an
owner, officer, director, or
member of
REDWOOD SCIENTIFIC
TECHNOLOGIES, INC., a
California corporation;
REDWOOD SCIENTIFIC
TECHNOLOGIES, Inc., a
Nevada corporation;
REDWOOD SCIENTIFIC
TECHNOLOGIES, Inc., a
Delaware corporation;
IDENTIFY, LLC, a Wyoming
limited liability company;
ADVANCED MEN'S
INSTITUTE PROLONGZ

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

2

LLC, d/b/a AMI, a California )
limited liability company; and )
RUN AWAY PRODUCTS, )
LLC, a New York limited )
liability company; and )
both general and limited )
partner of )
CAROLS PLACE LIMITED )
PARTNERSHIP, an Arizona )
limited liability partnership; )
)
**DANIELLE CADIZ**, a/k/a Danielle )
Walker, individually; )
)
**REDWOOD SCIENTIFIC** )
**TECHNOLOGIES, INC.**, a )
California corporation, also )
d/b/a Rengalife; )
)
**REDWOOD SCIENTIFIC** )
**TECHNOLOGIES, INC.**, a )
Nevada corporation; )
)
**REDWOOD SCIENTIFIC** )
**TECHNOLOGIES, INC.**, a )
Delaware corporation; )
)
**IDENTIFY, LLC**, a Wyoming )
limited liability company; )
)
**ADVANCED MEN'S INSTITUTE** )
**PROLONGZ LLC**, d/b/a )
AMI, a California limited )
liability company; )
)
**RUN AWAY PRODUCTS, LLC**, a )
New York limited liability )
company; and )
)
**CAROLS PLACE LIMITED** )

3

**PARTNERSHIP**, an Arizona limited liability partnership,  )
)
)
Defendants.    )

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, Section 918(c) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c), and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, Section 4 of ROSCA, 15 U.S.C. § 8403, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), Section 1005.10(b) of EFTA's implementing Regulation E, 12 C.F.R. § 1005.10, and Section 310.4(b)(1)(v) of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(v), in connection with their false and unsubstantiated claims for dissolvable film strips advertised for smoking cessation, weight loss, and male sexual performance; a related autoship continuity program resulting in unauthorized shipments and charges; abusive telemarketing through robocalls; and unsubstantiated earnings claims for a multi-level marketing scheme.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345; 15 U.S.C. §§ 45(a) and 53(b); 15 U.S.C. § 8404(a); and 15 U.S.C. § 1693o(c).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce, and Section 12, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-8405, which prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers, including providing clear and conspicuous disclosure of all material terms of the transaction prior to obtaining the consumer's billing information, and obtaining the consumer's express informed consent before charging the consumer; EFTA, 15 U.S.C. §§ 1693-1693r, and its implementing Regulation E, 12 C.F.R. Part 1005, which regulate the rights, liabilities, and responsibilities of participants in electronic fund transfer systems; and the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, ROSCA, EFTA, Regulation E, and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of

monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b) and 56(a)(2)(A); 15 U.S.C. § 8404(a); and 15 U.S.C. § 1693o(c).

## SUMMARY OF THE CASE

6.    Individual Defendants Jason Cardiff, Eunjung Cardiff, and Danielle Cadiz have for years operated a fraudulent multi-pronged scheme that has bilked consumers out of millions of dollars through baseless advertising claims for products that purport to alleviate serious health conditions, while also enrolling consumers in unwanted autoship programs that have resulted in millions of dollars in unauthorized charges.

7.    Defendants' evolving business operation injures consumers in multiple ways.  First, Defendants' marketing of their dissolvable film strips relies on false or unsubstantiated claims for TBX-FREE (stop smoking aid), Eupepsia Thin (appetite suppressant), and Prolongz (men's sexual performance), including claims that those products were proven to work.  Defendants also make false claims that their film strips are made in the United States and are sold with money-back guarantees.  Then, Defendants enroll consumers – without prior notice and authorization and, in some cases, notwithstanding consumers' or Defendants' clear statements to the contrary – in autoship continuity plans that bill consumers monthly for unwanted products.  Defendants also make it difficult for consumers to cancel those plans and get their money back.  More recently, Defendants have turned to abusive telemarketing practices by delivering prerecorded marketing messages to millions of consumers.  Finally, Defendants recently launched a multi-level marketing scheme for which they make false or unsubstantiated earnings claims.

8.    Individual Defendants have operated the scheme through a web of interrelated companies, using Corporate Defendants as their alter egos.  Corporate Defendants form a common enterprise, and include three corporations with the

same name – Redwood Scientific Technologies, Inc., a California Corporation; Redwood Scientific Technologies, Inc. a Nevada Corporation; Redwood Scientific Technologies, Inc., a Delaware Corporation  – and at least 4 other entities, Identify, LLC; Advanced Men's Institute Prolongz LLC; Run Away Products, LLC; and Carols Place Limited Partnership.

## CORPORATE DEFENDANTS

9.    Corporate Defendant Redwood Scientific Technologies, Inc. ("Redwood California"), also doing business as Rengalife, is a California corporation with its principal place of business at 820 North Mountain Ave., Suite 100, Upland, CA 91786.  It has undergone name changes.  Redwood California was initially Advanced Men's Institute Prolongz LLC, which subsequently became Redwood Scientific Technologies LLC, and then finally the corporation Redwood California.  Redwood California transacts or has transacted business in this district and throughout the United States.  At times material to this Complaint, acting alone or in concert with others, Redwood California has advertised, marketed, distributed, or sold dissolvable film strips, including TBX-FREE, Eupepsia Thin, and Prolongz, to consumers throughout the United States.

10.    Corporate Defendant Redwood Scientific Technologies, Inc. ("Redwood Nevada") was, until December 2017, a Nevada corporation whose registered agent was located at 202 N. Carson Street, Carson City, NV 89701. Redwood Nevada was the parent of Redwood California, and it transacted business in this district and throughout the United States.

11.    Corporate Defendant Redwood Scientific Technologies, Inc. ("Redwood Delaware") is a Delaware corporation with its principal place of business at 820 North Mountain Ave., Suite 100, Upland, CA 91786.  Redwood Delaware was established in December 2017 as part of a merger between Greenway Design Group, Inc. and Redwood Nevada, thus becoming the parent of

Redwood California.  Through its subsidiaries, including Redwood California,
Redwood Delaware has advertised, marketed, distributed, or sold dissolvable film
strips, including TBX-FREE, Eupepsia Thin, and Prolongz, to consumers
throughout the United States.

12.    Corporate Defendant Identify, LLC ("Identify") is a Wyoming limited
liability company.  Identify has reserved multiple trade names in Wyoming,
including TBX-FREE, Redwood Scientific Technologies, Advanced Men's
Institute, and Runaway Products.  At times material to this Complaint, acting alone
or in concert with others, Identify has advertised, marketed, distributed, or sold
dissolvable film strips, including TBX-FREE, Eupepsia Thin, and Prolongz, to
consumers throughout the United States.  Currently, Identify is the primary seller
of TBX-FREE, Eupepsia Thin, and Prolongz, and receives revenue from the sales
of those products.  Identify's bank accounts receive funds for activities conducted
by other Corporate Defendants.

13.    Corporate Defendant Advanced Men's Institute Prolongz LLC
("AMI") was a California limited liability company formed in 2014 by Individual
Defendant Eunjung Cardiff.  The managing member of AMI is Corporate
Defendant Run Away Products, LLC.  At times material to this Complaint, acting
alone or in concert with others, AMI has advertised, marketed, distributed, or sold
Prolongz to consumers throughout the United States.

14.    Corporate Defendant Run Away Products, LLC ("Run Away") is a
New York limited liability company formed on March 10, 2009 by Individual
Defendant Eunjung Cardiff.  Run Away has at various times placed advertising for
Prolongz, and been responsible for meeting payroll for Corporate Defendant
Redwood California's employees.

15.    Corporate Defendant Carols Place Limited Partnership is an Arizona
asset management limited partnership formed on January 23, 2017.  Carols Place

Limited Partnership holds 69% of the Common Shares of Redwood Delaware for the benefit of Individual Defendants Jason and Eunjung Cardiff.  The two partners of Carols Place Limited Partnership are Carols Place Trust and Extension First, LLC, a Wyoming company formed on January 13, 2017 and owned by Individual Defendants Jason and Eunjung Cardiff.  Carols Place Trust is a bridge trust formed on January 17, 2017 under Nevada law.  Carols Place Trust owns the Cardiffs' home.  The only two settlors and trustees of Carols Place Trust are Individual Defendants Jason Cardiff and Eunjung Cardiff.  Carols Place Limited Partnership has received funds from Corporate Defendant Identify.

## INDIVIDUAL DEFENDANTS

### INDIVIDUAL DEFENDANT JASON CARDIFF

16.     Individual Defendant Jason Cardiff is the Founder, President, Chief Executive Officer, and a member of the Board of Directors of Corporate Defendant Redwood California, and the President, Chief Executive Officer, Secretary, Treasurer, and a Director of Corporate Defendant Redwood Delaware.  Mr. Cardiff owns more than 150 million shares of Corporate Defendant Redwood Delaware common stock and controls all 2.5 million shares of Redwood Delaware's Series A Super Voting Preferred Shares, accounting for 96.6 percent of Redwood Delaware's voting securities.  He was the President of Corporate Defendant Redwood Nevada before its December 2017 dissolution.  Mr. Cardiff is also the managing member and has held himself out as an owner of Corporate Defendant Identify; he has held himself out as the owner of Corporate Defendant AMI; Mr. Cardiff is also a member of Corporate Defendant Run Away.  Mr. Cardiff is a signatory on bank accounts of Corporate Defendants, as well as a trustee for Carols Place Trust.

17.     Individual Defendant Jason Cardiff participated in the creation and dissemination of advertising for TBX-FREE, Eupepsia Thin, and Prolongz.  Mr.

Cardiff has appeared in videos promoting TBX-FREE and Eupepsia Thin, in which he touts the products' efficacy. Mr. Cardiff also appeared in multiple videos promoting Defendant Redwood California's new multi-level marketing program (Rengalife), in which he claimed that Rengalife members are likely to earn substantial income. Mr. Cardiff negotiated with a telemarketing company to deliver millions of prerecorded messages, commonly known as robocalls, to consumers promoting Defendants' products, and his voice is used by Defendants in those calls. In addition, Mr. Cardiff appears to have been routinely copied on internal and external company emails, making him generally aware of company operations.

18.     Individual Defendant Jason Cardiff at all times material to this Complaint, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Corporate Defendants, including the acts and practices set forth in this Complaint. Mr. Cardiff resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

**INDIVIDUAL DEFENDANT EUNJUNG CARDIFF**

19.     Individual Defendant Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, is the Secretary, Director of Marketing, and a member of the Board of Directors of Corporate Defendant Redwood California, as well as its registered agent. She is the Chief Operating Officer, Chief Marketing Officer, and a Director of Corporate Defendant Redwood Delaware, and she owns 550,800 shares of that company's Common Stock. She was the Secretary of Corporate Defendant Redwood Nevada before its December 2017 dissolution. Ms. Cardiff organized Corporate Defendant AMI; is the managing member of Corporate Defendant Run

Away; and has signed financial documents identifying herself as an owner of Corporate Defendant Identify.

20. Individual Defendant Eunjung Cardiff is identified as part of the Management Team on the website of Corporate Defendant Redwood California, and her profile says that:

> At Redwood Scientific Technologies, Inc., [Ms. Cardiff] serves as the Marketing Director, in which she oversees management's activities. Eunjung also supervises the company's research and development activities – the bread and butter of Redwood. As all management personnel reports [sic] to Eunjung, she has the best insights into the company's marketing strategy. Eunjung's focus on ensuring that the company "meets" its financial targets, especially "acquisition cost per new customer," guarantee[s] [t]he the company's success and profitability. She also works [closely] with Jason to constitute, layout, and execute the company's success strategy.

21. Individual Defendant Eunjung Cardiff, who is married to Individual Defendant Jason Cardiff, participated in the dissemination of advertising for TBX-FREE, Eupepsia Thin, and Prolongz. She was the principal person responsible for buying media for the three products. She participated in responding to requests for advertising claim substantiation during the television advertising clearance process for TBX-FREE. Ms. Cardiff also monitored the call centers receiving calls from consumers to purchase TBX-FREE, Eupepsia Thin, and Prolongz. Ms. Cardiff also assisted Individual Defendant Jason Cardiff in filming some of the Facebook Live videos promoting Rengalife. Ms. Cardiff's voice also is used by Defendants in robocalls to consumers, and she paid for robocall expenses. She has applied for multiple merchant accounts on behalf of several Corporate Defendants and she is a signatory on several of their checking accounts, as well as a trustee for Carols

11

Place Trust.

22.    Individual Defendant Eunjung Cardiff, at all times material to this Complaint, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Corporate Defendants, including the acts and practices set forth in this Complaint. Ms. Cardiff resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

### INDIVIDUAL DEFENDANT DANIELLE CADIZ

23.    Individual Defendant Danielle Cadiz, a/k/a Danielle Walker, has served as Corporate Defendant Redwood California's Director of Operations since December 2016 and as its Business Manager since January 2015. Ms. Cadiz's Linkedin.com profile describes her responsibilities at Corporate Defendant Redwood California as "leading day to day business operations, office management, [Accounts Payable/Accounts Receivable], cash flow, Human Resources and strategic planning."  Ms. Cadiz executes virtually all of the activities of Corporate Defendants and has actual and implied authority to make decisions on behalf of Corporate Defendants.

24.    In the course of her official responsibilities, Individual Defendant Danielle Cadiz receives information about consumer complaints.  She also has communicated with the foreign manufacturers of the Defendants' film strip products and appeared in a video promoting the film strip technology, entitled "The End of the Pill," where she was identified as Corporate Defendant Redwood California's "Operations Manager."  Ms. Cadiz, along with Individual Defendant Jason Cardiff, negotiated with a telemarketing company to deliver millions of robocalls to consumers promoting several of Defendants' products.  Ms. Cadiz

signed the contract for services with the telemarketing company and monitored the company's performance under the contract.

25.     Individual Defendant Danielle Cadiz, at all times material to this Complaint, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Corporate Defendants, including the acts and practices set forth in this Complaint. Ms. Cadiz resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMON ENTERPRISE

26.     Corporate Defendants have operated as a common enterprise while engaging in the illegal acts and practices alleged in the Complaint.  Individual Defendants Jason Cardiff, Eunjung Cardiff, and Danielle Cadiz have conducted the alleged deceptive practices described herein through the interrelated network of Corporate Defendants, which share a business purpose, business functions, and employees; are commonly controlled by Individual Defendants; and have commingled funds.  Defendants have been able to delay detection of chargeback activity from credit card companies and merchant card banks by using multiple company names, bank accounts, and merchant accounts virtually interchangeably since 2014.  Because Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

## ALTER EGO

27.    There is such a unity of interest between Corporate Defendants and Individual Defendants Jason Cardiff and Eunjung Cardiff that they are alter egos. Corporate Defendants are all dominated and controlled by Individual Defendants Jason Cardiff and Eunjung Cardiff and were used to further the deceptive scheme described herein.  Individual Defendants Jason and Eunjung Cardiff use personal credit cards to pay for expenses of Corporate Defendants and hold their stock in Redwood Nevada and Redwood Delaware in the name of Corporate Defendant Carols Place Limited Partnership. Corporate Defendant Carols Place Limited Partnership is comprised of Carols Place Trust and Extension First, LLC, which are both owned by the Cardiffs; Carols Place Trust also owns the Cardiffs' home.

28.    Failure to disregard the Corporate Defendants' corporate forms would sanction a fraud and injustice by shielding and safeguarding them from liability for their roles in a deceptive scheme that has caused millions of dollars in consumer injury, and would unjustly enrich them by permitting them to keep moneys obtained from consumers through fraud.

## COMMERCE

29.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

30.    Defendants have manufactured, labeled, advertised, marketed, promoted, offered for sale, sold, and distributed to consumers dissolvable film strip products, including strips sold under the brand names TBX-FREE, Eupepsia Thin, and Prolongz.

31.    TBX-FREE, Eupepsia Thin, and Prolongz are manufactured in China or India.

32.    Defendants market TBX-FREE, Eupepsia Thin, and Prolongz as over-the-counter homeopathic drugs that consumers place on their tongues and then press against the roofs of their mouths.

33.    According to its package label, the active ingredient in TBX-FREE is "Laburnum anagyroides 1X" and its purpose is the "Homeopathic treatment of chronic nicotinism."

34.    According to its package label, the active ingredient in Eupepsia Thin is "Paullinia Cupana H.B.K. 1X" and its purpose is as a "Homeopathic appetite suppressant."

35.    According to its package label, the active ingredients in Prolongz are "Damiana Extract 1X (10 mg) … and Ginseng Extract 1X (10 mg)" and its purpose is as a "Homeopathic Sexual Enhancement Strip."

36.    Defendants have sold Prolongz since at least 2014, TBX-FREE since at least 2015, and Eupepsia Thin since at least 2017.  Defendants have sold Prolongz, TBX-FREE, and Eupepsia Thin on multiple websites.  Defendants have charged $49.95 for a box of TBX-FREE containing 120 film strips, and $49.95 for a box of Eupepsia Thin containing 60 film strips.  Defendants have offered a box of Prolongz containing 60 film strips for a 15-day free-trial upon the payment of $4.98 in shipping and handling, and have charged $89.95 upon the expiration of the trial period.

## TBX-FREE ADVERTISING

37.     Defendants have advertised TBX-FREE through a national television infomercial campaign and on the Internet, including websites and Facebook Live videos.  The core messages of this advertising have been that TBX-FREE enables users to quit smoking, that it is clinically proven to do so, and that it is superior to

other smoking cessation aids.  These materials contain the following statements and depictions, among others:

A.    Excerpts from tbxfree.com website (captured 03/16/2017):

Revolutionary New Stop Smoking Product

More effective than the Patch and Gum

#1 Choice by Smokers

***

**88% Success Rate**

***

In clinical studies cited in The New England Journal of Medicine, the active ingredient in TBX-FREE™ has an 88% cure care [sic] compared to the patch and gum combined.

***



***

**PROVEN IN RESEARCH STUDIES TO HELP**

**SMOKERS QUIT THEIR ADDICTION!**

***

**The Breakthrough**
**Stop Smoking Aid**
**That Calms Cigarette Cravings!**
**Proven in research studies to**
**help smokers quit their addiction!**

B.    TBX-FREE Facebook Live post (posted 02/24/2017):

1        PRESENTER [DEFENDANT JASON CARDIFF]: . . .  So I'm
2    going to show you what we've done .  We've developed the
3    most successful stop-smoking product on the market, period,
4    plain and simple.  I challenge anybody that tells me they have a
5    more successful stop-smoking product.  It doesn't exist.

6                               ***

7        If you've tried to stop smoking, if you want to stop
8    smoking, if you want to quit, if you want to make that change,
9    this is the product for you.  And what you get and how it works
10   and the magic is it has no nicotine in it, first off.  But it does
11   have an active ingredient in it.

12                               ***

13       And how this works is what's really important.  . . .
14  [T]his little strip here, you put it on your tongue, and it releases
15  a chemical to the brain, which is naturally found in nature, and
16  it makes you feel like you've had a cigarette.

17       Now, that's the most important part.  We've replaced the
18  feeling of smoking with a non-nicotine-based product.  And in
19  five short days -- five days -- you get all the nicotine out of
20  your system.  You now have the nicotine out of your system
21  and you have the chance to become and live a smoke-free life.
22  And that is how the product works.  That is why it has an 88
23  percent success rate, and we can look here, we have an -- we
24  have a proven track record of over an 88 percent success rate
25  from some of the greatest medical institutions and universities
26  in the United States and the U.K.  And that's why it works so
27  well -- no nicotine in your system.

28

*** 

What does one month supply, an entire month, of TBX-Free -- it comes with two of these packets, two of them, okay? A whole month supply, it's 120 strips, which if you follow the direction should be more than you ever need.

I don't really understand. You know you've tried to stop. You've tried to stop five, six, seven, ten times. This product will do it for you. You can quit smoking with TBX-Free. Here's the best part, right? We offer a lifetime, money-back guarantee. . . . Lifetime, money-back guarantee for any reason, okay? If the product doesn't work for you or you become a smoker again, not only will we either give you your money back or we'll send you another box, whatever you want. We want the highest quality customer experience possible. You know the patches and gums won't give you any guarantee because they know they don't work. . . . So lifetime, money-back guarantee. You have nothing to lose, everything to gain, the number, right here. . . . You get a one-month supply for [$]49.95, and you don't pay shipping. Just think about it. Just what have you got to lose? It's what you spend on cigarettes in a week. Can you imagine? You're -- all of a sudden you're smoke-free?

C.     Excerpts from TBX-FREE infomercial (captured 03/27/ 2018):

SPOKESMAN: This amazing strip delivers the same calming effect but with no tar, no tobacco, no nicotine, no ashes, no odor, huh, and my favorite, Taylor, no secondhand smoke.

***

SPOKESWOMAN:  To be able to break the chain of addiction with smokers, we have developed a product that gives you the freedom to not be addicted to any type of nicotine product.  TBX-FREE is unique among stop-smoking products because of the delivery technology and it contains no nicotine.  This nicotine-free system allows you to successfully stop smoking and at the same time you do not become addicted to TBX-FREE – like you might with the nicotine gum or patch.

NARRATOR:  Have you ever wanted to quit smoking but didn't think you could?  Now, you can.  Imagine living a smoke-free, nicotine-free life.  Because of TBX-FREE, thousands of people are breaking the addiction of cigarettes.  People around the world have discovered this amazing breakthrough and, now, through this TV offer -- Redwood Scientific Technologies is giving you an opportunity of a lifetime.  TBX-FREE is a fast-acting, dissolvable strip that is setting cigarette smokers -- free for life.  With TBX-FREE, you control the habit, the habit doesn't control you.

***

SPOKESWOMAN:  TBX-FREE is a fast strip delivery technology.  You just place it on your tongue and it dissolves instantly and your nicotine craving disappears.  And the moment it hits your system, you have the same satisfaction as if you had just finished a cigarette.

***

19



***

UNIDENTIFIED FEMALE:  I smoked about a pack a day for ten years.  I tried the patch first and I would still smoke.  You know, I was wearing the patch, I would still smoke cigarettes.  When I was chewing the gum, I would still smoke cigarettes.  And then I tried the e-cig -- e-cigarettes and even those, still nicotine, you know, I kind of said, you know, I need to try something that's, you know, not nicotine.  And I was really surprised how TBX works.

UNIDENTIFIED FEMALE:  TBX-FREE is the only thing that works.  I've tried the gum, the patch, nothing works.  And, plus, no side effects.  What could be better?

D.    TBX-FREE Facebook Live post (posted 01/09/2017):

PRESENTER [DEFENDANT JASON CARDIFF]:  We have an 88% effective rate in long-term cure in long-term

smokers.  A long-term smoker is someone who's been smoking
more than 5 years, more than a pack or around a pack a day on
average.

Our clinical data on TBX-FREE have done [sic] by some
of the greatest medical and scientific institutions anywhere that
we know of, including, not limited to the New England Journal
of Medicine, which ranks our product ten times more effective
than nicotine-replacement therapy to stop smoking.  That's
who's giving us this data.

E.     TBX-FREE Facebook Live post (posted 02/07/2017):

PRESENTER [DEFENDANT JASON CARDIFF]:  I
want to share with you what is TBX-Free, how does it work,
what is the secret to learn how to stop smoking cigarettes fast.  I
mean really fast, within a week, within ten days.

We have long-term smokers that have learned this secret,
that have been smoking for 30-plus years, two packs a day or
more, and they no longer smoke cigarettes.  If you've tried the
patch and the gum, maybe you've tried hypnosis, maybe you've
tried Chantix, and you're a long-term smoker, I need your
attention, just a little bit of your attention.

***

Now, you should never need more than one month.  After
five days of use, all the nicotine will be cleansed out of your
system... And people say, well, does it work?  Well, we have an
88 percent success rate.  We have a lifetime money-back
guarantee.

***

21

But first you have to stop smoking.  You have to stop smoking, and you're addicted to something we believe internally as a group and a company, cigarettes are the most -- one of the most harmful killers of America -- of Americans. And -- and, you know, we're an American-based company.  We have an American-based product.  We're here, located in Southern California.  We have an all-U.S.-based team here at our laboratories, and we're here for you.

38.    Jason Cardiff is the "Presenter" appearing in the TBX-FREE Facebook Live posts quoted above.

## EUEPSIA THIN ADVERTISING

39.    Defendants have advertised Eupepsia Thin through a national television infomercial campaign and on the Internet, including websites and Facebook Live videos.  The core message of this advertising has been that Eupepsia Thin causes or enables substantial weight loss without users having to diet, increase their exercise, or make other lifestyle changes.  These materials contain the following statements and depictions, among others:

A.    Excerpts from bethinrx.com website (captured 02/05/2018):



LIVE THE

# EUPEPSIA

**LIFESTYLE!**

→ NO DIETS
→ NO GIVING UP FOOD
→ NATURAL AND EFFECTIVE

\*\*\*

FDA Registered.
Natural, homeopathic and wholesome.
Proven active ingredient is an effective appetite suppressant.

\*\*\*



\*\*\*

- Eupepsia Thin™ contains a clinically proven super ingredient called Paullinia cupana H.B.K.
- Eupepsia Thin™'s incredible active ingredient sends the brain the sensation of fullness.
- Once Eupepsia Thin™ mouth strip dissolve [sic] on your tongue, the active ingredient hits your blood stream sending the feeling of fullness which lasts for hours which in turn controls caloric intake.

\*\*\*

Studies show the new product, Eupepsia Thin, gives people a chance to live a more active lifestyle and keep weight off.

\*\*\*

23

<div align="center">

**Safe & Effective Weight-Loss**

Current calorie reduction and meal plans have less than 5% success rate while the new product, Eupepsia Thin™, has a substantially higher success rate.  Until now there was no better way to shed the weight other than going through a huge lifestyle change.

\*\*\*

**Lose up to 15 pounds**

your first month with **Eupepsia Thin** oral strips without diets or changing your food or lifestyle choices.

\*\*\*

</div>

**What is the price of Eupepsia Thin™?**

If you would like to **lose 8-20 lbs** – our one month supply at **69.95** will work for you.

If you would like to **lose 20-50 lbs** – our three month supply at **169.95** will work for you.

If you would like to **lose 50-70 lbs** – our six month supply at **239.95** will work for you.

If you would like to **lose 70-100 lbs** – our one year supply at **456.95** will work for you.

<div align="center">

\*\*\*

</div>

**Is Eupepsia Thin™ 100% natural?**

Unlike most diets and supplements on the market,

Eupepsia Thin™ is all natural and FDA registered,

without fillers or dangerous ingredients, eliminating side

effects or withdrawals.

B.    Excerpts from Eupepsia Thin infomercial (captured 07/24/2017):

ON SCREEN:  ARE YOU READY TO LOSE

BEFORE and AFTER PHOTOS

10 lbs

20 lbs

<div align="center">24</div>

1    100 lbs

2    WITHOUT GIVING UP YOUR FAVORITE FOODS!

3    NARRATOR:  Are you ready to lose 10, 20, even 100 pounds

4    without giving up your favorite foods or adding any exercise?

5    ***

6    NARRATOR:  The ingredients in Eupepsia will begin to

7    activate in your system in less than 20 seconds.  In minutes,

8    you'll feel your appetite suppress, giving you control over how

9    much you eat.

10    ***

11    NARRATOR:  This is exactly what you've been waiting for to

12    help you shed those unwanted pounds.

13    ON SCREEN:  Before photo

14    Danny Lost 45 lbs!

15    From 230 lbs to 185 lbs!

16    DANNY:  Forty-five pounds.  I went from 230 back to 185.

17    ON SCREEN:  Before photo

18    Tricia Lost 20 lbs!

19    From 135 lbs to 115 lbs!

20    TRICIA:  My current weight today is 115 pounds and I feel

21    absolutely amazing.  I am able to, you know, just eat whatever I

22    want and still drink wine as well.

23    ***

24    ON SCREEN:  YOU HAVE NOTHING TO LOSE.

25    But The Weight!

26    NARRATOR:  With Eupepsia, you have nothing to lose but the

27    weight.

28

25

SPOKESWOMAN 2:  . . .  This one-of-a-kind product will help you lose weight without stepping one foot in the gym or giving up any of your favorite foods.

ON SCREEN:  NO COUNTING CALORIES OR TRACKING FOOD!

SPOKESWOMAN 2:  No counting calories or tracking food and no expensive gym memberships to pay.

\*\*\*

SPOKESMAN 1: We are so confident that Eupepsia will work for you, it comes with a lifetime guarantee.



\*\*\*

ON SCREEN:  Before photo 240 lbs

   Karen Lost 90 lbs!

   Now 150 lbs!

KAREN:  I'm half the size I used to be.  I can get in half of these jeans.  That's quite an accomplishment.

\*\*\*

26

ON SCREEN:  Before photo

Todd Lost 132 lbs!

From 360 lbs to 228 lbs!

TODD:  I tell you what, ever since I got the Eupepsia product, I have been amazed.  I lost -- actually, I weighed 360 pounds.  I lost 132 pounds on it.  Very easy to do.  And, now, I'm at 228 pounds.

And I tell you what, I've never felt better. I feel so good. My body is extremely different now.  I don't fight to breathe. My kidney level is back to normal.  I have no diabetes whatsoever.  I used to take five insulin shots a day.  I no longer have to take nothing for diabetes.  My kidneys are at a good function and I just -- I tell you what, Eupepsia has been awesome.

C.    Eupepsia Thin package labeling:

- **Oral Strip
  EASY WEIGHT LOSS**

  _____

  **Safe & Effective**
  Still eat your favorite foods
  No change in exercise required

- Made in USA

- Clinically proven to help suppress appetite between meals.

40.    At least some of the people who provided testimonials in the Eupepsia Thin infomercial were actors who had been paid to appear in the infomercial and

27

who had not used Eupepsia Thin to lose the weight they discussed in their

testimonials.

## PROLONGZ ADVERTISING

41.    Defendants have advertised Prolongz through a national television

infomercial campaign and on the Internet.  The core message of this advertising

has been that Prolongz boosts men's sexual performance, including by lengthening

the duration of sex and preventing premature ejaculation.  These materials contain

the following statements and depictions, among others:

A.    Excerpts from 2014 Prolongz infomercial:

ON SCREEN:



NARRATOR: Through this special offer, Advanced Men's

Institute is giving men the opportunity of a lifetime.

ON SCREEN:          [blinking lights and font]



NARRATOR:  Do you want longer lasting sex?  Do you want more time being intimate with your partner?

NARRATOR:  Do you want to satisfy your partner like never before?  Now it's possible.

ON SCREEN:



NARRATOR:  Thanks to a new first of a kind sexual performance product called Prolongz.

29

B.     Excerpts from 2015 prolongz.com website (captured May 16, 2018):

### 30 DAY MONEY BACK GUARANTEE!

**Prolongz is guaranteed to increase your ejaculatory control levels and overall sexual performance. …**

***





The proprietary blend of ingredients in Prolongz reacts with the chemicals in the brain that control the major parts of sexual excitement. Current products on the market are topical anesthetics which don't treat the problem; they only treat the symptom. Prolongz is a FDA registered Over-The-Counter Homeopathic Drug, the strips dissolve in 20 Seconds; combining a high % dosage blast of Damiana & Ginseng.

Click here to view the complete Drug Facts Panel.
Prolongz™ is a FDA registered OTC homeopathic drug, which helps in the prevention of Premature Ejaculation (PE). It is a first of its kind product which uses Oral (sublingual) dissolvable Strip delivery technology for the treatment of PE.

C.     Excerpts from 2016 prolongz.com website (captured May 16, 2018):



## DEFENDANTS' DECEPTIVE SALES AND BILLING PRACTICES IN CONNECTION WITH TBX-FREE, EUPEPSIA THIN, AND PROLONGZ

42.     Defendants' advertising, including websites, infomercials, and social media, lists both website links and toll-free numbers that consumers can use to place orders for TBX-FREE, Eupepsia Thin, and Prolongz ("the Products"). Consumers then purchase the Products through inbound sales calls and website orders.

### Defendants' Failure to Disclose Autoship Programs
### at the Time of the Initial Sale

43.     When consumers order the Products and provide their payment information, Defendants have routinely enrolled them in a continuing autoship program, which is commonly known as a continuity plan, without disclosing, or disclosing adequately, to those consumers either the enrollment, or the terms and conditions of the autoship program.  Defendants' autoship program then makes additional shipments to consumers at regular intervals and Defendants charge the credit or debit cards that consumers provided for their initial purchase for the subsequent shipments.  Thus, if a consumer placed an order for a supply of any of the Products, the Defendants have often repeatedly, and on a continuing basis, charged the consumer for additional product without further authorization.  In numerous instances, Defendants have not disclosed, or have not disclosed adequately, these material terms to consumers before consumers provide their credit or debit card information, and therefore have not obtained consumers' express informed consent to the autoship program and the additional charges.

44.     In the case of website orders for TBX-FREE, Defendants' websites have not disclosed, or have not disclosed adequately, the negative option feature of their autoship program, whereby they interpret consumers' silence or failure to contact them as consumers' tacit acceptance of enrollment and of the receipt of

32

additional shipments and charges.  In numerous instances, when consumers have proceeded to the shopping cart, provided their billing information, and completed the purchase, there has been no adequate disclosure about Defendants' autoship program or that any additional charges would be placed on a consumer's credit or debit card.

45.    For telephone orders for the Products, in numerous instances, Defendants' call center representatives similarly have not disclosed that Defendants will enroll consumers automatically into a continuing autoship program that will result in additional shipments and charges to consumers' credit or debit cards.  In many cases, consumers have specifically asked not to be enrolled in an autoship program but Defendants did so anyway.  In many cases, Defendants' call center employees assured consumers they will not be enrolled in an autoship program but Defendants did so anyway.

46.    At the time of the initial sale, Defendants do not disclose, or do not adequately disclose, their terms and conditions for cancellation and refunds for autoshipments before obtaining consumers' billing information.  Instead, consumers are later advised by Defendants' customer service representatives that they must request cancellation, obtain a return merchandise authorization ("RMA") number, and mail products back to Defendants at their own expense.

47.    In cases in which consumers pay for their initial purchase using debit cards, Defendants have debited consumers' bank accounts for the additional periodic shipments.  Defendants did not obtain written authorization signed or similarly authenticated from consumers authorizing the recurring electronic fund transfers from their accounts, and did not subsequently provide consumers with a copy of such a written authorization.

**Consumers' Post-Sale Experiences – Unauthorized Charges**

48.    Defendants ship their Products to consumers on a periodic basis and charge their credit or debit cards without consumers' consent for any charge other than the initial purchase.

49.    Consumers must contact Defendants to reject additional shipments and charges and to cancel their undisclosed and unauthorized enrollment in the autoship program.

50.    Defendants' mechanisms for stopping recurring shipments and charges are often not effective.  Consumers are often not able to reach Defendants when they call to stop recurring shipments and charges.  On many occasions when consumers do cancel their enrollment in the autoship program, Defendants continue sending additional shipments and placing additional charges on consumers' credit and debit cards.

51.    Defendants do not honor their money-back guarantees.  Consumers who seek a refund are often told that the charges are not refundable.

**DEFENDANTS' ILLEGAL TELEMARKETING CAMPAIGN**

52.    In February 2018, Defendants caused prerecorded messages, commonly known as robocalls, to be delivered to consumers.  Defendants planned robocall campaigns for multiple products.

53.    Defendants' initial contract with the telemarketing company provided for "ringless voicemails" to be delivered to 1,500,000 consumers.

54.    Defendants disseminated robocalls to targeted groups of consumers, such as men over the age of 40 in the state of California, and delivered prerecorded messages, some of which featured the voice of Individual Defendant Jason Cardiff.

55.    Defendants also conducted a robocall campaign for TBX-FREE using messages featuring the voice of Individual Defendant Eunjung Cardiff.

56.     Hundreds of consumers have complained about receiving unsolicited prerecorded messages for Defendants' products.

## DECEPTIVE RENGALIFE EARNINGS CLAIMS

57.     In March 2018, Defendants launched Rengalife, a multi-level marketing program.

58.     Rengalife members advance up the line from Executive to Director, and then to Vice President and Senior Vice President, based on the number of recruits in their downline networks, all of whom are making monthly purchases of at least $199.80 of Redwood Scientific dissolvable film strips via autoship. Members earn "commissions" on the monthly purchases of Redwood products made by recruits who are one, two, and three levels below them in their network, including a 30 percent "commission" on purchases by those team members one level down whom they recruited directly.

59.     Defendants promoted Rengalife through a variety of media, including, but not limited to, online videos featuring Defendant Jason Cardiff.  Defendants' advertising made strong earnings claims for the Rengalife program, including the following statements, among others:

A.     Rengalife.com/network-marketing:

> "**Finally your dreams can become real!**
> It all begins by signing up as a Rengalife member.
> By becoming part of the Rengalife family, you will be on the path to creating your ideal life.  Whether you are looking for a few extra dollars or pursuing an opportunity to replace a full time income, Rengalife has the way."

B.     "Get Started Today" Facebook Live video (posted 4/4/2018):

> PRESENTER [JASON CARDIFF]:  So you pick a package, and if I told you that you could make $2,000 a month, $5,000 a

month, $100,000 a month, we have somebody on pace to make . . . $100,000 a year. We've only been live a week and a half. If I told you you had to make a little tiny investment in product for yourself to get to the executive level, if I showed you how to spend $199.80 and you could make [$]5,000 a month, $6,000 a month, is that a good investment? And you would say, yes, it is, it's a very good investment.

60.    Defendants represented that Directors are guaranteed a "Minimum monthly Paid commission [of] $600," Vice Presidents $2,600 per month, and Senior Vice Presidents $12,600 per month.

61.    Individual Defendant Jason Cardiff put these guarantees in terms of annual earnings:

Rengalife "New Levels" Vimeo video (captured May 25, 2018):

PRESENTER [JASON CARDIFF]: . . . That takes you from executive to director. That also locks in your annual salary at a minimum -- a very minimum of $7,200 a year once you go from that level of executive to director.

***

And at a vice president level, not only do you start to enjoy some of the super first class bucket list travel, but you also lock in your annual income at a minimum of over $30,000.

***

The next level is a senior vice president level. . . . This means . . . you've locked in your income at $144,000 a year. You're also receiving the three weeks of first class travel.

62. Rengalife also promises one-time bonuses as members advance through the ranks. New Directors receive a $500 bonus, new Vice Presidents $1,200, and new Senior Vice Presidents $10,000.

63. A Rengalife member must have ten people in his or her network to become a Director, 110 to become a Vice President, and 1,100 to become a Senior Vice President.

64. Defendants did not have actual earnings data for Rengalife members at the time they made their earnings claims, nor did they have any basis for earnings claims based on the sale of Redwood film strips, because those products have never been sold without deceptive and unfair practices.

65. The Rengalife program is structured such that, if members follow Defendants' instructions for advancing through the program by recruiting new members, the vast majority of participants will lose money, not earn substantial income.

## VIOLATIONS OF THE FTC ACT

66. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

67. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

68. Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics. For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, TBX-FREE, Eupepsia Thin, and Prolongz are "drugs" as defined in Section 15(b) of the FTC Act, 15 U.S.C. § 55(b).

## **UNSUBSTANTIATED EFFICACY CLAIMS AND FALSE CLAIMS THAT TBX-FREE, EUPEPSIA THIN, AND PROLONGZ ARE CLINICALLY PROVEN TO BE EFFECTIVE**

### **COUNT I**

### **FALSE OR UNSUBSTANTIATED EFFICACY CLAIMS FOR TBX-FREE**

69.    Through the means described in Paragraph 37, Defendants have represented, directly or indirectly, expressly or by implication, that:

A.    TBX-FREE is an effective smoking cessation product;

B.    TBX-FREE is more effective than either nicotine patches or nicotine gum in enabling cigarette smokers to stop smoking;

C.    TBX-FREE enables many cigarette smokers to quit in seven to ten days;

D.    TBX-FREE has an 88 percent success rate, including among people who have smoked cigarettes for more than five years; and

E.    Smokers should not need to purchase more than one month of TBX-FREE.

70.    The representations set forth in Paragraph 69 are false or misleading or were not substantiated at the time the representations were made.

71.    Therefore, the making of the representations as set forth in Paragraph 69 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

38

# COUNT II

## FALSE PROOF CLAIMS FOR TBX-FREE

72.    Through the means described in Paragraph 37, Defendants have represented, directly or indirectly, expressly or by implication, that:

A.    Clinical studies have been conducted on TBX-FREE, and have shown that TBX-FREE is an effective smoking cessation product;

B.    TBX-FREE has been proven in clinical studies to be more effective than nicotine patches or nicotine gum in enabling smokers to stop smoking;

C.    Clinical studies of TBX-FREE conducted on 10,600 people have shown that TBX-FREE has an "88% success rate";

D.    The New England Journal of Medicine ("NEJM"), Harvard Health Publications, and Johns Hopkins University have published clinical studies proving that TBX-FREE is an effective smoking cessation product; and

E.    NEJM's clinical studies showed that TBX-FREE is ten times more effective for smoking cessation than nicotine replacement therapy.

73.    The representations set forth in Paragraph 72 are false.

74.    Therefore, the making of the representations as set forth in Paragraph 72 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

39

# COUNT III

## FALSE OR UNSUBSTANTIATED EFFICACY CLAIMS

## FOR EUPEPSIA THIN

75.    Through the means described in Paragraph 39, Defendants have represented, directly or indirectly, expressly or by implication, that:

    A.    Eupepsia Thin is an effective appetite suppressant and weight loss aid;

    B.    Eupepsia Thin starts working in less than 20 seconds, and suppresses a user's appetite within minutes;

    C.    Eupepsia Thin enables users to lose 10, 20, or even 100 pounds without dieting, giving up their favorite foods, or increasing their exercise;

    D.    Eupepsia Thin users can lose 15 pounds their first month without dieting or changing their food or lifestyle;

    E.    Eupepsia Thin users can lose as much as 20 pounds in one month and as much as 50 pounds in three months;

    F.    Eupepsia Thin is more effective at causing weight loss than conventional calorie reduction and meal plans; and

    G.    Eupepsia Thin enables consumers to avoid gaining back weight they lose, without any lifestyle changes.

76.    The representations set forth in Paragraph 75 are false or misleading or were not substantiated at the time the representations were made.

77.    Therefore, the making of the representations as set forth in Paragraph 75 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

40

## COUNT IV

## FALSE PROOF CLAIMS FOR EUPEPSIA THIN

78.    Through the means described in Paragraph 39, Defendants have represented, directly or indirectly, expressly or by implication, that clinical studies have been conducted on Eupepsia Thin and those studies show that it is an effective appetite suppressant and weight loss aid.

79.    The representations set forth in Paragraph 78 are false.

80.    Therefore, the making of the representations as set forth in Paragraph 78 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT V

## FALSE OR UNSUBSTANTIATED EFFICACY
## CLAIMS FOR PROLONGZ

81.    Through the means described in Paragraph 41, Defendants have represented, directly or indirectly, expressly or by implication, that:

      A.    Prolongz substantially increases ejaculation control and the duration of sex; and

      B.    Prolongz treats or prevents premature ejaculation.

82.    The representations set forth in Paragraph 81 are false or misleading or were not substantiated at the time the representations were made.

83.    Therefore, the making of the representations as set forth in Paragraph 81 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT VI

### FALSE PROOF CLAIMS FOR PROLONGZ

84.    Through the means described in Paragraph 41, Defendants have
represented, directly or indirectly, expressly or by implication, that Prolongz is
clinically proven to increase ejaculation control and the duration of sex for more
than 97% of users.

85.    The representations set forth in Paragraph 84 are false.

86.    Therefore, the making of the representations as set forth in Paragraph
84 of this Complaint constitutes a deceptive act or practice and the making of false
advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of
the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## ADDITIONAL VIOLATIONS OF THE FTC ACT

## COUNT VII

### FALSE CLAIMS THAT EUPEPSIA THIN

### IS MADE IN THE UNITED STATES

87.    Through the means described in Paragraph 39, Defendants have
represented, directly or indirectly, expressly or by implication, that Eupepsia Thin
is made in the United States.

88.    The representation set forth in Paragraph 87 is false.

89.    Therefore, the making of the representation as set forth in Paragraph
87 of this Complaint constitutes a deceptive act or practice and the making of false
advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of
the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT VIII

## FALSE CLAIMS THAT TBX-FREE, EUPEPSIA THIN, AND PROLONGZ ARE SOLD WITH MONEY-BACK GUARANTEES

90.     Through the means described in Paragraphs 37, 39, and 41, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who are not satisfied with the Products will get their money back.

91.     The representations set forth in Paragraph 90 are false.  Many consumers who request their money back from Defendants are denied refunds.

92.     Therefore, the making of the representations as set forth in Paragraph 90 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT IX

## DECEPTIVE TESTIMONIALS

93.     Through the means described in Paragraph 39, Defendants have represented, directly or indirectly, expressly or by implication, that the product users depicted in the Eupepsia Thin infomercial were actual persons who had successfully used Eupepsia Thin to lose substantial amounts of weight.

94.     In truth and in fact, at least some of the testimonialists who appeared in the infomercial were actors who had been recruited and paid for brief on-screen appearances, and had not used Eupepsia Thin to lose the weight they discussed in the advertising.

95.     Therefore, the making of the representation as set forth in Paragraph 93 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT X

## FAILURE TO DISCLOSE ADEQUATELY AUTOMATIC ENROLLMENTS
## IN CONTINUITY PLANS

96.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Products, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who provide their billing information are placing a product order.

97.    In numerous instances in which Defendants made the representation set forth in Paragraph 96, Defendants failed to disclose, or disclose adequately, that consumers who provided their billing information for a product order would be enrolled automatically in a continuity plan for future autoshipments of the Products that would be charged to their credit or debit cards.  This additional information would be material to consumers in their decision to purchase Defendants' products.

98.    Defendants' failure to disclose, or disclose adequately, the material information described in Paragraph 97, in light of the representation set forth in Paragraph 96, constitutes a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT XI

## MISREPRESENTATIONS – CONTINUING AUTOSHIP PROGRAM

99.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Products, Defendants have represented, directly or indirectly, expressly or by implication, that consumers will not be enrolled in an autoship program and that their credit or debit card will be charged only for a one-time purchase of the Products.

100.    The representations set forth in Paragraph 99 are false.  In numerous instances where Defendants have told consumers they will not be enrolled in an autoship program, Defendants have enrolled consumers in an autoship program,

charging consumers' credit or debit cards for additional shipments they did not agree to purchase.

101.   Therefore, the  making of the representations as set forth in Paragraph 99 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT XII

## UNFAIRLY CHARGING CONSUMERS WITHOUT AUTHORIZATION

102.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of the Products, Defendants have caused charges to be submitted for payment to the credit and debit cards of consumers without the express informed consent of those consumers.

103.   Defendants' acts or practices as set forth in Paragraph 102 cause or are likely to cause substantial injury to consumers that those consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

104.   Therefore, Defendants' acts or practices as set forth in Paragraph 102 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and 45(n).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT (ROSCA)

105.   In 2010, Congress passed ROSCA, 15 U.S.C. §§ 8401-05, which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  15 U.S.C. § 8401.

106. Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the TSR, 16 C.F.R. § 310.2(w), unless the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides a simple mechanism to stop recurring charges. *See* 15 U.S.C. § 8403.

107. The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

108. As described above in Paragraphs 42 through 47, Defendants advertise and sell their Products to consumers through a negative option feature as defined by the TSR. *See* 16 C.F.R. § 310.2(w).

109. Under Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT XIII
## VIOLATIONS OF ROSCA

110. In numerous instances, in connection with the selling of TBX-FREE on the Internet through a negative option feature, Defendants have failed to:

  A. Clearly and conspicuously disclose all material terms of the negative option feature of the Product purchase before obtaining the consumer's billing information;

B.    Obtain the consumer's express informed consent to the negative

option feature before charging the consumer's credit card or

debit card; and/or

C.    Provide simple mechanisms for a consumer to stop recurring

charges to the consumer's credit card or debit card.

111.    Defendants' practices as set forth in Paragraph 110 are a violation of

Section 4 of ROSCA, 15 U.S.C. § 8403, and are therefore a violation of a rule

promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C.

§ 8404(a), and therefore constitute an unfair or deceptive act or practice in or

affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT AND REGULATION E

112.    Section 907(a) of the EFTA, 15 U.S.C. § 1693(a), provides that a

"preauthorized electronic fund transfer from a consumer's account may be

authorized by the consumer only in writing, and a copy of such authorization shall

be provided to the consumer when made." Section 903(10) of EFTA, 15 U.S.C. §

1693a(10), provides that the term "preauthorized electronic fund transfer" means

"an electronic fund transfer authorized in advance to recur at substantially regular

intervals."

113.    Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), provides

that "[p]reauthorized electronic fund transfers from a consumer's account may be

authorized only by a writing signed or similarly authenticated by the consumer.

The person that obtains the authorization shall provide a copy to the consumer."

114.    Section 1005.10(b) of the Consumer Financial Protection Bureau's

Official Staff Commentary to Regulation E ("Official Staff Commentary to

Regulation E"), 12 C.F.R. § 1005.10(b), Supp. I, provides that "[t]he authorization

process should evidence the consumer's identity and assent to the authorization."

1   *Id.* ¶ 10(b), cmt. 5.  The Official Staff Commentary to Regulation E further

2   provides that "[a]n authorization is valid if it is readily identifiable as such and the

3   terms of the preauthorized transfer are clear and readily understandable." *Id.*

4   ¶ 10(b), cmt. 6.

5       115.   Pursuant to Section 918(c) of EFTA, 15 U.S.C. § 1693o(c), every

6   violation of EFTA and Regulation E constitutes a violation of the FTC Act.

7   **COUNT XIV**

8   **EFTA AND REGULATION E VIOLATIONS – UNAUTHORIZED**

9   **DEBITING FROM CONSUMERS' ACCOUNTS**

10      116.   In numerous instances, Defendants debit consumers' bank accounts

11  on a recurring basis without obtaining a written authorization signed or similarly

12  authenticated from consumers for preauthorized electronic fund transfers from

13  their accounts, thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a),

14  and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

15      117.   In numerous instances, Defendants debit consumers' bank accounts

16  on a recurring basis without providing to the consumer a copy of a written

17  authorization signed or similarly authenticated by the consumer for preauthorized

18  electronic fund transfers from the consumer's account, thereby violating Section

19  907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12

20  C.F.R. § 1005.10(b).

21      118.   By engaging in violations of EFTA and Regulation E as set forth in

22  Paragraphs 116 and 117, the Defendants have engaged in violations of the FTC

23  Act.  15 U.S.C. § 1693o(c).

24  **<u>VIOLATIONS OF THE TELEMARKETING SALES RULE</u>**

25      119.   Congress directed the FTC to prescribe rules prohibiting abusive and

26  deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15

27  U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively

28

amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

120.  Under the TSR, a "telemarketer" is any person who, in connection with telemarketing, initiates or receives telephone calls to or from a consumer or donor.  16 C.F.R. § 310.2(ff).

121.  Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.  16 C.F.R. § 310.2(x).

122.  As amended, effective September 1, 2009, the TSR prohibits initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service.  16 C.F.R. §310.4(b)(1)(v).  Calls delivering prerecorded messages are commonly called "robocalls."

123.  Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT XV

## UNLAWFUL PRERECORDED MESSAGES

124.  Through the means described in Paragraphs 52 through 56, as applicable, in numerous instances in connection with telemarketing, Defendants have engaged in initiating or causing the initiation of outbound telephone calls that delivered prerecorded messages to induce the sale of goods or services, in violation of 16 C.F.R. § 310.4(b)(1)(v).

**RENGALIFE**

**COUNT XVI**

**MISREPRESENTATIONS REGARDING EARNINGS**

125.   Through the means described in Paragraphs 57 through 65, Defendants have represented, directly or indirectly, expressly or by implication, that people who become Rengalife members are likely to earn substantial income.

126.   The representation set forth in Paragraph 125 is false, misleading, or was not substantiated at the time the representation was made.

127.   Therefore, the making of the representation as set forth in Paragraph 125 of this Complaint constitutes a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**CONSUMER INJURY**

128.   Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, EFTA, Regulation E, and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

129.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 5 of ROSCA, 15 U.S.C. § 8404, Section 918(c) of EFTA, 15 U.S.C. § 1693o(c), Section 6 of the Telemarketing Act, 15 U.S.C. § 6105, and the Court's own equitable powers, requests that the Court:

A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access to all corporate premises, and appointment of a receiver.

B.    Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, EFTA, Regulation E, and the TSR, by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, ROSCA, EFTA, Regulation E, and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated: _October 3, 2018_

_____

ELIZABETH SANGER
esanger@ftc.gov
JAMES A. PRUNTY

51

jprunty@ftc.gov
EDWIN RODRIGUEZ
erodriguez@ftc.gov
SHIRA D. MODELL
smodell@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580

STACY PROCTER (Local Counsel)
sprocter@ftc.gov
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

52

# EXHIBIT 2a

1

2

3

4

5

6

7

8

9

10

11

```
FILED
CLERK, U.S. DISTRICT COURT

November 8, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____VPC_____ DEPUTY
```

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

No. ED 5:18-cv-02104-SJO-PLAx

**FEDERAL TRADE COMMISSION**,

Plaintiff,

v.

**JASON CARDIFF**, individually and
as an owner, officer, director, or
member of
REDWOOD SCIENTIFIC
TECHNOLOGIES, INC., a
California corporation;
REDWOOD SCIENTIFIC
TECHNOLOGIES, Inc., a
Nevada corporation;
REDWOOD SCIENTIFIC
TECHNOLOGIES, Inc., a
Delaware corporation;
IDENTIFY, LLC, a Wyoming
limited liability company;
ADVANCED MEN'S
INSTITUTE PROLONGZ LLC,

~~[PROPOSED]~~ **PRELIMINARY
INJUNCTION WITH ASSET
FREEZE, RECEIVER, AND
OTHER EQUITABLE RELIEF
AGAINST JASON CARDIFF
AND EUNJUNG CARDIFF**

1

d/b/a AMI, a California limited
liability company; and
RUN AWAY PRODUCTS,
LLC, a New York limited
liability company; and
both general and limited partner
of
CAROLS PLACE LIMITED
PARTNERSHIP, an Arizona
limited liability partnership;

**EUNJUNG CARDIFF**, a/k/a Eunjung
Lee, a/k/a Eunjung No,
individually and as an owner,
officer, director, or member of
REDWOOD SCIENTIFIC
TECHNOLOGIES, INC., a
California corporation;
REDWOOD SCIENTIFIC
TECHNOLOGIES, Inc., a
Nevada corporation;
REDWOOD SCIENTIFIC
TECHNOLOGIES, Inc., a
Delaware corporation;
IDENTIFY, LLC, a Wyoming
limited liability company;
ADVANCED MEN'S
INSTITUTE PROLONGZ LLC,
d/b/a AMI, a California limited
liability company; and
RUN AWAY PRODUCTS,
LLC, a New York limited
liability company; and
both general and limited partner
of
CAROLS PLACE LIMITED
PARTNERSHIP, an Arizona
limited liability partnership;

**DANIELLE CADIZ**, a/k/a Danielle

2

Walker, individually;

**REDWOOD SCIENTIFIC TECHNOLOGIES, INC.**, a California corporation, also d/b/a Rengalife;

**REDWOOD SCIENTIFIC TECHNOLOGIES, INC.**, a Nevada corporation;

**REDWOOD SCIENTIFIC TECHNOLOGIES, INC.**, a Delaware corporation;

**IDENTIFY, LLC**, a Wyoming limited liability company;

**ADVANCED MEN'S INSTITUTE PROLONGZ LLC**, d/b/a AMI, a California limited liability company;

**RUN AWAY PRODUCTS, LLC**, a New York limited liability company; and

**CAROLS PLACE LIMITED PARTNERSHIP**, an Arizona limited liability partnership,

Defendants.

On October 3, 2018, Plaintiff, the Federal Trade Commission, filed its Complaint for Permanent Injunction and Other Equitable Relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the Restore Online Shoppers' Confidence Act, ("ROSCA"), 15 U.S.C.

3

§§ 8401-8405, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, and moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants Jason Cardiff, Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, Danielle Cadiz, a/k/a Danielle Walker, Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership.

A Temporary Restraining Order ("TRO") was entered by this Court on October 10, 2018, setting a Preliminary Injunction hearing for October 23, 2018 at 2:00 p.m. Plaintiff and Defendants Jason Cardiff and Eunjung Cardiff stipulated in advance of the October 23 hearing to an extension of the TRO and a continuance of the Preliminary Injunction hearing until such date as the Court set.

On October 22, 2018, the Receiver submitted an Affidavit on Non-Compliance for Temporary Restraining Order detailing bank withdrawals and attempted bank transactions by Jason Cardiff and Eunjung Cardiff in violation of the TRO.

On October 24, 2018, the Court extended the TRO and continued the Preliminary Injunction hearing to November 7, 2018 as to Jason Cardiff and Eunjung Cardiff, and ordered them to return assets to the Receiver. (Dkt. No. 48) The Court also entered a Preliminary Injunction against all seven Corporate Defendants. (Dkt. 46) On November 1, 2018, the Receiver reported that the Cardiffs had not returned any funds to the Receiver. (Dkt. 53)

Under Section XXX of the extended TRO, Individual Defendants Jason Cardiff and Eunjung Cardiff were required to file any answering pleadings,

affidavits, motions, expert reports or declarations, or legal memoranda no later than four days prior to the hearing to show cause why a Preliminary Injunction should not issue (i.e., by Friday, November 2, 2018). Individual Defendants Jason Cardiff and Eunjung Cardiff did not file any such pleadings.

The Court held a Preliminary Injunction hearing on November 7, 2018, at which counsel for Plaintiff, counsel for the Receiver, and Defendants Jason Cardiff and Eunjung Cardiff appeared. The Court heard testimony and argument from the parties and the Receiver.

## FINDINGS OF FACT

The Court, having entered a Temporary Restraining Order and having considered the declarations, exhibits, and the memorandum of points and authorities filed in support thereof, as well as testimony and oral argument at the November 7 Preliminary Injunction hearing, and being otherwise advised, finds that:

A. This Court has jurisdiction over the subject matter of this case, and there is good cause to believe that it will have jurisdiction over all parties hereto and that venue in this district is proper.

B. In numerous instances, Defendants have misrepresented the effectiveness of their dissolvable film strip products for smoking cessation, weight loss, and improved male sexual performance, thereby misleading vulnerable consumers. Defendants have then further injured many consumers by placing them on unauthorized continuity plans that resulted in additional charges to their credits cards or withdrawals from their debit accounts. Defendants have also made false earnings claims as part of a multilevel marketing plan, and illegally caused more than one million robocalls to be made to consumers' telephones.

C. There is good cause to believe that Defendants have engaged in and are likely to engage in acts or practices that violate Sections 5(a) and 12 of the FTC Act, Section 4 of ROSCA, Section 907(a) of EFTA, EFTA's implementing

Regulation E, and the Telemarketing Sales Rule ("TSR"), and that Plaintiff is therefore likely to prevail on the merits of this action. As demonstrated by Defendants' own advertising and communications, consumer complaints, declarations, and the additional documentation filed by the FTC, the Commission has established a likelihood of success in showing that Defendants have deceptively marketed TBX-FREE, Eupepsia Thin, and Prolongz, placed consumers on continuity plans without their prior authorization, charged consumers' credit cards and debited their bank accounts without authorization, caused robocalls to be made to more than one million consumers to induce the sale of goods or services, and misrepresented the earnings that people who join their multi-level marketing program are likely to make.

     D.    The FTC is likely to succeed in showing that Corporate Defendants Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership operate as a common enterprise and are the alter egos of Jason Cardiff and Eunjung Cardiff.

     E.    There is good cause to believe that immediate and irreparable harm will result from Defendants' ongoing violations of the FTC Act, ROSCA, EFTA and Regulation E, and the TSR unless Defendants are restrained and enjoined by order of this Court.

     F.    There is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers – including monetary restitution, rescission, or disgorgement – will occur from the sale, transfer, destruction or other disposition or concealment by Defendants of their assets or records, unless Defendants are restrained and enjoined by order of this Court.

6

G.      Good cause exists for continuing the receivership and the asset freeze imposed pursuant to the TRO issued in this case, and permitting Plaintiff and the Receiver to take expedited discovery.  Defendants Jason Cardiff and Eunjung Cardiff each violated the asset freeze provision of the TRO, as discussed in the Receiver's Affidavit on Non-Compliance for Temporary Restraining Order, and then failed to return to the funds they had withdrawn from frozen bank accounts as they were directed to do by the Court's October 24, 2018 Order.

H.      Weighing the equities and considering Plaintiff's likelihood of ultimate success on the merits, this Order is in the public interest.

I.      This Court has authority to issue this Order pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Federal Rule of Civil Procedure 65, and the All Writs Act, 28 U.S.C. § 1651.

J.      No security is required of any agency of the United States for issuance of a Preliminary Injunction.  Fed. R. Civ. P. 65(c).

## DEFINITIONS

For the purpose of this Order, the following definitions shall apply:

A.      "Asset" means any legal or equitable interest in, right to, or claim to, any property, wherever located and by whomever held.

B.      "Continuity Program" means any plan, arrangement, or system under which a consumer is periodically charged for products or services, without prior notification by the seller before each charge.

C.      "Corporate Defendant(s)" means Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership, and each of their subsidiaries, affiliates, successors, and assigns.

D.      "Defendant(s)" means Corporate Defendants, Jason Cardiff, Eunjung Cardiff, and Danielle Cadiz, individually, collectively, or in any combination.

E.      "Document" is synonymous in meaning and equal in scope to the usage of "document" and "electronically stored information" in Federal Rule of Civil Procedure 34(a), Fed. R. Civ. P. 34(a), and includes writings, drawings, graphs, charts, photographs, sound and video recordings, images, Internet sites, web pages, websites, electronic correspondence, including email and instant messages, contracts, accounting data, advertisements, FTP Logs, Server Access Logs, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, computer records, customer or sales databases, and any other electronically stored information, including Documents located on remote servers or cloud computing systems, and other data or data compilations from which information can be obtained directly or, if necessary, after translation into a reasonably usable form.  A draft or non-identical copy is a separate document within the meaning of the term.

F.      "Electronic Data Host" means any person or entity in the business of storing, hosting, or otherwise maintaining electronically stored information. This includes, but is not limited to, any entity hosting a website or server, and any entity providing "cloud based" electronic storage.

G.      "Individual Defendant(s)" means Jason Cardiff, Eunjung Cardiff, and Danielle Cadiz, individually, collectively, or in any combination.

H.      "Negative Option" means, in an offer or agreement to sell or provide any good or service, a provision under which the consumer's silence or failure to take an affirmative action to reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer or agreement.

I.      "Person" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

J.      "Preauthorized Electronic Fund Transfer" means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

K.      "Receiver" means the receiver identified in Section XV of this Order and any deputy receivers that shall be named by the receiver.

L.      "Receivership Entities" means Corporate Defendants as well as any other entity that has conducted any business related to Defendants' marketing and sale of dissolvable film strips and promotion of the Rengalife multilevel marketing program, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant.

M.      "Receivership Property" means any Assets, wherever located, that are: (1) owned, controlled, or held by or for the benefit of the Receivership Entities, Jason Cardiff, or Eunjung Cardiff, in whole or in part; (2) in the actual or constructive possession of the Receivership Entities, Jason Cardiff, or Eunjung Cardiff; or (3) owned, controlled, or held by, or in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, trust, or other entity directly or indirectly owned or controlled by the Receivership Entities, Jason Cardiff, or Eunjung Cardiff, including the Jurikel Family Trust, and Carols Place Trust.

## ORDER

## I.      PROHIBITED BUSINESS ACTIVITIES

**IT IS THEREFORE ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or offering for sale of any goods, services, or programs are preliminarily restrained and enjoined from misrepresenting or assisting others in misrepresenting, expressly or by implication:

A.    Any material fact about TBX-FREE, Eupepsia Thin, or Prolongz, including, but not limited to:

1.    That TBX-FREE is an effective smoking cessation product;

2.    That TBX-FREE is more effective than either nicotine patches or nicotine gum in enabling cigarette smokers to stop smoking;

3.    That TBX-FREE enables many cigarette smokers to quit in seven to ten days;

4.    That TBX-FREE has an 88% success rate, including among people who have smoked cigarettes for more than five years;

5.    That smokers should not need to purchase more than one month of TBX-FREE;

6.    That clinical studies have been conducted on TBX-FREE, and have shown that TBX-FREE is an effective smoking cessation product;

7.    That TBX-FREE has been proven in clinical studies to be more effective than nicotine patches or nicotine gum in enabling smokers to stop smoking;

8.    That clinical studies of TBX-FREE conducted on 10,600 people have shown that TBX-FREE has an "88% success rate";

9.    That The New England Journal of Medicine ("NEJM"), Harvard Health Publications, and Johns Hopkins University have published clinical studies proving that TBX-FREE is an effective smoking cessation product;

10.   That NEJM's clinical studies showed that TBX-FREE is ten times more effective for smoking cessation than nicotine replacement therapy;

11.   That Eupepsia Thin is an effective appetite suppressant and weight loss aid;

10

12. That Eupepsia Thin starts working in less than 20 seconds, and suppresses a user's appetite within minutes;

13. That Eupepsia Thin enables users to lose 10, 20, or even 100 pounds without dieting, giving up their favorite foods, or increasing their exercise;

14. That Eupepsia Thin users can lose 15 pounds their first month without dieting or changing their food or lifestyle;

15. That Eupepsia Thin users can lose as much as 20 pounds in one month and as much as 50 pounds in three months;

16. That Eupepsia Thin is more effective at causing weight loss than conventional calorie reduction and meal plans;

17. That Eupepsia Thin enables consumers to avoid gaining back weight they lose, without any lifestyle changes.

18. That clinical studies have been conducted on Eupepsia Thin and those studies show that it is an effective appetite suppressant and weight loss aid;

19. That Prolongz substantially increases ejaculation control and the duration of sex;

20. That Prolongz treats or prevents premature ejaculation;

21. That Prolongz is clinically proven to increase ejaculation control and the duration of sex for more than 97% of users;

22. That Eupepsia Thin is made in the United States;

23. That individuals appearing in advertising for Eupepsia Thin used that product successfully to lose weight; and

24. That consumers who are not satisfied with the product they purchased will get their money back;

B. Any material fact about any multi-level marketing plan, including, but not limited to, the income that participants in the plan are likely to earn; and

11

C.     Any other fact material to consumers concerning any good or service, such as:  the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

## II.   PROHIBITIONS AGAINST UNFAIR AND DECEPTIVE NEGATIVE OPTION MARKETING PRACTICES

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any good or service are preliminarily restrained and enjoined from charging, causing to be charged, assisting others in charging, or attempting to charge any consumer in any sale of a good or service sold through a negative option without:

A.     Clearly and conspicuously disclosing all material terms of the negative option features before obtaining the consumer's billing information;

B.     Obtaining a consumer's express informed consent, written or similarly authorized, to the negative option features before making any charge; and

C.     Providing a simple mechanism for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, or other financial account.

## III.   PROHIBITIONS AGAINST UNAUTHORIZED CHARGES

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are preliminarily restrained and enjoined from charging, causing to be charged, assisting others in charging, or attempting to charge any consumer for any good or service without first obtaining the consumer's express informed consent, written or similarly authorized, to the charge.

## IV. PROHIBITIONS AGAINST DEBITING CONSUMERS' BANK ACCOUNTS WITHOUT AUTHORIZATION

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any good or service, are preliminarily restrained and enjoined from:

A.      Failing to timely obtain written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account before initiating any Preauthorized Electronic Fund Transfer; and

B.      Failing to provide to the consumer a copy of a valid written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account.

## V. PROHIBITION OF PRERECORDED MARKETING CALLS

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby preliminarily restrained and enjoined from initiating or causing the initiation of outbound telephone calls delivering prerecorded messages to induce the sale of goods or services.

## VI. PROHIBITION ON RELEASE OF CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby preliminarily restrained and enjoined from:

A.    Selling, renting, leasing, transferring, or otherwise disclosing, the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or identifying information of any person that any Defendant obtained in connection with any activity that pertains to the subject matter of this Order; and

B.    Benefitting from or using the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or identifying information of any person that any Defendant obtained in connection with any activity that pertains to the subject matter of this Order.

Provided, however, that Defendants Jason Cardiff and Eunjung Cardiff may disclose such identifying information to a law enforcement agency, to their attorneys as required for their defense, as required by any law, regulation, or court order, or in any filings, pleadings or discovery in this action in the manner required by the Federal Rules of Civil Procedure and by any protective order in the case.

## VII.  ASSET FREEZE

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are preliminarily restrained and enjoined from:

A.    Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any Assets that are:

1.    Owned or controlled, directly or indirectly, by any Defendant, including, but not limited to, those for which any Defendant is a signatory on the account;

14

2.  Held, in part or in whole, for the benefit of any Defendant;

3.  In the actual or constructive possession of any Defendant; or

4.  Owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant.

B.  Opening or causing to be opened any safe deposit boxes, commercial mail boxes, or storage facilities titled in the name of any Defendant or subject to access by any Defendant, except as necessary to comply with written requests from the Receiver acting pursuant to its authority under this Order;

C.  Incurring charges or cash advances on any credit, debit, or ATM card issued in the name, individually or jointly, of any Corporate Defendant or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant, or of which any Defendant is an officer, director, member, or manager. This includes any corporate bankcard or corporate credit card account for which any Defendant is, or was on the date that this Order was signed, an authorized signer; or

D.  Cashing any checks or depositing any money orders or cash received from consumers, clients, or customers of any Defendant.

The Assets affected by this Section shall include: (1) all Assets of Defendants as of the time the TRO was entered; (2) all Assets obtained by Defendants after the TRO was entered if those Assets are derived from any activity that is the subject of the Complaint in this matter or that is prohibited by this Order; and (3) all Assets owned or controlled, directly or indirectly, by Defendant Jason Cardiff or Defendant Eunjung Cardiff, including, but not limited to, the Jurikel Family Trust or Carols Place Trust. This Section does not prohibit any transfers to the Receiver or repatriation of foreign Assets specifically required by this Order.

15

## VIII. DUTIES OF ASSET HOLDERS AND OTHER THIRD PARTIES

**IT IS FURTHER ORDERED** that any financial or brokerage institution, Electronic Data Host, credit card processor, payment processor, merchant bank, acquiring bank, independent sales organization, third party processor or vendor, payment gateway, insurance company, business entity, or person who receives actual notice of this Order (by service or otherwise) that:

a) has held, controlled, or maintained custody, through an account or otherwise, of any Document on behalf of Defendant Jason Cardiff or Defendant Eunjung Cardiff or any Asset that has been owned or controlled, directly or indirectly, by Defendant Jason Cardiff or Defendant Eunjung Cardiff; held, in part or in whole, for the benefit of Defendant Jason Cardiff or Defendant Eunjung Cardiff; in the actual or constructive possession of Defendant Jason Cardiff or Defendant Eunjung Cardiff; or owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by Defendant Jason Cardiff or Defendant Eunjung Cardiff;

b) has held, controlled, or maintained custody, through an account or otherwise, of any Document or Asset associated with credits, debits, or charges made on behalf of Defendant Jason Cardiff or Defendant Eunjung Cardiff, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales organizations, third party processors or vendors, payment gateways, insurance companies, or other entities; or

16

c)  has extended credit to Defendant Jason Cardiff or Defendant Eunjung Cardiff, including through a credit card account, shall:

A.  Hold, preserve, and retain within its control and prohibit the withdrawal, removal, alteration, assignment, transfer, pledge, encumbrance, disbursement, dissipation, relinquishment, conversion, sale, or other disposal of any such Document or Asset, as well as all Documents or other property related to such Assets, except by further order of this Court;

B.  Deny any person, except the Receiver, access to any safe deposit box, commercial mail box, or storage facility that is titled in the name of Defendant Jason Cardiff or Defendant Eunjung Cardiff, either individually or jointly, or otherwise subject to access by Defendant Jason Cardiff or Defendant Eunjung Cardiff;

C.  Provide Plaintiff's counsel and the Receiver, unless already provided pursuant to the TRO, within three (3) days of receiving a copy of this Order, a sworn statement setting forth:

1.  The identification number of each such account or Asset;

2.  The balance of each such account, or a description of the nature and value of each such Asset as of the close of business on the day on which this Order is served, and, if the account or other Asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other Asset was remitted; and

3.  The identification of any safe deposit box, commercial mail box, or storage facility that is either titled in the name, individually or jointly, of Defendant Jason Cardiff or Defendant Eunjung Cardiff, or is otherwise subject to access by Defendant Jason Cardiff or Defendant Eunjung Cardiff; and

17

D. Upon the request of Plaintiff's counsel or the Receiver, promptly provide Plaintiff's counsel and the Receiver with copies of all records or other Documents pertaining to any account covered by this Section or Asset, including originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, including wire transfers and wire transfer instructions, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and all logs and records pertaining to safe deposit boxes, commercial mail boxes, and storage facilities.

Provided, however, that this Section does not prohibit any transfers to the Receiver or repatriation of foreign Assets specifically required by this Order.

## IX. FINANCIAL DISCLOSURES

**IT IS FURTHER ORDERED** that, to the extent not already done pursuant to the TRO, Defendants Jason Cardiff and Eunjung Cardiff, within five (5) days of service of this Order upon them, shall:

A. Prepare and deliver to Plaintiff's counsel and the Receiver completed financial statements on the forms attached to this Order as **Attachment A** (Financial Statement of Individual Defendant) for each Individual Defendant, and **Attachment B** (Financial Statement of Corporate Defendant) for each Corporate Defendant and for Carols Place Trust and the Jurikel Family Trust;

B. Prepare and deliver to Plaintiff's counsel and the Receiver completed **Attachment C** (IRS Form 4506, Request for Copy of a Tax Return) for each Individual Defendant and Corporate Defendant;

C. Identify to Plaintiff's counsel and the Receiver all bank accounts for all entities for which Defendant Jason Cardiff or Defendant Eunjung Cardiff has been an officer, director, member, owner, or signatory for the last five (5) years, including, but not limited to, the entities Defendant Jason Cardiff identified in his Financial Statement of Individual Defendant and the entities Defendant Eunjung Cardiff identified in her Financial Statement of Individual Defendant; and

18

D.  Deliver to Plaintiff's counsel and the Receiver any inventory of the contents of any residence owned or leased by Defendants Jason Cardiff or Eunjung Cardiff, prepared for any purpose, including, but not limited to, obtaining insurance.

## X.  FOREIGN ASSET REPATRIATION

**IT IS FURTHER ORDERED** that, to the extent not already done pursuant to the TRO, within five (5) days following the service of this Order, Defendant Jason Cardiff, Defendant Eunjung Cardiff, and Carols Place Trust shall:

A.  Provide Plaintiff's counsel and the Receiver with a full accounting, verified under oath and accurate as of the date of this Order, of all Assets, Documents, and accounts outside of the United States that are:  (1) titled in the name, individually or jointly, of any Defendant; (2) held by any person or entity for the benefit of any Defendant or for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant;

B.  Take all steps necessary to provide the Receiver and Plaintiff's counsel access to all Documents and records that may be held by third parties located outside of the territorial United States of America, including signing the Consent to Release of Financial Records, appended to this Order as **Attachment D.**

C.  Transfer to the territory of the United States and deliver to the Receiver all Documents and Assets located in foreign countries that are: (1) titled in the name, individually or jointly, of any Defendant, or any trust or other entity for which any Defendant is a beneficiary or trustee; (2) held by any person or entity for the benefit of any Defendant or for the benefit of any corporation, partnership, asset protection trust, or other entity that is directly or indirectly

owned, managed or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant; and

D.     The same business day as any repatriation, (1) notify the Receiver and Plaintiff's counsel of the name and location of the financial institution or other entity that is the recipient of such Documents or Assets; and (2) serve this Order on any such financial institution or other entity.

## XI.    NON-INTERFERENCE WITH ASSET FREEZE AND REPATRIATION

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby preliminarily restrained and enjoined from taking any action, directly or indirectly, which may result in the encumbrance, transfer, relocation, or dissipation of domestic or foreign Assets, or in the hindrance of the repatriation required by this Order, including, but not limited to:

A.     Sending any communication or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all Defendants' Assets have been fully repatriated pursuant to this Order or any other order issued by this Court; or

B.     Notifying any trustee, protector, or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a court order, until such time that all Defendants' Assets have been fully repatriated pursuant to this Order or any other order issued by this Court.

## XII. CONSUMER CREDIT REPORTS

**IT IS FURTHER ORDERED** that Plaintiff may obtain credit reports concerning Defendants Jason Cardiff and Eunjung Cardiff pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. 1681b(a)(1), and that, upon written request, any credit reporting agency from which such reports are requested shall provide them to Plaintiff.

## XIII. PRESERVATION OF RECORDS

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby preliminarily restrained and enjoined from:

A.     Destroying, erasing, falsifying, writing over, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, Documents that relate to: (1) the business, business practices, Assets, or business or personal finances of any Defendant; (2) the business practices or finances of entities directly or indirectly under the control of any Defendant; or (3) the business practices or finances of entities directly or indirectly under common control with any other Defendant; and

B.     Failing to create and maintain Documents that, in reasonable detail, accurately, fairly, and completely reflect Defendants' incomes, disbursements, transactions, and use of Defendants' Assets.

## XIV. REPORT OF NEW BUSINESS ACTIVITY

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby preliminarily restrained and enjoined from creating, operating, or exercising any control over any business

entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship, or corporation, without first providing Plaintiff's counsel and the Receiver with a written statement disclosing: (1) the name of the business entity; (2) the address and telephone number of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities.

## XV. CONTINUATION OF THE RECEIVERSHIP

**IT IS FURTHER ORDERED** that Robb Evans & Associates shall continue to serve as the Receiver of the Receivership Entities and of the Assets of Defendants Jason Cardiff and Eunjung Cardiff that are:

1. Owned, controlled, or held by or for the benefit of Defendant Jason Cardiff or Defendant Eunjung Cardiff, in whole or in part;

2. In the actual or constructive possession of Defendant Jason Cardiff or Defendant Eunjung Cardiff; or

3. Owned, controlled, or held by, or in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, trust, or other entity directly or indirectly owned or controlled by Defendant Jason Cardiff or Defendant Eunjung Cardiff;

with full powers of an equity receiver. The Receiver shall be solely the agent of this Court in acting as Receiver under this Order.

## XVI. DUTIES AND AUTHORITY OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver is directed and authorized to accomplish the following:

A. Assume full control of the Receivership Entities by removing, as the Receiver deems necessary or advisable, any director, officer, independent contractor, employee, attorney, or agent of any Receivership Entity from control of, management of, or participation in, the affairs of the Receivership Entity;

B.     Take exclusive custody, control, and possession of all Assets and Documents of, or in the possession, custody, or under the control of, any Receivership Entity and all Assets of Defendants Jason Cardiff and Eunjung Cardiff covered by Part XV of this Order, wherever situated.  The Receiver shall have access to all personal and business premises and storage facilities owned, controlled, or used by the Receivership Entities or Defendants Jason Cardiff or Eunjung Cardiff, and any offsite commercial mailboxes or virtual offices used by Defendants, to inventory all Assets and remove Assets from the premises if appropriate.  Defendants Jason Cardiff and Eunjung Cardiff are prohibited from removing any Assets from these locations before or after the Receiver's inspection. The Receiver and Defendants Jason Cardiff and Eunjung Cardiff shall coordinate to effect an inspection of the Cardiffs' personal residence during the week of November 11, 2018.  The Receiver may exclude any individuals within his discretion, including but not limited to Defendants, Defendants' friends and family, and any employees of Defendants from part or all of the personal and business premises during the time of the Receiver's access.  The Receiver is authorized to employ the assistance of law enforcement as he deems necessary to effect service and peacefully implement this Order.  Provided, however, that the Receiver shall not, without further order of this Court, take physical possession of the primary residence of Defendants Jason Cardiff and Eunjung Cardiff;

C.     Take exclusive custody, control, and possession of all Documents or Assets associated with credits, debits, or charges made on behalf of any Receivership Entity, wherever situated, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales organizations, third party processors, payment gateways, insurance companies, or other entities;

D.     Conserve, hold, manage, and prevent the loss of all Receivership Property, and perform all acts necessary or advisable to preserve the value of those

Assets.  The Receiver shall assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Entities. The Receiver shall have full power to sue for, collect, and receive, all Receivership Property and all Assets of other persons or entities whose interests are now under the direction, possession, custody, or control of, the Receivership Entities or of Jason Cardiff or Eunjung Cardiff.  Provided, however, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer's debt to the Receivership Entities has resulted from the deceptive acts or practices or other violations of law alleged in the Complaint in this matter, without prior Court approval;

E.      Take exclusive custody, control, and possession of the following valuable articles in the possession, custody, or under the control of, Defendants Jason Cardiff or Eunjung Cardiff or Carols Place Limited Partnership, wherever situated:

1.      Ladies 14K yellow gold and diamond ring.  Insured for $11,813.

2.      Ladies diamond pendent setting 14 KT.  Insured for $23,730.

3.      Ladies Diamond Stud Earrings.  Insured for $34,125.

4.      Ladies Diamond Fancy Ring.  Insured for $31,763.

5.      Mens Roadster SM WG/WG Paved Bezel.  Insured for $32,550.

6.      Ladies handmade platinum diamond bracelet.  Insured for $46,725.

7.      Mens GTS 18KT white gold Daytona Rolex.  Insured for $42,000.

8.      5.08 ct round diamond I color S12 Clarity EGL platinum ring. Insured for $102,076.

9.      Mens Rolex Yacht-Master 18K gold watch.  Insured for $14,125.

10.     Ladies Love Bra yellow gold 4 dia[] 17 cm.  Insured for $9,819.

11.     Ladies yellow gold ring, Serial #UD0824.  Insured for $2,284.

12.     Ladies fancy diamond bracelet.  Insured for $39,397.

13.     Mens Rolex watch 18KT gold Pearlmaster.  Insured for $33,180.

14. Tiffany pearl bracelet. Insured for $3,166.

15. Ladies emerald and diamond ring. Insured for $24,856.

16. IWC Portofino moon phase watch. Insured for $8,000.

17. Pre-owner Ladies stainless steel Patek Phili[ppe]. Insured for $8,145.

18. Rolex Vintage Thund[er]. Insured for $9,000.

19. Stuart Moore "Aronade" platinum diamond. Insured for $12,650.

20. Peter Philippe annual calendar wristwatch. Insured for $41,300.

21. 18K yellow gold Tiffany Diamond Bracelet. #B0164. Insured for $7,600.

22. "Living Room" Artist Romero Britto. Insured for $12,600.

23. Hermes Birkin bag, size 35 (Togo leather; in Sienna color). Insured for $20,000.

24. Hermes Birkin bag, size 35 (Togo leather; Curry). Insured for $20,000.

25. Ladies ring round center stone 8.5 cts, VS2 with diamonds. Insured for $532,000.

26. MenOCOs Patek Philippe gold calendar watch model 5035J. Insured for $28,500.

F. Obtain, conserve, hold, manage, and prevent the loss of all Documents of the Receivership Entities, and perform all acts necessary or advisable to preserve such Documents. The Receiver shall: divert mail; preserve all Documents of the Receivership Entities that are accessible via electronic means (such as online access to financial accounts and access to electronic documents held onsite or by Electronic Data Hosts, by changing usernames, passwords or other log-in credentials; take possession of all electronic Documents of the Receivership Entities stored onsite or remotely; take whatever steps necessary to preserve all such Documents; and obtain the assistance of the FTC's Digital

Forensic Unit for the purpose of obtaining electronic documents stored onsite or remotely.

G.     Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

H.     Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as Receiver.  The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Entities prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure Assets of the Receivership Entities, such as rental payments;

I.     Take all steps necessary not already taken pursuant to the TRO to secure and take exclusive custody of each location from which the Receivership Entities operate their businesses.  Such steps may include, but are not limited to, any of the following, as the Receiver deems necessary or advisable:  (1) securing the location by changing the locks and alarm codes and disconnecting any Internet access or other means of access to the computers, servers, internal networks, or other records maintained at that location; and (2) requiring any persons present at the location to leave the premises, to provide the Receiver with proof of identification, and/or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises Documents or Assets of the Receivership Entities, including, but not limited to, telephones, computers, and tablets paid for by the Receivership Entities.  Law enforcement personnel, including, but not limited to, police or sheriffs, may assist the Receiver in implementing these provisions in order to keep the peace and maintain security. If

requested by the Receiver, the United States Marshal will provide appropriate and necessary assistance to the Receiver to implement this Order and is authorized to use any necessary and reasonable force to do so;

      J.    Take all steps necessary to prevent the modification, destruction, or erasure of any web page or website registered to and operated, in whole or in part, by any Defendants, and to provide access to all such web pages or websites to Plaintiff's representatives, agents, and assistants, as well as Defendants and their representatives;

      K.    Enter into and cancel contracts and purchase insurance as advisable or necessary;

      L.    Prevent the inequitable distribution of Assets and determine, adjust, and protect the interests of consumers who have transacted business with the Receivership Entities;

      M.    Make an accounting, as soon as practicable, of the Assets and financial condition of the receivership and file the accounting with the Court and deliver copies thereof to all parties;

      N.    Institute, compromise, adjust, appear in, intervene in, defend, dispose of, or otherwise become party to any legal action in state, federal or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Entities, or to carry out the Receiver's mandate under this Order, including, but not limited to, actions challenging fraudulent or voidable transfers;

      O.    Issue subpoenas to obtain Documents and records pertaining to the Receivership, and conduct discovery in this action on behalf of the receivership estate, in addition to obtaining other discovery as set forth in this Order;

      P.    Open one or more bank accounts at designated depositories for funds of the Receivership Entities.  The Receiver shall deposit all funds of the Receivership Entities in such designated accounts and shall make all payments and

disbursements from the receivership estate from such accounts. The Receiver shall serve copies of monthly account statements on all parties;

Q. Maintain accurate records of all receipts and expenditures incurred as Receiver;

R. Allow Plaintiffs' representatives, agents, and assistants, as well as Defendants' representatives and Defendants themselves, reasonable access to the premises of the Receivership Entities, or any other premises where the Receivership Entities conduct business. The purpose of this access shall be to inspect and copy any and all books, records, Documents, accounts, and other property owned by, or in the possession of, the Receivership Entities or their agents. The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access;

S. Allow Plaintiffs' representatives, agents, and assistants, as well as Defendants and their representatives reasonable access to all Documents in the possession, custody, or control of the Receivership Entities;

T. Cooperate with reasonable requests for information or assistance from any state or federal civil or criminal law enforcement agency;

U. Suspend business operations of the Receivership Entities if in the judgment of the Receiver such operations cannot be continued legally and profitably;

V. If the Receiver identifies a nonparty entity as a Receivership Entity, promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court. Provided, however, that the Receiver may delay providing such notice until the Receiver has established control of the nonparty entity and its assets and records, if the Receiver determines that notice to the entity or the parties before the Receiver establishes control over the entity may result in the destruction of records,

1   dissipation of assets, or any other obstruction of the Receiver's control of the

2   entity;

3       W.      If in the Receiver's judgment the business operations cannot be

4   continued legally and profitably, take all steps necessary to ensure that any of the

5   Receivership Entities' web pages or websites relating to the activities alleged in the

6   Complaint cannot be accessed by the public, or are modified for consumer

7   education and/or informational purposes, and take all steps necessary to ensure that

8   any telephone numbers associated with the Receivership Entities cannot be

9   accessed by the public, or are answered solely to provide consumer education or

10  information regarding the status of operations; and

11      X.      File timely reports with the Court at reasonable intervals or as

12  otherwise directed by the Court.

13  **XVII.    TRANSFER OF RECEIVERSHIP PROPERTY TO RECEIVER**

14      **IT IS FURTHER ORDERED** that, to the extent not already done pursuant

15  to the TRO, Defendants and any other person with possession, custody, or control

16  of (1) property of, or records relating to, the Receivership Entities or (2) the Assets

17  of Jason Cardiff or Eunjung Cardiff or any trusts for which they are beneficiaries

18  or trustees, shall, upon notice of this Order by personal service or otherwise, fully

19  cooperate with and assist the Receiver in taking and maintaining possession,

20  custody, or control of the Assets and Documents of the Receivership Entities and

21  the Assets of Jason Cardiff or Eunjung Cardiff and immediately provide, transfer,

22  or deliver to the Receiver possession, custody, and control of, the following:

23      A.      All Assets held by or for the benefit of the Receivership Entities or of

24  Jason Cardiff or Eunjung Cardiff, except for real property used as the primary

25  residence of Jason Cardiff and Eunjung Cardiff;

26      B.      All Documents or Assets associated with credits, debits, or charges

27  made on behalf of any Receivership Entity, wherever situated, including reserve

28  funds held by payment processors, credit card processors, merchant banks,

acquiring banks, independent sales organizations, third party processors, payment gateways, insurance companies, or other entities;

C.     All Documents of or pertaining to the Receivership Entities or to the Assets of Jason Cardiff or Eunjung Cardiff;

D.     All computers, electronic devices, mobile devices, and machines used to conduct the business of the Receivership Entities;

E.     All Assets and Documents belonging to other persons or entities whose interests are under the direction, possession, custody, or control of the Receivership Entities; and

F.     All keys, codes, user names, passwords, and all other means of authentication necessary to gain or to secure access to any Assets or Documents of or pertaining to the Receivership Entities, including access to their business premises, means of communication, mobile phones, accounts, computer systems (onsite and remote), Electronic Data Hosts, or other property.

In the event that any person or entity fails to deliver or transfer any Asset, Document, or otherwise fails to comply with any provision of this Section, the Receiver may file an Affidavit of Non-Compliance regarding the failure and a motion seeking compliance or a contempt citation.

## XVIII.   PROVISION OF INFORMATION TO RECEIVER

**IT IS FURTHER ORDERED** that, to the extent not already done pursuant to the TRO, Jason Cardiff and Eunjung Cardiff shall immediately provide to the Receiver:

A.     A list of all Assets and accounts of the Receivership Entities that are held in any name other than the name of a Receivership Entity, or by any person or entity other than a Receivership Entity;

B.     A list of all Assets and accounts of Jason Cardiff or Eunjung Cardiff that are held in any name other than their own names, or by any person or entity other than themselves;

C.     A list of all agents, employees, officers, attorneys, servants and those persons in active concert and participation with the Receivership Entities, or who have been associated or done business with the Receivership Entities; and

D.     A description of any documents covered by attorney-client privilege or attorney work product, including files where such documents are likely to be located, authors or recipients of such documents, and search terms likely to identify such electronic documents.

## XIX.     COOPERATION WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Defendants, Receivership Entities, Defendants' or Receivership Entities' officers, agents, employees, and attorneys, all other persons in active concert or participation with any of them, and any other person with possession, custody, or control of:

1.     Receivership Property or records relating to Receivership Property; or

2.     Other records relating to the Receivership Entities;

who receive actual notice of this Order shall fully cooperate with and assist the Receiver.  This cooperation and assistance shall include, but is not limited to, providing information to the Receiver that the Receiver deems necessary to exercise the authority and discharge the responsibilities of the Receiver under this Order; providing any keys, codes, user names, passwords, and all other means required to access any computers, electronic devices, mobile devices, machines (onsite or remotely), and any cloud account (including specific method to access account) or electronic file in any medium; advising all persons who owe money to any Receivership Entity that all debts should be paid directly to the Receiver; and transferring funds at the Receiver's direction and producing records related to the Receivership Property and sales of the Receivership Entities.

# XX. NON-INTERFERENCE WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Defendants, Receivership Entities, Defendants' or Receivership Entities' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and any other person served with a copy of this Order, are hereby restrained and enjoined from directly or indirectly:

A.      Interfering with the Receiver's efforts to manage, or take custody, control, or possession of, the Assets or Documents subject to the receivership;

B.      Transacting any of the business of the Receivership Entities;

C.      Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any Assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Receivership Entities, Jason Cardiff, or Eunjung Cardiff; or

D.      Refusing to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court.

# XXI. STAY OF ACTIONS

**IT IS FURTHER ORDERED** that, except by leave of this Court, during the pendency of the receivership ordered herein, Defendants, their officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and their corporations, subsidiaries, divisions, or affiliates, and all investors, creditors, stockholders, lessors, customers and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons, are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the Assets or Documents of the Receivership Entities or over the Assets of Jason Cardiff and Eunjung Cardiff, including, but not limited to:

32

A. Filing or assisting in the filing of a petition for relief under the Bankruptcy Code, 11 U.S.C. § 101 et seq., or of any similar insolvency proceeding on behalf of the Receivership Entities;

B. Commencing, prosecuting, or continuing a judicial, administrative, or other action or proceeding against the Receivership Entities, including the issuance or employment of process against the Receivership Entities, except that such actions may be commenced if necessary to toll any applicable statute of limitations;

C. Filing or enforcing any lien on any Asset of the Receivership Entities, taking or attempting to take possession, custody, or control of any Asset of the Receivership Entities, Jason Cardiff, or Eunjung Cardiff; or attempting to foreclose, forfeit, alter, or terminate any interest in any Asset of the Receivership Entities, Jason Cardiff, or Eunjung Cardiff, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise.

Provided, however, that this Order does not stay:  (1) the commencement or continuation of a criminal action or proceeding; (2) the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; or (3) the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

## XXII.   COMPENSATION OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by, in the possession or control of, or which may be received by, the Receivership Entities, Jason Cardiff, or Eunjung Cardiff.  The Receiver shall file with the Court and serve on the parties periodic requests for the

33

payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of entry of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

## XXIII. RECEIVER'S BOND

**IT IS FURTHER ORDERED** that the Receiver shall file with the Clerk of this Court, unless already filed, a bond in the sum of $15,000 with sureties to be approved by the Court, conditioned that the Receiver will well and truly perform the duties of the office and abide by and perform all acts the Court directs. 28 U.S.C. § 754.

## XXIV. SURRENDER OF PASSPORTS

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff shall surrender any and all domestic and foreign passports to the Receiver on or before November 12, 2018 at 12:00 p.m. (noon).

## XXV. DISTRIBUTION OF ORDER BY DEFENDANTS

**IT IS FURTHER ORDERED** that Defendants Jason Cardiff and Eunjung Cardiff shall immediately provide a copy of this Order to each affiliate, telemarketer, marketer, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, attorney, spouse, subsidiary, division, and representative of any Defendant, and shall, within ten (10) days from the date of entry of this Order, provide Plaintiff and the Receiver with a sworn statement that this provision of the Order has been satisfied, which statement shall include the names, physical addresses, phone number, and email addresses of each such person or entity who received a copy of the Order. Furthermore, Defendants Jason Cardiff and Eunjung Cardiff shall not take any action that would encourage officers, agents, members, directors, employees, salespersons, independent contractors, attorneys, subsidiaries, affiliates, successors, assigns or other persons

34

or entities in active concert or participation with them to disregard this Order or believe that they are not bound by its provisions.

## XXVI. EXPEDITED DISCOVERY

**IT IS FURTHER ORDERED** that, notwithstanding the provisions of Fed. R. Civ. P. 26(d) and (f) and 30(a)(2)(A)(iii), and pursuant to Fed. R. Civ. P. 30(a), 34, and 45, Plaintiff and the Receiver are granted leave, from any time after service of this Order until a Rule 16(b) scheduling order is issued, to conduct limited expedited discovery for the purpose of discovering: (1) the nature, location, status, and extent of Defendants' Assets; or (2) compliance with this Order. The limited expedited discovery set forth in this Section shall proceed as follows:

A. Plaintiff and the Receiver may take the deposition of parties and non-parties. Forty-eight (48) hours notice shall be sufficient notice for such depositions. The limitations and conditions set forth in Rules 30(a)(2)(B) and 31(a)(2)(B) of the Federal Rules of Civil Procedure regarding subsequent depositions of an individual shall not apply to depositions taken pursuant to this Section. Any such deposition taken pursuant to this Section shall not be counted towards the deposition limit set forth in Rules 30(a)(2)(A) and 31(a)(2)(A) and depositions may be taken by telephone or other remote electronic means.

B. Plaintiff and the Receiver may serve upon parties requests for production of Documents or inspection that require production or inspection within five (5) days of service, provided, however, that three (3) days of notice shall be deemed sufficient for the production of any such Documents that are maintained or stored only in an electronic format.

C. Plaintiff and the Receiver may serve upon parties interrogatories that require response within five (5) days after Plaintiff serves such interrogatories.

D. Plaintiff and the Receiver may serve subpoenas upon non-parties that direct production or inspection within five (5) days of service.

35

E.  Service of discovery upon a party to this action, taken pursuant to this Section, shall be sufficient if made by facsimile, email, or by overnight delivery.

F.  Any expedited discovery taken pursuant to this Section is in addition to, and is not subject to, the limits on discovery set forth in the Federal Rules of Civil Procedure and the Local Rules of this Court. The expedited discovery permitted by this Section does not require a meeting or conference of the parties, pursuant to Rules 26(d) & (f) of the Federal Rules of Civil Procedure.

G.  The Parties are exempted from making initial disclosures under Fed. R. Civ. P. 26(a)(1) until further order of this Court.

## XXVII.  SERVICE OF THIS ORDER

**IT IS FURTHER ORDERED** that copies of this Order may be served by any means, including facsimile, electronic mail or other electronic messaging, personal or overnight delivery, U.S. Mail or FedEx, by agents and employees of Plaintiff, by any law enforcement agency, or by private process server, upon any Defendant or any person (including any financial institution) that may have possession, custody or control of any Asset or Document of any Defendant, or that may be subject to any provision of this Order pursuant to Rule 65(d)(2) of the Federal Rules of Civil Procedure. For purposes of this Section, service upon any branch, subsidiary, affiliate or office of any entity shall effect service upon the entire entity.

## XXVIII. CORRESPONDENCE AND SERVICE ON PLAINTIFF

**IT IS FURTHER ORDERED** that, for the purpose of this Order, all correspondence and service of pleadings on Plaintiff shall be addressed to:

Elizabeth Sanger
James A. Prunty
Edwin Rodriguez
Shira D. Modell
Federal Trade Commission
600 Pennsylvania Ave., NW

Washington, DC 20580
Tel: (202) 326-2757, -2438, -3147, -3116
Fax: (202) 326-3259
Email: esanger@ftc.gov; jprunty@ftc.gov; erodriguez@ftc.gov; smodell@ftc.gov

## XXIX.  DURATION OF THE ORDER

**IT IS FURTHER ORDERED** that this Order shall expire upon entry of a final judgment in this case.

## XXX.  RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes.

SO ORDERED, this _____8th_____ day of November, 2018, at ____11:54 a____.m.

_____

UNITED STATES DISTRICT JUDGE

37

# ATTACHMENT A

**FEDERAL TRADE COMMISSION**

**FINANCIAL STATEMENT OF INDIVIDUAL DEFENDANT**

**Definitions and Instructions:**

1. Complete all items. Enter "None" or "N/A" ("Not Applicable") in the first field only of any item that does not apply to you. If you cannot fully answer a question, explain why.

2. "Dependents" include your spouse, live-in companion, dependent children, or any other person, whom you or your spouse (or your children's other parent) claimed or could have claimed as a dependent for tax purposes at any time during the past five years.

3. "Assets" and "Liabilities" include ALL assets and liabilities, located within the United States or any foreign country or territory, whether held individually or jointly and whether held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

4. Attach continuation pages as needed. On the financial statement, state next to the Item number that the Item is being continued. On the continuation page(s), identify the Item number(s) being continued.

5. Type or print legibly.

6. Initial each page in the space provided in the lower right corner.

7. Sign and date the completed financial statement on the last page.

**Penalty for False Information:**

Federal law provides that any person may be imprisoned for not more than five years, fined, or both, if such person:

(1) "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or devise a material fact; makes any materially false, fictitious or fraudulent statement or representation; or makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry" (18 U.S.C. § 1001);

(2) "in any . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true" (18 U.S.C. § 1621); or

(3) "in any ( . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information . . . knowing the same to contain any false material declaration" (18 U.S.C. § 1623).

For a felony conviction under the provisions cited above, federal law provides that the fine may be not more than the greater of (i) $250,000 for an individual or $500,000 for a corporation, or (ii) if the felony results in pecuniary gain to any person or pecuniary loss to any person other than the defendant, the greater of twice the gross gain or twice the gross loss. 18 U.S.C. § 3571.

Case 5:23-cv-00021-JGB-DTB Document 135-2 Filed 12/02/24 Page 98 of 482 Page ID
#:5628
Case 5:18-cv-02104-SJO-PLA Document 39-2 Filed 11/08/18 Page 40 of 70 Page ID #:968

## BACKGROUND INFORMATION

### Item 1.  Information About You

| Full Name | Social Security No. |
|---|---|

| Current Address of Primary Residence | Driver's License No. | State Issued |
|---|---|---|

| | Phone Numbers<br>Home: (   ) | Date of Birth:     /   /<br>(mm/dd/yyyy) |
|---|---|---|
| | Fax:  (   ) | Place of Birth |

| ☐Rent  ☐Own          From (Date):    /   /<br>(mm/dd/yyyy) | E-Mail Address |
|---|---|

Internet Home Page

### Previous Addresses for past five years (if required, use additional pages at end of form)

| Address | From:    /   /<br>(mm/dd/yyyy)     Until:    /   /<br>(mm/dd/yyyy)<br><br>☐Rent  ☐Own |
|---|---|
| Address | From:    /   /          Until:    /   /<br><br>☐Rent  ☐Own |
| Address | From:    /   /          Until:    /   /<br><br>☐Rent  ☐Own |

Identify any other name(s) and/or social security number(s) you have used, and the time period(s) during which they were used:

### Item 2.  Information About Your Spouse or Live-In Companion

| Spouse/Companion's Name | Social Security No. | Date of Birth<br>   /   /<br>(mm/dd/yyyy) |
|---|---|---|

| Address (if different from yours) | Phone Number<br>(   ) | Place of Birth |
|---|---|---|
| | ☐Rent  ☐Own          From (Date):    /   /<br>(mm/dd/yyyy) | |

Identify any other name(s) and/or social security number(s) you have used, and the time period(s) during which they were used:

| Employer's Name and Address | Job Title |
|---|---|
| | Years in Present Job | Annual Gross Salary/Wages<br>$ |

### Item 3.  Information About Your Previous Spouse

| Name and Address | Social Security No. |
|---|---|
| | Date of Birth<br>   /   /<br>(mm/dd/yyyy) |

### Item 4.  Contact Information (name and address of closest living relative other than your spouse)

| Name and Address | Phone Number<br>(   ) |
|---|---|

Initials: _____

## Item 5. Information About Dependents (whether or not they reside with you)

| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
|---|---|---|
| | Relationship | |
| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
| | Relationship | |
| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
| | Relationship | |
| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
| | Relationship | |

## Item 6. Employment Information/Employment Income

Provide the following information for this year-to-date and for each of the previous five full years, for each business entity of which you were a director, officer, member, partner, employee (including self-employment), agent, owner, shareholder, contractor, participant or consultant at any time during that period. "Income" includes, but is not limited to, any salary, commissions, distributions, draws, consulting fees, loans, loan payments, dividends, royalties, and benefits for which you did not pay (*e.g.*, health insurance premiums, automobile lease or loan payments) received by you or anyone else on your behalf.

| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
|---|---|---|---|---|
| | From (Month/Year) / | To (Month/Year) / | Year 20 | Income $ $ |
| Ownership Interest? ☐ Yes ☐ No | | | | |
| Positions Held | From (Month/Year) | To (Month/Year) | | $ |
| | / | / | | $ |
| | / | / | | $ |
| | / | / | | $ |
| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
| | From (Month/Year) / | To (Month/Year) / | Year 20 | Income $ $ |
| Ownership Interest? ☐ Yes ☐ No | | | | |
| Positions Held | From (Month/Year) | To (Month/Year) | | $ |
| | / | / | | $ |
| | / | / | | $ |
| | / | / | | $ |
| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
| | From (Month/Year) / | To (Month/Year) / | Year 20 | Income $ $ |
| Ownership Interest? ☐ Yes ☐ No | | | | |
| Positions Held | From (Month/Year) | To (Month/Year) | | $ |
| | / | / | | $ |
| | / | / | | $ |
| | / | / | | $ |

Initials: _____

## Item 7. Pending Lawsuits Filed By or Against You or Your Spouse

List all pending lawsuits that have been filed by or against you or your spouse in any court or before an administrative agency in the United States or in any foreign country or territory. **Note:** *At Item 12, list lawsuits that resulted in final judgments or settlements in your favor. At Item 21, list lawsuits that resulted in final judgments or settlements against you.*

| Caption of Proceeding | Court or Agency and Location | Case No. | Nature of Proceeding | Relief Requested | Status or Disposition |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## Item 8. Safe Deposit Boxes

List all safe deposit boxes, located within the United States or in any foreign country or territory, whether held individually or jointly and whether held by you, your spouse, or any of your dependents, or held by others for the benefit of you, your spouse, or any of your dependents.

| Name of Owner(s) | Name & Address of Depository Institution | Box No. | Contents |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Initials: _____

## FINANCIAL INFORMATION

**REMINDER:** When an item asks for information regarding your "assets" and "liabilities" include <u>ALL</u> assets and liabilities, located within the United States or in any foreign country or territory, or institution, whether held individually or jointly, and whether held by you, your spouse, or any of your dependents, or held by others for the benefit of you, your spouse, or any of your dependents. In addition, provide all documents requested in Item 24 with your completed Financial Statement.

## ASSETS

### Item 9. Cash, Bank, and Money Market Accounts

List cash on hand (as opposed to cash in bank accounts or other financial accounts) and all bank accounts, money market accounts, or other financial accounts, including but not limited to checking accounts, savings accounts, and certificates of deposit. The term "cash on hand" includes but is not limited to cash in the form of currency, uncashed checks, and money orders.

| a. Amount of Cash on Hand $ | | Form of Cash on Hand | |
|---|---|---|---|
| b. Name on Account | Name & Address of Financial Institution | Account No. | Current Balance |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |

### Item 10. Publicly Traded Securities

List all publicly traded securities, including but not limited to, stocks, stock options, corporate bonds, mutual funds, U.S. government securities (including but not limited to treasury bills and treasury notes), and state and municipal bonds. Also list any U.S. savings bonds.

| Owner of Security | | Issuer | Type of Security | No. of Units Owned |
|---|---|---|---|---|
| Broker House, Address | | Broker Account No. | | |
| | | Current Fair Market Value $ | | Loan(s) Against Security $ |
| Owner of Security | | Issuer | Type of Security | No. of Units Owned |
| Broker House, Address | | Broker Account No. | | |
| | | Current Fair Market Value $ | | Loan(s) Against Security $ |
| Owner of Security | | Issuer | Type of Security | No. of Units Owned |
| Broker House, Address | | Broker Account No. | | |
| | | Current Fair Market Value $ | | Loan(s) Against Security $ |

Initials: _____

## Item 11.  Non-Public Business and Financial Interests

List all non-public business and financial interests, including but not limited to any interest in a non-public corporation, subchapter-S corporation, limited liability corporation ("LLC"), general or limited partnership, joint venture, sole proprietorship, international business corporation or personal investment corporation, and oil or mineral lease.

| Entity's Name & Address | Type of Business or Financial Interest (e.g., LLC, partnership) | Owner (e.g., self, spouse) | Ownership % | If Officer, Director, Member or Partner, Exact Title |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## Item 12.  Amounts Owed to You, Your Spouse, or Your Dependents

| Debtor's Name & Address | Date Obligation Incurred (Month/Year) / | Original Amount Owed $ | Nature of Obligation (if the result of a final court judgment or settlement, provide court name and docket number) |
|---|---|---|---|
| | Current Amount Owed $ | Payment Schedule $ | |
| Debtor's Telephone | Debtor's Relationship to You | | |
| Debtor's Name & Address | Date Obligation Incurred (Month/Year) / | Original Amount Owed $ | Nature of Obligation (if the result of a final court judgment or settlement, provide court name and docket number) |
| | Current Amount Owed $ | Payment Schedule $ | |
| Debtor's Telephone | Debtor's Relationship to You | | |

## Item 13.  Life Insurance Policies

List all life insurance policies (including endowment policies) with any cash surrender value.

| Insurance Company's Name, Address, & Telephone No. | Beneficiary | Policy No. | Face Value $ |
|---|---|---|---|
| | Insured | Loans Against Policy $ | Surrender Value $ |
| Insurance Company's Name, Address, & Telephone No. | Beneficiary | Policy No. | Face Value $ |
| | Insured | Loans Against Policy $ | Surrender Value $ |

## Item 14.  Deferred Income Arrangements

List all deferred income arrangements, including but not limited to, deferred annuities, pensions plans, profit-sharing plans, 401(k) plans, IRAs, Keoghs, other retirement accounts, and college savings plans (e.g., 529 Plans).

| Trustee or Administrator's Name, Address & Telephone No. | Name on Account | | Account No. |
|---|---|---|---|
| | Date Established / / (mm/dd/yyyy) | Type of Plan | Surrender Value before Taxes and Penalties $ |
| Trustee or Administrator's Name, Address & Telephone No. | Name on Account | | Account No. |
| | Date Established / / | Type of Plan | Surrender Value before Taxes and Penalties $ |

Initials: _____

## Item 15. Pending Insurance Payments or Inheritances
List any pending insurance payments or inheritances owed to you.

| Type | Amount Expected | Date Expected (mm/dd/yyyy) |
|------|-----------------|----------------------------|
|      | $               | /   /                      |
|      | $               | /   /                      |
|      | $               | /   /                      |

## Item 16. Vehicles
List all cars, trucks, motorcycles, boats, airplanes, and other vehicles.

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|--------------|------|-------------------------|------------------|------------------------|-------------------|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|--------------|------|-------------------------|------------------|------------------------|-------------------|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|--------------|------|-------------------------|------------------|------------------------|-------------------|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|--------------|------|-------------------------|------------------|------------------------|-------------------|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

## Item 17. Other Personal Property
List all other personal property not listed in Items 9-16 by category, whether held for personal use, investment or any other reason, including but not limited to coins, stamps, artwork, gemstones, jewelry, bullion, other collectibles, copyrights, patents, and other intellectual property.

| Property Category (e.g., artwork, jewelry) | Name of Owner | Property Location | Acquisition Cost | Current Value |
|--------------------------------------------|---------------|-------------------|------------------|---------------|
| | | | $ | $ |
| | | | $ | $ |
| | | | $ | $ |

Initials: _____

## Item 18. Real Property
List all real property interests (including any land contract)

| Property's Location | Type of Property | Name(s) on Title or Contract and Ownership Percentages |
|---|---|---|
| | | |

| Acquisition Date (mm/dd/yyyy) / / | Purchase Price $ | Current Value $ | Basis of Valuation |
|---|---|---|---|

| Lender's Name and Address | Loan or Account No. | Current Balance On First Mortgage or Contract $ |
|---|---|---|
| | | Monthly Payment $ |

| Other Mortgage Loan(s) (describe) | Monthly Payment $ | ☐ Rental Unit |
|---|---|---|
| | Current Balance $ | Monthly Rent Received $ |

| Property's Location | Type of Property | Name(s) on Title or Contract and Ownership Percentages |
|---|---|---|
| | | |

| Acquisition Date (mm/dd/yyyy) / / | Purchase Price $ | Current Value $ | Basis of Valuation |
|---|---|---|---|

| Lender's Name and Address | Loan or Account No. | Current Balance On First Mortgage or Contract $ |
|---|---|---|
| | | Monthly Payment $ |

| Other Mortgage Loan(s) (describe) | Monthly Payment $ | ☐ Rental Unit |
|---|---|---|
| | Current Balance $ | Monthly Rent Received $ |

# LIABILITIES

## Item 19. Credit Cards
List each credit card account held by you, your spouse, or your dependents, and any other credit cards that you, your spouse, or your dependents use, whether issued by a United States or foreign financial institution.

| Name of Credit Card (e.g., Visa, MasterCard, Department Store) | Account No. | Name(s) on Account | Current Balance |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |

## Item 20. Taxes Payable
List all taxes, such as income taxes or real estate taxes, owed by you, your spouse, or your dependents.

| Type of Tax | Amount Owed | Year Incurred |
|---|---|---|
| | $ | |
| | $ | |
| | $ | |

Initials: _____

**Item 21. Other Amounts Owed by You, Your Spouse, or Your Dependents.**
List all other amounts, not listed elsewhere in this financial statement, owed by you, your spouse, or your dependents.

| Lender/Creditor's Name, Address, and Telephone No. | Nature of Debt (if the result of a court judgment or settlement, provide court name and docket number) | | |
|---|---|---|---|
| | Lender/Creditor's Relationship to You | | |

| Date Liability Was Incurred<br>/ /<br>(mm/dd/yyyy) | Original Amount Owed<br>$ | Current Amount Owed<br>$ | Payment Schedule |
|---|---|---|---|

| Lender/Creditor's Name, Address, and Telephone No. | Nature of Debt (if the result of a court judgment or settlement, provide court name and docket number) | | |
|---|---|---|---|
| | Lender/Creditor's Relationship to You | | |

| Date Liability Was Incurred<br>/ /<br>(mm/dd/yyyy) | Original Amount Owed<br>$ | Current Amount Owed<br>$ | Payment Schedule |
|---|---|---|---|

## OTHER FINANCIAL INFORMATION

**Item 22. Trusts and Escrows**
List all funds and other assets that are being held in trust or escrow by any person or entity for you, your spouse, or your dependents. Include any legal retainers being held on your behalf by legal counsel. Also list all funds or other assets that are being held in trust or escrow by you, your spouse, or your dependents, for any person or entity.

| Trustee or Escrow Agent's Name & Address | Date Established (mm/dd/yyyy) | Grantor | Beneficiaries | Present Market Value of Assets* |
|---|---|---|---|---|
| | / / | | | $ |
| | / / | | | $ |
| | / / | | | $ |

*If the market value of any asset is unknown, describe the asset and state its cost, if you know it.

**Item 23. Transfers of Assets**
List each person or entity to whom you have transferred, in the aggregate, more than $5,000 in funds or other assets during the previous five years by loan, gift, sale, or other transfer (exclude ordinary and necessary living and business expenses paid to unrelated third parties). For each such person or entity, state the total amount transferred during that period.

| Transferee's Name, Address, & Relationship | Property Transferred | Aggregate Value* | Transfer Date (mm/dd/yyyy) | Type of Transfer (e.g., Loan, Gift) |
|---|---|---|---|---|
| | | $ | / / | |
| | | $ | / / | |
| | | $ | / / | |

*If the market value of any asset is unknown, describe the asset and state its cost, if you know it.

Initials: _____

**Item 24.  Document Requests**
Provide copies of the following documents with your completed Financial Statement.

|  |  |
|---|---|
|  | Federal tax returns filed during the last three years by or on behalf of you, your spouse, or your dependents. |
|  | All applications for bank loans or other extensions of credit (other than credit cards) that you, your spouse, or your dependents have submitted within the last two years, including by obtaining copies from lenders if necessary. |
| Item 9 | For each bank account listed in Item 9, all account statements for the past 3 years. |
| Item 11 | For each business entity listed in Item 11, provide (including by causing to be generated from accounting records) the most recent balance sheet, tax return, annual income statement, the most recent year-to-date income statement, and all general ledger files from account records. |
| Item 17 | All appraisals that have been prepared for any property listed in Item 17, including appraisals done for insurance purposes.  You may exclude any category of property where the total appraised value of all property in that category is less than $2,000. |
| Item 18 | All appraisals that have been prepared for real property listed in Item 18. |
| Item 21 | Documentation for all debts listed in Item 21. |
| Item 22 | All executed documents for any trust or escrow listed in Item 22.  Also provide any appraisals, including insurance appraisals that have been done for any assets held by any such trust or in any such escrow. |

## SUMMARY FINANCIAL SCHEDULES

**Item 25.  Combined Balance Sheet for You, Your Spouse, and Your Dependents**

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on Hand (Item 9) | $ | Loans Against Publicly Traded Securities (Item 10) | $ |
| Funds Held in Financial Institutions (Item 9) | $ | Vehicles - Liens (Item 16) | $ |
| U.S. Government Securities (Item 10) | $ | Real Property – Encumbrances (Item 18) | $ |
| Publicly Traded Securities (Item 10) | $ | Credit Cards (Item 19) | $ |
| Non-Public Business and Financial Interests (Item 11) | $ | Taxes Payable (Item 20) | $ |
| Amounts Owed to You (Item 12) | $ | Amounts Owed by You (Item 21) | $ |
| Life Insurance Policies (Item 13) | $ | **Other Liabilities (Itemize)** | |
| Deferred Income Arrangements (Item 14) | $ | | $ |
| Vehicles (Item 16) | $ | | $ |
| Other Personal Property (Item 17) | $ | | $ |
| Real Property (Item 18) | $ | | $ |
| **Other Assets (Itemize)** | | | $ |
| | $ | | $ |
| | $ | | $ |
| | $ | | $ |
| **Total Assets** | $ | **Total Liabilities** | $ |

**Item 26.  Combined Current Monthly Income and Expenses for You, Your Spouse, and Your Dependents**
Provide the current monthly income and expenses for you, your spouse, and your dependents.  Do not include credit card payments separately; rather, include credit card expenditures in the appropriate categories.

| Income (State source of each item) | | Expenses | |
|---|---|---|---|
| Salary - After Taxes<br>Source: | $ | Mortgage or Rental Payments for Residence(s) | $ |
| Fees, Commissions, and Royalties<br>Source: | $ | Property Taxes for Residence(s) | $ |
| Interest<br>Source: | $ | Rental Property Expenses, Including Mortgage Payments, Taxes, and Insurance | $ |
| Dividends and Capital Gains<br>Source: | $ | Car or Other Vehicle Lease or Loan Payments | $ |
| Gross Rental Income<br>Source: | $ | Food Expenses | $ |
| Profits from Sole Proprietorships<br>Source: | $ | Clothing Expenses | $ |
| Distributions from Partnerships, S-Corporations, and LLCs<br>Source: | $ | Utilities | $ |

Initials: _____

| Item 26.  Combined Current Monthly Income and Expenses for You, Your Spouse, and Your Dependents (cont.) | | | | |
|---|---|---|---|---|
| Distributions from Trusts and Estates<br>Source: | $ | | Medical Expenses, Including Insurance | $ |
| Distributions from Deferred Income Arrangements<br>Source: | $ | | Other Insurance Premiums | $ |
| Social Security Payments | $ | | Other Transportation Expenses | $ |
| Alimony/Child Support Received | $ | | **Other Expenses (Itemize)** | |
| Gambling Income | $ | | | $ |
| **Other Income (Itemize)** | | | | $ |
| | $ | | | $ |
| | $ | | | $ |
| | $ | | | $ |
| **Total Income** | $ | | Total Expenses | $ |

## ATTACHMENTS

**Item 27.  Documents Attached to this Financial Statement**
List all documents that are being submitted with this financial statement.  For any Item 24 documents that are not attached, explain why.

| Item No. Document Relates To | Description of Document |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court.  I have used my best efforts to obtain the information requested in this statement.  The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge.  I have provided all requested documents in my custody, possession, or control.  I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines).  I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

_____
(Date)

_____
Signature

# ATTACHMENT B

# FEDERAL TRADE COMMISSION

## FINANCIAL STATEMENT OF CORPORATE DEFENDANT

**Instructions**:

1.  Complete all items.  Enter "None" or "N/A" ("Not Applicable") where appropriate.  If you cannot fully answer a question, explain why.

2.  The font size within each field will adjust automatically as you type to accommodate longer responses.

3.  In completing this financial statement, "the corporation" refers not only to this corporation but also to each of its predecessors that are not named defendants in this action.

4.  When an Item asks for information about assets or liabilities "held by the corporation," include <u>ALL</u> such assets and liabilities, located within the United States or elsewhere, held by the corporation or held by others for the benefit of the corporation.

5.  Attach continuation pages as needed.  On the financial statement, state next to the Item number that the Item is being continued.  On the continuation page(s), identify the Item number being continued.

6.  Type or print legibly.

7.  An officer of the corporation must sign and date the completed financial statement on the last page and initial each page in the space provided in the lower right corner.

**Penalty for False Information**:

Federal law provides that any person may be imprisoned for not more than five years, fined, or both, if such person:

(1) "in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry" (18 U.S.C. § 1001);

(2) "in any . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true" (18 U.S.C. § 1621); or

(3) "in any (. . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information . . . knowing the same to contain any false material declaration." (18 U.S.C. § 1623)

For a felony conviction under the provisions cited above, federal law provides that the fine may be not more than the greater of (i) $250,000 for an individual or $500,000 for a corporation, or (ii) if the felony results in pecuniary gain to any person or pecuniary loss to any person other than the defendant, the greater of twice the gross gain or twice the gross loss. 18 U.S.C. § 3571.

## BACKGROUND INFORMATION

**Item 1.**          **General Information**

Corporation's Full Name _____

Primary Business Address _____ From (Date) _____

Telephone No. _____ Fax No. _____

 E-Mail Address_____ Internet Home Page_____

All other current addresses & previous addresses for past five years, including post office boxes and mail drops:

Address_____ From/Until_____

Address_____ From/Until_____

Address_____ From/Until_____

All predecessor companies for past five years:

Name & Address _____ From/Until _____

Name & Address _____ From/Until _____

Name & Address _____ From/Until _____

**Item 2.**          **Legal Information**

Federal Taxpayer ID No. _____ State & Date of Incorporation _____

State Tax ID No. _____ State _____ Profit or Not For Profit _____

Corporation's Present Status:  Active _____ Inactive _____ Dissolved _____

If Dissolved:  Date dissolved _____ By Whom _____

Reasons _____

Fiscal Year-End (Mo./Day) _____ Corporation's Business Activities _____

**Item 3.**          **Registered Agent**

Name of Registered Agent _____

Address _____ Telephone No. _____

**Item 4.**          **Principal Stockholders**

List all persons and entities that own at least 5% of the corporation's stock.

<div style="text-align:center">Name & Address                                                                                  % Owned</div>

_____  _____

_____  _____

_____  _____

_____  _____

**Item 5.**          **Board Members**

List all members of the corporation's Board of Directors.

Name & Address                                % Owned        Term (From/Until)

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

**Item 6.**          **Officers**

List all of the corporation's officers, including *de facto* officers (individuals with significant management responsibility whose titles do not reflect the nature of their positions).

<div style="text-align:center">Name & Address                                                                                  % Owned</div>

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

Case 5:23-cr-00021-JGB   Document 135-2   Filed 03/02/24   Page 112 of 482   Page
ID #:5642
Case 8:18-cv-01644-SJO-JLA   Document 55-2   Filed 11/08/18   Page 54 of 73   Page ID #:582

<u>**Item 7.**</u>　　　　**Businesses Related to the Corporation**

List all corporations, partnerships, and other business entities in which this corporation has an ownership interest.

|  <u>Name & Address</u> | <u>Business Activities</u> | <u>% Owned</u> |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

State which of these businesses, if any, has ever transacted business with the corporation _____

_____

<u>**Item 8.**</u>　　　　**Businesses Related to Individuals**

List all corporations, partnerships, and other business entities in which the corporation's principal stockholders, board members, or officers (i.e., the individuals listed in Items 4 - 6 above) have an ownership interest.

| <u>Individual's Name</u> | <u>Business Name & Address</u> | <u>Business Activities</u> | <u>% Owned</u> |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

State which of these businesses, if any, have ever transacted business with the corporation _____

_____

<u>**Item 9.**</u>　　　　**Related Individuals**

List all related individuals with whom the corporation has had any business transactions during the three previous fiscal years and current fiscal year-to-date.  A "related individual" is a spouse, sibling, parent, or child of the principal stockholders, board members, and officers (i.e., the individuals listed in Items 4 - 6 above).

| <u>Name and Address</u> | <u>Relationship</u> | <u>Business Activities</u> |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Page  4                                                                Initials _____

**Item 10.**  **Outside Accountants**

List all outside accountants retained by the corporation during the last three years.

| Name | Firm Name | Address | CPA/PA? |
|------|-----------|---------|---------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

**Item 11.**  **Corporation's Recordkeeping**

List all individuals within the corporation with responsibility for keeping the corporation's financial books and records for the last three years.

| Name, Address, & Telephone Number | Position(s) Held |
|-----------------------------------|------------------|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**Item 12.**  **Attorneys**

List all attorneys retained by the corporation during the last three years.

| Name | Firm Name | Address |
|------|-----------|---------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Case 5:23-cv-00021-JGB_A Document 135-2 Filed 03/02/24 Page 114 of 482 Page
Case 5:18-cv-02104-SJO-PLA Document 55-2 Filed 11/03/18 Page 50 of 76 Page ID #:3584
ID #:5644

<u>**Item 13.**</u>      **Pending Lawsuits Filed by the Corporation**

List all pending lawsuits that have been filed by the corporation in court or before an administrative agency. (List lawsuits that resulted in final judgments or settlements in favor of the corporation in Item 25).

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

<u>**Item 14.**</u>        **Current Lawsuits Filed Against the Corporation**

List all pending lawsuits that have been filed against the corporation in court or before an administrative agency.  (List lawsuits that resulted in final judgments, settlements, or orders in Items 26 - 27).

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Page  7                                                          Initials _____

Case 5:23-cv-00021-JGB_A Document 135-2 Filed 12/08/24 Page 116 of 482 Page ID #:5646
Case 5:18-cv-02104-SJO-PLA Document 55-2 Filed 11/03/18 Page 58 of 70 Page ID #:3586
ID #:5646

<u>**Item 15.**</u>   **Bankruptcy Information**

List all state insolvency and federal bankruptcy proceedings involving the corporation.

Commencement Date _____ Termination Date _____ Docket No. _____

If State Court: Court & County _____ If Federal Court: District _____

Disposition _____

<u>**Item 16.**</u>   **Safe Deposit Boxes**

List all safe deposit boxes, located within the United States or elsewhere, held by the corporation, or held by others for the benefit of the corporation.  *On a separate page, describe the contents of each box.*

| <u>Owner's Name</u> | <u>Name & Address of Depository Institution</u> | <u>Box No.</u> |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

<u>**FINANCIAL INFORMATION**</u>

**REMINDER:  When an Item asks for information about assets or liabilities "held by the corporation," include <u>ALL</u> such assets and liabilities, located within the United States or elsewhere, held by the corporation or held by others for the benefit of the corporation.**

<u>**Item 17.**</u>   **Tax Returns**

List all federal and state corporate tax returns filed for the last three complete fiscal years.  *Attach copies of all returns.*

| <u>Federal/<br>State/Both</u> | <u>Tax Year</u> | <u>Tax Due<br>Federal</u> | <u>Tax Paid<br>Federal</u> | <u>Tax Due<br>State</u> | <u>Tax Paid<br>State</u> | <u>Preparer's Name</u> |
|---|---|---|---|---|---|---|
| _____ | _____ | $_____ | $_____ | $_____ | $_____ | _____ |
| _____ | _____ | $_____ | $_____ | $_____ | $_____ | _____ |
| _____ | _____ | $_____ | $_____ | $_____ | $_____ | _____ |

Page  8                 Initials _____

58

**Item 18.**        **Financial Statements**

List all financial statements that were prepared for the corporation's last three complete fiscal years and for the current fiscal year-to-date.  *Attach copies of all statements, providing audited statements if available.*

| Year | Balance Sheet | Profit & Loss Statement | Cash Flow Statement | Changes in Owner's Equity | Audited? |
|------|---------------|-------------------------|---------------------|---------------------------|----------|
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |

**Item 19.**        **Financial Summary**

For each of the last three complete fiscal years and for the current fiscal year-to-date for which the corporation has not provided a profit and loss statement in accordance with Item 18 above, provide the following summary financial information.

|  | Current Year-to-Date | 1 Year Ago | 2 Years Ago | 3 Years Ago |
|--|----------------------|------------|-------------|-------------|
| Gross Revenue | $_____ | $_____ | $_____ | $_____ |
| Expenses | $_____ | $_____ | $_____ | $_____ |
| Net Profit After Taxes | $_____ | $_____ | $_____ | $_____ |
| Payables | $_____ |  |  |  |
| Receivables | $_____ |  |  |  |

**Item 20.**        **Cash, Bank, and Money Market Accounts**

List cash and all bank and money market accounts, including but not limited to, checking accounts, savings accounts, and certificates of deposit, held by the corporation.  The term "cash" includes currency and uncashed checks.

Cash on Hand $_____ Cash Held for the Corporation's Benefit $_____

| Name & Address of  Financial Institution | Signator(s) on Account | Account No. | Current Balance |
|------------------------------------------|------------------------|-------------|-----------------|
| _____ | _____ | _____ | $_____ |
| _____ | _____ | _____ | $_____ |
| _____ | _____ | _____ | $_____ |
| _____ | _____ | _____ | $_____ |

<u>**Item 21.**</u>        **Government Obligations and Publicly Traded Securities**

List all U.S. Government obligations, including but not limited to, savings bonds, treasury bills, or treasury notes, held by the corporation.  Also list all publicly traded securities, including but not limited to, stocks, stock options, registered and bearer bonds, state and municipal bonds, and mutual funds, held by the corporation.

Issuer _____ Type of Security/Obligation _____

No. of Units Owned _____ Current Fair Market Value $_____ Maturity Date _____

Issuer _____ Type of Security/Obligation _____

No. of Units Owned _____ Current Fair Market Value $_____ Maturity Date _____


<u>**Item 22.**</u>        **Real Estate**

List all real estate, including leaseholds in excess of five years, held by the corporation.

Type of Property_____ Property's Location_____

Name(s) on Title and Ownership Percentages_____

Current Value $_____ Loan or Account No. _____

Lender's Name and Address_____

Current Balance On First Mortgage $_____ Monthly Payment $_____

Other Loan(s) (describe)_____ Current Balance $_____

Monthly Payment $_____ Rental Unit?_____ Monthly Rent Received $_____


Type of Property_____ Property's Location_____

Name(s) on Title and Ownership Percentages_____

Current Value $_____ Loan or Account No. _____

Lender's Name and Address_____

Current Balance On First Mortgage $_____ Monthly Payment $_____

Other Loan(s) (describe)_____ Current Balance $_____

Monthly Payment $_____ Rental Unit?_____ Monthly Rent Received $_____

<u>**Item 23.**</u>       **Other Assets**

List all other property, by category, with an estimated value of $2,500 or more, held by the corporation, including but not limited to, inventory, machinery, equipment, furniture, vehicles, customer lists, computer software, patents, and other intellectual property.

| <u>Property Category</u> | <u>Property Location</u> | <u>Acquisition Cost</u> | <u>Current Value</u> |
|---|---|---|---|
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |

<u>**Item 24.**</u>       **Trusts and Escrows**

List all persons and other entities holding funds or other assets that are in escrow or in trust for the corporation.

| <u>Trustee or Escrow Agent's Name & Address</u> | <u>Description and Location of Assets</u> | <u>Present Market Value of Assets</u> |
|---|---|---|
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |

## Item 25.      Monetary Judgments and Settlements Owed To the Corporation

List all monetary judgments and settlements, recorded and unrecorded, owed to the corporation.

Opposing Party's Name & Address_____

Court's Name & Address_____ Docket No._____

Nature of Lawsuit_____ Date of Judgment_____ Amount $_____

Opposing Party's Name & Address_____

Court's Name & Address_____ Docket No._____

Nature of Lawsuit_____ Date of Judgment_____ Amount $_____


## Item 26.      Monetary Judgments and Settlements Owed By the Corporation

List all monetary judgments and settlements, recorded and unrecorded, owed by the corporation.

Opposing Party's Name & Address_____

Court's Name & Address_____ Docket No._____

Nature of Lawsuit_____ Date_____ Amount $_____

Opposing Party's Name & Address_____

Court's Name & Address_____ Docket No._____

Nature of Lawsuit_____ Date of Judgment_____ Amount $_____

Opposing Party's Name & Address_____

Court's Name & Address_____ Docket No._____

Nature of Lawsuit_____ Date of Judgment_____ Amount $_____

Opposing Party's Name & Address_____

Court's Name & Address_____ Docket No._____

Nature of Lawsuit_____ Date of Judgment_____ Amount $_____

Opposing Party's Name & Address_____

Court's Name & Address_____ Docket No._____

Nature of Lawsuit_____ Date of Judgment_____ Amount $_____

Case 5:23-cv-00021-JGB-DTB Document 135-2 Filed 03/02/24 Page 121 of 482 Page ID #:5591
Case 5:15-cv-01004-SJO-PLA Document 55-2 Filed 11/03/16 Page 63 of 70 Page ID #:3591
ID #:5651

**Item 27.**        **Government Orders and Settlements**

List all existing orders and settlements between the corporation and any federal or state government entities.

Name of Agency _____ Contact Person _____

Address _____ Telephone No. _____

Agreement Date _____ Nature of Agreement _____

**Item 28.**        **Credit Cards**

List all of the corporation's credit cards and store charge accounts and the individuals authorized to use them.

<table>
<tr><td align="center">Name of Credit Card or Store</td><td align="center">Names of Authorized Users and Positions Held</td></tr>
<tr><td>_____</td><td>_____</td></tr>
<tr><td>_____</td><td>_____</td></tr>
<tr><td>_____</td><td>_____</td></tr>
<tr><td>_____</td><td>_____</td></tr>
<tr><td>_____</td><td>_____</td></tr>
</table>

**Item 29.**        **Compensation of Employees**

List all compensation and other benefits received from the corporation by the five most highly compensated employees, independent contractors, and consultants (other than those individuals listed in Items 5 and 6 above), for the two previous fiscal years and current fiscal year-to-date. "Compensation" includes, but is not limited to, salaries, commissions, consulting fees, bonuses, dividends, distributions, royalties, pensions, and profit sharing plans. "Other benefits" include, but are not limited to, loans, loan payments, rent, car payments, and insurance premiums, whether paid directly to the individuals, or paid to others on their behalf.

| Name/Position | Current Fiscal Year-to-Date | 1 Year Ago | 2 Years Ago | Compensation or Type of Benefits |
|---|---|---|---|---|
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |

Case 5:18-cv-02104-SJO-PLA Document 35-2 Filed 11/03/18 Page 64 of 73 Page ID #:3592

<u>**Item 30.**</u>     **Compensation of Board Members and Officers**

List all compensation and other benefits received from the corporation by each person listed in Items 5 and 6, for the current fiscal year-to-date and the two previous fiscal years.  "Compensation"  includes, but is not limited to, salaries, commissions, consulting fees, dividends, distributions, royalties, pensions, and profit sharing plans.  "Other benefits" include, but are not limited to, loans, loan payments, rent, car payments, and insurance premiums, whether paid directly to the individuals, or paid to others on their behalf.

| Name/Position | Current Fiscal Year-to-Date | 1 Year Ago | 2 Years Ago | Compensation or Type of Benefits |
|---|---|---|---|---|
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |

<u>**Item 31.**</u>     **Transfers of Assets Including Cash and Property**

List all transfers of assets over $2,500 made by the corporation, other than in the ordinary course of business, during the previous three years, by loan, gift, sale, or other transfer.

| Transferee's Name, Address, & Relationship | Property Transferred | Aggregate Value | Transfer Date | Type of Transfer (*e.g.*, Loan, Gift) |
|---|---|---|---|---|
| _____ | _____ | $_____ | _____ | _____ |
| _____ | _____ | $_____ | _____ | _____ |
| _____ | _____ | $_____ | _____ | _____ |
| _____ | _____ | $_____ | _____ | _____ |
| _____ | _____ | $_____ | _____ | _____ |

Page  14                                                                              Initials _____

**Item 32.**     **Documents Attached to the Financial Statement**

List all documents that are being submitted with the financial statement.

| Item No. Document Relates To | Description of Document |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

     I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court.  I have used my best efforts to obtain the information requested in this statement.  The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge.  I have provided all requested documents in my custody, possession, or control.  I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines).  I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

_____          _____
(Date)                                       Signature

 

                                               _____
                                               Corporate Position

# ATTACHMENT C

Form **4506**

(July 2017)

Department of the Treasury
Internal Revenue Service

## Request for Copy of Tax Return

▶ **Do not sign this form unless all applicable lines have been completed.**
▶ **Request may be rejected if the form is incomplete or illegible.**
▶ **For more information about Form 4506, visit** *www.irs.gov/form4506.*

OMB No. 1545-0429

**Tip.** You may be able to get your tax return or return information from other sources. If you had your tax return completed by a paid preparer, they should be able to provide you a copy of the return. The IRS can provide a **Tax Return Transcript** for many returns free of charge. The transcript provides most of the line entries from the original tax return and usually contains the information that a third party (such as a mortgage company) requires. See **Form 4506-T, Request for Transcript of Tax Return,** or you can quickly request transcripts by using our automated self-help service tools. Please visit us at IRS.gov and click on "Get a Tax Transcript..." or call 1-800-908-9946.

| | |
|---|---|
| **1a** Name shown on tax return. If a joint return, enter the name shown first. | **1b First social security number on tax return, individual taxpayer identification number, or employer identification number (see instructions)** |
| **2a** If a joint return, enter spouse's name shown on tax return. | **2b Second social security number or individual taxpayer identification number if joint tax return** |

**3** Current name, address (including apt., room, or suite no.), city, state, and ZIP code (see instructions)

**4** Previous address shown on the last return filed if different from line 3 (see instructions)

**5** If the tax return is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number.

**Caution:** If the tax return is being mailed to a third party, ensure that you have filled in lines 6 and 7 before signing. Sign and date the form once you have filled in these lines. Completing these steps helps to protect your privacy. Once the IRS discloses your tax return to the third party listed on line 5, the IRS has no control over what the third party does with the information. If you would like to limit the third party's authority to disclose your return information, you can specify this limitation in your written agreement with the third party.

**6** **Tax return requested.** Form 1040, 1120, 941, etc. and all attachments as originally submitted to the IRS, including Form(s) W-2, schedules, or amended returns. Copies of Forms 1040, 1040A, and 1040EZ are generally available for 7 years from filing before they are destroyed by law. Other returns may be available for a longer period of time. Enter only one return number. If you need more than one type of return, you must complete another Form 4506. ▶ _____

**Note:** If the copies must be certified for court or administrative proceedings, check here . . . . . . . . . . . . . . . . ☐

**7** **Year or period requested.** Enter the ending date of the year or period, using the mm/dd/yyyy format. If you are requesting more than eight years or periods, you must attach another Form 4506.

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

**8** **Fee.** There is a $50 fee for each return requested. **Full payment must be included with your request or it will be rejected. Make your check or money order payable to "United States Treasury." Enter your SSN, ITIN, or EIN and "Form 4506 request" on your check or money order.**

| | | | |
|---|---|---|---|
| **a** | Cost for each return . . . | $ | 50.00 |
| **b** | Number of returns requested on line 7 . . . | | |
| **c** | Total cost. Multiply line 8a by line 8b | $ | |

**9** If we cannot find the tax return, we will refund the fee. If the refund should go to the third party listed on line 5, check here . . . . . ☐

**Caution:** Do not sign this form unless all applicable lines have been completed.

**Signature of taxpayer(s).** I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax return requested. If the request applies to a joint return, at least one spouse must sign. If signed by a corporate officer, 1 percent or more shareholder, partner, managing member, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506 on behalf of the taxpayer. **Note:** This form must be received by IRS within 120 days of the signature date.

☐ **Signatory attests that he/she has read the attestation clause and upon so reading declares that he/she has the authority to sign the Form 4506.** See instructions.

Phone number of taxpayer on line 1a or 2a

**Sign Here**

▶ _____
  **Signature** (see instructions)                    Date

▶ _____
  **Title** (if line 1a above is a corporation, partnership, estate, or trust)

▶ _____
  **Spouse's signature**                              Date

**For Privacy Act and Paperwork Reduction Act Notice, see page 2.**          Cat. No. 41721E          Form **4506** (Rev. 7-2017)

Form 4506 (Rev. 7-2017) — Page **2**

Section references are to the Internal Revenue Code unless otherwise noted.

## Future Developments

For the latest information about Form 4506 and its instructions, go to *www.irs.gov/form4506*. Information about any recent developments affecting Form 4506, Form 4506-T and Form 4506T-EZ will be posted on that page.

## General Instructions

**Caution:** Do not sign this form unless all applicable lines have been completed.

**Purpose of form.** Use Form 4506 to request a copy of your tax return. You can also designate (on line 5) a third party to receive the tax return.

**How long will it take?** It may take up to 75 calendar days for us to process your request.

**Tip.** Use Form 4506-T, Request for Transcript of Tax Return, to request tax return transcripts, tax account information, W-2 information, 1099 information, verification of nonfiling, and records of account.

**Automated transcript request.** You can quickly request transcripts by using our automated self-help service tools. Please visit us at IRS.gov and click on "Get a Tax Transcript..." or call 1-800-908-9946.

**Where to file.** Attach payment and mail Form 4506 to the address below for the state you lived in, or the state your business was in, when that return was filed. There are two address charts: one for individual returns (Form 1040 series) and one for all other returns.

If you are requesting a return for more than one year or period and the chart below shows two different addresses, send your request to the address based on the address of your most recent return.

## Chart for individual returns (Form 1040 series)

**If you filed an individual return and lived in:**

| If you filed an individual return and lived in: | Mail to: |
|---|---|
| Alabama, Kentucky, Louisiana, Mississippi, Tennessee, Texas, a foreign country, American Samoa, Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands, or A.P.O. or F.P.O. address | Internal Revenue Service RAIVS Team Stop 6716 AUSC Austin, TX 73301 |
| Alaska, Arizona, Arkansas, California, Colorado, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington, Wisconsin, Wyoming | Internal Revenue Service RAIVS Team Stop 37106 Fresno, CA 93888 |
| Connecticut, Delaware, District of Columbia, Florida, Georgia, Maine, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia, West Virginia | Internal Revenue Service RAIVS Team Stop 6705 P-6 Kansas City, MO 64999 |

## Chart for all other returns

**If you lived in or your business was in:**

| If you lived in or your business was in: | Mail to: |
|---|---|
| Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Hawaii, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wyoming, a foreign country, American Samoa, Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands, or A.P.O. or F.P.O. address | Internal Revenue Service RAIVS Team P.O. Box 9941 Mail Stop 6734 Ogden, UT 84409 |
| Connecticut, Delaware, District of Columbia, Georgia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, West Virginia, Wisconsin | Internal Revenue Service RAIVS Team P.O. Box 145500 Stop 2800 F Cincinnati, OH 45250 |

## Specific Instructions

**Line 1b.** Enter your employer identification number (EIN) if you are requesting a copy of a business return. Otherwise, enter the first social security number (SSN) or your individual taxpayer identification number (ITIN) shown on the return. For example, if you are requesting Form 1040 that includes Schedule C (Form 1040), enter your SSN.

**Line 3.** Enter your current address. If you use a P.O. box, please include it on this line 3.

**Line 4.** Enter the address shown on the last return filed if different from the address entered on line 3.

**Note:** If the addresses on lines 3 and 4 are different and you have not changed your address with the IRS, file Form 8822, Change of Address. For a business address, file Form 8822-B, Change of Address or Responsible Party — Business.

**Signature and date.** Form 4506 must be signed and dated by the taxpayer listed on line 1a or 2a. The IRS must receive Form 4506 within 120 days of the date signed by the taxpayer or it will be rejected. Ensure that all applicable lines are completed before signing.



*You must check the box in the signature area to acknowledge you have the authority to sign and request the information. The form will not be processed and returned to you if the box is unchecked.*

**Individuals.** Copies of jointly filed tax returns may be furnished to either spouse. Only one signature is required. Sign Form 4506 exactly as your name appeared on the original return. If you changed your name, also sign your current name.

**Corporations.** Generally, Form 4506 can be signed by: (1) an officer having legal authority to bind the corporation, (2) any person designated by the board of directors or other governing body, or (3) any officer or employee on written request by any principal officer and attested to by the secretary or other officer. A bona fide shareholder of record owning 1 percent or more of the outstanding stock of the corporation may submit a Form 4506 but must provide documentation to support the requester's right to receive the information.

**Partnerships.** Generally, Form 4506 can be signed by any person who was a member of the partnership during any part of the tax period requested on line 7.

**All others.** See section 6103(e) if the taxpayer has died, is insolvent, is a dissolved corporation, or if a trustee, guardian, executor, receiver, or administrator is acting for the taxpayer.

**Note:** If you are Heir at law, Next of kin, or Beneficiary you must be able to establish a material interest in the estate or trust.

**Documentation.** For entities other than individuals, you must attach the authorization document. For example, this could be the letter from the principal officer authorizing an employee of the corporation or the letters testamentary authorizing an individual to act for an estate.

**Signature by a representative.** A representative can sign Form 4506 for a taxpayer only if this authority has been specifically delegated to the representative on Form 2848, line 5. Form 2848 showing the delegation must be attached to Form 4506.

**Privacy Act and Paperwork Reduction Act Notice.** We ask for the information on this form to establish your right to gain access to the requested return(s) under the Internal Revenue Code. We need this information to properly identify the return(s) and respond to your request. If you request a copy of a tax return, sections 6103 and 6109 require you to provide this information, including your SSN or EIN, to process your request. If you do not provide this information, we may not be able to process your request. Providing false or fraudulent information may subject you to penalties.

Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation, and cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103.

The time needed to complete and file Form 4506 will vary depending on individual circumstances. The estimated average time is: **Learning about the law or the form,** 10 min.; **Preparing the form,** 16 min.; and **Copying, assembling, and sending the form to the IRS,** 20 min.

If you have comments concerning the accuracy of these time estimates or suggestions for making Form 4506 simpler, we would be happy to hear from you. You can write to:

Internal Revenue Service
Tax Forms and Publications Division
1111 Constitution Ave. NW, IR-6526
Washington, DC 20224.

Do not send the form to this address. Instead, see *Where to file* on this page.

# ATTACHMENT D

## CONSENT TO RELEASE FINANCIAL RECORDS

    I, _____ of _____, (City, State), do hereby direct any bank, saving and loan association, credit union, depository institution, finance company, commercial lending company, credit card processor, credit card processing entity, automated clearing house, network transaction processor, bank debit processing entity, automated clearing house, network transaction processor, bank debit processing entity, brokerage house, escrow agent, money market or mutual fund, title company, commodity trading company, trustee, or person that holds, controls, or maintains custody of assets, wherever located, that are owned or controlled by me or at which there is an account of any kind upon which I am authorized to draw, and its officers, employees, and agents, to disclose all information and deliver copies of all documents of every nature in its possession or control which relate to the said accounts to any attorney of the Federal Trade Commission, and to give evidence relevant thereto, in the matter of [       ], now pending in the United States District Court of [       ], and this shall be irrevocable authority for so doing.

    This direction is intended to apply to the laws of countries other than the United States of America which restrict or prohibit disclosure of bank or other financial information without the consent of the holder of the account, and shall be construed as consent with respect hereto, and the same shall apply to any of the accounts for which I may be a relevant principal.

Dated:_____    Signature:_____

                      Printed Name:_____

# EXHIBIT 2

<table>
<tr><td><strong>FILED</strong><br>CLERK, U.S. DISTRICT COURT<br><br>October 10, 2018<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___VPC___ DEPUTY</td></tr>
</table>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**Federal Trade Commission**,

      Plaintiff,

      v.

**Jason Cardiff, et al.,**

      Defendants.

**FILED UNDER SEAL**

Case No. 18-cv-2104

*EX PARTE* TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF A TEMPORARY RECEIVER, AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

      Plaintiff, the Federal Trade Commission, has filed its Complaint for Permanent Injunction and Other Equitable Relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the Restore Online Shoppers' Confidence Act, ("ROSCA"), 15 U.S.C. §§ 8401-8405, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r, and Section 6

1

of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, and has moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants Jason Cardiff, Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, Danielle Cadiz, a/k/a Danielle Walker, Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership.

## FINDINGS OF FACT

The Court, having considered the Complaint, the *ex parte* Application for a Temporary Restraining Order, declarations, exhibits, and the memorandum of points and authorities filed in support thereof, and being otherwise advised, finds that:

A.     This Court has jurisdiction over the subject matter of this case, and there is good cause to believe that it will have jurisdiction over all parties hereto and that venue in this district is proper.

B.     In numerous instances, Defendants have misrepresented the effectiveness of their dissolvable film strip products for smoking cessation, weight loss, and improved male sexual performance, thereby misleading vulnerable consumers.  Defendants have then further injured many consumers by placing them on unauthorized continuity plans that resulted in additional charges to their credits cards or withdrawals from their debit accounts.  Defendants have also made false earnings claims as part of a multilevel marketing plan, and illegally caused more than one million robocalls to be made to consumers' telephones.

C.     There is good cause to believe that Defendants Jason Cardiff, Eunjung Cardiff, Danielle Cadiz, Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific

Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership have engaged in and are likely to engage in acts or practices that violate Sections 5(a) and 12 of the FTC Act, Section 4 of ROSCA, Section 907(a) of EFTA, EFTA's implementing Regulation E, and the Telemarketing Sales Rule ("TSR"), and that Plaintiff is therefore likely to prevail on the merits of this action.  As demonstrated by Defendants' own advertising and communications, consumer complaints, declarations, and the additional documentation filed by the FTC, the Commission has established a likelihood of success in showing that Defendants have deceptively marketed TBX-FREE, Eupepsia Thin, and Prolongz, placed consumers on continuity plans without their prior authorization, charged consumers' credit cards and debited their bank accounts without authorization, caused robocalls to be made to more than one million consumers to induce the sale of goods or services, and misrepresented the earnings that people who join their multi-level marketing program are likely to make.

D.     The FTC is likely to succeed in showing that Corporate Defendants Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership operate as a common enterprise and are the alter egos of Jason Cardiff and Eunjung Cardiff.

E.     There is good cause to believe that immediate and irreparable harm will result from Defendants' ongoing violations of the FTC Act, ROSCA, EFTA and Regulation E, and the TSR unless Defendants are restrained and enjoined by order of this Court.

F.     There is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers – including monetary restitution, rescission, or disgorgement – will occur from the sale,

3

transfer, destruction or other disposition or concealment by Defendants of their assets or records, unless Defendants are immediately restrained and enjoined by order of this Court; and that, in accordance with Fed. R. Civ. P. 65(b) and Local Rule 7-19.2, the interests of justice require that this Order be granted without prior notice to Defendants. Thus, there is good cause for relieving Plaintiff of the duty to provide Defendants with prior notice of its Motion for a Temporary Restraining Order.

G.      Good cause exists for freezing the assets of all Defendants, appointing a temporary receiver over the Receivership Entities and over the assets of Jason Cardiff and Eunjung Cardiff, permitting Plaintiff and the Receiver immediate access to the Defendants' business premises, and permitting Plaintiff and the Receiver to take expedited discovery.

H.      Weighing the equities and considering Plaintiff's likelihood of ultimate success on the merits, a temporary restraining order with an asset freeze, the appointment of a temporary receiver, immediate access to business premises, expedited discovery, and other equitable relief is in the public interest.

I.      This Court has authority to issue this Order pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Federal Rule of Civil Procedure 65, and the All Writs Act, 28 U.S.C. § 1651.

J.      No security is required of any agency of the United States for issuance of a temporary restraining order. Fed. R. Civ. P. 65(c).

## DEFINITIONS

For the purpose of this Order, the following definitions shall apply:

A.      "Asset" means any legal or equitable interest in, right to, or claim to, any property, wherever located and by whomever held.

B.      "Continuity Program" means any plan, arrangement, or system under which a consumer is periodically charged for products or services, without prior notification by the seller before each charge.

4

C.    "Corporate Defendant(s)" means Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership, and each of their subsidiaries, affiliates, successors, and assigns.

D.    "Defendant(s)" means Corporate Defendants, Jason Cardiff, Eunjung Cardiff, and Danielle Cadiz, individually, collectively, or in any combination.

E.    "Document" is synonymous in meaning and equal in scope to the usage of "document" and "electronically stored information" in Federal Rule of Civil Procedure 34(a), Fed. R. Civ. P. 34(a), and includes writings, drawings, graphs, charts, photographs, sound and video recordings, images, Internet sites, web pages, websites, electronic correspondence, including email and instant messages, contracts, accounting data, advertisements, FTP Logs, Server Access Logs, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, computer records, customer or sales databases, and any other electronically stored information, including Documents located on remote servers or cloud computing systems, and other data or data compilations from which information can be obtained directly or, if necessary, after translation into a reasonably usable form.  A draft or non-identical copy is a separate document within the meaning of the term.

F.    "Electronic Data Host" means any person or entity in the business of storing, hosting, or otherwise maintaining electronically stored information. This includes, but is not limited to, any entity hosting a website or server, and any entity providing "cloud based" electronic storage.

G.    "Individual Defendant(s)" means Jason Cardiff, Eunjung Cardiff, and Danielle Cadiz, individually, collectively, or in any combination.

H.    "Negative Option" means, in an offer or agreement to sell or provide

5

any good or service, a provision under which the consumer's silence or failure to take an affirmative action to reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer or agreement.

I.  "Person" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

J.  "Preauthorized Electronic Fund Transfer" means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

K.  "Receiver" means the temporary receiver appointed in Section XV of this Order and any deputy receivers that shall be named by the temporary receiver.

L.  "Receivership Entities" means Corporate Defendants as well as any other entity that has conducted any business related to Defendants' marketing and sale of dissolvable film strips and promotion of the Rengalife multilevel marketing program, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant.

M.  "Receivership Property" means any Assets, wherever located, that are: (1) owned, controlled, or held by or for the benefit of the Receivership Entities, Jason Cardiff, or Eunjung Cardiff, in whole or in part; (2) in the actual or constructive possession of the Receivership Entities, Jason Cardiff, or Eunjung Cardiff; or (3) owned, controlled, or held by, or in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, trust, or other entity directly or indirectly owned or controlled by the Receivership Entities, Jason Cardiff, or Eunjung Cardiff, including the Jurikel Family Trust, and Carols Place Trust.

**ORDER**

**I.     PROHIBITED BUSINESS ACTIVITIES**

6

**IT IS THEREFORE ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or offering for sale of any goods, services, or programs are temporarily restrained and enjoined from misrepresenting or assisting others in misrepresenting, expressly or by implication:

A.  Any material fact about TBX-FREE, Eupepsia Thin, or Prolongz, including, but not limited to:

1.  That TBX-FREE is an effective smoking cessation product;

2.  That TBX-FREE is more effective than either nicotine patches or nicotine gum in enabling cigarette smokers to stop smoking;

3.  That TBX-FREE enables many cigarette smokers to quit in seven to ten days;

4.  That TBX-FREE has an 88% success rate, including among people who have smoked cigarettes for more than five years;

5.  That smokers should not need to purchase more than one month of TBX-FREE;

6.  That clinical studies have been conducted on TBX-FREE, and have shown that TBX-FREE is an effective smoking cessation product;

7.  That TBX-FREE has been proven in clinical studies to be more effective than nicotine patches or nicotine gum in enabling smokers to stop smoking;

8.  That clinical studies of TBX-FREE conducted on 10,600 people have shown that TBX-FREE has an "88% success rate";

9.  That The New England Journal of Medicine ("NEJM"), Harvard Health Publications, and Johns Hopkins University

7

have published clinical studies proving that TBX-FREE is an effective smoking cessation product;

10. That NEJM's clinical studies showed that TBX-FREE is ten times more effective for smoking cessation than nicotine replacement therapy;

11. That Eupepsia Thin is an effective appetite suppressant and weight loss aid;

12. That Eupepsia Thin starts working in less than 20 seconds, and suppresses a user's appetite within minutes;

13. That Eupepsia Thin enables users to lose 10, 20, or even 100 pounds without dieting, giving up their favorite foods, or increasing their exercise;

14. That Eupepsia Thin users can lose 15 pounds their first month without dieting or changing their food or lifestyle;

15. That Eupepsia Thin users can lose as much as 20 pounds in one month and as much as 50 pounds in three months;

16. That Eupepsia Thin is more effective at causing weight loss than conventional calorie reduction and meal plans;

17. That Eupepsia Thin enables consumers to avoid gaining back weight they lose, without any lifestyle changes.

18. That clinical studies have been conducted on EupepsiaThin and those studies show that it is an effective appetite suppressant and weight loss aid;

19. That Prolongz substantially increases ejaculation control and the duration of sex;

20. That Prolongz treats or prevents premature ejaculation;

21. That Prolongz is clinically proven to increase ejaculation control and the duration of sex for more than 97% of users;

8

22.   That Eupepsia Thin is made in the United States;

23.   That individuals appearing in advertising for Eupepsia Thin used that product successfully to lose weight; and

24.   That consumers who are not satisfied with the product they purchased will get their money back;

B.   Any material fact about any multi-level marketing plan, including, but not limited to, the income that participants in the plan are likely to earn; and

C.   Any other fact material to consumers concerning any good or service, such as:  the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

## II.   PROHIBITIONS AGAINST UNFAIR AND DECEPTIVE NEGATIVE OPTION MARKETING PRACTICES

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any good or service are temporarily restrained and enjoined from charging, causing to be charged, assisting others in charging, or attempting to charge any consumer in any sale of a good or service sold through a negative option without:

A.   Clearly and conspicuously disclosing all material terms of the negative option features before obtaining the consumer's billing information;

B.   Obtaining a consumer's express informed consent, written or similarly authorized, to the negative option features before making any charge; and

C.   Providing a simple mechanism for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, or other financial account.

9

## III. PROHIBITIONS AGAINST UNAUTHORIZED CHARGES

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are temporarily restrained and enjoined from charging, causing to be charged, assisting others in charging, or attempting to charge any consumer for any good or service without first obtaining the consumer's express informed consent, written or similarly authorized, to the charge.

## IV. PROHIBITIONS AGAINST DEBITING CONSUMERS' BANK ACCOUNTS WITHOUT AUTHORIZATION

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any good or service, are temporarily restrained and enjoined from:

A.    Failing to timely obtain written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account before initiating any Preauthorized Electronic Fund Transfer; and

B.    Failing to provide to the consumer a copy of a valid written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account.

## V. PROHIBITION OF PRERECORDED MARKETING CALLS

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from

initiating or causing the initiation of outbound telephone calls delivering prerecorded messages to induce the sale of goods or services.

## VI.  PROHIBITION ON RELEASE OF CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from:

A. Selling, renting, leasing, transferring, or otherwise disclosing, the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or identifying information of any person that any Defendant obtained in connection with any activity that pertains to the subject matter of this Order; and

B. Benefitting from or using the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or identifying information of any person that any Defendant obtained in connection with any activity that pertains to the subject matter of this Order.

Provided, however, that Defendants may disclose such identifying information to a law enforcement agency, to their attorneys as required for their defense, as required by any law, regulation, or court order, or in any filings, pleadings or discovery in this action in the manner required by the Federal Rules of Civil Procedure and by any protective order in the case.

## VII.  ASSET FREEZE

**IT IS FURTHER ORDERED** that Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from:

A.    Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any Assets that are:

   1.    Owned or controlled, directly or indirectly, by any Defendant, including, but not limited to, those for which a Defendant is a signatory on the account;

   2.    Held, in part or in whole, for the benefit of any Defendant;

   3.    In the actual or constructive possession of any Defendant; or

   4.    Owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant.

B.    Opening or causing to be opened any safe deposit boxes, commercial mail boxes, or storage facilities titled in the name of any Defendant or subject to access by any Defendant, except as necessary to comply with written requests from the Receiver acting pursuant to its authority under this Order;

C.    Incurring charges or cash advances on any credit, debit, or ATM card issued in the name, individually or jointly, of any Corporate Defendant or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant, or of which any Defendant is an officer, director, member, or manager.  This includes any corporate bankcard or corporate credit card account for which any Defendant is, or was on the date that this Order was signed, an authorized signer; or

D.    Cashing any checks or depositing any money orders or cash received from consumers, clients, or customers of any Defendant;

The Assets affected by this Section shall include:  (1) all Assets of Defendants as of the time this Order is entered; and (2) Assets obtained by Defendants after this

12

Order is entered if those Assets are derived from any activity that is the subject of the Complaint in this matter or that is prohibited by this Order; and (3) all Assets owned or controlled, directly or indirectly, by Jason Cardiff, Eunjung Cardiff, the Jurikel Family Trust, or Carols Place Trust. This Section does not prohibit any transfers to the Receiver or repatriation of foreign Assets specifically required by this Order.

## VIII. DUTIES OF ASSET HOLDERS AND OTHER THIRD PARTIES

**IT IS FURTHER ORDERED** that any financial or brokerage institution, Electronic Data Host, credit card processor, payment processor, merchant bank, acquiring bank, independent sales organization, third party processor or vendor, payment gateway, insurance company, business entity, or person who receives actual notice of this Order (by service or otherwise) that:

(a)    has held, controlled, or maintained custody, through an account or otherwise, of any Document on behalf of any Defendant or any Asset that has been owned or controlled, directly or indirectly, by any Defendant; held, in part or in whole, for the benefit of any Defendant; in the actual or constructive possession of any Defendant; or owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant;

(b)    has held, controlled, or maintained custody, through an account or otherwise, of any Document or Asset associated with credits, debits, or charges made on behalf of any Defendant, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales

13

organizations, third party processors or vendors, payment

gateways, insurance companies, or other entities; or

(c)  has extended credit to any Defendant, including through a credit

card account, shall:

A.   Hold, preserve, and retain within its control and prohibit the

withdrawal, removal, alteration, assignment, transfer, pledge, encumbrance,

disbursement, dissipation, relinquishment, conversion, sale, or other disposal of

any such Document or Asset, as well as all Documents or other property related to

such Assets, except by further order of this Court;

B.   Deny any person, except the Receiver, access to any safe deposit box,

commercial mail box, or storage facility that is titled in the name of any Defendant,

either individually or jointly, or otherwise subject to access by any Defendant;

C.   Provide Plaintiff's counsel and the Receiver, within three (3) days of

receiving a copy of this Order, a sworn statement setting forth:

1.   The identification number of each such account or Asset;

2.   The balance of each such account, or a description of the nature

and value of each such Asset as of the close of business on the

day on which this Order is served, and, if the account or other

Asset has been closed or removed, the date closed or removed,

the total funds removed in order to close the account, and the

name of the person or entity to whom such account or other

Asset was remitted; and

3.   The identification of any safe deposit box, commercial mail

box, or storage facility that is either titled in the name,

individually or jointly, of any Defendant, or is otherwise subject

to access by any Defendant; and

D.   Upon the request of Plaintiff's counsel or the Receiver, promptly

provide Plaintiff's counsel and the Receiver with copies of all records or other

14

Documents pertaining to any account covered by this Section or Asset, including originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, including wire transfers and wire transfer instructions, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and all logs and records pertaining to safe deposit boxes, commercial mail boxes, and storage facilities.

Provided, however, that this Section does not prohibit any transfers to the Receiver or repatriation of foreign Assets specifically required by this Order.

## IX.   FINANCIAL DISCLOSURES

**IT IS FURTHER ORDERED** that each Defendant, within five (5) days of service of this Order upon them, shall prepare and deliver to Plaintiff's counsel and the Receiver:

A.     Completed financial statements on the forms attached to this Order as **Attachment A** (Financial Statement of Individual Defendant) for each Individual Defendant, and **Attachment B** (Financial Statement of Corporate Defendant) for each Corporate Defendant and for Carols Place Trust and the Jurikel Family Trust; and

B.     Completed **Attachment C** (IRS Form 4506, Request for Copy of a Tax Return) for each Individual and Corporate Defendant.

## X.   FOREIGN ASSET REPATRIATION

**IT IS FURTHER ORDERED** that within five (5) days following the service of this Order, Jason Cardiff, Eunjung Cardiff, Carols Place Trust, and each Corporate Defendant shall:

A.     Provide Plaintiff's counsel and the Receiver with a full accounting, verified under oath and accurate as of the date of this Order, of all Assets,

Documents, and accounts outside of the United States that are: (1) titled in the name, individually or jointly, of any Defendant; (2) held by any person or entity for the benefit of any Defendant or for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant;

      B.    Take all steps necessary to provide the Receiver and Plaintiff's counsel access to all Documents and records that may be held by third parties located outside of the territorial United States of America, including signing the Consent to Release of Financial Records appended to this Order as **Attachment D.**

      C.    Transfer to the territory of the United States and deliver to the Receiver all Documents and Assets located in foreign countries that are: (1) titled in the name, individually or jointly, of any Defendant, or any trust or other entity for which any Defendant is a beneficiary or trustee; (2) held by any person or entity for the benefit of any Defendant or for the benefit of any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant; and

      D.    The same business day as any repatriation, (1) notify the Receiver and Plaintiff's counsel of the name and location of the financial institution or other entity that is the recipient of such Documents or Assets; and (2) serve this Order on any such financial institution or other entity.

## XI.   NON-INTERFERENCE WITH ASSET FREEZE AND REPATRIATION

     **IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from

taking any action, directly or indirectly, which may result in the encumbrance, transfer, relocation, or dissipation of domestic or foreign Assets, or in the hindrance of the repatriation required by this Order, including, but not limited to:

  A. Sending any communication or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all Defendants' Assets have been fully repatriated pursuant to this Order; or

  B. Notifying any trustee, protector, or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a court order, until such time that all Defendants' Assets have been fully repatriated pursuant to this Order.

## XII. CONSUMER CREDIT REPORTS

  **IT IS FURTHER ORDERED** that Plaintiff may obtain credit reports concerning any Defendants pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. 1681b(a)(1), and that, upon written request, any credit reporting agency from which such reports are requested shall provide them to Plaintiff.

## XIII. PRESERVATION OF RECORDS

  **IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from:

  A. Destroying, erasing, falsifying, writing over, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, Documents that relate to: (1) the business, business practices, Assets, or business or personal finances of any Defendant; (2) the business practices or finances of entities directly or indirectly under the control of any Defendant; or (3)

the business practices or finances of entities directly or indirectly under common control with any other Defendant; and

      B.    Failing to create and maintain Documents that, in reasonable detail, accurately, fairly, and completely reflect Defendants' incomes, disbursements, transactions, and use of Defendants' Assets.

## XIV. REPORT OF NEW BUSINESS ACTIVITY

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from creating, operating, or exercising any control over any business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship, or corporation, without first providing Plaintiff's counsel and the Receiver with a written statement disclosing: (1) the name of the business entity; (2) the address and telephone number of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities.

## XV. TEMPORARY RECEIVER

**IT IS FURTHER ORDERED** that Robb Evans & Associates, LLC is appointed as temporary receiver of the Receivership Entities and of the assets of Jason Cardiff and Eunjung Cardiff that are:

      1.    Owned, controlled or held by or for the benefit of Jason Cardiff or Eunjung Cardiff, in whole or in part;

18

2.       In the actual or constructive possession of Jason Cardiff or Eunjung Cardiff; or

3.       Owned, controlled or held by, or in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, trust, or other entity directly or indirectly owned or controlled by Jason Cardiff or Eunjung Cardiff;

with full powers of an equity receiver. The Receiver shall be solely the agent of this Court in acting as Receiver under this Order.

## XVI. DUTIES AND AUTHORITY OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver is directed and authorized to accomplish the following:

A.      Assume full control of the Receivership Entities by removing, as the Receiver deems necessary or advisable, any director, officer, independent contractor, employee, attorney, or agent of any Receivership Entity from control of, management of, or participation in, the affairs of the Receivership Entity;

B.      Take exclusive custody, control, and possession of all Assets and Documents of, or in the possession, custody, or under the control of, any Receivership Entity and all Assets of Jason Cardiff and Eunjung Cardiff covered by Part XV of this Order, wherever situated, except for real property used as the residence of Jason Cardiff and Eunjung Cardiff;

C.      Take exclusive custody, control, and possession of all Documents or Assets associated with credits, debits, or charges made on behalf of any Receivership Entity, wherever situated, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales organizations, third party processors, payment gateways, insurance companies, or other entities;

D.      Conserve, hold, manage, and prevent the loss of all Receivership Property, and perform all acts necessary or advisable to preserve the value of those Assets.  The Receiver shall assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Entities. The Receiver shall have full power to sue for, collect, and receive, all Receivership Property and all Assets of other persons or entities whose interests are now under the direction, possession, custody, or control of, the Receivership Entities or of Jason Cardiff or Eunjung Cardiff.  Provided, however, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer's debt to the Receivership Entities has resulted from the deceptive acts or practices or other violations of law alleged in the Complaint in this matter, without prior Court approval;

E.      Take exclusive custody, control, and possession of the following valuable articles in the possession, custody, or under the control of, Defendants Jason Cardiff, Eunjung Cardiff, or Carols Place Limited Partnership, wherever located:

1.      Ladies 14K yellow gold and diamond ring.  Insured for $11,813.

2.      Ladies diamond pendent setting 14 KT.  Insured for $23,730.

3.      Ladies Diamond Stud Earrings.  Insured for $34,125.

4.      Ladies Diamond Fancy Ring.  Insured for $31,763.

5.      Mens Roadster SM WG/WG Paved Bezel.  Insured for $32,550.

6.      Ladies handmade platinum diamond bracelet.  Insured for $46,725

7.      Mens GTS 18KT white gold Daytona Rolex.  Insured for $42,000.

20

8. 5.08 ct round diamond I color S12 Clarity EGL platinum ring. Insured for $102,076.

9. Mens Rolex Yacht-Master 18K gold watch. Insured for $14,125.

10. Ladies Love Bra yellow gold 4 dia[] 17 cm. Insured for $9,819.

11. Ladies yellow gold ring, Serial #UD0824. Insured for $2,284.

12 Ladies fancy diamond bracelet. Insured for $39,397.

13. Mens Rolex watch 18KT gold Pearlmaster. Insured for $33,180.

14. Tiffany pearl bracelet. Insured for $3,166.

15. Ladies emerald and diamond ring. Insured for $24,856.

16. IWC Portofino moon phase watch. Insured for $8,000.

17. Pre-owner Ladies stainless steel Patek Phili[ppe]. Insured for $8,145.

18. Rolex Vintage Thund[er]. Insured for $9,000.

19. Stuart Moore "Aronade" platinum diamond. Insured for $12,650.

20. Peter Philippe annual calendar wristwatch. Insured for $41,300.

21. 18K yellow gold Tiffany Diamond Bracelet. #B0164. Insured for $7,600.

22. "Living Room" Artist Romero Britto. Insured for $12,600.

23. Hermes Birkin bag, size 35 (Togo leather; in Sienna color). Insured for $20,000.

24. Hermes Birkin bag, size 35 (Togo leather; Curry). Insured for $20,000

25. Ladies ring round center stone 8.5 cts, VS2 with diamonds. Insured for $532,000.

26. MenOCOs Patek Philippe gold calendar watch model 5035J. Insured for $28,500.

Defendants Jason Cardiff and Eunjung Cardiff shall deliver all of the foregoing articles to the Receiver at a place and time to be determined by the Receiver.

F. Obtain, conserve, hold, manage, and prevent the loss of all Documents of the Receivership Entities, and perform all acts necessary or advisable to preserve such Documents. The Receiver shall: divert mail; preserve all Documents of the Receivership Entities that are accessible via electronic means (such as online access to financial accounts and access to electronic documents held onsite or by Electronic Data Hosts, by changing usernames, passwords or other log-in credentials; take possession of all electronic Documents of the Receivership Entities stored onsite or remotely; take whatever steps necessary to preserve all such Documents; and obtain the assistance of the FTC's Digital Forensic Unit for the purpose of obtaining electronic documents stored onsite or remotely.

G. Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

H. Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as Receiver. The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Entities prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure Assets of the Receivership Entities, such as rental payments;

22

I.  Take all steps necessary to secure and take exclusive custody of each location from which the Receivership Entities operate their businesses.  Such steps may include, but are not limited to, any of the following, as the Receiver deems necessary or advisable:  (1) securing the location by changing the locks and alarm codes and disconnecting any Internet access or other means of access to the computers, servers, internal networks, or other records maintained at that location; and (2) requiring any persons present at the location to leave the premises, to provide the Receiver with proof of identification, and/or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises Documents or Assets of the Receivership Entities, including, but not limited to, telephones, computers, and tablets paid for by the Receivership Entities.  Law enforcement personnel, including, but not limited to, police or sheriffs, may assist the Receiver in implementing these provisions in order to keep the peace and maintain security.  If requested by the Receiver, the United States Marshal will provide appropriate and necessary assistance to the Receiver to implement this Order and is authorized to use any necessary and reasonable force to do so;

J.  Take all steps necessary to prevent the modification, destruction, or erasure of any web page or website registered to and operated, in whole or in part, by any Defendants, and to provide access to all such web page or websites to Plaintiff's representatives, agents, and assistants, as well as Defendants and their representatives;

K.  Enter into and cancel contracts and purchase insurance as advisable or necessary;

L.  Prevent the inequitable distribution of Assets and determine, adjust, and protect the interests of consumers who have transacted business with the Receivership Entities;

23

M.     Make an accounting, as soon as practicable, of the Assets and financial condition of the receivership and file the accounting with the Court and deliver copies thereof to all parties;

N.     Institute, compromise, adjust, appear in, intervene in, defend, dispose of, or otherwise become party to any legal action in state, federal or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Entities, or to carry out the Receiver's mandate under this Order, including, but not limited to, actions challenging fraudulent or voidable transfers;

O.     Issue subpoenas to obtain Documents and records pertaining to the Receivership, and conduct discovery in this action on behalf of the receivership estate, in addition to obtaining other discovery as set forth in this Order;

P.     Open one or more bank accounts at designated depositories for funds of the Receivership Entities.  The Receiver shall deposit all funds of the Receivership Entities in such designated accounts and shall make all payments and disbursements from the receivership estate from such accounts.  The Receiver shall serve copies of monthly account statements on all parties;

Q.     Maintain accurate records of all receipts and expenditures incurred as Receiver;

R.     Allow Plaintiffs' representatives, agents, and assistants, as well as Defendants' representatives and Defendants themselves, reasonable access to the premises of the Receivership Entities, or any other premises where the Receivership Entities conduct business.  The purpose of this access shall be to inspect and copy any and all books, records, Documents, accounts, and other property owned by, or in the possession of, the Receivership Entities or their agents.  The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access;

S.     Allow Plaintiffs' representatives, agents, and assistants, as well as Defendants and their representatives reasonable access to all Documents in the possession, custody, or control of the Receivership Entities;

T.     Cooperate with reasonable requests for information or assistance from any state or federal civil or criminal law enforcement agency;

U.     Suspend business operations of the Receivership Entities if in the judgment of the Receiver such operations cannot be continued legally and profitably;

V.     If the Receiver identifies a nonparty entity as a Receivership Entity, promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court. Provided, however, that the Receiver may delay providing such notice until the Receiver has established control of the nonparty entity and its assets and records, if the Receiver determines that notice to the entity or the parties before the Receiver establishes control over the entity may result in the destruction of records, dissipation of assets, or any other obstruction of the Receiver's control of the entity;

W.     If in the Receiver's judgment the business operations cannot be continued legally and profitably, take all steps necessary to ensure that any of the Receivership Entities' web pages or websites relating to the activities alleged in the Complaint cannot be accessed by the public, or are modified for consumer education and/or informational purposes, and take all steps necessary to ensure that any telephone numbers associated with the Receivership Entities cannot be accessed by the public, or are answered solely to provide consumer education or information regarding the status of operations; and

X.     Report to this Court on or before the date set for the hearing to Show Cause regarding the Preliminary Injunction or as otherwise directed by the Court, regarding: (1) the steps taken by the Receiver to implement the terms of the Order;

(2) the value of all assets and sum of all liabilities of the Receivership Entities; (3) the steps the Receiver intends to take in the future to protect receivership assets, recover receivership assets from third parties, and adjust receivership liabilities; (4) the Receiver's opinion on whether any portion of the business of any of the Receivership Entities can continue to operate legally and profitably; and (5) any other matters that the Receiver believes should be brought to the Court's attention.

## XVII. TRANSFER OF RECEIVERSHIP PROPERTY TO RECEIVER

**IT IS FURTHER ORDERED** that Defendants and any other person with possession, custody or control of (1) property of, or records relating to, the Receivership Entities or (2) the Assets of Jason Cardiff or Eunjung Cardiff or any trusts for which they are beneficiaries or trustees, shall, upon notice of this Order by personal service or otherwise, fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the Assets and Documents of the Receivership Entities and the Assets of Jason Cardiff or Eunjung Cardiff and immediately provide, transfer, or deliver to the Receiver possession, custody, and control of, the following:

A.      All Assets held by or for the benefit of the Receivership Entities or of Jason Cardiff or Eunjung Cardiff, except for real property used as the residence of Jason Cardiff and Eunjung Cardiff;

B.      All Documents or Assets associated with credits, debits, or charges made on behalf of any Receivership Entity, wherever situated, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales organizations, third party processors, payment gateways, insurance companies, or other entities;

C.      All Documents of or pertaining to the Receivership Entities or to the Assets of Jason Cardiff or Eunjung Cardiff;

D.      All computers, electronic devices, mobile devices, and machines used to conduct the business of the Receivership Entities;

26

E.     All Assets and Documents belonging to other persons or entities whose interests are under the direction, possession, custody, or control of the Receivership Entities; and

F.     All keys, codes, user names, passwords, and all other means of authentication necessary to gain or to secure access to any Assets or Documents of or pertaining to the Receivership Entities, including access to their business premises, means of communication, mobile phones, accounts, computer systems (onsite and remote), Electronic Data Hosts, or other property.

In the event that any person or entity fails to deliver or transfer any Asset, Document, or otherwise fails to comply with any provision of this Section, the Receiver may file an Affidavit of Non-Compliance regarding the failure and a motion seeking compliance or a contempt citation.

## XVIII.     PROVISION OF INFORMATION TO RECEIVER

**IT IS FURTHER ORDERED** that Receivership Entities and Jason Cardiff and Eunjung Cardiff shall immediately provide to the Receiver:

A.     A list of all Assets and accounts of the Receivership Entities that are held in any name other than the name of a Receivership Entity, or by any person or entity other than a Receivership Entity;

B.     A list of all Assets and accounts of Jason Cardiff and Eunjung Cardiff that are held in any name other than their own names, or by any person or entity other than themselves;

C.     A list of all agents, employees, officers, attorneys, servants and those persons in active concert and participation with the Receivership Entities, or who have been associated or done business with the Receivership Entities; and

D.     A description of any documents covered by attorney-client privilege or attorney work product, including files where such documents are likely to be located, authors or recipients of such documents, and search terms likely to identify such electronic documents.

27

# XIX. COOPERATION WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Defendants, Receivership Entities, Defendants' or Receivership Entities' officers, agents, employees, and attorneys, all other persons in active concert or participation with any of them, and any other person with possession, custody, or control of:

1. Receivership Property or records relating to Receivership Property; or

2. Other records relating to the Receivership Entities;

who receive actual notice of this Order shall fully cooperate with and assist the Receiver. This cooperation and assistance shall include, but is not limited to, providing information to the Receiver that the Receiver deems necessary to exercise the authority and discharge the responsibilities of the Receiver under this Order; providing any keys, codes, user names, passwords, and all other means required to access any computers, electronic devices, mobile devices, machines (onsite or remotely), and any cloud account (including specific method to access account) or electronic file in any medium; advising all persons who owe money to any Receivership Entity that all debts should be paid directly to the Receiver; and transferring funds at the Receiver's direction and producing records related to the Receivership Property and sales of the Receivership Entities.

# XX. NON-INTERFERENCE WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Defendants, Receivership Entities, Defendants' or Receivership Entities' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and any other person served with a copy of this Order, are hereby restrained and enjoined from directly or indirectly:

A. Interfering with the Receiver's efforts to manage, or take custody, control, or possession of, the Assets or Documents subject to the receivership;

B. Transacting any of the business of the Receivership Entities;

C.      Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any Assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Receivership Entities, Jason Cardiff, or Eunjung Cardiff; or

D.      Refusing to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court.

## XXI.  STAY OF ACTIONS

**IT IS FURTHER ORDERED** that, except by leave of this Court, during the pendency of the receivership ordered herein, Defendants, Defendants' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and their corporations, subsidiaries, divisions, or affiliates, and all investors, creditors, stockholders, lessors, customers and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons, are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the Assets or Documents of the Receivership Entities or over the assets of Jason Cardiff and Eunjung Cardiff, including, but not limited to:

A.      Filing or assisting in the filing of a petition for relief under the Bankruptcy Code, 11 U.S.C. § 101 et seq., or of any similar insolvency proceeding on behalf of the Receivership Entities;

B.      Commencing, prosecuting, or continuing a judicial, administrative, or other action or proceeding against the Receivership Entities, including the issuance or employment of process against the Receivership Entities, except that such actions may be commenced if necessary to toll any applicable statute of limitations;

C.     Filing or enforcing any lien on any Asset of the Receivership Entities, taking or attempting to take possession, custody, or control of any Asset of the Receivership Entities, Jason Cardiff, or Eunjung Cardiff; or attempting to foreclose, forfeit, alter, or terminate any interest in any Asset of the Receivership Entities, Jason Cardiff, or Eunjung Cardiff, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise.

Provided, however, that this Order does not stay: (1) the commencement or continuation of a criminal action or proceeding; (2) the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; or (3) the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

## XXII. COMPENSATION OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by, in the possession or control of, or which may be received by, the Receivership Entities, Jason Cardiff, or Eunjung Cardiff. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of entry of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

## XXIII.  RECEIVER'S BOND

**IT IS FURTHER ORDERED** that the Receiver shall file with the Clerk of this Court a bond in the sum of $15,000 with sureties to be approved by the Court, conditioned that the Receiver will well and truly perform the duties of the office and abide by and perform all acts the Court directs.  28 U.S.C. § 754.

## XXIV.  IMMEDIATE ACCESS TO BUSINESS PREMISES AND RECORDS

**IT IS FURTHER ORDERED** that:

A.	In order to allow Plaintiff and the Receiver to preserve Assets and evidence relevant to this action and to expedite discovery, Plaintiff and the Receiver, and their representatives, agents, contractors, and assistants, shall have immediate access to the business premises and storage facilities, owned, controlled, or used by the Receivership Entities.  Such locations include, but are not limited to:  820 North Mountain Ave., Suite 100, Upland, CA 91786; 870 North Mountain Ave., Suites 115 and 118, Upland, CA 91786; any additional business locations if they are discovered during the immediate access, and any offsite location or commercial mailbox used by the Receivership Entities.  The Receiver may exclude Defendants, Receivership Entities, and their employees from the business premises during the immediate access.

B.	Plaintiff and the Receiver, and their representatives, agents, contractors, and assistants, are authorized to remove Documents from the Receivership Entities' premises in order that they may be inspected, inventoried, and copied.  Plaintiff shall return any removed materials to the Receiver within five (5) business days of completing inventorying and copying, or such time as is agreed upon by Plaintiff and the Receiver;

C.	Plaintiff's access to the Receivership Entities' documents pursuant to this Section shall not provide grounds for any Defendant to object to any subsequent request for documents served by Plaintiff.

D.      Plaintiff and the Receiver, and their representatives, agents, contractors, and assistants, are authorized to obtain the assistance of federal, state and local law enforcement officers as they deem necessary to effect service and to implement peacefully the provisions of this Order;

E.      If any Documents, computers, or electronic storage devices containing information related to the business practices or finances of the Receivership Entities are at a location other than those listed herein, including personal residence(s) of any Defendant, then, immediately upon receiving notice of this order, Defendants and the Receivership Entities shall produce to the Receiver all such Documents, computers, and electronic storage devices, along with any codes or passwords needed for access.  In order to prevent the destruction of computer data, upon service of this Order, any such computers or electronic storage devices shall be powered down in the normal course of the operating system used on such devices and shall not be powered up or used until produced for copying and inspection; and

F.      If any communications or records of any Receivership Entity are stored with an Electronic Data Host, such Entity shall, immediately upon receiving notice of this order, provide the Receiver with the username, passwords, and any other login credential needed to access the communications and records, and shall not attempt to access, or cause a third party to attempt to access, the communications or records.

## XXV.  DISTRIBUTION OF ORDER BY DEFENDANTS

**IT IS FURTHER ORDERED** that Defendants shall immediately provide a copy of this Order to each affiliate, telemarketer, marketer, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, attorney, spouse, subsidiary, division, and representative of any Defendant, and shall, within ten (10) days from the date of entry of this Order, provide Plaintiff and the Receiver with a sworn statement that this provision of the Order has been

satisfied, which statement shall include the names, physical addresses, phone number, and email addresses of each such person or entity who received a copy of the Order. Furthermore, Defendants shall not take any action that would encourage officers, agents, members, directors, employees, salespersons, independent contractors, attorneys, subsidiaries, affiliates, successors, assigns or other persons or entities in active concert or participation with them to disregard this Order or believe that they are not bound by its provisions.

## XXVI. EXPEDITED DISCOVERY

**IT IS FURTHER ORDERED** that, notwithstanding the provisions of Fed. R. Civ. P. 26(d) and (f) and 30(a)(2)(A)(iii), and pursuant to Fed. R. Civ. P. 30(a), 34, and 45, Plaintiff and the Receiver are granted leave, at any time after service of this Order, to conduct limited expedited discovery for the purpose of discovering: (1) the nature, location, status, and extent of Defendants' Assets; or (2) compliance with this Order. The limited expedited discovery set forth in this Section shall proceed as follows:

A. Plaintiff and the Receiver may take the deposition of parties and non-parties. Forty-eight (48) hours notice shall be sufficient notice for such depositions. The limitations and conditions set forth in Rules 30(a)(2)(B) and 31(a)(2)(B) of the Federal Rules of Civil Procedure regarding subsequent depositions of an individual shall not apply to depositions taken pursuant to this Section. Any such deposition taken pursuant to this Section shall not be counted towards the deposition limit set forth in Rules 30(a)(2)(A) and 31(a)(2)(A) and depositions may be taken by telephone or other remote electronic means.

B. Plaintiff and the Receiver may serve upon parties requests for production of Documents or inspection that require production or inspection within five (5) days of service, provided, however, that three (3) days of notice shall be deemed sufficient for the production of any such Documents that are maintained or stored only in an electronic format.

C.     Plaintiff and the Receiver may serve upon parties interrogatories that require response within five (5) days after Plaintiff serves such interrogatories.

D.     Plaintiff and the Receiver may serve subpoenas upon non-parties that direct production or inspection within five (5) days of service.

E.     Service of discovery upon a party to this action, taken pursuant to this Section, shall be sufficient if made by facsimile, email, or by overnight delivery.

F.     Any expedited discovery taken pursuant to this Section is in addition to, and is not subject to, the limits on discovery set forth in the Federal Rules of Civil Procedure and the Local Rules of this Court.  The expedited discovery permitted by this Section does not require a meeting or conference of the parties, pursuant to Rules 26(d) & (f) of the Federal Rules of Civil Procedure.

G.     The Parties are exempted from making initial disclosures under Fed. R. Civ. P. 26(a)(1) until further order of this Court.

## XXVII.  SERVICE OF THIS ORDER

**IT IS FURTHER ORDERED** that copies of this Order as well as Plaintiff's *Ex Parte* Application For (1) A Temporary Restraining Order And Order To Show Cause Why A Preliminary Injunction Should Not Issue And (2) Order Waiving Notice Requirement and all other pleadings, Documents, and exhibits filed contemporaneously with that Application (other than the complaint and summons), may be served by any means, including facsimile, electronic mail or other electronic messaging, personal or overnight delivery, U.S. Mail or FedEx, by agents and employees of Plaintiff, by any law enforcement agency, or by private process server, upon any Defendant or any person (including any financial institution) that may have possession, custody or control of any Asset or Document of any Defendant, or that may be subject to any provision of this Order pursuant to Rule 65(d)(2) of the Federal Rules of Civil Procedure.  For purposes of this Section, service upon any branch, subsidiary, affiliate or office of any entity shall effect service upon the entire entity.

34

## XXVIII.  CORRESPONDENCE AND SERVICE ON PLAINTIFF

**IT IS FURTHER ORDERED** that, for the purpose of this Order, all correspondence and service of pleadings on Plaintiff shall be addressed to:

> Elizabeth Sanger
> James A. Prunty
> Edwin Rodriguez
> Shira D. Modell
> Federal Trade Commission
> 600 Pennsylvania Ave., NW
> Washington, DC 20580
> Tel: (202) 326-2757, -2438, -3147, -3116
> Fax: (202) 326-3259
> Email:  esanger@ftc.gov; jprunty@ftc.gov; erodriguez@ftc.gov; smodell@ftc.gov

## XXIX.  PRELIMINARY INJUNCTION HEARING

**IT IS FURTHER ORDERED** that, pursuant to Fed. R. Civ. P. 65(b), Defendants shall appear before this Court on the 23rd day of October, 2018, at 2:00 p.m. to show cause, if there is any, why this Court should not enter a preliminary injunction, pending final ruling on the Complaint against Defendants, enjoining the violations of the law alleged in the Complaint, continuing the freeze of the Defendants' Assets, continuing the receivership, and imposing such additional relief as may be appropriate.

## XXX.  BRIEFS AND AFFIDAVITS CONCERNING PRELIMINARY INJUNCTION

**IT IS FURTHER ORDERED** that:

A.      Defendants shall file with the Court and serve on Plaintiff's counsel any answering pleadings, affidavits, motions, expert reports or declarations, or legal memoranda no later than **four (4) days** prior to the order to show cause hearing scheduled pursuant to this Order.  Plaintiff may file responsive or supplemental pleadings, materials, affidavits, or memoranda with the Court and serve the same on counsel for Defendants no later than **one (1) day** prior to the

order to show Cause hearing. Provided that such affidavits, pleadings, motions, expert reports, declarations, legal memoranda, or oppositions must be served by personal or overnight delivery, facsimile or email, and be received by the other party or parties no later than 5:00 p.m. Pacific Time on the appropriate dates set forth in this Section.

B.    An evidentiary hearing on Plaintiff's request for a preliminary injunction is not necessary unless Defendants demonstrate that they have, and intend to introduce, evidence that raises a genuine and material factual issue. The question of whether this Court should enter a preliminary injunction shall be resolved on the pleadings, declarations, exhibits, and memoranda filed by, and oral argument of, the parties. Live testimony shall be heard only on further order of this Court. Any motion to permit such testimony shall be filed with the Court and served on counsel for the other parties at least five (5) days prior to the preliminary injunction hearing in this matter. Such motion shall set forth the name, address, and telephone number of each proposed witness, a detailed summary or affidavit revealing the substance of each proposed witness's expected testimony, and an explanation of why the taking of live testimony would be helpful to this Court. Any papers opposing a timely motion to present live testimony or to present live testimony in response to another party's timely motion to present live testimony shall be filed with this Court and served on the other parties at least three (3) days prior to the order to show cause hearing.

Provided, however, that service shall be performed by personal or overnight delivery, facsimile, or email, and Documents shall be delivered so that they shall be received by the other parties no later than 5:00 p.m. Pacific Time on the appropriate dates provided in this Section.

## XXXI.  DURATION OF THE ORDER

**IT IS FURTHER ORDERED** that this Order shall expire fourteen (14) days from the date of entry noted below, unless within such time, the Order is extended for an additional period pursuant to Fed. R. Civ. P. 65(b)(2).

## XXXII.  RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes.

SO ORDERED, this 10th day of October, 2018 @ 3:00 p.m.

_S. Jame Oteis_

_____

UNITED STATES DISTRICT JUDGE

37

# EXHIBIT 3

1  Michael Gerard Fletcher (State Bar No. 070849)
    mfletcher@frandzel.com
2  Craig A. Welin (State Bar No.138418)
    cwelin@frandzel.com
3  Hal D. Goldflam  (State Bar No.179689)
    hgoldflam@frandzel.com
4  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   1000 Wilshire Boulevard, Nineteenth Floor
5  Los Angeles, California 90017-2427
   Telephone: (323) 852-1000
6  Facsimile: (323) 651-2577

7  Attorneys for Receiver ROBB EVANS
   AND ASSOCIATES LLC

8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                         WESTERN DIVISION

12

13  FEDERAL TRADE COMMISSION,          Case No. 5:18-cv-02104-SJO-PLA

14            Plaintiff,               **REPORT OF RECEIVER'S
                                       ACTIVITIES FOR THE PERIOD
15        v.                           FROM OCTOBER 10, 2018
                                       THROUGH OCTOBER 31, 2018**
16  JASON CARDIFF, et al.,
                                       [NO HEARING ASSIGNED]
17            Defendants.

18

19

20

21

22

23

24

25

26

27

28

TO: THE HONORABLE S. JAMES OTERO, JUDGE OF THE UNITED STATES DISTRICT COURT.

Robb Evans & Associates LLC, Receiver in the above-entitled matter, herewith submits its Report of Activities for the period from October 10, 2018 through October 31, 2018.

DATED: November 1, 2018     FRANDZEL ROBINS BLOOM & CSATO, L.C.
MICHAEL GERARD FLETCHER
CRAIG A. WELIN
HAL D. GOLDFLAM

By:    /s/ Hal D. Goldflam
_____
HAL D. GOLDFLAM
Attorneys for Receiver ROBB
EVANS & ASSOCIATES LLC

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

2

**Robb Evans & Associates LLC**
**Receiver of**
**Redwood Scientific Technologies, Inc. et al.**

**REPORT OF RECEIVER'S ACTIVITIES**
**OCTOBER 10, 2018 THROUGH OCTOBER 31, 2018**

This report covers the activities of the Receiver[1] since the inception of the receivership. This is the first report to the Court on the progress of the receivership. It does not constitute an audit of financial condition and is intended only to provide information for use by the Court in assessing the progress of the receivership.

## Overview

This report will describe the steps taken by the Receiver to implement the terms of the Temporary Restraining Order (TRO). This report will also describe the destruction of Receivership Entity records in May 2018 on orders from Jason Cardiff and an additional potential violation of the TRO.

## Custody, Control, and Possession

On October 12, 2018 the Receiver took control of the business premises located at 820 and 870 North Mountain Ave. in Upland, CA. There was one employee present at 820 North Mountain Ave., Suite 100. Offices for Individual Defendants Jason Cardiff and Eunjung Cardiff are at Suite 100.

Jason Cardiff was present at 870 North Mountain Ave., Suite 115. Upon seeing the TRO, he advised the Receiver that the office was that of People United for Christians (PUFC), which was not mentioned in the paperwork he saw.

As set forth below, the operations of Redwood Scientific Technologies, Inc. (Redwood) and the PUFC are intertwined and comingled.

The Receiver interviewed five individuals at 870 North Mountain Ave.

The first individual interviewed by the Receiver stated that he worked as a warehouse worker and sales representative for Redwood. He stated his primary job was to move the Redwood

---

[1] Reference to the Receiver in this report means the Receiver, the Receiver's deputies, and staff.

inventory located in that entity's warehouse across the hall into a small office located in Suite 115 that had been set up with shelves for inventory. He did not know why he was moving inventory owned by one company into a suite purportedly occupied by PUFC. In addition to relocating inventory, he stated he made sales calls on companies in the area for the purpose of selling dissolvable film strips to aid in smoking cessation, weight loss, sleep aid, and improved sexual performance for men and women.

The other four individuals that were interviewed by the Receiver all stated they worked for PUFC. The Receiver learned that PUFC is a "virtual ministry" whose message was delivered by Mr. Cardiff, the Master Prophet. Mr. Cardiff exclusively determined the ministry's message through solicitation campaigns which he took from a library of previously used campaigns found in one of the offices.

Two of the four individuals were part time and only worked when called in and the other two were permanent, salaried employees. All four employees worked on solicitation campaigns for PUFC, one preparing art work, others preparing the mailers with the inclusion of religious symbols in the mailings. The Receiver observed that the employees were cutting small swatches of cheesecloth representing an item of religious significance. One full-time employee and one part-time employee also did computer input reflecting the amount of money received for a particular campaign. This input entailed taking information off of the front of empty return envelopes that Defendant Eunjung Cardiff sent to the suite after opening them and removing the money in them. The envelopes had the sender's name and address in the upper left hand corner. In the lower left hand corner there was a code for the marketing campaign the envelope was returned on. Hand written on the right side of the envelope was a number representing the amount of money received in that envelope.

One employee told the Receiver that in August, 2018 there was a meeting with all employees of Redwood and PUFC where it was announced to employees they would begin selling medical marijuana (CBD) dissolvable film strips. When that company required help in packaging that product, PUFC employees would go to 820 North Mountain and work there. The four PUFC employees were always paid by PUFC, even when work was done for Redwood, although the individual responsible for keeping track of employee time used an internal code to designate which hours in the pay period were worked at Redwood and which at PUFC. One PUFC employee listed her supervisor as Julie. The only Julie the Receiver was able to locate in the records is on the payroll report for Redwood.

Employees of PUFC stated that after the third quarter, 2017, employees did not receive checks with paystubs and that at year end they did not receive 2017 W-2 reports for their use in completing their taxes. The employee stated that when she pressed Mr. Cardiff, he became very angry and referred her to a Redwood supervisor who told her PUFC had not reported any information to the Internal Revenue Service and therefore, the employees did not need to either.

In addition, the Receiver observed a substantial amount of Redwood paper records located in the 870 Mountain Ave. suites. Some file cabinets contained records for both Redwood and the ministry.

The 870 Mountain Ave. suites are leased to Intel Property LLC, a Wyoming Limited Liability Company. The Guarantor on this lease is Redwood.

Defendant Danielle Cadiz, who is on Redwood's payroll, is listed as Manager on the application for Messengers for Christ World Healing's post office box application (Exhibit 1). This post office box receives mail from solicitations made by PUFC.

The Receivership Entities utilize Google Suites for email and for their documents. The Receiver took steps to change the administrative password for Google Suites and restricted access by anyone not authorized by the Receiver. Representatives of the Federal Trade Commission (FTC) commenced a forensic image of the data contained in Google Suites.

The Receivership Entities utilize QuickBooks for their accounting system. The Receiver accessed and downloaded the QuickBooks data.

The Receiver changed the locks to all of the office suites and took control of the mail.

## Interview with Jason Cardiff

On October 12, 2018 the Receiver met with Mr. Cardiff and explained to him the asset freeze provisions and the duties of the Receiver as detailed in the TRO[2].

Mr. Cardiff told the Receiver that credit card merchant processors for the Receivership Entities had terminated processing several months ago and there were no current merchant processing accounts. He stated that as a result the total sales for last month were about $7,000.

The Receiver directed Mr. Cardiff to Section XVI. paragraph E. of the TRO which requires the Receiver to take custody, control, and possession of various valuable articles. Mr. Cardiff told the Receiver that all of the items listed in the TRO had been liquidated over the past few years. He first said the items had been liquidated over the last two to three years and then later said over the last four to five years. He further stated that everything was sold for cash at pawn shops overseas and most items were sold at pawn shops in London. He also told the Receiver that he had no records reflecting the sale of any of the assets detailed in the TRO. The Receiver then asked Mr. Cardiff about item 25, his wife's (defendant Eunjung Cardiff) 8.5 carat diamond ring which is insured for $532,000. In response, Mr. Cardiff explained that the

---

[2] Tracy Green, Esq., an attorney who is representing Mr. Cardiff in the discovery dispute with the FTC, was on a speaker phone during this interview. Ms. Green reinforced the Receiver's explanation of the TRO, including the asset freeze provisions.

ring was sold in Abu Dhabi and proceeds of the sale were wire transferred to a trust in the Cook Islands. He stated there are currently no funds in the trust because the funds were wire transferred back to the United States to fund business operations. In response to further questions from the Receiver, he stated that neither he nor his wife is a trustee of the Cook Islands trust and he does not know how the trust works or who provides instructions to the trust to transfer funds.

The Receiver obtained a current insurance policy for the jewelry from Roger Stone Insurance agency. The policy period is from February 11, 2018 to February 11, 2019 and the annual premium is $16,868.77. The coverage still includes the 8.5 carat diamond ring discussed above (Exhibit 2, Item#27 on page 2).

The Receiver will investigate this issue further, but has preliminarily concluded that Mr. Cardiff's explanation about the disposition of these valuable assets that remain insured and the operation of the Cook Islands trust strains credibility and truthfulness.

## Interview with Danielle Walker a/k/a Danielle Cadiz

On October 27, 2018 the Receiver interviewed Danielle Walker. Ms. Walker was the former Operations Director of Redwood and provided a great deal of information to the Receiver.

The Receiver asked Ms. Walker if Mr. Cardiff or anyone else issued instructions to destroy computer files after receiving the FTC's Civil Investigative Demand (CID) in August 2017. Ms. Walker told the Receiver that Redwood received an additional CID in May of 2018. According to Ms. Walker, the May 2018 CID contained a list of key words. The CID instructed Redwood to search all computer files for these key words and to produce any responsive documents to the FTC. Ms. Walker told the Receiver that Mr. Cardiff instructed Redwood's employees to search their documents for these key words and to delete any documents with any of the key words. According to Ms. Walker, Mr. Cardiff said "that if the FTC got a hold of anything with key words, especially those that discussed 88%, we would all be in a lot of trouble and we would lose everything."

## Business Activities Prohibited by the Temporary Restraining Order

The TRO directs that any material fact about the defendants' products including TBX-FREE, Eupepsia Thin, or Prolongz may not be misrepresented, expressly or by implication including, but not limited to, claims that:

- TBX-FREE is an effective smoking cessation product is more effective than either nicotine patches or nicotine gum;

- Eupepsia Thin is an effective appetite suppressant and weight loss aid and starts working in less than 20 seconds and suppresses a user's appetite within minutes; and
- Prolongz treats or prevents premature ejaculation.

The Receiver viewed numerous products displayed in several areas of the main office, Suite 100, including samples of TBX-FREE, Eupepsia, and Prolongz.  The Receiver also studied a six-panel color foldout Product Catalog displaying and describing these three products.  The Catalog and the product cartons have text with the prohibited claims, including… "allows smokers to stop smoking once and for all…has an 88% cure compared to the patch and gum combined; …creating the sensation of feeling full almost instantly, suppressing your appetite…easy weight loss; …homeopathic drug, which helps in the prevention of Premature Ejaculation (PE)."

Scripts posted near the desks of telephone receptionists contained similar wording to use when discussing products with in-bound callers.

## Certain Duties and Authorities of the Receiver

Included in the Court's directions to the Receiver is the Order to "Suspend business operations of the Receivership Entities if in the judgment of the Receiver such operations cannot be continued legally and profitably."  The Receiver has considered facts and issues related to each prong of this directive.

The Receiver has concluded business operations of the Receivership Entities cannot be continued lawfully.  As described above, the existing products and advertising materials contain text with claims that are prohibited by the TRO.

The Receiver has concluded business operations of the Receivership Entities cannot be continued profitably.  Financial information below fully describes the hopelessly insolvent financial condition and operation of the Receivership Entities.  In addition to negative cash balances of about $114,000, there are approximately $5.0 million in current liabilities.  Mr. Cardiff stated all liabilities are delinquent and several cash advance loans are in litigation or subject to judgment.  The audited financial statements for 2015 and 2016 from Redwood's independent auditor show accumulated losses of about $9.9 million as of December 31, 2016.  Redwood's financial records, which appear to be incomplete and not fully current, show additional net losses from January 1, 2017 through October 12, 2018 of approximately $1.99 million, indicating accumulated losses could now total about $11.9 million.  Documents on site indicate the premises rent is substantially delinquent.  The Receiver has determined there could be potential payroll tax liability claims from the Internal Revenue Service because of improperly classifying employees as independent contractors.

## Financial Information

Based on the Receiver's preliminary review and analysis of the account details recorded under Redwood's QuickBooks accounting file, the creditability of Redwoods accounting records are in doubt. Redwood's bank accounts did not appear to be properly and periodically reconciled through the current time period, and many of the accounting records appear to be outdated or transactions appear not to be properly recorded.

Advanced Men's Institute Prolongz LLC (AMI) was organized in January 2014 in California and began selling its products in February 2014. In November 2014, AMI changed its name to Redwood Scientific Technologies LLC. Immediately after the name change, Redwood Scientific Technologies LLC converted from a limited liability company into a California corporation and became Redwood Scientific Technologies Inc. (Redwood California) in January 2015.

Redwood Scientific Technologies Inc. was also incorporated in the state of Nevada on December 17, 2014 (Redwood Nevada). In January 2015, a Share Exchange Agreement was entered into between Redwood California and Jason Cardiff, the shareholder and Chief Executive Officer of Redwood California, in which Mr. Cardiff transferred 100% of Redwood California he owned to Redwood Nevada and Redwood California became a wholly owned subsidiary of Redwood Nevada.

The Receiver obtained the online access to the Receivership Entities' QuickBooks accounting from Mr. Cardiff. The QuickBooks accounting file is in the name of Redwood Scientific Technologies Inc., which appears to be the accounting records for Redwood California and Redwood Nevada (collectively referred as Redwood). The QuickBooks accounting file for Redwood is stored on the QuickBooks online website.

Redwood's QuickBooks accounting file contains multiple bank accounts, which are in the name of affiliated entities and subsidiaries other than Redwood, including but not limited to, Advanced Men's Institute Prolongz LLC (shown as "AMI"), American Nutra Partners LLC (shown as "AM Nutra Partner" or "AM Nutra P LLC"), Expo Supplements, LLC (shown as "Expo Supplements"), Nature's Future LLC (shown as "Nature's Fut LLC") Owl Enterprises, LLC (shown as "OWL"), Top Hill Shop, Ltd (shown as "Top Hill Shop"), Smoke Stop, LLC (shown as "Smoke Shop"), TV Sales LLC, and Intel Property, LLC (shown as "Checking_70"). In addition to the affiliated entities and subsidiaries above, the Receiver also discovered a binder in Mr. Cardiff's office, which contain many corporate documents along with a list of entity names (Exhibit 3), which appear to be affiliated entities of the Receivership Entities. These demonstrate that the Receivership Entities have created a complex web of affiliated entities and subsidiaries in order to open many credit card merchant processing accounts to receive revenue from consumers or to hold the assets for the Receivership Entities.

The financial statements generated from Redwood's QuickBooks accounting file, including profit and loss and balance sheet by year are under Exhibit 4 and 5.

According to Redwood's QuickBooks accounting records, the Receivership Entities generated approximately $19.6 million in gross sales from January 1, 2015 through October 12, 2018, and the refunds and chargebacks were approximately $1.38 million during the same period. The net sales revenue was approximately $18.2 million from January 1, 2015 through October 12, 2018.

The Receivership Entities' books and records show their operations have suffered significant losses since the inception of operations. All of the sales revenue was spent to cover the cost of goods sold and expenses. Cost of goods sold was approximately $3.2 million from its inception to October 12, 2018. The most significant expenses on the books were media expenses (approximately $10.2 million), advertising expenses (approximately $2.8 million) and payroll and wages (approximately $3.2 million, including payroll taxes), which totaled nearly $16 million or 77% of the total expenses. The total net losses from its inception through October 12, 2018 were approximately $6.4 million.

Redwood's balance sheet shows approximately $2.5 million in total assets as of October 12, 2018, which primarily consists of the account receivables ("AR Limelight") of $1.2 million and inter-company receivables ("Intercompany Runway") of $921,104.54. The Receiver reviewed the account details, which reflect that the last transaction for account receivables was dated July 11, 2018 and the last transaction for inter-company receivables was dated January 17, 2018, both of which appear to be outdated and not properly reconciled. Lime Light CRM, Inc. (Lime Light) is the former Customer Relationship Management System (CRM) service provider for the Receivership Entities, and the Receiver served Lime Light with the TRO and obtained the CRM data for the Receivership Entities for further assessment as discussed below.

Redwood's balance sheet shows a negative balance of $113,724.58 in cash and bank account balances as of October 12, 2018. The Receiver served the TRO on all known financial institutions and merchant processors that were used by the Receivership Entities, which is discussed in more detail below.

In addition, Redwood's balance sheet shows approximately $5.1 million in common stock, which include the capital contributions raised from the public and received from outside investors. The Receiver found a 2014 independent auditor's report, which indicates that, in 2015, Redwood Nevada began a public placement offering for a maximum of 2,222,222 units at a purchase price of $2.25 per unit. Each unit consists of one share of Redwood Nevada's common stock, par value of $0.01 per share, and a warrant to purchase the number of shares of common stock as is equal to 50% of the number of shares of common stock underlying the investor's unit at an exercise price of $2.75 per share. The Receiver also discovered a copy of the subscription escrow agreement pertaining to this public placement offering, which is under Exhibit 6.

Redwood's books and records show that all of the capital contributions received from investors were spent.  As of October 12, 2018 the books also reflect total liabilities of approximately $5 million.

As noted above, based on the Receiver's preliminary review and analysis of the account details recorded under Redwood's QuickBooks accounting file, the creditability of Redwoods accounting records are in doubt.  Redwood's bank accounts did not appear to be properly and periodically reconciled through the current time period, and many of the accounting records appear to be outdated or transactions appear not to be properly recorded.  For example, the Receiver discovered in Mr. Cardiff's office a document regarding a recent disbursement authorization dated July 18, 2018 (Exhibit 7) for the funding of $725,000, including $362,250 to Redwood, $2,750 to Legal & Compliance LLC, $35,000 to Auctus Fund Management LLC, and $325,000 to Auctus Fund LLC.   According to this authorization, Redwood authorized Auctus Fund LLC to initiate debit and credit entries to Redwood's accounts at Zions Bank.   The Receiver reviewed Redwood's QuickBooks accounting records and was unable to locate or reconcile the recording pertaining to these transactions, other than a deposit of $223,250 received on May 5, 2018, which was recorded as short-term loan – Legal and Compliance LLC but still remained as an unpaid liability on Redwood's books as of October 12, 2018.  It is unclear to the Receiver whether or not and to which account Redwood has received $362,250 or has made any payments to Auctus Fund Management LLC or Auctus Fund LLC pursuant to this authorization.

In addition, on October 22, 2018 the Receiver obtained audited financial statements for 2015 and 2016 from Redwood's Independent Auditor, EKS&H LLP.  The 2016 audited balance sheet shows accumulated losses of about $9.9 million as of December 31, 2016 (Exhibit 8), which is significantly different from $5.6[3] million shown on Redwood's QuickBooks accounting records (Exhibit 5).  The audited profit and loss statements show net losses for 2015 and 2016 of about $5.7 million and $4.2 million, respectively (Exhibit 9).   However, Redwood's profit and loss statements generated from its QuickBooks accounting file at Exhibit 4 show the net losses for 2015 and 2016 were approximately $3.3 million and $1 million, respectively.

## Customer Relationship Management (CRM)

The Receivership Entities maintained consumer data on CRM hosted by Lime Light.  Apparently, Lime Light terminated the relationship with the Receivership Entities in June 2018.

---

[3] This includes $4,589,074.18 in retained earnings as of December 31, 2016 and 2016 net loss of $1,014,432.08 shown in Exhibit 4.

The Receiver served the TRO on Lime Light and obtained the CRM data of the Receivership Entities directly from Lime Light. According to the CRM data, the product sales and sale orders were recorded from February 7, 2014 to June 15, 2018. The Receiver reviewed, compared and analyzed the sales in the CRM and the sales recorded on the books as shown below.

| Based on Redwood's QuickBooks | 2015 | 2016 | 2017 | 1/1/2018~ 6/15/2018 | TOTAL |
|---|---|---|---|---|---|
| Sales | $ 4,578,794.44 | $ 5,400,000.72 | $ 297,000.81 | $ 25,500.00 | $ 10,301,295.97 |
| Sales Limelight | - | - | 6,892,212.81 | 959,694.47 | 7,851,907.28 |
| Sales Retail | - | 73,626.60 | 1,154,725.15 | 101,199.85 | 1,329,551.60 |
| Total Sales Per Books <A> | $ 4,578,794.44 | $ 5,473,627.32 | $ 8,343,938.77 | $ 1,086,394.32 | $ 19,482,754.85 |

| Per CRM Data | 2015 | 2016 | 2017 | 1/1/2018~ 6/15/2018 | TOTAL |
|---|---|---|---|---|---|
| Approved & Shipped Sales <B> | $ 4,495,822.52 | $ 5,274,316.61 | $ 6,154,233.33 | $ 977,714.71 | $ 16,902,087.17 |
| Variances <A> - <B> | $ 82,971.92 | $ 199,310.71 | $ 2,189,705.44 | $ 108,679.61 | $ 2,580,667.68 |

Other than some timing differences, the most significant variance was likely related to retail sales, which was recorded under "Sales Retail" account.

The Receiver reviewed the sales details on the books, and it shows that Redwood recorded (under "Sales-Limelight" or "Sales" and "Account Receivable" on the books) based on CRM data on a monthly basis. Starting from 2017, they also separately recorded the retail sales (under "Sales Retail" and "AR-limelight" on the books) other than the sales. It is unclear to the Receiver if Redwood did not properly reconcile the retail sales or whether there was an overstatement of these retail sales because the books still show approximately $1.2 million in "AR-Limelight" outstanding and not collected to date (Exhibit 5).

## PUFC

PUFC was registered as a non-profit entity with the State of California on May 21, 2013. Ms. Walker told the Receiver that early in its existence, PUFC would raise money and make donations to one of the outside Board Member's charity, St. Vincent Church. When those donations ceased, the outside Board Member resigned. Ms. Walker was not aware of any other charitable donations made by PUFC because "there was never enough money in the bank." Ms. Walker stated that Mr. Cardiff obtained his solicitation mailing lists from his former father-in-law, Peter Popoff. According to information on the Internet Mr. Popoff is a televangelist who has been accused for at least the past 30 years of making deceptive or

fraudulent claims to heal sickness and promoting products such as "blessed water" and "holy sand" to potential susceptible and vulnerable viewers. The information also reports that Mr. Popoff, referring to himself as a Prophet, promised "fabulous extreme fortune" and "miracles" in exchange for donations to his organization. After a donation, multiple solicitation letters follow, requesting more donations in exchange for miracles.

Ms. Walker stated that Mr. Cardiff produced and completed three mailings each month in sets of about 76,000, 24,000, and 8,000 to consumers listed in a mailing data base. The three sets totaled about 108,000 letters. The second and third mailing sets were smaller and were directed to selected portions of the first mailing group.

The Receiver located multiple copies of a computer-generated mass-produced letter that Mr. Cardiff fashioned as a personal note to the target individuals addressed. The four-page letter came from an unidentified "Master Prophet" and included within the letter the name and address, including address barcode, of an individual the Master Prophet appeared to be on a first name basis. Further attempts to personalize the letter are in the form of faux hand written notations, check marks, underscores, asterisks, circles and encouragement to read on, in green ink. There is also an extensive use of bold type. The letter is overflowing with religious terminology, promises from God, divination of future events and assurances of money to come to the target individuals.

Text contained in letters include the following:

**The powerful events I witnessed in the spirit realm (that) reveal that your upcoming future is altogether ASTOUNDING.**

**Realize one thing: God would never direct me to write you like this if He wasn't ALREADY TAKING MEASURES TO BLESS YOU!**

**I tried to make sure that you had this MIRACULOUS ANOINTED OIL in your hands…Steps one through three involve putting the miraculous anointed oil on painful areas of the body. Step four involves putting the miraculous anointed oil on a cell phone and mailbox to facilitate the notification and receipt of money "a LARGE SUM OF MONEY sooner than you think."**

Following the promises is a strong request, almost a directive, to send a donation of $40 to $250 to "see God move with your prayer needs."

Attached at Exhibit 10 is one of several letters with similar characteristics designed to solicit donations.

The Receiver downloaded a database that purportedly contains consumer information for funds generated by direct mailing campaigns in 2018. The dates in the database begin on June 15, 2018 and end on October 12, 2018. During this time period there were 4,823 donations totaling approximately $163,000 or about an average of $40,750 per month.

The Receiver also found a copy of PUFC's QuickBooks file in the Receivership Entities' Google Suites. The Receiver reviewed PUFC's QuickBooks records (Exhibit 11), which only recorded the transactions from December 2017 to April 2018, and the total income and expenses for the same period were approximately $14,300 and $52,700, respectively. According to Ms. Walker, PUFC's QuickBooks accounting only recorded the transactions for vendor payments, and they did not record all the income received from donations.

Although the Receiver does not have sufficient information about the donation income that PUFC has collected since its inception, the personal financial information submitted by Mr. Cardiff and his wife shows that they received $2,010,000 of income from their employment from 2014 to 2018, including $1,525,000 from PUFC and $485,0000 from Redwood.

## Bank and Credit Card Merchant Processing Accounts

The Receiver has located and frozen numerous accounts in financial institutions and with credit card merchant processors. Currently, $312,942.09 is frozen in accounts with financial institutions and $248,789.07[4] is frozen in accounts with credit card merchant processors. Several financial institutions have not yet confirmed accounts subject to the TRO.

## Violations of the TRO

The Receiver filed its affidavit on non-compliance with the TRO on October 22, 2018. On October 24, 2018 this Court ordered the Cardiffs to return $8,715 to the Receiver by October 25, 2018. To date, the Cardiffs have not returned any funds to the Receiver, nor have they contacted the Receiver about returning funds.

On October 17, 2018 the Receiver was informed that a female picked up the mail at the post office box in La Verne (Exhibit 1).

On October 18, 2018 the Receiver went to the post office and showed employees pictures on Eunjung Cardiff. One employee tentatively identified Ms. Cardiff as the individual who picked up the mail the previous day. That same day, the Receiver picked up 323 envelopes that contained $5,170.72 in cash, checks, and money orders. Since the initial recovery of mail, the

---

[4] This amount may be reduced due to future credit card chargebacks initiated by consumers.

Case 5:23-cr-00021-JGB   Document 135-2   Filed 12/02/24   Page 181 of 482   Page
ID #:5711
Case 5:18-cv-02104-SJO-PLA   Document 52-2   Filed 11/01/18   Page 14 of 74   Page ID #:3207

Receiver has taken possession of an additional 1,484 envelopes than contained $20,831.02 in cash, checks and money orders.

The Receiver is continuing its investigation to determine who picked up the mail in violation of the TRO.

Respectfully submitted,

/s/

Robb Evans & Associates LLC
Receiver

# Exhibit 1

ACE ID: KN38MQ (FACILITY MANAGER/SUPERVISOR)   BOX-SECTION:  91750 - LA VERNE   10/18/2018

**** RESTRICTED INFORMATION ****   *WebBATS*

Home | Customer | Payments | Reports | Utility | Key/Combo | Locks | Tools | Help | Exit

## Edit 1093 for Boxes/Services   ⑦

The Edit 1093 for Boxes/Services page allows users to edit customer information.
For additional information, click here.

### Customer Profile

| | |
|---|---|
| Customer Number | -6063 |
| Will This Box Be Used for | ◉ Organization/Business Use |
| | ○ Residential/Personal |
| Group E Box | NO   Fee To No Fee |
| Application Date | 05/08/2013 |

Next Payment Due Date   10/31/2018

Begin Date   05/08/2013

### Applicant Information

| | |
|---|---|
| Name of Organization/Business (if applicable) | MESSENGERS FOR CHRIST WORLD HE |
| Applicant First Name | DANIELLE   MI | Last Name  CADIZ |
| Title (Required if Business) | MANAGER |
| Country | UNITED STATES OF AMERICA |
| Address Line 1 | 250 W 1ST ST   Address Line 2  STE 310 |
| Address Line 3 | |
| City | CLAREMONT   State/Province  California |
| ZIP/Postal Code | 91711   -   Telephone  [   ]  Ext. |
| Email Address | DANIELLE@OFFICEEXECS.COM   Customer Declined or No Email ☐  or date |
| Box Overflow | ☐ |
| Applicant's Client Name | |

### Identification Verification

| | |
|---|---|
| Primary Photo ID Type | DRIVER'S LICENSE   Identification No  [        ] ****2720 |
| Secondary ID Type | HOME INSURANCE POLICY   Verification Date  05/08/2013 |
| Last Verified By | LB   Report Suspicious Activity |

### Service Application

| | |
|---|---|
| PO Box   370 | Next Payment Due Date   10/31/2018 |
| Caller | |
| Reserve | |
| Key/Combo | Keys Issued   2 |
| Express Mail Reshipment ☐ | Federal Agency ☐ |
| Recurring Payment   NONE | |

### Additional Services

To add or cancel a service, please go to Customer > Additional Services > Add/Cancel Additional Services.

SIGNATURE ON FILE ☑    STREET ADDRESSING ☑

WebBATS - Edit 1093 for Boxes/Services

**STREET ADDRESSING**

| Alternate Street Address : | City: | State: |
|---|---|---|
| 3355 N WHITE AVE # 370 | LA VERNE | CA |

**11-Digit Street Address Zip Code:**

91750611695

**Additional Names**

| Individual | EUNJUNG | CARDIFF |
|---|---|---|
| Individual | MARK | SCHEIB |

**Add Individual**

First [ ] MI [ ] Last [ ]
First [ ] MI [ ] Last [ ]
First [ ] MI [ ] Last [ ]
First [ ] MI [ ] Last [ ]
First [ ] MI [ ] Last [ ]

**Add Company**

Company [ ]
Company [ ]
Company [ ]
Company [ ]
Company [ ]

Save

10/18/2018

.../webbats/pages/edit1093.do?

# Exhibit 2

Case 5:23-cv-00021-JGB_LA Document 135-2 Filed 12/03/24 Page 186 of 482 Page
Case 8:18-cv-02104-SJO-PLA Document 52-2 Filed 12/21/18 Page 19 of 76 Page ID #:5212
ID #:5716

# Personal Collections Renewal Policy

Prepared For: Jason Cardiff and Eunjung Cardiff

Date: 12/28/2017

Agency Name: Roger Stone Insurance Agency

Agency Phone Number: (949) 757-0270

12/28/2017

**Dear Jason Cardiff and Eunjung Cardiff,**

Thank you for your continued confidence in Nationwide® Private Client and Roger Stone Insurance Agency to service your insurance needs.

We are pleased to present you with your personalized renewal policy. We designed this policy to protect your assets and provide you peace of mind. When you acquire new possessions or your assets change, please advise your insurance agent so we can ensure your exposures are properly protected.

Crestbrook has formally transitioned to Nationwide Private Client. Nationwide, a Fortune 100 company based in Columbus, Ohio, is one of the largest and strongest diversified insurance and financial services organizations in the U.S. and is rated A+ by both A.M. Best and Standard & Poor's.

Delivering on our promise - in the event of a loss, our claims service is available 24/7, 365 days a year (855) 473-6410 or via email PrivateClient@nationwide.com.

If you have any questions about your policy or if you would like to know if you qualify for any additional credits or discounts, please contact your local agent.

We appreciate the opportunity to be your carrier of choice and will work hard to protect what is important to you.

Regards,

Jim Pedersen
President, Nationwide Private Client

**Private Client**

### Your Renewal Policy Declaration
**Personal Collections Policy**
Policy Number
Policy Period 02/11/2018 to 02/11/2019

Jason Cardiff and Eunjung Cardiff
700 W 25th St
Upland, CA 91784-1119

Roger Stone Insurance Agency, CA003125
5015 Birch St
Newport Beach, CA 92660-2162
(949) 757-0270

### General Policy Information
**Issued: 12/28/2017**
These Declarations are a part of the policy named above and identified by the policy number above. They supersede any Declarations issued earlier. Your Personal Collections Policy will provide the insurance described in this policy in return for the premium and compliance with all applicable policy provisions. See policy for details regarding additional coverages and policy coverage options. Coverage is provided where a premium or limit of liability is shown for the coverage(s) below or in the attached schedule.

**Policy Period From  02/11/2018  To  02/11/2019** but only if the required premium for this period has been paid and only for annual renewal periods if premiums are paid as required.  Each period begins and ends at 12:01 A.M. standard time at the Residence Premises.

### How You saved on this Policy with Nationwide Private Client

Protective Device Discount Applies
Modified Scheduled Rating Discount Applies

### Changes Made to Your Policy

Jewelry Item # 1: ONE LADIES 14K YELLOW GOLD AND DIAMOND RING Item Limit changed from 11,813 to 12,097
Jewelry Item # 2: ONE LADIES DIAMOND PENDANT SETTING 14 KT WHI Item Limit changed from 23,730 to 24,300
Jewelry Item # 3: ONE PAIR OF LADIES DIAMOND STUD EARRINGS WIT Item Limit changed from 34,125 to 34,944
Jewelry Item # 4: ONE LADIES DIAMOND FANCY RING CONTAINING 1 R Item Limit changed from 31,763 to 32,526
Jewelry Item # 5: ONE MENS ROADSTER SM WG/WG PAVED BEZEL WITH Item Limit changed from 32,550 to 33,332
Jewelry Item # 6: ONE LADIES HANDMADE PLATINUM DIAMOND BRACELE Item Limit changed from 46,725 to 47,847
Jewelry Item # 7: ONE MENS GTS 18KT WHITE GOLD DAYTONA ROLEX W Item Limit changed from 42,000 to 43,008
Jewelry Item # 8: 5.08CT ROUND DIAMOND I COLOR SI2 CLARITY EGL PLATINUM RING Item Limit

Underwritten by Crestbrook Insurance Company



Case 5:23-cv-00021-JGB_ Document 135-2 Filed 12/02/24 Page 189 of 482 Page
ID #:5719
Case 5:18-cv-02104-SJO-PLA Document 52-2 Filed 11/01/18 Page 29 of 78 Page ID #:3215

Private Client

**Your Renewal Policy Declaration**
**Personal Collections Policy**
Policy Number !
Policy Period 02/11/2018  to 02/11/2019

changed from 102,076 to 104,526
Jewelry Item # 9: ONE MENS ROLEX YACHT-MASTER 18K GOLD WATCH Item Limit changed from 14,125 to 14,464
Jewelry Item # 10: ONE LADIES LOVE BRA YELLOW GOLD 4 DIA 17CM Item Limit changed from 9,819 to 10,055
Jewelry Item # 11: ONE LADIES YELLOW GOLD RING, SERIAL #UD0824 Item Limit changed from 2,284 to 2,339
Jewelry Item # 12: ONE LADIES FANCY DIAMOND BRACELET Item Limit changed from 39,375 to 40,320
Jewelry Item # 13: MEN'S ROLEX WATCH 18KT GOLD PEARLMASTER"MAST Item Limit changed from 33,180 to 33,977
Jewelry Item # 14: 1 TIFFANY PEARL BRACELET Item Limit changed from 3,166 to 3,242
Jewelry Item # 15: ONE LADIES EMERALD AND DIAMOND RING CONTAINI Item Limit changed from 24,856 to 25,453
Jewelry Item # 16: IWC PORTOFINO MOON PHASE WATCH Item Limit changed from 8,000 to 8,192
Jewelry Item # 17: PRE-OWNER LADY'S STAINLESS STEEL PATEK PHILI Item Limit changed from 8,145 to 8,341
Jewelry Item # 18: ROLEX MODEL NAME: ROLEX VINTAGE THUND Item Limit changed from 9,000 to 9,216
Jewelry Item # 19: ONE STUART MOORE "ARONADE" PLATINUM DIAMOND Item Limit changed from 12,650 to 12,954
Jewelry Item # 20: PETER PHILIPPE ANNUAL CALENDER WRISTWATCH Item Limit changed from 41,300 to 42,292
Jewelry Item # 21: 18K YG Tiffany Diamond Bracelet - B01764 Item Limit changed from 7,600 to 7,783
FineArts Item # 22: "LIVING ROOM" ARTIST ROMERO BRITTO MEDIUM SI Item Limit changed from 12,600 to 12,903
Jewelry Item # 27: ladies ring round center stone 8.5cts, VS2 with diamonds Item Limit changed from 532,000 to 544,768
Jewelry Item # 28: MenÔÇÒs Patek Philippe gold calendar watch model 5035J Item Limit changed from 28,500 to 29,184

**PROPERTY INSURED**

**1. Scheduled Valuable Articles**

| Personal Property Class | Total Amount Of Insurance | Blanket Per Item Max Limit | Premium |
|---|---|---|---|
| Jewelry | $1,125,160 | | $16,675.36 |
| Fine Arts with 10% Earthquake Deductible | $12,903 | | $13.41 |
| Collectibles with 10% Earthquake Deductible | $40,000 | | $180.00 |

Underwritten by Crestbrook Insurance Company

P 1502 (01-13)
Page  2



**Your Renewal Policy Declaration**
**Personal Collections Policy**
Policy Number
Policy Period 02/11/2018 to 02/11/2019

**2. Blanket Coverage**

| | |
|---|---|
| **Total Annual Premium:** | **$16,868.77** |

**SCHEDULE OF PERSONAL PROPERTY ITEMS INSURED**

"Refer to Schedule of Valuable Articles"

**FORMS AND ENDORSEMENTS MADE PART OF POLICY**

G8000 01/13 Privacy statement - Crestbrook
G8021CA 02/14 Summary of Rights
G8018CA 02/14 Important Information for California Policyholders
P9003CA 02/14 California Amendatory Endorsement
G8019CA 02/14 Premium Refund Disclosure - California
P1400 01/13 Personal Collections Policy
P9012 01/13 Schedule of Valuable Articles

**Issued By: Nationwide Private Client**
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 8877 North Gainey Center Drive • Scottsdale, Arizona 85258
A stock company wholly owned by Nationwide Mutual Insurance Company

**How to Contact Us:**
24-Hours Claims Reporting       1-855-473-6410

Underwritten by Crestbrook Insurance Company



Case 5:23-cv-00021-JGB_A Document 185-2 Filed 12/03/24 Page 191 of 482 Page
ID #:5721
Case 8:18-cv-01204-SJO-PLA Document 52-1 Filed 10/31/18 Page 206 of 75 Page ID #:217

Crestbrook Insurance Company

## SCHEDULE OF VALUABLE ARTICLES

| Item Number | Property/Class | Limit of Liability | Description |
|---|---|---|---|
| 1 | Jewelry | $ 12097 | ONE LADIES 14K YELLOW GOLD AND DIAMOND RING |
| 2 | Jewelry | $ 24300 | ONE LADIES DIAMOND PENDANT SETTING 14 KT WHI |
| 3 | Jewelry | $ 34944 | ONE PAIR OF LADIES DIAMOND STUD EARRINGS WIT |
| 4 | Jewelry | $ 32526 | ONE LADIES DIAMOND FANCY RING CONTAINING 1 R |
| 5 | Jewelry | $ 33332 | ONE MENS ROADSTER SM WG/WG PAVED BEZEL WITH |
| 6 | Jewelry | $ 47847 | ONE LADIES HANDMADE PLATINUM DIAMOND BRACELE |
| 7 | Jewelry | $ 43008 | ONE MENS GTS 18KT WHITE GOLD DAYTONA ROLEX W |
| 8 | Jewelry | $ 104526 | 5.08CT ROUND DIAMOND I COLOR SI2 CLARITY EGL PLATINUM RING |
| 9 | Jewelry | $ 14464 | ONE MENS ROLEX YACHT-MASTER 18K GOLD WATCH |
| 10 | Jewelry | $ 10055 | ONE LADIES LOVE BRA YELLOW GOLD 4 DIA 17CM |
| 11 | Jewelry | $ 2339 | ONE LADIES YELLOW GOLD RING, SERIAL #UD0824 |
| 12 | Jewelry | $ 40320 | ONE LADIES FANCY DIAMOND BRACELET |
| 13 | Jewelry | $ 33977 | MEN'S ROLEX WATCH 18KT GOLD PEARLMASTER"MAST |

1

Crestbrook Insurance Company

P9012 (01-13)

## SCHEDULE OF VALUABLE ARTICLES

| Item Number | Property/Class | Limit of Liability | | Description |
|---|---|---|---|---|
| 14 | Jewelry | $ | 3242 | 1 TIFFANY PEARL BRACELET |
| 15 | Jewelry | $ | 25453 | ONE LADIES EMERALD AND DIAMOND RING CONTAINI |
| 16 | Jewelry | $ | 8192 | IWC PORTOFINO MOON PHASE WATCH |
| 17 | Jewelry | $ | 8341 | PRE-OWNER LADY'S STAINLESS STEEL PATEK PHILI |
| 18 | Jewelry | $ | 9216 | ROLEX MODEL NAME: ROLEX VINTAGE THUND |
| 19 | Jewelry | $ | 12954 | ONE STUART MOORE "ARONADE" PLATINUM DIAMOND |
| 20 | Jewelry | $ | 42292 | PETER PHILIPPE ANNUAL CALENDER WRISTWATCH |
| 21 | Jewelry | $ | 7783 | 18K YG Tiffany Diamond Bracelet - B01764 |
| 22 | Fine Arts | $ | 12903 | "LIVING ROOM" ARTIST ROMERO BRITTO MEDIUM SI |
| 25 | Collectibles | $ | 20000 | Hermes Birkin Bag, size 35, Togo leather in Sienna color |
| 26 | Collectibles | $ | 20000 | Hermes Togo Birkin bag size 35 in Curry |
| 27 | Jewelry | $ | 544768 | ladies ring round center stone 8.5cts, VS2 with diamonds |
| 28 | Jewelry | $ | 29184 | MenÔÇÖs Patek Philippe gold calendar watch model 5035J |

# Exhibit 3

## TABLE OF CONTENTS

| 1 | Direct Management Service | 13 | MARF DBA Clean Water for Life |
|---|---|---|---|
| | Diversified Gold Group | | Messenger for Christ UK |
| | Eco Glass | | New Era Ministries |
| 4 | Faith Time Inc. | 16 | New Income Now |
| | Fast Forward Media | | Real Deal Products |
| | First Choice Media Inc. | | Riley Aviation |
| 7 | FCM Direct Sales, Inc. | 19 | Run Away Media |
| | (a)First Choice Media DTH Inc. (b) G2 Broadcasting | | Run Away Products DBA Lash 28 |
| | JCardiff Corp. | | Tyrant Management Group |
| 10 | Kelly Media Group, Inc. | 22 | Vertex Watch Inc. |
| | Kelly Product Group PTY | | Vertex Watch Ltd. UK |
| | Medical Aid Research Fund | | Ukams Aka First Choice Media Direct Sales |

# Exhibit 4

Case 5:23-cv-00021-JGB Document 185-2 Filed 12/02/24 Page 196 of 482 Page ID #:5726
Case 8:18-cv-01604-SJO-FLA Document 52 Filed 11/01/18 Page 29 of 76 Page ID #:3222

Page 1 of 3

**Redwood Scientific Technologies Inc.**
**Profit & Loss**
All Transactions
Downloaded from its QuickBooks Accounting File

| | 2015 | 2016 | 2017 | 1/1/2018~ 10/12/2018 | TOTAL |
|---|---|---|---|---|---|
| **Income** | | | | | |
| Sales | 4,578,794.44 | 5,400,000.72 | 297,000.81 | 32,297.48 | 10,308,093.45 |
| Sales Limelight | 0.00 | 0.00 | 6,892,212.81 | 965,507.06 | 7,857,719.87 |
| Sales Retail | 0.00 | 73,626.60 | 1,154,725.15 | 101,933.54 | 1,330,285.29 |
| Sales - Shipping and Handling | 0.00 | 0.00 | 58,406.91 | 8,106.74 | 66,513.65 |
| 47930 - Sales - Amazon | 0.00 | 0.00 | 0.00 | 33,377.38 | 33,377.38 |
| Misc Income | 336.21 | 0.00 | 0.00 | 1,075.75 | 1,411.96 |
| Uncategorized Income | 0.00 | 0.00 | 0.00 | 203.84 | 203.84 |
| Sales Refund & Allowances | 0.00 | (20,896.32) | (691,767.85) | (45,054.26) | (757,718.43) |
| Sales - Returns | (240,352.77) | (167,474.32) | 0.00 | 0.00 | (407,827.09) |
| Void/Refund Revenue | 0.00 | (28,343.00) | 0.00 | (189,817.47) | (218,160.47) |
| **Total Income** | 4,338,777.88 | 5,256,913.68 | 7,710,577.83 | 907,630.06 | 18,213,899.45 |
| **Cost of Goods Sold** | | | | | |
| Cost of Goods Sold | 350,004.52 | 628,952.09 | 521,617.11 | 87,708.88 | 1,588,282.60 |
| Merchant Account Fees & Exp | 296,099.93 | 469,324.15 | 157,388.94 | 129,606.55 | 1,052,419.57 |
| Freight and Shipping Costs | 219,441.26 | 163,182.18 | 45,958.92 | 3,253.56 | 431,835.92 |
| Printing & Reproduction | 38,967.11 | 17,674.87 | 26,905.37 | 507.53 | 84,054.88 |
| US Customs & Border Protection | 0.00 | 22,370.00 | 500.00 | 0.00 | 22,870.00 |
| Product Samples Expense | 1,034.29 | 0.00 | 0.00 | 0.00 | 1,034.29 |
| **Total COGS** | 905,547.11 | 1,301,503.29 | 752,370.34 | 221,076.52 | 3,180,497.26 |
| **Gross Profit** | 3,433,230.77 | 3,955,410.39 | 6,958,207.49 | 686,553.54 | 15,033,402.19 |
| **Expense** | | | | | |
| Media Exp | 4,184,253.55 | 1,427,083.08 | 2,944,391.16 | 1,641,061.87 | 10,196,789.66 |
| Payroll Wages and Salaries | 632,783.93 | 831,085.63 | 1,012,333.87 | 339,325.54 | 2,815,528.97 |
| Advertising and Promotion | 579,254.68 | 1,045,893.95 | 899,192.92 | 19,996.53 | 2,544,338.08 |
| Professional Fees | 139,115.63 | 148,274.28 | 208,160.85 | 127,469.79 | 623,020.55 |
| Rent Expense | 150,158.09 | 102,835.71 | 116,180.14 | 82,341.43 | 451,515.37 |

Case 5:23-cv-00021-JGB Document 185-2 Filed 12/02/24 Page 197 of 482 Page ID #:5727
Case 5:18-cv-02104-SJO-PLA Document 52 Filed 11/04/18 Page 30 of 76 Page ID #:3223
Page 2 of 3

**Redwood Scientific Technologies Inc.**
**Profit & Loss**
All Transactions
Downloaded from its QuickBooks Accounting File

| | 2015 | 2016 | 2017 | 1/1/2018~ 10/12/2018 | TOTAL |
|---|---|---|---|---|---|
| Payroll Taxes | 132,641.91 | 61,834.87 | 194,694.25 | 34,126.45 | 423,297.48 |
| Legal Fees | 115,491.00 | 135,632.01 | 119,548.06 | 10,000.00 | 380,671.07 |
| Computer and Software Expense | 107,027.99 | 77,942.48 | 141,818.13 | 39,656.32 | 366,444.92 |
| Fulfillment Expense | 283,388.68 | 49,807.65 | 4,427.20 | 1,960.59 | 339,584.12 |
| Outside Services | 99,567.12 | 81,835.68 | 101,960.93 | 891.56 | 284,255.29 |
| Automobile Expense | 53,851.92 | 62,531.25 | 90,530.85 | 61,892.98 | 268,807.00 |
| Telephone Expense | 85,290.47 | 69,468.60 | 77,758.40 | 16,035.75 | 248,553.22 |
| Travel Expense | 122,964.11 | 65,207.80 | 55,052.13 | 2,919.22 | 246,143.26 |
| Postage and Delivery | 31.98 | 2,578.74 | 170,667.91 | 10,677.25 | 183,955.88 |
| Employee Benefits | 46,158.02 | 27,323.48 | 51,504.74 | 29,859.56 | 154,845.80 |
| Insurance Expense | 48,803.64 | 77,890.74 | 16,227.71 | 7,566.26 | 150,488.35 |
| Marketing | 0.00 | 916.61 | 121,934.67 | 27,395.25 | 150,246.53 |
| Shipping | 39.22 | 6,629.67 | 86,191.93 | 39,500.43 | 132,361.25 |
| Office Expense | 0.00 | 9,236.44 | 60,791.29 | 24,004.57 | 94,032.30 |
| Shipping Supplies | 9,357.88 | 24,468.47 | 46,763.61 | 4,797.48 | 85,387.44 |
| Repairs and Maintenance | 215.00 | 36,996.91 | 32,842.17 | 3,581.00 | 73,635.08 |
| Bank Service Charges | 10,276.11 | 7,645.04 | 37,630.92 | 8,921.74 | 64,473.81 |
| Office Supplies | 20,627.03 | 27,972.55 | 10,504.56 | 5,040.70 | 64,144.84 |
| Miscellaneous | 0.00 | 42,555.62 | 20,458.85 | 0.00 | 63,014.47 |
| Interest Expense | 0.00 | 14,293.56 | 41,819.23 | 0.00 | 56,112.79 |
| Dues and Subscriptions | 16,215.57 | 13,675.88 | 15,742.76 | 736.72 | 46,370.93 |
| Meals and Entertainment | 21,506.27 | 11,509.30 | 8,230.07 | 655.29 | 41,900.93 |
| Commission Expense | 4,841.35 | (34.08) | 0.00 | 28,591.34 | 33,398.61 |
| Printing and Reproduction | 3,207.02 | 5,189.39 | 9,317.73 | 4,379.65 | 22,093.79 |
| Utilities | 4,000.68 | 6,715.36 | 8,322.92 | 2,780.91 | 21,819.87 |
| Web Services | 0.00 | 8,458.82 | 12,841.16 | 0.00 | 21,299.98 |
| Business License & Permits | 8,967.78 | 4,161.85 | 7,609.95 | 349.59 | 21,089.17 |
| Consulting | 0.00 | 0.00 | 5,602.00 | 4,060.00 | 9,662.00 |
| Training | 8,808.00 | 0.00 | 0.00 | 0.00 | 8,808.00 |
| Product Liability | 741.44 | 1,976.37 | 3,273.95 | 580.95 | 6,572.71 |

Case 5:23-cv-00021-JGB Document 135-2 Filed 12/02/24 Page 198 of 482 Page ID #:5728
Case 5:18-cv-02104-SJO-PLA Document 52 Filed 11/01/18 Page 30 of 76 Page ID #:3224

Page 3 of 3

**Redwood Scientific Technologies Inc.**
**Profit & Loss**
All Transactions
Downloaded from its QuickBooks Accounting File

| | 2015 | 2016 | 2017 | 1/1/2018~ 10/12/2018 | TOTAL |
|---|---|---|---|---|---|
| **Reimbursable** | 2,178.04 | 59.61 | 3,502.46 | 152.73 | 5,892.84 |
| **Service Fees** | 0.00 | 0.00 | 3,660.74 | 1,500.00 | 5,160.74 |
| **Franchise Tax** | 3,642.31 | 0.00 | 0.00 | 0.00 | 3,642.31 |
| **FINANCE CHARGE** | 0.00 | 0.00 | 2,500.00 | 0.00 | 2,500.00 |
| **Donation** | 1,512.00 | 165.00 | 337.52 | 0.00 | 2,014.52 |
| **Human Resource - Hiring** | 0.00 | 0.00 | 573.85 | 995.00 | 1,568.85 |
| **Federal Income Tax** | 0.00 | 0.00 | 0.00 | 1,082.12 | 1,082.12 |
| **Total Expense** | 6,896,918.42 | 4,489,818.32 | 6,744,901.59 | 2,584,886.57 | 20,716,524.90 |
| **Other Income/Expense** | | | | | |
| **Other Expense** | | | | | |
| Loss on Settlement of Lawsuit | 0.00 | 432,789.21 | 0.00 | 0.00 | 432,789.21 |
| Ask My Accountant | 0.00 | 0.00 | (25,000.00) | 337,211.74 | 312,211.74 |
| Bad Debt | 47,786.00 | 10,289.46 | 0.00 | 0.00 | 58,075.46 |
| Prov(Benefit)for Taxes Deferred | 0.00 | 36,836.98 | 0.00 | 0.00 | 36,836.98 |
| Discounts Allowed | 0.00 | 108.50 | 0.00 | 0.00 | 108.50 |
| Income Tax Expense - Federal | (131,255.00) | 0.00 | 700.00 | 0.00 | (130,555.00) |
| Income Tax Expense - State | (34,172.00) | 0.00 | 0.00 | 0.00 | (34,172.00) |
| **Total Other Expense** | (117,641.00) | 480,024.15 | (24,300.00) | 337,211.74 | 675,294.89 |
| **Net Other Income** | 117,641.00 | (480,024.15) | 24,300.00 | (337,211.74) | (675,294.89) |
| **Net Income** | (3,346,046.65) | (1,014,432.08) | 237,605.90 | (2,235,544.77) | (6,358,417.60) |

# Exhibit 5

Redwood Scientific Technologies Inc.

# Balance Sheet

**All Transactions**
Downloaded from its QuickBooks Accounting File

|  | Dec 31, 14 | Dec 31, 15 | Dec 31, 16 | Dec 31, 17 | Oct 12, 18 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| **Checking/Savings** | | | | | |
| AMI Citibank 2531 | 1,990.49 | 24,755.10 | 10,665.65 | 929.18 | 241.48 |
| AMI HSBC-4731-6 | 24.74 | 0.00 | 0.00 | 0.00 | 0.00 |
| BOFA  AM Nutra Partner - 5185 | 269.34 | 0.00 | 0.00 | 0.00 | (3,098.50) |
| Checking - 43P | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Checking_47 | 0.00 | 0.00 | 0.00 | 105,000.59 | 140,831.64 |
| Checking_54 | 0.00 | 0.00 | 0.00 | (21,735.89) | (115,801.28) |
| Checking_62 | 0.00 | 0.00 | 0.00 | 8,518.68 | (248.08) |
| Checking_70 | 0.00 | 0.00 | 0.00 | 118.80 | (101,249.70) |
| Checking_94 | 0.00 | 0.00 | 0.00 | 19,523.62 | (2,975.38) |
| Citibank- 0178 | 0.00 | 0.00 | 1,285.86 | 0.00 | 0.00 |
| Citibank- 7471 | 0.00 | 0.00 | 1,539.59 | 805.27 | 805.27 |
| Citibank  AM Nutra P LLC - 4409 | 29.41 | 40,104.27 | 4,675.59 | 0.00 | 0.00 |
| Citibank Cking RSTI-7294 | 0.00 | (20,249.72) | 0.00 | 0.00 | 0.00 |
| Citibank Expo Supplements-4227 | (221.68) | 0.00 | 0.00 | 0.00 | 0.00 |
| Citibank Expo Supplements-8977 | (20.00) | 0.00 | 0.00 | 0.00 | 0.00 |
| Citibank Healthy Way Expr-2059 | 0.00 | 1,391.00 | 1,016.00 | 0.00 | 0.00 |
| Citibank Nature's Fut  LLC-1770 | 2.55 | 27,120.85 | 2,847.64 | 0.00 | 0.00 |
| Citibank OWL -1996 | 3.75 | 0.00 | 0.00 | 0.00 | 0.00 |
| Citibank RST - Smoke Shop 4048 | 0.00 | 0.00 | 606.33 | 0.00 | 0.00 |
| Citibank RSTI-3081  -Closed | 0.00 | 390,209.40 | 6,602.68 | 0.00 | 0.00 |
| Citibank RSTI-5409 | 0.00 | 130,113.22 | 37,813.95 | 0.00 | 0.00 |
| Citibank Top Hill Shop Ltd-2778 | 0.00 | 1,894.39 | 96,826.10 | (20.00) | (20.00) |
| National Bank of Cal  AMI-6346 | 939.51 | 2,013.66 | 0.00 | 0.00 | 0.00 |
| National Bank of Cal NF-6478 | 0.00 | 1,756.80 | 0.00 | 0.00 | 0.00 |
| TV Sales LLC | 0.00 | 0.00 | 0.00 | 0.00 | (32,210.03) |
| **Total Checking/Savings** | 3,018.11 | 599,108.97 | 163,879.39 | 113,140.25 | (113,724.58) |
| **Accounts Receivable** | | | | | |
| **Accounts Receivable** | | | | | |
| Provision for doubtful accounts | 0.00 | (9,886.00) | (20,175.46) | 0.00 | 0.00 |
| Accounts Receivable - Other | 0.00 | 29,150.32 | 96,686.25 | 54,735.42 | 54,734.62 |
| **Total Accounts Receivable** | 0.00 | 19,264.32 | 76,510.79 | 54,735.42 | 54,734.62 |
| AR Limelight | 0.00 | 392,618.29 | 849,091.48 | 1,366,475.86 | 1,199,705.49 |
| **Total Accounts Receivable** | 0.00 | 411,882.61 | 925,602.27 | 1,421,211.28 | 1,254,440.11 |
| **Other Current Assets** | | | | | |
| Due to/from People United for C | 0.00 | 0.00 | 0.00 | 0.00 | (11,183.96) |
| Intercompany Runaway | 0.00 | 426,897.37 | 620,463.83 | 920,615.36 | 921,104.54 |
| Inventory  Asset | 30,960.15 | 67,081.36 | 2,564.48 | 41,690.77 | 41,690.77 |
| Inventory Asset | 0.00 | 0.00 | 0.00 | 1,733.40 | 761.40 |
| Prepaid Expense - Other | 16,857.54 | 1,500.00 | 0.00 | 0.00 | 0.00 |
| Prepaid Rent | 0.00 | 5,762.84 | 21,330.93 | 31,937.18 | 31,937.18 |
| Prior Company Receivables (dele | 42,627.60 | 0.00 | 0.00 | 0.00 | 0.00 |
| Retention Receivable | 357,086.20 | 438,765.92 | 366,057.00 | 330,983.65 | 293,077.89 |

**Redwood Scientific Technologies Inc.**

## Balance Sheet
### All Transactions
Downloaded from its QuickBooks Accounting File

|  | Dec 31, 14 | Dec 31, 15 | Dec 31, 16 | Dec 31, 17 | Oct 12, 18 |
|---|---|---|---|---|---|
| Uncategorized Asset | 0.00 | 0.00 | 0.00 | 0.00 | 18,095.95 |
| Undeposited Funds | 0.00 | 0.00 | 7,706.24 | 7,706.24 | 7,706.24 |
| Total Other Current Assets | 447,531.49 | 940,007.49 | 1,018,122.48 | 1,334,666.60 | 1,303,190.01 |
| Total Current Assets | 450,549.60 | 1,950,999.07 | 2,107,604.14 | 2,869,018.13 | 2,443,905.54 |
| **Fixed Assets** |  |  |  |  |  |
| Furniture and Equipment | 0.00 | 0.00 | 0.00 | 13,781.65 | 13,781.65 |
| Total Fixed Assets | 0.00 | 0.00 | 0.00 | 13,781.65 | 13,781.65 |
| **TOTAL ASSETS** | **450,549.60** | **1,950,999.07** | **2,107,604.14** | **2,882,799.78** | **2,457,687.19** |
| **LIABILITIES & EQUITY** |  |  |  |  |  |
| Liabilities |  |  |  |  |  |
| Current Liabilities |  |  |  |  |  |
| Accounts Payable |  |  |  |  |  |
| Accounts Payable | 0.00 | 179,833.97 | 737,036.96 | 787,345.76 | 786,597.13 |
| Accrued Liability | 17,895.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Accounts Payable | 17,895.00 | 179,833.97 | 737,036.96 | 787,345.76 | 786,597.13 |
| **Credit Cards** |  |  |  |  |  |
| Credit Cards |  |  |  |  |  |
| American Express | 31,289.00 | 21,974.14 | 0.00 | 4,343.90 | (322,245.32) |
| AMEX 0-52006 (0-53004) | 0.00 | 0.00 | 23,509.47 | 41,228.92 | 77,196.85 |
| AMEX 0-88009 | 0.00 | 0.00 | 24.99 | 264.99 | 579.96 |
| AMEX 4-06008 | 0.00 | 0.00 | 238.75 | 247.01 | 148.01 |
| AMEX 4-36004 | 0.00 | 0.00 | 3,242.65 | 6,237.71 | 80,510.74 |
| AMEX 6-35003 | 0.00 | 0.00 | 2,053.79 | (970.02) | (970.02) |
| Amex 9-67002 (9-68000) | 0.00 | 0.00 | (8,755.60) | 113,428.80 | 147,359.42 |
| Credit Cards - Other | 0.00 | 0.00 | 0.00 | (85,927.37) | 1,314,072.63 |
| Total Credit Cards | 31,289.00 | 21,974.14 | 20,314.05 | 78,853.94 | 1,296,652.27 |
| Total Credit Cards | 31,289.00 | 21,974.14 | 20,314.05 | 78,853.94 | 1,296,652.27 |
| **Other Current Liabilities** |  |  |  |  |  |
| 23003 - S-T Loan  - Vernon Capi | 0.00 | 0.00 | 0.00 | 135,919.20 | 22,555.47 |
| 23004 - S-T Loan - Argus Capita | 0.00 | 0.00 | 0.00 | 0.00 | (138,139.99) |
| 23006 - S-T Loan - APP GROUP IN | 0.00 | 0.00 | 0.00 | 0.00 | 110,225.79 |
| 23007 - S-T Loan - ACE Funding | 0.00 | 0.00 | 0.00 | 0.00 | 44,225.00 |
| 23008 - S-T Loan from ORG CAPIT | 0.00 | 0.00 | 0.00 | 0.00 | 2,491.45 |
| 23009 - S-T Loan - LEGAL AND CO | 0.00 | 0.00 | 0.00 | 0.00 | 223,250.00 |
| Accrued Advertising | 0.00 | 1,234,421.58 | 617,210.79 | 617,210.79 | 617,210.79 |
| Accrued Expenses | 0.00 | 156,959.50 | 156,959.50 | 156,959.50 | 156,959.50 |
| Due to Shareholder | 0.00 | 189,235.06 | 237,828.02 | 279,458.21 | 279,323.21 |
| Due to Shareholder - Carlos Pla | 0.00 | 0.00 | 0.00 | (2,200.00) | 341,300.00 |
| Income Tax Payable | 165,427.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Loan from Highcrest | 0.00 | 0.00 | 0.00 | 0.00 | (10,250.00) |

Redwood Scientific Technologies Inc.

## Balance Sheet
### All Transactions
#### Downloaded from its QuickBooks Accounting File

|  | Dec 31, 14 | Dec 31, 15 | Dec 31, 16 | Dec 31, 17 | Oct 12, 18 |
|---|---|---|---|---|---|
| Los Angeles County - Long Beach | 0.00 | 0.00 | 0.00 | 0.00 | 365.10 |
| N/P-Redwood Scientific NV Corp | 12,500.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Note Payable (Advertising) | 0.00 | 0.00 | 1,016,174.79 | 845,680.02 | 845,680.02 |
| Payroll Liabilities | 0.00 | 130,000.00 | 227,500.00 | 227,500.00 | 227,500.00 |
| Sales Tax Payable | 0.00 | 0.00 | 4,118.72 | 7,531.09 | 631.09 |
| San Bernardino County - S B  Ci | 0.00 | 0.00 | 36.92 | 0.00 | 0.00 |
| Santa Clara County - Big Basin | 0.00 | 0.00 | 0.00 | 0.00 | (0.10) |
| Short Term Loan from Knight Cap | 0.00 | 0.00 | 0.00 | 99,332.10 | 35,286.76 |
| Total Other Current Liabilities | 177,927.00 | 1,710,616.14 | 2,259,828.74 | 2,367,390.91 | 2,758,614.09 |
|  |  |  |  |  |  |
| Total Current Liabilities | 227,111.00 | 1,912,424.25 | 3,017,179.75 | 3,233,590.61 | 4,841,863.49 |
|  |  |  |  |  |  |
| Long Term Liabilities |  |  |  |  |  |
| N/P-Eunjung | 1,048.00 | 1,048.00 | 1,048.00 | 1,048.00 | 1,048.00 |
| Warrant Liability | 0.00 | 224,968.00 | 224,968.00 | 222,718.00 | 222,347.30 |
| Total Long Term Liabilities | 1,048.00 | 226,016.00 | 226,016.00 | 223,766.00 | 223,395.30 |
|  |  |  |  |  |  |
| Total Liabilities | 228,159.00 | 2,138,440.25 | 3,243,195.75 | 3,457,356.61 | 5,065,258.79 |
|  |  |  |  |  |  |
| Equity |  |  |  |  |  |
| Additional paid-in Capital | 50,000.00 | (227,792.78) | (227,792.78) | 71,577.22 | 274,107.22 |
| Additional Paid-in Capital BCF | 0.00 | (363,698.00) | (363,698.00) | (363,698.00) | (363,698.00) |
| Common Stock $0.01 par value | 0.00 | 5,034,507.78 | 5,131,707.78 | 5,153,337.78 | 5,153,337.78 |
| Member Contribution | 207,073.00 | 207,073.00 | 207,073.00 | 207,073.00 | 207,073.00 |
| Opening Balance Equity | 0.00 | 0.00 | (30,918.35) | (28,489.47) | (28,489.47) |
| Owners/Members Draw | (248,457.00) | (248,457.00) | (248,457.00) | (248,457.00) | (248,457.00) |
| Retained Earnings | 213,774.60 | (1,243,027.53) | (4,589,074.18) | (5,603,506.26) | (5,365,900.36) |
| Net Income | 0.00 | (3,346,046.65) | (1,014,432.08) | 237,605.90 | (2,235,544.77) |
| Total Equity | 222,390.60 | (187,441.18) | (1,135,591.61) | (574,556.83) | (2,607,571.60) |
|  |  |  |  |  |  |
| TOTAL LIABILITIES & EQUITY | 450,549.60 | 1,950,999.07 | 2,107,604.14 | 2,882,799.78 | 2,457,687.19 |

# Exhibit 6

# SUBSCRIPTION ESCROW AGREEMENT

This Subscription Escrow Agreement (this "Agreement") is entered into and effective as of June 8th, by and among **Redwood Scientific Technologies, Inc.**, a Nevada corporation (the "Company") and **SUNTRUST BANK**, a Georgia banking corporation (the "Escrow Agent") and **Newport Coast Securities, Inc.**, a New York corporation (the "Banker"),

## W I T N E S S E T H:

**WHEREAS, the** Company proposes to offer for sale (the "Offering") a maximum of (2,222,222) units of securities, (the "Units"),at a subscription price of $2.25 per Unit ("Unit Price") with each unit consisting of 1 share of Common Stock at $0.01 par value per share (the "Common Stock") and a warrant ("Warrants") to purchase the number of shares of Common Stock equal to 50% of the number of Common Stock underlying the Investors Unit ("Warrant Shares") at an exercise price of $2.75 per share ("Exercise Price"), payable in cash pursuant to subscription agreements ("Subscription Agreements") for an aggregate maximum offering price of $5,000,000[1] (the "Maximum Offering"); and

**WHEREAS,** the Shares are proposed to be offered for sale to investors (the "Subscribers") by participating broker-dealers pursuant to an exemption from registration under the Securities Act of 1933, as amended, and pursuant to exemptions from registration under certain state securities laws;

**WHEREAS,** the Offering shall terminate by the earlier to occur of (a) receipt of the Maximum Offering (subject to increase to cover over-allotments, if any) or (b) September 30, 2015 (the "Initial Termination Date"), unless otherwise extended for thirty (30) days by the mutual agreement of the Company and the Banker;

**WHEREAS,** the Company may hold multiple closings between the date of this Agreement and the Closing Date (as hereinafter defined) to raise the Maximum Offering (each a "Closing" and collectively, the "Closings");

**NOW THEREFORE,** in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Company and the Escrow Agent agree as follows:

1.    Deposits in Escrow.

(a)    The Subscribers shall deposit or cause to be deposited with the Escrow Agent, to be held in escrow under the terms of this Agreement, all proceeds received from the sale of the Shares to the Subscribers (the "Subscription Proceeds"). The Escrow Agent shall have no responsibility for Subscription Proceeds until such proceeds are actually received, clear through normal banking channels and constitute collected funds. The Escrow Agent shall have no duty to collect or seek to compel payment of any Subscription Proceeds, except to place such proceeds or instruments representing such proceeds for deposit and payment through customary banking channels. Checks for Subscription Proceeds furnished by Subscribers shall be made payable to: **SunTrust Bank, as Escrow Agent for Redwood Scientific Technologies, Inc.**

(b)    The Company or the Banker shall deliver to the Escrow Agent, in a form acceptable to the Escrow Agent, schedules disclosing the name and address of each of the Subscribers, the number of Shares subscribed for by each Subscriber, the Federal tax identification number of each of the Subscribers, the amount of Subscription Proceeds received from each Subscriber, and such other information as will enable the Escrow Agent to attribute to a particular Subscriber all Subscription Proceeds received by the Escrow Agent.

---

[1] The Company may accept additional subscriptions for up to 222,22 Units ($500,000) for over-allotments.

2.  **Rejection of Subscription Agreement.**

    (a)     Any Subscription Agreement may be rejected by the Company in whole or in part. The Company shall promptly notify the Escrow Agent in writing in the event of any such rejection. Upon the receipt of a written notice of rejection from the Company pertaining to any Subscription Agreement, the Escrow Agent shall return to the Subscriber whose name appears on the rejected Subscription Agreement the Subscription Agreement (if then in the Escrow Agent's possession) and the Subscription Proceeds tendered by such Subscriber, without payment of interest; provided such Subscriber's Subscription Proceeds constitute collected funds held by the Escrow Agent.

    (b)     In the event the Escrow Agent receives written notice from the Company that a Subscription Agreement has been withdrawn by a Subscriber, the Escrow Agent shall return to such Subscriber whose name appears on the withdrawn Subscription Agreement the Subscription Agreement (if then in the Escrow Agent's possession) and the Subscription Proceeds tendered by such Subscriber, without payment of interest; provided such Subscriber's Subscription Proceeds constitute collected funds held by the Escrow Agent.

3.  **Disbursements.**

    (a)     If prior to 3:00 P.M. Eastern time on the Initial Termination Date, the Escrow Agent receives written notice, in the form of **Exhibit C** attached hereto and made a part hereof ("Extension Notice"), and signed by the Company and the Banker stating that the Initial Termination Date has been extended for up to another 30 days (such 30th day being referred to as the "Extension Date"), then the Initial Termination Date shall be extended to the date set forth in the Extension Notice. The term "Final Closing Date" means the latest possible date included in the last Extension Notice received by the Escrow Agent, or the Initial Termination Date if an Extension Notice is not received.

    (b)
    (c)     At any such time on or before the Final Closing Date, the Escrow Agent has received written notice signed by the Company and the Banker that a Closing shall take place, the Escrow Agent shall disburse all Subscription Proceeds then held by the Escrow Agent and any earnings thereon to the account of the Company, unless otherwise directed as per written directions signed by the Company and the Banker to the Escrow Agent.

    (d)     Following the earlier of: (i) receipt and disbursement of the Maximum Offering, (ii) written notice from the Company and the Banker that the Offering has terminated, or (iii) the Final Closing Date, this Agreement (except as otherwise provided herein) shall terminate.

    (c)     If, the Escrow Agent has not received an Extension Notice by the Initial Termination Date, then the Escrow Agent shall release all funds received to the Company. Upon disbursement of all of the Subscription Proceeds and earnings thereon held by the Escrow Agent as provided in this Section 3(b), this Agreement (except as otherwise provided herein) shall terminate.

    (d)     The Company shall provide a copy of this Agreement to each Subscriber.

4.  **Investment of Subscription Proceeds; Compensation of Escrow Agent.**

    (a)     All funds received by the Escrow Agent shall be held only in non-interest bearing bank accounts at Suntrust Bank.

    (b)     On or before the execution and delivery of this Agreement, the Company shall provide to the Escrow Agent a completed Form W-9 or Form W-8, whichever is appropriate. Notwithstanding anything to the contrary herein provided, except for the delivery of Form 1099's, the Escrow Agent shall have no duty to prepare or file any Federal or state tax report or return with respect to any funds held pursuant to this Agreement or any income earned thereon. The Company shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Subscription Proceeds or any earnings or interest thereon unless such tax, late payment, interest, penalty or other cost or expense was finally adjudicated by a court of competent jurisdiction to have been directly caused by the gross negligence of willful misconduct of the Escrow Agent. The indemnification provided in this section is in addition to the indemnification provided in other sections of this Agreement and shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement

(c)     The Company agrees to pay to the Escrow Agent compensation, and to reimburse the Escrow Agent for costs and expenses, all in accordance with the provisions of Exhibit B hereto, which is incorporated herein by reference and made a part hereof. The fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Agreement; provided, however, that in the event that the conditions for the disbursement of funds are not fulfilled, or the Escrow Agent renders any service not contemplated in this Agreement, or there is any assignment of interest in the subject matter of this Agreement or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Agreement or the subject matter hereof, then the Company shall compensate the Escrow Agent for such extraordinary services and reimburse the Escrow Agent for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event. To the extent permitted by applicable law, the Escrow Agent shall have, and is hereby granted, a prior lien upon and first priority security interest in the Subscription Proceeds held hereunder (and the earnings and interest accrued thereon) with respect to its unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights, superior to the interests of any other persons or entities and without judicial action to foreclose such lien and security interest, and the Escrow Agent shall have and is hereby granted the right to set off and deduct any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from the Subscription Proceeds held hereunder (and the earnings and interest accrued thereon). The provisions of this section shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

5.     Duties of Escrow Agent; Indemnification.

(a)     This Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent hereto, which duties shall be deemed purely ministerial in nature, and no implied duties or obligations shall be read into this Agreement against the Escrow Agent. The Escrow Agent shall in no event be deemed to be a fiduciary to the Company, the Subscribers, or any other person or entity under this Agreement.  The permissive rights of the Escrow Agent to do things enumerated in this Agreement shall not be construed as duties. In performing its duties under this Agreement, or upon the claimed failure to perform its duties, the Escrow Agent shall not be liable for any damages, losses or expenses other than damages, losses or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the Escrow Agent's willful misconduct or gross negligence. In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The Escrow Agent shall have no liability with respect to the the Company to perform in accordance with this Agreement. The Escrow Agent shall have no liability with respect to the transfer or distribution of any funds affected by the Escrow Agent pursuant to wiring or transfer instructions provided to the Escrow Agent in accordance with the provisions of this Agreement. The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with this Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.

(b)     No provision of this Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Agreement.

(c)     This Agreement constitutes the entire agreement between the Escrow Agent, the Company and the Banker in connection with the subject matter of this Agreement, and no other agreement entered into by the Company related to the subject matter of this Agreement, including, without limitation, the Subscription Agreements, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be deposited with the Escrow Agent or the Escrow Agent may have knowledge thereof.

(d)     The Escrow Agent shall in no way be responsible for nor shall it be its duty to notify the Company or any other person or entity interested in this Agreement of any payment required or maturity occurring under this Agreement or under the terms of any instrument deposited herewith unless such notice is explicitly provided for in this Agreement.

(e)     The Escrow Agent shall be protected in acting upon any written instruction, notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which the Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, items directing investment or non-investment of funds, items requesting or authorizing release, disbursement or retainage of the subject matter of this Agreement and items amending the terms of this Agreement. The Escrow Agent shall be under no duty or obligation to inquire into or investigate the validity, accuracy or content of any such notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document. The Escrow Agent shall have no duty or obligation to make any formulaic calculations of any kind hereunder.

(f)     The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. The Escrow Agent shall be entitled to seek the advice of legal counsel with respect to any matter arising under this Agreement and the Escrow Agent shall have no liability and shall be fully protected with respect to any action taken or omitted pursuant to the advice of such legal counsel. The Company shall be liable for, and shall promptly pay, upon demand by the Escrow Agent, the reasonable and documented fees and expenses of any such legal counsel.

(g)     The Company represents and warrants to the Escrow Agent that there is no security interest in the Subscription Proceeds or the earnings thereon or any part of the Subscription Proceeds or such earnings; no financing statement under the Uniform Commercial Code of any jurisdiction is on file in any jurisdiction claiming a security interest in or describing, whether specifically or generally, the Subscription Proceeds or the earnings thereon or any part of the Subscription Proceeds or such earnings; and the Escrow Agent shall have no responsibility at any time to ascertain whether or not any security interest exists in the Subscription Proceeds or the earnings thereon or any part of the Subscription Proceeds or such earnings or to file any financing statement under the Uniform Commercial Code of any jurisdiction with respect to the Subscription Proceeds, the earnings thereon or any part thereof.

(h)     In the event of any disagreement resulting in adverse claims or demands being made in connection with the matters covered by this Agreement, or in the event that the Escrow Agent, in good faith, is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to the Company, any Subscriber or any other person or entity for its failure or refusal to act, and the Escrow Agent shall be entitled to continue to refrain from acting until (i) the rights of the Company, the Subscribers and all other interested persons and entities shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjudged and all doubt resolved by agreement among the Company and all other interested persons and entities, and the Escrow Agent shall have been notified thereof in writing signed by the Company and all such persons and entities. Notwithstanding the preceding, the Escrow Agent may in its discretion obey the order, judgment, decree or levy of any court, whether with or without jurisdiction, or of an agency of the United States or any political subdivision thereof, or of any agency of any State of the United States or of any political subdivision of any thereof, and the Escrow Agent is hereby authorized in its sole discretion to comply with and obey any such orders, judgments, decrees or levies. The rights of the Escrow Agent under this sub-paragraph are cumulative of all other rights which it may have by law or otherwise.

In the event of any disagreement or doubt, as described above, the Escrow Agent shall have the right, in addition to the rights described above and at the election of the Escrow Agent, to tender into the registry or custody of any court having jurisdiction, all funds and property held under this Agreement, and the Escrow Agent shall have the right to take such other legal action as may be appropriate or necessary, in the sole discretion of the Escrow Agent. Upon such tender, the Escrow Agent shall be discharged from all further duties under this Agreement; provided, however, that any such action of the Escrow Agent shall not deprive the Escrow Agent of its compensation and right to reimbursement of expenses hereunder arising prior to such action and discharge of the Escrow Agent of its duties hereunder.

(i)     The Escrow Agent may resign at any time from its obligations under this Agreement by providing written notice to the Company. Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been furnished. In such event, the Company shall promptly appoint a successor escrow agent. In the event no successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Agreement; provided, however, that any such action of the Escrow Agent shall not deprive the Escrow Agent of its compensation and right to reimbursement of expenses hereunder arising prior to such action and discharge of the Escrow Agent of its duties hereunder. The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder.

(j)     Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business of the Escrow Agent may be transferred, shall be the Escrow Agent under this Agreement without further act.

(k)     The Company agrees to indemnify, defend and hold harmless the Escrow Agent and each of the Escrow Agent's officers, directors, agents and employees (the "Indemnified Parties") from and against any and all losses, liabilities, claims, damages, expenses and costs (including, without limitation, attorneys' fees and expenses) of every nature whatsoever (collectively, "Losses") which any such Indemnified Party may incur and which arise directly or

indirectly from this Agreement or which arise directly or indirectly by virtue of the Escrow Agent's undertaking to serve as Escrow Agent hereunder; provided, however, that no Indemnified Party shall be entitled to indemnity with respect to Losses that have been finally adjudicated by a court of competent jurisdiction to have been directly caused by such Indemnified Party's gross negligence or willful misconduct. The provisions of this section shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

      (l)    The Company acknowledges that the Escrow Agent is serving as escrow agent for the limited purposes set forth herein and represents, covenants and warrants to the Escrow Agent that no statement or representation, whether oral or in writing, has been or will be made to any Subscriber to the effect that the Escrow Agent has investigated the desirability or advisability of investment in the Shares or approved, endorsed or passed upon the merits of such investment or is otherwise involved in any manner with the transactions contemplated hereby, other than as escrow agent under this Agreement. It is further agreed that the Company shall not use or permit the use of the name "SunTrust," "SunTrust Bank," "SunTrust Banks, Inc." or any variation thereof in any sales presentation, placement or offering memorandum or literature pertaining directly or indirectly to the Offering except strictly in the context of the duties of the Escrow Agent as escrow agent under this Agreement. Any breach or violation of the paragraph shall be grounds for immediate termination of this Agreement by the Escrow Agent.

      (m)    The Escrow Agent shall have no duty or responsibility for determining whether the Shares or the offer and sale thereof conform to the requirements of applicable Federal or state securities laws, including but not limited to the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended. The Company represents and warrants to the Escrow Agent that the Shares and the Offering will comply in all respects with applicable Federal and state securities laws and further represents and warrants that the Company has obtained and acted upon the advice of legal counsel with respect to such compliance with applicable Federal and state securities laws. The Company acknowledges that the Escrow Agent has not participated in the preparation or review of any sales or offering material relating to the Offering or the Shares. In addition to any other indemnities provided for in this Agreement, the Company agrees to indemnify and hold harmless the Indemnified Parties from and against any and all Losses incurred by any of the Indemnified Parties which directly or indirectly arise from any violation or alleged violation of any Federal or state securities laws; provided, however, that no Indemnified Party shall have the right to be indemnified hereunder with respect to any Losses that have been finally adjudicated by a court of competent jurisdiction to have been directly caused by such Indemnified Party's gross negligence or willful misconduct. The Company hereby agrees that the indemnifications and protections afforded the Escrow Agent and the other Indemnified Parties in this section shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

      (n)    The Escrow Agent and any director, officer or employee of the Escrow Agent may become pecuniarily interested in any transaction in which the Company may be interested and may contract and lend money to the Company and otherwise act as fully and freely as though it were not escrow agent under this Agreement. Nothing herein shall preclude the Escrow Agent from acting in any other capacity for the Company.

6.    **Notices.**

Any notice, request for consent, report, or any other communication required or permitted in this Agreement shall be in writing and shall be deemed to have been given when delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by electronic mail to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by United States mail, postage prepaid, or by certified mail, return receipt requested and postage prepaid, in each case to the appropriate address set forth below or at such other address as any party hereto may have furnished to the other parties hereto in writing:

If to Escrow Agent:    **SunTrust Bank**
    **Attn: Escrow Services**

    **Phone #: 804-782-**
    **Fax #: 804-225-7141**
    **Email:**    **@suntrust.com**

If to Company:    Redwood    Scientific    Technologies, Inc.
    250    W.    First    Street.    Suite    310
    Claremont, CA 91711

_____

E-mail:_____

Tax Identification #:_____

With a copy to (which shall not constitute notice):

> Hunter Taubman Fischer LLC
> 1450 Broadway, 26th Floor
> New York, NY 10018

If to the Banker:

_____

_____

_____

E-mail:_____

Any party hereto may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party hereto. Notwithstanding anything to the contrary herein provided, the Escrow Agent shall not be deemed to have received any notice, request, report or other communication hereunder prior to the Escrow Agent's actual receipt thereof.

7.  Successors and Assigns; Amendment.

The rights created by this Agreement shall inure to the benefit of and the obligations created hereby shall be binding upon the successors and assigns of the Escrow Agent and the Company; provided, however, that except as provided in Section 5(j) neither this Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of the other party hereto. This Agreement may not be amended without the written consent of all parties in writing.

8.  Construction.

This Agreement shall be construed and enforced according to the laws of the State of Georgia.

9.  Severability.

If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid, illegal or unenforceable, then the remainder of this Agreement and the application thereof will nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated by this Agreement are not affected in any manner materially adverse to any party hereto. Upon such determination that any provision is invalid, illegal or unenforceable, the parties hereto agree to replace such provision with a valid, legal and enforceable provision that will achieve, to the maximum extent legally permissible, the economic, business and other purposes of such provision.

10.  Term.

This Agreement shall terminate and the Escrow Agent shall be discharged of all responsibilities hereunder at such time as the Escrow Agent shall have disbursed all Subscription Proceeds and any earnings thereon in accordance with the provisions of this Agreement; provided, however, that the provisions of Sections 4(b), 4(c), 5(k) and 5(m) hereof shall survive any termination of this Agreement and any resignation or removal of the Escrow Agent.

11.  Counterparts.

This Agreement may be executed in separate facsimile or other electronic counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

12. **Authorized Signatures.** Contemporaneously with the execution and delivery of this Agreement and, if necessary, from time to time thereafter, the Company shall execute and deliver to the Escrow Agent a Certificate of Incumbency substantially in the form of Exhibit A hereto (a "Certificate of Incumbency") for the purpose of establishing the identity and authority of persons entitled to issue notices, instructions or directions to the Escrow Agent on behalf of the Company. Until such time as the Escrow Agent shall receive an amended Certificate of Incumbency replacing any Certificate of Incumbency theretofore delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on the most recent Certificate of Incumbency furnished to the Escrow Agent.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

**SunTrust Bank, as Escrow Agent**

By:_____

Title:_____

**Company: REDWOOD SCIENTIFIC TECHNOLOGIES, INC.**

By: _Jason Cardiff_____

Title:CEO_____

**Banker: NEWPORT COAST SECURITIES, INC.**

By:_____

Title:_____

**EXHIBIT A**

**Certificate of Incumbency**
**(List of Authorized Representatives)**

Client Name: _____

As an Authorized Officer of the above referenced entity, I hereby certify that each person listed below is an authorized signor for such entity, and that the title and signature appearing beside each name is true and correct.

| **Name** | **Title** | **Signature** | **Contact Number** |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

DATE: _____

By: _____

Name: _____

Title: _____

**EXHIBIT B**

**Schedule of Fees & Expenses**

**TO BE PROVIDED BY SUNTRUST**

**Exhibit C**
**Extension Notice**

Date: _____

**SunTrust Bank**
[ ]
Attention: [ ]

Dear Mr./Ms. [_____]:

       In accordance with the terms of paragraph 3(a) of a Subscription Escrow Agreement dated June [ ], 2015 by and among **Redwood Scientific Technologies, Inc.**, a Nevada corporation (the "Company") and **SUNTRUST BANK,** a Georgia banking corporation (the "Escrow Agent") and **Newport Coast Securities, Inc.**, a New York corporation (the "Banker"), the Company and the Banker hereby notify the Escrow Agent that the Closing Date has been extended from September 30, 2015 to [ ].

Very truly yours,

**Redwood Scientific Technologies, Inc.**

By:_____
Name: Jason Cardiff
Title: CEO

**Newport Coast Securities, Inc.**

By:_____
Name: [ ]
Title: CEO

# Exhibit 7

# DISBURSEMENT AUTHORIZATION

TO:      AUCTUS FUND, LLC ("Auctus")

FROM:      REDWOOD SCIENTIFIC TECHNOLOGIES, INC. (the "Company")

DATE:      July 18, 2018

RE:      Disbursement of Funds

In connection with the funding of an aggregate of $725,000.00 pursuant to that certain Securities Purchase Agreement dated as of July 18, 2018 (the "Agreement"), you are hereby directed to disburse such funds currently held in or being sent to escrow in the Attorney Trust Account of Legal & Compliance, LLC as directed by Auctus as follows:

1.      $362,250.00 to the Company in accordance with the wire transfer instructions attached as Schedule A hereto;

2.      $2,750.00 to Legal & Compliance, LLC in accordance with the wire transfer instructions attached as Schedule B hereto, for Auctus' legal fees;

3.      $35,000.00 to Auctus Fund Management, LLC in accordance with the wire transfer instructions attached as Schedule C hereto; and

4.      $325,000.00 to Auctus Fund, LLC, for the Company's benefit (to be applied to the repayment of the convertible promissory note in the original principal amount of $250,000.00 issued by the Company to Auctus on May 8, 2018), in accordance with the wire transfer instructions attached as Schedule D hereto.

[signature page follows]

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer as of the date first above written.

REDWOOD SCIENTIFIC TECHNOLOGIES, INC.

By: _____

Name: Jason Cardiff

Title: Chief Executive Officer

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed as of day and year first above written.

**THE COMPANY:**

**REDWOOD SCIENTIFIC TECHNOLOGIES, INC.**

By: _____

    Name: JASON CARDIFF

    Title: CHIEF EXECUTIVE OFFICER

**INVESTOR:**

**AUCTUS FUND, LLC**

By: _____

    Name: LOU POSNER

    Title: MANAGING DIRECTOR

Upon receipt of such funds, you may release from escrow the Note, the Purchase Agreement and the Instructions to Transfer Agent (each as defined in the Agreement).

REDWOOD SCIENTIFIC TECHNOLOGIES, INC.

By: _____
Name: Jason Cardiff
Title: Chief Executive Officer

IN WITNESS WHEREOF, this Security Agreement has been executed as of the date first set written above.

**REDWOOD SCIENTIFIC TECHNOLOGIES, INC.**

By: _____ _chief Execute 9/u3_

Name: Jason Cardiff
Title: Chief Executive Officer

**AUCTUS FUND, LLC**

By: _____
Name: Lou Posner
Title: Managing Member

**PRIVILEGED AND CONFIDENTIAL**

The information and any accompanying documents is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this communication is not the intended recipient or the employee or agent responsible to deliver the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying or use of this communication is strictly prohibited. If you receive this communication in error, please notify me immediately by email and delete it from your computer system, destroy the original communication and its attachments without reading them or saving them to disk or otherwise. Thank you.

2

**PRIVILEGED AND CONFIDENTIAL**

The information and any accompanying documents is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this communication is not the intended recipient or the employee or agent responsible to deliver the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying or use of this communication is strictly prohibited. If you receive this communication in error, please notify me immediately by email and delete it from your computer system, destroy the original communication and its attachments without reading them or saving them to disk or otherwise. Thank you.

2

Case 5:23-cr-00021-JGB   Document 185-2   Filed 12/02/24   Page 222 of 482   Page
ID #:5752
Case 8:18-cv-02104-SJO-PLA   Document 52-2   Filed 10/01/18   Page 55 of 76   Page ID #:3248

EXHIBIT A
(see attached)

## AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS

Redwood Scientific Technologies, Inc., a Delaware corporation (the "Company") issued that certain senior secured convertible promissory note to Auctus Fund, LLC (the "Holder") on July 18, 2018, in the principal amount of $725,000.00 (the "Note"). The Company hereby irrevocably authorizes the Holder to initiate debit and credit entries to its checking account indicated below (the "Account") and the depository named below (the "Depository"), to debit or credit the same to such Account, for the amounts specified in the Note until the Note is satisfied in its entirety. The Company hereby represents and certifies that the Account is used for commercial and/or business purposes only.

Depository Name: <u>Redwood Scientific Technologies, Inc.</u>

Name of Bank: _____ Zion Bank _____

Routing/ABA Number: _____ 0054 _____

Account Number: _____ 4694 _____

A copy of a voided check for the Account is attached hereto as Exhibit "A". This authority is to remain in full force and effect until the Holder confirms in a signed writing that the Note has been satisfied in full, and in a manner as to afford the Depository a reasonable opportunity to act on it.

Redwood Scientific Technologies, Inc.

By: _____

Name: <u>Jason Cardiff</u>

Title: <u>Chief Executive Officer</u>

## AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS

Redwood Scientific Technologies, Inc., a Delaware corporation (the "Company") issued that certain senior secured convertible promissory note to Auctus Fund, LLC (the "Holder") on July 18, 2018, in the principal amount of $725,000.00 (the "Note"). The Company hereby irrevocably authorizes the Holder to initiate debit and credit entries to its checking account indicated below (the "Account") and the depository named below (the "Depository"), to debit or credit the same to such Account, for the amounts specified in the Note until the Note is satisfied in its entirety. The Company hereby represents and certifies that the Account is used for commercial and/or business purposes only.

Depository Name: <u>Redwood Scientific Technologies, Inc.</u>

Name of Bank: <u>Zion Bank</u>

Routing/ABA Number: <u>)054</u>

Account Number: <u>4462</u>

A copy of a voided check for the Account is attached hereto as Exhibit "A". This authority is to remain in full force and effect until the Holder confirms in a signed writing that the Note has been satisfied in full, and in a manner as to afford the Depository a reasonable opportunity to act on it.

Redwood Scientific Technologies, Inc.

By: _____
Name: Jason Cardiff
Title: Chief Executive Officer

AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS

Redwood Scientific Technologies, Inc., a Delaware corporation (the "Company") issued that certain senior secured convertible promissory note to Auctus Fund, LLC (the "Holder") on July 18, 2018, in the principal amount of $725,000.00 (the "Note"). The Company hereby irrevocably authorizes the Holder to initiate debit and credit entries to its checking account indicated below (the "Account") and the depository named below (the "Depository"), to debit or credit the same to such Account, for the amounts specified in the Note until the Note is satisfied in its entirety. The Company hereby represents and certifies that the Account is used for commercial and/or business purposes only.

Depository Name: <u>Redwood Scientific Technologies, Inc.</u>

Name of Bank: <u>Zion Bank</u>

Routing/ABA Number: <u>0054</u>

Account Number: <u>4454</u>

A copy of a voided check for the Account is attached hereto as Exhibit "A". This authority is to remain in full force and effect until the Holder confirms in a signed writing that the Note has been satisfied in full, and in a manner as to afford the Depository a reasonable opportunity to act on it.

Redwood Scientific Technologies, Inc.

By: _____
Name: Jason Cardiff
Title: Chief Executive Officer

## AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS

Redwood Scientific Technologies, Inc., a Delaware corporation (the "Company") issued that certain senior secured convertible promissory note to Auctus Fund, LLC (the "Holder") on July 18, 2018, in the principal amount of $725,000.00 (the "Note"). The Company hereby irrevocably authorizes the Holder to initiate debit and credit entries to its checking account indicated below (the "Account") and the depository named below (the "Depository"), to debit or credit the same to such Account, for the amounts specified in the Note until the Note is satisfied in its entirety. The Company hereby represents and certifies that the Account is used for commercial and/or business purposes only.

Depository Name: <u>Redwood Scientific Technologies, Inc.</u>

Name of Bank: <u>Zion Bank</u>

Routing/ABA Number: <u>0054</u>

Account Number: <u>1470</u>

A copy of a voided check for the Account is attached hereto as Exhibit "A". This authority is to remain in full force and effect until the Holder confirms in a signed writing that the Note has been satisfied in full, and in a manner as to afford the Depository a reasonable opportunity to act on it.

Redwood Scientific Technologies, Inc.

By: _____
Name: <u>Jason Cardiff</u>
Title: <u>Chief Executive Officer</u>

## AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS

Redwood Scientific Technologies, Inc., a Delaware corporation (the "Company") issued that certain senior secured convertible promissory note to Auctus Fund, LLC (the "Holder") on July 18, 2018, in the principal amount of $725,000.00 (the "Note"). The Company hereby irrevocably authorizes the Holder to initiate debit and credit entries to its checking account indicated below (the "Account") and the depository named below (the "Depository"), to debit or credit the same to such Account, for the amounts specified in the Note until the Note is satisfied in its entirety. The Company hereby represents and certifies that the Account is used for commercial and/or business purposes only.

Depository Name: <u>Redwood Scientific Technologies, Inc.</u>

Name of Bank: <u>Zinn Bank</u>

Routing/ABA Number: <u>20054</u>

Account Number: <u>.4447</u>

A copy of a voided check for the Account is attached hereto as Exhibit "A". This authority is to remain in full force and effect until the Holder confirms in a signed writing that the Note has been satisfied in full, and in a manner as to afford the Depository a reasonable opportunity to act on it.

Redwood Scientific Technologies, Inc.

By: _____
Name: <u>Jason Cardiff</u>
Title: <u>Chief Executive Officer</u>

Case 5:23-cv-00021-JGB_ Document 185-2 Filed 12/02/24 Page 228 of 482 Page
ID #:5758
Case 5:18-cv-02104-SJO-PLA Document 52-2 Filed 11/01/18 Page 60 of 76 Page ID #:5254

Date

**First Western Trust**
Attention: Karen Walker
P.O. Box 7424
Jackson, WY 83002

**RE: Employee Access**

To Whom It May Concern:

Please allow internet access and account inquiry access to my account(s) for the
following person:

>   **NAME:**
>   **ADDRESS:**
>   **PHONE:**
>   **SSN:**
>   **EMAIL ADDRESS:**

I understand that this gives authority to this person to see online and make account
inquires on the following account:

>   **ACCOUNT NAME:**  **Put any and all Accounts for Business**
>   **Account Number**  or list by individual account numbers

Sincerely,

Name of Owner

## Schedule C

| | |
|---|---|
| Account Name: | Auctus Fund Management, LLC |
| Account Address: | 545 Boylston Street, 2nd Floor, Boston, MA 02116 |
| ABA Routing Number: | 0120 |
| Account Number: | |
| Bank Name: | Citizens Bank |
| Bank Address: | 1 Exchange Place<br>53 State Street<br>Boston, MA 02109 |

## Schedule D

| | |
|---|---|
| Account Name: | Auctus Fund, LLC |
| Account Address: | 545 Boylston Street, 2nd Floor, Boston, MA 02116 |
| ABA Routing Number: | 2186 |
| Account Number: | |
| Bank Name: | People's United Bank |
| Bank Address: | 850 Main Street, Bridgeport, CT 06604 |

IN WITNESS WHEREOF, the undersigned has executed this Officer's Certificate as of the date first written above.

_____

Jason Cardiff
Chief Executive Officer

Case 8:18-cv-02104-SJO-PLA   Document 52-2   Filed 11/01/18   Page 65 of 76   Page ID #:5762

# Exhibit 8

# REDWOOD SCIENTIFIC TECHNOLOGIES, INC.

## Consolidated Balance Sheets

|  | December 31, | |
| --- | --- | --- |
|  | 2016 | 2015 |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 161,708 | $ 583,566 |
| Accounts receivable, net | 73,421 | 19,264 |
| Inventory | 65,506 | 113,463 |
| Prepaids and other current assets | 55,385 | 7,263 |
| Total current assets | 356,020 | 723,556 |
| Non-current assets | | |
| Retention receivable | 366,057 | 438,767 |
| Total non-current assets | 366,057 | 438,767 |
| Total assets | $ 722,077 | $ 1,162,323 |
| **Liabilities and Stockholders' Deficit** | | |
| Current liabilities | | |
| Accounts payable | $ 829,983 | $ 201,808 |
| Accrued liabilities | 916,453 | 469,941 |
| Advances from related party | 238,876 | 202,783 |
| Series A convertible notes ($1,500,000 face value, net of $0 and $124,856 debt discount, respectively) | 1,500,000 | 1,375,144 |
| Note payable, current portion | 451,174 | - |
| Total current liabilities | 3,936,486 | 2,249,676 |
| Non-current liabilities | | |
| Other long-term liabilities | - | 1,075,000 |
| Note payable, less current portion | 590,001 | |
| Derivative warrant liability | 1,132,705 | 1,316,953 |
| Total non-current liabilities | 1,722,706 | 2,391,953 |
| Total liabilities | 5,659,192 | 4,641,629 |
| Commitments and contingencies | | |
| Stockholders' deficit | | |
| Preferred stock, $0.01 par value; 10,000,000 shares authorized; no shares issued or outstanding | - | - |
| Common stock, $0.01 par value; 50,000,000 shares authorized; 8,225,142 (2016) and 5,916,556 (2015) shares issued; 7,475,142 (2016) and 5,916,556 (2015) shares outstanding | 74,530 | 59,166 |
| Additional paid-in capital | 4,905,682 | 2,192,965 |
| Accumulated deficit | (9,917,327) | (5,731,437) |
| Total stockholders' deficit | (4,937,115) | (3,479,306) |
| Total liabilities and stockholders' deficit | $ 722,077 | $ 1,162,323 |

See notes to consolidated financial statements.

- 3 -

# Exhibit 9

# REDWOOD SCIENTIFIC TECHNOLOGIES, INC.

## Consolidated Statements of Operations

| | For the Years Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Sales, net | $ 4,555,725 | $ 3,586,968 |
| Cost of sales | 1,104,210 | 1,152,691 |
| Gross profit | 3,451,515 | 2,434,277 |
| Operating expenses | | |
| Advertising and media | 2,545,048 | 3,346,304 |
| Payroll, benefits, and related | 3,568,068 | 835,675 |
| General and administrative | 1,105,162 | 1,255,493 |
| Rents and occupancy | 179,020 | 239,449 |
| Total operating expenses | 7,397,298 | 5,676,921 |
| Loss from operations | (3,945,783) | (3,242,644) |
| Other (expense) income | | |
| Interest expense | (424,355) | (1,514,942) |
| Unrealized loss (gain) on derivative warrants | 184,248 | (29,598) |
| Loss on settlement of lawsuit | - | (1,075,000) |
| Other income | - | 165,427 |
| Total other expense | (240,107) | (2,454,113) |
| Loss before income taxes | (4,185,890) | (5,696,757) |
| Income tax expense | | |
| Federal taxes | - | - |
| State taxes | - | - |
| Total income tax expense | - | - |
| Net loss | $ (4,185,890) | $ (5,696,757) |

See notes to consolidated financial statements.

Case 8:18-cv-02104-SJO-FLA   Document 52-2   Filed 11/01/18   Page 69 of 76   Page ID #:3262

# Exhibit 10

 *Master Prophet said...*

**Peter, for a reason that I'll explain to you in just a moment, I had an irresistible urge to ask God to give me a glimpse into your future - and what I saw was GLORIOUS! I tried to make sure that you had this MIRACULOUS ANOINTED OIL in your hands as soon as I got your call. It was very important to me that you have what the Spirit showed me during this time of Miracle manifestation in your life.**

****AUTO**ALL FOR AADC 112
Peter

Rockaway Beach, NY 11693-1736

⊩⊩⊪⊩⊪⊩⊪⊩⊪⊩⊪⊩⊪⊩⊪⊩⊪⊩⊪⊩⊪⊩⊪⊩⊪⊩

✳ Dear Peter,

   I was so happy when you made contact with me and I want you to know I take this very seriously I am here for you and I want to lead you and guide you into a place that makes your dreams come true. I also need you to know whatever you share with me is private I am your personal Master Prophet and I have pledged to the Lord to keep you private and safe at all costs. From time to time as the Lord leads, I will communicate with you. And when I do all I ask is that you take time to respond. <u>As far as I am concerned this is a personal ministry</u> and it is all about <u>you and GOD</u>.

   Peter, I want to agree with you and we need to take special steps. I take it very seriously and I see God moving on this even now.

   Yes, <u>it's true, for a very special reason that I'll explain</u> in this letter, I suddenly had an irresistible urge to take a peek into your future.

   You know, Peter, I've only very rarely felt this urge or leading to look into the future to help someone <u>**but when I do it's for an important** reason.</u>

   The last time this happened to me was when I sensed that an <u>**extremely happy**</u> event would take place in the life of one of the people whom God had led to me. This person is a precious woman who lives in Lafayette, LA. She has given me permission to use her name in my correspondence with you.

   Debra asked me to help her at a particularly difficult time in her life. She was struggling with health and family problems as well as satanic bondages. And she also had an urgent need for money. Unfortunately, she could get no help from anyone. **Even her own pastor refused to deal with her any further!** It seemed in the natural that there were no indications of any favorable changes in her situation.

   One morning, I had an almost <u>**irresistible urge to pray for Debra**</u> as I was thinking about her situation and her family. Without hesitation, I began to pray and almost immediately I began **to sense a strange and powerful anointing coming upon me.** My eyes were closed and when I opened my eyes I was in a vision. What I saw left me with no doubt: Yes, Debra would soon receive a significant <u>amount of money.</u> (I saw the number 2, followed by several zeros in the vision)

   **I saw several other things about her life and <u>several steps of faith</u> that she needed to take in order to release this miracle.**

   I wrote Debra right away to let her know what the Lord had shown her and what steps of faith she needed to take to release this miracle (just like I'm writing to you today). I told her exactly when to sow a special seed and the amount she should sow **to get the miracle harvest she needed.**

   I didn't hear from her for a while. A few weeks ago, I got a letter from her son. She told me that **after his mother acted in obedience and used the faith tools that I sent her she unexpectedly received the delightful amount of $18,000.00!** Debra has, by now, seen a tremendous change in her situation; her financial difficulties have been eased by this unexpected blessing. You can read the inspiring letter her daughter sent me along with the rest of her story, reproduced at the end of my letter to you.

   If I've taken this much time to tell you Debra's story, it's simply because yesterday morning after I got your request for the Miracle Oil, **I had an irresistible URGE TO PRAY FOR YOU, Peter, exactly as I did for Debra!**

   In fact, I honestly believe you could very well have the same experience as Debra, that is to say, <u>**you could be getting your hands on a LARGE SUM OF MONEY sooner than you think.**</u> In your case as well as Debra's I believe this sum will come from an unexpected source… a source that only God knows about. I can even tell you that the number 10, followed by several zeros is what I saw in the VISION of the LORD.

✳ Yes, it's true, and just as for Debra, I had a sudden desire to pray and wait upon the Lord concerning her situation. I am now <u>receiving the</u> same spiritual prompting and am feeling the same powerful anointing pulsating through

*KEEP READING* →

Case 5:23-cv-00021-JGB-A   Document 135-2   Filed 12/02/24   Page 238 of 482   Page
ID #:5768
Case 5:18-cv-02104-SJO-PLA   Document 52   Filed 11/01/18   Page 2 of 76   Page ID #:264

me. As I opened my eyes what I saw was a spiritual vision. **The powerful events I
witnessed in the spirit realm reveled that your upcoming future is altogether ASTOUNDING!** Listen,
and then you be the judge.

First of all, I can tell you that **if you'll take the FAITH STEPS that I'm about to
reveal to you** and I will tell you exactly what to do, your life and your loved one's
life will take some of the most incredible turns. Your Faith will break the chain
that hinders your financial deliverance. **You'll see your season change and your life will be
transformed in a manner that will utterly amaze you!**

**The first thing that I saw in the vision while praying for you was this:**

I saw a new day dawning for you! The sun was just beginning to break over
the horizon in front of you. I heard the voice of the Lord proclaim: **"the night is
over; the darkness is dissipating, and a new day is dawning for my Child."**

**Here is the interpretation that the Lord gave me concerning the rising of the sun.** It
foretells that the person for whom it's destined (YOU) will very shortly have an
unexpected, considerable and significant amount of money. The rising sun
signifies triumph over your circumstances and situation as well as a new spirit
of initiative. The rising sun also signifies a very lively spirit and very strong
spiritual perception. **When the anointing of the Holy Spirit comes upon you, you will
demonstrate brilliant intelligence.** Do you remember how the doctors of the law were
astonished when they heard 12-year-old Jesus speak?

I can tell you, as I told Debra, **exactly** what Faith Steps to take to see the
release of this money and when, **and exactly how to take them.**

**In order for me to be completely precise, I will also need your participation that
will be indispensable for you to attain this sum.**

But this amount of **money will not be the only amount you get because I saw a second
blessing coming to you several weeks after you received the first amount.** In fact, you were
still rejoicing about the first amount when this second blessing came in. The
second blessing will be a little less than the first blessing…but the way it
comes to you will be very interesting. Partner English, you'll know beyond a
shadow of a doubt that it's miracle money, that is comes from God and that it was
released as a direct result of your faith and obedience unto the Lord. I'll tell
you more about this a little later…

**THE SECOND VISION THAT GOD GAVE ME for you…**

**I saw fiery chariots driven by Angels just like the ones that carried Elijah into heaven drawn by
magnificent, powerful horses.** The Lord began to give me the interpretation of this
**VISION.** This vision signifies angelic protection, and God given triumph in your
circumstances and difficult situations. BUT angelic hosts ready to do battle also
signify that some battles lie ahead. **It is vitally important that we know the EXACT
significance of this VISION so that you can be ready for whatever Satan throws at you.** Yes, it's
possible to completely avoid Satan's traps if act now and follow divine guidance
and direction.

**THE THIRD VISION THAT GOD LET ME SEE,** while thinking carefully about your
situation…

This was a very strange vision of a man walking in semi-darkness with lamps
attached to his shoes so that he could see where he was going. In Biblical times
this was the way people who walked at night could see the perils, roadblocks and
obstacles that lay ahead.

**This vision-the LORD let me know-has two different interpretations.** First, there is
someone who is close to you and you are not certain about this person's feelings
and intentions. Second, you are about to have an extremely favorable, rewarding
and unforeseen encounter.

✳ It is of utmost importance to you, that you know exactly where you stand
with the first individual and know exactly what the encounter with this second
individual signifies.

Beloved, if this is the case, I believe that you are right on the edge of
seeing a **SOLUTION** that will bring this person who occupies your thoughts back to
you **more loving and attentive** to you and the things of God than ever before. My first
impression seems to be that you are having some problems with a person who you
hold very dear. Do you feel that they are not as free and open with you as they
once were? Is this person less interested in you?

✳ **Concerning the second individual:** You will have some unforeseen encounters that
could drastically alter or completely change your life. You have, within the
circle of people you deal with, someone very close who is looking to you —OVER—

for guidance and inspiration. Do you know who this is or might be?

— 3 —

**THIS IS WHAT YOU MUST DO, RIGHT AWAY!**

You must very carefully follow the faith steps that I have outlined for you using the Miracle Anointing Oil. **Without your participation I will not be able to give you INDISPENSABLE explanations** regarding these visions and these events that will strongly influence your life. Your action now will release the power to experience victory over your circumstances.

Just as for Debra, the **VISION** indicated to me with certainty that you should receive, over the course of the next few months, an important amount of money (as I've told you I saw the number 10 followed by many zeros). **By taking this step of faith, you'll actually be setting yourself up for the supernatural blessing.**

When we united our faith in agreement, Debra succeeded in getting enough to solve her immediate problems, when she had nothing that predisposed her to riches…So wouldn't the same hold true for you?

**The second VISION, remember, tells about a "problem" that might soon appear in your life.**

It's **imperative** that we know the exact nature of this problem, so we can either completely avoid it or plan a strategy to overcome it. This is the reason why it's necessary that you act on your faith TODAY **(don't wait one more day!)** so I can tell you with greater accuracy what danger seems to threaten you, and how you can ensure that it never appears.

**The third vision** concerned your relationships and matters of the heart… specifically I believe it dealt with certain people in your family and circle of acquaintances.

Does the person who occupies your thoughts seem distant or disinterested in you? Do they seem less affectionate? Do you feel someone is trying to move further away from you? **If this is the case, you must absolutely know more!** It's the reason for which you need to follow through with this relationship that you've begun with this prophet.

As you can see, **it's truly necessary for your well-being and your future that you ACT NOW!** There are some steps of faith that only you can take; I can't take them for you… you, and no one else.

Follow these instructions… Fill a basin with warm water**. NOW EMPTY THE MIRACLE ANOINTED OIL into the basin.** As you "move the anointed oil water" around in the basin, pray this prayer, **"OH GOD, IN THE NAME OF JESUS…COMPLETE EVERY GOOD WORK YOU HAVE STARTED IN MY LIFE…AND LET MY OBEDIENCE TODAY COME UP BEFORE YOU AS A MEMORIAL OF MY FAITH AND OBEDIENCE! AMEN."** *FOLLOW EXACT DIRECTIONS!*

By exactly following the directions the Lord gave me for you, I was shown in the spirit several things that will start to happen. In the next 16 days you will begin to experience harmonious relationships because of an inner feeling of calm and balance. Your plans will work out well, and your goals will be more easily achieved than at other times in your entire life. **Other people will not stand in your way, and you can expect favors or at least less resistance from others and even those seen as enemies will move in your favor.** People that were enemies in the past will not know what happened and will want to help you… **Great financial advancement is favored because of increased confidence and ease; you see things are all going to fall into place in your favor.**

Now this can only happen if God moves and we are united together I need you to follow the steps below:

✓ My child, **FIRST:** take a clean washcloth and wash your eyes with this anointed oil water. Keep your eyes closed as you do this! The Holy Ghost desires to sharpen your focus and increase your perception to see things you have formerly overlooked **AND ALSO TO SEE NEW OPPORTUNITIES THAT YOU WOULD NOT HAVE SEEN! GLORY!**

✓ **SECOND:** Wash your feet with this water that you placed the Miracle oil. **GOD IS ENDEAVORING TO WALK YOU INTO A TOMORROW UNLIKE ANY YESTERDAY YOU HAVE EVER KNOWN! What I see is ABSOLUTELY INCREDIBLE!** In fact, I "sense" you have been going through some very difficult times. Am I right? Some of the personal problems you have been dealing with seem at times almost INSURMOUNTABLE! I "discern" you not only need a serious touch in your body, but also your mind is

*GO ON TO PAGE 4*

overwhelmed by worry and fatigue. Beloved, get ready for some radical changes…**YOUR FAITH IS NOW ON THE "CUTTING EDGE"! GLORY!**

I feel your faith touching the heart of God, right now! **STEP THREE:** Anywhere in your body where there is sickness or pain, gently wash this area with this water that you placed the oil in, saying **"IN THE NAME OF JESUS, BE MADE WHOLE!"** Remember, God used Anointed oil in the Bible to bring more miracles to more people than any other method. If I didn't feel a definite witness of the Holy Ghost between us now, and knew beyond a shadow of a doubt you were a believer, **YOU WOULD NOT BE HOLDING THIS LETTER IN YOUR HAND!**

Lynette, while this "faith cycle" is high between us **WE MUST CONCENTRATE ON YOUR MONEY MATTERS AND ESPECIALLY ON RELEASING THESE TWO SUMS OF MONEY THAT GOD SHOWED ME**! Realize one thing: God would never direct me to write you like this if He wasn't **ALREADY TAKING MEASURES TO BLESS YOU!**

**STEP FOUR:** Wipe off your phone with this cloth. You are going to get news after you do this that will be worth thousands of dollars to you. Throw a few drops of this Anointed oil on your mailbox because **money is COMING after you do this in faith! GLORY!** I am seeing a breakthrough amount of money it should be more than $3,950.50 and it is important that when this happens you act as one of God's silent Angels. I am also seeing God move with your prayer needs but only as long as we have agreement together.

You must now walk toward God in your giving. I feel in the spirit a seed that will move God is $60.00. If you in no way can give $60.00, give at least $40.00. I am also seeing for you a challenge amount of $250.00 don't let the Devil take your blessings. We both know you cannot lose by giving; only the devil will tell you to stop. God wants you to prosper and satan wants to hold you back and keep you down. That is why I am here to intervene on your behalf and push you through to the promises that belong to you. In this month and at this time you must **SOW A TURN AROUND SEED OF YOUR FIRST FRUITS.** Maybe there are some tithes you have been saving.

After you finish these steps of faith **your answer will let me know that YOU HAVE OBEYED GOD** and I will then be able to give you more specific insights and directions from God. These revelations from God will give you the certainty you're missing and that you need to avoid danger and grab hold of the two blessings God is sending your way. *DO NOT WAIT!*

This is so important, I need you to write your name on the Anointed Oil Packet and send back the empty Anointed Oil Packet to me along with your prayer requests. Once I have this I will be able to hold it in prayer and agreement and place it on my special prayer altar for 24 hours on your behalf. Once that is done and the spirits and spoken to me I will send you the anointed turn around kit.

I'm waiting with impatience for news from you that you completed the faith steps of obedience that I gave you. **Now fill out the prayer page and get it back to me right away!** Don't let this sit in your home longer than 24 hours.

With Love and Prayers,

*Look for your Anointed Oil inside the enclosed return envelope. I can't wait to get it back!*

People United For Christians ● PO Box 370 ● La Verne CA 91750-0370

**Please make vow offerings payable to People United For Christians. Thank you!**

# Exhibit 11

**People United for Christians**

## Profit & Loss

All Transactions
Downloaded from its QuickBooks Accounting File

|  | Dec 31, 17 | Apr 17, 18 | TOTAL |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| Income | | | |
| Direct Public Support | | | |
| Gifts in Kind - Goods | 5,980.13 | 0.00 | 5,980.13 |
| Direct Public Support - Other | 0.00 | 8,307.62 | 8,307.62 |
| Total Direct Public Support | 5,980.13 | 8,307.62 | 14,287.75 |
| Total Income | 5,980.13 | 8,307.62 | 14,287.75 |
| | | | |
| Expense | | | |
| Contract Services | | | |
| Outside Contract Services | 2,144.77 | 8,052.57 | 10,197.34 |
| Contract Services - Other | 508.13 | 5,909.90 | 6,418.03 |
| Total Contract Services | 2,652.90 | 13,962.47 | 16,615.37 |
| | | | |
| Operations | | | |
| Printing and Copying | 0.00 | 5,558.40 | 5,558.40 |
| Supplies | 0.00 | 683.98 | 683.98 |
| Total Operations | 0.00 | 6,242.38 | 6,242.38 |
| | | | |
| Payroll Expenses | 1,498.42 | 8,227.48 | 9,725.90 |
| Postage | 1,490.00 | 18,632.33 | 20,122.33 |
| | | | |
| Total Expense | 5,641.32 | 47,064.66 | 52,705.98 |
| | | | |
| Net Ordinary Income | 338.81 | (38,757.04) | (38,418.23) |
| | | | |
| **Net Income** | **338.81** | **(38,757.04)** | **(38,418.23)** |

Case 5:23-cv-00021-JGB_A Document 185-2 Filed 12/03/24 Page 243 of 482 Page
Case 5:18-cv-02104-SJO-PLA Document 52-2 Filed 11/01/18 Page 76 of 76 Page ID #:3269
ID #:5773

## People United for Christians
## Balance Sheet
### All Transactions
### Downloaded from its QuickBooks Accounting File

|  | Dec 31, 17 | Apr 17, 18 |
|---|---|---|
| **ASSETS** |  |  |
|   **Current Assets** |  |  |
|     **Checking/Savings** |  |  |
|       PUFC- Citizens | 338.81 | (37,722.07) |
|     **Total Checking/Savings** | 338.81 | (37,722.07) |
|   **Total Current Assets** | 338.81 | (37,722.07) |
| **TOTAL ASSETS** | **338.81** | **(37,722.07)** |
|  |  |  |
| **LIABILITIES & EQUITY** |  |  |
|   **Liabilities** |  |  |
|     **Current Liabilities** |  |  |
|       **Accounts Payable** |  |  |
|         Accounts Payable | 0.00 | 696.16 |
|       Total Accounts Payable | 0.00 | 696.16 |
|     Total Current Liabilities | 0.00 | 696.16 |
|   **Total Liabilities** | 0.00 | 696.16 |
|  |  |  |
|   **Equity** |  |  |
|     Retained Earnings | 0.00 | 338.81 |
|     Net Income | 338.81 | (38,757.04) |
|   **Total Equity** | 338.81 | (38,418.23) |
|  |  |  |
| **TOTAL LIABILITIES & EQUITY** | **338.81** | **(37,722.07)** |

# EXHIBIT 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | October 9, 2020 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 1 of 28 |
|---|---|---|---|

Present: The Honorable    DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT [423, 441]**

This matter is before the Court on the cross-motions for summary judgment ("MSJs") brought by Plaintiff Federal Trade Commission ("FTC") [Doc. # 423] and by Defendants Jason Cardiff and Eunjung Cardiff [Doc. # 441]. The cross-MSJs are fully briefed. [Doc. ## 490, 491, 498, 499.] The Court held a hearing on October 9, 2020.

For the reasons stated below, the Court **GRANTS** in part Plaintiff's MSJ as to the Cardiffs' liability and **DENIES** in part Defendants' MSJ relating to the Cardiffs' liability.

**I.**
**EVIDENTIARY OBJECTIONS**

The Cardiffs object to many of the FTC's Statements of Undisputed Fact because they "lack [] timeframe" and because Defendants ceased to advertise and market the three products at issue in February 2018, months before this action was filed in October 2018. *See* Defs.' Statement of Genuine Disputes [Doc. # 491-1]. Unless otherwise stated, the Court **OVERRULES** those objections because: (1) the time frame is clear by the context of the asserted fact, (2) the FTC states the relevant time frames in the Complaint, (3) evidence in the record indicates that the products continued to be marketed and sold later in 2018, and (4) evidence of past violations is relevant to the FTC's claims.

The Cardiffs also make repeated blanket objections to Statements of Undisputed Fact as irrelevant without any support for the objection. Where the Court determines that facts are relevant and refers to them, the Court **OVERRULES** the relevance objection. Insofar as the Court does not rely on a given fact in rendering its decision, the Court **OVERRULES** the relevance objection as moot.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 2 of 28 |

Finally, the Court notes that a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact. *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997). Similarly, assertions in briefs that are unsupported by citations to evidence do not give rise to disputed facts. *See* Fed. R. Civ. P 56(c)(1)(A) (requiring a party to support its factual position by "citing to particular parts of materials on the record"); *Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015) ("[A]rguments in briefs are not evidence."); *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979) (conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of fact).

The Court addresses other evidentiary objections in its discussion below as needed.

## II.
## BACKGROUND[1]

### A.     The Cardiffs and their Businesses

At all times relevant to this action, Defendants Jason and Eunjung Cardiff were owners, officers, directors and/or members of the business entity Defendants in this action:  Redwood Scientific Technologies, Inc. ("Redwood") (encompassing Redwood California, Redwood Nevada, and Redwood Delaware); Run Away Products, LLC ("Run Away"); Advanced Men's Institute Prolongz LLC ("AMI"); and Identify LLC (together, the "Entity Defendants").[2] SUF 18-36, 45-47, 52-67.

Run Away, AMI, and Redwood are iterations of the same entity such that the Cardiffs frequently refer to them interchangeably in business records.  In 2009, Eunjung formed Run Away and was its President and manager, and Jason was a member and Vice President.  SUF 34-36.  In 2014, Eunjung formed AMI and was a member, owner, and Chief Executive Officer ("CEO"),

---

[1] Due to Defendants' failure to adhere to the Initial Standing Order's instructions when providing disputed and undisputed facts, the Court relies on the FTC's response to the Defendants' Statement of Genuine Dispute ("DGSD") for the majority of undisputed facts.  For clarity, the Court cites to the FTC's response as the Statement of Undisputed Facts ("SUF") and notes Defendants' objections where necessary.  [Doc. # 499-1.]  The Court also cites to the FTC's response to Defendants' additional Statement of Undisputed Material Facts ("DSUMF").  [Doc. # 490-1.]

[2] In 2017, Jason became the sole member and manager of Defendant Identify LLC and used it as an umbrella to register Redwood Scientific Technologies, Runaway Products, Advanced Men's Institute, and TBX-FREE as Identify's trade names.  SUF 32-33, 47-48, 254.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 3 of 28 |

while Jason was managing member, owner, and President. SUF 45, 53, 57-59, 209, 224. Eunjung changed AMI's name to Redwood Scientific Technologies, LLC in November 2014, and then converted it to its corporate form, Redwood California. SUF 61, 210-11. Between January 1, 2014 and October 3, 2018, Jason was the sole owner, President, CEO, Chief Financial Officer ("CFO"), Secretary, and director of Redwood California, and Eunjung was its owner, director, Secretary, Chief Operating Officer ("COO"), and Director of Marketing. SUF 9-24, 61-65, 256. Redwood Nevada was incorporated in December 2014, and Redwood CA became a wholly-owned subsidiary of Redwood Nevada. SUF 212-13, 215. Redwood Delaware was formed when Redwood Nevada merged with a Delaware corporation in 2017. SUF 217. The Cardiffs retained similar positions in Redwood Nevada and Redwood Delaware to the ones they held in Redwood CA. SUF 25-31, 66-67. The principal places of business for both Redwood Nevada and Redwood Delaware are in California. SUF 214, 218.

In 2017, Jason became the sole member and manager of Defendant Identify LLC and used it as an umbrella to register Redwood Scientific Technologies, Runaway Products, Advanced Men's Institute, and TBX-FREE as Identify's trade names. SUF 32-33, 47-48, 254. Jason and Eunjung were also named beneficiaries of Carols Place Trust and owner/partners (through two entities that the Cardiffs control) of Defendant Carols Place Limited Partnership, which now holds 99.9 percent of the Cardiffs' common shares in Redwood Delaware, as well as title to the Cardiffs' residence in Upland, CA. SUF 37-40, 68-71,172, 228, 278.

Redwood and other Entity Defendants were in the business of marketing what the Cardiffs call "homeopathic dissolvable thin-film strip products," including an aid to smoking cessation called TBX-FREE; an appetite suppressant and weight loss supplement called Eupepsia Thin; and a men's sexual performance product called Prolongz (together, the "Products"). SUF 233. The Products were primarily marketed to consumers through television infomercials, websites, and social media posts described in more detail below. SUF 234. As of October 22, 2018, Redwood was still selling all three products. SUF 232.

The Cardiffs do not dispute that all of the Entity Defendants, not just Redwood, were involved in selling the Products. Several Entity Defendants share office space and employees. SUF 235-36, 250-53. Danielle Walker, who worked for the Cardiffs in various capacities, including as the Director of Operations for Redwood, where she worked from late 2014 until October 2018, attested that "it was all a single business operation marketing oral film strips." SUF 249.[3] The Entity Defendants all participated in advertising the Products, applied for and obtained

---

[3] Walker was also a Defendant in this action who settled and stipulated to a permanent injunction that the Court approved on May 16, 2019. [Doc. # 114.]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 4 of 28 |

merchant accounts to process payments for the Products, and purchased or acted as consignees for oral film strips from suppliers in China and India. SUF 236-39. In response to one supplier's bank's request to clarify that all of these companies whose names appeared on invoices are related, Jason Cardiff signed a statement as President of Identify, LLC that declared that Redwood, AMI, Run Away, and Identify were "our group of companies (our sister concern companies)." SUF 240.

Undisputed evidence shows that both Cardiffs controlled the Entity Defendants' bank accounts and used various bank accounts to meet operational costs for Redwood and their other businesses and to pay for the Cardiffs' personal expenses such as luxury car leases, cruises, resort lodging, private charter air travel, and clothing and department store purchases. SUF 51, 72-75, 78, 170, 173-77, 234-46, 251. Between April 2015 and May 2018, the Entity Defendants transferred almost $4 million between themselves. SUF 264. Both Cardiffs have also personally guaranteed payments promised by one or more of their businesses. SUF 123, 171, 266. While the Cardiffs assert that they invested $3 million of their "own money" into Redwood, and Eunjung asserts that she invested $800,000 personally into Redwood, no records or financial documents support either assertion. DSUMF 1, 28.

The Cardiffs do not dispute that they had final authority over most, if not all, business decisions regarding the Entity Defendants. SUF 206.[4] For example, Jason Cardiff had final approval of Redwood's websites and all Redwood product advertising online, in video, and in print. SUF 82-83. Eunjung Cardiff approved payment of invoices and bills, was in charge of tracking media performance, and received daily charts showing which advertisement generated each sales call. SUF 146-47, 173, 180. Both Cardiffs were heavily involved in the creation and final approval of advertising material for the Products, as well as decisions on when and where to place advertisements. SUF 87-98. The Cardiffs do not contest most of the FTC's detailed accounts of their involvement with third-party contractors' advertising campaigns for the three Products, as discussed in more detail below. *See* SUF 114-116, 118-119 (Jason instructed a subcontractor to include claims from Redwood's website in television advertisement); SUF 122 (Jason supervised the design of Eupepsia Thin product packaging); SUF 150 (Eunjung confirmed an advertisement for TBX-FREE that stated guaranteed withdrawal-free smoking cessation); SUF 153 (Eunjung asked for the Eupepsia Thin advertisement to state "Lose up to 100 pounds"); SUF 169 (Eunjung provided the voiceover for at least two Eupepsia Thin television advertisements); SUF 124-26, 167-68 (both Cardiffs were involved in a telemarketing campaign delivering ringless voicemail

---

[4] Although the Cardiffs assert that Danielle Walker had the authority to make decisions on contracts, expenses, and advertising when the Cardiffs were not available, they do not provide evidence that Walker in fact made any decisions that the Cardiffs did not approve of, and other employees recall seeing Jason in the Redwood CA office almost daily and Eunjung in the office weekly. SUF 206.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 5 of 28 |

messages and used their voices in recorded messages). Jason also wrote and directed creation of content for Facebook advertisements. SUF 84-85. The Court thus need not go into each undisputed fact regarding the Cardiffs' involvement in producing and approving the advertisements in detail.

**B.     Product Advertising**

Defendants purchased media time for television commercials to promote the Products through at least four media companies: Inter/Media Time Buying Corp. ("Inter/Media"), Havas Edge, Diversified Mercury Communications, LLC ("Mercury Media"), and Cannella Response Television, LLC ("Cannella"). SUF 131. In 2014, Run Away contracted with Inter/Media and Havas Edge to run advertisements about Prolongz. SUF 100-12, 619-21. From 2014 to 2018, Redwood contracted with Cannella, paying over $6.5 million to buy media time to advertise all three Products, mostly through 28-minute television informercials. SUF 135, 184. From 2017 to February 2018, Redwood contracted with Mercury Media for television advertising time for TBX-FREE and Eupepsia Thin. SUF 293, 314-16, 475-77.

**1.     TBX-FREE**

Defendants sold TBX-FREE from at least 2015 to 2018 with reported net sales of $7,227,009.27. SUF 281, 292. TBX-FREE film strips targeted people who wanted to stop smoking. SUF 280. According to the TBX-FREE packaging, each film strip contains "Laburnum anagyroides 1X." SUF 283. The purported active ingredient is cytisine. DSUMF 46. Defendants registered TBX-FREE as an "unapproved homeopathic" drug with the Federal Drug Administration ("FDA"). DSUMF 6.

Defendants advertised TBX-FREE using national television commercials, websites, social media (including Facebook, Instagram, and YouTube), print, and robocalls. SUF 293, 317-20. From 2015 to 2018, Cannella purchased media time for a total of 6,416 airings of TBX-FREE advertising. SUF 310. In late 2017 and February 2018, Mercury Media arranged for TBX-FREE commercials to be broadcast on national cable television. SUF 313-16. Below are some of the representations made in Defendants' TBX-FREE television advertising:

- TBX-FREE is ready to set you free from nicotine addiction forever and the addiction to tobacco and cigarettes.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 6 of 28 |

- Did you know the cure rate for the FDA approved patch and gum is a whopping 2 percent? That's right. A 2 percent success rate at best . . . . And what about the other 98 percent? . . . Well, we have you 100 percent covered.
- With an 88 percent success rate . . . TBX-FREE is the number one choice by smokers.
- HUNDREDS & HUNDREDS OF CLINICAL STUDIES PERFORMED ON OVER 10,600 SMOKERS!
- If you'll get your treatment started today, in as little as 30 days, you should never want to smoke another cigarette again.

SUF 322-27.

The TBXFREE.com/2 website made similar statements that the product was more effective than nicotine patches or gum and had an 88 percent success rate, among other statements. SUF 328-35. The website also stated that "[i]n clinical studies cited in The New England Journal of Medicine, the active ingredient in TBX-FREE has an 88% cure care [sic] compared to the patch and gum combined"; "Clinically Proven: New England Journal of Medicine STOP SMOKING NOW"; and "Clinically Proven Johns Hopkins University / The New England Journal of Medicine / Harvard Health Publications / Harvard Medical School." SUF 335-38.

Jason Cardiff appears in Facebook advertisements in January 2017 making similar claims regarding the 88 percent effective rate in long-term smokers and asserting: "Our clinical data on TBX-Free has been done by some of the greatest medical and scientific institutions anywhere that we know of, including, [sic] not limited to the New England Journal of Medicine, which ranks our product ten times more effective than nicotine-replacement therapy to stop smoking." He says TBX-FREE works "really fast, within a week, within ten days" and that "you should never need more than one month." SUF 343-50. Eunjung Cardiff's voice appeared in a ringless voicemail advertising TBX-FREE, describing it as "the stop smoking product that has changed so many lives." SUF 362.

While Eunjung asserts that thousands of customers gave positive reviews of TBX-FREE, there is no evidence of those reviews outside of her declaration. DSUMF 5.

### 2. Eupepsia Thin

Defendants sold Eupepsia Thin from 2017 to 2018 with $1,936,459.02 million in net sales. SUF 458. They advertised Eupepsia Thin as an effective appetite suppressant and weight loss aid

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 7 of 28 |
|---|---|---|---|

through national television campaigns and websites. SUF 459-60, 482-522. The active ingredient is "Paulinia cupana H.B.K. et K. 1x," or guarana. SUF 194, 453; Jason Decl., Ex. 1 [Doc. # 441-2]. Cannella alone arranged for 8,039 airings of Eupepsia Thin advertisements. SUF 474.

Below are some of the representations made in Defendants' Eupepsia Thin television advertising:

- Eupepsia is a safe and effective way to help you control your appetite.
- The ingredients in Eupepsia will begin to activate in your system in less than 20 seconds. . . . In minutes, you will feel your appetite suppress, giving you control over how much you eat.
- Are you ready to lose 10, 20, even 100 pounds without following a strict and complicated diet plan?
- If you would like to lose 8-20lbs – our one month supply at [$]69.95 will work for you. If you would like to lose 20-50lbs – our three month supply at [$]169.95 will work for you.
- Current calorie reduction and meal plans have less than 5% success rate while the new product, Eupepsia Thin has a substantially higher success rate.

SUF 482-85, 504, 506, 508, 529-31. The Eupepsia Thin website promised, *inter alia*, "Lose up to 15 pounds your first month with Eupepsia Thin oral strips without diets or changing your food or lifestyle choices." SUF 508. The product packaging asserts that it is "Clinically proven to help suppress appetite between meals," and an advertising insert in the packaging claims that "Eupepsia Thin is the product with proven clinical research to help you keep the weight off for life." SUF 521-22.

The Eupepsia Thin advertisements and websites also contained testimonials from individuals claiming that they used the product to lose weight, with Dan Hogan claiming to have lost 45 pounds, Karen Spero claiming to have lost 90 pounds, and Todd Preston claiming to have lost 132 pounds. SUF 1, 493-95, 497, 513-14, 761. Each of these three testimonialists admit in declarations that they did not use Eupepsia Thing to lose weight and were instructed by the infomercial director to say that their weight loss was due to Eupepsia Thin. SUF 762-68.

Jason Cardiff denies that he knew that people giving testimonials about their experiences with Eupepsia Thin in television advertisements had not used Eupepsia Thin to lose weight. SUF 120-121. The evidence shows, however, that Jason responded to an e-mail from contractor Ty Sherrell stating: "[I] am working on getting testimonials from people who have already lost weight

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 8 of 28 |

and I'm getting before pictures for them . . . they will still have the product and do the testimonials but ill [sic] have before pictures from their past fat lives lol [.]" Sands Decl., Att. 3 at 38-39 [Doc. # 434-1]. Even more telling is the fact that the infomercial regarding Euepsia Thin was filmed in February 2017, *before* Redwood started selling the product, further undercutting Jason's self-serving denial. SUF 199. Defendants do not provide any evidence to contradict the sworn declarations of the three testimonialists. SUF 121, 762.

A seal that appeared on Eupepsia Thin product packaging and Defendants' websites denoted that Eupepsia Thin was "Made in USA." SUF 712-16.

### 3. Prolongz

Defendants sold Prolongz from 2013 to 2018 but reported only gross sales from 2015 to 2017 of $5,985,747.96. SUF 610, 615. Defendants advertised Prolongz as a male ejaculation control product on television and on websites. According to the Prolongz label, each film strip contains "10 mg Damiana Extract 1X and 10 mg of Ginseng Extract 1X." SUF 607. Cannella alone arranged for 4,748 airings of Prolongz ads. SUF 634. The television advertisements state that Prolongz substantially increases ejaculation control and increases the duration of sex. SUF 636-39. The prolongz.com website claims, *inter alia*, that Prolongz is an FDA registered drug that is "a first of its kind product which uses Oral (sublingual) dissolvable Strip technology for the treatment of PE" and "Prolongz is guaranteed to increase your ejaculatory control levels and overall sexual performance." SUF 640-41, 643.

The website also claims that Prolongz was clinically tested, stating that "[i]n clinical studies, the ingredients in Prolongz™ by Advanced Men's Institute (AMI) were proven to increase ejaculatory control level of over 97% in men" and "[p]roven to effectively increase the length in Sex for over 97% of Thousands of Men who have tried Prolongz." SUF 644-45.

### C. Product Substantiation

The Cardiffs admit that they did not conduct any human clinical studies of TBX-FREE as a smoking cessation product or Eupepsia Thin as a weight loss product. SUF 194-95, 375, 535-538, 599. Instead, they argue that the clinical studies done on the "active" ingredients of each Product and separate articles about thin strip technology supported the Products' efficacy. *See* DSUMF 40. Jason admits that he is not a scientific expert, noting, "I can't say I understood everything in these articles" about thin strip technology. Cardiff Decl. at ¶ 11 [Doc. # 491-3]. The Cardiffs also assert that the FDA "approved" the Products' packaging and labeling, even though

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 9 of 28 |

all three were in fact registered in the National Drug Code Directory as an "unapproved homeopathic" drug, which does not denote FDA approval. DSUMF 54, 59, 65.

The Cardiffs were aware of the need for substantiation for the claims of the Products' effectiveness and provided substantiation packets to networks consisting of articles about TBX-FREE's and Eupepsia Thin's active ingredients. SUF 157-58, 190, 192; Cardiff Decl. at ¶¶ 23-25, Ex. 1-2 [Doc. # 441-2].[5] Eunjung in particular handled requests for substantiation. *See, e.g.*, SUF 162-63 (she was informed that FDA approval, not just registration, was needed to satisfy certain networks); 165 (she was informed that "[t]estimonials will need to be provided, to make sure weight loss claims weren't due to being paid").

The FTC has retained experts in the fields of smoking cessation, weight-loss, and male sexual health who each concluded that Defendants' efficacy claims are not substantiated by competent and reliable scientific evidence and did not find any clinical testing of TBX-FREE, Eupepsia Thin, or Prolongz to support Defendants' "clinically proven" claims. The Cardiffs have submitted no expert testimony rebutting the analysis of the FTC's experts.[6]

### 1. TBX-FREE

The FTC's smoking cessation expert, Dr. Judith Prochaska, opines that Defendants do not have substantiation for the challenged TBX-FREE claims.[7] SUF 433-437. She says that to substantiate these claims, experts in the field of nicotine addiction would require randomized,

---

[5] It is not clear what Eunjung offered as substantiation for Prolongz besides asserting that "[t]he FDA registration is proof that our product is certified by the FDA as an over the counter drug that treats the condition[.]" SUF 160. The package for Eupepsia Thin was put together by a contract researcher. SUF 192.

[6] The Cardiffs argue that each of the experts' opinions should be excluded for analyzing claims made about the Products prior to February 2018. *See, e.g.*, SUF 376, 539, 649. As discussed below in Section III.A.2, some misleading advertisements continued after February 2018, and Defendants continued to sell the Products until October 2018. Furthermore, the lack of substantiation for prior claims made about the Products is relevant to the Cardiffs' liability and likelihood for violations to recur. The Court **OVERRULES** the objection.

[7] The Cardiffs argue that Dr. Prochaska's opinions should be excluded because her expert report, which was produced in support of the FTC's application for TRO in October 2018, does not comply with Rule 26(a)'s requirement to provide a list of all other cases in which she testified as an expert at trial or by deposition and a statement of the compensation to be paid for her testimony. SUF 376. Information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). The Cardiffs have not sought discovery sanctions under Rule 37, and there is no indication of harm the Cardiffs have suffered since 2018 from the lack of disclosure. The Court **OVERRULES** the objection.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 10 of 28 |

controlled trial evidence from a study of TBX-FREE involving nicotine-dependent subjects and comparing TBX-FREE to a placebo. Dr. Prochaska found no evidence in her independent search of scientific literature that supports the challenged TBX-FREE claims. SUF 392, 414.

The Cardiffs have conceded that the 88 percent success rate claim is false. SUF 438. That figure is not even substantiated by the studies that Jason (who has not been qualified as an expert) describes in his declaration, which involved 60 smokers, 13.8 percent of whom quit smoking during a 12-month period with the aid of cytisine, with results on par with "smokers receiving nicotine replacement therapy." Jason Cardiff Decl. at ¶ 13 [Doc. # 441-1]. Dr. Prochaska reviewed that article and other articles on the effectiveness of cytisine and noted that a few cytisine studies of a completely different product that follow the standards of experts in the field have demonstrated modest efficacy for smoking cessation. SUF 375, 421, 438. Dr. Prochaska opines that these studies cannot be extrapolated to support any of the TBX-FREE efficacy claims, let alone the claim that TBX-FREE has an 88 percent success rate, due to the differences in dosages, dosage regimens, and modes of administration. SUF 426-31.

The New England Journal of Medicine also confirmed that it did not publish clinical studies or other materials demonstrating that TBX-FREE is an effective smoking cessation product or that users of the product had an 88 percent success rate. SUF 445-46.

### 2. Eupepsia Thin

Dr. David Levitsky, the FTC's weight-loss expert, opines that Defendants' appetite suppression and weight-loss claims regarding Eupepsia Thin are not supported by reliable scientific evidence. SUF 570, 577-85, 588-97. He explains that to substantiate the efficacy claims made for Eupepsia Thin, experts in the weight-loss field would require double-blind, randomized, placebo-controlled trial evidence from a study of the product itself or from a product using the same ingredients in the same dosages; ideally, the results would be replicated by independent laboratories. SUF 555. Successful results would show statistically significant improvements on standard outcome measures, including clinical (not self-reported) measurements of weight and body fat. SUF 566-67.

Dr. Levitsky reviewed the purported substantiation that Defendants submitted to the FTC and determined that it does not support the efficacy claims. SUF 568, 570, 576-84. In addition, Dr. Levitsky's own review of the scientific literature regarding the purported main ingredient of Eupepsia Thin—Paullinia Cupana H.B.K. 1X (caffeine)—found no studies that can be extrapolated to the product. SUF 569-70, 572-75. Dr. Levitsky stated that some research suggests

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 11 of 28 |
|---|---|---|---|

that high doses (more than 400 mg) of caffeine are associated with appetite suppression, but that there is no evidence that Eupepsia Thin, a homeopathic product, contains that much caffeine or that caffeine consumption causes weight loss. SUF 573-75.

In addition, as discussed above, the Eupepsia Thin advertisements and websites used false testimonials from individuals who did not use Eupepsia Thin to lose weight. SUF 762-63.

Defendants' claim on Eupepsia Thin product packaging and their websites that Eupepsia Thin was "Made in USA" is also false, as the Cardiffs were aware that Eupepsia Thin strips and packaging was manufactured in China and India. SUF 712-16, 718-21.

### 3. Prolongz

Dr. Hossein Sadeghi-Nejad, an expert in urology and sexual medicine, opines that Defendants have no reliable science to support the Prolongz ejaculation control claims. SUF 704-05. Dr. Sadeghi-Nejad says that to substantiate the Prolongz claims of increased ejaculatory control and treatment or prevention of premature ejaculation, experts in his field would require randomized, double-blind, properly controlled human clinical testing of Prolongz or a substantially similar product using the same dosage and route of administration. SUF 664-671. Dr. Sadeghi-Nejad has found no relevant evidence in the scientific literature that meets these standards. SUF 683-703.

He also reviewed the purported substantiation material Defendants provided to the FTC—a pilot survey and a collection of journal articles on other products—and opines that Defendants' substantiation does not meet the standards of experts in the field. SUF 683-702. The pilot survey sponsored by Defendants did not have a randomized control group. SUF 686. The study lasted only one week and involved only 29 test subjects and was thus too short and too small to yield accurate and reliable results. SUF 687-89. The scientific literature compiled by Defendants on the purported active ingredients in Prolongz was not comparable either to the dosage or to the route of administration of Prolongz. SUF 694-702.

### D. Consumer Contact, Shipping, and Billing Programs

### 1. Money-back guarantee

Defendants advertised money-back guarantees for the Products. SUF 725-36. For example, Jason claimed in a TBX-FREE Facebook video, "We have a lifetime money-back

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 12 of 28 |

guarantee. So for any reason if it doesn't work, you don't even need to ship it back." SUF 726. In Eupepsia Thin television advertisements, the following words would appear on screen— "MONEY BACK GUARANTEE LIFETIME 1-800-5551212 thinliferx.com"—while the spokeswoman says, "We are so confident that Eupepsia will work for you, it comes with a lifetime guarantee." SUF 732.

In many instances, however, Defendants denied refunds to consumers based on refund policies and conditions that had never been disclosed to consumers. SUF 743, 747, 753. In practice, Defendants limited their "lifetime" guarantee to 30 days. SUF 738. In addition, Jason instructed his customer service staff to cap daily refunds not to exceed daily revenue, in contravention of the product guarantees. SUF 749-54. This resulted in backlogs of customers waiting to receive their refunds. SUF 755.

### 2. Autoship plans and unauthorized charges

For most of the time they sold the Products, Defendants enrolled consumers who ordered the Products into unauthorized autoship programs, which resulted in consumers being repeatedly charged for additional shipments. SUF 772-76. Although the Cardiffs assert that Redwood "had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program," the Cardiffs fail to provide any proof of this "strict policy" besides Jason's declaration. SUF 798. Several customers reported not being told about the autoship enrollment, and an FTC investigator making an undercover purchase of TBX-FREE experienced the same undisclosed autoship enrollment. SUF 810-16. Redwood employees confirm that until late 2017, Cardiff told his sales representatives not to disclose the autoship plan at time of purchase for purchases made on the phone. Moreover, even after autoship disclosures were added to sales call scripts, sales representatives often failed to mention the disclosures or added customers to autoship policies regardless of the customer's preference. SUF 785-87, 798, 799-08, 811-12. Defendants thus made unauthorized charges on consumers' credit and debit cards and made it difficult for consumers to cancel recurring charges. SUF 748-57, 783, 815-19, 821-24, 826, 829-33, 839-41, 847, 822, 825. As for purchases made online, Defendants' websites contained information about an auto-ship/recurring billing program on the "terms and conditions" page of the websites and made auto-ship the default feature. SUF 775-83. Payment processing consultants informed Jason Cardiff that failure to disclose the auto-ship program on the websites' checkout page was improper. SUF 777-83.

Defendants processed unauthorized charges on stored debit and credit cards of consumers who had made only a one-time purchase, sometimes over a year after the consumer's original

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 13 of 28 |
|---|---|---|---|

purchase. SUF 839-52. Jason denies this. The FTC has submitted testimony of Redwood employees and documentary evidence of emails Jason sent or received indicating his approval of a scheme to process unauthorized autoship enrollments and charges on the debit or credit cards of consumers who had made only one-time purchases. According to one employee, Jason directed a group of employees to initiate these charges, telling them they had to successfully charge at least $10,000 per day, and threatening to fire at least one of them if she did not comply. SUF 839, 843-44, 848-52. An email from a Redwood employee reads, "Per Jason [t]he straight sale 1 month supply orders between December 21, 1017 [sic] – January 22, 2018 will be placed on continuity." Melendez Decl., Att. 6 at 38 [Doc. # 428-3]. When an employee emailed that she tried to process over 300 orders but most of the cards were declined due to expiration, Jason responded "Increase the year," referring to the expiration date. *Id.*, Att. 6 at 73 [Doc. # 428-3]. The emails indicate Jason's knowledge and approval of a Redwood policy of making unauthorized charges. He provides no supporting evidence for his denial.

Between January and April 2018, Defendants processed unauthorized charges for at least 1,500 consumers. SUF 847.[8]

### 3. Ringless voicemail messages

In early 2018, Defendants contracted with two services to deliver 2.5 million prerecorded ringless voicemail messages straight to consumers' voicemails. SUF 856-57. More than 1.5 million messages were delivered to consumers. SUF 178-79, 856-57, 859.

Jason controlled the telemarketing campaigns that delivered ringless voicemail messages, and his voice is heard in two recorded messages promoting male sexual enhancement products in a campaign that ran from February 2018 through July 2018. SUF 124-25, 938. Eunjung's voice is heard in a ringless voicemail message promoting TBX-FREE that went straight to consumers' voicemail boxes. SUF 167-68. She also approved payment for the ringless voicemail contracts. SUF 178-79.

### 4. Rengalife

From March to July 2018, the Cardiffs developed and began a multilevel marketing program called Rengalife. SUF 201-05, 863-72, 879. Via Facebook, their website, and an email to consumers who had previously purchased the Products, including an undercover FTC

---

[8] This campaign of unauthorized charges began over four months after Defendants received the FTC's Civil Investigative Demand ("CID") and continued until the FTC filed suit to enforce the CID. SUF 1-2, 4-6.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 14 of 28 |

investigator, Defendants promised that anyone joining Rengalife for a minimum monthly spend of $199.80 would make a minimum annual salary of $7,200 and unlimited earning potential when they sold oral film strip products to others. SUF 870, 873, 878-91, 897. Jason's control over this program is undisputed. SUF 127-28.

Although Jason asserts that no one signed up, the email sent to the FTC investigator claimed that over 200 individuals had signed up between March 26, 2018 and April 9, 2018, and declarations from Rengalife members and Danielle Walker show that the Rengalife program did successfully recruit members. SUF 869, 873-75. The Cardiffs admit that they did not have actual earnings data from Rengalife members to substantiate their earnings claims, and the FTC expert Dr. Stacie Bosley attests that nearly all Rengalife members would be forced to be in a negative financial position due to purchasing more film strips than they could sell. SUF 898-99, 933-36. Jason halted the program in July 2018. SUF 863.

**E.      FTC investigation**

The FTC issued a Civil Investigative Demand (CID) on August 3, 2017. SUF 1. The CID's specifications required that Redwood produce documents and information pertaining to the advertising of TBX-FREE and Eupepsia Thin oral film strips and pertaining to autoship programs and unauthorized charges. SUF 2. The CID and accompanying cover letter instructed Redwood to preserve all documents that may be responsive to the CID's requests. Redwood failed to timely comply with the CID, and the FTC initiated an enforcement action against Redwood on October 30, 2017 in the U.S. District Court for the Central District of California, No. CV 17-07921-SJO (PLAx) (C.D. Cal. 2017) (Otero, J.) [Doc. # 1]. On January 15, 2018, Judge Otero issued an order compelling Redwood to comply with the FTC's CID, and on March 6, 2018, he issued an order for Redwood to show cause why it should not be held in contempt for failure to comply with the CID. SUF 5-6.

Between March 22 and June 14, 2018, the FTC received voluminous records from Redwood that did not contain any video advertising or dissemination schedules for TBX-FREE or Eupepsia Thin. SUF 7, 9.[9] Video advertising and dissemination schedules also were not found in Redwood's offices after Judge Otero issued the initial TRO in the instant case on October 10, 2018. SUF 10. The parties dispute whether the Cardiffs destroyed documents relating to the Products' advertising. SUF 11-14.

---

[9] Although Defendants argue that they "would have included" those schedules and video advertising in the "data dumps provided to the FTC," they do not point to any evidence that they did so. SUF 9.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | | Date | October 9, 2020 |
|---|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | | Page | 15 of 28 |
|---|---|---|---|---|

The FTC did not issue a warning letter to Defendants. DSUMF 12.

**F.    The Instant Action**

On October 10, 2018, the FTC filed a Complaint for Permanent Injunction and Other Equitable Relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), against the Cardiffs and Entity Defendants, alleging that the Cardiffs "have for years operated a fraudulent multi-pronged scheme that has bilked consumers out of millions of dollars through baseless advertising claims for products that purport to alleviate serious health conditions, while also enrolling consumers in unwanted autoship programs that have resulted in millions of dollars in unauthorized charges." Compl. at ¶ 1 [Doc. # 1]. That day, the Court issued a Temporary Restraining Order ("TRO") freezing the Cardiffs' assets and appointing a Temporary Receiver. [Doc. # 29.] On November 8, 2018, the Court entered a Preliminary Injunction maintaining the asset freeze and receiver appointment. [Doc. # 59.]

In brief, since November 2018, the Court has held the Cardiffs in contempt several times for failure to abide by the Court's Orders to turn over documents and funds; approved a settlement between the Receiver and Inter/Media (which has a state court judgment against the Cardiffs) to divide the proceeds of the sale of the Cardiffs' residence; issued another TRO and Preliminary Injunction putting Cardiff's new company, VPL Medical Inc., under receivership under the terms of the original Preliminary Injunction; denied multiple attempts to alter the Preliminary Injunction and/or remove the Receiver; and denied a motion to stay pending appeal of the VPL Preliminary Injunction to the Ninth Circuit and a U.S. Supreme Court decision on the scope of injunctive relief under Section 13(b) of the FTC Act.

In the Order denying the Cardiffs' *Ex Parte* Application to stay the proceedings, however, the Court recognized that the United States Supreme Court will likely decide whether restitution is available under Section 13(b) in its decision on a pair of cases: *F.T.C. v. Credit Bureau Center*, 937 F.3d 764 (7th Cir. 2019), *cert. granted*, 2020 WL 3865251 (U.S. July 9, 2020), and *F.T.C. v. AMG Capital Management, LLC*, 910 F.3d 417 (9th Cir. 2018), *cert. granted*, 2020 WL 3865250 (U.S. July 9, 2020) (together, the "Consolidated Appeals"). [Doc. # 485.] The Court did not find a stay of the cross-MSJs on the Cardiffs' liability to be necessary, but noted that a stay at a later date may be appropriate due to uncertainty regarding the breadth and scope of the remedy.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | | Date | October 9, 2020 |
|---|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | | Page | 16 of 28 |

## III.
## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.* Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

When faced with cross-motions for summary judgment, the Court considers each motion on its own merits to determine whether the Rule 56 summary judgment standard is satisfied. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Where the issues before the Court are questions of law, the case is particularly "well suited" for summary judgment. *Del Real, LLC v. Harris*, 966 F. Supp. 2d 1047, 1051 (E.D. Cal. 2013); *see also Asuncion v. Dist. Dir. of U.S. Immigration & Naturalization Serv.*, 427 F.2d 523, 524 (9th Cir. 1970) (district court properly resolved motion for summary judgment where issues presented were comprised solely of questions of law).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | October 9, 2020 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 17 of 28 |

## IV.
## DISCUSSION

The FTC moves for summary judgment on each of its claims under the FTC Act, Restore Online Shoppers' Confidence Act ("ROSCA"), Electronic Fund Transfer Act ("EFTA"), and the Telemarketing Sales Rule ("TSR") and seeks a permanent injunction prohibiting Jason and Eunjung Cardiff from engaging in deceptive or unfair business practices and ordering equitable monetary relief in the amount of $18,213,899.

The Cardiffs move for summary judgment on each of the FTC's claims, arguing that: (1) the FTC treated Defendants unfairly by choosing to litigate rather than issuing a warning letter; (2) Defendants discontinued sales and marketing prior to the FTC filing this action and had reasonable basis to believe in the efficacy of their products; (3) the FTC Act does not support the FTC's "common enterprise" theory; (4) Section 13(b) of the FTC Act does not provide for restitution; and (5) when calculating a restitution award, reliance may not be imputed to every consumer.

The Court first considers the Cardiffs' motion.

### A.    The Cardiffs' Motion for Summary Judgment

The Court already has dispensed with one of the Cardiffs' arguments regarding its authority to order monetary equitable relief under Section 13(b) of the FTC Act, notwithstanding *Liu v. Securities and Exchange Commission*, 140 S. Ct. 1936 (2020). *See* March 10, 2020 Order at 5-7 [Doc. # 305]; July 7, 2020 Order at 6-9 [Doc. # 388]; September 9, 2020 Order at 6 [Doc. # 485]. Since the issuance of this Court's rulings in this regard, no new authority has abrogated *Federal Trade Commission v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982), which construed Section 13(b) to give courts the "'authority to grant any ancillary relief necessary to accomplish complete justice,'" including the "power to order restitution." *Id.* at 1113. Indeed, binding Ninth Circuit decisions after *Singer* have confirmed that Section 13(b) permits equitable monetary relief. *See, e.g.*, *F.T.C. v. AMG Capital Mgmt.*, LLC, 910 F.3d 417, 426 (9th Cir. 2018), *cert. granted*, 2020 WL 3865250 (U.S. July 9, 2020); *F.T.C. v. AT&T Mobility*, 883 F.3d 848, 864 (9th Cir. 2018). After the Supreme Court decided *Liu*, this Court held that *Liu* did not displace well-established Ninth Circuit precedent because its holding was cabined to a provision of the Securities and Exchange Act. July 7, 2020 Order at 8 [Doc. # 388]. In that same vein, the Ninth Circuit's recent decision in *Securities and Exchange Commission v. Yang*, No. 19-55289, (9th Cir. Aug. 6, 2020), does not affect the Court's ability to grant restitutionary relief under the FTC Act.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 18 of 28 |
|---|---|---|---|

The Court has also previously held that there is no requirement that funds frozen to pay a possible restitutionary award be traceable to the alleged illegal activity. July 7, 2020 Order at 5 n.4. [Doc. # 388] (citing *F.T.C. v. Commerce Planet, Inc.*, 815 F.3d 593, 601 (9th Cir. 2016) (finding tracing requirements have never applied in Section 13(b) cases)). In that same Order, the Court found that the FTC provided sufficient notice to Defendants of the basis of its equitable monetary relief. *Id.* at 6. The Cardiffs have not provided any reason for the Court to reconsider its prior rulings.

Due to the uncertainty about the scope and breadth of restitutionary relief under Section 13(b), however, the Court will defer ruling and entering judgment on the remedies in this case until after the Supreme Court has rendered its decision in the Consolidated Appeals.

The Court turns next to the new arguments raised in the Cardiffs' MSJ as to their liability.

### 1. Selective prosecution and failure to issue warning letters

The Cardiffs acknowledge that "the selective prosecution doctrine has not been applied in civil cases brought by agencies." Defs.' Reply at 6; *see, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 463 (1996) (noting that a criminal defendant may assert that a "prosecutor has brought the charge for reasons forbidden by the Constitution"); *Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131, 1140 (N.D. Cal. 2000) ("[W]hile *Armstrong* is a case of critical importance in the criminal context, it is less instructive in a civil case such as the present one."). Furthermore, even if they could raise selective prosecution in this context, the Cardiffs have not articulated any reason why the FTC's enforcement action against them violates their constitutional rights. *See Wayte v. United States*, 470 U.S. 598, 608 (1985) (holding that equal protection prohibits the government from selectively prosecuting an individual on the basis of race, ethnicity, or religion); *Blackledge v. Perry*, 417 U.S. 21, 27 (1974) (holding that due process prohibits a prosecutor from vindictively prosecuting a defendant for the defendant's exercise of a statutory, procedural, or other protected right).

The Cardiffs also acknowledge that there is "certainly nothing in the statute that *requires* pre-suit warning of a lawsuit." Defs.' Reply at 5. The Court therefore denies Defendants' summary judgment motion to the extent it relies on the selective prosecution argument.[10] *Id.* at 6.

---

[10] Related to this argument is Defendants' assertion that the FTC did not engage in good-faith settlement discussions with them. *See* Defs.' MSJ at 14-15. The FTC objects to disclosure of settlement discussions. Pl.'s Opp. at 27-28. The Court agrees that the content of settlement discussions is not relevant to the legal disputes at issue here.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | | Date | October 9, 2020 |
|---|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | | Page | 19 of 28 |
|---|---|---|---|---|

### 2.  Voluntary cessation of illegal conduct

The Cardiffs also argue that Redwood had ceased all of its purportedly deceptive, unfair, or otherwise illegal conduct months before the FTC brought this action. Defs.' Reply at 8-9.  The Cardiffs have previously raised this argument in their motion to dissolve the Preliminary Injunction [Doc. # 265], and the Court rejected it as a matter of law and fact.  March 10, 2020 Ord. at 4-5 [Doc. # 305].

Even if a violation of the FTC Act has ceased, an injunction will issue under §53(b) if there is reason to believe that the past conduct is "likely to recur." *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (holding to obtain an injunction, the FTC must show there is a "cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive").  As the Court held when it denied reconsideration of the Preliminary Injunction, not only were Defendants' statements that Redwood's operations had ceased not credible, but "[e]ven if Defendants had stopped business operations prior to the filing of the Complaint, the presence of products, shipping boxes, labels, and receipt of an order demonstrates that Defendants were likely to engage in future business operations." March 10, 2020 Ord. at 4-5 [Doc. # 305.]  Furthermore, the Cardiffs admit that Defendants were still selling TBX-FREE, Eupepsia Thin, and Prolongz on October 12, 2018, when the Complaint was filed.  SUF 232.  Although they argue that the Products' sales were *de minimis* after July 2018, when Redwood began winding down operations, and that Redwood ceased doing business in September 2018, Eunjung has attested that she was still paying Redwood employees in October 2018 when the TRO was entered.  DSUMF 22a, 25; Eunjung Decl. at ¶ 7 [Doc. # 147-2].  It is uncontroverted that, according to Internet Archive captures of ordertbxfree.com, as late as September 17, 2020, TBX-FREE was still advertised as having an 88% success rate, despite the Cardiffs acknowledging the deceptive nature of that statistic. *See* Sands Decl., Att. 12 [Doc. # 499-2].  In addition, the Cardiffs started using paid robocalls on February 14, 2018, and continued to deliver ringless voicemails until July 2018.  SUF 124-25, 320. Jason also worked on developing Rengalife until July 2018.  SUF 201.

"Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1238 (9th Cir. 1999) (quoting *United States v. Concentrated Phosphate Export Ass'n., Inc.*, 393 U.S. 199, 203 (1968)).  Here, the Court notes that the egregiousness of the Cardiffs' knowing misrepresentations about the efficacy of the Products, years of profiting off the Products, total lack of "protestations of repentance," and plans to continue in the film strip business indicate likelihood of engaging in similar unfair acts or practices in the

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 20 of 28 |

future. *United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952); *see also F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1202 (10th Cir. 2009); *S.E.C. v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). Moreover, the Cardiffs' demonstrated eagerness to launch new business ventures without any assurances—sincere or otherwise—that consumer protection violations will not recur heightens the likelihood that they will engage in similar deceptive practices in the absence of court intervention.

### 3. Common enterprise

Defendants cite no legal authority for their argument that there is no common enterprise liability in an FTC enforcement action. Rather, courts routinely apply the elements for determining common enterprise in FTC cases at the summary judgment stage. *See, e.g.*, *F.T.C. v. Elegant Sols., Inc.*, No. SA CV 19-1333-JVS (KESx), 2020 WL 4390381, at *11 (C.D. Cal. July 6, 2020) (granting summary judgment and finding that defendants operated as a common enterprise); *F.T.C. v. Consumer Def., LLC*, No. CV 18-00030-JCM (BNWx), 2019 U.S. Dist. LEXIS 225283, at *5-6 (D. Nev. Dec. 5, 2019) (same); *FTC v. AMG Servs.*, No. CV 12-00536-GMN (VCFx), 2017 U.S. Dist. LEXIS 66689, at *26-28 (D. Nev. May 1, 2017) (same). The Ninth Circuit has held that "[w]here corporate entities operate together as a common enterprise, each may be held liable for the deceptive acts and practices of the others." *F.T.C. v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014). A common enterprise may be demonstrated by "strongly interdependent economic interests or the pooling of assets and revenues." *F.T.C. v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010). Here, the undisputed facts indicate that the Cardiffs and the Entity Defendants are all involved in the sale of the Products and that money, products, and employees flowed freely between them. The FTC has amply shown that the Cardiffs are beneficiaries and masterminds of a common enterprise to sell the Products through the Entity Defendants, which constitute various iterations and shells of one another.[11]

Furthermore, individuals are liable for corporate violations of the FTC Act if they (1) "participated directly in the deceptive acts or had the authority to control them and (2) [ ] had knowledge of the misrepresentations, [were] recklessly indifferent to the truth or falsity of the misrepresentation, or [were] aware of a high probability of fraud along with an intentional avoidance of the truth." *F.T.C. v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012) (quoting *F.T.C. v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009)). The Cardiffs

---

[11] Although the uncontroverted facts tend to support a finding that the Entity Defendants and the Cardiffs were also alter egos, the Court need not specifically address that argument because it has found common enterprise liability and individual liability.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 21 of 28 |
|---|---|---|---|

do not seriously dispute that they controlled the Entity Defendants and it is uncontroverted that they had knowledge of the misrepresentations in advertising or were recklessly indifferent to the falsity of the misrepresentations.

* * *

For the foregoing reasons, Defendants' MSJ is **DENIED**, to the extent it argues against the Cardiffs' liability.

**B.      The FTC's Motion for Summary Judgment**

  **1.    FTC Act claims (Counts 1-12)**

The FTC brings 12 claims against Defendants for violations of Section 5(a) and Section 12 of the FTC Act.  Section 5(a) prohibits deceptive and unfair acts or practices in or affecting commerce.  15 U.S.C. § 45(a).  Section 12 prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.  15 U.S.C. § 52.  The Cardiffs do not dispute that TBX-FREE, Eupepsia Thin, and Prolongz are drugs within the definition of Section 12.  *Cf. F.T.C. v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1266 & 1272 (S.D. Fla. 1999) (holding that diet pills are a "food" and/or "drug" for purposes of Section 12).

For both Section 5(a) and Section 12 violations, the FTC "will find an act or practice deceptive if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."  *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (citation omitted); *see also F.T.C. v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001).  The FTC may assert a "falsity" theory, in which it must prove that the express or implied message conveyed by the advertising is false, or the "reasonable basis theory," in which it must prove that the advertiser lacked a reasonable basis to assert the message was true.  *Pantron I Corp.*, 33 F.3d at 1096.  To determine whether an advertiser has satisfied the reasonable basis requirement, the Court must determine first "what level of substantiation the advertiser is required to have for his advertising claims[,]" then "whether the advertiser possessed that level of substantiation."  *Id.*  Defendants must establish what substantiation they relied on, and the FTC must show that the substantiation is inadequate. *John Beck Amazing Profits, LLC*, 865 F. Supp. 2d at 1067.

A misleading impression is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."  *F.T.C. v.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 22 of 28 |

*Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (citation and quotation marks omitted). If the Court finds that "no reasonable factfinder could conclude that the [advertisement] was not likely to mislead consumers acting reasonably under the circumstances in a way that is material," the Court may grant summary judgment on the FTC Act violations. *Id.*

An act is unfair under Section 5(n) if it causes substantial injury not outweighed by countervailing benefits to consumers or competition, and that consumers themselves could not reasonably have avoided. 15 U.S.C. § 45(n); *see also F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010).

### a. False or unsubstantiated efficacy and false proof claims (Counts 1-6)

The FTC's first six counts against Defendants are based on false or unsubstantiated efficacy and false proof for each of the three Products. The Cardiffs themselves refer to the Products' advertising prior to February 2018 as "potentially misleading," and they offer no expert opinions to rebut Plaintiff's expert opinions that the Products' advertising is unsubstantiated. Defs.' Opp. at 12. Instead, the Cardiffs argue that they reasonably believed that the Products were effective based on scientific literature regarding their "active" ingredients. *Id.* at 15. They have no expert qualifications to justify their "reasonable" belief, however, and the studies they cite regarding cytisine's effect on smoking cessation and guarana's effect on appetite suppression do not support the claims Defendants made about TBX-FREE's and Eupepsia Thin's efficacy. As for Prolongz, Defendants did conduct a pilot study of its effect on 29 participants. But according to the FTC's expert, that study was unreliable, and it did not "prove[] to effectively increase the length in Sex for over 97% of *Thousands* of Men who have tried Prolongz." SUF 644-45 (emphasis added). Accordingly, the FTC's experts have shown that the Cardiffs' alleged substantiation is inadequate both as to the efficacy of the Products as well as to the truthfulness of claims that any of the Products have been "clinically proven" to affect consumers' health. It is immaterial whether the Cardiffs believed they were acting in good faith by relying on the studies they had read, when they have acted with "reckless indifference" to the falsity of their statements by concocting numbers and ignoring advertisers' and networks' requests for greater substantiation. *Network Servs. Depot*, 617 F.3d at 1140.

What is material is the proven effectiveness of products that promise quick results on three important consumer health concerns: smoking cessation, weight loss, and male sexual performance. Defendants ran ads untruthfully claiming that: TBX-FREE has an 88% success rate, is endorsed by the New England Journal of Medicine, and is more effective than nicotine patches or gum; Eupepsia Thin is guaranteed to result in weight loss fast without a change in diet; and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | October 9, 2020 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 23 of 28 |
|---|---|---|---|

Prolongz is clinically proven to work for thousands of men. These guarantees of success, testimonials, clinical studies, and endorsements by prominent academic institutions are certainly material to a consumer purchasing the Products.

Accordingly, the Court **GRANTS** summary judgment on Counts 1 through 6 for violations of Sections 5(a) and 12 of the FTC Act.

### b. False "Made in the United States" advertising (Count 7)

The FTC has authority under Section 5 to regulate claims of U.S. origin in advertising. *See "Made in USA" and Other U.S. Origin Claims*, 62 Fed. Reg. 63756, 1997 WL 737641 (Dec. 2, 1997). The FTC recognizes two types of U.S. origin statements: unqualified and qualified. *Id.* An unqualified statement claims only that the product is of U.S. origin, while a qualified statement goes on to explain the source of the ingredients. *Id.* The FTC distinguishes between statement types because consumers expect that products labeled with unqualified statements of U.S. origin contain a high amount of U.S. content. *Id.* at *63763. Accordingly, the FTC permits unqualified statements of U.S. origin only when "all or virtually all" of the ingredients are domestic; that is, the product must contain no more than a *de minimis* amount of foreign content and have "been last substantially transformed in the United States." *Id.* at *63756.

It is undisputed that Eupepsia Thin strips are made in India and China. Defendants' employees attest that the product packaging was also made in China. Walker Decl. at ¶ 48 [Doc. # 424-1]; Wu Decl. at ¶¶ 8, 12-13 [Doc. # 428-5]. Jason admits that "the products were received from China and India in bags containing 500 strips per bag. The products were removed, ETC." Jason Decl. at ¶ 83 [Doc. # 491-3]. The Cardiffs cite no evidence about what transformation the strips underwent once they arrived in the United States. Their Opposition provides inadmissible argument regarding the cost of "organizing the strips, inserting them into plastic cartridges with labeling, [and] sealing them in plastic bags with labeling." Defs.' Opp. at 23. Even if the Court could take those assertions into consideration, the Court finds as a matter of law that "all or virtually all" of the Eupepsia Thin strips were not made of domestic ingredients or substantially transformed in the United States, thus rendering an unqualified "Made in USA" statement false.

The Court **GRANTS** summary judgment on Count 7 for violation of Section 5(a) of the FTC Act for a false unqualified U.S. origin claim.

---

**CIVIL MINUTES—GENERAL** Initials of Deputy Clerk <u>KT</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 24 of 28 |
|---|---|---|---|

### c. False money-back guarantee (Count 8)

The Cardiffs do not dispute that Defendants advertised money-back guarantees, including lifetime money-back guarantees, but that any consumer that received a refund for a Product needed to satisfy certain steps and restrictions first. This constitutes a material deceptive act or practice that is likely to mislead. *See FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1005-06, 1012 (N.D. Ind. 2000) (granting summary judgment where defendants falsely represented that program came with money-back guarantee without disclosing material conditions before purchase), *aff'd*, 312 F.3d 259 (7th Cir. 2002).

The Court **GRANTS** summary judgment on Count 8 for violation of Sections 5(a) and 12 of the FTC Act.

### d. Deceptive testimonials (Count 9)

Based on the uncontroverted fact that Jason knew that the Eupepsia Thin testimonialists had already lost weight without taking Eupepsia Thin, the Cardiffs acted with reckless indifference to the falsity of the testimonials, which were material to consumers. *See, e.g.*, *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1228 (D. Nev. 2011) (granting summary judgment on FTC's deception count where defendants presented no evidence showing that certain testimonials were genuine), *aff'd in part and vacated in part on other grounds*, 763 F.3d 1094 (9th Cir. 2014). Jason's summary denial of knowledge in his declaration is insufficient to create a dispute of material fact where there is documentary evidence that he knew and approved of the contractor hiring testimonialists who had already lost weight without using Eupepsia Thin, and that the testimonials were filmed before Redwood even began selling the product. *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997).

The Court **GRANTS** summary judgment on Count 9 for violation of Sections 5(a) and 12 of the FTC Act.

### e. Failure to adequately disclose and misrepresentation of automatic enrollment in autoship plans (Counts 10 and 11)

The FTC has submitted testimony of former Redwood employees indicating that Jason instructed them not to disclose the autoship program to consumers and, when they did, they falsely reassured customers they would not be enrolled in an autoship program. When an FTC investigator bought TBX-FREE undercover, he was not informed of the autoship program. Online customers

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | | Date | October 9, 2020 |
|---|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | | Page | 25 of 28 |
|---|---|---|---|---|

were also enrolled by default into an autoship program despite no notice of enrollment at the checkout page, with autoship terms buried in the terms and conditions section of a website. The Cardiffs have submitted no evidence, other than general denials, showing that they made the required disclosures or corrected any misrepresentations, and they have failed to create a genuine dispute of material fact.

Failing to inform consumers that they will be enrolled in an autoship program that includes monthly charges is a material omission that is likely to mislead reasonable consumers. Misrepresentations about the autoship program are also material and likely to mislead reasonable consumers. *See F.T.C. v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1224 (D. Nev. 2011), *aff'd in relevant part* 763 F.3d 1094 (9th Cir. 2014) (finding a monthly membership fee not adequately disclosed in violation of the FTC Act where it was buried in the terms and conditions in fine print).

The Court **GRANTS** summary judgment on Counts 10 and 11 for violations of Sections 5(a) and 12 of the FTC Act.

### f.   Unfairly charging customers regarding autoship plan (Count 12)

Although Jason generally attests that customers always had an autoship option when purchasing the Products, the testimony and documentary facts show that Jason knew and approved of a program by which Redwood employees directly charged customers' saved debit and credit cards without their consent. By not citing to supporting evidence, the Cardiffs have failed to create a genuine dispute of material fact on this issue.

Clearly, charging consumers without their consent (1) injures them, (2) without any increase in services or benefits, and (3) is not at all avoidable, given the lack of disclosure that consumers would be charged for an autoship program. *See Neovi*, 604 F.3d at 1157; *see also F.T.C. v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1079 (C.D. Cal. 2012), *aff'd in relevant part*, 642 F. App'x 680 (9th Cir. 2016) (granting summary judgment against defendant that signed consumers up for a continuity program without their consent).

The Court **GRANTS** summary judgment on Count 12 for unfair practices under Section 5(n) of the FTC Act.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 26 of 28 |

### 2. Restore Online Shoppers' Confidence Act claim (Count 13)

In 2010, Congress passed the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401-05, to promote consumer confidence in online commerce. Section 4 of ROSCA generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, which is defined as "an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w); *see* 15 U.S.C. § 8403. A seller may only use a negative option feature if the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides a simple mechanism to stop recurring charges. 15 U.S.C. § 8403.

For the reasons stated above, there is no genuine dispute of material fact that Defendants employed a negative option feature in which consumers were enrolled in a monthly autoship program that shipped products to them without consent and unless consumers took the affirmative step to cancel the autoship program (and sometimes, even then, were not able to effectuate a cancellation).

The Court **GRANTS** summary judgment on Count 13 for violation of ROSCA.

### 3. Electronic Fund Transfer Act claim (Count 14)

The Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r, and its implementing Regulation E, 12 C.F.R. Part 1005, regulate the rights, liabilities, and responsibilities of participants in electronic fund transfer systems. Violations of EFTA and Regulation E as set forth in Paragraphs 116 and 117 also constitute violations of the FTC Act. 15 U.S.C. § 1693o(c).

The record shows that Defendants (1) debited consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated from consumers for preauthorized electronic fund transfers from their accounts, and (2) debited bank accounts on a recurring basis without providing to the consumer a copy of a written authorization signed or similarly authenticated by the consumer for preauthorized electronic fund transfers from the consumer's account, thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b). The Cardiffs have not provided evidence raising a genuine dispute of material fact regarding their failure obtain required written

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | October 9, 2020 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 27 of 28 |
|---|---|---|---|

authorizations for certain bank transfers from consumers. *See Grant Connect*, 827 F. Supp. 2d at 1231-32.

The Court **GRANTS** summary judgment on Count 14 for violation of EFTA.

### 4. Telemarketing Sales Rule claim (Count 15)

Section 310.4(b)(1)(v) of the FTC's Telemarketing Sales Rule ("TSR") prohibits initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service. 16 C.F.R. § 310.4(b)(1)(v). The Cardiffs admit that Defendants used two companies to send prerecorded ringless voicemails to 1.5 million consumers advertising the Products and have provided no evidence that Defendants obtained from recipients of the calls an express agreement in writing authorizing the placement of such calls. *See id.* § 310.4(b)(1)(v)(A).

The Court **GRANTS** summary judgment on Count 15 for violation of the TSR.

### 5. Misrepresentation regarding earnings claim (Count 16)

The Cardiffs admit that they did not have earnings data to substantiate claims of sure earnings from becoming a member of Rengalife. The FTC's expert concluded that nearly all Rengalife members would be forced to be in a negative financial position due to purchasing more films trips than they could sell. Although the Cardiffs aver that they abandoned Rengalife quickly when they realized it would not be profitable, they have not shown a genuine dispute of material fact that they in fact made misrepresentations regarding earnings claims. The Court finds that Defendants' Rengalife emails, website, and Facebook posts and livestreams made material misrepresentations in a manner likely to mislead reasonable consumers. *See F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).

The Court **GRANTS** summary judgment on Count 16 for violation of Section 5(a) of the FTC Act.

### V.
### CONCLUSION

In light of the foregoing, the Court **GRANTS in part** the FTC's MSJ as to the Cardiffs' liability and **DENIES in part** the Cardiffs' MSJ relating to the Cardiffs' liability.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | October 9, 2020 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 28 of 28 |
|---|---|---|---|

The Court defers ruling and judgment on the proper remedy pending the Supreme Court's decision in the Consolidated Appeals. The parties shall file a joint status report within 15 days of the Supreme Court's ruling, proposing a new briefing schedule as to the remedies phase, if appropriate.

Unless and until the Court orders otherwise, the Preliminary Injunctions [Doc. ## 59, 389] remain in effect.

**IT IS SO ORDERED.**

# EXHIBIT 5



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |  |
|---|---|---|
| **Federal Trade Commission**, | ) ) ) ) | No. ED CV 18-2104-DMG (PLAx) |
| Plaintiff, | ) ) | DEFAULT JUDGMENT INCLUDING PERMANENT INJUNCTION AS TO |
| v. | ) ) | REDWOOD SCIENTIFIC TECHNOLOGIES, INC. (CA), REDWOOD |
| **Jason Cardiff, et al.**, | ) ) | SCIENTIFIC TECHNOLOGIES, INC. (NV) REDWOOD SCIENTIFIC |
| Defendants. | ) ) ) | TECHNOLOGIES, INC. (DE), IDENTIFY, LLC, ADVANCED MEN'S INSTITUTE |
|  | ) ) | PROLONGZ LLC, RUN AWAY PRODUCTS, LLC, AND CAROLS PLACE |
|  | ) ) ) | LIMITED PARTNERSHIP |
|  | ) ) ) |  |

On October 3, 2018, Plaintiff, the Federal Trade Commission ("FTC" or "the Commission"), filed its Complaint for Permanent Injunction and Other Equitable Relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §53(b), the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401-8405, and the Electronic Fund Transfer Act

-1-

("EFTA"), 15 U.S.C. §§ 1693-1693r, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105 and moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants Jason Cardiff, Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, Danielle Cadiz, a/k/a Danielle Walker, and corporate defendants, Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership ("Corporate Defendants"). [Doc. # 1.]

This Court entered a temporary restraining order ("TRO") on October 10, 2018. [Doc. # 29.] On October 24, 2018, the Court entered a Preliminary Injunction with an asset freeze and appointed a receiver over the Corporate Defendants. [Doc. # 46.]

On March 5, 2019, the Commission filed an Application for the Clerk to Enter Defaults Against the Corporate Defendants Pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. [Doc. ## 89, 89-1.] The Clerk entered default against the seven Corporate Defendants between March 5, 2019 and March 7, 2019. [Doc. ## 91, 92, 96.]

On August 6, 2020, the Commission moved for entry of default judgments against all seven Corporate Defendants pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Rule 55-1. [Doc. # 422.] The Commission filed its Proposed Default Judgment on September 3, 2021. [Doc. # 651.]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      This action was initiated by the FTC under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 5 of ROSCA, 15 U.S.C. § 8404, Section 918(c) of EFTA, 15 U.S.C. § 1693o(c), and Section 6 of the Telemarketing Act, 15 U.S.C. §

6105. The Commission's Complaint sought both permanent injunctive relief and equitable monetary relief for the acts and practices as alleged therein.

2. The Court has jurisdiction over this matter and over the Corporate Defendants and venue in this district is proper under 15 U.S.C. § 53(b) and 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d).

3. The Corporate Defendants' activities as alleged in the Commission's Complaint were in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4. The Commission's Complaint stated a claim upon which relief can be granted against the Corporate Defendants.

5. The Corporate Defendants had proper notice of this lawsuit. They never filed an answer to the Complaint.

6. The allegations in the Commission's Complaint are taken as true against the Corporate Defendants.

7. Those allegations and evidence supporting them established that between 2013 and October 12, 2018, the Corporate Defendants violated:

    a. Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, which prohibit unfair and deceptive acts or practices in or affecting commerce;

    b. Section 4 of ROSCA, 15 U.S.C. § 8403, which prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule, 16 C.F.R. § 310.2(w), unless the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the

charge; and (c) provides a simple mechanism to stop recurring charges;

    c.    Section 907(a) of EFTA, 15 U.S.C. § 1693e(a) and Section 1005.10(b) of EFTA's implementing Regulation E, 12 C.F.R. § 1005.10, which provides that a preauthorized electronic fund transfer (which is elsewhere defined as an electronic fund transfer authorized in advance to recur at substantially regular intervals) from a consumer's account may be authorized by the consumer only in a writing signed or similarly authenticated by the consumer, and require that a copy of such authorization shall be provided to the consumer when made; and

    d.    Section 310.4(b)(1)(v) of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(v).

8.    Jason Cardiff and Eunjung Cardiff operated the Corporate Defendants as a common enterprise. The Corporate Defendants "constitute[d] various iterations and shells of one another" and the Cardiffs and the Corporate Defendants were "all involved in the sale of the Products and . . . money, products, and employees flowed freely between them." Summary Judgment Order at 20 [Doc. # 511.]

9.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue injunctive relief against violations of the FTC Act. Section 19 of the FTC Act, § 57b, empowers the Court to grant such relief as it finds necessary to redress injury to consumers from the Defendants' violations of ROSCA and the TSR, including rescission or reformation of contracts and refund of money.

10.    The danger of future violations by the Corporate Defendants justifies the issuance of permanent injunctive relief, including banning them from engaging in certain activities.

11.     This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

12.     Pursuant to Federal Rule of Civil Procedure 65(d), this Order is binding upon the Corporate Defendants, their officers, agents, servants, employees, attorneys, wholly-owned subsidiaries, successors and assigns, and upon those persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

13.     Entry of this Order is in the public interest, and there being no just reason or delay, the Clerk is directed to enter judgment in favor of Plaintiff Federal Trade Commission immediately.

**THEREFORE, IT IS ORDERED** as follows:

### DEFINITIONS

For the purpose of this Order, the following definitions shall apply:

A.     "**Acquirer**" or "**Acquiring Bank**" means a business organization, Financial Institution, or an agent of a business organization or Financial Institution that has authority from an organization that operates or licenses a credit card system (e.g., Visa, MasterCard, American Express or Discover) to authorize Merchants to accept, transmit, or process payment by credit card through the credit card system for money, products, or anything else of value.

B.     "**Billing Information**" means any data that enables any person to access a consumer's account, such as a credit card, checking, savings, share or similar account, utility bill, or mortgage loan account, or debit card.

C.     "**Business Venture**" means any written or oral business arrangement, however denominated, whether or not covered by 16 C.F.R. Part 437, that consists of the payment of any consideration for the right or

-5-

means to offer, sell, or distribute Goods or Services.  The definition of Business Venture includes multilevel marketing programs.

D.    **"Charge(s)," "Charged," or "Charging"** means any attempt to collect money or other consideration from a consumer, including, but not limited to, causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

E.    **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.    In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.    A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.    An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.    In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

F. "**Covered Product**" means any Dietary Supplement, Food, Drug, or Device.

G. "**Credit Card Laundering**" means: (a) presenting or depositing into, or causing or allowing another to present or deposit into, the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; (b) employing, soliciting, or otherwise causing or allowing a Merchant, or an employee, representative, or agent of a Merchant, to present to or deposit into the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; or (c) obtaining access to the credit card system through the use of a business relationship or an affiliation with a Merchant, when such access is not authorized by the Merchant Account agreement or the applicable credit card system.

H. "**Credit Card Sales Draft**" means any record or evidence of a credit card transaction.

-7-

I.  "**Corporate Defendant(s)**" means Redwood Scientific Technologies, Inc. (CA); Redwood Scientific Technologies, Inc. (NV); Redwood Scientific Technologies, Inc. (DE); Identify, LLC; Advanced Men's Institute Prolongz LLC; Run Away Product, LLC; and Carols Place Limited Partnership, individually, collectively, or in any combination.

J.  "**Defendant(s)**" means Jason Cardiff, Eunjung Cardiff, and the Corporate Defendants, individually, collectively, or in any combination.

K.  "**Device**" means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them; (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in humans or other animals; or (3) intended to affect the structure or any function of the body of humans or other animals; and which does not achieve any of its principal intended purposes through chemical action within or on the body of humans or other animals and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes.

L.  "**Dietary Supplement**" means:  (1) any product labeled as a Dietary Supplement or otherwise represented as a Dietary Supplement; or (2) any pill, tablet, capsule, powder, softgel, gelcap, liquid, or other similar form containing one or more ingredients that are a vitamin, mineral, herb or other botanical, amino acid, probiotic, or other dietary substance for use by humans to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite,

-8-

constituent, extract, or combination of any ingredient described above, that is intended to be ingested, and is not represented to be used as a conventional Food or as a sole item of a meal or the diet.

M.  "**Drug**" means:  (1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of humans or other animals; and (4) articles intended for use as a component of any article specified in (1), (2), or (3); but does not include devices or their components, parts, or accessories.

N.  "**Essentially Equivalent Product**" means a product that contains the identical ingredients, except for inactive ingredients (e.g., binders, colors, fillers, excipients) in the same form and dosage, and with the same route of administration (e.g., orally, sublingually), as the Covered Product; *provided that* the Covered Product may contain additional ingredients if reliable scientific evidence generally accepted by experts in the field indicates that the amount and combination of additional ingredients is unlikely to impede or inhibit the effectiveness of the ingredients in the Essentially Equivalent Product.

O.  "**Financial Institution**" means any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956 (12 U.S.C. § 1843(k)). An institution that is significantly engaged in financial activities is a Financial Institution.

P.      "**Food**" means: (1) any article used for food or drink for humans or other animals; (2) chewing gum; and (3) any article used for components of any such article.

Q.      "**Good(s) or Service(s)**" includes merchandise, products, plans, or programs.

R.      "**Investment Opportunity**" means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

S.      "**Made in the United States**" means any representation, express or implied, that a product, or a specified component thereof, is of U.S.-origin, including a representation that such product is "made," "manufactured," "built," or "produced" in the United States or in America, or any other U.S.-origin claim.

T.      "**Merchant**" means (a) any person or entity engaged in the sale or marketing of any goods or services, or soliciting a charitable contribution, or (b) any person or entity who applies for or obtains Payment Processing services.

U.      "**Merchant Account**" means any account with an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables an individual, a business, or other organization to accept payments of any kind.

V.      "**Negative Option Feature**" means, in an offer or agreement to sell or provide any Good or Service, a provision under which the consumer's silence or failure to take affirmative action to reject a Good or Service, or to cancel the agreement, is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

W.  "**Payment Processing**" means providing a person or entity, directly or indirectly, with the means used to charge or debit accounts through the use of any payment method or mechanism, including, but not limited to, remotely created payment orders, remotely created checks, ACH debits, or debit, credit, prepaid, or stored value cards. Whether accomplished through the use of software or otherwise, Payment Processing includes, among other things: (a) reviewing and approving Merchant applications for payment processing services; (b) providing the means to transmit sales transactions data from Merchants to Acquiring Banks or other Financial Institutions; (c) clearing, settling, or distributing proceeds of sales transactions from Acquiring Banks or Financial Institutions to Merchants; or (d) processing chargebacks or returned remotely created payment orders, remotely created checks, or ACH checks.

X.  "**Person**" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

Y.  "**Preauthorized Electronic Fund Transfer**" means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

Z.  "**Receiver**" means Robb Evans & Associates, LLC.

## ORDER

## I.  BAN ON NEGATIVE OPTION SALES

**IT IS ORDERED** that Corporate Defendants, whether acting directly or through an intermediary, are permanently restrained and enjoined from the advertising, marketing, promotion, offering for sale, or sale of any Good or Service with a Negative Option Feature.

## II.  BAN ON ROBOCALLS AND RINGLESS VOICEMAILS

**IT IS FURTHER ORDERED** that Corporate Defendants, whether acting directly or through an intermediary, are permanently restrained and enjoined from initiating telephone calls delivering prerecorded messages, including ringless voicemails.

### III. BAN ON MULTILEVEL MARKETING

**IT IS FURTHER ORDERED** that Corporate Defendants, whether acting directly or through an intermediary, are permanently restrained and enjoined from engaging or participating in any multilevel marketing program.

### IV. BAN ON THE ADVERTISING, MARKETING, PROMOTION, OFFERING FOR SALE, OR SALE OF DISSOLVABLE ORAL FILM STRIPS TO END-USER CONSUMERS

**IT IS FURTHER ORDERED** that Corporate Defendants, whether acting directly or through an intermediary, are permanently restrained and enjoined from the advertising, marketing, promoting, or offering for sale of any dissolvable oral film strip to end-user consumers.

### V. PROHIBITED REPRESENTATIONS: REGARDING HEALTH-RELATED CLAIMS REQUIRING HUMAN CLINICAL TESTING FOR SUBSTANTIATION

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation that such product:

    A.    Helps users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

B. Causes or assists in causing weight loss, including any specific representation about the amount of weight loss;

C. Suppresses or helps suppress appetite;

D. Causes or assists in causing weight loss without dieting or any change in food or lifestyle;

E. Helps users avoid gaining back any weight they lost;

F. Increases ejaculation control or the duration of sex;

G. Treats or prevents premature ejaculation;

H. Cures, mitigates, or treats any disease; or

I. Is comparable or superior to other treatments for quitting smoking, weight loss, or sexual performance, or in curing, mitigating, or treating any disease,

unless the representation is non-misleading, and, at the time of making such representation, Corporate Defendants possess and rely upon competent and reliable scientific evidence substantiating that the representation is true. For purposes of this Section, competent and reliable scientific evidence must consist of human clinical testing of the product, or of an Essentially Equivalent Product, that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true. Such testing must be: (1) randomized, double-blind, and placebo-controlled; and (2) conducted by researchers qualified by training and experience to conduct such testing. In addition, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as described in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to

the Commission.  Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

**VI.     PROHIBITED REPRESENTATIONS:  OTHER HEALTH-RELATED CLAIMS**

     **IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation, other than representations covered under the Section of this Order entitled Prohibited Representations:  Regarding Health-Related Claims Requiring Human Clinical Testing For Substantiation, about the health benefits, performance, efficacy, safety, or side effects of the product, unless the representation is non-misleading, and, at the time of making such representation, Corporate Defendants possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

     For purposes of this Section, competent and reliable scientific evidence means tests, analyses, research, or studies (1) that have been conducted and evaluated in an objective manner by experts in the relevant disease, condition, or function to which the representation relates; (2) that are generally accepted by such experts to yield accurate and reliable results; and (3) that are randomized, double-blind, and placebo-controlled human clinical testing of the Covered Product, or of

an Essentially Equivalent Product, when such experts would generally require such human clinical testing to substantiate that the representation is true. In addition, when such tests or studies are human clinical tests or studies, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as set forth in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission. Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VII. PRESERVATION OF RECORDS RELATING TO COMPETENT AND RELIABLE HUMAN CLINICAL TESTS OR STUDIES

**IT IS FURTHER ORDERED** that, with regard to any human clinical test or study ("test") upon which Corporate Defendants rely to substantiate any claim covered by this Order, they shall secure and preserve all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of the test, including:

A. All protocols and protocol amendments, reports, articles, write-ups, or other accounts of the results of the test, and drafts of such documents reviewed by the test sponsor or any other person not employed by the research entity;

B. All documents referring or relating to recruitment; randomization; instructions, including oral instructions, to participants; and participant compliance;

C. Documents sufficient to identify all test participants, including any participants who did not complete the test, and all communications with any participants relating to the test; all raw data collected from participants enrolled in the test, including any participants who did not

-15-

complete the test; source documents for such data; any data dictionaries; and any case report forms;

D. All documents referring or relating to any statistical analysis of any test data, including any pretest analysis, intent-to-treat analysis, or between-group analysis performed on any test data; and

E. All documents referring or relating to the sponsorship of the test, including all communications and contracts between any sponsor and the test's researchers.

*Provided, however*, the preceding preservation requirement does not apply to a reliably reported test, unless the test was conducted, controlled, or sponsored, in whole or in part by: (1) Corporate Defendants; (2) their officers, agents, representatives, or employees; (3) any other person or entity in active concert or participation with Corporate Defendants; (4) any person or entity affiliated with or acting on behalf of Corporate Defendants; (5) any supplier of any ingredient contained in the product at issue to any of the foregoing or to the product's manufacturer; or (6) the supplier or manufacturer of such product.

For purposes of this Section, "reliably reported test" means a report of the test has been published in a peer-reviewed journal, and such published report provides sufficient information about the test for experts in the relevant field to assess the reliability of the results.

For any test conducted, controlled, or sponsored, in whole or in part, by or on behalf of, Corporate Defendants, they must establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of any personal information collected from or about participants. These procedures must be documented in writing and must contain administrative, technical, and physical safeguards appropriate to the size and complexity of the entity sponsoring the test, the nature and scope of that entity's activities, and the sensitivity of the personal information collected from or about the participants.

-16-

## VIII.  PROHIBITED REPRESENTATIONS:  TESTS, STUDIES, OR OTHER RESEARCH

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration:

A.      That the product is clinically proven to:

      1.   Help users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

      2.   Cause or assist in causing weight loss, including any specific representation about the amount of weight loss;

      3.   Suppress or help suppress appetite;

      4.   Cause or assist in causing weight loss without dieting or any change in food or lifestyle;

      5.   Help users avoid gaining back any weight they lost;

      6.   Increase ejaculation control or the duration of sex;

      7.   Treat or prevent premature ejaculation; or

      8.   Be comparable or superior to other treatments for quitting smoking.

B.      That the performance or benefits of the product are scientifically or clinically proven or otherwise established; or

      The existence, contents, validity, results, conclusions, or interpretations of any test, study, or other research.

-17-

## IX. FDA-APPROVED CLAIMS

**IT IS FURTHER ORDERED** that nothing in this Order prohibits Corporate Defendants, their officers, agents, employees, and attorneys, or all other persons in active concert or participation with any of them from:

A. For any Drug product, making a representation that is approved for inclusion in labeling for such Drug product under a new drug application or biologics license application approved by the Food and Drug Administration, or, for any nonprescription Drug product authorized by Section 505G of the Food, Drug, and Cosmetics Act, 21 U.S.C. § 355h ("FDCA") to be marketed without an approved new drug application, making a representation that is permitted or required to appear in its labeling in accordance with Section 505G(a)(1)-(3) of the FDCA, 21 U.S.C. § 355h(a)(1)-(3), or a final administrative order under Section 505G(b) of the FDCA, 21 U.S.C. § 355h(b); and

B. For any product, making a representation that is specifically authorized for use in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990 or permitted under Sections 303-304 of the Food and Drug Administration Modernization Act of 1997.

## X. PROHIBITED MISREPRESENTATIONS: ENDORSEMENTS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from making, or assisting others in making, any misrepresentation, expressly or by implication, (1) about the status of any endorser or person providing a review of the Good or Service, including a misrepresentation that the endorser or reviewer is an independent or ordinary user

of the Good or Service, or (2) that any person or organization has endorsed any Good or Service.

## XI.  PROHIBITED MISREPRESENTATIONS:  U.S. ORIGIN CLAIMS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, or any other product, are permanently restrained and enjoined from making, or assisting others in making, any representation, expressly or by implication, that it is Made in the United States unless:

A.  The final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States; or

B.  A Clear and Conspicuous qualification appears immediately adjacent to the representation that accurately conveys the extent to which the product contains foreign parts, ingredients or components, and/or processing; or

C.  For a claim that a product is assembled in the United States, the product is last substantially transformed in the United States, the product's principal assembly takes place in the United States, and United States assembly operations are substantial.

## XII. PROHIBITED REPRESENTATIONS:  EARNINGS CLAIMS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing,

promotion, offering for sale, or sale of any Good or Service, including Business Ventures or Investment Opportunities, are permanently restrained and enjoined from:

    A.    Misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, any material fact, including:

        1.    That participants will or are likely to achieve substantial sales or earn substantial income or profit;

        2.    The amount of sales, income, or profit that participants have actually earned;

        3.    The amount of time or effort required to earn an amount of compensation or to advance; or

        4.    The total costs or any material restrictions, limitations, or conditions;

    B.    Making any representation, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, regarding the amount of sales, income, or profit that a participant can expect to earn, including that participants will or are likely to achieve substantial sales or earn substantial income or profit, unless the representation is non-misleading, and, at the time such representation is made, Corporate Defendants possess and rely upon competent and reliable evidence that is sufficient to substantiate that the representation is true.

## XIII. PROHIBITED MISREPRESENTATIONS: OTHER MATERIAL FACTS

    **IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or

participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promoting, offering for sale, sale, or distribution of any Good or Service are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration, any material fact concerning such Good or Service, including:

A. The success rate or rate of customer satisfaction;

B. The total costs;

C. Any refund policy;

D. Any material restrictions, limitations, or conditions, including any conditions that might limit certain consumers' ability to obtain the full benefits of the proffered Good or Service;

E. Any material aspect of its performance, efficacy, nature, or central characteristics, including that the benefits of the proffered Good or Service can be obtained quickly or easily;

F. Any cost to the consumer to purchase, receive, use, or return the Good or Service;

G. That the consumer will not be Charged for any Good or Service;

H. That a Good or Service is offered on a "free," "trial," "sample," "bonus," "gift," "no obligation," or "discounted" basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge;

I. The timing or manner of any Charge or bill;

J.    That the consumer can obtain a Good or Service for a processing, service, shipping, handling, or administrative fee with no further obligation;

K.    The purpose(s) for which the consumer's Billing Information will be used;

L.    The date by which the consumer will incur any obligation or be Charged unless the consumer takes affirmative steps to prevent or stop such a Charge;

M.    That a transaction has been authorized by the consumer; or

N.    Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the Good or Service.

## XIV.  PROHIBITIONS CONCERNING REFUNDS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from failing to honor a refund, return, or cancellation request that complies with any policy of Corporate Defendants to make refunds or allow returns or cancellations.

## XV.  PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order are permanently restrained and enjoined from:

A.    Credit Card Laundering;

B.   Making, or assisting others in making, directly or by implication, any false or misleading statement in order to obtain Payment Processing services;

C.   Failing to disclose to an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables a person to accept payments of any kind any material information related to a Merchant Account including, but not limited to, the identity of any owner, manager, director, or officer of the applicant for or holder of a Merchant Account, and any connection between an owner, manager, director, or officer of the applicant for or holder of a Merchant Account and any third person who has been or is placed in a Merchant Account monitoring program, had a Merchant Account terminated by a payment processor or a Financial Institution, or has been fined or otherwise disciplined in connection with a Merchant Account by a payment processor or a Financial Institution; and

D.   Engaging in any tactics to avoid fraud-and-risk-monitoring programs established by any Financial Institution, Acquiring Bank, or the operators of any payment system, including, but not limited to, tactics such as balancing or distributing sales transactions among multiple Merchant Accounts or merchant billing descriptors; splitting a single sales transaction into multiple smaller transactions; or using a shell company to apply for a Merchant Account.

## XVI.  PROHIBITION AGAINST UNAUTHORIZED CHARGES

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, promotion, offering

-23-

for sale, or sale of any Good or Service, are permanently restrained and enjoined from Charging, causing to be Charged, assisting others in Charging, or attempting to Charge any consumer, without obtaining the consumer's express informed consent to the Charge and having created and maintained a record of such consent.

## XVII. PROHIBITION AGAINST DEBITING CONSUMERS' BANK ACCOUNTS WITHOUT AUTHORIZATION

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any Good or Service, are permanently restrained and enjoined from:

A. Failing to timely obtain written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account before initiating any Preauthorized Electronic Fund Transfer; and

B. Failing to provide to the consumer a copy of a valid written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account.

## XVIII. CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that:

A. Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

1. Disclosing, using, or benefitting from, or assisting others in disclosing, using, or benefitting from, customer information, including the name, address, telephone number, email address,

-24-

social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that Corporate Defendants obtained prior to entry of this Order in connection with the advertising, promotion, offering for sale, or sale of Defendants' oral film strips or Rengalife; and

2.      Failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after entry of this Order.

*Provided, however*, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

B.      Upon termination of the receivership, the Receiver shall not return any customer information to the Defendants.

## XIX.  ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Corporate Defendants obtain acknowledgments of receipt of this Order:

A.      Corporate Defendants, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For 20 years after entry of this Order, Corporate Defendants for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, must deliver a copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and

(3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.  From each individual or entity to which Corporate Defendants delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XX.  COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Corporate Defendants make timely submissions to the Commission:

A.  One year after entry of this Order, Corporate Defendants must each submit a compliance report, sworn under penalty of perjury.  Each of them must:

1.  Identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences;

2.  Identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest;

3.  Describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership;

4.  Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

-26-

5.  Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

6.  Describe the activities of each business, including the Goods or Services offered, the means of manufacturing, labeling, advertising, promotion, offering for sale, sale or distribution, and the involvement of any other Defendant (which Corporate Defendants must describe if they know or should know due to their own involvement);

7.  Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

8.  Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.  For 20 years after entry of this Order, Corporate Defendants must each submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.  Name, including aliases or fictitious name, or residence address;

2.  Title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity;

3.  Any designated point of contact; or

4.  The structure of any entity that such Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any

subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.    Corporate Defendants must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.    Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.    Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. Jason Cardiff, et al., X190001.

## XXI. RECORDKEEPING

**IT IS FURTHER ORDERED** that Corporate Defendants must create certain records for 20 years after entry of the Order, and retain each such record for 5 years. Specifically, Corporate Defendants, for any business that each such Defendant, individually or collectively with any other Defendant, is a majority owner or controls directly or indirectly, must create and retain the following records:

A.    Accounting records showing the revenues from all Goods or Services sold;

B. Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. Records of all consumer complaints and refund requests concerning the subject matter of this Order, whether received directly or indirectly, such as through a third party, and any response;

D. All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E. A copy of each unique advertisement or other marketing material.

## XXII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Corporate Defendants' compliance with this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission, Corporate Defendants each must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B. For matters concerning this Order, the Commission is authorized to communicate directly with Corporate Defendants. Corporate Defendants must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C. The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D. Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Corporate Defendants, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## XXIII. EXPIRATION OF PRELIMINARY INJUNCTION PROVISIONS

A. Upon entry of this Order, the provisions of the Preliminary Injunction [Doc. # 46], including the asset freeze and receivership, shall expire, except to the extent provided in the Court's February 28, 2022 Order regarding discharge of the Receiver [Doc. # 702]. Upon the Receiver's completion of the tasks described in paragraphs 5 through 11 of that Order, and the Court's approval of the Receiver's final report, the Receiver will be discharged for all purposes.

## XXIII. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this 1st day of March, 2022.**

**DOLLY M. GEE**

**UNITED STATES DISTRICT JUDGE**

# EXHIBIT 6

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**Federal Trade Commission**,

Plaintiff,

v.

**Jason Cardiff**, et al.,

Defendants.

No. ED CV 18-2104-DMG (PLAx)

FINAL JUDGMENT INCLUDING PERMANENT INJUNCTION AS TO DEFENDANTS JASON CARDIFF AND EUNJUNG CARDIFF

On October 3, 2018, Plaintiff, the Federal Trade Commission ("FTC" or the "Commission"), filed its Complaint for Permanent Injunction and Other Equitable Relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401-8405, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, and moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining

1

order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants Jason Cardiff, Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, Danielle Cadiz, a/k/a Danielle Walker, Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership.  [Doc. # 1.]

This Court entered a temporary restraining order ("TRO") on October 10, 2018.  [Doc. # 29.]  On October 24, 2018, the Court extended the TRO as to Defendants Jason Cardiff and Eunjung Cardiff ("the Cardiffs").  [Doc. # 48.]  On November 8, 2018, the Court entered a Preliminary Injunction as to Defendants Jason Cardiff and Eunjung Cardiff.  [Doc. # 59.]

On August 6, 2020, the Commission moved for summary judgment as to Defendants Jason Cardiff and Eunjung Cardiff on all counts of the Complaint. [Doc. # 423.]  On October 9, 2020, the Court granted summary judgment against the Cardiffs on all sixteen counts in the Commission's Complaint.  [Doc. # 511.] The Commission filed a proposed Final Judgment on September 3, 2021.  [Doc. # 651.]

### FINDINGS OF FACT AND CONCLUSIONS OF LAW:

1.     This Court has jurisdiction over this matter and over the Cardiffs and venue in this district is proper under 15 U.S.C. § 53(b) and 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d).

2.     At all relevant times, the Cardiffs' activities as alleged in the Commission's Complaint were in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

3.     The Complaint charged that Defendants, including Jason Cardiff and Eunjung Cardiff, participated in deceptive and unfair acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, Section 4 of

ROSCA, 15 U.S.C. § 8403, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), Section 1005.10(b) of EFTA's implementing Regulation E, 12 C.F.R. § 1005.10(b), and Section 310.4(b)(1)(v) of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(v), in the marketing of Defendants' oral film strips and the Rengalife multilevel marketing program. The Complaint sought both permanent injunctive relief and equitable monetary relief for the challenged acts or practices.

4. The Complaint stated a claim upon which relief can be granted against the Cardiffs.

5. The Cardiffs violated Sections 5(a) and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a) and 52, by making:

    a. False or unsubstantiated efficacy clams and false proof claims for their oral film strips TBX-FREE, Eupepsia Thin, and Prolongz;

    b. False money-back guarantee claims for those oral film strips;

    c. False claims that Eupepsia Thin oral film strips were made in the United States, and that testimonialists appearing in advertising for Eupepsia Thin had used the product to lose weight; and

    d. False claims that consumers would not be enrolled in an autoship program and that their credit or debit card would be charged only for a one-time purchase of oral film strips.

6. The Cardiffs violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by:

    a. Failing to disclose, or disclose adequately, that consumers who provided their billing information for a product order would be enrolled automatically in a continuity plan for future

3

autoshipments of oral film strips that would be charged to their credit or debit cards; and

b.  Making false and unsubstantiated claims that people who became Rengalife members were likely to earn substantial income.

7.  The Cardiffs violated Sections 5(a) and 5(n) of the FTC Act, 15 U.S.C. §§ 45(a), 45(n), by causing charges to be submitted for payment to consumers' credit and debit cards without the express informed consent of those consumers.

8.  The Cardiffs violated Section 4 of ROSCA, 15 U.S.C. § 8403, by charging consumers for TBX-FREE oral film strips sold over the Internet through a negative option feature as defined in the TSR, 16 C.F.R. §3102(w) without:  (a) clearly and conspicuously disclosing all material terms of the transaction before obtaining the consumer's billing information; (b) obtaining the consumer's express informed consent before making the charge; and (c) providing a simple mechanism to stop recurring charges.

9.  The Cardiffs violated Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), by debiting consumers' bank accounts without first obtaining written authorizations signed or similarly authorized by those consumers for preauthorized electronic fund transfers from their accounts, or providing those consumers a copy of a written authorization signed or similarly authenticated by them.

10.  The Cardiffs violated the TSR by initiating or causing the initiation of outbound telephone calls that delivered prerecorded messages intended to induce the purchase of oral film strips.

11.  The Cardiffs operated the Corporate Defendants as a common enterprise, and the Corporate Defendants were "all involved in the sale of the Products [with] money, products, and employees flow[ing] freely between them." Summary Judgment Order at 20-21 [Doc. # 511].  The Cardiffs were the

4

"beneficiaries and masterminds" of the common enterprise, and "had knowledge of the misrepresentations in advertising or were recklessly indifferent to the falsity of the misrepresentations." *Id.*

12.     At all times material to the Complaint, both Jason Cardiff and Eunjung Cardiff formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in Findings 5 to 11, above, and both of them are therefore liable for injunctive relief.

13.     At all times material to the Complaint, both Jason Cardiff and Eunjung Cardiff knew of or were recklessly indifferent to the acts and practices set forth in Findings 5 to 11, above.

14.     The danger of future violations by Jason Cardiff and Eunjung Cardiff justifies the issuance of permanent injunctive relief, including banning them from engaging in certain activities.

15.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue injunctive relief for the Defendants' law violations.  Section 19 of the FTC Act, § 57b, empowers the Court to grant such relief as it finds necessary to redress injury to consumers from the Defendants' violations of ROSCA and the TSR, including rescission or reformation of contracts and refund of money.

16.     This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

17.     Pursuant to Federal Rule of Civil Procedure 65(d), the provisions of this Order are binding upon Jason Cardiff and Eunjung Cardiff, their successors and assigns, and their officers, agents, employees and attorneys, and upon those persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

18.     Entry of this Order is in the public interest, and there being no just reason for delay, the Clerk is directed to enter judgment in favor of Plaintiff Federal Trade Commission immediately.

5

**THEREFORE, IT IS ORDERED** as follows:

**DEFINITIONS**

For the purpose of this Order, the following definitions shall apply:

A.      "**Acquirer**" or "**Acquiring Bank**" means a business organization, Financial Institution, or an agent of a business organization or Financial Institution that has authority from an organization that operates or licenses a credit card system (e.g., Visa, MasterCard, American Express or Discover) to authorize Merchants to accept, transmit, or process payment by credit card through the credit card system for money, products, or anything else of value.

B.      "**Billing Information**" means any data that enables any person to access a consumer's account, such as a credit card, debit card, checking, savings, share or similar account, utility bill, or mortgage loan account.

C.      "**Business Venture**" means any written or oral business arrangement, however denominated, whether or not covered by 16 C.F.R. Part 437, that consists of the payment of any consideration for the right or means to offer, sell, or distribute Goods or Services.  The definition of Business Venture includes multilevel marketing programs.

D.      "**Charge(s),**" "**Charged,**" **or** "**Charging**" means any attempt to collect money or other consideration from a consumer, including, but not limited to, causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

E.      "**Clear(ly) and conspicuous(ly)**" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.      In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a television

advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

F. **"Covered Product"** means any Dietary Supplement, Food, Drug, or Device.

G.    **"Credit Card Laundering"** means: (a) presenting or depositing into, or causing or allowing another to present or deposit into, the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; (b) employing, soliciting, or otherwise causing or allowing a Merchant, or an employee, representative, or agent of a Merchant, to present to or deposit into the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; or (c) obtaining access to the credit card system through the use of a business relationship or an affiliation with a Merchant, when such access is not authorized by the Merchant Account agreement or the applicable credit card system.

H.    **"Credit Card Sales Draft"** means any record or evidence of a credit card transaction.

I.    **"Corporate Defendant(s)"** means Redwood Scientific Technologies, Inc. (CA); Redwood Scientific Technologies, Inc. (NV); Redwood Scientific Technologies, Inc. (DE); Identify, LLC; Advanced Men's Institute Prolongz LLC; Run Away Product, LLC; and Carols Place Limited Partnership, individually, collectively, or in any combination.

J.    **"Defendant(s)"** means all of the named Defendants, individually, collectively, or in any combination.

K.    **"Device"** means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them; (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in humans or other animals; or (3) intended to affect the structure or any function of the body of humans or other

8

animals; and which does not achieve any of its principal intended purposes through chemical action within or on the body of humans or other animals and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes.

L.    "**Dietary Supplement**" means:  (1) any product labeled as a Dietary Supplement or otherwise represented as a Dietary Supplement; or (2) any pill, tablet, capsule, powder, softgel, gelcap, liquid, or other similar form containing one or more ingredients that are a vitamin, mineral, herb or other botanical, amino acid, probiotic, or other dietary substance for use by humans to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of any ingredient described above, that is intended to be ingested, and is not represented to be used as a conventional Food or as a sole item of a meal or the diet.

M.    "**Drug**" means:  (1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of humans or other animals; and (4) articles intended for use as a component of any article specified in (1), (2), or (3); but does not include devices or their components, parts, or accessories.

N.    "**Essentially Equivalent Product**" means a product that contains the identical ingredients, except for inactive ingredients (e.g., binders, colors, fillers, excipients) in the same form and dosage, and with the same route of administration (e.g., orally, sublingually), as the Covered Product; *provided that* the Covered Product may contain additional ingredients if reliable scientific evidence generally accepted by experts in the field indicates that the amount and combination of

additional ingredients is unlikely to impede or inhibit the effectiveness of the ingredients in the Essentially Equivalent Product.

O. "**Financial Institution**" means any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956 (12 U.S.C. § 1843(k)). An institution that is significantly engaged in financial activities is a Financial Institution.

P. "**Food**" means: (1) any article used for food or drink for humans or other animals; (2) chewing gum; and (3) any article used for components of any such article.

Q. "**Good(s) or Service(s)**" includes merchandise, products, plans, or programs.

R. "**Investment Opportunity**" means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

S. "**Made in the United States**" means any representation, express or implied, that a product, or a specified component thereof, is of U.S.-origin, including a representation that such product is "made," "manufactured," "built," or "produced" in the United States or in America, or any other U.S.-origin claim.

T. "**Merchant**" means (a) any person or entity engaged in the sale or marketing of any goods or services, or soliciting a charitable contribution, or (b) any person or entity who applies for or obtains Payment Processing services.

U. "**Merchant Account**" means any account with an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables an individual, a business, or other organization to accept payments of any kind.

V. "**Negative Option Feature**" means, in an offer or agreement to sell or provide any Good or Service, a provision under which the consumer's silence or

failure to take affirmative action to reject a Good or Service, or to cancel the agreement, is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

     W.    "**Payment Processing**" means providing a person or entity, directly or indirectly, with the means used to charge or debit accounts through the use of any payment method or mechanism, including, but not limited to, remotely created payment orders, remotely created checks, ACH debits, or debit, credit, prepaid, or stored value cards. Whether accomplished through the use of software or otherwise, Payment Processing includes, among other things: (a) reviewing and approving Merchant applications for payment processing services; (b) providing the means to transmit sales transactions data from Merchants to Acquiring Banks or other Financial Institutions; (c) clearing, settling, or distributing proceeds of sales transactions from Acquiring Banks or Financial Institutions to Merchants; or (d) processing chargebacks or returned remotely created payment orders, remotely created checks, or ACH checks.

     X.    "**Person**" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

     Y.    "**Preauthorized Electronic Fund Transfer**" means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

     Z.    "**Receiver**" means Robb Evans & Associates, LLC.

## ORDER

## I.   BAN ON NEGATIVE OPTION SALES

     **IT IS ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined

from the advertising, marketing, promotion, offering for sale, or sale of any Good or Service with a Negative Option Feature.

## II. BAN ON ROBOCALLS AND RINGLESS VOICEMAILS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from initiating telephone calls delivering prerecorded messages, including ringless voicemails.

## III. BAN ON MULTILEVEL MARKETING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, facilitating, or advising, are permanently restrained and enjoined from engaging or participating in any multilevel marketing program.

## IV. BAN ON THE ADVERTISING, MARKETING, PROMOTION, OFFERING FOR SALE, OR SALE OF DISSOLVABLE ORAL FILM STRIPS TO END-USER CONSUMERS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from the advertising, marketing, promotion, offering for sale, or sale of any dissolvable oral film strip to end-user consumers.

## V. PROHIBITED REPRESENTATIONS: HEALTH-RELATED CLAIMS REQUIRING HUMAN CLINICAL TESTING FOR SUBSTANTIATION

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling,

advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation that such product:

    A.    Helps users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

    B.    Causes or assists in causing weight loss, including any specific representation about the amount of weight loss;

    C.    Suppresses or helps suppress appetite;

    D.    Causes or assists in causing weight loss without dieting or any change in food or lifestyle;

    E.    Helps users avoid gaining back any weight they lost;

    F.    Increases ejaculation control or the duration of sex;

    G.    Treats or prevents premature ejaculation;

    H.    Cures, mitigates, or treats any disease; or

    I.    Is comparable or superior to other treatments for quitting smoking, weight loss, or sexual performance, or in curing, mitigating, or treating any disease,

unless the representation is non-misleading, and, at the time of making such representation, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable scientific evidence substantiating that the representation is true.  For purposes of this Section, competent and reliable scientific evidence must consist of human clinical testing of the product, or of an Essentially Equivalent Product, that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.  Such testing must be:  (1) randomized, double-blind, and placebo-controlled; and (2) conducted

13

by researchers qualified by training and experience to conduct such testing.  In addition, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as described in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission.  Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VI. PROHIBITED REPRESENTATIONS:  OTHER HEALTH-RELATED CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation, other than representations covered under the Section of this Order entitled Prohibited Representations:  Health-Related Claims Requiring Human Clinical Testing For Substantiation, about the health benefits, performance, efficacy, safety, or side effects of the product, unless the representation is non-misleading, and, at the time of making such representation, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

14

For purposes of this Section, competent and reliable scientific evidence means tests, analyses, research, or studies (1) that have been conducted and evaluated in an objective manner by experts in the relevant disease, condition, or function to which the representation relates; (2) that are generally accepted by such experts to yield accurate and reliable results; and (3) that are randomized, double-blind, and placebo-controlled human clinical testing of the Covered Product, or of an Essentially Equivalent Product, when such experts would generally require such human clinical testing to substantiate that the representation is true. In addition, when such tests or studies are human clinical tests or studies, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as set forth in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission. Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VII. PRESERVATION OF RECORDS RELATING TO COMPETENT AND RELIABLE HUMAN CLINICAL TESTS OR STUDIES

**IT IS FURTHER ORDERED** that, with regard to any human clinical test or study ("test") upon which Jason Cardiff or Eunjung Cardiff rely to substantiate any claim covered by this Order, they shall secure and preserve all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of the test, including:

A. All protocols and protocol amendments, reports, articles, write-ups, or other accounts of the results of the test, and drafts of such documents reviewed by the test sponsor or any other person not employed by the research entity;

B. All documents referring or relating to recruitment; randomization; instructions, including oral instructions, to participants; and participant compliance;

15

C.      Documents sufficient to identify all test participants, including any participants who did not complete the test, and all communications with any participants relating to the test; all raw data collected from participants enrolled in the test, including any participants who did not complete the test; source documents for such data; any data dictionaries; and any case report forms;

D.      All documents referring or relating to any statistical analysis of any test data, including any pretest analysis, intent-to-treat analysis, or between-group analysis performed on any test data; and

E.      All documents referring or relating to the sponsorship of the test, including all communications and contracts between any sponsor and the test's researchers.

*Provided, however*, the preceding preservation requirement does not apply to a reliably reported test, unless the test was conducted, controlled, or sponsored, in whole or in part by: (1) Jason Cardiff or Eunjung Cardiff; (2) their officers, agents, representatives, or employees; (3) any other person or entity in active concert or participation with Jason Cardiff or Eunjung Cardiff; (4) any person or entity affiliated with or acting on behalf of Jason Cardiff or Eunjung Cardiff; (5) any supplier of any ingredient contained in the product at issue to any of the foregoing or to the product's manufacturer; or (6) the supplier or manufacturer of such product.

For purposes of this Section, "reliably reported test" means a report of the test has been published in a peer-reviewed journal, and such published report provides sufficient information about the test for experts in the relevant field to assess the reliability of the results.

For any test conducted, controlled, or sponsored, in whole or in part, by or on behalf of, Jason Cardiff or Eunjung Cardiff, they must establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of any personal information collected from or about participants.  These procedures must

16

be documented in writing and must contain administrative, technical, and physical safeguards appropriate to the size and complexity of the entity sponsoring the test, the nature and scope of that entity's activities, and the sensitivity of the personal information collected from or about the participants.

## VIII.  PROHIBITED REPRESENTATIONS:  TESTS, STUDIES, OR OTHER RESEARCH

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration:

    A.    That the product is clinically proven to:

        1.    Help users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

        2.    Cause or assist in causing weight loss, including any specific representation about the amount of weight loss;

        3.    Suppress or help suppress appetite;

        4.    Cause or assist in causing weight loss without dieting or any change in food or lifestyle;

        5.    Help users avoid gaining back any weight they lost;

        6.    Increase ejaculation control or the duration of sex;

        7.    Treat or prevent premature ejaculation; or

        8.    Be comparable or superior to other treatments for quitting smoking.

    B.    That the performance or benefits of the product are scientifically or

17

clinically proven or otherwise established; or

C.   The existence, contents, validity, results, conclusions, or interpretations of any test, study, or other research.

## IX.   FDA-APPROVED CLAIMS

**IT IS FURTHER ORDERED** that nothing in this Order prohibits Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, or all other persons in active concert or participation with any of them from:

A.   For any Drug product, making a representation that is approved for inclusion in labeling for such Drug product under a new drug application or biologics license application approved by the Food and Drug Administration, or, for any nonprescription Drug product authorized by Section 505G of the Food, Drug, and Cosmetics Act, 21 U.S.C. § 355h,  ("FDCA") to be marketed without an approved new drug application, making a representation that is permitted or required to appear in its labeling in accordance with  Section 505G(a)(1)-(3) of the FDCA, 21 U.S.C. § 355h(a)(1)-(3), or a final administrative order under Section 505G(b) of the FDCA, 21 U.S.C. § 355h(b); and

B.   For any product, making a representation that is specifically authorized for use in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990 or permitted under Sections 303-304 of the Food and Drug Administration Modernization Act of 1997.

## X.   PROHIBITED MISREPRESENTATIONS:  ENDORSEMENTS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from making, or assisting others

18

in making, any misrepresentation, expressly or by implication, (1) about the status of any endorser or person providing a review of the Good or Service, including a misrepresentation that the endorser or reviewer is an independent or ordinary user of the Good or Service, or (2) that any person or organization has endorsed any Good or Service.

## XI.     PROHIBITED MISREPRESENTATIONS:  U.S. ORIGIN CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, or any other product, are permanently restrained and enjoined from making, or assisting others in making, any representation, expressly or by implication, that it is Made in the United States unless:

A.     The final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States; or

B.     A Clear and Conspicuous qualification appears immediately adjacent to the representation that accurately conveys the extent to which the product contains foreign parts, ingredients or components, and/or processing; or

C.     For a claim that a product is assembled in the United States, the product is last substantially transformed in the United States, the product's principal assembly takes place in the United States, and United States assembly operations are substantial.

## XII.    PROHIBITED REPRESENTATIONS:  EARNINGS CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert

or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, or sale of any Good or Service, including Business Ventures or Investment Opportunities, are permanently restrained and enjoined from:

A.    Misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, any material fact, including:

1.    That participants will or are likely to achieve substantial sales or earn substantial income or profit;

2.    The amount of sales, income, or profit that participants have actually earned;

3.    The amount of time or effort required to earn an amount of compensation or to advance; or

4.    The total costs or any material restrictions, limitations, or conditions;

B.    Making any representation, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, regarding the amount of sales, income, or profit that a participant can expect to earn, including that participants will or are likely to achieve substantial sales or earn substantial income or profit, unless the representation is non-misleading, and, at the time it is made, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable evidence that is sufficient to substantiate that the representation is true.

## XIII.  PROHIBITED MISREPRESENTATIONS:  OTHER MATERIAL FACTS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert

20

or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration, any material fact concerning such Good or Service, including:

A.    The success rate or rate of customer satisfaction;

B.    The total costs;

C.    Any refund policy;

D.    Any material restrictions, limitations, or conditions, including any conditions that might limit certain consumers' ability to obtain the full benefits of the proffered Good or Service;

E.    Any material aspect of its performance, efficacy, nature, or central characteristics, including that the benefits of the proffered Good or Service can be obtained quickly or easily;

F.    Any cost to the consumer to purchase, receive, use, or return the Good or Service;

G.    That the consumer will not be Charged for any Good or Service;

H.    That a Good or Service is offered on a "free," "trial," "sample," "bonus," "gift," "no obligation," or "discounted" basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge;

I.    The timing or manner of any Charge or bill;

J.    That the consumer can obtain a Good or Service for a processing, service, shipping, handling, or administrative fee with no further obligation;

K.    The purpose(s) for which the consumer's Billing Information will be used;

L.    The date by which the consumer will incur any obligation or be Charged unless the consumer takes affirmative steps to prevent or stop such a Charge;

M.    That a transaction has been authorized by the consumer; or

N.    Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the Good or Service.

## XIV.  PROHIBITIONS CONCERNING REFUNDS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from failing to honor a refund, return, or cancellation request that complies with any policy to make refunds or allow returns or cancellations.

## XV.  PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.    Credit Card Laundering;

B.    Making, or assisting others in making, directly or by implication, any false or misleading statement in order to obtain Payment Processing services;

C.    Failing to disclose to an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables a person to accept payments of any kind any material

information related to a Merchant Account including, but not limited to, the identity of any owner, manager, director, or officer of the applicant for or holder of a Merchant Account, and any connection between an owner, manager, director, or officer of the applicant for or holder of a Merchant Account and any third person who has been or is placed in a Merchant Account monitoring program, had a Merchant Account terminated by a payment processor or a Financial Institution, or has been fined or otherwise disciplined in connection with a Merchant Account by a payment processor or a Financial Institution; and

D.     Engaging in any tactics to avoid fraud-and-risk-monitoring programs established by any Financial Institution, Acquiring Bank, or the operators of any payment system, including, but not limited to, tactics such as balancing or distributing sales transactions among multiple Merchant Accounts or merchant billing descriptors; splitting a single sales transaction into multiple smaller transactions; or using a shell company to apply for a Merchant Account.

## XVI.  PROHIBITION AGAINST UNAUTHORIZED CHARGES

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, promotion, offering for sale, or sale of any Good or Service, are permanently restrained and enjoined from Charging, causing to be Charged, assisting others in Charging, or attempting to Charge any consumer, without obtaining the consumer's express informed consent to the Charge and having created and maintained a record of such consent.

## XVII. PROHIBITION AGAINST DEBITING CONSUMERS' BANK ACCOUNTS WITHOUT AUTHORIZATION

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether

acting directly or indirectly, in connection with the sale of any Good or Service, are permanently restrained and enjoined from:

A. Failing to timely obtain written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account before initiating any Preauthorized Electronic Fund Transfer; and

B. Failing to provide to the consumer a copy of a valid written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account.

## XVIII. CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that:

A. Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

1. Disclosing, using, or benefitting from, or assisting others in disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that Corporate Defendants obtained prior to entry of this Order in connection with the advertising, promotion, offering for sale, or sale of Defendants' oral film strips or Rengalife; and

2. Failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after entry of this Order.

24

> *Provided, however*, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

B.     Upon termination of the receivership, the Receiver shall not return any customer information to the Defendants.

## XIX.  ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff obtain acknowledgments of receipt of this Order:

A.     Jason Cardiff and Eunjung Cardiff, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.     For 20 years after entry of this Order, Jason Cardiff and Eunjung Cardiff for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, must deliver a copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which Jason Cardiff or Eunjung Cardiff delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XX.  COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff make timely submissions to the Commission:

A.      One year after entry of this Order, Jason Cardiff and Eunjung Cardiff must each submit a compliance report, sworn under penalty of perjury.  Each of them must:

1.      Identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences;

2.      Identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest;

3.      Describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership;

4.      Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

5.      Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

6.      Describe the activities of each business, including the Goods or Services offered, the means of manufacturing, labeling, advertising, promotion, offering for sale, sale or distribution, and the involvement of any other Defendant (which Jason Cardiff and Eunjung Cardiff must describe if they know or should know due to their own involvement);

7.      Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

8.      Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.      For 20 years after entry of this Order, Jason Cardiff and Eunjung Cardiff must each submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.   Name, including aliases or fictitious name, or residence address;

2.   Title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity;

3.   Any designated point of contact; or

4.   The structure of any entity that such Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.   Jason Cardiff and Eunjung Cardiff must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.   Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.   Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The subject line must begin:  FTC v. Jason Cardiff, et al., X190001.

## XXI.  RECORDKEEPING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff must create certain records for 20 years after entry of the Order, and retain each such record for 5 years.  Specifically, Jason Cardiff and Eunjung Cardiff, for any business that such Defendant, individually or collectively with any other Defendants, is a majority owner or controls directly or indirectly, must create and retain the following records:

A.	Accounting records showing the revenues from all Goods or Services sold;

B.	Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.	Records of all consumer complaints and refund requests concerning the subject matter of this Order, whether received directly or indirectly, such as through a third party, and any response;

D.	All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E.	A copy of each unique advertisement or other marketing material.

## XXII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Jason Cardiff and Eunjung Cardiff's compliance with this Order:

A.	Within 14 days of receipt of a written request from a representative of the Commission, Jason Cardiff and Eunjung Cardiff each must:  submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.  The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of

28

Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

      B.     For matters concerning this Order, the Commission is authorized to communicate directly with Jason Cardiff and Eunjung Cardiff. Jason Cardiff and Eunjung Cardiff must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.

      C.     The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

      D.     Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Jason Cardiff and Eunjung Cardiff, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## XXIII. EXPIRATION OF PRELIMINARY INJUNCTION PROVISIONS

      A.     Upon entry of this Order, the provisions of the Preliminary Injunction [Doc. # 59], including the asset freeze and receivership, shall expire, except to the extent provided in the Court's February 28, 2022 Order regarding discharge of the Receiver [Doc. # 702]. Upon the Receiver's completion of the tasks described in paragraphs 5 through 11 of that Order, and the Court's approval of the Receiver's final report, the Receiver will be discharged for all purposes.

## XXIV. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this 1st day of March, 2022.**

_____

**DOLLY M. GEE**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT 7

# CONTENTS

| | Page |
|---|---|
| Summary and purpose | 2 |
| Brief Description | 2 |
| Background and Need | 4 |
|     Consumer product warranties | 4 |
|         Background | 4 |
|         Needs | 6 |
|     Federal Trade Commission improvements | 8 |
| Section by Section Analysis | 11 |
|     Title I | 11 |
|         Definitions | 11 |
|         Disclosure requirements | 15 |
|         Designation of warranties | 16 |
|         Federal standards for warranty | 17 |
|         Full and limited warranties of a consumer product | 19 |
|         Service contracts | 20 |
|         Designation of representatives | 20 |
|         Limitation on disclaimer of implied warranties | 21 |
|         Federal Trade Commission | 21 |
|         Private remedies | 22 |
|         Government enforcement | 24 |
|         Saving provision | 25 |
|         Scope | 25 |
|         Effective date | 26 |
|     Title II | 26 |
|         Expanded Federal Trade Commission jurisdiction | 26 |
|         Civil penalties | 27 |
|         Consumer redress | 27 |
|         Penalty for violation of cease and desist order | 29 |
|         Commission self-representation | 29 |
|         Expansion of jurisdiction | 29 |
|         Securing of documentary evidence | 30 |
|         Reporting requirements | 30 |
|         Expansion of jurisdiction | 30 |
|         Injunctions | 30 |
|         Enforcement proceedings | 31 |
|         Financial institutions | 31 |
|         Legislative rulemaking | 32 |
| Text of S. 356, as reported | 32 |
| Costs | 45 |
| Record vote | 46 |
| Changes in existing law | 46 |
| Agency comments | 53 |

(III)

Calendar No. 143

| 93D CONGRESS | SENATE | REPORT |
|---|---|---|
| 1st Session | | No. 93–151 |

## MAGNUSON-MOSS WARRANTY-FEDERAL TRADE COMMISSION IMPROVEMENT ACT

MAY 14, 1973.—Ordered to be printed

Mr. MAGNUSON, from the Committee on Commerce,
submitted the following

# REPORT

[To accompany S. 356]

The Committee on Commerce to which was referred the bill (S. 356) to provide minimum disclosure standards for written consumer product warranties against defect or malfunction; to define minimum Federal content standards for such warranties; to amend the Federal Trade Commission Act in order to improve consumer protection activities; and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

(1)

## SUMMARY AND PURPOSE

S. 356, the "Magnuson-Moss Warranty Federal Trade Commission Improvement Act," is designed to help the American consumer to find and enforce greater reliability in the tangible personal property he buys for "personal, family, or household purposes." Title I of the bill sets forth disclosure and designation standards for written warranties on each consumer product that costs the consumer more than $5; defines Federal contents standards for full warranties; and provides meaningful consumer remedies for the breach of written warranty and written service contract obligations. Title II of the bill improves the Federal Trade Commissions ability to deal with unfair consumer acts and practices "affecting" interstate commerce by granting the Commission the power to: (1) seek preliminary or permanent injunctions, (2) initiate actions in district courts seeking specific redress for consumers injured by unfair or deceptive acts or practices, and (3) secure civil penalties for knowing violations of the Federal Trade Commission Act. In addition, title II authorizes the Commission to represent itself in court and makes more uniform the operation of the F.T.C. Act as it applies to financial institutions.

It is the purpose of this bill to improve the position of the consumer in the marketplace by making the Federal agency responsible for his economic well being (the F.T.C.) more effective and by delineating with specificity the duties which suppliers of consumer products assume when offering warranties or service contracts in writing on consumer products. In addition, this bill aims to increase the ability of the consumer to make more informed product choices and to enable him to economically pursue his own remedies when a supplier of a consumer product breaches a voluntarily assumed warranty or service contract obligation.

## BRIEF DESCRIPTION

Title I of S. 356 requires the supplier of a consumer product costing more than $5 who chooses to warrant in that product writing to clearly and conspicuously disclose the contents of that warranty and to designate the warranty as either a "full" warranty in compliance with Federal standards, or to describe the warranty with easily understood language indicating the specific limitations. Title I would prohibit a supplier offering a warranty in writing from disclaiming his implied warranties. Thus, the present misleading practice of using very limited express warranties to reduce consumer rights which would have been available but for the disclaimer of implied warranties is prohibited by title I.

If a supplier fails to honor his warranty or service contract promises, the consumer can avail himself of certain specified remedies. If that supplier has provided a bona fide informal dispute settlement mechanism by which disputes between suppliers and consumers are to be resolved, then the consumer would utilize the informal dispute settlement mechanism before pursuing other avenues of redress. If a supplier does not have an informal dispute settlement mechanism for resolving consumer complaints, or if the consumer is not satisfied with the results obtained in any informal dispute settlement proceeding, the consumer can pursue his legal remedies in a court of competent jurisdiction, provided that he has afforded the supplier a reasonable opportunity to cure the breach. Such pursuit is made economically feasible by the provision in the bill which awards reasonable attorneys fees (based on actual time expended) and court costs to any successful consumer litigant. In addition to authorizing private consumer remedies, the bill provides that any violation of title I is a violation of the Federal Trade Commission Act. The Federal Trade Commission or the Attorney General can seek preliminary injunctions against persons violating such provisions.

Title II would authorize the Federal Trade Commission to seek either a preliminary or permanent injunction against parties committing acts or practices which are unfair or deceptive to consumers. Title II would also authorize the Commission to assess civil penalties (up to $10,000 per violation) against those suppliers of consumer products who knowingly commit unfair or deceptive acts or practices in violation of Section 5(a)(1) of the Federal Trade Commission Act. Such penalties could be compromised, mitigated, or settled if the Commission provides a public statement of its reasons for such action and the court approved the compromise, mitigation, or settlement.

In order to redress consumer injury resulting from violations of the Federal Trade Commission Act, the Commission is authorized to initiate civil actions in United States district court seeking reasonable and appropriate consumer redress. While redress under this provision could not include exemplary or punitive damages, relief could include recission, reformation, refunding of money, return of property, or other appropriate relief for those injured by an unfair or deceptive act or practice.

Title II of S. 356 expands the Federal Trade Commission's jurisdiction beyond activities "in" interstate commerce to those acts or practices "affecting" interstate commerce. The Commission is authorized to act through its own attorneys in situations in which it is now represented by the Attorney General of the United States.

Finally, title II of S. 356 removes the present exemption for banks from the Federal Trade Commission Act. In order to make the prohibitions against unfair or deceptive acts or practices in the consumer credit field uniform, all financial institutions are made subject to those provisions of the Federal Trade Commission Act relating to unfair or deceptive acts or practices to consumers. Enforcement powers under this section, however, are mandatorily delegated to the various Federal financial regulatory institutions, with the proviso that the Commission, pursuant to section 553 of Title 5 of the United States Code, may request and shall receive redelegation of those enforcement powers if it is shown that they are not being effectively carried out by the relevant Federal financial regulatory agency.

### BACKGROUND AND NEED

#### CONSUMER PRODUCT WARRANTIES

*Background*

In response to a growing tide of complaints regarding automobile warranties, the Federal Trade Commission instituted a field investigation in 1965 to see if in fact there was a significant failure of performance on the part of automobile manufacturers to live up to their warranty promises.

While the Federal Trade Commission investigation was being conducted. Senator Magnuson and Senator Hayden introduced warranty legislation late in 1967 which covered automobiles and appliances. These bills required suppliers to disclose clearly and conspicuously the terms of their warranties. The Magnuson bill would have established an advisory council on guarantees, warranties, and servicing to conduct a comprehensive study and investigation of the adequacy of performance of guarantees and the extent of difficulty in securing competent servicing of consumer products. No action was taken on these bills in the 90th Congress.

In response to the proposed warranty legislation, and as an extension of its initial investigative effort, the Federal Trade Commission asked its staff to prepare a comprehensive report on automobile warranty practices. That report was published in October of 1968 and concluded among other things that, "performance of manufacturers and dealers under the warranty has not achieved the levels implied by the warranty, and failure to perform up to warranted standards has been encountered in the manufacture and the preparation of cars for delivery to consumers." The report went on to conclude that, "in servicing under the warranty an excessive amount of service does not meet the standards of consumer acceptability, and replacement of cars which have revealed serious malfunctions and which cannot be repaired by the dealer is infrequent."

While the Federal Trade Commission was attempting to shed some light on the automobile warranty problem, a task force on appliance warranties and services designed to accomplish the purposes of Senator Magnuson's proposed advisory council was created. The task force consisted of the Secretaries of Commerce and Labor, the Chairman of the Federal Trade Commission, and the Special Assistant to the President for Consumer Affairs. Not only was this task force supposed to study the warranty problem, but it was also supposed to encourage voluntary action on the part of industry and determine the need for Federal legislation. In January 1969, the task force published a report which included comprehensive recommendations of the various participants. The report concluded that—

There are a number of problems associated with major appliance warranties. However, the underlying and basic problem which must be solved, is how to persuade or compel a manufacturer or retailer to provide the purchaser of a major appliance with a meaningful guarantee which they will honor in both letter and spirit subsequent to the sale.

The task force then recommended that:

At the end of one year, if it appears that substantial progress is not being made toward the solution of these problems, the mentioned officials should consider the nature and scope of legislation necessary to achieve the desired results.

In anticipation of the possible need for legislation, Senator Magnuson began to discuss possible legislative proposals in early 1969. On October 27, 1969, Senator Magnuson and Senator Moss introduced the Consumer Products Guarantee Act (S. 3074). On October 30, 1969, President Nixon, in his consumer message, reconstituted the Task Force on Appliance Warranties and Services and asked it to report on the problem.

Initial hearings on S. 3074 were held in late January 1970. At that time the Federal Trade Commission promised to submit its report on the Automobile warranty soon; the Task Force on Appliance Warranties and Services said it would report to the Committee in March.

On February 19, 1970, the Federal Trade Commission issued its automobile warranties report which advocated Federal legislation to solve automobile warranty and service problems. The Commission proposed enactment of "a new and comprehensive Automobile Quality Control Act, which would give statutory recognition to the public utility obligations of automobile manufacturers and provide for minimum standards of quality, durability, and performance of new automobiles and all parts thereof, and which would place a statutory obligation on manufacturers to provide consumers with defect-free automobiles in compliance with such standards and to repair defective automobiles and automobile parts which do not conform to such standards." In short, the Commission advocated the creation of a mandatory statutory warranty through the direct regulation of product quality.

In March of 1970 the Administration gave testimony before the Congress which emphasized the need for Federal warranty legislation covering a wide range of consumer products. After careful study, the Senate Commerce Committee amended the Magnuson-Moss bill to incorporate certain constructive suggestions of the Administration, industry, and consumer witnesses and ordered S. 3074 reported. The reported bill was passed by the Senate unanimously on July 1, 1970. Although the House held hearings on S. 3074 and related bills, no action was taken by the House prior to the adjournment of the 91st Congress.

The warranty provisions of S. 3074 were reintroduced in the 92d Congress in a refined form along with the Federal Trade Commission Reform Proposals discussed below as the "Consumer Product Warranties and Federal Trade Commission Improvements Act of 1971" (S. 986). The Committee again held extensive hearings on the warranty and the Federal Trade Commission reform proposals, and following intensive executive consideration of S. 986, the Committee ordered the bill reported to the floor of the Senate.

The Administration was also active in the warranty field. The President indicated in his consumer message of February 24, 1971, that he would propose a "Fair Warranty Disclosure Act" to provide for clearer warranties and prohibit the use of deceptive warranties. This

proposal was transmitted by the Attorney General on March 8, 1971, and introduced by Senator Magnuson on March 12, 1971, by request, as S. 1221.

After consideration on the floor, S. 986 passed the Senate by a vote of 72 to 2; this marked the second time that the Senate had overwhelmingly approved comprehensive warranty legislation. Unfortunately, the House was not able to move rapidly enough to report and pass a companion piece of legislation before the end of the 92d Congress.

A refined version of this same bill was introduced by Chairman Magnuson and Senator Moss in the 93d Congress on January 12, 1973, as S. 356. In lieu of holding further hearings on this proposal, the committee solicited comments from all those interested in the legislation. After further refinements, the Committee unanimously ordered the legislation reported to the floor of the Senate.

*Needs*

For many years warranties have confused and misled the American consumers. A warranty is a complicated legal document whose full essence lies buried in myriads of reported legal decisions and in complicated State codes of commercial law. The consumers' understanding of what a warranty on a particular product means to him frequently does not coincide with the legal meaning.

This was not always the case. When the use of a warranty in conjunction with the sale of a product first become commonplace, it was typically a concept that the contracting parties understood and bargained for, usually at arms length. One could decide whether or not to purchase a product with a warranty, and bargain for that warranty accordingly. Since then, the relative bargaining power of those contracting for the purchase of consumer products has changed radically. Today, most consumers have little understanding of the frequently complex legal implications of warranties on consumer products. Typically, a consumer today cannot bargain with consumer product manufacturers or suppliers to obtain a warranty or to adjust the terms of a warranty voluntarily offered. Since almost all consumer products sold today are typically done so with a contract of adhesion, there is no bargaining over contractual terms. S. 356 attempts to remedy some of the defects resulting from this gross inequality in bargaining power, and return the sense of fair play to the warranty field that has been lost through the years as the organizational structure of our society has evolved. The warranty provisions of S. 356 are not only designed to make warranties understandable to consumers, but to redress the ill effects resulting from the imbalance which presently exists in the relative bargaining power of consumers and suppliers of consumer products.

The warranty provisions of S. 356 are designed to meet four basic needs:

(1) The need for consumer understanding.
(2) The need for minimum warranty protection for consumers,
(3) The need for assurance of warranty performance, and
(4) The need for better product reliability.

First, the bill is designed to promote consumer understanding. Far too frequently, suppliers of consumer products fail to communicate to the consumer what, in fact, they are offering him in that small piece of paper proudly labeled "warranty". The consumer really does not know what to expect from the warranty offered. Whom should he notify if his product stops working during the warranty period? What are his responsibilities after notification? How soon can he expect a fair replacement? Will repair or replacement cost him anything? There is a great need to generate consumer understanding by clearly and conspicuously disclosing the terms and conditions of the warranty and by telling the consumer what to do if his guaranteed product becomes defective or malfunctions.

Second, the bill is designed to insure consumers certain basic protections when they purchase consumer products which have written warranties. Normally when goods are sold, the law provides that certain warranties by implication accompany the sale of these goods. For example, the law usually implies a warranty of fitness for ordinary use or, when the seller knows that the goods are to be used by the buyer for a particular purpose, the law implies a warranty of fitness for a particular purpose. The law allows the seller to disclaim his implied warranties only by using such words as "as is" or "without fault" or by disclaiming the implied warranties when issuing an express warranty. These rules do no injustice to commercial buyers who are sophisticated in the ways of the marketplace and can judge the import of the express warranty and the meaning of the disclaimer of the implied warranty. Unfortunately, the ordinary purchaser of consumer products does not know the meaning of words in an express warranty which state, for example, "this warranty is in lieu of any other express warranties or the implied warranties of merchantability or fitness." In this situation a consumer's rights may, without his knowledge, be limited rather than expanded when a supplier of consumer products gives him a piece of paper with a bold claim of warranty written across the top. The issuance of a limited express warranty while simultaneously disclaiming implied warranties has become an increasingly common practice which results in many cases in a document which could be more accurately described as a limitation on liability rather than a warranty. Therefore, there is a need to prohibit the disclaimer of implied warranties when a supplier of consumer products guarantees his products in writing.

The third major problem concerning warranties confronting consumers today relates to warranty enforcement. Even in the relatively rare situation where the consumer fully understands the meaning of a warranty, and there has been no disclaimer of the implied warranties, he frequently is in no better position because the warrantor does not live up to the promises he has made. Because enforcement of the warranty through the courts is prohibitively expensive, there exists no currently available remedy for consumers to enforce warranty obligations. If warrantors who did not perform as promised suffered direct economic detriment, they would have strong incentives to perform. Therefore there is a need to insure warrantor performance by monitarily penalizing the warrantor for non-performance—and awarding that penalty to the consumer as compensation for his loss. One way to effectively meet this need is by providing for reasonable attorneys fees and court costs to successful consumer litigants, thus making con-

sumer resort to the courts feasible. It is hoped that by making court actions feasible, suppliers will be encouraged to develop workable informal dispute settlement procedures for the expeditious settlement of consumer complaints.

In the final analysis, many warranty problems could be cured if products were made sufficiently reliable to last the length of the warranty period and beyond. Thus, there is a basic need to stimulate better product design and quality control for the production of more reliable products. One way of accomplishing this is by making it economically rewarding for producers of consumer products to build reliability into their products.

Under present marketing conditions, the consumer has available to him little or no information about the product reliability potential of any consumer product he buys. He cannot look to the length of the warranty period as a possible indicator of product reliability, because variance in warranty terms and performance permits producers of less reliable products to compete on ostensibly the same terms of duration as producers of more reliable products. Both producers may use the rubrick "warranty" and offer identical duration periods, but one producer might warrant parts only and require the consumer to mail the product to the plant while the other producer might provide for repair without charge and fix the product in the home. Only when the rules of the warranty game are clarified so that the consumer can look to the warranty duration of the guaranteed product as an indicator of product reliability (because all costs of breakdown have been internalized) will consumers be able to differentiate on the basis of price between more reliable and less reliable products. This ability to differentiate should produce economic rewards from increased sales and reduced service costs for the producer of more reliable products.

Before the duration of the warranty can become a useful comparative gauge of product reliability, it is necessary to clearly designate for the consumer whether the warrantor of the product is willing to assume all costs connected with the repair or replacement of the warranted product and whether he is willing to absorb all consumer costs incidental to any failure to live up to the promises of free and timely repair or replacement. Only a warrantor giving this type of "full" warranty is in a position to increase his profit, by making product reliability or service capability improvements. Furthermore, to the extent that consumer choice in the marketplace is guided by the desire for product reliability measured by the duration of the warranty, there will be an incentive for suppliers of consumer products to offer full warranties of relatively long duration. Therefore, there is a need to identify for the consumer which products are fully warranted and to create standards for "full" warranties.

### FEDERAL TRADE COMMISSION IMPROVEMENTS

In 1938 the Wheeler-Lea Trade Commission Act expanded the powers of the Federal Trade Commission to cover "unfair or deceptive acts or practices in commerce." The purpose of this expanded authority, in the words of the House Committee report, was to make "the consumer, who may be injured by an unfair trade practice, of equal concern, before the law, with the merchant or manufacturer injured by the unfair methods of a dishonest competitor." Congress, however, did not accompany this broad grant of authority with a concomitant expansion of the Commission's powers of enforcement, except partially in the limited area of food, drug and cosmetic advertising.

Thus the sole enforcement weapon available to the FTC to police the vast majority of consumer frauds, deception, and cheating has been the cease and desist order. Even in 1938, a minority of the House Committee reporting the Wheeler-Lea Act recognized and decried the inadequacy of such a limited enforcement power:

> * * * Unless the disseminator of a false advertisement knows at the time of the dissemination that he may at some time in the future be held accountable by a criminal or civil penalty action for the unlawful dissemination, he will not be deterred from such dissemination. It is just this deterring effect that is lacking when dependence is placed upon cease and desist orders for enforcement.

Their fears proved well founded. Each subsequent decade has brought forth indictments of the FTC's incapacity to enforce section 5(a)(1) of the Federal Trade Commission Act.

In the 90th Congress, Chairman Magnuson introduced and the Senate passed S. 3065, the "Deceptive Sales Act", which would have given the FTC authority to seek preliminary injunctions to bring unfair or deceptive practices to a halt immediately in appropriate circumstances. The House did not act. This legislation was reintroduced in substantially identical form in the 91st Congress, on May 26, 1969, by Consumers Subcommittee Chairman Moss and Chairman Magnuson, as S. 2246.

On October 31, 1969, President Nixon, in his consumer message to Congress, called for "expanded powers for a revitalized Federal Trade Commission, to enable it to protect consumers promptly and effectively." The Administration's "Consumer Protection Act of 1969" was introduced by Chairman Magnuson, together with Senators Baker, Griffin, Prouty, and Scott as S. 3201, on December 3, 1969.

The Consumer Subcommittee of the Commerce Committee commenced hearings on these proposals shortly after the introduction of S. 3201, receiving the testimony of Mrs. Knauer, Consumer Advisor to the President, and Assistant Attorney General McLaren on behalf of the Administration. The Subcommittee also sought the benefit of the experience of each Commissioner of the FTC individually.

Commissioner Philip Elman, in testimony before the Committee, explained how the FTC's regulatory anemia was related to its dependence upon cease and desist orders:

> * * * [A]s to most products and services offered the public, the principle protection for the consumer is left to the Federal Trade Commission and its limited power to prohibit unfair and deceptive practices solely through issuance of orders to cease and desist having only prospective effect. Unless and until an order based on past violations is issued, no penalties, criminal or civil, can be imposed for practices that

violate the law, no matter how flagrant and harmful to the public. And even as to respondents under order, they are subject to civil penalties only if violations of the order are proved in a new, separate proceeding brought by the attorney general in a federal court. Finally, while injured consumers are given a private right of action under a few statutes (e.g., the Consumer Credit Protection Act), no recovery of damages may be had under the FTC act even when they result from unfair and deceptive practices which violate an outstanding order to cease and desist.

And Commissioner Mary Gardner Jones strongly concurred:

* * * [W]hat we need are stronger sanctions. A cease and desist order is not enough to provide the kind of deterrent that one needs so that in fact business will police itself, because no agency, state or federal, can police violations of law. What you depend on is for the community to police itself. But in order for a community to police itself, you have to have effective sanctions.* * *

Burgeoning public impatience with the Commission in the consumer conscious 1960's—fueled by revelations of bureaucratic ineptitude and consumer neglect—led President Nixon in April, 1969, to seek from the American Bar Association a "professional appraisal of the present efforts of the FTC in the field of consumer protection." The ABA responded with a landmark study performed by a special commission under the Chairmanship of Miles W. Kirkpatrick. Among other things, the Kirkpatrick Commission concluded:

* * * We believe that effective law enforcement in this area requires the creation of new procedural devices, including a right in the FTC, in appropriate situations, to seek preliminary injunctions against deceptive practices, and some form of private relief for or on behalf of consumers injured by such practices.

FTC Chairman Casper Weinberger, who had taken the reigns of the Commission at the moment in its 50 year history when it had reached its nadir in public esteem and confidence, on behalf of a unanimous Commission, sought new powers from Congress. In addition to authority to obtain preliminary injunctions, Chairman Weinberger asked for (1) authority to assess civil penalties for existing violations of law, (2) authority to assess civil penalties for violations of existing commission orders, and (3) authority to award damages to consumers injured by acts or practices found by the commission to violate the law.

Chairman Weinberger told the Committee that these provisions "represent extremely important proposals, the enactment of which will enable the Commission to give the country's consumers the protection from unfair and deceptive practices to which they are entitled." Support for these statements has been restated by both succeeding Chairmen, Miles W. Kirkpatrick, and Louis A. Engman.

Although S. 3201 was reported to the floor too late in the second session of the 91st Congress to receive floor action, Chairman Magnuson and Senator Moss renewed their efforts to improve the Federal Trade Commission Act in the 92d Congress through the introduction of the "Consumer Products Warranties and Federal Trade Commission Improvements Act of 1971," which combined the warranty provisions discussed above with the FTC reforms.

After extensive consideration of this legislation, the Committee reported it favorably to the floor of the Senate, where it passed by a vote of 72 to 2. In the rush of business surrounding the end of the 92nd session, the House was unable to act.

On January 12, 1973, Chairman Magnuson and Senator Moss introduced S. 356, a refined version of the same legislation. Comments on the bill were solicited, and after further refinements, the legislation was ordered reported to the floor of the Senate.

SECTION-BY-SECTION ANALYSIS

TITLE I

*Definitions (section 101)*

(1) As used in title I, "Commission" means the Federal Trade Commission.

(2) The term "consumer product" is limited to tangible personal property, not realty. Furthermore, to qualify as a consumer product, the tangible personal property must normally be used for either personal, family, or household purposes.

There are many products which are used for both personal and business purposes. For example, a typewriter is clearly a consumer product when used in the home by members of the family. It is not uncommon, however, for typewriters to be purchased by businessmen for exclusively business purposes. This may create an ambiguous situation in many instances. To the extent that there is any necessary ambiguity in the term "consumer product," the ambiguity should be resolved in favor of coverage. Personal or family use of a typewriter is not uncommon; therefore, for the purposes of this title, a typewriter would be considered a "consumer product" if any question arose. Of course, the Federal Trade Commission could exempt a warrantor from the disclosure and labeling provisions of the bill to the extent that he sells consumer products to persons for use in their businesses.

The term "consumer product" is also defined to include property which is intended to be attached to, or installed in, real property—without regard to whether it is so attached or installed. An appliance which has been attached to or installed in real property might no longer be considered "tangible personal property" for purposes other than this bill because the appliance may become a fixture, and thus be characterized as realty rather than personalty. The definition of "consumer product" insures that fixtures which are normally used for personal, family or household purposes will be covered by the act without regard to whether the object in question would be considered realty or personalty for some other purpose.

The term "consumer product" is limited in subsection (2) of section 101 by the sentence, "not withstanding the foregoing, the provisions of 102 and 103 of this title affecting consumer products apply only to consumer products each of which actually costs the purchaser more than $5." This language has the effect of excluding products costing $5 or less from the disclosure and designation requirements of title I.

However, any such excluded consumer product remains subject to the provisions of the Federal Trade Commission Act, and, if it is warranted in writing, to the other sections of this title, particularly section 110. A written warranty on a consumer product costing $5 or less which meets Federal standards for warranties under section 104 of this title may be designated a "full" warranty, although there is no requirement that it be so labeled. Of course, if such a warranty did not meet Federal standards, the prohibitions of the Federal Trade Commission Act against unfair or deceptive acts would prohibit it from being labeled as a "full" warranty.

(3) The term "consumer" is defined in subsection (3) of section 101 as the first retail buyer of any consumer product; any person to whom such product is transferred for use for personal, family, or household purposes during the effective period of time of a written warranty or service contract which is applicable to such product; and any other person who is entitled by the terms of such written warranty or service contract or by operation of law to enforce the obligations of such warranty or service contract. The use of the term person is meant in its most all-inclusive sense; for example, a corporation purchasing a color television set may be deemed to be a "consumer" within the meaning of this act.

The intent of the definition is to make clear that the supplier is not entitled to specify which classes of people may enforce the obligations of the warranty or service contract so long as the product is transferred for use for personal, family, or household purposes during the term of the warranty or service contract. Voluntarily assumed warranty or service contract obligations extend at least to the first purchaser and any subsequent transferee during the obligation period who uses the product for personal, family, or household purposes. Because the term "consumer" designates the scope of the warranty obligation, it also includes any other person who may enforce the obligations of the warranty or service contract either by operation of law or by the terms of the warranty or service contract.

The definition of consumer is not intended to include persons who utilize consumer products for commercial purposes. For instance, a clothes washer might be purchased by a consumer and subsequently transferred within the warranty period to a person who installs the machine in a commercial laundromat. The subsequent transferee would not be a consumer, since the product is not being used for personal, family, or household purposes.

(4) The concept of "reasonable and necessary maintenance" is defined in subsection (4) of Section 101, and is used in Section 104(d). If a supplier can show that a consumer has failed to provide reasonable and necessary maintenance, he is entitled to avoid his duties to repair or replace a malfunctioning or defective warranted consumer product if the lack of reasonable and necessary maintenance caused the malfunction or defect. "Reasonable" maintenance means that maintenance which the consumer could be expected to perform or have performed, given the skills he or she may be expected to possess and the tools normally available to a consumer, or the availability of maintenance facilities. "Necessary" maintenance includes the concept of reasonable maintenance but goes further to require that the reasonable

maintenance be necessary in order to keep the consumer product operating in a predetermined manner and performing its intended function.

(5) The term "repair" is defined in subsection (5) of Section 101 to include not only repair in the normal sense of correcting a malfunctioning consumer product, but also replacement of that malfunctioning product with a new consumer product or a component thereof which is identical or equivalent to the malfunctioning consumer product or component. The term is used in Section 104 in defining the duties of suppliers meeting Federal standards for warranties. To that extent, the concept of repairs set forth in subsection (5) of section 101 has direct applicability only to a "full" warranty. However, it is possible that in the context of a warranty other than a "full" warranty, the definition of repair in this bill might serve as a guide to the meaning of the word "repair".

(6) The term "replacement" is defined in subsection (6) of section 101. This term has direct applicability only to "full" warranties but might also serve as a guide in other warranty situations. The term includes the normal concept of replacement and requires that such replacement be with a new consumer product. The term also includes the refunding of the actual purchase price of the consumer product if repair or replacement is not commercially practicable or if the purchaser is willing to accept such refund in lieu of repair or replacement. In other words, the purchaser is required to accept a refund in lieu of repair or replacement if such repair and replacement it not commercially practicable; on the other hand, if repair and replacement is commercially practicable the consumer may, if he desires, accept such refund in lieu of repair or replacement if it is offered. This would allow the supplier, when he decides that neither repair nor replacement is commercially practicable, to refund the purchase price. A supplier could decide that repair or replacement is not commercially practicable, for example, in a situation of supplier-consumer disagreement over such things as whether reasonable and necessary maintenance has been performed, or whether misuse has occurred. This allows the supplier to make a business decision as to when neither replacement in kind nor repair is commercially practicable and to instead refund the purchase price.

Of course, when a product is to be replaced, the consumer is obliged to make the defective product "available" to the supplier. If the product is portable, the consumer might have to return the product to the point of purchase. In making a product "available" the consumer is required to free that product of any liens or incumbrances, but in those situations where fixtures are to be replaced, the consumer should be under no obligation to make the malfunctioning consumer product available free and clear of any liens or incumbrances attached to it because it is part of the real property. It would be impracticable to require the consumer to pay off the mortgage on his house in order to be eligible for replacement. The substitution of one such fixture for another should result in the transfer of the security interest on the defective product to the new consumer product so that the interest of the secured party would not be prejudiced.

(7) The term "supplier" is defined in subsection (7) of Section 101 as any person (including any partnership, corporation, or association) engaged in the business of making a consumer product or service contract available to consumers, either directly or indirectly. This definition would include all persons in the distribution chain including the component supplier, the manufacturer, the distributor, and the retailer.

Because the definition of "supplier" excludes those persons not regularly engaged in the business of making consumer products available to consumers, the warranty provisions of S. 356 do not apply to periodic private transactions.

(8) The term "warrantor" is defined in subsection (8) of section 101 as any supplier or any other party who gives a warranty in writing. Thus, a party not selling a product but offering a warranty on the product for the benefit of a consumer would be a warrantor.

(9) The term "warranty" is defined in subsection (9) of section 101 as including guarantee, and to warrant is to guarantee.

(10) The term "warranty in writing" or "written warranty" is defined in subsection (10) of section 101. Depending upon whether or not the warranty incorporates at a minimum the uniform Federal standards for warranty set forth in section 104, it may be either a "full warranty" or a "limited warranty".

(11) The words "warranty in writing against defect or malfunction of a consumer product" are defined in subsection (11) of section 101. A warranty in writing against defect or malfunction is one in which there is a written affirmation of fact or promise made "at the time of sale". Therefore, as applied to advertising, only point of sale advertising could be found to create a warranty in writing under the terms of this definition. Of course, this is not the case with respect to the broader category of express warranty as used in section 110(d). In order to create a warranty in writing against defect or malfunction of a consumer product under this section, the written affirmation or promise must relate to the nature of the material or workmanship and promise or affirm that such material or workmanship is defect free or will meet a specified level of performance for a particular period of time.

For example, a written statement given at the time of sale that a particular clothes washer would "effectively wash clothes" would create a "warranty in writing against defect or malfunction of the consumer product" if that statement became part of the basis of the bargain between the supplier and the purchaser. This statement would represent a "promise" that the "material or workmanship" of the product are such that it will "meet a specified level of performance", namely washing clothes effectively. Alternatively, a warranty in writing against defect or malfunction of the consumer product could arise if the supplier undertakes in writing to refund, repair, replace, or take other remedial action with respect to the sale of a consumer product in the event that the product fails to meet specifications set forth in the undertaking. For example, the supplier might state: "if this washer doesn't wash clothes effectively, I will refund its purchase price." Since this represents an undertaking in writing to refund the purchase price of the product if the product fails to wash clothes effectively, a warranty in writing against defect or malfunction of a

consumer product would have been created. In any event, any written affirmation, promise or undertaking discussed above would have to become part of the basis of the bargain between the supplier and the purchaser to qualify as a "warranty in writing against defect or malfunction of a consumer product".

(12) The term "without charge" is defined in subsection (12) of section 101. In section 104 a supplier making a "full" warranty and thus necessarily meeting or exceeding Federal standards must repair or replace any malfunctioning or defective consumer product within a reasonable time and "without charge". Normally a warrantor who assumes the obligation to remedy a defect or malfunction within a reasonable time and "without charge" would not assess a consumer with any cost attendant to the discharge of the warranty obligations. For example, the warrantor could not require the purchaser to return a consumer product by mail if the consumer had to pay for the postage or it was very difficult to mail. Likewise, if a repair facility was located at an unreasonable distance, it would normally be expected that the supplier would bear the cost of transporting the product to that facility. (See discussion of section 104, infra.)

The term does not necessarily mean that the warrantor must necessarily compensate the purchaser for incidental expenses, however, if the supplier can affirmatively demonstrate that such expenses should be borne by the purchaser. (See section 104, infra.)

Subsection 12 of section 101, however, does affirmatively require the warrantor to compensate the purchaser for any reasonable, incidental expenses resulting from the warrantor's failure to repair or replace within a reasonable time the malfunctioning or defective consumer product. Such incidental expenses may also be compensated if the warrantor imposes any unreasonable duties upon the purchaser as a condition of servicing, repair or replacement. (The use of the term incidental expenses here is not to be confused with the concept of incidental or consequential damages, which are to be governed by state law. See section 113(c).)

*Disclosure Requirements (section 102)*

Section 102 of title I outlines disclosure requirements for suppliers of consumer products who offer warranties in writing or service contracts in writing. Suppliers are required to disclose fully and conspicuously in simply and readily understood language the terms and conditions of their warranties. The Federal Trade Commission is authorized to detail these disclosure requirements in accordance with procedures set forth in section 109 of title I.

Enumerated in section 102 are certain informational areas which the Federal Trade Commission is to consider when promulgating disclosure regulations. These guidelines exemplify information that would promote consumer understanding of warranties both at the time of the sale and when the product breaks down. For example, subparagraph (h) of paragraph (2) of subsection (a) of section 102 suggests that the warrantor tell the consumer on what days and during what hours he will perform his obligations in case of defect or malfunction. For instance, if a refrigerator breaks down, a consumer could consult his warranty to ascertain whether the warrantor had emergency service on Saturdays or Sundays. This information, coupled

with that in subparagraph i) relating to the period of time it would take the warrantor to effect repair or replacement, would enable the consumer to know what to expect and to take necessary precaution against the spoilage of food in the interim before the necessary repairs could be completed. Such information would also be useful to the consumer in making a product selection at the time of sale. One may be more prone to purchase products from a supplier who provides emergency service for such items as refrigerators.

The Committee is of the belief that the informal dispute resolving mechanisms encouraged in section 110 will be useful for the redress of grievances only when their existence is known. Subparagraphs (j) and (k) suggests that the consumer should be notified of his ability to seek redress through both any informal dispute settlement mechanisms that the warrantor may offer or through legal remedies made economically feasible because of provision for recovery of reasonable costs, including attorney's fees based on actual time expended. Furthermore, if the warrantor is required to inform the consumer of his rights in the event the warrantor fails to perform, the Committee believes that the warrantor will have greater incentive to perform as promised.

Of course, the items of information suggested for disclosure in Section 102(a)(2)(A) through (K) are not intended to be either mandatory or exclusive. The Commission may well determine, in accordance with section 109, that disclosure of additional items of information may be appropriate. For instance, it may well be that for some products, disclosure of what constitutes "reasonable and necessary maintenance" would be appropriate.

Section 102(a)(1) authorizes the Federal Trade Commission to determine the manner and form in which information pertaining to any written warranty should be presented and displayed in advertising, labeling, point-of-sale material, or other representations in writing. Subsection (b) makes explicit the fact that the Commission is not authorized by this title to prescribe the duration of warranties given or to require that a product or its components be warranted. While it is the intent of the Committee that the Commission under authority of title I of this bill may not prescribe the substance of written warranties, except to the extent provided in section 104, this limitation is to be read in conjunction with the savings provision in section 112 which says that, "Nothing contained in this title shall be construed to repeal, invalidate, or supersede the Federal Trade Commission Act (15 U.S.C. 41 et. seq.) or any statute defined as an Anti-Trust Act." Furthermore, the Commission is expressly granted the authority to prescribe rules requiring warranty or service contract periods to be extended to compensate the consumer for the time during which the warranted use of his product was lost as a result of a defect or malfunction. As stated in section 102(b), such an extension should not occur unless the consumer is denied the use of his product at least ten days. The ten-day figure should be cumulative over the duration of the warranty period, since otherwise the purpose of any such rule could be circumvented.

*Designation of Warranties (section 103)*

Section 103 of title I requires suppliers who warrant in writing their consumer products to clearly and conspicuously designate such war-

ranties in a manner that will enable consumers to readily discern the type of warranty being given. If a warranty meets the Federal standards set forth in Section 104, and does not limit the liability of the warrantor for consequential damages, then it is to be conspicuously designated as a "full (statement of duration)" warranty. For example, an appliance guaranteed for a full year in accordance with Section 103(a)(1) would have a warranty headed with the designation: "full one year warranty." If a warranty in writing limits the liability of the warrantor for consequential damages, but in all other respects meets the requirements set forth in Section 104, then it shall be labeled as a "full (statement of duration) warranty (remedy limited to free repair or replacement within a reasonable time, without charge)". If a warranty in writing does not meet Federal standards, it would be designated in such a way as to clearly indicate to the consumer the fact that it is a "limited" as opposed to a "full" warranty. The designation should indicate the limited scope of the coverage afforded. For example, a warranty on an appliance might be designated as a "parts only warranty", or a warranty on an article of clothing might be headed "colorfastness only". The Federal Trade Commission, in Section 109, is empowered to define in detail the designation requirements for limited warranties.

There are several exceptions to the designation requirements set forth in section 103. First, if a product costs the purchaser $5 or less, a warranty on that product does not need to be designated in accordance with section 104. Second, the Federal Trade Commission may, pursuant to section 109, exempt a supplier from complying with the designation requirements in section 103. Finally, section 103(b) excludes from the designation requirements of Section 103 "expressions of general policy concerning customer satisfaction which are not subject to any specific limitations." For example, a statement such as "satisfaction guaranteed or your money back" does not have to be designated as a full or partial warranty. Section 103(b) also exempts such general policy statements from the provisions of sections 102 and 104 of title I. In order to be eligible for exemption, a general policy statement must not be subject to any "specific" limitations. The word "specific" is included in order to protect a supplier from a consumer who uses a product for 10 years and then complains of dissatisfaction with the product. A refusal of a supplier to honor such an expression of dissatisfaction from a consumer who has used a product without expressing his objections for 10 years would not amount to a "specific" limitation on the general policy concerning consumer satisfaction.

In those situations where the purchaser may obtain both written statements or representations not subject to any specific limitations as well as specific warranties in writing from the same supplier of a consumer product, the written statement or representation not subject to any specific limitations should control unless the warranty in writing clearly and conspicuously excludes the guarantee of consumer satisfaction. (See also section 110(d)(2)). In any event, any statement or representation falling within the exclusion contained in section 103(b) would remain subject to the provisions of the Federal Trade Commission Act and to section 110 of title I.

*Federal Standards for Warranty (section 104)*

The minimum duties which a supplier must assume when giving a "full" warranty are described in section 104 of title I. At a mini-

mum, the supplier must promise to repair or replace any malfunctioning or defective consumer product covered by the warranty, within a reasonable time, and without charge. In addition, the warrantor is prohibited from imposing any duties other than notification upon the purchaser as a condition of securing repair or replacement of a consumer product covered by a warranty meeting Federal standards, unless the warrantor can affirmatively demonstrate that additional duties would be reasonable.

The words "repair," and "replace," are defined with specificity in section 101 of title I. The concept of "reasonable time" cannot be precisely defined. The amount of time which is reasonable will vary according to the customary time for repair of similar consumer products, the location of the defective consumer product in relation to the repair facility, the consumer's day to day need for the product, and other factors. The term "without charge" is defined in paragraph 12 of section 101 of title I. In order to add certainty and specificity to the relationship between the supplier and the purchaser, the Federal Trade Commission is empowered under Section 109(e) to define, to the extent possible, the duties imposed upon the supplier who decides to fully warrant his products. Such rules and regulations would be promulgated in accordance with the procedures set forth in section 109 of title I.

In determining whether a supplier can impose duties other than notification upon the purchaser, a court or the Commission would compare the magnitude of the economic burdens "necessarily" imposed upon a warrantor against the magnitude of the burdens of inconvenience and expense "necessarily" imposed upon the purchaser. The word "necessarily" requires a court or the Commission to explore the alternatives available to the supplier and the purchaser before weighing the supplier's burden against the purchaser's burden. As an illustration, suppose the manufacturer of a small, portable consumer product offers a "full" warranty but requires the consumer to personally deliver the product to a service center in case of malfunction or defect. The supplier might argue that this is a reasonable burden because it would be cheaper for the purchaser to bring the product to the service center than it would be for the supplier to maintain a pick-up system. Before evaluating the reasonableness of the duty imposed by the supplier, a court or the Commission should explore alternative methods of returning the product to the service center for repair.

For example, it may be less costly to all parties concerned to use the mails or a private delivery service to transport the malfunctioning or defective product. If this were so, then placing the burden of personal delivery to the service center upon the consumer would be unreasonable. Further analysis may be necessary, however, in order to determine what type of mailing duty or delivery to the private carrier would be reasonable. For example, the warrantor in the above example might change his warranty to require the purchaser to mail the defective or malfunctioning consumer product to a service center for repair. If the average rate of return for repair or replacement of the product is one for every hundred sold and if the average cost for mailing that product to the service center is $1.00, the supplier's economic burden would be $1.00 per hundred sold, assuming he already absorbs the cost of mailing the product back to the consumer. In all likelihood, this

cost would be passed on to purchasers of these products by charging 1¢ more per product. If the supplier pays the cost of the return mailing, then the cost to the one purchaser out of one hundred who has to send his product for repair would be his time in having to package and mail the product plus the 1¢ increase in purchase price. The remaining 99¢ would be paid by other purchasers, and the price of the product involved would reflect both its acquisition and complete warranty cost. If the consumer was required to pay the mailing charge, then his expense would be his time required to package and mail the product plus the $1.00 mailing charge; this would impose a burden on him which would be one hundred times greater. The burden on the supplier, however, would remain relatively constant in either situation. A requirement for the consumer to pay the mailing cost would, therefore, be unreasonable because the magnitude of the burden imposed upon the consumer in relation to the magnitude of the burden imposed upon the supplier is so much greater.

Subsection (b) of section 104 gives the purchaser or consumer the right to demand and receive replacement of a consumer product which has needed repair an unreasonable number of times during the warranty period. The provision is designed to rectify the situation where a consumer has received a product which turns out to be a "lemon", or where the supplier's repair system is so ineffectual that defects are not corrected even though the product is repeatedly returned for repair. In the face of continual malfunctions of the consumer product, the ability to continue to return the product for repair is insufficient recourse for the consumer. In order to give specificity to the language "unreasonable number of times during the warranty period," the Federal Trade Commission, in section 109(e), has been directed to "define in detail" the provisions of subsection (d) of section 104. This would allow the FTC by rule to establish what in fact is "an unreasonable number of times" for different categories of consumer products. A full refund of the purchase price in lieu of replacement with a new product would satisfy the requirements of this section if the supplier determined that repair or replacement was not commercially practicable in the circumstances. In either case, the burden of depreciation is to fall upon the supplier. (See discussion of section 101(6), supra.)

Subsection (c) of section 104 states that the full warranty duties assumed by a supplier extend to the consumer. "Consumer" is defined in section 101(3).

Subsection (d) of section 104 states that a supplier does not have to repair or replace a consumer product which malfunctions or becomes defective during the warranty period if he can sustain the burden of proof and show that damage, while in the possession of the purchaser, (opposed to damage in transit prior to the possession, for example), or unreasonable use caused the product to malfunction or become defective. (See discussion of "reasonable and necessary maintenance" supra, at section 102.)

*Full and Limited Warranties of a Consumer Product (section 105)*

Section 105 states that the warranty provisions in S. 356 would not prohibit the selling of both full, full (with limitation of liability for consequential damages), and limited warranties if such warranties are clearly and conspicuously differentiated. For example, a consumer

product might be sold with a "full one year warranty—remedy limited to free repair or replacement within a reasonable time, without charge". The supplier might also offer free parts replacement for an additional year. That limited warranty might be labeled a "two year free parts replacement guarantee." In other words, the measures of time for the limited warranty would run from the time of purchase to the end of the warranty period. In the example given the limited warranty during the first year would actually be subsumed under the full warranty.

*Service Contracts (section 106)*

Section 106 provides that a supplier may sell a service contract to the purchaser in lieu of, or in addition to, the warranty. Section 106 requires that a service contract fully and conspicuously disclose in simple and readily understood language its terms and conditions. The Federal Trade Commission is authorized to prescribe the manner and form in which the terms of service contracts should be clearly and conspicuously disclosed. The effect of this section is to require the same sort of disclosure requirements on both service contracts and warranties so that both will be fully understandable to the consumer.

*Designation of Representatives (section 107)*

In hearings before the Committee in the 92d Congress, concern was expressed that warrantors might be prevented from delegating to representatives the performance obligations assumed under a written warranty. Section 107 states that nothing in title I shall be construed to prevent any warrantor from making any "reasonable and equitable arrangements" for representatives to perform warranty duties.

The Committee did not intend to allow warrantors to make unjust or inequitable arrangements under which representatives would be bound to perform warranty duties. The phrase "reasonable and equitable arrangements" is intended to make clear that, to the extent a supplier asks or requires another party to assume responsibilities under the warranty, that party is not to be victimized by unreasonable or inequitable arrangements. Hence one of the purposes of this section is to insure that the manufacturer does not escape his liability under this title by shifting responsibility to dealers, wholesalers, retailers, or others in the chain of distribution. Since manufacturers have primary control over the quality of products, the intent of this section is to place full responsibility on them, while at the same time allowing others, such as dealers, to perform services related to warranties if they are equitably compensated. Therefore, this section also states that "no such arrangements shall relieve the warrantor of his direct responsibility to the purchaser or necessarily make the representative a co-warrantor." For example, the Federal Trade Commission has reported that some of the problems associated with automobile warranties in the past may have resulted from the failure of auto manufacturers to reasonably and equitably compensate their dealers for warranty work.

Nothing in section 107 is intended to dictate the method of compensation for warranty or service contract work, so long as whatever method used insures that such compensation is equitable. For instance, the supplier could build into the wholesale price the cost of warranty service and then compensate dealers who perform the warranty obligations by direct payment for services performed; or the manufacturer could establish a low wholesale price that excludes the cost of war-

ranty service and a dealer who performs the warranty obligation could receive his compensation out of the dollar margin between the wholesale and retail price. While both methods could be examples of compensation which would satisfy the requirements of section 107 so long as the particular arrangements are "reasonable and equitable," direct payments would be the more likely method to meet the test.

While a manufacturer can issue a warranty that says certain authorized service representatives will repair or replace the defective product, the consumer has recourse directly against the manufacturer as warrantor, if these representatives fail to perform. The manufacturer could not defend against an action for failure to perform by arguing that the designated representative, not the manufacturer, was responsible for the failure of performance.

*Limitation on Disclaimer of Implied Warranties (section 108)*

Subsection (a) of section 108 prohibits a supplier (defined in paragraph 7 of Section 101) from disclaiming implied warranties such as the warranties of merchantibility or fitness, thereby building a base of protection for consumers whose products are warranted in writing. This subsection is designed to eliminate the practice of giving an express warranty while simultaneously disclaiming implied warranties. This practice has often had the effect of limiting the rights of the consumer rather than expanding them, as he might be led to believe.

Subsection (b) of section 108 has been included in the bill to clarify the relationship between implied warranties and express warranties. The subsection states that implied warranties may not be limited as to duration either expressly or impliedly through a designated warranty in writing or other express warranty. This provision clarifies the relationship between express and implied warranties on consumer products, by maintaining the independence of one from the other. This will mean that the implied warranties, created by operation of law, can only be limited by operation of law and not "expressly or impliedly" by an express warranty. As a result, suppliers and consumers are placed on equal footing when determining how long a particular implied warranty lasts. Through negotiation between consumer and supplier (and ultimately through determination by courts if that becomes necessary) the duration of an implied warranty such as the warranty of fitness for ordinary use would be established. Thus, a consumer whose warranty in writing for one year is unenforceable because the warranted product malfunctioned one year and six days after the time of purchase might still have recourse against the supplier for warranty of fitness for ordinary use.

It is not the intent of the Committee to alter in any way the manner in which implied warranties are created under the Uniform Commercial Code. For instance, an implied warranty of fitness for particular purpose which might be created by an installing supplier is not, in many instances, enforceable by the consumer against the manufacturing supplier. The Committee does not intend to alter currently existing state law on these subjects.

*Federal Trade Commission (section 109)*

The Federal Trade Commision is required to promulgate rules and regulations to facilitate the implementation of certain aspects of title

I. The Commission is to define in detail the disclosure requirements for warranties set out in 102, and to define the disclosure requirements for service contracts as provided in section 106; it is to determine when a warranty in writing does not have to be designated in accordance with section 103, and to define in detail the disclosure requirements of section 103 (2) (a) ; and it is to define in detail the duties set forth in section 104 (a), (b), and (c), and to define their applicability to warrantors of different categories of consumer products with "full" warranties.

Section 109 also sets forth in the procedure which the Federal Trade Commission is required to follow in establishing these rules. The language describing the type of procedure which the Commission is to follow in promulgating rules represents a compromise between simple informal rulemaking procedures and the more complex, complicated, and time consuming formal hearing procedures contained in sections 556 and 557 of title 5 of the United States Code. But for the qualifying words "structured so as to proceed as expeditiously as practicable," the Commission would be bound to follow at all times the formal hearing procedure when carrying out its rulemaking responsibilities. The qualifying words, however, have been added to indicate the Committee's desire not to require a formal oral hearing with cross examination as a part of all proceedings. It is the intent of the Committee to afford interested parties, both consumers and industry representatives, greater procedural rights than accorded under section 553. Therefore, the Committee provides for a public record and an opportunity for an agency hearing which assures judicial review on the basis of "substantial evidence." (See section 706 of title 5 of the United States Code.)

As to the type of public record developed and the form of agency hearing provided, the Committee is of the opinion that the Federal Trade Commission can best determine the type of proceeding it should hold so as to promulgate rules as expeditiously as practicable. The Committee desires to avoid the abuse of cross examination by interested parties which delays unduly the rulemaking process. Therefore, it is anticipated that expeditious rulemaking would not normally include formal hearings. But an opportunity for all interested persons to participate in the rulemaking should be afforded. In many situations, in the Committee's view, interested persons could submit all or part of the evidence in written form. The Committee also expects the Federal Trade Commission to exercise vigorously its discretion which permits it "as a matter of policy . . . to provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence." (See subsection (b) of section 556 of title 5 of the United States Code.) Such Commission action would avoid unwarranted delays caused by repetitious testimony offered by parties with essentially common interests.

*Private Remedies (section 110)*

Section 110 spells out the remedies available to the purchaser of consumer products. A purchaser can utilize informal dispute settlement procedures established by suppliers or, having afforded a supplier a reasonable opportunity to cure, may resort to formal adversary proceedings with reasonable attorney's fees available if successful in the litigation (including settlement).

Subsection (a) of section 110 declares that it is the policy of Congress to encourage the development of informal dispute settlement mechanisms. If a supplier develops such a mechanism, then the "consumer" as defined in title I is required to utilize such mechanism as part of the opportunity given the supplier to cure a breach prior to resorting to formal legal action. The Federal Trade Commission is empowered to promulgate guidelines for the establishment of these informal dispute settlement mechanisms and is required to supervise them on its own initiative or when petitioned by an interested party to insure their bona fide operation. This provision is not intended to require the Commission to review individual disputes but only to require them to oversee generally dispute settlement mechanisms.

Subsection (b) authorizes any "consumer" (defined in section 101 (3)) to sue for breach of warranty or service contract in an appropriate district court, but any such suit shall be subject to the jurisdictional requirements of section 1331 of title 28 of the United States Code. In effect, this means a person or at this time a class of persons must show individual damages of ten thousand dollars or more in order to bring suit in a Federal court.

But any "consumer" damaged by the failure of a supplier to comply with any obligations assumed under an express or implied warranty or service contract subject to this title—i.e. a warranty in writing, a service contract in writing, an express warranty (defined in section 110(d)(1)), or implied warranties—may sue in any State or District of Columbia court of competent jurisdiction. Thus, for the most part, the Federal rights created by title I of this bill will be enforced in State rather than Federal courts.

As previously mentioned, prior to commencing any proceeding authorized by title I a purchaser must afford the supplier a reasonable opportunity to cure any breach, including the utilization of any bona fide informal dispute settlement mechanism. Any purchaser who utilizes an informal dispute settlement mechanism would not be prevented from seeking formal judicial relief following such utilization. Of course in a class action suit only representatives of the class would have to avail themselves of any bona fide informal dispute settlement mechanism on behalf of the class before the class action suit could be instituted.

In order to preserve the status quo as to the eligibility under State law for participation in class actions, subsection (b) of section 110 provides that "nothing in this subsection shall be construed to change in any way the jurisdictional or venue requirements of any State." Because Federal rights would be enforced in State courts, some might argue that limitations that certain States impose on participation in class action litigation, would not be valid. The above-mentioned language preserves such limitations but does not affect the requirement that suits authorized by title I may not be maintained until a purchaser or his representative first utilizes any bona fide informal dispute settlement mechanism which the supplier has provided.

Subsection (c) of section 110 provides for the recovery of court costs and reasonable attorney's fees in the event a "consumer", as de-

fined in title I, is successful in a suit for breach of an express or implied warranty or service contract obligation. This provision would make economically feasible the pursuit of remedies by consumers in State and Federal courts. It should be noted that an attorney's fee is to be based upon actual time expended rather than being tied to any percentage of the recovery. This requirement is designed to make the pursuit of consumer rights involving inexpensive consumer products economically feasible. Of course, where small claims courts are available and function adequately in resolving consumer disputes, the Committee encourages their use; and to the extent legal representation is not necessary in such courts, attorney's fees would probably not be available.

Subsection (d) of section 110 defines an "express warranty" in a manner paralleling the Uniform Commercial Code's definition. If a consumer product accompanied by a warranty in writing or service contract in writing has been expressly warranted outside the writing, then the purchaser can enforce the terms of that warranty against the supplier actually making it and recover court costs and reasonable attorney's fees. For example, a salesman selling a consumer product warranted in writing for one year who said: "I guarantee that this product will perform perfectly for 5 years" would be deemed to have created an express warranty. If he was not acting as an agent for the retailer or manufacturer in making that statement, only the salesman himself would be the warrantor, and the purchaser would have recourse only against the salesman in enforcing the terms of the express warranty. Of course an affirmation merely of the value of the consumer product or service or a statement purporting to be merely the supplier's opinion or commendation would not create an express warranty.

### Government Enforcement (section 111)

Subsection (a) of section 111 states that any failure to comply with the requirements imposed by or pursuant to title I shall be considered a violation of section 5 of the Federal Trade Commission Act.

Paragraph (1) of subsection (b) of section 111 gives the district courts of the United States jurisdiction to restrain violations of title I in an action brought by the Attorney General or the Commission. Any temporary restraining order or preliminary injunction would be issued by a District Court without bond. Such restraining order or preliminary injunction may be dissolved if a complaint is not filed within a reasonable time after issuance as specified by the court. Provision is made for joining other parties as the court deems appropriate, and to that end nationwide service of process is provided for.

Paragraph (2) of subsection (b) of section 111 authorizes the Attorney General to serve a civil investigative demand upon any person "under investigation" who may be in the possession, custody or control of documentary material relative to any violation of title I. The procedures to be followed in serving civil investigative demands are set out in detail in section 111. It is important to note that such demand may be served only on persons who are under investigation. This burden, however, should not be great because the Attorney General, believing anyone to be in possession of documentary material relevant to any violation of this title, could put that person under investigation

prior to the serving of a demand in order to comply with the "under investigation" requirement.

### Savings Provision (section 112)

This section states the authority of the Federal Trade Commission under the Federal Trade Commission Act is in no way superseded by this title. This provision also assures that those products not specifically covered under this bill because of the $5 exemption applicable to section 102 and 103 are, nevertheless, subject to the Federal Trade Commission's power to proscribe unfair and deceptive acts or practices. (*See also* section 113(c)).

### Scope (section 113)

Subsection (a) of this section states that the provisions of the bill and the powers granted to both the Federal Trade Commission and to the Attorney General extend to the sale of consumer products and services "affecting" interstate commerce as well as those "in" interstate commerce. This subsection would make the rights and remedies in title I available to low income consumers within our cities who are often victimized by acts only "affecting" interstate commerce. A proviso was included in subsection (a) to make clear that the operation of this Act is not to interfere with the operation of other Federal laws, such as the Clean Air Act.

Subsection (b) of section 113 specifies the way in which title I would interact with State laws regulating warranty practices. States would be preempted from requiring labeling or disclosure requirements that differed from those prescribed pursuant to title I of this bill. This was designed to insure that suppliers of consumer products would not have to print warranties in conformance with the many possible State and Territorial disclosure formulas or labeling procedures. Rules of the Federal Trade Commission detailing disclosure and designation requirements pursuant to sections 102 and 109 would preempt any different State requirements. Any rules defining "full" warranty duties (section 104) would constitute preemptive national standards for warranties unless the Commission permitted a State to deviate from those rules in a manner prescribed in the rule.

Because title I of this bill allows a supplier to give a warranty or not as he chooses and because it allows him to define the contents of any warranty given (as long as it is not unfair or deceptive or does not contain a disclaimer or limitation on the duration of implied warranties), the Committee has not been willing to follow the suggestion of those affected persons who asked that federal legislation totally preempt State action. The Committee was of the opinion that States should be free to determine that, for the protection of their citizens, a higher level of warranty protection would be required. Of course, the way in which any mandatory warranty protection would be required to be presented would have to be consistent with federal disclosure and designation standards. Furthermore, to the extent a supplier offers a "full" warranty in compliance with Federal standards, he is protected against the imposition of additional burdens by a State unless the Federal Trade Commission, in exercising its rulemaking authority, permits such imposition in accordance with the considerations set out in section 113(b).

For the purposes of illustration, it would probably be consistent with the provisions of subsection (b) of section 113 for a State to determine that all widgets sold in that State must contain a "Parts Only Warranty" for one year or a "Full One Year Warranty". In other words, a State can work within the provisions of this bill, and the rules and regulations implementing it, to advance the interests of consumers within its borders by mandating coverages which the Federal bill describes but does not mandate.

Subsection (c) of section 113 states that nothing in title I changes State law which allows a person to recover consequential damages for injury to the person resulting from a breach of warranty, or any State law which restricts the ability of a warrantor to limit his liability for consequential damages. For instance, since section 2–719 of the Uniform Commercial Code permits the limitation of remedies only when such a provision is included in the warranty, any limitation on incidental or consequential damages would have to be clearly disclosed in accordance with section 103.

### Effective date (section 114)

Section 114 sets forth the timing for implementation of title I. The effective date is six months after the date of enactment, except that any of those portions of title I which can not reasonably be met without the promulgation of rules, shall take effect six months after the promulgation of such rules by the Federal Trade Commission (with an additional six month extention possible). The Commission is to promulgate such rules as soon as possible, but no event later than one year after the date of enactment of this Act. The time limitations contained in section 114 regarding the promulgation of rules by the Commission apply only to the promulgation of initial rules and do not restrict the Commission's rule-making activity in the warranty area *in futuro*.

Comments received by the Committee on this section expressed fears that a rule or regulation might be applied to merchandise manufactured prior to its effective date. The intent of the Committee is clear that, "this title shall take effect six months after the date of its enactment but shall not apply to consumer products manufactured prior to such effective date." Furthermore, any rules promulgated by the Commission would not take effect until six months after their final promulgation, except that the Commission may provide an additional six months so that suppliers can bring their written warranties into compliance. Thus any product manufactured prior to these effective dates would not have to comply with either the provisions of the Act or rules promulgated by the Commission.

### TITLE II

### Expanded Federal Trade Commission Jurisdiction (section 201)

Section 201 of this title expands the Federal Trade Commission's jurisdiction from acts and practices "in" interstate commerce to those "affecting" interstate commerce. This expansion of the Commission's jurisdiction is intended to permit more effective policing of the marketplace by bringing within reach practices which are unfair or deceptive and which, while local in character, nevertheless have an adverse impact upon interstate commerce.

In considering certain arguments against expansion of the Commission's jurisdiction, the Committee was mindful of the danger of making the Commission alone responsible for eradicating fraud and deceit in every corner of the marketplace. This is not the Committee's intent in expanding the jurisdiction of the Commission. State and local consumer protection efforts are not to be supplanted by this expansion of jurisdiction. In many situations the Commission, through its Consumer Advisory Boards and expanded field office operations would work concurrently with State and local governments to attack in their incipiency flagrant consumer abuses. However, this expansion of jurisdiction, in conjunction with the authority to seek injunctive relief, will enable the Commission to move against local consumer abuses where State or local consumer protection programs are nonexistent or where fly-by-night operators hit one local area and then quickly move on to another before local officials can take action. (For similar expansion of authority see section 206 and 209 of title II of this bill.)

### Civil Penalties (section 202)

This section of the bill authorizes the Federal Trade Commission, through its own attorneys, to initiate civil actions to recover penalties against any person (including partnerships, corporations, or other entities) who commits an act or engages in a practice which he knows is unfair or deceptive to consumers and prohibited by section 5(a)(1). The maximum penalty recoverable would be $10,000 per violation, but this penalty could be settled if the Commission publicly stated its reasons and the court approved the settlement.

It should be noted that the word "consumer" as used in title II is not related to the definition of that term in title I. The use of the word "consumer" in title II is to be read in its broadest sense and is not limited to those persons defined in section 101(3) of title I of S. 356.

In any civil action initiated under authority of the amendment to the Federal Trade Commission Act set forth in this section, the Commission would have to show "actual knowledge or knowledge fairly implied from objective circumstances." A violation of a Commission rule would in most cases constitute a violation with "knowledge fairly implied from objective circumstances" unless the person against whom the action was brought could show why he should not have been expected to have knowledge of the Commission rule or that the rule itself is invalid.

The civil penalty which can be imposed is $10,000 "for each such violation." The Commission would have to judge what constituted "each such violation" in the particular case, but "each such violation" would not necessarily be each product unfairly or deceptively sold. The focus, in the opinion of the Committee, should be on the decision-making process of the person against whom the penalty is sought, the number of different decisions he made and the harm generated by those decisions.

### Consumer Redress (section 203)

After a cease-and-desist order is made final, the Commission may seek remedial relief on behalf of consumers injured by the specific

unfair or deceptive act or practice which was the subject of the cease-and-desist proceeding in an action initiated in Federal district court. This provision would enable the Commission to more adequately protect consumers by affording them specific redress for their injuries. At the present time, cease-and-desist orders have prospective application only and afford no specific consumer redress to consumers who have been injured. A proceeding for consumer redress under section 203 could seek relief only for injury sustained as a result of the particular unfair or deceptive act or practice which was the subject of the cease and desist order.

In granting new powers to the Commission, section 203 does not in any way purport to supplant private actions by consumers. The Committee's intent in giving these remedial powers was (1) to reinforce the Commission's credibility in policing the marketplace by authorizing sanctions which could realistically be expected to inhibit unlawful business practices, and (2) to enable the Commission, where its investigation of an act or practice revealed damage to consumers, to utilize the results of that investigation for the benefit of the damaged parties.

The nature of the relief the Commission would obtain from the court on behalf of consumers would be limited only by the nature of the injury done and the remedial powers of the court. The enumeration in section 203 of the types of relief available are advisory only and would not limit the Commission in pleading or the court in acting to fashion other appropriate remedial relief. It is clear, however, that no punitive or exemplary damages are authorized under this section.

This section would not affect whatever power the Commission may have under section 5 of the FTC Act to fashion relief in its initial cease-and-desist order, such as corrective advertising or any other remedy, which may be appropriate to terminate effectively unfair or deceptive acts or practices. Likewise, there is no intent on the part of the Committee to disturb the Commission's power to compel restitution by its own order when such restitution is necessary to terminate a continuing violation of section 5 of the Federal Trade Commission Act. Section 203 is applicable to those situations where the Commission acts to make specific consumers whole and is not intended to supplant general actions by the Commission which are designed to dissipate the prior effects of unfair or deceptive acts or practices.

The court is expressly authorized to give notice reasonably calculated, under all the circumstances, to appraise all consumers allegedly injured by the defendant's acts, of the pendency of the action for redress under section 203. While an action under section 203 is not a class action, it may be useful for the court to be guided by some of the provisions of Federal Rule of Civil Procedure 23. It is anticipated that those consumers actually receiving notice under this provision would be considered parties by representation in a section 203 action and bound by any judgment therein as if they were actual parties. Therefore, in any subsequent suit brought by such consumers under State law, they would be bound under the doctrine of collateral estoppel, as to issues actually litigated and necessarily determined in the section 203 action.

It is anticipated that a final cease-and-desist order will be given the same effect in a subsequent action for redress under section 203 that a government obtained antitrust decree is given in a subsequent private treble damage action. In that situation, the government obtained decree (including an FTC order) is given only prima facie effect and is thus at least rebuttable. It is not the intent of the Committee to encourage respondents to resist the finalization of cease-and-desist orders because of fear of the effects of an FTC order in a possible consumer redress action under section 203. This effect would be both unfortunate for the Federal Trade Commission, resulting in further delays in FTC proceedings, and unfair to the respondents, who would have to conduct themselves before the FTC with too strong an eye on the possible effect of the FTC cease and desist order in a subsequent consumer redress action under section 203. Thus, it is anticipated that a final cease-and-desist order would be given prima facie effect in a subsequent action under section 203, as is already the case under section 5(a) of the Clayton Act (see 15 U.S.C. 16(a)).

Finally, section 203 makes clear that the court has the power to consolidate an action under section 203 with any other action requesting the same or substantially the same relief upon motion of any party.

*Penalty for Violation of Cease and Desist Order (section 204)*

This section increases the potential penalty for violation of an order of the Commission from $5,000 to $10,000. The FTC may seek such penalty through its own attorneys rather than relying upon the Justice Department. In addition to increasing the penalty, this section authorizes the Commission to seek mandatory injunctions against persons in violation of a Commission order for whom the threat of economic penalty is more apparent than real because they have no available resources with which to pay the penalty.

*Commission Self-Representation (section 205)*

This section insures that the Commission will be able to represent itself in any civil proceeding involving the Federal Trade Commission Act. At the present time, the Commission must, in many situations, rely on the Department of Justice, which has been sluggish in the past in enforcing regulatory agency decisions in Federal courts. Similar authority to litigate to enforce independent agency determinations is already enjoyed by the National Labor Relations Board (see 29 U.S.C. 154(a)).

In addition to the representational authority specifically provided the Commission by sections 202, 203, 204, 207, 208, and 210 in actions to redress consumer grievances, and to enforce Commission orders, penalties, and subpoenas, the Committee intends to permit the Commission to conduct and control all other litigation involving Commission action under the FTC Act, whether the Commission be acting as plaintiff or defendant. Without intending any limitation, the Committee has in mind, for instance, actions seeking injunctions, declaratory judgments or other relief.

*Expansion of Jurisdiction (section 206)*

See discussion in section 201 supra.

*Securing of Documentary Evidence* (*section 207*)

This section is basically designed to simplify the securing of documentary evidence and testimony. It authorizes the Commission to seek documentary evidence from any "party"; under the present terms of the Federal Trade Commission Act such evidence may be obtained only from "corporations".

As authorized in sections 202 and 205, the Commission may act through its own attorneys to enforce the Federal Trade Commission Act. Section 207 permits the FTC to use its own attorneys "to invoke the aid of a court in requiring the attendance and testimony of witnesses and the production of documentary evidence" and authorizes the Commission to go to court in its own behalf to seek "writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the Commission issued under this Act."

*Reporting Requirements* (*section 208*)

This section streamlines reporting requirements under the Federal Trade Commission Act. The Commission is authorized to seek a civil penalty against any corporation which fails to file any annual or special report required by the Federal Trade Commission Act. Currently, a more complicated procedure involving the Department of Justice is necessary.

*Expansion of Jurisdiction* (*section 209*)

See discussion in section 201 supra.

*Injunctions* (*section 210*)

This section would permit the Commission to obtain either a preliminary or permanent injunction through court procedures initiated by its own attorneys against any act or practice which is unfair or deceptive to a consumer, and thus prohibited by section 5 of the Federal Trade Commission Act. The purpose of section 210 is to permit the Commission to bring an immediate halt to unfair or deceptive acts or practices when to do so would be in the public interest. At the present time such practices might continue for several years until agency action is completed. Victimization of American consumers should not be so shielded.

Section 210 authorizes the granting of a temporary restraining order or a preliminary injunction without bond pending the issuance of a complaint by the Commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final within the meaning of section 5. The test the Commission would have to meet in order to secure this injunctive relief is similar to the test it must already meet when attempting to secure an injunction against false advertising of food, drugs, devices, or cosmetics. (See 15 USC 53(a).)

Provision is also made in section 210 for the Commission to seek and, after a hearing, for a court to grant a permanent injunction. This will allow the Commission to seek a permanent injunction when a court is reluctant to grant a temporary injunction because it cannot be assured of a early hearing on the merits. Since a permanent injunction could only be granted after such a hearing, this will assure the court of the ability to set a definite hearing date. Furthermore, the Commission will have the ability, in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order. Commission resources will be better utilized, and cases can be disposed of more efficiently.

*Enforcement Proceedings* (*section 211*)

This section permits the Commission to enforce penalties under the Federal Trade Commission Act. It is similar in concept to sections 202 and 205.

*Financial Institutions* (*section 212*)

This section removes from the Federal Trade Commission Act the presently existing exemption for banks insofar as unfair or deceptive acts or practices affecting commerce are concerned. The intent of the Committee in taking this action is to remove the anticompetitive situation which exists at present because some financial institutions are regulated for consumer protection purposes by the Federal Trade Commission and some are not, even though both types of institutions are offering substantially the same services to consumers. Second, presently existing Federal financial regulatory agencies either do not have the power or the desire to promulgate and enforce strong and uniform rules and regulations prohibiting unfair or deceptive acts or practices in the consumer credit field. The report of the National Commission on Consumer Finance has recommended that a single agency be given the power to promulgate rules and regulations in this area. It makes little sense to have agencies whose primary duty is to insure the solvency and liquidity of the institutions under their jurisdiction promulgating rules and regulations the violation of which may provide for potentially substantial civil penalties. The assumption of an active consumer protection role by such an agency could have a detrimental effect on the very solvency of the institution which the agency is required to protect. Furthermore, just as the Federal Reserve Board is authorized under the Truth In Lending Act to prescribe rules and regulations dealing with credit cost disclosure which apply to all creditors, it makes sense that the Commission should be empowered to issue rules and regulations to prevent unfair or deceptive acts or practices on the part of all business enterprises, including financial institutions.

The Federal Trade Commission would not issue rules or regulations in areas which are already adequately covered by the Federal Reserve Board's regulations under the Truth in Lending Act. If the Commission's legislative rulemaking authority is affirmed, then such rules would apply to financial institutions in the same manner as they would to all business enterprises. (See discussion of rulemaking, infra.)

Section 212 requires that the Commission consult with the various Federal financial regulatory agencies listed therein prior to prescribing rules and regulations. Furthermore, section 212 requires the Commission to delegate the power to enforce these rules and regulations to the

various Federal financial regulatory institutions listed therein. The Commission, however, may at any time by rule in accordance with section 553 of title 5 of the United States Code, request and receive redelegation of the enforcement powers under this section from any agency. This provision was included in order to insure that there is strong and uniform enforcement of the rules and regulations prohibiting unfair or deceptive acts or practices in the consumer credit field.

*Legislative Rulemaking*

During the 92d Congress, the Magnuson-Moss Warranty-FTC bill (S. 986) as passed by the Senate contained a provision reaffirming the legislative rulemaking authority of the Commission. A similar provision was included in S. 356 as introduced in the 93d Congress, but in a letter to Chairman Magnuson dated March 26, 1973, Chairman Engman informed the committee that:

> * * * the commission has concluded that it should await the imminent court decision and seek additional legislative authority only in the event of an adverse decision. The Commission, therefore, recommends that section 206 be deleted from the bill. Such a course will not jeopardize Commission rulemaking, and, in the meantime, American consumers can begin to reap the benefits associated with prompt enactment of the less controversial amendments provided in the legislation before this committee.

In accordance with the Commission's recommendation, the Committee deleted the rulemaking provisions from S. 356 in executive session.

Chairman Magnuson has pledged, however, to reintroduce legislation granting the Commission the power to promulgate legislative rules in the event of a decision by the courts which is adverse to the Commission on this issue. In other words, the deletion of rulemaking powers by the Committee is not to be read in any way as a reversal of the Senate's position in the 92d Congress, when it passed legislation by a vote of 72–2 which expressly conferred legislative rulemaking power upon the Commission.

### TEXT OF S. 356 AS REPORTED

A BILL TO provide disclosure standards for written consumer product warranties against defect or malfunction; to define Federal content standards for such warranties; to amend the Federal Trade Commission Act in order to improve its consumer protection activities; and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Magnuson-Moss Warranty-Federal Trade Commission Improvement Act.

## TITLE I—CONSUMER PRODUCT WARRANTIES

#### DEFINITIONS

SEC. 101. As used in this Title—
(1) "Commission" means the Federal Trade Commission.
(2) "Consumer product" means any tangible personal property

any real property regardless of whether it is so attached or installed. Notwithstanding the foregoing, the provisions of sections 102 and 103 of this title affecting consumer products apply only to consumer products each of which actually costs the purchaser more than five dollars.

(3) "Consumer" means the first buyer at retail of any consumer product; any person to whom such product is transferred for use for personal, family, or household purposes during the effective period of which is normally used for personal, family, or household purposes, including any such property intended to be attached to or installed in time of a written warranty or service contract which is applicable to such product; and any other person who is entitled by the terms of such written warranty or service contract or by operation of law to enforce the obligations of such warranty or service contract.

(4) "Reasonable and necessary maintenance" consists of those operations which the purchaser reasonably can be expected to perform or have performed to keep a consumer product operating in a predetermined manner and performing its intended function.

(5) "Repair" may, at the option of the warrantor include replacement with a new, identical or equivalent consumer product or component(s) thereof.

(6) "Replacement" or "to replace", as used in section 104 of this title, means in addition to the furnishing of a new, identical or equivalent consumer product (or component(s) thereof), the refunding of the actual purchase price of the consumer product—
    (1) if repair is not commercially practicable; or
    (2) if the purchaser is willing to accept such refund in lieu of repair or replacement.
If there is replacement of a consumer product, the replaced consumer product (free and clear of all liens and encumbrances) shall be made available to the supplier.

(7) "Supplier" means any person (including any partnership, corporation, or association) engaged in the business of making a consumer product or service contract available to consumers, either directly or indirectly. Occasional sales of consumer products by persons not regularly engaged in the business of making such products available to consumers shall not make such persons "suppliers" within the meaning of this title.

(8) "Warrantor" means any supplier or other party who gives a warranty in writing.

(9) "Warranty" includes guaranty; to "warrant" means to guarantee.

(10) "Warranty in writing" or "written warranty" means a warranty in writing against defect or malfunction of a consumer product.
    (A) "Full warranty" means a written warranty which incorporates the uniform Federal standards for warranty set forth in section 104 of this title.
    (B) "Limited warranty" means a written warranty subject to the provisions of this title which does not incorporate at a minimum the uniform Federal standards for warranty set forth in section 104 of this title.

(11) A "warranty in writing against defect or malfunction of a consumer product" means:
    (A) any written affirmation of fact or written promise made at the time of sale by a supplier to a purchaser which relates to the

nature of the material or workmanship and affirms or promises that such material or workmanship is defect-free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing to refund, repair, replace, or take other remedial action with respect to the sale of a consumer product if such product fails to meet the specifications set forth in the undertaking,

which written affirmation, promise, or undertaking becomes part of the basis of the bargain between the supplier and the purchaser.

(12) "Without charge" means that the warrantor(s) cannot assess the purchaser for any costs the warrantor or his representatives incur in connection with the required repair or replacement of a consumer product warranted in writing. The term does not mean that the warrantor must necessarily compensate the purchaser for incidental expenses. However, if any incidental expenses are incurred because the repair or replacement is not made within a reasonable time or because the warrantor imposed an unreasonable duty upon the purchaser as a condition of securing repair or replacement, then the purchaser shall be entitled to recover such reasonable incidental expenses in any action against the warrantor for breach of warranty under section 110(b) of this title.

### DISCLOSURE REQUIREMENTS

Sec. 102. (a) In order to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products, the Commission is authorized to issue rules, in accordance with section 109 of this title, which may—

(1) prescribe the manner and form in which information with respect to any written warranty shall be clearly and conspicuously presented or displayed when such information is contained in advertising, labeling, point-of-sale material, or other representations in writing; and

(2) require the inclusion in any written warranty, in simple and readily understood language, fully and conspicuously disclosed, items of information which may include, among others:

(A) clear identification of the name and address of the warrantor;

(B) identity of the class or classes of persons to whom the warranty is extended;

(C) the products or parts covered;

(D) a statement of what the warrantor will do in the event of a defect or malfunction—at whose expense—and for what period of time;

(E) a statement of what the purchaser must do and what expenses he must bear;

(F) exceptions and exclusions from the terms of the warranty;

(G) the step-by-step procedure which the purchaser should take in order to obtain performance of any obligation under the warranty, including the identification of any class of persons authorized to perform the obligations set forth in the warranty;

(H) on what days and during what hours the warrantor will perform his obligations;

(I) the period of time within which, after notice of malfunction or defect, the warrantor will under normal circumstances repair, replace, or otherwise perform any obligations under the warranty;

(J) the availability of any informal dispute settlement procedure offered by the warrantor and a recital that the purchaser must resort to such procedure before pursuing any legal remedies in the courts; and

(K) a recital that any purchaser who successfully pursues his legal remedies in court may recover the reasonable costs incurred, including reasonable attorney's fees.

(b) Nothing in this title shall be deemed to authorize the Commission to prescribe the duration of warranties given or to require that a product or any of its components be warranted, except that the Commission may prescribe rules pursuant to section 553 of title 5, United States Code, that the term of a warranty or service contract shall be extended to correspond with any period in excess of a reasonable period (not less than ten days) during which the purchaser is deprived of the use of a product by reason of a defect or malfunction. Except as provided in section 104 of this title, nothing in this title shall be deemed to authorize the Commission to prescribe the scope or substance of written warranties.

(c) No warrantor of a consumer product may condition his warranty of such product on the consumer's using, in connection with such product, any article or service which is directly or indirectly identified by brand, trade, or corporate name; except that the prohibition of this subsection may be waived by the Commission if it finds that the imposition of such a condition is reasonable and in the public interest.

### DESIGNATION OF WARRANTIES

Sec. 103. (a) Any supplier warranting in writing a consumer product shall clearly and conspicuously designate such warranty as provided herein unless exempted from doing so by the Commission pursuant to section 109 of this title:

(1) If the written warranty incorporates the uniform Federal standards for warranty set forth in section 104 of this title, and does not limit the liability of the warrantor for consequential damages, then it shall be conspicuously designated as "full (statement of duration)" warranty, guaranty, or word of similar meaning. If the written warranty incorporates the uniform Federal standards for written warranty set forth in section 104 of this title and limits or excludes the liability of the warrantor for consequential damages as permitted by applicable State law, then it shall be conspicuously designated as "full (statement of duration)" warranty, guaranty, or word of similar import. "(Liability for consequential damages limited; remedy restricted to free repair or replacement within a reasonable time, without charge)", or as otherwise prescribed by the Commission pursuant to section 109 of this title.

(2) If the written warranty does not incorporate the Federal standards for warranty set forth in section 104 of this title, then it shall be designated in such manner so as to indicate clearly and conspicuously the limited scope of the coverage afforded.

36

(b) Written statements or representations, such as expressions of general policy concerning customer satisfaction which are not subject to any specific limitations shall not be deemed to be warranties in writing for purposes of sections 102, 103, and 104 of this title but shall remain subject to the provisions of the Federal Trade Commission Act and section 110 of this title.

## UNIFORM FEDERAL STANDARDS FOR WRITTEN WARRANTY

SEC. 104. (a) Any supplier warranting in writing a consumer product must undertake at a minimum the following duties in order to be deemed to have incorporated the uniform Federal standards for written warranty—

    (1) to repair or replace any malfunctioning or defective consumer product covered by such warranty;

    (2) within a reasonable time; and

    (3) without charge.

In fulfilling the above duties, the warrantor shall not impose any duty upon a purchaser as a condition of securing such repair or replacement other than notification unless the warrantor can demonstrate that such a duty is reasonable. In a determination by the Commission or a court of whether or not any such additional duty or duties are reasonable, the magnitude of the economic burden necessarily imposed upon the warrantor (including costs passed on to the purchaser) shall be weighed against the magnitude of the burdens of inconvenience and expense necessarily imposed upon the purchaser.

(b) If repair is necessitated an unreasonable number of times during the warranty period the purchaser shall have the right to demand and receive replacement of the consumer product.

(c) The above duties extend from the warrantor to the consumer.

(d) The performance of the duties enumerated in subsection (a) of this section shall not be required of the warrantor if he can show that damage while in the possession of the purchaser or unreasonable use (including failure to provide reasonable and necessary maintenance) caused any warranted consumer product to malfunction or become defective.

## FULL AND LIMITED WARRANTIES OF A CONSUMER PRODUCT

SEC. 105. Nothing in this title shall prohibit the selling of a consumer product which has both full, full (with limitation of liability for consequential damages) and limited warranties if such warranties are clearly and conspicuously differentiated.

## SERVICE CONTRACTS

SEC. 106. Nothing in this title shall be construed to prevent a supplier from selling a service contract to the purchaser in addition to or in lieu of a warranty in writing if the terms and conditions of such contract are fully and conspicuously disclosed in simple and readily understood language. The Commission is authorized to determine, in accordance with section 109 of this title, the manner and form in which the terms and conditions of service contracts shall be clearly and conspicuously disclosed.

37

## DESIGNATION OF REPRESENTATIVES

SEC. 107. Nothing in this title shall be construed to prevent any warrantor from making any reasonable and equitable arrangements for representatives to perform duties under a written warranty except that no such arrangements shall relieve the warrantor of his direct responsibilities to the purchaser nor necessarily make the representative a cowarrantor.

## LIMITATION ON DISCLAIMER OF IMPLIED WARRANTIES

SEC. 108. (a) There shall be no express disclaimer of implied warranties to a purchaser if any written warranty or service contract in writing is made by a supplier to a purchaser with regard to a consumer product.

(b) For purposes of this title, implied warranties may not be limited as to duration expressly or impliedly through a designated warranty in writing or other express warranty.

## FEDERAL TRADE COMMISSION

SEC. 109. The Commission is authorized to establish rules pursuant to section 553 of title 5, United States Code, upon a public record after an opportunity for an agency hearing structured so as to proceed as expeditiously as practicable to—

    (a) prescribe the manner and form in which information with respect to any written warranty shall be disclosed and the items of information to be included in any written warranty as provided in section 102 of this title;

    (b) prescribe the manner and form in which terms and conditions of service contracts shall be disclosed as provided in section 106 of this title;

    (c) determine when a warranty in writing does not have to be designated in accordance with section 103 of this title;

    (d) define in detail the disclosure requirements in paragraph (2) of subsection (a) of section 103 of this title; and

    (e) define in detail the duties set forth in subsections (a), (b), and (c) of section 104 of this title and their applicability to warrantors of different categories of consumer products with "full" warranties.

## PRIVATE REMEDIES

SEC. 110. (a) Congress hereby declares it to be its policy to encourage suppliers to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms. Such informal dispute settlement procedures should be created by suppliers in cooperation with independent and governmental entities pursuant to guidelines established by the Commission. If a supplier incorporates any such informal dispute settlement procedure in any written warranty or service contract, such procedure shall initially be used by any consumer to resolve any complaint arising under such warranty or service contract. The bona fide operation of any such dispute settlement procedure shall be subject to review by

the Commission on its own initiative or upon a written complaint filed by any injured party.

(b) Any purchaser damaged by the failure of a supplier to comply with any obligations assumed under a written warranty or service contract in writing subject to this title may bring suit for breach of such warranty or service contract in an appropriate district court of the United States subject to the jurisdictional requirements of section 1331 of title 28, United States Code. Any purchaser damaged by the failure of a supplier to comply with any obligations assumed under an express or implied warranty or service contract subject to this title may bring suit in any State or District of Columbia court of competent jurisdiction. Prior to commencing any legal proceeding for breach of warranty or service contract under this section, a purchaser must have afforded the supplier a reasonable opportunity to cure the alleged breach and must have used the informal dispute settlement mechanisms, if any, established under subsection (a) of this section. Nothing in this subsection shall be construed to change in any way the jurisdictional or venue requirements of any State.

(c) Any purchaser who shall finally prevail in any suit or proceeding for breach of an express or implied warranty or service contract brought under section (b) of this section shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by such purchaser for or in connection with the institution and prosecution of such suit or proceeding, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

(d) (1) For the purposes of this section, an "express warranty" is created as follows:

(A) Any affirmation of fact or promise made by a supplier to the purchaser which relates to a consumer product or service and becomes part of the basis of the bargain creates an express warranty that the consumer product or service shall conform to the affirmation or promise.

(B) Any description of a consumer product which is made part of the bargain creates an express warranty that the consumer product shall conform to the description.

(C) Any sample or model which is made part of the basis of the bargain creates an express warranty that the consumer product shall conform to the sample or model.

It is not necessary to the creation of express warranty that the supplier use formal words such as "warranty" or "guaranty" or that he have a specific intention to make a warranty. An affirmation merely of the value of the consumer product or service or a statement purporting to be merely the supplier's opinion or commendation of the consumer product or service does not by itself create a warranty.

(2) Only the supplier actually making an affirmation of fact or promise, a description, or providing a sample or model shall be deemed to have created an express warranty under this section and any rights arising thereunder may only be enforced against such supplier and no other supplier.

GOVERNMENT ENFORCEMENT

SEC. 111. (a) It shall be unlawful and a violation of section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)) for any person (including any partnership, corporation, or association) subject to the provisions of this title to fail to comply with any requirement imposed on such person by or pursuant to this title or to violate any prohibition contained in this title.

(b) (1) The district courts of the United States shall have jurisdiction to restrain violations of this title in an action by the Attorney General or by the Commission by any of its attorneys designated by it for such purpose. Upon a proper showing, and after notice to the defendant, a temporary restraining order or preliminary injunction shall be granted without bond: *Provided, however,* That if a complaint is not filed within such period as may be specified by the court after the issuance of the restraining order or preliminary injunction, the order or injunction may, upon motion, be dissolved. Wherever it appears to the court that the interests of justice require that other persons should be parties in the action, the court may cause them to be summoned whether or not they reside in the district in which the court is held, and to that end process may be served in any district.

(2) (A) Whenever the Attorney General has reason to believe that any person under investigation may be in possession, custody, or control of any documentary material, relevant to any violation of this title, he may, prior to the institution of a proceeding under this section cause to be served upon such person, a civil investigative demand requiring such person to produce the documentary material for examination.

(B) Each such demand shall—

(i) state the nature of the conduct alleged to constitute the violation of this title which is under investigation;

(ii) describe the class or classes of documentary material to be produced thereunder with such definiteness and certainty as to permit such material to be fairly identified;

(iii) prescribe a return date which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and

(iv) identify the custodian to whom such material shall be furnished.

(C) No demand shall—

(i) contain any requirement which would be held to be unreasonable if contained in a subpena duces tecum issued by a court of the United States in a proceeding brought under this section; or

(ii) require the production of any documentary evidence which would be privileged from disclosure if demanded by a subpena duces tecum issued by a court of the United States in any proceeding under this section.

(D) Any such demand may be served at any place within the territorial jurisdiction of any court of the United States.

(E) Service of any such demand or of any petition filed under subparagraph (G) of this subsection may be made upon any person, partnership, corporation, association, or other legal entity by—

(i) delivering a duly executed copy thereof to such person or to any partner, executive officer, managing agent, or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on behalf of such person, partnership, corporation, association, or entity;

(ii) delivering a duly executed copy thereof to the principal office or place of business of the person, partnership, corporation, association, or entity to be served; or

(iii) depositing such copy in the United States mails, by registered or certified mail duly addressed to such person, partnership, corporation, association, or entity at its principal office or place of business.

(F) A verified return by the individual serving any such demand or petition setting forth the manner of such service shall be proof of such service. In the case of service by registered or certified mail, such return shall be accompanied by the return post office receipt of delivery of such demand.

(G) The provisions of sections 4 and 5 of the Antitrust Civil Process Act (15 U.S.C. 1313, 1314) shall apply to custodians of material produced pursuant to any demand and to judicial proceedings for the enforcement of any such demand made pursuant to this section: *Provided, however,* That documents and other information obtained pursuant to any civil investigative demand issued hereunder and in the possession of the Department of Justice may be made available to duly authorized representatives of the Commission for the purpose of investigations and proceedings under this title and under the Federal Trade Commission Act, subject to the limitations upon use and disclosure contained in section 4 of the Antitrust Civil Process Act (15 U.S.C. 1313).

### SAVING PROVISION

Sec. 112. Nothing contained in this title shall be construed to repeal, invalidate, or supersede the Federal Trade Commission Act (15 U.S.C. 41 et seq.) or any statute defined as an Antitrust Act.

### SCOPE

Sec. 113. (a) The provisions of this title and the powers granted hereunder to the Commission and the Attorney General shall extend to all sales of consumer products and service contracts affecting interstate commerce: *Provided,* That such provisions and powers shall not be exercised in such a manner as to interfere with warranties applicable to consumer products, or components thereof, created and governed by other Federal law.

(b) Labeling, disclosure, or other requirements of a State with respect to written warranties and performance thereunder, not identical to those set forth in section 102, 103, or 104 of this title or with rules and regulations of the Commission issued in accordance with the procedures set forth in section 109 of this title, or with guidelines of the Commission, shall not be applicable to warranties complying therewith. However, if, upon application of an appropriate State agency, the Commission determines (pursuant to rules issued in accordance with the Federal Trade Commission Act, as amended) that any requirement of such State (other than a labeling or disclosure requirement) covering any transaction to which this title applies—

(1) affords protection to consumers greater than the requirements of this title; and

(2) does not unduly burden interstate commerce,

then transactions complying with any such State requirement shall be exempt from the provisions of this title to the extent specified in such determination for so long as such State continues to administer and enforce effectively any such greater requirement.

(c) Nothing in this title shall be construed to supersede any provision of State law regarding consequential damages for injury to the person or any State law restricting the ability of a warrantor to limit his liability for consequential damages.

### EFFECTIVE DATE

Sec. 114. (a) Except for the limitations in subsection (b) of this section, this title shall take effect six months after the date of its enactment but shall not apply to consumer products manufactured prior to such effective date.

(d) Those requirements in this title which cannot be reasonably met without the promulgation of rules by the Commission shall take effect six months after the final publication of such rules which shall be published (subject to future amendment or revocation) as soon as possible but no later than one year after the date of enactment of this Act: *Provided,* That the Commission, for good cause shown, may provide designated classes of suppliers up to six months additional time to bring their written warranties into compliance with rules promulgated under this title.

(c) The Commission shall promulgate initial rules for initial implementation of this title, including guidelines for the establishment of informal dispute settlement procedures pursuant to section 110(a) of this title, as soon as possible after enactment but in no event later than one year after the date of enactment of this Act.

## TITLE II—FEDERAL TRADE COMMISSION IMPROVEMENTS

Sec. 201. Section 5 of the Federal Trade Commission Act (15 U.S.C. 45) is amended by striking out the words "in commerce" wherever they appear and inserting in lieu thereof "affecting commerce".

Sec. 202. Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)) is amended by inserting after paragraph (6) as amended by section 212 of this title the following new paragraph:

"(7) The Commission may initiate civil actions in the district courts of the United States against persons, partnerships, or corporations engaged in any act or practice which is unfair or deceptive to a consumer and is prohibited by subsection (a)(1) of this section with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by subsection (a)(1) of this section, to obtain a civil penalty of not more than $10,000 for each such violation. The Commission may comprise, mitigate, or settle any action for a civil penalty if such settlement is accompanied by a public statement of its reasons and is approved by the court."

Sec. 203. Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)) is amended by inserting after paragraph (7) as added by section 202 of this title the following new paragraph:

"(8) After an order of the Commission to cease and desist from engaging in acts or practices which are unfair or deceptive to consumers and proscribed by section 5(a)(1) of this Act has become final as provided in subsection (g) of this section, the Commission, by any of its attorneys designated by it for such purpose, may institute civil actions in the district courts of the United States to obtain such relief as the court shall find necessary to redress injury to consumers caused by the specific acts or practices which were the subject of the proceeding pursuant to subsection (b) of this section and the resulting cease-and-desist order, including, but not limited to, rescission or reformation of contracts, the refund of money or return of property, public notification of the violation, and the payment of damages, except that nothing in this section is intended to authorize the imposition of any exemplary or punitive damages. The court shall cause notice to be given reasonably calculated, under all of the circumstances, to apprise all consumers allegedly injured by the defendant's acts of the pendency of such action. No action may be brought by the Commission under this subsection more than two years after an order of the Commission upon which such action is based has become final. Any action initiated by the Commission under this subsection may be consolidated as the court deems appropriate with any other action requesting the same or substantially the same relief upon motion of a party to any such action.

Sec. 204. Section 5(l) of the Federal Trade Commission Act (15 U.S.C. 45(l)) is amended by striking subsection (l) and inserting in lieu thereof the following new paragraph:

"(l) Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States or by the Commission in its own name by any of its attorneys designated by it for such purpose. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission."

Sec. 205. Section 5 of the Federal Trade Commission Act (15 U.S.C. 45) is amended by adding at the end thereof the following new subsection:

"(m) Whenever in any civil proceeding involving this Act the Commission is authorized or required to appear in a court of the United States, or to be represented therein by the Attorney General of the United States, the Commission may elect to appear in its own name by any of its attorneys designated by it for such purpose."

Sec. 206. Section 6 of the Federal Trade Commission Act (15 U.S.C. 46) is amended by striking out the words "in commerce" wherever they appear and inserting in lieu thereof "in or whose business affects commerce".

Sec. 207. Section 9 of the Federal Trade Commission Act (15 U.S.C. 49) is amended by—

(a) deleting the word "corporation" in the first sentence of the first unnumbered paragraph and inserting in lieu thereof the word "party";

(b) inserting after the word "Commission" in the second sentence of the second unnumbered paragraph the phrase "acting through any of its attorneys designated by it for such purpose": and

(c) deleting the fourth unnumbered paragraph and inserting in lieu thereof the following:

"Upon the application of the Attorney General of the United States or of the Commission, acting through any of its attorneys designated by it for such purpose, the district courts of the United States shall have jurisdiction to issue writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the Commission issued under this Act."

Sec. 208. Section 10 of the Federal Trade Commission Act (15 U.S.C. 50) is amended by deleting the third unnumbered paragraph and inserting in lieu thereof the following:

"If any corporation required by this Act to file any annual or special report shall fail to do so within the time fixed by the Commission for filing such report, then, if such failure shall continue for thirty days after notice of such default, the corporation shall forfeit to the United States the sum of $100 for each and every day of the continuance of such failure. Such forfeiture shall be payable into the Treasury of the United States and shall be recoverable in a civil suit brought by the Attorney General or by the Commission, acting through any of its attorneys designated by it for such purpose, in the district where the corporation has its principal office or in any district in which it does business."

Sec. 209. Section 12 of the Federal Trade Commission Act (15 U.S.C. 52) is amended by striking out the words "in commerce" wherever they appear and inserting in lieu thereof "in or having an effect upon commerce".

Sec. 210. Section 13 of the Federal Trade Commission Act (15 U.S.C. 53) is amended by redesignating "(b)" as "(c)" and inserting the following new subsection:

"(b) Whenever the Commission has reason to believe—

"(1) that any person, partnership, or corporation is engaged in, or is about to engage in, any act or practice which is unfair or deceptive to a consumer, and is prohibited by section 5, and

"(2) that the enjoining thereof pending the issuance of a complaint by the Commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final within the meaning of section 5, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any

such act or practice. Upon a proper showing that such action would be
in the public interest, and after notice to the defendant, a temporary
restraining order or a preliminary injunction may be granted without
bond: *Provided, however,* That if a complaint under section 5 is not
filed within such period as may be specified by the court after issuance
of the temporary restraining order or preliminary injunction, the order
or injunction may be dissolved by the court and be of no further force
and effect: *Provided further,* That in proper cases the Commission may
seek, and, after proper proof, the court may issue a permanent injunc-
tion. Any such suit shall be brought in the district in which such per-
son, partnership, or corporation resides or transacts business."

SEC. 211. Section 16 of the Federal Trade Commission Act (15 U.S.C.
56) is amended to read as follows:

"SEC. 16. Whenever the Federal Trade Commission has reason to
believe that any person, partnership, or corporation is liable to a
penalty under section 14 or under subsection (1) of section 5 of this
Act, it shall—

"(a) certify the facts to the Attorney General, whose duty it
shall be to cause appropriate proceedings to be brought for the
enforcement of the provisions of such section or subsection; or

"(b) itself cause such appropriate proceedings to be brought."

SEC. 212. (a) Section 5(a)(6) of the Federal Trade Commission
Act (15 U.S.C. 45(a)(6)) is amended—

(1) by striking out "banks,"; and

(2) by adding at the end thereof before the period a colon and
the following:

"*Provided however,* That with respect to financial institutions such
authority shall only be exercised to prevent unfair or deceptive acts or
practices affecting commerce (including acts or practices which are
unfair or deceptive to a consumer)"

(b) Section 5 of the Federal Trade Commission Act (15 U.S.C. 45)
is amended by adding at the end of subsection (m), added by section
205 of this title, the following two new subsections:

"(n) Rules and regulations prescribed by the Commission in carry-
ing out the authority conferred by this section with respect to unfair
or deceptive acts or practices (including acts or practices which are
unfair or deceptive to a consumer) shall, insofar as they apply to or
affect any financial institution as defined in section 5(o)(3) of this
Act, be issued only after consultation with—

"(1) the Comptroller of the Currency, if the institution is a na-
tional bank or a bank operating under the code of law of the Dis-
trict of Columbia;

"(2) the Board of Governors of the Federal Reserve System,
if the institution is a member bank of the Federal Reserve System
(other than a bank referred to in paragraph (1));

"(3) the Board of Directors of the Federal Deposit Insurance
Corporation, if the institution is a bank the deposits of which are
insured by such corporation (other than a bank referred to in
paragraph (1) or (2));

"(4) the Federal Home Loan Bank Board, if the institution is
a member of a Federal Home Loan Bank or the accounts of
which are insured by the Federal Savings and Loan Insurance
Corporation; or

"(5) the Administrator of the National Credit Union Admin-

istration, if the institution is a credit union the accounts of which
are insured by such Administrator.

"(o)(1) The power of the Commission to prevent financial insti-
tutions from using unfair or deceptive acts or practices affecting com-
merce (including acts or practices which are unfair or deceptive to a
consumer), pursuant to paragraph (6) of subsection (a) of this sec-
tion, shall be delegated by the Commission, subject to paragraph (2)
of this subsection, to—

"(A) the Comptroller of the Currency, if the institution is a
national bank or a bank operating under the code of law of the
District of Columbia;

"(B) the Board of Governors of the Federal Reserve System, if
the institution is a member bank of the Federal Reserve System
(other than a bank referred to in paragraph (A));

"(C) the Board of Governors of the Federal Deposit Insurance
Corporation, if the institution is a bank the deposits of which are
insured by such corporation (other than a bank referred to in
paragraph (A) or (B));

"(D) the Federal Home Loan Bank Board, if the institution
is a member of a Federal Home Loan Bank or the accounts of
which are insured by the Federal Savings and Loan Insurance
Corporation; or

"(E) the Administrator of the National Credit Union Admin-
istration, if the institution is a credit union the accounts of which
are insured by such Administrator.

"(2) At any time by rule in accordance with section 553 of title 5,
United States Code, the Commission may request and shall receive
redelegation of the power to prevent particular financial institutions
regulated by a particular agency described in paragraph (1) of this
subsection from using unfair or deceptive acts or practices affecting
commerce (including acts or practices which are unfair or deceptive
to a consumer) from any agency to which such power has been dele-
gated in accordance with such paragraph, upon a finding that such
redelegation is necessary to prevent any such financial institutions
from using unfair or deceptive acts or practices.

"(3) As used in this section, the term "financial institution" means—

"(A) any bank the deposits of which are insured by the Federal
Deposit Insurance Corporation;

"(B) any Savings and Loan Association the accounts of which
are insured by the Federal Savings and Loan Insurance
Corporation;

"(C) any thrift or home financing institution which is a member
of a Federal Home Loan Bank; or

"(D) any credit union the accounts of which are insured by
the Administrator of the National Credit Union Administration."

## Costs

The committee estimates that costs for implementation of title I
of S. 356 would be as follows:

Average additional cost per year for five years following enactment:

| | |
|---|---:|
| Staff attorneys | $375,000 |
| Clerical personnel | 84,000 |
| Equipment, etc. | 92,000 |
| **Total** | **551,000** |

46

It is estimated that cost for implementation of title II of S. 356 would be as follows:

Average additional cost per year for five years following enactment:

| | |
|---|---|
| Staff attorneys | $100,000 |
| Clerical personnel | 30,000 |
| Equipment, etc. | 20,000 |
| Total | 150,000 |

The letter from Lewis A. Engman, Chairman of the Federal Trade Commission to Chairman Magnuson estimating costs follows:

FEDERAL TRADE COMMISSION,
*Washington, D.C.*

Hon. WARREN G. MAGNUSON,
*Chairman, Committee on Commerce,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This is in response to the request of your staff for an estimate of the additional cost which will be attributable to the enactment of S. 356.

It is estimated that Title I (Consumer Product Warranties) will result in an average additional cost per year for five years following enactment as follows:

| | |
|---|---|
| Staff attorneys | $375,000 |
| Clerical personnel | 84,000 |
| Equipment, etc. | 92,000 |
| Total | 551,000 |

Total annual additional average cost of Title I for five years: $551,000 per year.

It is estimated that Title II (FTC Act amendments) will result in an average additional cost per year for five years following enactment as follows:

| | |
|---|---|
| Staff attorneys | $100,000 |
| Clerical personnel | 30,000 |
| Equipment, etc. | 20,000 |
| Total | 150,000 |

Total annual additional average cost of Title II for five years: $150,000 per year.

Total annual additional average cost of Title I and Title II for five years: $701,000 per year.

Sincerely,

LEWIS A. ENGMAN, *Chairman.*

VOTE IN COMMITTEE ON MOTION TO ORDER S. 986 TO BE REPORTED

A quorum being present, the Chairman moved, without objection, to order S. 986 to be reported. There being no objection, the bill was ordered to be reported.

CHANGES IN EXISTING LAW

In compliance with Subsection (4) of Rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill as reported are shown as follows (existing law proposed to be omitted is

47

enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

SECTION 5 OF THE FEDERAL TRADE COMMISSION ACT, AS AMENDED
(15 U.S.C. 45)

(a) (1) Unfair methods of competition [in] *affecting* commerce, and unfair or deceptive acts or practices [in] *affecting* commerce, are hereby declared unlawful.

\*          \*          \*          \*          \*          \*          \*

(6) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except [banks,] common carriers subject to the Acts to regulate commerce, air carriers, and foreign air carriers subject to the Federal Aviation Act of 1958, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition [in] *affecting* commerce and unfair or deceptive acts or practices [in] *affecting* commerce: *Provided however, that with respect to financial institutions such authority shall only be exercised to prevent unfair or deceptive acts or practices affecting commerce (including acts or practices which are unfair or deceptive to a consumer).*

(7) *The Commission may initiate civil actions in the district courts of the United States against persons, partnerships, or corporatons engaged in any act or practice which is unfair or deceptive to a consumer and is prohibited by subsection (a)(1) of this section with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair and deceptive and is prohibited by subsection (a)(1) of this section, to obtain a civil penalty of not more than $10,000 for each such violation. The Commission may compromise, mitigate, or settle any action for a civil penalty if such settlement is accomplished by a public statement of its reasons and approved by the court.*

(8) *After an order of the Commission to cease and desist from engaging in acts or practices which are unfair or deceptive to consumers and proscribed by section 5(a)(1) of this Act has become final as provided in subsection (g) of this section, the Commission, by any of its attorneys designated by it for such purpose, may institute civil actions in the district courts of the United States to obtain such relief as the court shall find necessary to redress injury to consumers caused by the specific acts or practices which were the subject of the proceeding pursuant to subsection (b) of this section and the resulting cease-and-desist order, including, but not limited to, recission or reformation of contracts, the refund of money or return of property, public notification of the violation, and the payment of damages, except that nothing in this section is intended to authorize the imposition of any exemplary or punitive damages. The court shall cause notice to be given reasonably calculated, under all of the circumstances, to apprise all consumers allegedly injured by the defendant's acts of the pendency of such action. No action may be brought by the Commission under this subsection more than two years after an order of the Commission upon*

*which such action is based has become final. Any action initiated by the Commission under this subsection may be consolidated as the court deems appropriate with any other action requesting the same or substantially the same relief upon motion of a party to such action.*

(b) Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice [in] *affecting* commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. * * *

\*      \*      \*      \*      \*      \*      \*

(l) Any person, partnership, or corporation who violates an order of the Commission [to cease and desist] *after* it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than [$5,000] *$10,000* for each violation, which shall accrue to the United States and may be recovered in a civil action brought by [the United States.] *Attorney General or the Commission in its own name by any of its attorneys designated by it for such purpose.* Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission each day of continuance of such failure or neglect shall be deemed a separate offense. *In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission.*

(m) *Whenever in any civil proceeding involving this Act the Commission is authorized or required to appear in a court of the United States, or to be represented therein by the Attorney General of the United States, the Commission may elect to appear in its own name by any of its attorneys designated by it for such purpose.*

(n) *Rules and regulations prescribed by the Commission in carrying out the authority conferred by this section with respect to unfair or deceptive acts or practices (including acts or practices which are unfair or deceptive to a consumer) shall, insofar as they apply to or affect any financial institution as defined in section 5 (o) (3) of this Act, be issued only after consultation with—*

*(1) the Comptroller of the Currency, if the institution is a national bank or a bank operating under the code of law of the District of Columbia;*

*(2) the Board of Governors of the Federal Reserve System, if the institution is a member bank of the Federal Reserve System (other than a bank referred to in paragraph (1));*

*(3) the Board of Directors of the Federal Deposit Insurance Corporation, if the institution is a bank the deposits of which are insured by such corporation (other than a bank referred to in paragraph (1) or (2));*

*(4) the Federal Home Loan Bank Board, if the institution is a member of a Federal Home Loan Bank or the accounts of which are insured by the Federal Savings and Loan Insurance Corporation; or*

*(5) the Administrator of the National Credit Union Administration, if the institution is a credit union the accounts of which are insured by such Administrator.*

(o)(1) *The power of the Commission to prevent financial institutions from using unfair or deceptive acts or practices affecting commerce (including acts or practices which are unfair or deceptive to a consumer), pursuant to paragraph (6) of subsection (a) of this section, shall be delegated by the Commission, subject to paragraph (2) of this subsection, to—*

*(A) the Comptroller of the Currency, if the institution is a national bank or a bank operating under the code of law of the District of Columbia;*

*(B) the Board of Governors of the Federal Reserve System, if the institution is a member bank of the Federal Reserve System (other than a bank referred to in paragraph (A));*

*(C) the Board of Governors of the Federal Deposit Insurance Corporation, if the institution is a bank the deposits of which are insured by such corporation (other than a bank referred to in paragraph (A) or (B));*

*(D) the Federal Home Loan Bank Board, if the institution is a member of a Federal Home Loan Bank or the accounts of which are insured by the Federal Savings and Loan Insurance Corporation; or*

*(E) the Administrator of the National Credit Union Administration, if the institution is a credit union the accounts of which are insured by such Administrator.*

(2) *At any time by rule in accordance with section 553 of title 5, United States Code, the Commission may request and shall receive redelegation of the power to prevent particular financial institutions regulated by a particular agency described in paragraph (1) of this subsection from using unfair or deceptive acts or practices affecting commerce (including acts or practices which are unfair or deceptive to a consumer) from any agency to which such power has been delegated in accordance with such paragraph, upon a finding that such redelegation is necessary to prevent any such financial institutions from using unfair or deceptive acts or practices.*

(3) *As used in this section, the term "financial institution" means—*

*(A) any bank the deposits of which are insured by the Federal Deposit Insurance Corporation;*

*(B) any Savings and Loan Association the accounts of which are insured by the Federal Savings and Loan Insurance Corporation;*

*(C) any thrift or home financing institution which is a member of a Federal Home Loan Bank; or*

*(D) any credit union the accounts of which are insured by the Administrator of the National Credit Union Administration.*

\*      \*      \*      \*      \*      \*      \*

## Section 6 of the Federal Trade Commission Act (15 U.S.C. 46)

That the commission shall also have power—

(a) To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in *or whose business affects* commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships.

(b) To require by general or special orders, corporations engaged in *or whose business affects* commerce, excepting banks and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the commission in such form as the commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing * * *

＊　　＊　　＊　　＊　　＊　　＊　　＊

## Section 9 of the Federal Trade Commission Act (15 U.S.C. 46)

That for the purposes of this Act the commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any [corporation] *party* being investigated or proceeded against; and the commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation. * * *

Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpoena the commission *acting through any of its attorneys designated by it for such purpose* may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.

＊　　＊　　＊　　＊　　＊　　＊　　＊

Upon the application of the Attorney General [of the United States] *or the Commission, acting through any of its attorneys designated by it for such purpose,* [at the request of the Commission,] the district courts of the United States shall have jurisdiction to issue writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the Commission [made in pursuance thereof] *issued under this Act.*

＊　　＊　　＊　　＊　　＊　　＊　　＊

## Section 10 of the Federal Trade Commission Act (15 U.S.C. 50)

＊　　＊　　＊　　＊　　＊　　＊　　＊

If any corporation required by this Act to file any annual or special report shall fail so to do within the time fixed by the Commission for filing [the same, and] *such report, then, if* such failure shall continue for thirty days after notice of such default, the corporation shall forfeit to the United States the sum of $100 for each and every day of the continuance of such failure, [which] *such* forfeiture shall be payable into the Treasury of the United States, and shall be recoverable in a civil suit [in the name of the United States] brought *by the Attorney General or by the Commission, acting through any of its own attorneys designated by it* for such purpose, in the district where the corporation has its principal office or in any district in which it shall do business. [It shall be the duty of the various United States attorneys, under the direction of the Attorney General of the United States, to prosecute for the recovery of forfeitures. The costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States.]

＊　　＊　　＊　　＊　　＊　　＊　　＊

### Section 12 of the Federal Trade Commission Act (15 U.S.C. 52)

(a) It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—

(1) by United States mails, or in *or having an effect upon* commerce by any means, for the purpose of inducing or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, or cosmetics; or

(2) By any means, for the purpose of inducing or which is likely to induce directly or indirectly, the purchase in *or having an effect upon* commerce of food, drugs, devices, or cosmetics.

(b) The dissemination or the causing to be disseminated of any false advertisement within the provisions of subsection (a) of this section shall be an unfair or deceptive act or practice in *or having an effect upon* commerce within the meaning of section 5.

### Section 13 of the Federal Trade Commission Act (15 U.S.C. 53)

(a) Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is engaged in, or is about to engage in, the dissemination or the causing of the dissemination of any advertisement in violation of section 12, and

(2) that the enjoining thereof pending the issuance of a complaint by the commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or the order of the Commission to cease and desist made thereon has become final within the meaning of section 5, would be to the interest of the public,

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States or in the United States court of any Territory, to enjoin the dissemination or the causing of the dissemination of such advertisement. Upon proper showing a temporary injunction or restraining order shall be granted

without bond. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.

(b) *Whenever the Commission has reason to believe—*

*(1) that any person, partnership, or corporation is engaged in, or is about to engage in, any act or practice which is unfair or deceptive to a consumer, and is prohibited by section 5, and*

*(2) that the enjoining thereof pending the issuance of a complaint by the Commission under section 5 and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final within the meaning of section 5, would be to the interest of the public—*

*the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: Provided, however, That if a complaint under section 5 is not filed within such period as may be specified by the court after the issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: Provided further, That in proper cases the Commission may seek, and after proper proof, the court may issue a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.*

[(b)] (c). Whenever it appears to the satisfaction of the court in the case of a newspaper, magazine, periodical, or other publication, published at regular intervals—

(1) that restraining the dissemination of a false advertisement in any particular issue of such publication would delay the delivery of such issue after the regular time therefor, and

(2) that such delay would be due to the method by which the manufacture and distribution of such publication is customarily conducted by the publisher in accordance with sound business practice, and not to any method or device adopted for the evasion of this section or to prevent or delay the issuance of an injunction or restraining order with respect to such false advertisement or any other advertisement, the court shall exclude such issue from the operation of the restraining order or injunction.

SECTION 16 OF THE FEDERAL TRADE COMMISSION ACT AS AMENDED, (15 U.S.C. 56)

SEC. 16. Whenever the Federal Trade Commission has reason to believe that any person, partnership, or corporation is liable to a penalty under Section 14 or under subsection (1) of Section 5 *of this Act*, it shall—

(a) certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings for the enforcement of the provisions of such section or subsection [.] ; or

(b) *itself cause such appropriate proceedings to be brought.*

## AGENCY COMMENTS

Comments were requested from the following agencies and departments on February 20, 1973:

Department of Commerce
Federal Trade Commission
General Accounting Office
Department of Justice
Office of Consumer Affairs

As of May 2, 1973, only the Federal Trade Commission had commented on S. 356. The comments of the Commission follow:

FEDERAL TRADE COMMISSION,
*Washington, D.C., March 26, 1973.*

Hon. WARREN G. MAGNUSON,
*Chairman, Committee on Commerce,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This is in response to your request for the Commission's comments on S. 356 dealing with consumer product warranties and Federal Trade Commission Act amendments.

As the Commission has previously provided the Committee with its detailed views on S. 986, a nearly identical measure passed by the Senate during the 92d Congress, this report will address only those areas in which the bill or the Commission's position has been significantly modified. Where appropriate, we propose specific modifications which the Commission believes will serve to strengthen and clarify the Act.

TITLE I—CONSUMER PRODUCT WARRANTIES

The Commission reaffirms its belief that the provisions of Title I will benefit both consumers and businessmen. By establishing uniform standards of content and clarity for warranties on goods moving in interstate commerce, the legislation should help to improve product integrity and bring warranty performance into line with consumer expectations. Everyone stands to gain from the resulting enhancement of consumer confidence in industry. The Commission therefore enthusiastically supports the objectives and substance of Title I, and would add to its previous comments in only two areas.

The Commission strongly supports the language which has been added to Section 102(b) of the bill, providing that the Commission may prescribe rules for extending the period of time a warranty is in effect to correspond with any unreasonable period of time during which the consumer is deprived of the use of a product by reason of a defect or malfunction. Extending the warranty period where a consumer is deprived of use of the product for an unreasonable time period should generally encourage prompt action by the warrantor and should bring an end to the ploy occasionally encountered whereby some unscrupulous manufacturers and repair facilities avoid their warranty obligations by deliberate procrastination until the warranty term has expired.

In addition, the Commission would urge inclusion in S. 356 of a new provision along the lines of Section 102(c) of H.R. 20, the corresponding bill in the House. This section provides that no warrantor of a

consumer product may unreasonably condition his warranty on the consumer's using, in connection with such product, any article or service which is identified by brand name. This provision addresses the anticompetitive practice which the Commission has opposed in numerous court actions wherein a manufacturer uses a warranty unreasonably to tie his supplementary products or services to the warranted product. This leaves the consumer in the undesirable posture of losing his warranty protection if he purchases the supplementary items from another and perhaps less expensive source—even if he does so in complete ignorance of the warranty's provisions.

## TITLE II—FEDERAL TRADE COMMISSION IMPROVEMENTS

The Commission regards the FTC Act improvements as the most important consumer legislation now pending in Congress. It is convinced that the public should be afforded without delay the benefit of basic improvements to the FTC Act which have so long been considered and reconsidered. For years, the Commission has sought preliminary injunction authority to counter the misuse for purposes of delay of the due process mechanisms which are part of the Commission's procedures. For at least as long, the Commission has been trying unsuccessfully to achieve autonomy in the handling of its own litigation in the Federal courts. The attainment of these two objectives—preliminary injunction authority and autonomy in litigation matters—would in itself be a milestone achievement for the consumer.

### PRELIMINARY RESTRAINTS

The supplementation of its enforcement tools by the acquisition of authority to seek preliminary injunctions has long been a prime target in the Commission's program to streamline its procedures. The denial of consumer relief during the pendency of cease-and-desist proceedings, which average more than a year, and frequently require from three to five years, would be averted by use of injunctions in cases where this delay causes unusual harm.

While section 210 of this bill might afford considerable relief, it falls short of its potential by conditioning restraining orders and injunctions upon a showing by the Commission of "the same conditions and principles as injunctive relief against conduct or threatened conduct that will cause loss or damage as granted by courts of equity." Several considerations support the Commission's preference for a legislatively defined injunction based upon the criterion of public interest rather than upon traditional equity standards.

The equitable test requires proof of irreparable injury, no adequate remedy at law, and probability of success on the merits of the case-in-chief. Meeting such a standard is time-consuming and can involve proceedings which take on the dimensions of a trial. In view of the Commission's limited resources, this could significantly impair the usefulness of the injunctive approach. If provided with a more reasonably attainable standard, however, the Commission would be able to extend incipiency relief to many more cases where public harm is unduly aggravated by the continuance of a consumer abuse.

Accordingly, the Commission endorses the standard already contained in section 13(a) of the Federal Trade Commission Act, under which the Commission may seek an injunction against the false advertising of food, drugs, devices, and cosmetics. In *Federal Trade Commission* v. *Rhodes Pharmacal Co.*, 191 F. 2d 744 (9th Cir. 1951), the court construed that statutory "cause shown" standard to mean that "... all the Commission had to show was a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the Commission to believe that the defendants were engaged in the dissemination of false advertisements of a drug in violation of the Act." Thus, the court viewed the statute as vesting in the Commission the real authority to determine the questions of public interest, necessity, and "reason to believe"—determinations to be made before seeking the injunction in court.

This standard for obtaining preliminary injunctions is by no means without precedent outside the Federal Trade Commission Act. Various statutes establish similar standards as the grounds upon which injunctions may be obtained by other agencies. For example, under the Securities Exchange Act, 15 U.S.C. § 78 u(e), the Securities and Exchange Commission is authorized to seek injunctions "[w]henever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule or regulation thereunder . . . ."

Similarly, the National Labor Relations Board, under the National Labor Relations Act, 29 U.S.C. § 160(j), is authorized, upon issuance of a complaint ". . . charging that any person has engaged in or is engaging in an unfair labor practice . . ." to petition a United States district court for appropriate temporary relief or a restraining order. The district court is given jurisdiction ". . . to grant to the Board such temporary relief or restraining order as it deems just and proper."

The Food, Drug, and Cosmetic Act is yet another statute which provides authority to obtain injunctions upon meeting a statutory standard rather than upon traditional equitable grounds. It provides that for "cause shown," the district courts of the United States may restrain violations of section 331 of the Act. In bringing suits to obtain injunctions under this statute, the Justice Department has not been required to meet the traditional equitable standard.

Additional precedent for a statutory standard may also be found in both the Interstate Commerce Act, 49 U.S.C. § 5(8), authorizing the district courts to issue writs of injunction "upon complaint of the [Interstate Commerce] Commission alleging a violation of any of the provisions of the section . . ." and the Federal Communications Act, 47 U.S.C. § 36, authorizing the district courts, at the suit of the United States to enjoin the landing of cable in violation of sections 34–39 of Title 47, when the cable ". . . is about to be or is landed or is being operated without a license. . . ." Neither statute includes any requirement that the traditional equitable standard be met before the court may issue the injunction.

Thus, it is clear that, in seeking a statutory standard for obtaining injunctions, the Commission is seeking a grant of authority which

Congress has in the past deemed necessary for other government agencies to enforce effectively statutes under their jurisdicton. Its necessity, in terms of effective enforcement of the Federal Trade Commission Act, is compelling. Based on these considerations the Commission supports the injunctive provisions of H.R. 20 which would clothe the Commission with injunctive authority substantially similar to section 13 of the Federal Trade Commission Act. It is recommended that the provisons of section 204 of H.R. 20 be substituted for the language now contained in section 209 of S. 356.

### COMMISSION REPRESENTATION IN COURT PROCEEDINGS

The Commission strongly endorses the various sections of the bill which would afford it direct access to the courts. Specifically, S. 356 would authorize the Commission to appear in court in its own name and through its own attorneys in the following proceedings:

(a) Civil actions to supplement cease-and-desist orders with remedies to redress consumer grievances (Sec. 203).

(b) Civil actions to enforce cease-and-desist order violations (Sec. 204).

(c) Civil actions to enforce its own subpoenas (Sec. 207(b)).

(d) Civil penalty actions for failure to furnish reports required by Commission order (Sec. 208).

(e) Petitions for injunctions pendente lite and restraining orders (Sec. 210).

There are a number of compelling reasons supporting the Commission's firm conviction that it should have this authority to conduct its own litigation. In almost every case which is referred to the Justice Department, the investigation, pleadings, and briefs have been prepared by the Commission's staff. The additional hours which are required by both Justice Department and Commission personnel to brief trial attorneys are duplicative and nonproductive, and sometimes add greatly to the time required to dispose of Commission action.

In addition to this added time factor, further delay is attributable to the heavy caseload of the Justice Department's own cases and those of other agencies in the U.S. Attorneys' Offices. All of these cases are in competition for U.S. Attorneys' attention, and matters considered important to the Commission must often yield to the urgency of other matters. While these and other delays are often welcome by a respondent, they greatly hinder the Commission's efforts to expedite final disposition of its cases.

The Commission, therefore, firmly believes that it should have autonomy not only as regards those types of litigation covered by the provisions listed above, but over the entirety of its civil litigation under the Act. To accomplish this, we would leave undisturbed the Attorney General's present authority to represent the Commission in court proceedings, but would amend S. 356 to permit the Commission to elect to represent itself in all such matters. This arrangement would enable the Justice Department to continue to represent the Commission in these circumstances in which such representation would be in the overall interest of the Government, and would save valuable attorney hours in both agencies, expedite litigation, and make uniform the present ragged pattern of the Commission's representational authority.

### RULEMAKING

Rulemaking authority is, of course, an essential and highly useful regulatory tool which has long been relied upon by the Commission. The drafters of the Federal Trade Commission Act imposed a broad mandate on the Commission to empower it to define with specificity harmful practices. They recognized that specific legislative definition was undesirable since precise definitions would not withstand the ingenuity of those hoping to evade the law.

The Commission—as have other administrative agencies, such as the SEC, the FPC and the FCC—has found that rulemaking is often the best method for filling in gaps in its broad mandate. Agencies which have insisted on utilizing adjudication for broad policymaking have been consistently criticized. Some of the most recent criticism comes from the Ash Council Report, which found that administrative agencies "should rely less on the case-by-case approach to policy formulation and move increasingly in the direction of rulemaking, especially informal rulemaking and other expeditious procedures" (p. 49). The Administrative Conference has recently adopted a recommendation which strongly advocates simple, flexible and efficient rulemaking. Rulemaking is an efficient technique by which the Commission can perform its law enforcement function. Adjudication of necessity forecloses from participation others in a group who may be ultimately subject to the rule of law laid down by a case. Rulemaking on the other hand enables participation in the development of the law by all individuals who are concerned with it. Moreover, there is reason to believe that responsible businessmen will welcome and voluntarily comply with an agency's interpretation of the law if it is presented clearly and in a readily accessible form.

Recognizing its advantages, courts have upheld rulemaking authority for all of the major administrative agencies, and hence rulemaking has become a cornerstone in the administrative process. The Commission is confident that its rulemaking authority will be upheld by the court of appeals in its decision in the pending *National Petroleum Refiners Ass'n* case.

During the last session of the Congress the Commission supported legislative reaffirmation of its rulemaking authority because it recognized that the doubt created by the possibility of judicial challenge could significantly hinder its use of the rulemaking function for some unknown time. But now, a year and a half later, a judicial resolution of this uncertainty seems imminent and the re-evaluation of legislative priorities is necessary.

The Commission is becoming increasingly apprehensive that the controversy over rulemaking authority could unnecessarily jeopardize the rapid passage of the other essential, but less controversial provisions in the legislation under consideration. Experience over the past several years has demonstrated that the procedural aspects of rulemaking are so complex that the time required for their thorough analysis and the search for a consensus solution far exceeds that necessary to the thorough consideration of the other components of the legislation.

In view of the pending litigation, moreover, the Commission would oppose any statutory rulemaking provision limiting the flexibility of

58

our present authority. The Commission recognizes the need to achieve a balance between procedural efficiency and procedural safeguards and feels that judicial affirmation of the Commission's rulemaking authority will provide the flexibility needed to develop procedures which strike this essential balance.

For these reasons, the Commission has concluded that it should await the imminent court decision and seek additional legislative authority only in the event of an adverse decision. The Commission, therefore, recommends that section 206 be deleted from the bill. Such a course will not jeopardize Commission rulemaking, and, in the meantime, American consumers can begin to reap the benefits associated with prompt enactment of the less controversial amendments provided in the legislation before this committee.

Sincerely,

LEWIS A. ENGMAN, *Chairman.*

O

S. 356

# Ninety-third Congress of the United States of America

## AT THE SECOND SESSION

*Begun and held at the City of Washington on Monday, the twenty-first day of January, one thousand nine hundred and seventy-four*

## An Act

To provide minimum disclosure standards for written consumer product warranties; to define minimum Federal content standards for such warranties; to amend the Federal Trade Commission Act in order to improve its consumer protection activities; and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this act may be cited as the "Magnuson-Moss Warranty—Federal Trade Commission Improvement Act".

## TITLE I—CONSUMER PRODUCT WARRANTIES

### DEFINITIONS

SEC. 101. For the purposes of this title:

(1) The term "consumer product" means any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed).

(2) The term "Commission" means the Federal Trade Commission.

(3) The term "consumer" means a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).

(4) The term "supplier" means any person engaged in the business of making a consumer product directly or indirectly available to consumers.

(5) The term "warrantor" means any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty.

(6) The term "written warranty" means—

(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking,

which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

(7) The term "implied warranty" means an implied warranty arising under State law (as modified by sections 108 and 104(a)) in connection with the sale by a supplier of a consumer product.

(8) The term "service contract" means a contract in writing to perform, over a fixed period of time or for a specified duration,

S. 356—2

services relating to the maintenance or repair (or both) of a consumer product.

(9) The term "reasonable and necessary maintenance" consists of those operations (A) which the consumer reasonably can be expected to perform or have performed and (B) which are necessary to keep any consumer product performing its intended function and operating at a reasonable level of performance.

(10) The term "remedy" means whichever of the following actions the warrantor elects:

(A) repair,

(B) replacement, or

(C) refund;

except that the warrantor may not elect refund unless (i) the warrantor is unable to provide replacement and repair is not commercially practicable or cannot be timely made, or (ii) the consumer is willing to accept such refund.

(11) The term "replacement" means furnishing a new consumer product which is identical or reasonably equivalent to the warranted consumer product.

(12) The term "refund" means refunding the actual purchase price (less reasonable depreciation based on actual use where permitted by rules of the Commission).

(13) The term "distributed in commerce" means sold in commerce, introduced or delivered for introduction into commerce, or held for sale or distribution after introduction into commerce.

(14) The term "commerce" means trade, traffic, commerce, or transportation—

(A) between a place in a State and any place outside thereof, or

(B) which affects trade, traffic, commerce, or transportation described in subparagraph (A).

(15) The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Canal Zone, or American Samoa. The term "State law" includes a law of the United States applicable only to the District of Columbia or only to a territory or possession of the United States; and the term "Federal law" excludes any State law.

### WARRANTY PROVISIONS

SEC. 102. (a) In order to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products, any warrantor warranting a consumer product to a consumer by means of a written warranty shall, to the extent required by rules of the Commission, fully and conspicuously disclose in simple and readily understood language the terms and conditions of such warranty. Such rules may require inclusion in the written warranty of any of the following items among others:

(1) The clear identification of the names and addresses of the warrantors.

(2) The identity of the party or parties to whom the warranty is extended.

(3) The products or parts covered.

(4) A statement of what the warrantor will do in the event of a defect, malfunction, or failure to conform with such written warranty—at whose expense—and for what period of time.

(5) A statement of what the consumer must do and expenses he must bear.

(6) Exceptions and exclusions from the terms of the warranty.

S. 356—3

(7) The step-by-step procedure which the consumer should take in order to obtain performance of any obligation under the warranty, including the identification of any person or class of persons authorized to perform the obligations set forth in the warranty.

(8) Information respecting the availability of any informal dispute settlement procedure offered by the warrantor and a recital, where the warranty so provides, that the purchaser may be required to resort to such procedure before pursuing any legal remedies in the courts.

(9) A brief, general description of the legal remedies available to the consumer.

(10) The time at which the warrantor will perform any obligations under the warranty.

(11) The period of time within which, after notice of a defect, malfunction, or failure to conform with the warranty, the warrantor will perform any obligations under the warranty.

(12) The characteristics or properties of the products, or parts thereof, that are not covered by the warranty.

(13) The elements of the warranty in words or phrases which would not mislead a reasonable, average consumer as to the nature or scope of the warranty.

(b)(1)(A) The Commission shall prescribe rules requiring that the terms of any written warranty on a consumer product be made available to the consumer (or prospective consumer) prior to the sale of the product to him.

(B) The Commission may prescribe rules for determining the manner and form in which information with respect to any written warranty of a consumer product shall be clearly and conspicuously presented or displayed so as not to mislead the reasonable, average consumer, when such information is contained in advertising, labeling, point-of-sale material, or other representations in writing.

(2) Nothing in this title (other than paragraph (3) of this subsection) shall be deemed to authorize the Commission to prescribe the duration of written warranties given or to require that a consumer product or any of its components be warranted.

(3) The Commission may prescribe rules for extending the period of time a written warranty or service contract is in effect to correspond with any period of time in excess of a reasonable period (not less than 10 days) during which the consumer is deprived of the use of such consumer product by reason of failure of the product to conform with the written warranty or by reason of the failure of the warrantor (or service contractor) to carry out such warranty (or service contract) within the period specified in the warranty (or service contract).

(c) No warrantor of a consumer product may condition his written or implied warranty of such product on the consumer's using, in connection with such product, any article or service (other than article or service provided without charge under the terms of the warranty) which is identified by brand, trade, or corporate name; except that the prohibition of this subsection may be waived by the Commission if—

(1) the warrantor satisfies the Commission that the warranted product will function properly only if the article or service so identified is used in connection with the warranted product, and

(2) the Commission finds that such a waiver is in the public interest.

The Commission shall identify in the Federal Register, and permit public comment on, all applications for waiver of the prohibition of this subsection, and shall publish in the Federal Register its disposition of any such application, including the reasons therefor.

S. 356—4

(d) The Commission may by rule devise detailed substantive warranty provisions which warrantors may incorporate by reference in their warranties.

(e) The provisions of this section apply only to warranties which pertain to consumer products actually costing the consumer more than $5.

### DESIGNATION OF WARRANTIES

SEC. 103. (a) Any warrantor warranting a consumer product by means of a written warranty shall clearly and conspicuously designate such warranty in the following manner, unless exempted from doing so by the Commission pursuant to subsection (c) of this section:

(1) If the written warranty meets the Federal minimum standards for warranty set forth in section 104 of this Act, then it shall be conspicuously designated a "full (statement of duration) warranty".

(2) If the written warranty does not meet the Federal minimum standards for warranty set forth in section 104 of this Act, then it shall be conspicuously designated a "limited warranty".

(b) Sections 102, 103, and 104 shall not apply to statements or representations which are similar to expressions of general policy concerning customer satisfaction and which are not subject to any specific limitations.

(c) In addition to exercising the authority pertaining to disclosure granted in section 102 of this Act, the Commission may by rule determine when a written warranty does not have to be designated either "full (statement of duration)" or "limited" in accordance with this section.

(d) The provisions of subsections (a) and (c) of this section apply only to warranties which pertain to consumer products actually costing the consumer more than $10 and which are not designated "full (statement of duration) warranties".

### FEDERAL MINIMUM STANDARDS FOR WARRANTY

SEC. 104. (a) In order for a warrantor warranting a consumer product by means of a written warranty to meet the Federal minimum standards for warranty—

(1) such warrantor must as a minimum remedy such consumer product within a reasonable time and without charge, in the case of a defect, malfunction, or failure to conform with such written warranty;

(2) notwithstanding section 108(b), such warrantor may not impose any limitation on the duration of any implied warranty on the product;

(3) such warrantor may not exclude or limit consequential damages for breach of any written or implied warranty on such product, unless such exclusion or limitation conspicuously appears on the face of the warranty; and

(4) if the product (or a component part thereof) contains a defect or malfunction after a reasonable number of attempts by the warrantor to remedy defects or malfunctions in such product, such warrantor must permit the consumer to elect either a refund for, or replacement without charge of, such product or part (as the case may be). The Commission may by rule specify for purposes of this paragraph, what constitutes a reasonable number of attempts to remedy particular kinds of defects or malfunctions under different circumstances. If the warrantor replaces a component part of a consumer product, such replacement shall include installing the part in the product without charge.

S. 356—5

(b)(1) In fulfilling the duties under subsection (a) respecting a written warranty, the warrantor shall not impose any duty other than notification upon any consumer as a condition of securing remedy of any consumer product which malfunctions, is defective, or does not conform to the written warranty, unless the warrantor has demonstrated in a rulemaking proceeding, or can demonstrate in an administrative or judicial enforcement proceeding (including private enforcement), or in an informal dispute settlement proceeding, that such a duty is reasonable.

(2) Notwithstanding paragraph (1), a warrantor may require, as a condition to replacement of, or refund for, any consumer product under subsection (a), that such consumer product shall be made available to the warrantor free and clear of liens and other encumbrances, except as otherwise provided by rule or order of the Commission in cases in which such a requirement would not be practicable.

(3) The Commission may, by rule define in detail the duties set forth in section 104(a) of this Act and the applicability of such duties to warrantors of different categories of consumer products with "full (statement of duration)" warranties.

(4) The duties under subsection (a) extend from the warrantor to each person who is a consumer with respect to the consumer product.

(c) The performance of the duties under subsection (a) of this section shall not be required of the warrantor if he can show that the defect, malfunction, or failure of any warranted consumer product to conform with a written warranty, was caused by damage (not resulting from defect or malfunction) while in the possession of the consumer, or unreasonable use (including failure to provide reasonable and necessary maintenance).

(d) For purposes of this section and of section 102(c), the term "without charge" means that the warrantor may not assess the consumer for any costs the warrantor or his representatives incur in connection with the required remedy of a warranted consumer product. An obligation under subsection (a)(1)(A) to remedy without charge does not necessarily require the warrantor to compensate the consumer for incidental expenses; however, if any incidental expenses are incurred because the remedy is not made within a reasonable time or because the warrantor imposed an unreasonable duty upon the consumer as a condition of securing remedy, then the consumer shall be entitled to recover reasonable incidental expenses which are so incurred in any action against the warrantor.

(e) If a supplier designates a warranty applicable to a consumer product as a "full (statement of duration)" warranty, then the warranty on such product shall, for purposes of any action under section 110(d) or under any State law, be deemed to incorporate at least the minimum requirements of this section and rules prescribed under this section.

FULL AND LIMITED WARRANTING OF A CONSUMER PRODUCT

SEC. 105. Nothing in this title shall prohibit the selling of a consumer product which has both full and limited warranties if such warranties are clearly and conspicuously differentiated.

SERVICE CONTRACTS

SEC. 106. (a) The Commission may prescribe by rule the manner and form in which the terms and conditions of service contracts shall be fully, clearly, and conspicuously disclosed.

(b) Nothing in this title shall be construed to prevent a supplier or warrantor from entering into a service contract with the consumer

S. 356—6

in addition to or in lieu of a written warranty if such contract fully, clearly, and conspicuously discloses its terms and conditions in simple and readily understood language.

### DESIGNATION OF REPRESENTATIVES

SEC. 107. Nothing in this title shall be construed to prevent any warrantor from designating representatives to perform duties under the written or implied warranty: *Provided*, That such warrantor shall make reasonable arrangements for compensation of such designated representatives, but no such designation shall relieve the warrantor of his direct responsibilities to the consumer or make the representative a cowarrantor.

### LIMITATION ON DISCLAIMER OF IMPLIED WARRANTIES

SEC. 108. (a) No supplier may disclaim or modify (except as provided in subsection (b)) any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.

(b) For purposes of this title (other than section 104(a)(2)), implied warranties may be limited in duration to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty.

(c) A disclaimer, modification, or limitation made in violation of this section shall be ineffective for purposes of this title and State law.

### COMMISSION RULES

SEC. 109. (a) Any rule prescribed under this title shall be prescribed in accordance with section 553 of title 5, United States Code; except that the Commission shall give interested persons an opportunity for oral presentations of data, views, and arguments, in addition to written submissions. A transcript shall be kept of any oral presentation. Any such rule shall be subject to judicial review under section 18(e) of the Federal Trade Commission Act (as amended by section 202 of this Act) in the same manner as rules prescribed under section 18(a)(1)(B) of such Act, except that section 18(e)(3)(B) of such Act shall not apply.

(b) The Commission shall initiate within one year after the date of enactment of this Act a rulemaking proceeding dealing with warranties and warranty practices in connection with the sale of used motor vehicles; and, to the extent necessary to supplement the protections offered the consumer by this title, shall prescribe rules dealing with such warranties and practices. In prescribing rules under this subsection, the Commission may exercise any authority it may have under this title, or other law, and in addition it may require disclosure that a used motor vehicle is sold without any warranty and specify the form and content of such disclosure.

### REMEDIES

SEC. 110. (a)(1) Congress hereby declares it to be its policy to encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms.

S. 356—7

(2) The Commission shall prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty to which any provision of this title applies. Such rules shall provide for participation in such procedure by independent or governmental entities.

(3) One or more warrantors may establish an informal dispute settlement procedure which meets the requirements of the Commission's rules under paragraph (2). If—

(A) a warrantor establishes such a procedure,

(B) such procedure, and its implementation, meets the requirements of such rules, and

(C) he incorporates in a written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty,

then (i) the consumer may not commence a civil action (other than a class action) under subsection (d) of this section unless he initially resorts to such procedure; and (ii) a class of consumers may not proceed in a class action under subsection (d) except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the named plaintiffs (upon notifying the defendant that they are named plaintiffs in a class action with respect to a warranty obligation) initially resort to such procedure. In the case of such a class action which is brought in a district court of the United States, the representative capacity of the named plaintiffs shall be established in the application of rule 23 of the Federal Rules of Civil Procedure. In any civil action arising out of a warranty obligation and relating to a matter considered in such a procedure, any decision in such procedure shall be admissible in evidence.

(4) The Commission on its own initiative may, or upon written complaint filed by any interested person shall, review the bona fide operation of any dispute settlement procedure resort to which is stated in a written warranty to be a prerequisite to pursuing a legal remedy under this section. If the Commission finds that such procedure or its implementation fails to comply with the requirements of the rules under paragraph (2), the Commission may take appropriate remedial action under any authority it may have under this title or any other provision of law.

(5) Until rules under paragraph (2) take effect, this subsection shall not affect the validity of any informal dispute settlement procedure respecting consumer warranties, but in any action under subsection (d), the court may invalidate any such procedure if it finds that such procedure is unfair.

(b) It shall be a violation of section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)) for any person to fail to comply with any requirement imposed on such person by this title (or a rule thereunder) or to violate any prohibition contained in this title (or a rule thereunder).

(c)(1) The district courts of the United States shall have jurisdiction of any action brought by the Attorney General (in his capacity as such), or by the Commission by any of its attorneys designated by it for such purpose, to restrain (A) any warrantor from making a deceptive warranty with respect to a consumer product, or (B) any person from failing to comply with any requirement imposed on such person by or pursuant to this title or from violating any prohibition contained in this title. Upon proper showing that, weighing the equities and considering the Commission's or Attorney General's likelihood of ultimate success, such action would be in the public interest and after notice to the defendant, a temporary restraining order or preliminary injunction may be granted without bond. In the case of an

S. 356—8

action brought by the Commission, if a complaint under section 5 of the Federal Trade Commission Act is not filed within such period (not exceeding 10 days) as may be specified by the court after the issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect. Any suit shall be brought in the district in which such person resides or transacts business. Whenever it appears to the court that the ends of justice require that other persons should be parties in the action, the court may cause them to be summoned whether or not they reside in the district in which the court is held, and to that end process may be served in any district.

(2) For the purposes of this subsection, the term "deceptive warranty" means (A) a written warranty which (i) contains an affirmation, promise, description, or representation which is either false or fraudulent, or which, in light of all of the circumstances, would mislead a reasonable individual exercising due care; or (ii) fails to contain information which is necessary in light of all of the circumstances, to make the warranty not misleading to a reasonable individual exercising due care; or (B) a written warranty created by the use of such terms as "guaranty" or "warranty", if the terms and conditions of such warranty so limit its scope and application as to deceive a reasonable individual.

(d)(1) Subject to subsections (a)(3) and (e), a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—

(A) in any court of competent jurisdiction in any State or the District of Columbia; or

(B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection.

(2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

(3) No claim shall be cognizable in a suit brought under paragraph (1)(B) of this subsection—

(A) if the amount in controversy of any individual claim is less than the sum or value of $25;

(B) if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit; or

(C) if the action is brought as a class action, and the number of named plaintiffs is less than one hundred.

(e) No action (other than a class action or an action respecting a warranty to which subsection (a)(3) applies) may be brought under subsection (d) for failure to comply with any obligation under any written or implied warranty or service contract, and a class of consumers may not proceed in a class action under such subsection with respect to such a failure except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply. In the case of such a class action (other than a class action respecting a warranty to which subsection (a)(3) applies) brought

S. 356—9

under subsection (d) for breach of any written or implied warranty or service contract, such reasonable opportunity will be afforded by the named plaintiffs and they shall at that time notify the defendant that they are acting on behalf of the class. In the case of such a class action which is brought in a district court of the United States, the representative capacity of the named plaintiffs shall be established in the application of rule 23 of the Federal Rules of Civil Procedure.

(f) For purposes of this section, only the warrantor actually making a written affirmation of fact, promise, or undertaking shall be deemed to have created a written warranty, and any rights arising thereunder may be enforced under this section only against such warrantor and no other person.

#### EFFECT ON OTHER LAWS

SEC. 111. (a) (1) Nothing contained in this title shall be construed to repeal, invalidate, or supersede the Federal Trade Commission Act (15 U.S.C. 41 et seq.) or any statute defined therein as an Antitrust Act.

(2) Nothing in this title shall be construed to repeal, invalidate, or supersede the Federal Seed Act (7 U.S.C. 1551–1611) and nothing in this title shall apply to seed for planting.

(b) (1) Nothing in this title shall invalidate or restrict any right or remedy of any consumer under State law or any other Federal law.

(2) Nothing in this title (other than sections 108 and 104(a) (2) and (4)) shall (A) affect the liability of, or impose liability on, any person for personal injury, or (B) supersede any provision of State law regarding consequential damages for injury to the person or other injury.

(c) (1) Except as provided in subsection (b) and in paragraph (2) of this subsection, a State requirement—

    (A) which relates to labeling or disclosure with respect to written warranties or performance thereunder;

    (B) which is within the scope of an applicable requirement of sections 102, 103, and 104 (and rules implementing such sections), and

    (C) which is not identical to a requirement of section 102, 103, or 104 (or a rule thereunder),

shall not be applicable to written warranties complying with such sections (or rules thereunder).

(2) If, upon application of an appropriate State agency, the Commission determines (pursuant to rules issued in accordance with section 109) that any requirement of such State covering any transaction to which this title applies (A) affords protection to consumers greater than the requirements of this title and (B) does not unduly burden interstate commerce, then such State requirement shall be applicable (notwithstanding the provisions of paragraph (1) of this subsection) to the extent specified in such determination for so long as the State administers and enforces effectively any such greater requirement.

(d) This title (other than section 102(c)) shall be inapplicable to any written warranty the making or content of which is otherwise governed by Federal law. If only a portion of a written warranty is so governed by Federal law, the remaining portion shall be subject to this title.

#### EFFECTIVE DATE

SEC. 112. (a) Except as provided in subsection (b) of this section, this title shall take effect 6 months after the date of its enactment but shall not apply to consumer products manufactured prior to such date.

S. 356—10

(b) Section 102(a) shall take effect 6 months after the final publication of rules respecting such section; except that the Commission, for good cause shown, may postpone the applicability of such sections until one year after such final publication in order to permit any designated classes of suppliers to bring their written warranties into compliance with rules promulgated pursuant to this title.

(c) The Commission shall promulgate rules for initial implementation of this title as soon as possible after the date of enactment of this Act but in no event later than one year after such date.

## TITLE II—FEDERAL TRADE COMMISSION IMPROVEMENTS

### JURISDICTION OF COMMISSION

SEC. 201. (a) Section 5 of the Federal Trade Commission Act (15 U.S.C. 45) is amended by striking out "in commerce" wherever it appears and inserting in lieu thereof "in or affecting commerce".

(b) Subsections (a) and (b) of section 6 of the Federal Trade Commission Act (15 U.S.C. 46(a), (b)) are each amended by striking out "in commerce" and inserting in lieu thereof "in or whose business affects commerce".

(c) Section 12 of the Federal Trade Commission Act (15 U.S.C. 52) is amended by striking out "in commerce" wherever it appears and inserting in lieu thereof in subsection (a) "in or having an effect upon commerce," and in lieu thereof in subsection (b) "in or affecting commerce".

### RULEMAKING

SEC. 202. (a) The Federal Trade Commission Act (15 U.S.C. 41 et seq.) is amended by redesignating section 18 as section 21, and inserting after section 17 the following new section:

"SEC. 18. (a)(1) The Commission may prescribe—

"(A) interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 5(a)(1) of this Act), and

"(B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of such section 5(a)(1)). Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices.

"(2) The Commission shall have no authority under this Act, other than its authority under this section, to prescribe any rule with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 5(a)(1)). The preceding sentence shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce.

"(b) When prescribing a rule under subsection (a)(1)(B) of this section, the Commission shall proceed in accordance with section 553 of title 5, United States Code (without regard to any reference in such section to sections 556 and 557 of such title), and shall also (1) publish a notice of proposed rulemaking stating with particularity the reason for the proposed rule; (2) allow interested persons to submit written data, views, and arguments, and make all such submissions publicly available; (3) provide an opportunity for an informal hearing in accordance with subsection (c); and (4) promul-

S. 356—11

gate, if appropriate, a final rule based on the matter in the rulemaking record (as defined in subsection (e)(1)(B)), together with a statement of basis and purpose.

"(c) The Commission shall conduct any informal hearings required by subsection (b)(3) of this section in accordance with the following procedure:

"(1) Subject to paragraph (2) of this subsection, an interested person is entitled—

"(A) to present his position orally or by documentary submissions (or both), and

"(B) if the Commission determines that there are disputed issues of material fact it is necessary to resolve, to present such rebuttal submissions and to conduct (or have conducted under paragraph (2)(B)) such cross-examination of persons as the Commission determines (i) to be appropriate, and (ii) to be required for a full and true disclosure with respect to such issues.

"(2) The Commission may prescribe such rules and make such rulings concerning proceedings in such hearings as may tend to avoid unnecessary costs or delay. Such rules or rulings may include (A) imposition of reasonable time limits on each interested person's oral presentations, and (B) requirements that any cross-examination to which a person may be entitled under paragraph (1) be conducted by the Commission on behalf of that person in such manner as the Commission determines (i) to be appropriate, and (ii) to be required for a full and true disclosure with respect to disputed issues of material fact.

"(3)(A) Except as provided in subparagraph (B), if a group of persons each of whom under paragraphs (1) and (2) would be entitled to conduct (or have conducted) cross-examination and who are determined by the Commission to have the same or similar interests in the proceeding cannot agree upon a single representative of such interests for purposes of cross-examination, the Commission may make rules and rulings (i) limiting the representation of such interest, for such purposes, and (ii) governing the manner in which such cross-examination shall be limited.

"(B) When any person who is a member of a group with respect to which the Commission has made a determination under subparagraph (A) is unable to agree upon group representation with the other members of the group, then such person shall not be denied under the authority of subparagraph (A) the opportunity to conduct (or have conducted) cross-examination as to issues affecting his particular interests if (i) he satisfies the Commission that he has made a reasonable and good faith effort to reach agreement upon group representation with the other members of the group and (ii) the Commission determines that there are substantial and relevant issues which are not adequately presented by the group representative.

"(4) A verbatim transcript shall be taken of any oral presentation, and cross-examination, in an informal hearing to which this subsection applies. Such transcript shall be available to the public.

"(d)(1) The Commission's statement of basis and purpose to accompany a rule promulgated under subsection (a)(1)(B) shall include (A) a statement as to the prevalence of the acts or practices treated by the rule; (B) a statement as to the manner and context in which such acts or practices are unfair or deceptive; and (C) a statement as to the economic effect of the rule, taking into account the effect on small business and consumers.

S. 356—12

"(2) (A) The term 'Commission' as used in this subsection and subsections (b) and (c) includes any person authorized to act in behalf of the Commission in any part of the rulemaking proceeding.

"(B) A substantive amendment to, or repeal of, a rule promulgated under subsection (a)(1)(B) shall be prescribed, and subject to judicial review, in the same manner as a rule prescribed under such subsection. An exemption under subsection (g) shall not be treated as an amendment or repeal of a rule.

"(3) When any rule under subsection (a)(1)(B) takes effect a subsequent violation thereof shall constitute an unfair or deceptive act or practice in violation of section 5(a)(1) of this Act, unless the Commission otherwise expressly provides in such rule.

"(e)(1)(A) Not later than 60 days after a rule is promulgated under subsection (a)(1)(B) by the Commission, any interested person (including a consumer or consumer organization) may file a petition, in the United States Court of Appeals for the District of Columbia circuit or for the circuit in which such person resides or has his principal place of business, for judicial review of such rule. Copies of the petition shall be forthwith transmitted by the clerk of the court to the Commission or other officer designated by it for that purpose. The provisions of section 2112 of title 28, United States Code, shall apply to the filing of the rulemaking record of proceedings on which the Commission based its rule and to the transfer of proceedings in the courts of appeals.

"(B) For purposes of this section, the term 'rulemaking record' means the rule, its statement of basis and purpose, the transcript required by subsection (c)(4), any written submissions, and any other information which the Commission considers relevant to such rule.

"(2) If the petitioner or the Commission applies to the court for leave to make additional oral submissions or written presentations and shows to the satisfaction of the court that such submissions and presentations would be material and that there were reasonable grounds for the submissions and failure to make such submissions and presentations in the proceeding before the Commission, the court may order the Commission to provide additional opportunity to make such submissions and presentations. The Commission may modify or set aside its rule or make a new rule by reason of the additional submissions and presentations and shall file such modified or new rule, and the rule's statement of basis of purpose, with the return of such submissions and presentations. The court shall thereafter review such new or modified rule.

"(3) Upon the filing of the petition under paragraph (1) of this subsection, the court shall have jurisdiction to review the rule in accordance with chapter 7 of title 5, United States Code, and to grant appropriate relief, including interim relief, as provided in such chapter. The court shall hold unlawful and set aside the rule on any ground specified in subparagraphs (A), (B), (C), or (D) of section 706(2) of title 5, United States Code (taking due account of the rule of prejudicial error), or if—

"(A) the court finds that the Commission's action is not supported by substantial evidence in the rulemaking record (as defined in paragraph (1)(B) of this subsection) taken as a whole, or

"(B) the court finds that—

"(i) a Commission determination under subsection (c) that the petitioner is not entitled to conduct cross-examination or make rebuttal submissions, or

S. 356—13

"(ii) a Commission rule or ruling under subsection (c) limiting the petitioner's cross-examination or rebuttal submissions,

has precluded disclosure of disputed material facts which was necessary for fair determination by the Commission of the rule-making proceeding taken as a whole. The term 'evidence', as used in this paragraph, means any matter in the rulemaking record.

"(4) The judgment of the court affirming or setting aside, in whole or in part, any such rule shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of title 28, United States Code.

"(5)(A) Remedies under the preceding paragraphs of this subsection are in addition to and not in lieu of any other remedies provided by law.

"(B) The United States Courts of Appeal shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of a rule prescribed under subsection (a)(1)(B), if any district court of the United States would have had jurisdiction of such action but for this subparagraph. Any such action shall be brought in the United States Court of Appeals for the District of Columbia circuit, or for any circuit which includes a judicial district in which the action could have been brought but for this subparagraph.

"(C) A determination, rule, or ruling of the Commission described in paragraph (3)(B)(i) or (ii) may be reviewed only in a proceeding under this subsection and only in accordance with paragraph (3)(B). Section 706(2)(E) of title 5, United States Code, shall not apply to any rule promulgated under subsection (a)(1)(B). The contents and adequacy of any statement required by subsection (b)(4) shall not be subject to judicial review in any respect.

"(f)(1) In order to prevent unfair or deceptive acts or practices in or affecting commerce (including acts or practices which are unfair or deceptive to consumers) by banks, each agency specified in paragraph (2) of this subsection shall establish a separate division of consumer affairs which shall receive and take appropriate action upon complaints with respect to such acts or practices by banks subject to its jurisdiction. The Board of Governors of the Federal Reserve System shall prescribe regulations to carry out the purposes of this section, including regulations defining with specificity such unfair or deceptive acts or practices, and containing requirements prescribed for the purpose of preventing such acts or practices. Whenever the Commission prescribes a rule under subsection (a)(1)(B) of this section, then within 60 days after such rule takes effect such Board shall promulgate substantially similar regulations prohibiting acts or practices of banks which are substantially similar to those prohibited by rules of the Commission and which impose substantially similar requirements, unless such Board finds that (A) such acts or practices of banks are not unfair or deceptive, or (B) that implementation of similar regulations with respect to banks would seriously conflict with essential monetary and payments systems policies of the Board, and publishes any such finding, and the reasons therefor, in the Federal Register.

"(2) Compliance with regulations prescribed under this subsection shall be enforced under section 8 of the Federal Deposit Insurance Act, in the case of—

"(A) national banks and banks operating under the code of law for the District of Columbia, by the division of consumer affairs established by the Comptroller of the Currency;

S. 356—14

"(B) member banks of the Federal Reserve System (other than banks referred to in subparagraph (A)) by the division of consumer affairs established by the Board of Governors of the Federal Reserve System; and

"(C) banks insured by the Federal Deposit Insurance Corporation (other than banks referred to in subparagraph (A) or (B)), by the division of consumer affairs established by the Board of Directors of the Federal Deposit Insurance Corporation.

"(3) For the purpose of the exercise by any agency referred to in paragraph (2) of its powers under any Act referred to in that paragraph, a violation of any regulation prescribed under this subsection shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in paragraph (2), each of the agencies referred to in that paragraph may exercise, for the purpose of enforcing compliance with any regulation prescribed under this subsection, any other authority conferred on it by law.

"(4) The authority of the Board of Governors of the Federal Reserve System to issue regulations under this subsection does not impair the authority of any other agency designated in this subsection to make rules respecting its own procedures in enforcing compliance with regulations prescribed under this subsection.

"(5) Each agency exercising authority under this subsection shall transmit to the Congress not later than March 15 of each year a detailed report on its activities under this paragraph during the preceding calendar year.

"(g)(1) Any person to whom a rule under subsection (a)(1)(B) of this section applies may petition the Commission for an exemption from such rule.

"(2) If, on its own motion or on the basis of a petition under paragraph (1), the Commission finds that the application of a rule prescribed under subsection (a)(1)(B) to any person or class or persons is not necessary to prevent the unfair or deceptive act or practice to which the rule relates, the Commission may exempt such person or class from all or part of such rule. Section 553 of title 5, United States Code, shall apply to action under this paragraph.

"(3) Neither the pendency of a proceeding under this subsection respecting an exemption from a rule, nor the pendency of judicial proceedings to review the Commission's action or failure to act under this subsection, shall stay the applicability of such rule under subsection (a)(1)(B).

"(h)(1) The Commission may, pursuant to rules prescribed by it, provide compensation for reasonable attorneys fees, expert witness fees, and other costs of participating in a rulemaking proceeding under this section to any person (A) who has, or represents, an interest (i) which would not otherwise be adequately represented in such proceeding, and (ii) representation of which is necessary for a fair determination of the rulemaking proceeding taken as a whole, and (B) who is unable effectively to participate in such proceeding because such person cannot afford to pay costs of making oral presentations, conducting cross-examination, and making rebuttal submissions in such proceeding.

"(2) The aggregate amount of compensation paid under this subsection in any fiscal year to all persons who, in rulemaking proceedings in which they receive compensation, are persons who either (A) would be regulated by the proposed rule, or (B) represent persons who would

S. 356—15

be so regulated, may not exceed 25 percent of the aggregate amount paid as compensation under this subsection to all persons in such fiscal year.

"(3) The aggregate amount of compensation paid to all persons in any fiscal year under this subsection may not exceed $1,000,000.".

(b) Section 6(g) of the Federal Trade Commission Act (15 U.S.C. 46(g)) is amended by inserting "(except as provided in section 18 (a)(2) of this Act)" before "to make rules and regulations".

(c)(1) The amendments made by subsections (a) and (b) of this section shall not affect the validity of any rule which was promulgated under section 6(g) of the Federal Trade Commission Act prior to the date of enactment of this section. Any proposed rule under section 6(g) of such Act with respect to which presentation of data, views, and arguments was substantially completed before such date may be promulgated in the same manner and with the same validity as such rule could have been promulgated had this section not been enacted.

(2) If a rule described in paragraph (1) of this subsection is valid and if section 18 of the Federal Trade Commission Act would have applied to such rule had such rule been promulgated after the date of enactment of this Act, any substantive change in the rule after it has been promulgated shall be made in accordance with such section 18.

(d) The Federal Trade Commission and the Administrative Conference of the United States shall each conduct a study and evaluation of the rulemaking procedures under section 18 of the Federal Trade Commission Act and each shall submit a report of its study (including any legislative recommendations) to the Congress not later than 18 months after the date of enactment of this Act.

INVESTIGATIVE AUTHORITY

SEC. 203. (a)(1) Section 6(a) of the Federal Trade Commission Act (15 U.S.C. 46(a)) is amended by striking out "corporation" and inserting "person, partnership, or corporation"; and by striking out "corporations and to individuals, associations, and partnerships", and inserting in lieu thereof "persons, partnerships, and corporations".

(2) Section 6(b) of such Act is amended by striking out "corporations" where it first appears and inserting in lieu thereof "persons, partnerships, and corporations,"; and by striking out "respective corporations" and inserting in lieu thereof "respective persons, partnerships, and corporations".

(3) The proviso at the end of section 6 of such Act is amended by striking out "any such corporation to the extent that such action is necessary to the investigation of any corporation, group of corporations," and inserting in lieu thereof "any person, partnership, or corporation to the extent that such action is necessary to the investigation of any person, partnership, or corporation, group of persons, partnerships, or corporations,".

(b)(1) The first paragraph of section 9 of such Act (15 U.S.C. 49) is amended by striking out "corporation" where it first appears and inserting in lieu thereof "person, partnership, or corporation".

(2) The third paragraph of section 9 of such Act is amended by striking out "corporation or other person" both places where it appears and inserting in each such place "person, partnership, or corporation".

(3) The fourth paragraph of section 9 of such Act is amended by striking out "person or corporation" and inserting in lieu thereof "person, partnership, or corporation".

S. 356—16

(c) (1) The second paragraph of section 10 (15 U.S.C. 50) of such
Act is amended by striking out "corporation" each place where it
appears and inserting in lieu thereof in each such place "person, part-
nership, or corporation".

(2) The third paragraph of section 10 of such Act is amended by
striking out "corporation" where it first appears and inserting in lieu
thereof "persons, partnership, or corporation"; and by striking out
"in the district where the corporation has its principal office or in any
district in which it shall do business" and inserting in lieu thereof
"in the case of a corporation or partnership in the district where the
corporation or partnership has its principal office or in any district in
which it shall do business, and in the case of any person in the district
where such person resides or has his principal place of business".

REPRESENTATION

SEC. 204. (a) Section 16 of the Federal Trade Commission Act is
amended to read as follows:

"SEC. 16. (a) (1) Except as otherwise provided in paragraph (2)
or (3), if—

"(A) before commencing, defending, or intervening in, any
civil action involving this Act (including an action to collect
a civil penalty) which the Commission, or the Attorney General
on behalf of the Commission, is authorized to commence, defend,
or intervene in, the Commission gives written notification and
undertakes to consult with the Attorney General with respect
to such action; and

"(B) the Attorney General fails within 45 days after receipt
of such notification to commence, defend, or intervene in, such
action;

the Commission may commence, defend, or intervene in, and supervise
the litigation of, such action and any appeal of such action in its own
name by any of its attorneys designated by it for such purpose.

"(2) Except as otherwise provided in paragraph (3), in any civil
action—

"(A) under section 13 of this Act (relating to injunctive
relief);

"(B) under section 19 of this Act (relating to consumer
redress);

"(C) to obtain judicial review of a rule prescribed by the
Commission, or a cease and desist order issued under section 5
of this Act; or

"(D) under the second paragraph of section 9 of this Act
(relating to enforcement of a subpena) and under the fourth
paragraph of such section (relating to compliance with section 6
of this Act);

the Commission shall have exclusive authority to commence or defend,
and supervise the litigation of, such action and any appeal of such
action in its own name by any of its attorneys designated by it for such
purpose, unless the Commission authorizes the Attorney General to
do so. The Commission shall inform the Attorney General of the
exercise of such authority and such exercise shall not preclude the
Attorney General from intervening on behalf of the United States in
such action and any appeal of such action as may be otherwise pro-
vided by law.

"(3) (A) If the Commission makes a written request to the Attorney
General, within the 10-day period which begins on the date of the
entry of the judgment in any civil action in which the Commission

S. 356—17

represented itself pursuant to paragraph (1) or (2), to represent itself through any of its attorneys designated by it for such purpose before the Supreme Court in such action, it may do so, if—

"(i) the Attorney General concurs with such request; or

"(ii) the Attorney General, within the 60-day period which begins on the date of the entry of such judgment—

"(a) refuses to appeal or file a petition for writ of certiorari with respect to such civil action, in which case he shall give written notification to the Commission of the reasons for such refusal within such 60-day period; or

"(b) the Attorney General fails to take any action with respect to the Commission's request.

"(B) In any case where the Attorney General represents the Commission before the Supreme Court in any civil action in which the Commission represented itself pursuant to paragraph (1) or (2), the Attorney General may not agree to any settlement, compromise, or dismissal of such action, or confess error in the Supreme Court with respect to such action, unless the Commission concurs.

"(C) For purposes of this paragraph (with respect to representation before the Supreme Court), the term 'Attorney General' includes the Solicitor General.

"(4) If, prior to the expiration of the 45-day period specified in paragraph (1) of this section or a 60-day period specified in paragraph (3), any right of the Commission to commence, defend, or intervene in, any such action or appeal may be extinguished due to any procedural requirement of any court with respect to the time in which any pleadings, notice of appeal, or other acts pertaining to such action or appeal may be taken, the Attorney General shall have one-half of the time required to comply with any such procedural requirement of the court (including any extension of such time granted by the court) for the purpose of commencing, defending, or intervening in the civil action pursuant to paragraph (1) or for the purpose of refusing to appeal or file a petition for writ of certiorari and the written notification or failing to take any action pursuant to paragraph 3(A)(ii).

"(5) The provisions of this subsection shall apply notwithstanding chapter 31 of title 28, United States Code, or any other provision of law.

"(b) Whenever the Commission has reason to believe that any person, partnership, or corporation is liable for a criminal penalty under this Act, the Commission shall certify the facts to the Attorney General, whose duty it shall be to cause appropriate criminal proceedings to be brought."

(b) Section 5(m) of such Act is repealed.

(c) The amendment and repeal made by this section shall not apply to any civil action commenced before the date of enactment of this Act.

CIVIL PENALTIES FOR KNOWING VIOLATIONS

SEC. 205. (a) Section 5 of the Federal Trade Commission Act (15 U.S.C. 45(a)) is amended by inserting after subsection (l) the following new subsection:

"(m)(1)(A) The Commission may commence a civil action to recover a civil penalty in a district court of the United States against any person, partnership, or corporation which violates any rule under this Act respecting unfair or deceptive acts or practices (other than an interpretive rule or a rule violation of which the Commission has provided is not an unfair or deceptive act or practice in violation of

S. 356—18

subsection (a)(1)) with actual knowledge or knowledge fairly implied
on the basis of objective circumstances that such act is unfair or
deceptive and is prohibited by such rule. In such action, such person,
partnership, or corporation shall be liable for a civil penalty of not
more than $10,000 for each violation.

"(B) If the Commission determines in a proceeding under subsec-
tion (b) that any act or practice is unfair or deceptive, and issues a
final cease and desist order with respect to such act or practice, then
the Commission may commence a civil action to obtain a civil penalty
in a district court of the United States against any person, partner-
ship, or corporation which engages in such act or practice—

"(1) after such cease and desist order becomes final (whether
or not such person, partnership, or corporation was subject to
such cease and desist order), and

"(2) with actual knowledge that such act or practice is unfair
or deceptive and is unlawful under subsection (a)(1) of this
section.

In such action, such person, partnership, or corporation shall be liable
for a civil penalty of not more than $10,000 for each violation.

"(C) In the case of a violation through continuing failure to comply
with a rule or with section 5(a)(1), each day of continuance of such
failure shall be treated as a separate violation, for purposes of sub-
paragraphs (A) and (B). In determining the amount of such a civil
penalty, the court shall take into account the degree of culpability,
any history of prior such conduct, ability to pay, effect on ability to
continue to do business, and such other matters as justice may require.

"(2) If the cease and desist order establishing that the act or prac-
tice is unfair or deceptive was not issued against the defendant in
a civil penalty action under paragraph (1)(B) the issues of fact in
such action against such defendant shall be tried de novo.

"(3) The Commission may compromise or settle any action for a
civil penalty if such compromise or settlement is accompanied by a
public statement of its reasons and is approved by the court."

(b) The amendment made by subsection (a) of this section shall
not apply to any violation, act, or practice to the extent that such
violation, act, or practice occurred before the date of enactment of
this Act.

CONSUMER REDRESS

SEC. 206. (a) The Federal Trade Commission Act (15 U.S.C. 45(a))
is amended by inserting after section 18 the following new section:

"SEC. 19. (a)(1) If any person, partnership, or corporation violates
any rule under this Act respecting unfair or deceptive acts or prac-
tices (other than an interpretive rule, or a rule violation of which
the Commission has provided is not an unfair or deceptive act or
practice in violation of section 5(a)), then the Commission may com-
mence a civil action against such person, partnership, or corporation
for relief under subsection (b) in a United States district court or
in any court of competent jurisdiction of a State.

"(2) If any person, partnership, or corporation engages in any
unfair or deceptive act or practice (within the meaning of section
5(a)(1)) with respect to which the Commission has issued a final
cease and desist order which is applicable to such person, partner-
ship, or corporation, then the Commission may commence a civil action
against such person, partnership, or corporation in a United States
district court or in any court of competent jurisdiction of a State. If
the Commission satisfies the court that the act or practice to which the
cease and desist order relates is one which a reasonable man would

have known under the circumstances was dishonest or fraudulent, the court may grant relief under subsection (b).

"(b) The court in an action under subsection (a) shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be. Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages.

"(c)(1) If (A) a cease and desist order issued under section 5(b) has become final under section 5(g) with respect to any person's, partnership's, or corporation's rule violation or unfair or deceptive act or practice, and (B) an action under this section is brought with respect to such person's partnership's, or corporation's rule violation or act or practice, then the findings of the Commission as to the material facts in the proceeding under section 5(b) with respect to such person's, partnership's, or corporation's rule violation or act or practice, shall be conclusive unless (i) the terms of such cease and desist order expressly provide that the Commission's findings shall not be conclusive, or (ii) the order became final by reason of section 5(g)(1), in which case such finding shall be conclusive if supported by evidence.

"(2) The court shall cause notice of an action under this section to be given in a manner which is reasonably calculated, under all of the circumstances, to apprise the persons, partnerships, and corporations allegedly injured by the defendant's rule violation or act or practice of the pendency of such action. Such notice may, in the discretion of the court, be given by publication.

"(d) No action may be brought by the Commission under this section more than 3 years after the rule violation to which an action under subsection (a)(1) relates, or the unfair or deceptive act or practice to which an action under subsection (a)(2) relates; except that if a cease and desist order with respect to any person's, partnership's, or corporation's rule violation or unfair or deceptive act or practice has become final and such order was issued in a proceeding under section 5(b) which was commenced not later than 3 years after the rule violation or act or practice occurred, a civil action may be commenced under this section against such person, partnership, or corporation at any time before the expiration of one year after such order becomes final.

"(e) Remedies provided in this section are in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law. Nothing in this section shall be construed to affect any authority of the Commission under any other provision of law."

(b) The amendment made by subsection (a) of this section shall not apply to—

(1) any violation of a rule to the extent that such violation occurred before the date of enactment of this Act, or

(2) any act or practice with respect to which the Commission issues a cease-and-desist order, to the extent that such act or practice occurred before the date of enactment of this Act, unless such order was issued after such date and the person, partnership or corporation against whom such an order was issued had been notified in the complaint, or in the notice or order attached thereto, that consumer redress may be sought.

S. 356—20

AUTHORIZATION OF APPROPRIATIONS

SEC. 207. The Federal Trade Commission Act (15 U.S.C. 41 et seq.) is amended by inserting after section 19 the following new section:

"SEC. 20. There are authorized to be appropriated to carry out the functions, powers, and duties of the Federal Trade Commission not to exceed $42,000,000 for the fiscal year ending June 30, 1975; not to exceed $46,000,000 for the fiscal year ending June 30, 1976; and not to exceed $50,000,000 for the fiscal year ending in 1977. For fiscal years ending after 1977, there may be appropriated to carry out such functions, powers, and duties, only such sums as the Congress may hereafter authorize by law."

*Speaker of the House of Representatives.*

*Vice President of the United States and*
*President of the Senate.*

15

December 24, 1974

Dear Mr. Director:

The following bills were received at the White House on December 24th:

| | | | |
|---|---|---|---|
| S.J. Res. 40 | S. 3481 | H.R. 8958 | H.R. 14600 |
| S.J. Res. 133 | S. 3548 | H.R. 8981 | H.R. 14689 |
| S.J. Res. 262 | S. 3934 | H.R. 9182 | H.R. 14718 |
| S. 251 | S. 3943 | H.R. 9199 | H.R. 15173 |
| S. 356 | S. 3976 | H.R. 9588 | H.R. 15223 |
| S. 521 | S. 4073 | H.R. 9654 | H.R. 15229 |
| S. 544 | S. 4206 | H.R. 10212 | H.R. 15322 |
| S. 663 | H.J. Res. 1178 | H.R. 10701 | H.R. 15977 |
| S. 754 | H.J. Res. 1180 | H.R. 10710 | H.R. 16045 |
| S. 1017 | H.R. 421 | H.R. 10827 | H.R. 16215 |
| S. 1083 | H.R. 1715 | H.R. 11144 | H.R. 16596 |
| S. 1296 | H.R. 1820 | H.R. 11273 | H.R. 16925 |
| S. 1418 | H.R. 2208 | H.R. 11796 | H.R. 17010 |
| S. 2149 | H.R. 2933 | H.R. 11802 | H.R. 17045 |
| S. 2446 | H.R. 3203 | H.R. 11847 | H.R. 17085 |
| S. 2807 | H.R. 3339 | H.R. 11897 | H.R. 17468 |
| S. 2854 | H.R. 5264 | H.R. 12044 | H.R. 17558 |
| S. 2888 | H.R. 5463 | H.R. 12113 | H.R. 17597 |
| S. 2994 | H.R. 5773 | H.R. 12427 | H.R. 17628 |
| S. 3022 | H.R. 7599 | H.R. 12884 | H.R. 17655 |
| S. 3289 | H.R. 7684 | H.R. 13022 | |
| S. 3358 | H.R. 7767 | H.R. 13296 | |
| S. 3359 | H.R. 8214 | H.R. 13869 | |
| S. 3394 | H.R. 8322 | H.R. 14449 | |
| S. 3433 | H.R. 8591 | H.R. 14461 | |

Please let the President have reports and recommendations as to the approval of these bills as soon as possible.

Sincerely,

Robert D. Linder
Chief Executive Clerk

The Honorable Roy L. Ash
Director
Office of Management and Budget
Washington, D. C.

# EXHIBIT 8

# THE GENESIS OF CONSUMER PROTECTION REMEDIES UNDER SECTION 13(b) OF THE FTC ACT

David M. FitzGerald[1]

## Introduction

When I arrived at the Federal Trade Commission in 1976, no one imagined that Section 13(b) of the Federal Trade Commission Act[2] would become an important part of the Commission's consumer protection program. Section 13(b) had been on the books for three years, but had been used only once in a competition case, and not at all in the consumer protection arena. Moreover, it did not appear to have great promise as a consumer protection remedy. It gave the Commission authority to seek preliminary injunctions in aid of Commission administrative proceedings, but the Commission had had similar authority for many years in cases involving false advertising of food, cosmetics, drugs or medical devices, and had rarely used it. Section 13(b) also included a brief proviso authorizing the Commission to seek a permanent injunction "in proper cases," but it was generally assumed that in most cases the Commission would prefer to issue its own cease and desist order rather than seek a permanent injunction from a court.

By the time I left the Commission in 1990, however, Section 13(b) – and in particular the permanent injunction proviso – had become a significant weapon in the Commission's fight against consumer fraud. It was well-established by then that Section 13(b) authorized the Commission to seek not only preliminary and permanent injunctions

---

[1] Mr. FitzGerald served as a litigation attorney in the Federal Trade Commission's Office of General Counsel from 1976 to 1982, and as Assistant Director for Litigation in the Commission's Bureau of Consumer Protection from 1982 to 1990. He is currently Vice President and Deputy Chief Hearing Officer for the National Association of Securities Dealers (NASD). The views expressed here are his own, not those of NASD.

[2] 15 U.S.C. § 13(b).

to halt deceptive practices, but also asset freezes, appointment of receivers, restitution and other relief to redress injury resulting from consumer frauds.  As a federal appeals court explained in a 2002 decision, "The court's authority [under Section 13(b)] to order restitution to the victims [of a fraudulent scheme] and as an incident thereto to place the frozen assets in trust for them is not and cannot be questioned."[3]

Today Section 13(b) is a mainstay of the Commission's consumer protection program.  As of June 30, 2004, the Commission had 86 cases pending in federal district courts in which the Commission was seeking permanent injunctions and consumer redress under Section 13(b), with another 11 cases pending in federal courts of appeals.[4]  In contrast, the Commission had fewer than a dozen administrative cases pending before its Administrative Law Judges, most of which involved allegations of anticompetitive practices, rather than consumer deception.[5]

Below I offer a brief history tracing the development of the Commission's Section 13(b) authority during the period 1976 to 1990, from the perspective of one who litigated several of the early cases and later helped develop the Bureau of Consumer Protection's Section 13(b) program.

## I. <u>Background</u>

To appreciate the development of Section 13(b) during this period, one must understand the Commission's enforcement authority as it stood in 1976.  When it was

---

[3]  *FTC v. Think Achievement Corp.*, 312 F.2d 259, 262 (7th Cir. 2002).

[4]  Quarterly Federal Court Litigation Status Report, http://www.ftc.gov/ogc/status/status.pdf.  Section 13(b) cases represented 72% of the Commission's total court litigation docket, which also included two petitions for review of Commission cease and desist orders, 17 civil penalty cases, seven suits to enjoin Commission action or other defensive litigation, and 11 cases in which the Commission had filed amicus curiae briefs.

[5]  Information concerning pending administrative proceedings may be found at http://www.ftc.gov/os/adjpro/index.htm.

enacted 90 years ago, in 1914, Section 5 of the Federal Trade Commission Act prohibited "unfair methods of competition."[6]  In 1938, the Wheeler-Lea Act added the prohibition against "unfair or deceptive acts or practices" to Section 5, confirming the Commission's consumer protection mission.[7]

The Commission's principal tool for enforcing Section 5 was administrative proceedings leading to cease and desist orders.  Penalties could be imposed only on those who violated cease and desist orders issued against them.  This "one free bite" approach was deemed appropriate because the broad language of Section 5(a) was thought to give businesses little notice of the standards to which they would be held until the Commission applied Section 5 to specific conduct through a cease and desist order.

Many of the Commission's consumer protection cases, however, concerned consumer frauds accomplished through misrepresentations and deceptive omissions that clearly violated Section 5.  In those types of cases the cease and desist order remedy had two serious shortcomings.

A.  **Preliminary Relief**

First, the administrative process leading to a final cease and desist order, including a trial before an Administrative Law Judge (ALJ), Commission review of the ALJ's decision, and a court of appeals' review of the Commission's decision, was protracted, often taking several years.  In the meantime, the respondent remained free to employ the deceptive practices, causing continuing harm to the public.

---

[6]  Federal Trade Commission Act, ch. 311, § 5, 38 Stat. 719 (1914).

[7]  Wheeler-Lea Act, ch. 49, § 3, 52 Stat. 111 (1938).   Section 5, as amended, is codified at 15 U.S.C. § 45.

Congress began to address this problem in the Wheeler-Lea Act.  The Act added Section 12 to the FTC Act, making it unlawful to disseminate any "false advertisement … for the purpose of inducing or which is likely to induce, directly or indirectly, the purchase of food, drugs, devices, services, or cosmetics,"[8] and gave the Commission authority to institute administrative cease and desist order proceedings against persons who were disseminating advertisements that the Commission had reason to believe violated Section 12.  But Wheeler-Lea also added Section 13(a) to the FTC Act, which authorized the Commission to file an action in federal court to obtain a preliminary injunction to prevent the respondent from disseminating the challenged advertisements pending resolution of the Commission's administrative proceeding.  As a result, for the first time the Commission could take immediate action to protect the public from on-going deception.[9]  In cases that did not involve food, drugs, devices or cosmetics, however, the Commission still had no authority to seek preliminary relief.

In 1973, Congress addressed the problem comprehensively through Section 13(b).  Section 13(b) was originally part of broader proposed legislation to augment the Commission's enforcement authority, but it was dropped from that bill and inserted in the Trans-Alaska Pipeline Act,[10] because of concern that the Commission needed immediate

---

[8]  15 U.S.C. § 52.

[9]  15 U.S.C. § 53(a).  *See, e.g., FTC v. Thompson-King & Co.*, 109 F.2d 516 (7th Cir. 1940).   The Commission's *Statutes and Court Decisions* volume covering the period 1938 to 1940 includes many Section 13(a) injunctive orders, not otherwise reported, that the Commission obtained to halt false advertising of quack drugs, remedies and devices pending the completion of administrative proceedings. After 1940, however, the Commission used Section 13(a) rarely, although it brought two notable cases in the 1970's, *FTC v. National Com'n on Egg Nutrition*, 517 F.2d 485 (7th Cir. 1975) (respondent preliminarily enjoined from making certain representations concerning the state of scientific evidence linking the consumption of eggs with heart disease) and *FTC v. Simeon Management Corp.*, 532 F.2d 708 (9th Cir. 1976) (preliminary injunction prohibiting claims relating to the safety and efficacy of a weight loss plan employing a drug not approved for that purpose by the Food and Drug Administration denied).

[10]  Trans-Alaska Pipeline Act, P.L. 93-153, § 408, 87 Stat. 592 (1973).

4

authority to seek preliminary relief to prevent the consummation of anticompetitive mergers, particularly among energy companies.[11]  As enacted, however, Section 13(b) was by no means limited to merger cases.  It provided:

> Whenever the Commission has reason to believe (1) that any person, partnership or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission thereon has become final, would be in the interest of the public the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice.  Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond:  Provided, however, that if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect; Provided further, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.  …

This language tracked Section 13(a) closely, with two notable exceptions.  First, unlike Section 13(a), it applied to "any provision of law" enforced by the Commission; second, it authorized "a permanent injunction" in "proper cases."

## B.  Consumer Redress

Second, ordering a respondent to cease and desist from using deceptive practices might protect the public from future harm, but it did not remedy the injury to the public caused by the respondent's past deceptions, or deprive the respondent of the gains it had

---

[11]  By 1973, it was well-recognized that, once a merger was consummated, if the Commission later found the merger unlawful, it was very difficult to fashion a remedy that restored the balance of competition as it had existed before the merger.  *See FTC v. Dean Foods Co.*, 384 U.S. 597, 607 (1966) ("experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture").  With the nation in the midst of an energy crisis and gasoline prices increasing rapidly, maintaining competition in the energy industry was a pressing concern.

realized by employing them.  In 1973, the Commission attempted to address this shortcoming through a creative application of Section 5.  The Commission held that it was an unfair practice, in violation of Section 5, for a respondent to retain funds that it had received from consumers for a worthless product or service sold through deceptive or fraudulent practices.  To remedy this "continuing violation" of Section 5, the Commission ordered that the funds be returned to the consumers – *i.e.*, restitution.[12]

On review, however, in *Heater v. FTC*, the Ninth Circuit set aside that portion of the order.  Although the court acknowledged the Commission's broad authority to craft cease and desist remedies, it found that ordering restitution was "inconsistent and at variance with the over-all purpose and design of the [FTC Act].  In particular, it would permit the Commission to order private relief for harm caused by acts which occurred before the Commission had declared a statutory violation, and thus before giving notice that the prior conduct was within the statutory purview."[13]

In response, the Commission asked Congress to give it authority to order restitution.  Instead, in 1975 Congress added Section 19 to the FTC Act, authorizing the Commission to seek consumer redress in federal district court for either (1) violations of FTC trade regulation rules, or (2) acts or practices as to which the Commission had issued a final cease and desist order, if the Commission "satisfies the court that the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent…."  Section 19

---

[12] *Universal Credit Acceptance Corp.*, 82 F.T.C. 570 (1973).

[13] 503 F.2d 321, 323 (9th Cir. 1974).

expressly authorizes the court to award such relief as rescission or reformation of contracts, the refund of money or the return of property, or the payment of damages.[14]

## II.  Early Development of the Commission's Section 13(b) Authority

When I arrived at the Commission in June 1976, the principal remedy employed by the Commission was still the cease and desist order.  Although Section 13(b) had been enacted three years earlier, the Commission had made little use of it.

Certainly the Commission wanted to use Section 13(b) to seek preliminary injunctions to prevent the consummation of mergers pending the completion of Commission administrative proceedings, as Congress had envisioned.  Unfortunately, a practical difficulty quickly emerged.  To use Section 13(b) for that purpose, the Commission needed enough advance notice of a planned merger to gather and analyze relevant data, decide whether to challenge the merger, file the Section 13(b) case and make a "proper showing" to the court to justify a preliminary injunction – all before the merger was consummated.  The Hart-Scott-Rodino Antitrust Improvements Act of 1976[15] addressed this problem by requiring parties planning a merger to provide advance notice to the Commission and the Justice Department, but when I arrived that Act had not yet taken effect.  As a result, the Commission had brought only one Section 13(b) case, in which, without any reported opinion, the district court granted a limited "hold-separate"

---

[14]  Magnuson Moss Warranty – Federal Trade Commission Improvements Act, P.L. 93-637, § 206(a), 88 Stat. 2201 (1975) (codified at 15 U.S.C. § 57b).

[15]  Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. 94-435, § 201, 90 Stat. 1390 (1976) (codified, as amended, at 15 U.S.C. § 18a).

preliminary injunction after the acquiring firm had already purchased a 35% share of the acquired firm's stock.[16]

Shortly after I arrived, however, the Commission received enough advance warning of a planned merger of two regional supermarket chains to file its first Section 13(b) action to block a merger.  In *FTC v. Food Town Stores, Inc.*, after the district court denied the Commission's request for a temporary restraining order, the Commission sought and obtained an injunction pending appeal from the Fourth Circuit.  Judge Winter, sitting as a single circuit judge for purposes of the emergency motion, issued a decision emphatically supporting the Commission's right to obtain preliminary relief.  In particular, quoting the legislative history, he emphasized the preeminent importance of the public interest in "weighing the equities," as the court is required to do in deciding whether to order relief under Section 13(b).[17]  After Judge Winter granted an injunction pending appeal, the parties abandoned their planned merger, confirming the power of the Commission's Section 13(b) authority in the merger context.[18]

After the decision in *Food Town Stores*, Hart-Scott-Rodino came into effect. With notice of proposed mergers and a favorable opinion, the Commission began to use Section 13(b) aggressively, and, in many cases, successfully, and it quickly became an important part of the Commission's competition program.  The Commission's success

---

[16]  *FTC v. British Oxygen Co.*, No. 74-31 (D. Del.) (unreported).  *See FTC v. British Oxygen Co.*, 529 F.2d 196 (3d Cir. 1976) (*en banc*) (vacating a provision of the order because the district court's findings were inadequate).  Ultimately, the cease and desist order entered by the Commission in the underlying administrative proceeding was set aside on review, leading the district court to dissolve the hold-separate preliminary injunction.  *FTC v. British Oxygen Co.*, 437 F. Supp. 79 (D. Del. 1977).

[17]  539 F.2d 1339 (4th Cir. 1976).

[18]  *See FTC v. Food Town Stores, Inc.*, 547 F.2d 247 (4th Cir. 1977) (vacating the district court's order denying the Commission's motion for a temporary restraining order, and remanding with instructions to dismiss the case as moot, in light of the defendants' abandonment of the planned merger).

using Section 13(b) in competition cases led some Commission staff to consider how it might be used to advance the Commission's consumer protection mission, as well.

During the 1970's the Commission's consumer protection efforts were focused on trade regulation rulemaking proceedings, rather than case-by-case adjudication.[19]  These rulemaking proceedings, which would have significantly affected many areas of the economy if the proposed rules had ever become effective (few did), consumed most of the attention of the Commission's Bureau of Consumer Protection (BCP) policymakers and most of the Commission's BCP resources, but the Commission still brought some administrative consumer protection cases during this period.  The question was whether and how the Commission could use Section 13(b) effectively in those cases.

## A. <u>Preliminary Relief</u>

On its face, Section 13(b) authorizes the Commission to seek preliminary injunctions to stop on-going deceptive practices pending the completion of the Commission's administrative process.  Deceptive practices, however, are transitory.  Often, by the time the Commission had completed its investigation and initiated its administrative proceeding, the respondent had abandoned the practices that the Commission intended to challenge.  It made little sense to seek a preliminary injunction to halt practices that the respondent was no longer employing.[20]

---

[19]  In the 1960's, the Commission began using its rulemaking authority under Section 6(g) of the FTC Act, 15 U.S.C. § 46(g), to define specific acts and practices that it considered to violate Section 5.  In 1975, the Magnuson Moss Warranty – Federal Trade Commission Improvements Act, P.L. 93-637, § 202(a), 88 Stat. 2201, added Section 18 to the FTC Act (codified, as amended, at 15 U.S.C. § 57a), confirming the Commission's authority to issue such trade regulation rules.  *See United States v. JS&A Group, Inc.*, 716 F.2d 451 (7th Cir. 1983) (reviewing the history of Commission trade regulation rulemaking under Section 6(g) and the enactment of Section 18).

[20]  *See FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087-88 (9th Cir. 1985) (holding that the Commission cannot obtain an injunction under Section 13(b) against conduct that the defendant has ceased, absent evidence that the conduct is likely to recur).

In 1977, the Commission found an opportunity to use Section 13(b) in a more effective and creative manner when it filed suit against Australian Land Title, Ltd. (ALT) and its parent companies. The Commission alleged that ALT had sold interests in land in Australia to American consumers under long term sales contracts through deceptive sales practices, including misrepresentations and omission of critical information.[21] By the time the Commission completed its investigation and was prepared to file an administrative complaint, the sales had ended. The Commission was concerned, however, that the purchasers would continue to pay on their long term purchase contracts while the administrative proceedings were pending. In addition, the Commission believed that a Section 19 consumer redress case might be appropriate after the administrative proceeding concluded, but was concerned that by that time ALT might have dissipated the funds it had collected, making redress unfeasible.

In the Section 13(b) case, the Commission asked the district court to issue a preliminary injunction prohibiting ALT from continuing to collect payments under the contracts, or, alternatively, requiring ALT to deposit the payments in an escrow account, to ensure that the funds would be available for relief under Section 19. Before the court ruled, the parties reached a settlement under which the payments were placed in escrow, and ALT and its parent companies agreed to a Commission consent order that required them to forgo future payments under the contracts and to pay redress to consumers.[22]

In 1979, the Commission used the same approach in a similar case. The Commission issued an administrative complaint against Southwest Sunsites, Inc. and two related companies, alleging that they had employed a variety of misrepresentations and

---

[21] *FTC v. Australian Land Title, Ltd.*, No. 77-0199 (D. Hawaii).

[22] *Australian Land Title, Ltd.*, 92 F.T.C. 362 (1978).

deceptive omissions in the sale of land in Texas under long-term sales contracts.  As in *Australian Land Title*, the Commission also filed a Section 13(b) case in which it asked the district court to issue a preliminary injunction requiring, among other things, that the defendants escrow all funds paid by the purchasers to ensure that the funds would be available for relief under Section 19.  In this case, however, there was no settlement and the district court held that Section 13(b) did not authorize it to "freeze" the respondents' assets as the Commission requested.

In January 1982, the Fifth Circuit reversed, holding that "a grant of jurisdiction such as that contained in Section 13(b) carries with it the authorization for the district court to exercise the full range of equitable remedies traditionally available to it."  More specifically, the court held that a district court had authority under Section 13(b) to "order temporary, ancillary relief preventing the dissipation of assets or funds that may constitute part of the relief eventually ordered in the case."  The court reasoned that, although consumer redress would require a separate Section 19 case after the conclusion of the administrative proceeding, "[s]imply because the complete resolution of a matter will require a two-step process does not relieve a court of the task of determining how to preserve a state of affairs such that a meaningful decision can be rendered after full consideration of the merits." [23]

Although *Southwest Sunsites* adopted a favorable interpretation of Section 13(b), the process envisioned in that case was inefficient and protracted.  To obtain complete final relief, the Commission would need to litigate and win three separate actions:  (1) a Section 13(b) preliminary injunction proceeding to obtain a preliminary asset freeze; (2)

---

[23] *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 717-18 (5th Cir.), *cert. denied*, 479 U.S. 828 (1982).

an administrative proceeding leading to a final cease and desist order; and (3) a district court action to obtain consumer redress under Section 19.  Even before the *Southwest Sunsites* decision was issued, the Commission had begun to explore the possibility of using the permanent injunction proviso of Section 13(b) as a shortcut.

**B.  Permanent Injunctions and Consumer Redress**

Although most of the text of Section 13(b) concerns its use as an ancillary remedy in aid of administrative cease and desist proceedings, Section 13(b) also provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  The legislative history suggests that this was intended to "allow the Commission to seek a permanent injunction when a court is reluctant to grant a temporary injunction because it cannot be assured of a[n] early hearing on the merits [in the administrative proceeding]."  In addition, it was intended to give the Commission "the ability, in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease and desist order.  Commission resources will be better utilized, and cases can be disposed of more efficiently."[24]

In 1979, the Commission filed its first Section 13(b) permanent injunction suit, *FTC v. Virginia Homes Manufacturing Corp.*,[25] alleging that two mobile home manufacturers had issued written warranties to mobile homes purchasers that, on their face, misrepresented the purchasers' warranty rights under the Magnuson Moss Warranty

---

[24]  S. Rep. No. 93-151, at 30-31 (1973).

[25]  509 F. Supp 51 (D. Md.), *aff'd mem.*, 661 F.2d 920 (4th Cir. 1981).

Act.[26]  The Warranty Act provides that a violation of any of its provisions is also a violation of Section 5 of the FTC Act,[27] so the Commission could have employed its traditional administrative process, but it was concerned that the purchasers' warranty rights would expire, or they would forgo warranty claims based on the misrepresentations, before the Commission could issue a final cease and desist order. And, in light of *Heater*, it was not clear whether the Commission would have authority to require the respondents to notify the past purchasers of their true warranty rights.

Instead of issuing an administrative complaint, the Commission filed in court under the permanent injunction proviso of Section 13(b), seeking an order requiring the defendants to notify their past purchasers of their correct warranty rights.  The court granted the Commission's motion for summary judgment.  It held that this was a "proper case" for permanent injunctive relief under Section 13(b), noting that the Warranty Act was a provision of law enforced by the Commission and that the Commission's decision to file the case "was a legitimate exercise of prosecutorial discretion."  Furthermore, the court found that it had authority to order notification to past customers even though such relief was not expressly authorized by Section 13(b), because "the powers of a court of equity to issue appropriate orders are, if anything, more expansive than the powers of the independent agencies. … For these reasons, this Court finds that compulsory notice is implicitly authorized by § 13(b) so long as such notice would be essential to the effective discharge of the Court's responsibilities."[28]

---

[26]  Magnuson-Moss Warranty – Federal Trade Commission Improvements Act, P.L. 93-637, Title I, 88 Stat. 2183 (1975) (codified at 15 U.S.C. §§ 2301 *et seq.*).

[27]  15 U.S.C. § 2310(b).

[28]  509 F. Supp. at 55.

The Commission's next step was a bit bolder.  In 1979, shortly after filing *Virginia Homes*, the Commission filed *FTC v. Kazdin*, precisely the sort of "routine fraud" case described in the legislative history of Section 13(b).  The Commission alleged that an individual and two companies he controlled had marketed a "hair implant" process to more than 2,000 consumers through a variety of misrepresentations and deceptive omissions regarding the safety and efficacy of the process.  The Commission sought not only a permanent injunction prohibiting the defendants from employing such practices in the future, but also "ancillary relief," including restitution to the injured consumers, a freeze of the defendants' assets pending payment of restitution, imposition of a constructive trust on certain real estate, and the appointment of a receiver to sell the property.  After the court denied their motion to dismiss the Complaint, the defendants defaulted and the court entered judgment awarding the Commission the requested relief.[29]

In 1980, the Commission continued this approach in *FTC v. H.N. Singer, Inc.* The Commission alleged that the defendants had violated the Commission's Franchise Rule[30] and employed deceptive practices in the sale of business opportunities.  As in *Kazdin*, the Commission sought both a permanent injunction and ancillary relief, including restitution for injured consumers, and the Commission requested a preliminary order freezing the defendants' assets to ensure they would be available for redress.  The district court issued the requested preliminary injunction and the defendants appealed.

---

[29]  No. C 79-1857 (N.D. Ohio June 26, 1980).

[30]  "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures," 16 C.F.R. Part 436.

The Ninth Circuit affirmed, holding that the district court had authority to order the preliminary relief under both Section 13(b) and Section 19.[31]  With respect to Section 13(b), the court upheld the Commission's authority to seek permanent injunctions in "routine fraud" cases, such as the one at bar, and the district court's authority in such cases "to grant whatever preliminary injunctions are justified by the usual equitable standards …."  Most significantly, the court held:

> Congress, when it gave the district court authority to grant a permanent injunction against violations of any provisions of law enforced by the Commission, also gave the district court authority to grant any ancillary relief necessary to accomplish complete justice because it did not limit that traditional equitable power expressly or by necessary and inescapable inference.  In particular, Congress thereby gave the district court power to order rescission of contracts.  Hence §13(b) provides a basis for an order freezing assets.[32]

The *Singer* opinion became the foundation of the Commission's Section 13(b) program in the consumer protection arena.  Many other courts have followed *Singer*, holding that Section 13(b) gives the district courts broad remedial discretion, even though neither Section 13(b) itself nor its legislative history mentions any remedy other than injunctions; no court has disagreed.

The legal analysis that the Commission urged and the courts adopted is straightforward and well-established.  It rests on the Supreme Court's 1946 decision in *Porter v. Warner Holding Co.*  There the Court held that in an enforcement proceeding under the Emergency Price Control Act of 1942,[33] the district court had authority to order restitution of rent collected in violation of the Act even though the Act expressly

---

[31]  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982).

[32]  *Id.* at 1111-13.

[33]  56 Stat. 23, 33.

authorized only "a permanent or temporary injunction, restraining order, or other order." The Court explained that when Congress grants the district courts equitable jurisdiction to enjoin unlawful acts and practices,

> [u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. …
>
> Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. "The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction."[34]

The Supreme Court and the lower federal courts have applied this reasoning in many subsequent cases, upholding the district courts' authority to employ a broad range of equitable remedies in enforcement proceedings brought by an array of administrative agencies under statutes that, like Section 13(b), expressly authorize only injunctive relief.[35] The language of many of these statutory injunctive provisions is quite similar to the language of Section 13(b).[36]

---

[34] 328 U.S. 395, 398 (1946).

[35] *See, e.g.*, *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291-92 (1960) (reimbursement for lost wages); *ICC v. B&T Transp. Co.*, 613 F.2d 1182, 1186 (1st Cir. 1980) (restitution); *CFTC v. Hunt*, 591 F.2d 1211, 1222 (7th Cir.), *cert. denied*, 442 U.S. 921 (1979) (disgorgement); *University of S. Cal. v. Cost of Living Council*, 472 F.2d 1065, 1070 (Em. Ct. App. 1972), *cert. denied*, 410 U.S. 928 (1973) (restitution); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103-04 (2d Cir. 1972) (restitution and appointment of a receiver); *CAB v. Scottish-American Ass'n*, 411 F. Supp. 883, 888 (E.D.N.Y. 1976) (refunds).

[36] *See, e.g.*, 15 U.S.C. § 78u(d)(1), giving the SEC authority to seek permanent or temporary injunctive relief against any person who is engaged in or is about to engage in acts or practices in violation of the Exchange Act.

Critics, and defendants in Section 13(b) cases, have argued that Section 13(b) should be distinguished from the statutory provisions at issue in the *Porter* line of cases.[37] They point out that Congress squarely addressed the issue of consumer redress in Section 19, authorizing the district courts to award redress in specified circumstances.[38]  They argue that, under the reasoning of *Porter*, this supports a "necessary and inescapable inference" that Congress intended to limit the equitable authority of the district courts under the permanent injunction proviso of Section 13(b) to injunctive relief.

 The courts, however, have uniformly rejected these arguments, citing Section 19(e), a "savings clause" that provides:  "Remedies provided in this section are in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law.  Nothing in this section shall be construed to affect any authority of the Commission under any other provision of law."[39]  The courts have reasoned that this provision forestalls any "inescapable" inference that Congress intended to limit the equitable authority of the courts under Section 13(b).[40]  Therefore, they conclude, *Porter* applies, and the full range of equitable remedies is available under Section 13(b).

The Commission's success under Section 13(b), however, involved more than just articulating a well-supported legal theory.  At the outset, the Commission presented those

---

[37]  *See* Peter C. Ward, *Restitution for Consumers Under the Federal Trade Commission Act:  Good Intentions or Congressional Intentions?*, 41 Am. U. L. Rev. 1139 (Summer, 1992).

[38]  Under Section 19, the Commission may obtain redress for consumers only if (1) the defendant's actions either violated a Commission trade regulation rule, or were the subject of a final cease and desist order and involved conduct that "a reasonable man would have known under the circumstances was dishonest or fraudulent," and (2) the Commission commences the redress action within certain time periods specified in Section 19(d).

[39]  15 U.S.C. § 57b(e).

[40]  *See, e.g., Singer*, 668 F.2d at 1113.  Note, however, that under *Porter* the issue is whether Congress intended to restrict the remedial authority of the *courts*, while Section 19(e) addresses the authority of the *Commission*.

arguments in cases involving compelling facts.  The Commission's argument was appealing because it gave the courts discretion to award the relief called for by the facts, "securing complete justice," in the words of *Porter*.  It is, therefore, not really surprising that, in *Singer*, the same court that in *Heater* had concluded it would be "inconsistent and at variance with the over-all purpose and design" of the FTC Act for the *Commission* to order restitution found no similar limitation on the implied power of the *district courts* to order the same relief under the permanent injunction proviso of Section 13(b).

### III.  <u>Development of the Section 13(b) Program</u>

The early cases established that Section 13(b) had the potential to become an important element of the Commission's consumer protection program.  Within the Commission, however, Section 13(b) consumer protection cases were still largely viewed as curiosities, while the consumer protection mission focused on rulemaking.

That changed in the early 1980's, after a new administration took control of the Commission.  The new FTC leaders were philosophically opposed to the sweeping rulemaking efforts that had dominated the Commission's consumer protection program in the 1970's.  Instead, they wanted the Commission to pursue its consumer protection mission primarily through case-by-case adjudication, and they believed the Commission could serve the public by taking aggressive action against consumer frauds.

Experience had shown, however, that traditional administrative adjudication leading to a cease and desist order was not effective in combating fraud, because the respondent might continue to employ fraudulent practices while the administrative proceeding was pending, and could retain the gains earned through those practices even after the Commission issued its cease and desist order.  The Commission might have

attempted to overcome these weaknesses by seeking preliminary relief under Section 13(b), as it had in *Southwest Sunsites*, coupled with a Section 19 consumer redress action after it issued a final cease and desist order, but such a three-part process would have been lengthy and cumbersome.  The permanent injunction proviso of Section 13(b), as interpreted in *Singer*, offered a much more effective and efficient weapon against fraud, if the Commission could persuade other courts to follow *Singer*.

     The Commission, therefore, embarked on an ambitious program to identify and pursue fraudulent schemes in federal district court, under the permanent injunction proviso of Section 13(b).  *Singer* provided the legal framework to support this effort, but for the program to be successful, the Commission needed to realign the BCP staff's efforts from rulemaking and administrative adjudication to an entirely different enforcement approach under Section 13(b).

     As part of this effort, BCP created a new litigation office to encourage, evaluate and coordinate cases under Section 13(b).  BCP attorneys, whose responsibilities had previously been limited to administrative litigation and rulemaking, had to develop new skills to litigate Section 13(b) cases successfully in federal court.  To accomplish this, BCP's litigation office devised and conducted training programs in-house, as well as through outside organizations such as the National Institute for Trial Advocacy (NITA), helping BCP attorneys hone their litigation skills.  BCP also developed and implemented consistent litigation strategies and tactics for Section 13(b) cases.

     To pursue consumer frauds effectively, BCP also had to improve its ability to identify and investigate fraudulent schemes quickly.  Recognizing this, BCP staff established working relationships with other state and federal law enforcement agencies,

as well as non-governmental organizations, to help target widespread frauds as early as possible. Then BCP staff employed innovative investigatory techniques, such as posing as potential customers and tape-recording misleading sales presentations, to obtain the evidence needed to support persuasive Section 13(b) cases. In some cases, BCP staff cooperated with other law enforcement agencies on joint investigations.

In this way, the Commission successfully developed and presented compelling cases, winning wide-spread acceptance of the principles first articulated in *Singer*. Over the next several years, it became settled that the district courts have authority under Section 13(b) to grant whatever preliminary or permanent equitable relief they deem necessary to secure complete justice under the particular circumstances presented.[41] Preliminary relief may include temporary restraining orders (with or without notice) and preliminary injunctions that freeze the defendants' assets, appoint receivers to take control of their businesses, and require them to make an accounting. Final relief may include not only permanent injunctions, but rescission of contracts, restitution, disgorgement, or the imposition of constructive trusts and appointment trustees, as needed to redress injury to consumers.[42] As a result, Section 13(b) has become an important component of the Commission's consumer protection program, allowing the

---

[41] *See, e.g.*, *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988); *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir.), *cert. denied*, 493 U.S. 954 (1989); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991).

[42] *See, e.g.*, *FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282 (D. Minn. 1985) (restitution); *FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) (asset freeze, appointment of receiver, consumer redress); *FTC v. Atlantex Assocs.*, 872 F.2d 966 (11th Cir. 1989) (asset freeze, consumer redress); *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) (asset freeze, receiver); *FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir. 1996) (restitution, disgorgement); *FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) ("damages," disgorgement); *In re National Credit Mgmt. Group, L.L.C.*, 21 F. Supp. 2d 424 (D. N.J. 1998) (asset freeze, receiver); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) (consumer redress, performance bond); *FTC v. Capital City Mortgage Corp.*, 2004 U.S. Dist. LEXIS 9184 (D.D.C. May 6, 2004) (constructive trust); *FTC v. Direct Marketing Concepts, Inc.*, 2004 U.S. Dist. LEXIS 11628 (D. Mass. June 23, 2004) (accounting).

Commission to address fraudulent practices much more effectively than was ever possible through the administrative process.

## IV. <u>Final Observations</u>

Looking back may be nostalgic for those of us who were involved, but others may ask whether the development of the Commission's Section 13(b) authority offers any lessons for the future. On that topic, I offer a few closing thoughts:

- *Tend to the core mission.* Every successful organization focuses on achieving its core mission before extending outward. The development of Section 13(b) as an effective remedy allowed the Commission to improve significantly its ability to accomplish its core consumer protection mission. This benefited not only consumers, but the Commission itself, by advancing the public's perception of the Commission as an important and effective consumer protection agency, a perception that had been largely lost by the end of the 1970's.

- *Be sure you are making full and effective use of existing authority.* Section 13(b) was added to the FTC Act in 1973, but the Commission did not begin to explore its use in the consumer protection arena for several years, and did not employ it effectively until the 1980's. In the meantime, the Commission was asking Congress to give it additional authority, arguing that it lacked the tools it needed to protect consumers effectively.

- *Step cautiously when proceeding boldly.* In exploring its Section 13(b) authority, the Commission moved warily, selecting cases with compelling facts that established clear violations of well-established legal standards, and advancing well-supported legal arguments to support limited and clearly justified equitable

relief.  Through this carefully considered, step-by-step approach, the Commission established its basic Section 13(b) analyses and arguments, and obtained favorable decisions endorsing them, before pursuing a more ambitious agenda.

- *Don't overlook the value of basic research.*  Neither the text of Section 13(b) nor its legislative history disclosed a basis to argue for broad equitable relief.  Instead of stopping there, however, research into the case law interpreting statutes conferring similar injunctive authority on other agencies led to the *Porter* line of cases, providing critical support for a broad interpretation of Section 13(b).

- *Being out of the spotlight can be an advantage.*  In the early years, the effort to employ Section 13(b) in the consumer protection arena received relatively little attention from those who were not directly involved, and even the Commission's litigation successes were not viewed as particularly significant developments for the consumer protection program.  For those of us who saw the development of Section 13(b) as important, however, that was liberating, rather than frustrating, because it allowed us to pursue our efforts with little interference.

- *Don't let naysayers discourage pursuit of a promising theory or approach.*  When the early cases were proposed, many people within the Commission predicted they would be unsuccessful, because Section 13(b) authorized only injunctive relief.  If the doubters had stopped the Commission from filing the cases, the Commission might never have established the full range of remedies available to it under Section 13(b).  Without those remedies, the Commission could not have become the aggressive and successful foe of consumer fraud that it is today.

# EXHIBIT 9

# SUPREME COURT
# OF THE UNITED STATES

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - - -

AMG CAPITAL MANAGEMENT, LLC,        )

ET AL.,                             )

       Petitioners,         )

        v.                  ) No. 19-508

FEDERAL TRADE COMMISSION,           )

       Respondent.          )

- - - - - - - - - - - - - - - - - - -

Pages:  1 through 62

Place:  Washington, D.C.

Date:   January 13, 2021

## HERITAGE REPORTING CORPORATION

*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.   20005
(202) 628-4888
www.hrccourtreporters.com

1

```
 1      IN THE SUPREME COURT OF THE UNITED STATES
 2    - - - - - - - - - - - - - - - - - -
 3    AMG CAPITAL MANAGEMENT, LLC,           )
 4    ET AL.,                                )
 5                 Petitioners,              )
 6                   v.                      ) No. 19-508
 7    FEDERAL TRADE COMMISSION,              )
 8                 Respondent.               )
 9    - - - - - - - - - - - - - - - - - -
10
11                 Washington, D.C.
12              Wednesday, January 13, 2021
13
14              The above-entitled matter came on for
15    oral argument before the Supreme Court of the
16    United States at 10:00 a.m.
17
18    APPEARANCES:
19    MICHAEL PATTILLO, ESQUIRE, Fernandina Beach, Florida;
20         on behalf of the Petitioners.
21    JOEL R. MARCUS, ESQUIRE, Washington, D.C.;
22         on behalf of the Respondent.
23
24
25
```

```
 1                    C O N T E N T S

 2    ORAL ARGUMENT OF:                        PAGE:

 3    MICHAEL PATTILLO, ESQ.

 4         On behalf of the Petitioners          3

 5    ORAL ARGUMENT OF:

 6    JOEL R. MARCUS, ESQ.

 7         On behalf of the Respondent          30

 8    REBUTTAL ARGUMENT OF:

 9    MICHAEL PATTILLO, ESQ.

10         On behalf of the Petitioners         59

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Official - Subject to Final Review

3

```
 1                P R O C E E D I N G S
 2                              (10:00 a.m.)
 3              CHIEF JUSTICE ROBERTS:  We will hear
 4    argument this morning in Case 19-508, AMG
 5    Capital Management versus the Federal Trade
 6    Commission.
 7              Mr. Pattillo.
 8              ORAL ARGUMENT OF MICHAEL PATTILLO
 9              ON BEHALF OF THE PETITIONERS
10              MR. PATTILLO:  Thank you, Mr. Chief
11    Justice, and may it please the Court:
12              The FTC Act's test, structure, and
13    purpose make clear that when Section 13(b)
14    authorizes the Commission to seek a permanent
15    injunction, it means just that, a permanent
16    injunction as traditionally understood.  It does
17    not mean injunctions and all equitable relief or
18    injunctions and monetary relief for past harms.
19              Three features of the Act make that
20    especially clear.  First, 13(b) is limited to
21    cases where someone is violating or is about to
22    violate the Act.  That limit to ongoing or
23    imminent violations would make no sense if 13(b)
24    authorized retrospective monetary relief for
25    past harms.
```

4

1          Second, where the Act allows relief

2     beyond injunctions, it says so.  Section 5(l)

3     authorizes an injunction and further equitable

4     relief as appropriate.  That language would have

5     been pointless if the word "injunction" itself

6     implied all equitable relief.

7          Third, another provision, Section 19,

8     authorizes monetary relief for past consumer

9     injury.  But it provides safeguards, including a

10    statute of limitations, a heightened proof

11    requirement, and notice to victims.  Those

12    limits would be meaningless if they could be

13    evaded under 13(b).

14         Even if there were a presumption that

15    mentioning a specific type of equitable relief

16    meant all equitable relief, and there should not

17    be, those three features overcome it.

18         To be clear, the Commission can get

19    retrospective relief for consumer harm, but it

20    must invoke Section 19, the mechanism Congress

21    provided for that purpose.  That makes sense.

22    Because the Act's prohibitions are broad and

23    general, Congress, since 1914, made agency

24    processes the primary enforcement mechanism so

25    the agency can apply its expertise and give

 1    businesses notice on what is prohibited.

 2           Section 13(b), by contrast, is a

 3    narrow supplement for threatened harm where the

 4    Commission must come to court to stop the

 5    conduct quickly.  Where there is more time, like

 6    for backward-looking remedies, there was no

 7    reason for Congress to bypass agency

 8    responsibilities to provide guidance.

 9           CHIEF JUSTICE ROBERTS:  Mr. Pattillo,

10    one of the issues with your reading of the

11    statute is that it was passed roughly 50 years

12    ago, and in the intervening years, there's been

13    a significant change in how this Court

14    interprets statute -- statutes.

15           Back when this one was passed, we had

16    a pretty free-wheeling approach.  You know, we

17    weren't as confined to the specific language.

18    You sort of looked at what Congress had in mind

19    and -- and figured out the meaning in light of

20    that.

21           And, of course, today, we have a more

22    disciplined approach, you know, I think more

23    suited to our role under the Constitution.  But

24    shouldn't we construe this statute in the

25    environment in which Congress passed it in light

1    of the, as I said, more free-wheeling approach?

2          And I think there'd be a lot more

3    leeway to your friend on the other side argument

4    about an expansive reading of some of the

5    language.

6          So why -- why do we sort of adopt a --

7    I don't know what it is -- a view that -- that

8    is current today but wasn't current back then?

9          MR. PATTILLO:  Your Honor, I have two

10   responses to that question.  The first is that

11   this Court rejected a very similar argument in

12   Alexander v. Sandoval.  The argument was made

13   that, listen, at the time that Title VI of the

14   Civil Rights Act was enacted, the Court at that

15   time followed what you referred to as the more

16   free-wheeling approach to implying causes of

17   action and implied remedies.

18          And the Court said, be that as it may,

19   you know, we have since sworn off that method of

20   statutory interpretation and we decline, you

21   know, one -- one last drink.  And I think that

22   that applies equally here.  Whether or not that

23   was the motive at the time 13(b) was enacted,

24   the reasoning of Alexander versus Sandoval --

25          CHIEF JUSTICE ROBERTS:  Yeah, no, I --

1           MR. PATTILLO:  -- holds --

2           CHIEF JUSTICE ROBERTS:  -- I know

3   that's -- I know that's what we said.  Maybe I

4   just don't find that so -- so compelling.

5   It's -- it's -- it's -- you know, we try to look

6   at language as it was understood in other

7   contexts when we're interpreting provisions.

8   You know, we go back to the, you know, 1860

9   treatise and say what did that mean back then,

10  and we don't look at a contemporary dictionary.

11          Do you have any argument besides what

12  we said in Sandoval?

13          MR. PATTILLO:  Yes, I do.  The theory

14  that Congress somehow thought permanent

15  injunction carried with it all equitable relief

16  when it enacted 13(b) itself defies the three

17  features I mentioned in my opening.

18          In the very same legislation that

19  enacted 13(b), Congress expressly authorized an

20  injunction and other and further equitable

21  relief in Section 5(l).  So that cannot be

22  reconciled with the notion that Congress somehow

23  thought in -- the word "injunction" itself

24  automatically included all equitable relief a la

25  Porter's method of interpretation, much like the

1    --

2          CHIEF JUSTICE ROBERTS:  Thank you,

3    counsel.

4          Justice Thomas.

5          JUSTICE THOMAS:  Thank you, Mr. Chief

6    Justice.

7          Counsel, let's -- continuing along the

8    lines of the Chief Justice, let's assume that we

9    did not have Sections 5 and 19 and -- but you --

10   you still have the same language that we have in

11   13.

12         Would -- would it be reasonable to say

13   that Congress legislated against -- in that

14   case, in that instance, against the backdrop of

15   cases like Porter and Mitchell, and, if so, then

16   how would that change your argument?

17         MR. PATTILLO:  This Court looks to how

18   equitable terms are traditionally understood,

19   and permanent junctions traditionally exclude

20   monetary relief as compensation for past harm,

21   as Great-West noted.  And, here, the -- the

22   phrase, 13(b) itself refers to a permanent

23   injunction.

24         And you wouldn't ordinarily think of a

25   one-time order to turn over property as a

1    permanent -- as a permanent injunction, and so

2    the -- the specific language used in 13(b)

3    itself, even without reference, but also 13(b)

4    is limited to cases of imminent or ongoing harm.

5            And it wouldn't have made any sense to

6    authorize retrospective -- to -- to -- to link

7    the authority for retrospective monetary relief

8    to the availability of imminent or ongoing harm.

9    Consumers don't become more or less worthy of

10   redress for their injuries depending on whether

11   or not the conduct is ongoing.

12           JUSTICE THOMAS:  So, with that

13   argument, how would you address or deal with the

14   19th Century intellectual property cases that

15   allowed monetary relief incident to the

16   injunction?

17           MR. PATTILLO:  All of those cases

18   involve a situation where there was -- the

19   parties had a general right to seek all

20   equitable relief, and that is simply not the

21   case here.  This case, 13(b) is just limited to

22   injunctions, so whether or not the other relief

23   of an accounting might be available where all

24   equitable relief is available to the plaintiff,

25   that's not the case here.

```
1              Injunction means injunction in 13(b),
2      and we know that, and it's limited by the three
3      features of the Act that I've mentioned.
4              JUSTICE THOMAS:  Thank you.
5              CHIEF JUSTICE ROBERTS:  Justice
6      Breyer.
7              JUSTICE BREYER:  Good morning.  Here,
8      I thought the briefs were very good in this
9      case.  Blue brief, I think you're right.  Red
10     brief, I think you are right.  They can't both
11     be right, that's right.  All right.  You see
12     that's the old joke, but that's where I am.
13             So I'm pretty familiar with the
14     arguments and I see which way do we go, and the
15     argument, it seems to me, that's against you --
16     and I'll put the other half to the other side.
17             The argument that's against you is
18     simply this to me:  Law isn't perfect.  Courts
19     make mistakes.  We make mistakes too.  And this,
20     if it is a mistake, has been around for 50 years
21     and there's a pretty uniform interpretation
22     before the Seventh Circuit.
23             And if we never say let bygones be
24     bygones, I mean, we're going to be here to
25     Marbury versus Madison and beyond.  So too much
```

1    time has passed, water under the bridge,

2    good-bye.  Why doesn't that apply?

3              MR. PATTILLO:  Well, Your Honor, this

4    is the first time that the Court was called

5    to -- to step in to -- to resolve this conflict,

6    and the mode of interpretation has -- has

7    changed over -- over time, and the -- when the

8    courts of appeals took this approach during --

9              JUSTICE BREYER:  Oh, just wait.  For

10   my question, I'm assuming you're right on all

11   that, okay?  My question is still -- it's close,

12   and still the lower courts at least have been

13   uniform for 50 years.  We cannot undo everything

14   that was, in your opinion or mine or somebody

15   else's, decided not perfectly and may be wrong.

16   That's what I just asked.

17             MR. PATTILLO:  Well --

18             JUSTICE BREYER:  And so why wouldn't I

19   follow that very basic principle about courts

20   and how the judiciary has to function in a

21   society that's continuously changing?

22             MR. PATTILLO:  There are now two

23   courts of appeals, one on either side -- or,

24   excuse me, on -- there are courts of appeals on

25   either side.  There are now two courts of

Official — Subject to Final Review

1    appeals that have rejected the notion that 13(b)

2    carries with it all monetary relief, and there's

3    simply no rule that the first court of appeals

4    to issue its ruling on a particular version of

5    the law wins.  And so there's no reason to give

6    a -- a presumption to the -- the courts of

7    appeals that decided it first.

8              JUSTICE BREYER:  Okay.  Thank you.

9              CHIEF JUSTICE ROBERTS:  Justice Alito.

10             JUSTICE ALITO:  Mr. Pattillo, could I

11   ask you about the practicalities of -- of this

12   case.  Have some of the money in question here

13   already been distributed to the victims of this

14   scheme?

15             MR. PATTILLO:  Yes.  My understanding

16   is that around 500 million dollars has been

17   distributed.

18             JUSTICE ALITO:  If we rule in your

19   favor, what will happen with respect to those

20   individuals?  Will they be required to return

21   that money?

22             MR. PATTILLO:  I honestly don't know.

23   I would be surprised if -- if that is the

24   result.  One option would perhaps be for -- the

25   Commission would have to repay us out of -- out

```
 1      of the federal Judgment Fund, which, you know,

 2      is a reservoir that exists for paying

 3      liabilities of the United States.  I suppose it

 4      would be up to the Commission to decide whether

 5      the United States bears the burden of its error.

 6              JUSTICE ALITO:  What is the

 7      relationship between the -- the order in

 8      question here and the forfeiture order that was

 9      issued in the Southern District of New York in

10      Tucker's criminal case?  There, he was, as I

11      understand it, required to return 3 billion

12      dollars.  Is that -- does that encompass the

13      amount of money that's involved here?

14              MR. PATTILLO:  There is -- my

15      understanding is that there is some overlap

16      between the assets that were at issue.  I mean,

17      it -- Mr. Tucker just had -- had one pool of --

18      of resources, and to date, my understanding is

19      that the Commission and the Southern District

20      have been divvying up the different

21      responsibilities.

22              But it's also worth noting here that

23      the order in this case encompasses --

24      encompasses money paid by innocent parties, such

25      as Mrs. Tucker and Park 269, which were never
```

1    alleged to have been -- and that amount is over
2    27 million dollars.  They were never alleged to
3    have participated in any wrongdoing.  And so
4    those assets certainly couldn't be subject to
5    the criminal forfeiture as well.
6         JUSTICE ALITO:  Let me turn back
7    briefly to basically the same question that the
8    Chief Justice asked.  If -- I mean, most of the
9    members of Congress are not lawyers.  That was
10   true when this provision was enacted.  And even
11   those who were lawyers, perhaps like me, never
12   heard the word "equity" when they were in law
13   school.
14        So suppose one of those members said,
15   well, here, we're going to authorize the
16   Commission to seek an injunction, so I'm going
17   to look at the most recent edition of Black's
18   Law Dictionary, which defines an injunction in
19   part as "a judicial process operating in
20   personam and requiring a person to whom it is
21   directed to do or refrain from doing a
22   particular thing."
23        If the member read that definition,
24   wouldn't they think that it would authorize
25   exactly what was done here?

```
 1              MR. PATTILLO:  Perhaps there --

 2    injunctions are broad and flexible, and,

 3    certainly, as -- as the Court explained in

 4    Great-West, with lawyerly inventiveness, just

 5    about any order could be framed in terms of

 6    injunction -- of an injunction.

 7              But this Court has held that it --

 8    it's not just what Black's Law Diction --

 9    Dictionary says.  It's how the terms are

10    traditionally understood in equity.  And

11    permanent injunctions traditionally exclude

12    monetary relief as compensation for past harm.

13              JUSTICE ALITO:  All right.

14              MR. PATTILLO:  The fact that the

15    Commission --

16              JUSTICE ALITO:  Thank -- thank you.  I

17    -- I think --

18              CHIEF JUSTICE ROBERTS:  Justice --

19              JUSTICE ALITO:  -- my time has

20    expired.

21              CHIEF JUSTICE ROBERTS:  -- Justice

22    Sotomayor.

23              JUSTICE SOTOMAYOR:  Counsel, you argue

24    that there would be no reason for Congress to

25    provide for monetary remedies under Section 19
```

1    if the FTC could obtain disgorgement under

2    13(b).  But it makes sense to me that the FTC

3    might sometimes want to establish new rules

4    through agency adjudications that are binding on

5    absent parties and to which courts will defer.

6         So the more important question for me

7    is -- and I hope you can answer it -- is, why

8    would Congress authorize the FTC to seek a

9    permanent injunction if no other equitable

10   remedies were available?  It seems that under

11   your understanding of the statute, why would the

12   FTC ever pursue a permanent injunction under

13   13(b) rather than a cease-and-desist order that

14   could lead to monetary relief?  It could --

15        MR. PATTILLO:  The answer is that --

16        JUSTICE SOTOMAYOR:  Go ahead.

17        MR. PATTILLO:  -- sometimes -- I'm

18   sorry.  The answer is that 13(b) is a -- it's a

19   narrow supplement to the overall FTC Act, which

20   is -- which almost every other single provision

21   is about or in service of administrative

22   processes.  13(b) exists for situations where

23   there is threatened or ongoing harm, and it

24   allows the Commission to come to court to stop

25   the conduct quickly --

1          JUSTICE SOTOMAYOR:  But it could do
2     that --
3          MR. PATTILLO:  -- in order to get --
4          JUSTICE SOTOMAYOR:  -- it could do
5     that with a temporary injunction, and so it
6     doesn't need to do it with a permanent
7     injunction.  And if it's barred from getting
8     permanent relief and remedies, why would it ever
9     seek a permanent injunction?
10          MR. PATTILLO:  It would -- it just --
11     if it -- if -- there's no need if it's a routine
12     case where the agency doesn't need to
13     pronounce -- as is its statutory obligation, to
14     define whether or not -- apply its expertise and
15     define whether particular conduct is prohibited.
16     The -- the permanent injunction path through
17     district court might be a -- a quicker and more
18     expedient remedy.
19          But the fact is that the -- the Act's
20     prohibitions are broad and general.  And
21     Congress made agency processes the primary
22     enforcement mechanism, and its job is to
23     apply its expertise --
24          JUSTICE SOTOMAYOR:  So why -- why even
25     give it a permanent injunction when it wasn't,

1    according to your reading, able to recover

2    anything else under that process?

3            It could always do a temporary

4    injunction and stop impend -- and stop impending

5    harm that way and then always have to pursue

6    administrative process to get monetary relief.

7    It makes no sense to me.

8            MR. PATTILLO:  Because sometimes that

9    would be -- that would be good enough.

10   Sometimes just stopping the conduct is a

11   sufficient remedy in and of itself.  There won't

12   always need to be consumer redress in every

13   case.  And, in fact, you know, for most of

14   the -- most of the FTC's early history, it had

15   no authority to seek consumer redress whatsoever

16   until it was enacted in -- in Section 19.

17   Stopping the conduct was its primary

18   responsibility.

19           CHIEF JUSTICE ROBERTS:  Justice Kagan.

20           JUSTICE KAGAN:  Mr. Pattillo, I'd like

21   to go back to the Chief Justice's first

22   questions about which approach we're supposed to

23   use, our old approach, which was very liberal in

24   finding rights and remedies, or our new

25   approach, which is decidedly not.

19

```
1          And you said, well, Alexander v.
2    Sandoval, and the Chief asked you to put that --
3    the Chief Justice asked you to put that aside.
4    And I'd like you to put that aside as well.  I
5    think it's at least arguably very different.
6          Do you have a -- a theoretical
7    argument for why it is that we should be using
8    the new approach?  Because I would have thought
9    that the whole idea behind the new approach is
10   that what matters most is what Congress thinks
11   about a question, not what the Court thinks
12   about it, and that that would suggest, well,
13   we're supposed to be looking at what Congress
14   thought in 1973 given the backdrop of all of our
15   precedents.
16          MR. PATTILLO:  Well, as I mentioned,
17   the -- the words of the statute are the law.
18   The words of the statute tell you what Congress
19   intended.  And even under the old approach, what
20   -- if we're trying to discern whether Congress
21   thought that -- you know, that "injunction"
22   actually meant all relief, all we need to know
23   is that at the same time that Congress enacted
24   13(b) it also enacted Section 5(l).  And at that
25   time --
```

```
1              JUSTICE KAGAN:  So that --
2              MR. PATTILLO:  -- it expressly
3      authorized --
4              JUSTICE KAGAN:  -- that's an argument
5      -- I mean, that's an argument on a different
6      point, the point about what Congress would have
7      understood back then, but -- but I take that to
8      be assuming my premise, which is that the very
9      issue is -- I mean, that the thing we're
10     supposed to be figuring out is what Congress
11     would have assumed back then, isn't it?
12             MR. PATTILLO:  Yes, but I think we --
13     in -- in under -- in trying to think what
14     Congress understood about Porter and Mitchell,
15     we have to look at what else Porter and Mitchell
16     said, and notwithstanding Porter and Mitchell's
17     broad language, Congress also would have known
18     that Porter and Mitchell said you have to look
19     at the entire statute --
20             JUSTICE KAGAN:  Well, in -- in just --
21             MR. PATTILLO:  -- and you have to see
22     the --
23             JUSTICE KAGAN:  Sorry, Mr. Pattillo.
24     In -- in -- in -- in just two years before
25     Congress enacted this legislation, the Second
```

1    Circuit, you know, obviously, an important

2    circuit when it comes to these matters, held

3    that the FTC had power to seek restitution

4    because its statute said that the agency could

5    seek an injunction, the exact same question as

6    is -- as -- as we're confronting.

7         And the Second Circuit relies on

8    Porter, relies on Mitchell, relies on all the

9    old cases that you say are distinguishable, and

10   -- and said yes, an injunction includes

11   restitution according to Supreme Court law on

12   the subject.

13        So doesn't that suggest that the FTC

14   has a pretty good point about what Congress

15   understood in 1973?

16        MR. PATTILLO:  No, I don't think so.

17   If -- if the -- if Congress were looking to what

18   Porter held, Porter acknowledged that it was

19   looking to see whether an implied remedy was

20   consist -- it had to look and see if the implied

21   remedy was consistent with the statutory scheme.

22   And Porter found that even though there was

23   nothing that precluded an implied restitution

24   remedy, it said, look, there is another section

25   of the Emergency Price Control Act and that

1    provision addresses damages.  So the fact that

2    the -- that the statute elsewhere mentions

3    damages supersedes the possibility that there

4    could be an implied damages remedy.

5              JUSTICE KAGAN:  Thank you, Mr.

6    Pattillo.

7              MR. PATTILLO:  So, if Congress wanted

8    --

9              JUSTICE KAGAN:  Thank you very much.

10              CHIEF JUSTICE ROBERTS:  Justice

11    Gorsuch.

12              JUSTICE GORSUCH:  Good morning,

13    counsel.  I'd like your help with a -- a

14    line-drawing problem.  I -- I -- I think you

15    agree that an injunction can be used to provide

16    certain forms of equitable relief, including

17    restitution perhaps, an accounting, requiring a

18    freezing of assets, or handing over a thing of

19    value, but -- but it's -- it -- it can't go this

20    far.

21              How would you have us draw that line

22    and describe it?

23              MR. PATTILLO:  I think it's a -- I

24    think it's a fairly simple line, and we can look

25    to how Justice Story described it.  There's a

23

1    difference between -- there's a difference

2    between the initial determination as to who owns

3    the property, whether property should be

4    returned, and that principle is articulated in

5    terms of other equitable doctrines, such as

6    restitution.

7              Now there were instances in the past,

8    and these were, you know, more the -- certainly,

9    more the exception than the rule, where an

10   injunction might use -- be used to enforce that

11   prior decree, where -- where someone had already

12   been given the award of restitution that

13   determines the property right.

14             And then, if there was some other

15   reason why an additional coercive remedy was

16   needed, the injunction might issue to force

17   that.  As Justice Story explained in his

18   treatise, that type of injunction was issued

19   "after a decree in the nature of an execution to

20   enforce the underlying decree."  And that's

21   completely different from what the Commission

22   seeks here.

23             The Commission doesn't seek to use an

24   injunction to enforce a right to restitution.

25   It doesn't have a right to restitution under

```
 1    13(b).  It -- it's trying to -- to bootstrap
 2    that.  And so I -- I think that the distinction
 3    at equity was actually pretty clear.
 4              JUSTICE GORSUCH:  Thank you, counsel.
 5              CHIEF JUSTICE ROBERTS:  Justice
 6    Kavanaugh.
 7              JUSTICE KAVANAUGH:  Thank you, Chief
 8    Justice.
 9              And good morning, counsel.  Your
10    argument here is strikingly similar to the
11    argument advanced in the dissent in Porter by
12    Justice Rutledge, joined by Justices Reed and
13    Frankfurter, and the dissent in Mitchell written
14    by Justice Whittaker, joined by Justices Black
15    and Clark.
16              The Rutledge dissent, Justice Rutledge
17    dissent in Porter, for example, said "Congress
18    could not have been ignorant of the remedy of
19    restitution.  It knew how to give remedies it
20    wished to confer.  There was no need to add this
21    one, nor do I think it did so.  It did not give
22    it expressly."  That kind of argument.
23              What do we do with Porter and Mitchell
24    if we decide this case in your favor?  In other
25    words, how should we write the opinion with
```

1    respect to those cases?

2            MR. PATTILLO:  This Court doesn't need

3    to overrule Porter and Mitchell any more than it

4    needed to do so in Meghrig, which held that in

5    the context of RCRA, "injunction" did not mean

6    all equitable relief.

7            Neither Porter nor Mitchell involved a

8    statute with the three features that I mentioned

9    at the outset.  In neither case did Congress

10   elsewhere authorize an injunction and other and

11   further equitable relief, making it clear that

12   Congress didn't presume that an injunction

13   carried with it all equitable relief.

14           Neither Porter nor Mitchell addressed

15   a statute limited to ongoing or threatened

16   violations, which is the sort of thing that an

17   injunction would address but is totally

18   inconsistent with backwards-looking monetary

19   relief.

20           And neither statute in Porter or

21   Mitchell provided the very same monetary relief

22   in a separate provision -- here, that's Section

23   19 -- subject to various protections like a

24   statute of limitations that would be rendered

25   entirely meaningless if the Commission could

1    implicitly get the same relief under 13(b)

2    instead.

3           So Porter and Mitchell are entirely

4    distinguishable based on the statutory scheme.

5           JUSTICE KAVANAUGH:  And picking up on

6    one of Justice Breyer's questions, when you have

7    the combination of Porter and Mitchell plus some

8    maybe broad, you would say too tangential, but

9    some Congressional ratification argument, and

10   all the court of appeals for a number of years

11   interpreting it in the FTC's favor, at some

12   point, does all that combine, do you think, to

13   get us to a point of leave well enough alone?

14          I mean, certainly, stability in the

15   law is important.  And when you have Porter and

16   Mitchell plus ratification plus courts of

17   appeals, at some point, does that kick in?

18          MR. PATTILLO:  I -- I don't think so.

19   Long-standing error doesn't make it any less

20   error.  The statute is still the statute, and

21   now that the issue is before this Court, it's

22   the Court's duty to give the correct

23   interpretation of the statute, notwithstanding a

24   long history of error.

25          JUSTICE KAVANAUGH:  Thank you.

```
 1              CHIEF JUSTICE ROBERTS:  Justice
 2    Barrett.
 3              JUSTICE BARRETT:  Counsel, let's say
 4    that we agree with you about 13(b).  Your
 5    client, I don't understand you to be arguing
 6    that he has clean hands.  I mean, he's been
 7    convicted.  He has the dubious distinction of
 8    being the subject of an episode of "Dirty Money"
 9    on Netflix.
10              But you -- you suggested in your brief
11    that because of the safeguards of Section 19, in
12    particular, you know, the -- the reasonable man
13    standard, knowing and understanding that the
14    conduct was deceptive, that the FTC couldn't
15    have gotten a monetary remedy from him under 19.
16              So is -- is it your position that if
17    we adopt your view, there's no way for the FTC
18    to get the ill-gotten gains back from someone
19    who has violated the law like your client?
20              MR. PATTILLO:  I'm sorry, I didn't
21    mean to suggest that the FTC could not have
22    proven its case under Section 19, although I --
23    I do think there is a substantial question about
24    that.
25              In the -- in Judge Bea's dissent in
```

1      the decision below, he noted that, you know, the

2      three judges on the Ninth Circuit have looked at

3      the disclosures and they thought that they were

4      accurate and they were not deceived by that.

5              But notwithstanding that, the fact is

6      that, you know, the decision here doesn't just

7      affect my client, it doesn't just affect, you

8      know, payday lenders.  As our amici, the

9      Chamber, has pointed out and as, you know,

10     this -- the sweep of the FTC Act is about as

11     broad as you can get, reaching into every single

12     area of commerce, and it's precisely because the

13     prohibitions of the Act are so broad and general

14     that it's important to hold the Commission to

15     its primary responsibility of, you know, telling

16     businesses what the law is prospectively instead

17     of running to court instead, you know, trying to

18     seek retrospective monetary relief.

19             JUSTICE BARRETT:  Thank you, counsel.

20             CHIEF JUSTICE ROBERTS:  A minute to

21     wrap up, Mr. Pattillo.

22             MR. PATTILLO:  The question here is

23     whether 13(b)'s reference to "permanent

24     injunction" means permanent injunction or

25     whether it instead means all equitable relief

 1    and money for past harms.

 2              The three features of the Act that

 3    I've discussed confirm that "injunction" is

 4    limited to an injunction as that term was

 5    traditionally understood.

 6              To be any clearer, Congress would have

 7    to take the absurd step of saying, and by

 8    "injunction," we mean only injunction, not other

 9    remedies.  But this Court does not impose and

10    never has imposed any such requirement.

11              The FTC Act, moreover, is striking in

12    its consistent focus on agency processes to

13    prospectively define prohibited conduct.  Yet,

14    under the Commission's view, the single

15    sentence, second-level proviso in 13(b)

16    authorizing permanent injunctions is virtually

17    all the statute it needs.

18              The Commission can get all the

19    injunctions and monetary relief it wants without

20    the burdens of the administrative processes that

21    were its very reason for being.  That cannot be

22    right.  The Court should return the Commission

23    to the limits that Congress placed on its

24    authority.

25              CHIEF JUSTICE ROBERTS:  Thank you,

Official - Subject to Final Review

30

1   counsel.

2          Mr. Marcus.

3          ORAL ARGUMENT OF JOEL R. MARCUS

4            ON BEHALF OF THE RESPONDENT

5          MR. MARCUS:  Thank you, Mr. Chief

6   Justice, and my it please the Court:

7          The Petitioners are asking you to rule

8   that when Congress allowed the Commission to

9   enforce the FTC Act in federal court, it

10  intended that the Court would merely stop the

11  violations while letting the violator keep his

12  stolen money.

13         Such a ruling would radically depart

14  from the foundational principle of equity

15  recognized just last term in Liu that wrongdoers

16  should not profit from their own wrongdoing.

17         It would also profoundly deviate from

18  the understanding of injunctive remedies that

19  was embedded in the law when Congress enacted

20  Section 13(b), as many of the Court's questions

21  have recognized.

22         Courts of equity have recognized since

23  before the founding that the equitable power to

24  issue an injunction inherently includes the

25  power to order the return of unlawful gains.  As

1    the Court summed it up in Porter, nothing is

2    more clearly the subject of a suit for an

3    injunction than the recovery of that which has

4    been illegally acquired and which has given rise

5    to the necessity for injunctive relief.

6            Sections 19 and 5(l) of the Act, which

7    provide remedies when the Commission chooses to

8    enforce the Act administratively, do not create

9    an unmistakable inference that Congress intended

10   to limit traditional equitable powers when the

11   Commission chooses instead to proceed in court.

12   Section 19 expressly says otherwise in the

13   savings clauses.  Section 5(l) serves a

14   fundamentally different role in the Act than

15   Section 13(b), and its language reflects its

16   function.

17           A cease-and-desist order works like a

18   prohibitory injunction.  Congress therefore had

19   to specify the additional remedies it wanted for

20   a violation.  It did not need to do that in

21   Section 13(b) but could instead invoke its

22   understanding of the traditional equitable

23   powers of injunction without the need for

24   elaboration.

25           Together, the -- Sections 9 --

1    Sections 13(b), 19, and 5(l) work in harmony to

2    give the Commission a choice between effective

3    enforcement pathways that can provide meaningful

4    relief to victimized consumers.

5         CHIEF JUSTICE ROBERTS:  Counsel, a lot

6    of the cases you -- you cite in support of a

7    broad reading of injunction -- injunction and

8    equitable powers -- in fact, I think most of

9    them involve courts, not agencies.  And -- and

10   courts have broad inherent equitable power.  You

11   -- you don't sort of parse and construe their

12   authority very carefully, at least I don't think

13   so.  But this involves an agency, and an agency

14   only has the authority delegated to it by

15   Congress.  And I'm not sure we can assume that

16   those precedents involving courts apply so

17   smoothly in the context of an agency.

18        MR. MARCUS:  Well, certainly, the

19   agency has whatever power Congress has accorded

20   it, which is exactly why Congress had to be more

21   specific when it was talking about remedies for

22   the agency's own adjudicatory orders.

23        But Section 5 -- I'm sorry, Section

24   13(b) says the Commission may seek and the court

25   may grant a permanent injunction.  So what

1    Congress is saying there is that the Commission

2    can invoke the courts' equitable authority.  And

3    that then puts the issue squarely within the

4    courts' authority, as you just alluded to.

5           CHIEF JUSTICE ROBERTS:  Well, I'm not

6    sure that follows.  I mean, "the agency can seek

7    and the court can enforce" doesn't mean that the

8    same authority that a court has the agency has;

9    just that the court can enforce whatever

10   authority the agency has.

11          MR. MARCUS:  It doesn't say "enforce";

12   it says "grant."  And the court can enforce

13   under a different provision, Section 5, the

14   Commission's own orders.  But what Section 13(b)

15   is doing is it's giving the Commission the

16   ability to go to court to seek the relief that a

17   court can grant.  This is no different than what

18   the price administrator did in Porter or the

19   Department of Labor in --

20          CHIEF JUSTICE ROBERTS:  The -- your

21   friend on the other side makes the point that

22   "injunction" appears in the United States Code

23   throughout the code hundreds of times.  And is

24   your position that, whenever it does, a broader

25   range of equitable powers is conferred on an

1    agency?

2          MR. MARCUS:  Well, again, it's not

3    that the power is conferred on the agency; it's

4    that the court has inherent powers.  Now, in --

5    in many cases, it -- it may be appropriate in --

6    in conjunction with an injunction to engage in

7    other types of equitable remedies, but it's not

8    always appropriate.  These are case-by-case

9    determinations.

10          CHIEF JUSTICE ROBERTS:  Thank you,

11    counsel.

12          Justice Thomas.

13          JUSTICE THOMAS:  Thank you, Mr. Chief

14    Justice.

15          Mr. Marcus, Section 13(b)(1) says that

16    whenever the Commission has reason to believe

17    that a person, partnership, or corporation is

18    violating or is about to violate any provision

19    of law.  That seems to suggest that that

20    provision is focused on forward-looking,

21    preventing a -- a future or a present action.

22          It seems that what you're doing here

23    is using it for something that has already

24    happened.  Would you be kind enough to reconcile

25    your approach with the language of 13(b)?

1          MR. MARCUS:  I'd be happy to, Justice

2     Thomas.  "Is or is about to" echoes the standard

3     for the grant of an injunction.  For example,

4     the -- typically, an injunction requires there

5     to be ongoing or expected conduct, and -- but,

6     once the court's equity jurisdiction has been

7     properly invoked, the court can order associated

8     remedial relief.  And that's what happened in

9     all of the 19th Century intellectual property

10    cases.  And, in fact, in the Root case in

11    particular, the Court said your injunction --

12    I'm sorry, your patent has expired.  Therefore,

13    you can't seek an injunction and you cannot get

14    a naked monetary remedy.

15          But, here, there was ongoing conduct

16    at the time the FTC sued.  The court granted an

17    injunction.  And the question is, once the court

18    has had its authority triggered, once the court

19    has exercised that authority, can it also engage

20    in the traditional mechanisms of injunctive

21    relief?  And I think the answer in centuries of

22    law is pretty clear.

23          JUSTICE THOMAS:  Would you just take a

24    minute and explain again why -- from my

25    perspective, it seems as though what you're

```
 1    doing here fits more comfortably under Section
 2    19.  But would you explain why the Commission
 3    chooses to use Section 13 rather than Section 19
 4    again?
 5              MR. MARCUS:  Certainly.  Well, it --
 6    for one thing, it is easier to use Section 13 in
 7    many respects than it is in Section 19.  But,
 8    also, there are many cases where it doesn't take
 9    a lot of Commission expertise to explain why a
10    particular act is deceptive.  And, here,
11    certainly, it did not take the agency or even
12    the U.S. Attorney's Office for that matter to
13    explain to Scott Tucker that misleading people
14    about the terms of their loan was a deceptive
15    act.  So, when the Commission feels that it
16    doesn't need to expound on the -- the meaning
17    and boundaries of the FTC Act, it can bring
18    cases under Section 13.
19              Now, keep in mind, when it does that,
20    it gives up a bunch of stuff.  It gives up the
21    ability to find its own facts.  It gives up the
22    somewhat broader remedies that Section 19
23    allows, including -- Section 19 allows us to sue
24    in state court, as well as federal court.
25              And so each -- it's a little bit like
```

1    the choice between rulemaking and adjudication

2    in, you know, Bell Aerospace.  Congress wanted

3    the Commission to have flexibility to choose

4    between enforcement pathways.  They both --

5              CHIEF JUSTICE ROBERTS:  Justice

6    Breyer.

7              JUSTICE BREYER:  History matters.  I

8    think Justice Brandeis, when he started, was

9    faced with a business community that was very

10   suspicious of the FTC's power and thought it

11   would be abused and a progressive community that

12   thought it's absolutely necessary to bring bad

13   business practices under control.  So they

14   compromised.

15             The compromise was you've got to do

16   what the FTC says, but before it tells you to do

17   something, it will find that what you're doing

18   now is wrong.  It will find that.  It will be a

19   cease-and-desist order, later expanded under

20   Moss-Magnuson, I think, to include violation of

21   a rule.

22             So Section 5, cease-and-desist order

23   or violation of a rule, ha, damage of some kind.

24   Nineteen, the same thing.  And now we have right

25   in the middle 13, no protection like that

1    whatsoever.  Do not worry, says the FTC, we will

2    only use it in exceptional cases.

3         Ha!  In 2012, they repeal that.  And

4    now, 10 years later, after this has been in

5    effect for a few years, I read that 100 cases

6    under this provision are in the courts, compared

7    with 10 or 12 under the regular cases.

8         And you say it's just obvious, we're

9    going to get those people who think their bad

10   conduct is obvious.  Look at Skechers.  Look at

11   the Cardinal case.  Go back to the famous Unburn

12   case.  Add substantiation.

13        People wouldn't know that it is an

14   unfair practice that a chiropractor who was

15   married to a wife who had some income from the

16   company and therefore is a conclusion as to the

17   muscle toning of the company should be

18   discounted.  And that's the kind of case they're

19   bringing now.

20        Now do you see my point?  On the one

21   hand, it's well-established law in the lower

22   court.  On the other hand, if we interpret it

23   your way, we -- we -- we say your fears,

24   business community, were absolutely right.  It

25   is now up to the FTC.  Before you know the thing

1    is wrong, they hit you with bad damages.

2              This case?  Perhaps you're right.  But

3    Skechers, Cardinal, even Unburn, build strong

4    bodies eight ways, that was Wonder Bread.  They

5    only did it six ways.  I mean, you see, it's

6    giving the FTC -- that -- that -- you get my

7    point.  Now I'd like to hear an answer.

8              MR. MARCUS:  I do get your point,

9    Justice Breyer, and the answer is that in 1914,

10   when the -- when the Commission was created,

11   there was a bargain struck.  And in 1973, when

12   consumer fraud became rampant in the economy and

13   people were complaining about the toothless FTC,

14   there was a new bargain struck where the

15   Commission could go into court and seek remedies

16   in court as a litigant in the first instance.

17             Courts are, of course, bound by

18   principles of constitutional due process and

19   notice.  And if the court concludes that the --

20   that the chiropractor couldn't possibly

21   understand what was required of him, it will

22   find that a remedy is not available.

23             Many of the cases that you're

24   referring to, though, Justice Breyer, actually

25   involve settlements that were made with the

1    Commission in the course of administrative

2    proceedings.  These things do get complicated.

3    But those are companies that agreed to settle.

4              CHIEF JUSTICE ROBERTS:  Justice Alito.

5              JUSTICE ALITO:  In answer to Justice

6    Thomas's question, well, his -- your answer to

7    Justice Thomas's question leads me to ask this:

8    If the activity here had ceased before this

9    order was entered, would the court have been

10   able to enter it?

11             MR. MARCUS:  Well, so, if the activity

12   had ceased and it was -- there was no

13   possibility that it could have resumed again,

14   then the answer is typically no.  Of course,

15   there are some people who, when the FTC starts,

16   you know, inquiring about them, they stop for

17   the time being, only to resume again later.  But

18   if they --

19             JUSTICE ALITO:  And why would Congress

20   -- why would Congress draw that line?  Why would

21   it provide a -- a -- a restitution remedy when

22   there is still ongoing activity but no

23   restitution remedy when all of the harm has

24   already been completed?

25             MR. MARCUS:  Well -- well, because the

1    -- the remedy goes along with the injunctive

2    remedy.  It's inherent in the injunction that

3    the court can issue.  And that's what the

4    Congress has traditionally done.  It's what it

5    did in the 19th Century patent and copyright

6    cases.

7              JUSTICE ALITO:  What would be the

8    policy -- what would be the policy justification

9    for doing that?  Why would Congress draw that

10   line?

11             MR. MARCUS:  I can't tell you why

12   Congress would want to have a less-than-complete

13   remedy, but it's -- it's something that Congress

14   does quite often.  It does -- it's still to this

15   day in the Securities and Exchange Act cases.

16   It requires -- it -- there is an about to

17   requirement -- before they can get the equitable

18   relief.

19             JUSTICE ALITO:  We asked Mr. Pattillo

20   questions about how this provision would have

21   been understood in 1973.  His brief cites

22   comments made by a former FTC official,

23   Mr. FitzGerald, that addresses that directly,

24   and they are pretty damaging to your position.

25             Mr. FitzGerald says that when 13(b)

1    was enacted, nobody on the Commission imagined

2    that it would become an important part of its --

3    the Commission's consumer protection program.

4            But the Commission decided that

5    Section 19 was too time-consuming, so it

6    wanted -- it looked for a workaround, and

7    "neither the text of 13(b) nor its legislative

8    history disclosed a basis to argue for broad

9    equitable relief.  The Commission's attorneys

10   thought these arguments were not going to

11   succeed, but, to their surprise, they were

12   successful."

13           And you don't say anything about

14   Mr. FitzGerald.  Do you want to say something

15   about him now?

16           MR. MARCUS:  I'd be happy to, Justice

17   Alito.  Mr. FitzGerald, for one thing, is not

18   Congress.  So the question is what Congress

19   understood.  And there was a huge body of law

20   indicating that Congress understood what it was

21   doing.

22           But, beyond that, what

23   Mr. FitzGerald's article does indicate is that

24   in the 1970s, at the time when people were

25   complaining that the FTC was lackadaisical about

1    enforcement, the Commission's mindset was all

2    about rulemaking, making broad rules to govern

3    large industrial sectors, and it did take a

4    little while for the Commission's mindset to

5    change from a rulemaking to an enforcement

6    perspective.

7            But, once it did, it vigorously

8    started invoking Section 13(b), and, as has been

9    pointed out by the questioning, courts for 40

10   years now have accepted those things.  And

11   before the FTC even did this, courts had been

12   accepting the exact same arguments in the SEC

13   context.

14           JUSTICE ALITO:  All right.  Thank you.

15           CHIEF JUSTICE ROBERTS:  Justice

16   Sotomayor.

17           JUSTICE SOTOMAYOR:  Counsel, how do

18   you explain Section 5(l), which was passed at

19   the same time as Section 13(b) and separately

20   authorizes mandatory injunctions and further

21   equitable relief?

22           Why would Congress use a different

23   language for injunctive relief in one section

24   and just stop at "injunctive relief" and in the

25   other add "and further equitable relief" in a

1    different section?

2            MR. MARCUS:  Well, the textual

3    differences in the two provisions reflect their

4    functional differences.  Section 5(l) is used to

5    enforce cease-and-desist orders, the

6    administrative orders, and -- and so there

7    already basically is an injunction on the books,

8    and it's an injunction that doesn't come with

9    any traditional remedies.  So Congress had to

10   say exactly what remedies it wanted.  And that's

11   why it's limited to mandatory injunctions and

12   other equitable relief.

13           But, in Section 13, Congress didn't

14   need to do that.  It could rely on, could

15   piggyback on, all of the traditional remedies

16   inherent in a permanent injunction, which is

17   different from a mandatory injunction.  And so,

18   you know, you could look at it that, in fact,

19   what Congress wanted to make sure of was that,

20   no matter how the Commission proceeded, whether

21   it proceeded by administrative, by a

22   cease-and-desist order, or whether it went into

23   court as a litigant, that each time consumers

24   were harmed they would have the opportunity to

25   get redress for their victimization.

1          JUSTICE SOTOMAYOR:  Now I'm following
2     up slightly on Justice Alito's question.
3     Legislative history is not unimportant to me.
4     What am I to make of the fact that I saw nothing
5     in the history of this bill suggesting that
6     Congress understood that Section 13(b)
7     authorizes monetary awards?
8          Quite to the contrary, the prior
9     version of what became Section 19 triggered
10    extensive debate because there wasn't money
11    damages available, and Section 19 was passed to
12    remedy what was perceived as a fault in the bill
13    as it existed.
14          So what am I missing in terms of the
15    absence of anything to do with this issue before
16    Congress?
17          MR. MARCUS:  Well, you are correct,
18    Justice Sotomayor, that the legislative history
19    does not -- 13(b) itself does not explicitly
20    address money.  But there is a presumption that
21    Congress legislates against the backdrop of the
22    law.  And the backdrop of the law of injunction
23    really couldn't be clearer.
24          Now, when it comes to Section 19, the
25    debate about monetary remedies in Section 19 had

46

1     to do with the Commission's own ability to order

2     monetary remedies in its own administrative

3     processes as part of a cease-and-desist order.

4     The -- as Section 19 was being debated, the

5     Ninth Circuit ruled in the Heder case, which is

6     cited in our brief, that the Commission could

7     not order monetary remedies in its own

8     proceedings, and that's why money was front and

9     center in Congress's mind.  But it --

10          CHIEF JUSTICE ROBERTS:  Justice Kagan.

11          JUSTICE KAGAN:  Mr. Marcus, it seems

12    to me that the best argument against your

13    position, and -- and it's a strong one, comes

14    from Section 5 and Section 19, which have these

15    protections in them that Section 13 do not, that

16    there has to be a repeated violation, that there

17    has to be a certain kind of mens rea and so

18    forth.

19          And -- and it -- it does seem as

20    though your interpretation of Section 13 makes

21    those pretty much entirely irrelevant.  I mean,

22    you say, well, this is a choice.  There are two

23    pathways of different kinds of administrative

24    action.

25          But what -- what -- what seems

1   significant about those two pathways as you've

2   led them -- as you've laid them out, is that one

3   is so clearly better from the agency's

4   perspective.  And so I'm wondering if that's the

5   kind of choice that Congress really gave to the

6   agency.

7            MR. MARCUS:  Well, Justice Kagan, the

8   -- I think that the core of the answer goes back

9   to what Justice Breyer was describing in his

10  answer to me, which was a fear of Congress that

11  an agency would have too much power, and if

12  Congress gave the Commission the ability to

13  address economy-wide practices in -- in -- under

14  fairly broad terms, and it was concerned that

15  the agency was going to declare novel practices

16  to be deceptive or unfair or anticompetitive.

17           And so Congress was understandably

18  concerned and, therefore, included procedural

19  protections in -- you know, in -- in the

20  provisions regarding relief for agency

21  processes.  But what it --

22           JUSTICE KAGAN:  It seems as though

23  that's exactly why we should maintain the

24  integrity of those protections rather than your

25  interpretation, which essentially makes them

```
 1    irrelevant.  It was nice that Congress once
 2    thought that, but we don't have to deal with
 3    that anymore.
 4         MR. MARCUS:  It -- it doesn't make
 5    them irrelevant.  It just makes one pathway more
 6    attractive in certain instances than another,
 7    but, if the Commission does encounter a novel
 8    practice or if the Commission wishes to make its
 9    own fact-finding in -- in particularly
10    complicated cases or difficult cases, then it
11    can do that only in the administrative pathway.
12         So it's not just a -- it's not just a
13    freebie.  The Commission has to give something
14    up when it decides to go to federal court.  It
15    just so happens that, you know, there's a lot of
16    cases that we deal with that are not
17    particularly complicated and that do not require
18    a lot of explanation of what deception is.
19    There are scams that run amok all over the
20    place.
21         JUSTICE KAGAN:  If you could --
22         MR. MARCUS:  It's happening right now.
23         JUSTICE KAGAN:  Just going back to
24    Justice Breyer's numbers, I mean, can you give
25    me any sense of the empirics of this, how often
```

1    the FTC uses the cease-and-desist order route as

2    opposed to the go-to-court route?

3              MR. MARCUS:  I don't have exact

4    numbers for you, Justice Kagan, but, in most

5    antitrust cases, the Commission uses the

6    administrative route.  Of -- in at least several

7    cases a year, the Commission uses the

8    administrative route in consumer protection

9    cases, but there's no question that the agency

10   brings far more cases in court than it does in

11   the administrative process.

12             CHIEF JUSTICE ROBERTS:  Justice

13   Gorsuch --

14             MR. MARCUS:  But, again, that largely

15   reflects the --

16             CHIEF JUSTICE ROBERTS:  Justice

17   Gorsuch.

18             JUSTICE GORSUCH:  Oh, counsel, finish

19   your answer.  I'm -- I'm interested.

20             MR. MARCUS:  Oh, thank you.  That

21   largely reflects the -- the kind of basic

22   deceptiveness of much of the stuff that we deal

23   with on the consumer protection side.

24             JUSTICE GORSUCH:  Well, let -- let's

25   focus on the consumer protection side because I

 1    think the antitrust side, there are a lot more

 2    standards out there that people are familiar

 3    with.  But -- but Justice Breyer really does

 4    remind us of -- of the history here.  The FTC

 5    was set up in part to enact rules about

 6    deceptive conduct.  It chose not to go that

 7    route, preferred an enforcement route.  And --

 8    and recognizing that a term like "deceptive

 9    practices" in Section 5 is not exactly

10    self-defining -- it may lack some of the

11    substance that we now have at least under the

12    Sherman Act in the antitrust context -- laid out

13    a bunch of protections in Section 19 before your

14    money can be taken away.

15          We've all kind of wandered around this

16    question, but is -- isn't -- I think our core

17    concern is you're rendering that -- those

18    protections superfluous, that there's very

19    little incentive for the agency to ever comply

20    with them, and it's just a -- another step away

21    from what Congress had anticipated would be a

22    regulatory regime that's never materialized.

23          MR. MARCUS:  Well, certainly, Justice

24    Gorsuch, Congress did seem to recognize the

25    issue, and that's why it included savings

Official Subject to Final Review

51

 1    clauses in Section 19.  You know, I -- I -- I

 2    don't see much other explanation for very broad

 3    provisions that clearly on their face say this

 4    is in addition to other remedies and you can't

 5    use the existence of this provision to interpret

 6    other remedies.

 7              JUSTICE GORSUCH:  Let -- let me put

 8    the question a different way:  What incentive

 9    does the Commission have today to use Section

10    19?

11              MR. MARCUS:  The -- the Commission has

12    the incentive that I discussed, which are if it

13    wishes to engage in its own fact-finding and

14    use -- and draw its own legal conclusions to

15    address novel conduct --

16              JUSTICE GORSUCH:  Yes, but it -- it's

17    inherently difficult, and Section 13 is so

18    comparatively easy.  What -- what incentive

19    remains to do that?  I know it can, but why

20    would it?  Just as it can come up with rules

21    defining what unfair trade practices are but --

22    but chooses not to do so.

23              MR. MARCUS:  Well, it -- well, it

24    does.  I mean, so it -- it doesn't do it as

25    often, but it does do it.  And so that proves

     1    that there are cases where the Commission thinks

     2    we need to take this one.  This one's difficult

     3    enough.  This one's uncertain enough.  This one

     4    requires our application of agency expertise,

     5    and the Commission has to give up all that when

     6    it goes to federal court.

     7            Now some would say that it's actually

     8    better to have a commission litigating cases in

     9    federal court than it is to have the Commission

    10    making broad-based rules that may apply to

    11    non-parties.

    12            JUSTICE GORSUCH:  Thank you, counsel.

    13            MR. MARCUS:  So --

    14            CHIEF JUSTICE ROBERTS:  Justice

    15    Kavanaugh.

    16            JUSTICE KAVANAUGH:  Thank you, Chief

    17    Justice.

    18            And good morning, Mr. Marcus.  Good to

    19    be with you again.  I want to pick up on Justice

    20    Alito's question and Mr. FitzGerald's article,

    21    which I've read.  You obviously put forward good

    22    arguments on Porter and the Court's precedent

    23    and Congress's intent, as well as the body of

    24    court of appeals cases, but it seems that the

    25    problem you have is the text.  And in that

1    sense, this case really is a separation of

2    powers case.

3          I -- I -- I worked in the Executive

4    Branch for many years, so I understand how this

5    happens.  When you're in the Executive Branch or

6    an independent agency, you want to do good

7    things and prevent or punish bad things, and

8    sometimes your statutory authority is

9    borderline.  And it could be war policy or

10   immigration or environmental or what have you,

11   but with good intentions, the agency pushes the

12   envelope and stretches the statutory language to

13   do the good or prevent the bad.

14         The problem is -- is it results in a

15   transfer of power from Congress to the Executive

16   Branch to decide whether to exercise this new

17   authority.  That's a particular concern, at

18   least for me, with independent agencies.  So --

19   now why isn't the answer here, for the agency to

20   seek this new authority from Congress, for us to

21   maintain the principle that separation of

22   powers, that the agency should stick to the

23   authority in the -- in the text and not -- and

24   not go beyond that?

25         A 30,000-foot question.  Interested in

1    your responses to that.

2             MR. MARCUS:  Well, so, again, the

3    question, the real question, is what was

4    Congress's intent when it gave the Commission

5    the authority to seek a permanent injunction in

6    federal court.  And if it intended to accord the

7    agency the -- the ability to go ask the court

8    for all of the inherent equitable remedies, then

9    I think that resolves your concern about

10   separation of powers issues.

11            And, you know, again, it -- it

12   couldn't be clearer that -- that Congress,

13   legislating against the backdrop of injunctions,

14   would have had the intent to accord all the

15   traditional equitable remedies.

16            And, you know, this is not a -- this

17   is not a new question.  Even, you know, in the

18   California versus American Stores cases we cite

19   in our brief, the Court held that "injunction"

20   as used in the Clayton Act indicates Congress's

21   intention that traditional principles of equity

22   govern the grant of injunction -- of injunctive

23   relief.

24            And so, you know, ultimately, I -- I

25   think the -- the -- your concern is a valid one

Official Subject to Final Review

1    but is resolved if you look at what Congress

2    would have understood the words to mean when it

3    used them.  And there was, in fact, a common

4    understanding of what "injunction" meant in

5    1973.

6              JUSTICE KAVANAUGH:  Appreciate it, Mr.

7    Marcus.  Thank you.

8              CHIEF JUSTICE ROBERTS:  Justice

9    Barrett.

10             JUSTICE BARRETT:  Counsel, the -- the

11   damages award here or the money at stake here

12   was 1.3 billion dollars and then the 27 million

13   dollars collected from Mr. Tucker's wife.  And

14   when Justice Alito asked Mr. Pattillo how much

15   of that had been distributed to the victims, he

16   said about 500 million dollars.  So I -- I take

17   it the rest of that is in the Treasury, or does

18   the FTC have it right now?

19             MR. MARCUS:  So I'm glad you ask that

20   question, Justice Barrett.  I will get you a

21   clarification on what Mr. Pattillo said because

22   the money that's actually been distributed from

23   consumers comes from a different defendant, not

24   Tucker, not Mrs. Tucker, not any of the

25   Petitioners before this Court.  It comes from a

```
 1   bank that settled separately with the government

 2   and agreed to a restitution remedy in the

 3   criminal case that the Justice Department then

 4   turned over to the FTC to distribute to

 5   consumers.  So none of that money is the

 6   judgment in this particular case.

 7           JUSTICE BARRETT:  So what happens or

 8   has happened to the judgment, the money flowing

 9   from the judgment, in this particular case?

10           MR. MARCUS:  So, right now, there's

11   some money that is being held in an account

12   separately for -- for redress should the

13   Commission ultimately wind up with the ability

14   to distribute --

15           JUSTICE BARRETT:  How much money --

16           MR. MARCUS:  -- that money.

17           JUSTICE BARRETT:  -- in that account

18   compared to the 1.3 billion?

19           MR. MARCUS:  I don't know the exact

20   number, but it's tens of millions.  It's a --

21   it's a lot of money.

22           JUSTICE BARRETT:  But this is what I'm

23   -- I'm getting at.  It seems to me that

24   equitable remedies attempt to restore the

25   plaintiff to the position in which the plaintiff
```

```
 1    stood before the plaintiff was defrauded.  This
 2    money isn't traceable back to the FTC, and the
 3    money that's gained isn't all being distributed
 4    to the plaintiffs.  So it seems like it
 5    functions almost more like a fine.  It doesn't
 6    really seem analogous to, say, restitution to
 7    me.
 8              MR. MARCUS:  Well, I -- I'm not sure
 9    that's quite correct, because the point here is
10    that it's a -- it's -- it's an equitable remedy
11    meant to restore the victims to the place that
12    they were in before they were ripped off, and --
13              JUSTICE BARRETT:  But, if the victims
14    don't get the money or if all the money is not
15    traceable to the victims, that -- then all the
16    money is not remedying that wrong.
17              MR. MARCUS:  Well, no, we know -- we
18    know who the victims were and we know how much
19    they were -- we know how much was stolen from
20    each of them.  It's just a matter of collecting
21    the money, figuring out from this case whether
22    we are allowed to give back the money, and then
23    basically cutting checks to everybody.  Right
24    now, the money's being held in safekeeping.
25              JUSTICE BARRETT:  So the full 1.3
```

1    billion dollars will be distributed to the

2    victims?

3              MR. MARCUS:  As much of it as we can

4    get, yes.  We're not going to get 1.3 billion

5    dollars.  A lot of it was spent and it doesn't

6    exist anymore, and, you know, Tucker is now

7    judgment-proof for the most part.  But there

8    were bank accounts, houses, race cars, whatever,

9    assets that were seized and are being held

10   basically in trust forever.

11             JUSTICE BARRETT:  Thank you, counsel.

12   My time's expired.

13             CHIEF JUSTICE ROBERTS:  A minute to

14   wrap up, Mr. Marcus.

15             MR. MARCUS:  Thank you, Chief Justice.

16             I want to reiterate that a court with

17   the power of injunction sits as -- as a court of

18   equity.  And one thing that the Court should not

19   overlook is the basic principle of equity that

20   wrongdoers have to give back the money that they

21   took unlawfully.  AMG asks the Court to

22   disregard that principle.  But the Court should

23   have that principle firmly in mind when it

24   decides this case.

25             It should uphold the history and

Official Subject to Final Review

1    tradition and affirm once again that a permanent

2    injunction includes the power to restore victim

3    money that was wrongfully taken from them.  And

4    I don't think that -- that anything in Sections

5    19 or 5(l) rise to the level of an unmistakable

6    inference, which is the standard that is

7    required under Porter.

8          So the Court should affirm the

9    judgment below.  Thank you.

10          CHIEF JUSTICE ROBERTS:  Thank you,

11   counsel.

12          Rebuttal, Mr. Pattillo.

13     REBUTTAL ARGUMENT OF MICHAEL PATTILLO

14        ON BEHALF OF THE PETITIONERS

15          MR. PATTILLO:  I heard the Commission

16   say that this case should be decided by looking

17   at Congress's intent when it enacted 13(b).  And

18   the way we determine Congress's intent is by

19   looking at the words on the page.

20          Congress used the word "injunction"

21   with a clear historical meaning.  Even if, in

22   certain cases like Porter and Mitchell, that

23   term might be construed to carry with it other

24   equitable remedies, we know that's not the case

25   here.

 1            Even under Porter and Mitchell, Porter
 2       and Mitchell make clear that you must look at
 3       the statute and ask if another feature impliedly
 4       precludes broader relief.  The Commission
 5       suggests that standard isn't met here.  But all
 6       we have to do is look at Porter.
 7            In Porter, the existence of another
 8       provision providing a damages remedy was
 9       sufficient for the Court to conclude that it
10       should not also imply that same damages remedy
11       into the provision at issue.  That is precisely
12       what the Commission is trying to do here.  It is
13       trying to get precisely the same relief that
14       would have been available under 5(l),
15       injunctions and other equitable relief.
16            It's trying to get precisely the same
17       relief available under Section 19 but without
18       complying with any of its safeguards.  I heard
19       the Commission say that sometimes pathways --
20       one pathway might be more attractive.  Well, of
21       course, it's going to be more attractive for the
22       Commission to proceed under Section 13 than
23       Section 19, where it doesn't have to comply
24       with, for example, the heightened proof
25       requirement, where it doesn't have to comply

1    with the limitations period.  I -- I didn't hear

2    a single response to why Congress would have

3    intended to allow the same relief under two

4    pathways yet only provide protections in one but

5    not the other.

6         And the absence of a limitations

7    period is something that Meghrig pointed out.

8    It would be truly striking for a statute to

9    award retrospective monetary relief but not

10   include a statute of limitations.  That applies

11   equally here but even more so when you consider

12   what the Commission's core mission is here.

13        Here, the -- the Commission first

14   investigated this conduct, it first asked

15   Mr. Tucker about his disclosures, in 2002.  Yet,

16   subject to no limitations period, it sat on its

17   hands for a decade.

18        Now, if it were following the

19   prescriptions that Congress provided, in 2002,

20   if it thought that there was something wrong

21   with the disclosures, it should have gone in

22   then.  It should have thought to bring a stop to

23   it.  It could have gone -- it should have gone

24   to administrative processes to make clear that

25   this particular remedy -- or, excuse me, that

Official - Subject to Final Review

62

    1    these particular disclosures, which are

    2    widespread throughout the industry, were, in

    3    fact, not acceptable and a violation of the 5(l)

    4    act.  But it didn't do that.  And this case

    5    shows precisely why holding the Commission to

    6    its core mission of providing prospective

    7    monetary -- prospective guidance to business

    8    about what conduct is prohibited is so

    9    important.  It's exactly what Congress intended.

   10           And the entire structure of the -- of

   11    the Commission's mission is being altered by it

   12    choosing to go down the easy path of render --

   13    racking up huge judgments under 13(b) without

   14    the protections that Congress provided under

   15    Section 19.

   16           If there are no further questions, I

   17    would ask that the judgment of the court of

   18    appeals be reversed.  Thank you.

   19           CHIEF JUSTICE ROBERTS:  Thank you,

   20    counsel.  The case is submitted.

   21           (Whereupon, at 11:07 a.m., the case

   22    was submitted.)

   23

   24

   25

Official - Subject to Final Review

## 1

**1.3** [4] 55:12 56:18 57:25 58:4
**10** [2] 38:4,7
**10:00** [2] 1:16 3:2
**100** [1] 38:5
**11:07** [1] 62:21
**12** [1] 38:7
**13** [11] 1:12 8:11 36:3,6,18 37:25 44:13 46:15,20 51:17 60:22
**13(b** [38] 3:13,20,23 4:13 5:2 6:23 7:16,19 8:22 9:2,3, 21 10:1 12:1 16:2,13,18,22 19:24 24:1 26:1 27:4 29:15 30:20 31:15,21 32:1,24 33:14 34:25 41:25 42:7 43:8,19 45:6,19 59:17 62:13
**13(b)'s** [1] 28:23
**13(b)(1** [1] 34:15
**1860** [1] 17:8
**19** [31] 4:7,20 8:9 15:25 18:16 25:23 27:11,15,22 31:6, 12 32:1 36:2,3,7,22,23 42:5 45:9,11,24,25 46:4,14 50:13 51:1,10 59:5 60:17,23 62:15
**19-508** [1] 3:4
**1914** [2] 4:23 39:9
**1970s** [1] 42:24
**1973** [5] 19:14 21:15 39:11 41:21 55:5
**19th** [3] 9:14 35:9 41:5

## 2

**2002** [2] 61:15,19
**2012** [1] 38:3
**2021** [1] 1:12
**269** [1] 13:25
**27** [2] 14:2 55:12

## 3

**3** [2] 2:4 13:11
**30** [1] 2:7
**30,000-foot** [1] 53:25

## 4

**40** [1] 43:9

## 5

**5** [6] 8:9 32:23 33:13 37:22 46:14 50:9
**5(l** [11] 4:2 7:21 19:24 31:6, 13 32:1 43:18 44:4 59:5 60:14 62:3
**50** [3] 5:11 10:20 11:13
**500** [2] 12:16 55:16
**59** [1] 2:10

## 9

**9** [1] 31:25

## A

**a.m** [3] 1:16 3:2 62:21
**ability** [6] 33:16 36:21 46:1

**47:12 54:7 56:13
**able** [2] 18:1 40:10
**above-entitled** [1] 1:14
**absence** [2] 45:15 61:6
**absent** [1] 16:5
**absolutely** [2] 37:12 38:24
**absurd** [1] 29:7
**abused** [1] 37:11
**acceptable** [1] 62:3
**accepted** [1] 43:10
**accepting** [1] 43:12
**accord** [2] 54:6,14
**accorded** [1] 32:19
**according** [2] 18:1 21:11
**account** [2] 56:11,17
**accounting** [1] 9:23 22:17
**accounts** [1] 58:8
**accurate** [1] 28:4
**acknowledged** [1] 21:18
**acquired** [1] 31:4
**Act** [22] 3:19,22 4:1 6:14 10:3 16:19 21:25 28:10,13 29:2,11 30:9 31:6,8,14 36:10,15,17 41:15 50:12 54:20 62:4
**Act's** [3] 3:12 4:22 17:19
**action** [3] 6:17 34:21 46:24
**activity** [3] 40:8,11,22
**actually** [5] 19:22 24:3 39:24 52:7 55:22
**add** [3] 24:20 38:12 43:25
**addition** [1] 51:4
**additional** [2] 23:15 31:19
**address** [5] 9:13 25:17 45:20 47:13 51:15
**addressed** [1] 25:14
**addresses** [2] 22:1 41:23
**adjudication** [1] 37:1
**adjudications** [1] 16:4
**adjudicatory** [1] 32:22
**administrative** [13] 16:21 18:6 29:20 40:1 44:6,21 46:2,23 48:11 49:6,8,11 61:24
**administratively** [1] 31:8
**administrator** [1] 33:18
**adopt** [2] 6:6 27:17
**advanced** [1] 24:11
**Aerospace** [1] 37:2
**affect** [2] 28:7,7
**affirm** [1] 59:1,8
**agencies** [2] 32:9 53:18
**agency** [30] 4:23,25 5:7 16:4 17:12,21 21:4 29:12 32:13,13,17,19 33:6,8,10 34:1,1 36:11 47:6,11,15,20 49:9 50:19 52:4 53:6,11,19,22 54:7
**agency's** [2] 32:22 47:5
**ago** [1] 5:12
**agree** [2] 22:15 27:4
**agreed** [2] 40:3 56:2
**ahead** [1] 16:16
**AL** [1] 1:4

**Alexander** [3] 6:12,24 19:1
**Alito** [16] 12:9,10,18 13:6 14:6 15:13,16,19 40:4,5,19 41:7,19 42:17 43:14 55:14
**Alito's** [2] 45:2 52:20
**alleged** [2] 14:1,2
**allow** [1] 61:3
**allowed** [3] 9:15 30:8 57:22
**allows** [4] 4:1 16:24 36:23, 23
**alluded** [1] 33:4
**almost** [2] 16:20 57:5
**alone** [1] 26:13
**already** [5] 12:13 23:11 34:23 40:24 44:7
**altered** [1] 62:11
**although** [1] 27:22
**American** [1] 54:18
**AMG** [3] 1:3 3:4 58:21
**amici** [1] 28:8
**amok** [1] 48:19
**amount** [2] 13:13 14:1
**analogous** [1] 57:6
**another** [6] 4:7 21:24 48:6 50:20 60:3,7
**answer** [3] 16:7,15,18 35:21 39:7,9 40:5,6,14 47:8, 10 49:19 53:19
**anticipated** [1] 50:21
**anticompetitive** [1] 47:16
**antitrust** [3] 49:5 50:1,12
**appeals** [4] 11:8,23,24 12:1,3,7 26:10,17 52:24 62:18
**APPEARANCES** [1] 1:18
**appears** [1] 33:22
**application** [1] 52:4
**applies** [2] 6:22 61:10
**apply** [4] 4:25 11:2 17:14, 23 32:16 52:10
**Appreciate** [1] 55:6
**approach** [12] 5:16,22 6:1, 16 11:8 18:22,23,25 19:8,9, 19 34:25
**appropriate** [3] 4:4 34:5,8
**area** [1] 28:12
**arguably** [1] 19:5
**argue** [2] 15:23 42:8
**arguing** [1] 27:5
**argument** [24] 1:15 2:2,5,8 3:4,8 6:3,11,12 7:11 8:16 9:13 10:15,17 19:7 20:4,5 24:10,11,22 26:9 30:3 46:12 59:13
**arguments** [4] 10:14 42:10 43:12 52:22
**around** [3] 10:20 12:16 50:15
**article** [2] 42:23 52:20
**articulated** [1] 23:4
**aside** [1] 19:3,4
**asks** [1] 58:21
**assets** [4] 13:16 14:4 22:18 58:9

**associated** [1] 35:7
**assume** [2] 8:8 32:15
**assumed** [1] 20:11
**assuming** [2] 11:10 20:8
**attempt** [1] 56:24
**Attorney's** [1] 36:12
**attorneys** [1] 42:9
**attractive** [3] 48:6 60:20, 21
**authority** [9] 9:7 18:15 29:24 32:12,14 33:2,4,8,10 35:18,19 53:8,17,20,23 54:5
**authorize** [5] 9:6 14:15,24 16:8 25:10
**authorized** [3] 3:24 7:19 20:3
**authorizes** [5] 3:14 4:3,8 43:20 45:7
**authorizing** [1] 29:16
**automatically** [1] 17:24
**availability** [1] 9:8
**available** [7] 9:23,24 16:10 39:22 45:11 60:14,17
**award** [3] 23:12 55:11 61:9
**awards** [1] 45:7
**away** [2] 50:14,20

## B

**Back** [5] 5:15 6:8 7:8,9 14:6 18:21 20:7,11 27:18 38:11 47:8 48:23 57:2,22 58:20
**backdrop** [3] 8:14 19:14 45:21,22 54:13
**backward-looking** [1] 5:6
**backwards-looking** [1] 25:18
**bad** [5] 37:12 38:9 39:1 53:7,13
**bank** [2] 56:1 58:8
**bargain** [2] 39:11,14
**barred** [1] 17:7
**Barrett** [13] 27:2,3 28:19 55:9,10,20 56:7,15,17,22 57:13,25 58:11
**based** [1] 26:4
**basic** [3] 11:19 49:21 58:19
**basically** [4] 14:7 44:7 57:23 58:10
**basis** [1] 42:8
**Bea's** [1] 27:25
**Beach** [1] 1:19
**bears** [1] 13:5
**became** [2] 39:12 45:9
**become** [2] 9:9 42:2
**behalf** [8] 1:20,22 2:4,7,10 3:9 30:4 59:14
**behind** [1] 19:9
**believe** [1] 34:16
**Bell** [1] 37:2
**below** [2] 28:1 59:9
**besides** [1] 7:11
**best** [1] 46:12
**better** [2] 47:3 52:8

**between** [7] 13:7,16 23:1,2 32:2 37:1,4
**beyond** [4] 4:2 10:25 42:22 53:24
**bill** [2] 45:5,12
**billion** [5] 13:11 55:12 56:18 58:1,4
**binding** [1] 16:4
**bit** [1] 36:25
**Black** [1] 24:14
**Black's** [2] 14:17 15:8
**Blue** [1] 10:9
**bodies** [1] 39:4
**body** [2] 42:19 52:23
**books** [1] 44:7
**bootstrap** [1] 24:1
**borderline** [1] 53:9
**both** [2] 10:10 37:4
**bound** [1] 39:17
**boundaries** [1] 36:17
**Branch** [3] 53:4,5,16
**Brandeis** [1] 37:8
**Bread** [1] 39:4
**Breyer** [11] 10:6,7 11:9,18 12:8 37:6,7 39:9,24 47:9 50:3
**Breyer's** [2] 26:6 48:24
**bridge** [1] 11:1
**brief** [6] 10:9,10 27:10 41:21 46:6 54:19
**briefly** [1] 14:7
**briefs** [1] 10:8
**bring** [3] 36:17 37:12 61:22
**bringing** [1] 38:19
**brings** [1] 49:10
**broad** [13] 4:22 15:2 17:20 20:17 26:8 28:11,13 32:7, 10 42:8 43:2 47:14 51:2
**broad-based** [1] 52:10
**broader** [3] 33:24 36:22 60:4
**build** [1] 39:3
**bunch** [2] 36:20 50:13
**burden** [1] 13:5
**burdens** [1] 29:20
**business** [4] 37:9,13 38:24 62:7
**businesses** [2] 5:1 28:16
**bygones** [1] 10:23,24
**bypass** [1] 5:7

## C

**California** [1] 54:18
**called** [1] 11:4
**came** [1] 1:14
**cannot** [4] 7:21 11:13 29:21 35:13
**CAPITAL** [1] 1:3 3:5
**Cardinal** [2] 38:11 39:3
**carefully** [1] 32:12
**carried** [2] 7:15 25:13
**carries** [1] 12:2
**carry** [1] 59:23
**cars** [1] 58:8

Heritage Reporting Corporation

**Case** [32] 3:4 8:14 9:21,21, 25 10:9 12:12 13:10,23 17: 12 18:13 24:24 25:9 27:22 35:10 38:11,12,18 39:2 46: 5 53:1,2 56:3,6,9 57:21 58: 24 59:16,24 62:4,20,21

**case-by-case** [1] 34:8

**cases** [30] 3:21 8:15 9:4,14, 17 21:9 25:1 32:6 34:5 35: 10 36:8,18 38:2,5,7 39:23 41:6,15 48:10,10,16 49:5,7, 9,10 52:1,8,24 54:18 59:22

**causes** [1] 6:16

**cease-and-desist** [8] 16: 13 31:17 37:19,22 44:5,22 46:3 49:1

**ceased** [2] 40:8,12

**center** [1] 46:9

**centuries** [1] 35:21

**Century** [3] 9:14 35:9 41:5

**certain** [4] 22:16 46:17 48: 6 59:22

**certainly** [8] 14:4 15:3 23: 8 26:14 32:18 36:5,11 50: 23

**Chamber** [1] 28:9

**change** [3] 5:13 8:16 43:5

**changed** [1] 11:7

**changing** [1] 11:21

**checks** [1] 57:23

**CHIEF** [42] 3:3,10 5:9 6:25 7:2 8:2,5,8 10:5 12:9 14:8 15:18,21 18:19,21 19:2,3 22:10 24:5,7 27:1 28:20 29:25 30:5 32:5 33:5,20 34:10,13 37:5 40:4 43:15 46:10 49:12,16 52:14,16 55:8 58:13,15 59:10 62:19

**chiropractor** [2] 38:14 39: 20

**choice** [4] 32:2 37:1 46:22 47:5

**choose** [1] 37:3

**chooses** [4] 31:7,11 36:3 51:22

**choosing** [1] 62:12

**chose** [1] 50:6

**Circuit** [6] 10:22 21:1,2,7 28:2 46:5

**cite** [2] 32:6 54:18

**cited** [1] 46:6

**cites** [1] 41:21

**Civil** [1] 6:14

**clarification** [1] 55:21

**Clark** [1] 24:15

**clauses** [2] 31:13 51:1

**Clayton** [1] 54:20

**clean** [1] 27:6

**clear** [9] 3:13,20 4:18 24:3 25:11 35:22 55:9 61:20 62: 61:24

**clearer** [3] 29:6 45:23 54: 12

**clearly** [3] 31:2 47:3 51:3

**client** [2] 27:5,19 28:7

**close** [1] 11:11

**Code** [2] 33:22,23

**coercive** [1] 23:15

**collected** [1] 55:13

**collecting** [1] 57:20

**combination** [1] 26:7

**combine** [1] 26:12

**come** [4] 5:4 16:24 44:8 51: 20

**comes** [5] 21:2 45:24 46: 13 55:23,25

**comfortably** [1] 36:1

**comments** [1] 41:22

**commerce** [1] 28:12

**COMMISSION** [57] 1:7 3:6, 14 4:18 5:4 12:25 13:4,19 14:16 15:15 16:24 23:21, 23 25:25 28:14 29:18,22 30:8 31:7,11 32:2,24 33:1, 15 34:16 36:2,9,15 37:3 39:10,15 40:1 42:1,4 44: 20 46:6 47:12 48:7,8,13 49:5,7 51:9,11 52:1,5,8,9 54:4 56:13 59:15 60:4,12, 19,22 61:13 62:5

**Commission's** [9] 29:14 33:14 42:3,9 43:1,4 46:1 61:12 62:11

**common** [1] 55:3

**community** [3] 37:9,11 38: 24

**companies** [1] 40:3

**company** [2] 38:16,17

**comparatively** [1] 51:18

**compared** [2] 38:6 56:18

**compelling** [1] 7:4

**compensation** [2] 8:20 15: 12

**complaining** [2] 39:13 42: 25

**completed** [1] 40:24

**completely** [1] 23:21

**complicated** [3] 40:2 48: 10,17

**comply** [3] 50:19 60:23,25

**complying** [1] 60:18

**compromise** [1] 37:15

**compromised** [1] 37:14

**concern** [4] 50:17 53:17 54:9,25

**concerned** [2] 47:14,18

**conclude** [1] 60:9

**concludes** [1] 39:19

**conclusion** [1] 38:16

**conclusions** [1] 51:14

**conduct** [15] 5:5 9:11 16: 25 17:15 18:10,17 27:14 29:13 35:5,15 38:10 50:6 51:15 61:14 62:8

**confer** [1] 14:20

**conferred** [2] 33:25 34:3

**confined** [1] 5:17

**confirm** [1] 29:3

**conflict** [1] 11:5

**confronting** [1] 21:6

**Congress** [24] 4:20,23 5:7, 18,25 7:14,19,22 8:13 14:9 15:24 16:8 17:21 19:10,13, 18,20,23 20:6,10,14,17,25 21:14,17 22:7 24:17 25:9, 12 29:6,23 30:8,19 31:9,18 32:15,19,20 33:1 37:2 40: 19,20 41:4,9,12,13 42:18, 18,20 43:22 44:9,13,19 45: 6,16,21 47:5,10,12,17 48:1 50:21,24 53:15,20 54:12 55:1 59:20 61:2,19 62:9, 14

**Congress's** [6] 46:9 52:23 54:4,20 59:17,18

**Congressional** [1] 26:9

**conjunction** [1] 34:6

**consider** [1] 61:11

**consist** [1] 21:20

**consistent** [2] 21:21 29:12

**Constitution** [1] 5:23

**constitutional** [1] 39:18

**construe** [2] 5:24 32:11

**construed** [1] 59:23

**consumer** [9] 4:8,19 18:12, 15 39:12 42:3 49:8,23,25

**Consumers** [5] 9:9 32:4 44:23 55:23 56:5

**contemporary** [1] 7:10

**context** [4] 25:5 32:17 43: 13 50:12

**contexts** [1] 7:7

**continuing** [1] 8:7

**continuously** [1] 11:21

**contrary** [1] 45:8

**contrast** [1] 5:2

**Control** [2] 21:25 37:13

**convicted** [1] 27:7

**copyright** [1] 41:5

**core** [4] 47:8 50:16 61:12 62:6

**corporation** [1] 34:17

**correct** [3] 26:22 45:17 57: 9

**couldn't** [5] 14:4 27:14 39: 20 45:23 54:12

**counsel** [18] 8:3,7 15:23 22:13 24:4,9 27:3 28:19 30:1 32:5 34:11 43:17 49: 18 52:12 55:10 58:11 59: 11 62:20

**course** [5] 5:21 39:17 40:1, 14 60:21

**COURT** [67] 1:1,15 3:11 5: 4,13 6:11,14,18 8:17 11:4 12:3 15:3,7 16:24 17:17 19:11 21:11 25:2 26:10,21 28:17 29:9,22 30:6,9,10 31:1,11 32:24 33:7,8,9,12, 16,17 34:4 35:7,11,16,17, 18 36:24,24 38:22 39:15, 16,19 40:9 41:3 44:23 48:

14 49:10 52:6,9,24 54:6,7, 19 55:25 58:16,17,18,21, 22 59:8 60:9 62:17

**Court's** [4] 26:22 30:20 35: 6 52:22

**Courts** [18] 10:18 11:8,12, 19,23,24,25 12:6 16:5 26: 16 30:22 32:9,10,16 38:6 39:17 43:9,11

**courts'** [2] 33:2,4

**create** [1] 31:8

**created** [1] 39:10

**criminal** [3] 13:10 14:5 56: 3

**current** [2] 6:8,8

**cutting** [1] 57:23

## D

**D.C** [2] 1:11,21

**damage** [1] 37:23

**damages** [8] 22:1,3,4 39:1 45:11 55:11 60:8,10

**damaging** [1] 41:24

**date** [1] 13:18

**day** [1] 41:15

**deal** [4] 9:13 48:2,16 49:22

**debate** [2] 45:10,25

**debated** [1] 46:4

**decade** [1] 61:17

**deceived** [1] 28:4

**deception** [1] 48:18

**deceptive** [6] 27:14 36:10, 14 47:16 50:6,8

**deceptiveness** [1] 49:22

**decide** [3] 13:4 24:24 53: 16

**decided** [4] 11:15 12:7 42: 4 59:16

**decidedly** [1] 18:25

**decides** [2] 48:14 58:24

**decision** [2] 28:1,6

**declare** [1] 47:15

**decline** [1] 6:20

**decree** [3] 23:11,19,20

**defendant** [1] 55:23

**defer** [1] 16:5

**defies** [1] 7:16

**define** [3] 17:14,15 29:13

**defines** [1] 14:18

**defining** [1] 51:21

**definition** [1] 14:23

**defrauded** [1] 57:1

**delegated** [1] 32:14

**depart** [1] 30:13

**Department** [2] 33:19 56:3

**depending** [1] 9:10

**describe** [1] 22:22

**described** [1] 22:25

**describing** [1] 47:9

**determination** [1] 23:2

**determinations** [1] 34:9

**determine** [1] 59:18

**determines** [1] 23:13

**deviate** [1] 30:17

**Diction** [1] 15:8

**dictionary** [3] 7:10 14:18 15:9

**difference** [1] 23:1,1

**differences** [2] 44:3,4

**different** [13] 13:20 19:5 20:5 23:21 31:14 33:13,17 43:22 44:1,17 46:23 51:8 55:23

**difficult** [3] 48:10 51:17 52: 2

**directed** [1] 14:21

**directly** [1] 41:23

**Dirty** [1] 27:8

**discern** [1] 19:20

**disciplined** [1] 5:22

**disclosed** [1] 42:8

**disclosures** [4] 28:3 61:15, 21 62:1

**discounted** [1] 38:18

**discussed** [2] 29:3 51:12

**disgorgement** [1] 16:1

**disregard** [1] 58:22

**dissent** [5] 24:11,13,16,17 27:25

**distinction** [2] 24:2 27:7

**distinguishable** [2] 21:9 26:4

**distribute** [2] 56:4,14

**distributed** [6] 12:13,17 55:15,22 57:3 58:1

**divvying** [1] 13:20

**doctrines** [1] 23:5

**doing** [7] 14:21 33:15 34: 22 36:1 37:17 41:9 42:21

**dollars** [8] 12:16 13:12 14: 2 55:12,13,16 58:1,5

**done** [2] 14:25 41:4

**down** [1] 62:12

**draw** [4] 22:21 40:20 41:9 51:14

**drink** [1] 6:21

**dubious** [1] 27:7

**due** [1] 39:18

**during** [1] 11:8

**duty** [1] 26:22

## E

**each** [3] 36:25 44:23 57:20

**early** [1] 18:14

**easier** [1] 36:6

**easy** [2] 51:18 62:12

**echoes** [1] 35:2

**economy** [1] 39:12

**economy-wide** [1] 47:13

**edition** [1] 14:17

**effect** [1] 38:5

**effective** [1] 32:2

**eight** [1] 39:4

**either** [2] 11:23,25

**elaboration** [1] 31:24

**else's** [1] 11:15

**elsewhere** [2] 22:2 25:10

Official - Subject to Final Review

**embedded** [1] 30:19
**Emergency** [1] 21:25
**empirics** [1] 48:25
**enact** [1] 50:5
**enacted** [12] 6:14,23 7:16, 19 14:10 18:16 19:23,24 20:25 30:19 42:1 59:17
**encompass** [1] 13:12
**encompasses** [2] 13:23, 24
**encounter** [1] 48:7
**enforce** [10] 23:10,20,24 30:9 31:8 33:7,9,11,12 44:5
**enforcement** [7] 4:24 17:22 32:3 37:4 43:1,5 50:7
**engage** [3] 34:6 35:19 51:13
**enough** [5] 18:9 26:13 34:24 52:3,3
**enter** [1] 40:10
**entered** [1] 40:9
**entire** [2] 20:19 62:10
**entirely** [3] 25:25 26:3 46:21
**envelope** [1] 53:12
**environment** [1] 5:25
**environmental** [1] 53:10
**episode** [1] 27:8
**equally** [2] 6:22 61:11
**equitable** [37] 3:17 4:3,6, 15,16 7:15,20,24 8:18 9:20, 24 16:9 22:16 23:5 25:6, 11,13 28:25 30:23 31:10, 22 32:8,10 33:2,25 34:7 41:17 42:9 43:21,25 44:12 54:8,15 56:24 57:10 59:24 60:15
**equity** [9] 14:12 15:10 24:3 30:14,22 35:6 54:21 58:18, 19
**error** [4] 13:5 26:19,20,24
**especially** [1] 3:20
**ESQ** [2] 2:3,6,9
**ESQUIRE** [2] 1:19,21
**essentially** [1] 47:25
**establish** [1] 16:3
**ET** [1] 1:4
**evaded** [1] 4:13
**Even** [13] 4:19 3 14:10 17:24 19:19 21:22 36:11 39:3 43:11 54:17 59:21 60:1 61:11
**everybody** [1] 57:23
**everything** [1] 11:13
**exact** [4] 21:5 43:12 49:3 56:19
**exactly** [6] 14:25 32:20 44:10 47:23 50:9 62:9
**example** [3] 24:17 35:3 60:24
**exception** [1] 23:9
**exceptional** [1] 38:2
**Exchange** [1] 41:15

**exclude** [2] 8:19 15:11
**excuse** [2] 11:24 61:25
**execution** [1] 23:19
**Executive** [3] 53:3,5,15
**exercise** [1] 53:16
**exercised** [1] 35:19
**exist** [1] 58:6
**existed** [1] 45:13
**existence** [2] 51:5 60:7
**exists** [2] 13:2 16:22
**expanded** [1] 37:19
**expansive** [1] 6:4
**expected** [1] 35:5
**expedient** [1] 17:18
**expertise** [4] 4:25 17:14, 23 36:9 52:4
**expired** [3] 15:20 35:12 58:12
**explain** [5] 35:24 36:2,9,13 43:18
**explained** [2] 15:3 23:17
**explanation** [2] 48:18 51:2
**explicitly** [1] 45:19
**expound** [1] 36:16
**expressly** [4] 7:19 20:2 24:22 31:12
**extensive** [1] 45:10

**F**

**face** [1] 51:3
**faced** [1] 37:9
**fact** [11] 15:14 17:19 18:13 22:1 28:5 32:8 35:10 44:18 45:4 55:3 62:3
**fact-finding** [2] 48:9 51:13
**facts** [1] 36:21
**fairly** [2] 22:24 47:14
**familiar** [2] 10:13 50:2
**famous** [1] 38:11
**far** [2] 22:20 49:10
**fault** [1] 45:12
**favor** [3] 12:19 24:24 26:11
**fear** [1] 47:10
**fears** [1] 38:23
**feature** [1] 60:3
**features** [6] 3:19 4:17 7:17 10:3 25:8 29:2
**FEDERAL** [9] 1:7 3:5 13:1 30:9 36:24 48:14 52:6,9 54:6
**feels** [1] 36:15
**Fernandina** [1] 1:19
**few** [1] 38:5
**figured** [1] 5:19
**figuring** [2] 20:10 57:21
**find** [5] 7:4 36:21 37:17,18 39:22
**finding** [1] 18:24
**fine** [1] 57:5
**finish** [1] 49:18
**firmly** [1] 58:23
**First** [9] 3:20 6:10 11:4 12:3,7 18:21 39:16 61:13,14
**fits** [1] 36:1

**FitzGerald** [4] 41:23,25 42:14,17
**FitzGerald's** [2] 42:23 52:20
**flexibility** [1] 37:3
**flexible** [1] 15:2
**Florida** [1] 1:19
**flowing** [1] 56:8
**focus** [2] 29:12 49:25
**focused** [1] 34:20
**follow** [1] 11:19
**followed** [1] 6:15
**following** [2] 45:1 61:18
**follows** [1] 33:6
**force** [1] 23:16
**forever** [1] 58:10
**forfeiture** [2] 13:8 14:5
**former** [1] 41:22
**forms** [1] 22:16
**forth** [1] 46:18
**forward** [1] 52:21
**forward-looking** [1] 34:20
**found** [1] 21:22
**foundational** [1] 30:14
**founding** [1] 30:23
**framed** [1] 15:5
**Frankfurter** [1] 24:13
**fraud** [1] 39:12
**free-wheeling** [2] 5:16 6:1, 16
**freebie** [1] 48:13
**freezing** [1] 22:18
**friend** [2] 6:3 33:21
**front** [1] 46:8
**FTC** [30] 3:12 16:1,2,8,12, 19 21:3,13 27:14,17,21 28:10 29:11 30:9 35:16 36:17 37:16 38:1,25 39:6,13 40:15 41:22 42:25 43:11 49:1 50:4 55:18 56:4 57:2
**FTC's** [3] 18:14 26:11 37:10
**full** [1] 57:25
**function** [2] 11:20 31:16
**functional** [1] 44:4
**functions** [1] 57:5
**Fund** [1] 13:1
**fundamentally** [1] 31:14
**further** [6] 4:3 7:20 25:11 43:20,25 62:16
**future** [1] 34:21

**G**

**gained** [1] 57:3
**gains** [2] 27:18 30:25
**gave** [3] 47:5,12 54:4
**general** [4] 4:23 9:19 17:20 28:13
**getting** [2] 17:7 56:23
**give** [12] 4:25 12:5 17:25 24:19,21 26:22 32:2 48:13, 24 52:5 57:22 58:20
**given** [3] 19:14 23:12 31:4
**gives** [3] 36:20,20,21

**giving** [2] 33:15 39:6
**glad** [1] 55:19
**go-to-court** [1] 49:2
**good-bye** [1] 11:2
**Gorsuch** [11] 22:11,12 24:4 49:13,17,18,24 50:24 51:7,16 52:12
**got** [1] 37:15
**gotten** [1] 27:15
**govern** [2] 43:2 54:22
**government** [1] 56:1
**grant** [5] 32:25 33:12,17 35:3 54:22
**granted** [1] 35:16
**Great-West** [2] 8:21 15:4
**guidance** [2] 5:8 62:7

**H**

**ha** [2] 37:23 38:3
**half** [1] 10:16
**hand** [2] 38:21,22
**handing** [1] 22:18
**hands** [2] 27:6 61:17
**happen** [1] 12:19
**happened** [3] 34:24 35:8 56:8
**happening** [1] 48:22
**happens** [3] 48:15 53:5 56:7
**happy** [2] 35:1 42:16
**harm** [9] 4:19 5:3 8:20 9:4, 8 15:12 16:23 18:5 40:23
**harmed** [1] 44:24
**harmony** [1] 32:1
**harms** [3] 3:18,25 29:1
**hear** [3] 3:3 39:7 61:1
**heard** [3] 14:12 59:15 60:18
**Heder** [1] 46:5
**heightened** [2] 4:10 60:24
**held** [6] 15:7 21:2 18 25:4 54:19 56:11 57:24 58:9
**help** [1] 22:13
**historical** [1] 59:21
**history** [9] 18:14 26:24 37:7 42:8 45:3,5,18 50:4 58:25
**hit** [1] 39:1
**hold** [1] 28:14
**holding** [1] 62:5
**holds** [1] 7:1
**honestly** [1] 12:22
**Honor** [2] 6:9 11:3
**hope** [1] 16:7
**houses** [1] 58:8
**huge** [2] 42:19 62:13
**hundreds** [1] 33:23

**I**

**idea** [1] 19:9
**ignorant** [1] 24:18
**ill-gotten** [1] 27:18
**illegally** [1] 31:4
**imagined** [1] 42:1

**immigration** [1] 53:10
**imminent** [3] 3:23 9:4,8
**impend** [1] 18:4
**impending** [1] 18:4
**implicitly** [1] 26:1
**implied** [4] 6:6 7:21 21:19, 20,23 22:4
**impliedly** [1] 60:3
**imply** [1] 60:10
**implying** [1] 6:16
**important** [6] 16:6 21:1 26:15 28:14 42:2 62:9
**impose** [1] 29:9
**imposed** [1] 29:10
**incentive** [4] 50:19 51:8,12, 18
**incident** [1] 9:15
**include** [2] 37:20 61:10
**included** [3] 7:24 47:18 50:25
**includes** [3] 21:10 30:24 59:2
**including** [3] 4:9 22:16 36:23
**income** [1] 38:15
**inconsistent** [1] 25:18
**independent** [2] 53:6,18
**indicate** [1] 42:23
**indicates** [1] 54:20
**indicating** [1] 42:20
**individuals** [1] 12:20
**industrial** [1] 43:3
**industry** [1] 62:2
**inference** [2] 31:9 59:6
**inherent** [3] 32:10 34:4 41:2 44:16 54:8
**inherently** [2] 30:24 51:17
**initial** [1] 23:2
**injunction** [69] 3:15,16 4:3, 5 7:15,20,23 8:23 9:1,16 10:1,1 14:16,18 15:6,6 16:9,12 17:5,7,9,16,25 18:4 19:21 21:5,10 22:15 23:10, 16,18,24 25:5,10,12,17 28:24,24 29:3,4,8,8 30:24 31:3,18,23 32:7,7,25 33:22 34:6 35:3,4,11,13,17 41:2 44:7,8,16,17 45:22 54:5,19,22 55:4 58:17 59:2,20
**injunctions** [3] 3:17,18 4:2 9:22 15:2,11 29:16,19 43:20 44:11 54:6 60:15
**injunctive** [7] 30:18 31:5 35:20 41:1 43:23,24 54:22
**injuries** [1] 9:10
**injury** [1] 4:9
**innocent** [1] 13:24
**inquiring** [1] 40:16
**instance** [2] 8:14 39:16
**instances** [2] 23:7 48:6
**instead** [6] 26:28:16,17, 25 31:11,21
**integrity** [1] 47:24
**intellectual** [2] 9:14 35:9

intended [6] 19:19 30:10 31:9 54:6 61:3 62:9
intent [5] 52:23 54:4,14 59:17,18
intention [1] 54:21
intentions [1] 53:11
interested [2] 49:19 53:25
interpret [2] 38:22 51:5
interpretation [7] 6:20 7:25 10:21 11:6 26:23 46:20 47:25
interpreting [2] 7:7 26:11
interprets [1] 5:14
intervening [1] 5:12
inventiveness [1] 15:4
investigated [1] 61:14
invoke [3] 4:20 31:21 33:2
invoked [1] 35:7
invoking [1] 43:8
involve [3] 9:18 32:9 39:25
involved [2] 13:13 25:7
involves [1] 32:13
involving [1] 32:16
irrelevant [3] 46:21 48:1,5
isn't [7] 11:10 20:11 50:16 53:19 57:2,3 60:5
issue [11] 12:4 13:16 20:9 23:16 26:21 30:24 33:3 41:3 45:15 50:25 60:11
issued [2] 13:9 23:18
issues [5] 5:10 54:10
itself [7] 4:5 7:16,23 8:22 9:3 18:11 45:19

## J

January [1] 1:12
job [1] 17:22
JOEL [3] 1:21 2:6 30:3
joined [2] 24:12,14
joke [1] 10:12
Judge [1] 27:25
judges [1] 28:2
Judgment [6] 13:1 56:6,8,9 59:9 62:17
judgment-proof [1] 58:7
judgments [1] 62:13
judicial [1] 14:19
judiciary [1] 11:20
junctions [1] 8:19
jurisdiction [1] 35:6
JUSTICE [145] 3:3,11 5:9 6:25 7:2 8:2,4,5,6,8 9:12 10:4,5,5,7 11:9,18 12:8,9,9,10,18 13:6 14:6,8 15:13,16,18, 18,19,21,21,23 16:16 17:1, 4,24 18:19,19,20 19:3 20:1, 4,20,23 22:5,9,10,10,12,25 23:17 24:4,5,5,7,8,12,14, 16 26:5,6,25 27:1,1,3 28: 19,20 29:25 30:6 32:5 33: 5,20 34:10,12,13,14 35:1, 23 37:5,5,7,8 39:9,24 40:4, 4,5,5,7,19 41:7,19 42:16 43:14,15,15,17 45:1,2,18

46:10,10,11 47:7,9,22 48: 21,23,24 49:4,12,12,16,16, 18,24 50:3,23 51:7,16 52: 12,14,14,16,17,19 55:6,8,8, 10,14,20 56:3,7,15,17,22 57:13,25 58:11,13,15 59: 10 62:19
Justice's [1] 18:21
Justices [2] 24:12,14
justification [1] 41:8

## K

Kagan [15] 18:19,20 20:1,4, 20,23 22:5,9 46:10,11 47:7, 22 48:21,23 49:4
Kavanaugh [7] 24:6,7 26: 5,25 52:15,16 55:6
keep [2] 30:11 36:19
kick [1] 26:17
kind [8] 24:22 34:24 37:23 38:18 46:17 47:5 49:21 50: 15
kinds [1] 46:23
knowing [1] 27:13
known [1] 20:17

## L

la [1] 7:24
Labor [1] 33:19
lack [1] 50:10
lackadaisical [1] 42:25
laid [1] 47:2 50:12
language [11] 4:4 5:17 6:5 7:6 8:10 9:22 20:17 31:15 34:25 43:23 53:12
large [1] 43:3
largely [1] 49:14,21
last [2] 6:21 30:15
later [3] 37:19 38:4 40:17
Law [17] 10:18 12:5 14:12, 18 15:8 19:17 21:11 26:15 27:19 28:16 30:19 34:19 35:22 38:21 42:19 45:22, 22
lawyerly [1] 15:4
lawyers [2] 14:9,11
lead [1] 16:14
leads [1] 40:7
least [6] 11:12 19:5 32:12 49:6 50:11 53:18
leave [1] 26:13
led [1] 47:2
leeway [1] 6:3
legal [1] 51:14
legislated [1] 8:13
legislates [1] 45:21
legislating [1] 54:13
legislation [2] 7:18 20:25
legislative [3] 42:7 45:3,18
lenders [1] 28:8
less [2] 9:9 26:19
less-than-complete [1] 41:12
letting [1] 30:11

level [1] 59:5
liabilities [1] 13:3
liberal [1] 18:23
light [2] 5:19,25
limit [2] 3:22 31:10
limitations [4] 4:10 25:24 61:1,6,10,16
limited [7] 3:20 9:4,21 10:2 25:15 29:4 44:11
limits [2] 4:12 29:23
line [4] 22:21,24 40:20 41: 10
line-drawing [1] 22:14
lines [1] 8:8
link [1] 9:6
listen [1] 6:13
litigant [2] 39:16 44:23
litigating [1] 52:8
little [3] 36:25 43:4 50:19
Liu [1] 30:15
LLC [1] 1:3
loan [1] 36:14
long [1] 26:24
Long-standing [1] 26:19
look [14] 7:5,10 14:17 20: 15,18 21:20,24 22:24 38: 10,10 44:18 55:1 60:2,6
looked [3] 5:18 28:2 42:6
looking [5] 19:13 21:17,19 59:16,19
looks [1] 8:17
lot [8] 6:2 32:5 36:9 48:15, 18 50:1 56:21 58:5
lower [2] 11:12 38:21

## M

made [6] 4:23 6:12 9:5 17: 21 39:25 41:22
Madison [1] 10:25
maintain [2] 47:23 53:21
man [1] 27:2
MANAGEMENT [2] 1:3 3: 5
mandatory [3] 43:20 44:11, 17
many [6] 30:20 34:5 36:7,8 39:23 53:4
Marbury [1] 10:25
MARCUS [41] 1:21 2:6 30: 2,3,5 32:18 33:11 34:2,15 35:1 36:5 39:8 40:11,25 41:11 42:16 44:2 45:17 46: 11 47:7 48:4,22 49:3,14,20 50:23 51:11,23 52:13,18 54:2 55:7,19 56:10,16,19 57:8,17 58:3,14,15
married [1] 38:15
materialized [1] 50:22
matter [4] 1:14 36:12 44:20 57:20
matters [3] 19:10 21:2 37: 7
mean [19] 3:17 7:9 10:24 13:16 14:8 20:5,9 25:5 26:

1 4 27:6,21 29:8 33:6,7 39: 5 46:21 48:24 51:24 55:2
meaning [3] 5:19 36:16 59: 21
meaningful [1] 32:3
meaningless [2] 4:12 25: 25
means [4] 3:15 10:1 28:24, 25
meant [4] 4:16 19:22 55:4 57:11
mechanism [3] 4:20,24 17: 22
mechanisms [1] 35:20
Meghrig [2] 25:4 61:7
member [1] 14:23
members [2] 14:9,14
mens [1] 46:17
mentioned [4] 7:17 10:3 19:16 25:8
mentioning [1] 4:15
mentions [1] 22:2
merely [1] 30:10
met [1] 60:5
method [2] 6:19 7:25
MICHAEL [5] 1:19 2:3,9 3: 8 59:13
middle [1] 37:25
might [7] 9:23 16:3 17:17 23:10,16 59:23 60:20
million [4] 12:16 14:2 55: 12,16
millions [1] 56:20
mind [4] 5:18 36:19 46:9 58:23
mindset [2] 43:1,4
mine [1] 11:14
minute [3] 28:20 35:24 58: 13
misleading [1] 36:13
missing [1] 45:14
mission [3] 61:12 62:6,11
mistake [1] 10:20
mistakes [2] 10:19,19
Mitchell [17] 8:15 20:14,15, 18 21:8 24:13,23 25:3,7,14, 21 26:3,7,16 59:22 60:1,2
Mitchell's [1] 20:16
mode [1] 11:6
monetary [3] 3:18,24 4:8 8:20 9:7,15 12:2 15:12,25 16:14 18:6 25:18,21 27:15 28:18 29:19 35:14 45:7,25 46:2,7 61:9 62:7
money [28] 12:12,21 13:13, 24 27:8 29:1 30:12 45:10, 20 46:8 50:14 55:11,22 56: 5,8,11,15,16,21 57:2,3,14, 14,16,21,22 58:20 59:3
money's [1] 57:24
moreover [1] 29:11
morning [5] 3:4 10:7 22:12 24:9 52:18
Moss-Magnuson [1] 37:

20
most [8] 14:8,17 18:13,14 19:10 32:8 49:4 58:7
motive [1] 6:23
much [12] 7:25 10:25 22:9 46:21 47:11 49:22 51:2 55: 14 56:15 57:18,19 58:3
muscle [1] 38:17
must [4] 4:20 5:4 60:2

## N

naked [1] 35:14
narrow [2] 5:3 16:19
nature [1] 23:19
necessary [1] 37:12
necessity [1] 31:5
need [12] 17:6,11,12 18:12 19:22 24:20 25:2 31:20,23 36:16 44:14 52:2
needed [2] 21:16 25:4
needs [1] 29:17
Neither [5] 25:7,9,14,20 42: 7
Netflix [1] 27:9
never [6] 10:23 13:25 14:2, 11 29:10 50:22
New [9] 13:9 16:3 18:24 19: 8,9 39:14 53:16,20 54:17
nice [1] 48:1
Nineteen [1] 37:24
Ninth [2] 28:2 46:5
nobody [1] 42:1
non-parties [1] 52:11
none [1] 56:5
nor [4] 24:21 25:7,14 42:7
noted [2] 8:21 28:1
nothing [3] 21:23 31:1 45: 4
notice [3] 4:11 5:1 39:19
noting [1] 13:22
notion [2] 7:22 12:1
notwithstanding [3] 20: 16 26:23 28:5
novel [3] 47:15 48:7 51:15
number [2] 26:10 56:20
numbers [2] 48:24 49:4

## O

obligation [1] 17:13
obtain [1] 16:1
obvious [2] 38:8,10
obviously [2] 21:1 52:21
Office [1] 36:12
official [1] 41:22
often [3] 41:14 48:25 51:25
okay [2] 11:11 12:8
old [4] 10:12 18:23 19:19 27:9
once [6] 35:6,17,18 43:7 48:1 59:1
one [5] 5:10,15 6:21,21 11: 23 12:24 13:17 14:14 24: 21 26:6 36:6 38:20 42:17 43:23 46:13 47:2 48:5 52:

Official - Subject to Final Review

2,3 **54**:25 **58**:18 **60**:20 **61**:4

**one's** [2] **52**:2,3

**one-time** [1] 8:25

**ongoing** [9] 3:22 9:4,8,11 **16**:23 **25**:15 **35**:5,15 **40**:22

**only** [7] **29**:8 **32**:14 **38**:2 **39**:5 **40**:17 **48**:11 **61**:4

**opening** [1] 7:17

**operating** [1] **14**:19

**opinion** [2] **11**:14 **24**:25

**opportunity** [1] **44**:24

**opposed** [1] **49**:2

**option** [1] **12**:24

**oral** [5] 1:15 2:2,5 3:8 **30**:3

**order** [18] 8:25 13:7,8,23 **15**:5 **16**:13 **17**:3 **30**:25 **31**:17 **35**:7 **37**:19,22 **40**:9 **44**:22 **46**:1,3,7 **49**:1

**orders** [4] **32**:22 **33**:14 **44**:5,6

**ordinarily** [1] 8:24

**other** [24] 6:3 7:6,20 9:22 **10**:16,16 **16**:9,20 **23**:5,14 **24**:24 **25**:10 **29**:8 **33**:21 **34**:7 **38**:22 **43**:25 **44**:12 **51**:2, 4,6 **59**:23 **60**:15 **61**:5

**otherwise** [1] **31**:12

**out** [11] 5:19 **12**:25,25 **20**:10 **28**:9 **43**:9 **47**:2 **50**:2,12 **57**:21 **61**:7

**outset** [1] **25**:9

**over** [7] 8:25 **11**:7,7 **14**:1 **22**:18 **48**:19 **56**:4

**overall** [1] **16**:19

**overcome** [1] 4:17

**overlap** [1] **13**:15

**overlook** [1] **58**:19

**overrule** [1] **25**:3

**own** [10] **30**:16 **32**:22 **33**:14 **36**:21 **46**:1,2,7 **48**:9 **51**:13,14

**owns** [1] **23**:2

**P**

**PAGE** [2] 2:2 **59**:19

**paid** [1] **13**:24

**Park** [1] **13**:25

**parse** [1] **32**:11

**part** [5] **14**:19 **42**:2 **46**:3 **50**:5 **58**:7

**participated** [1] **14**:3

**particular** [7] **12**:4 **14**:22 **17**:15 **27**:12 **35**:11 **36**:10 **53**:17 **56**:6,9 **61**:25 **62**:1

**particularly** [2] **48**:9,17

**parties** [3] 9:19 **13**:24 **16**:5

**partnership** [1] **34**:17

**passed** [6] 5:11,15,25 **11**:1 **43**:18 **45**:11

**past** [7] 3:18,25 4:8 8:20 **15**:12 **23**:7 **29**:1

**patent** [2] **35**:12 **41**:5

**path** [2] **17**:16 **62**:12

**pathway** [3] **48**:5,11 **60**:20

**pathways** [6] **32**:3 **37**:4 **46**:23 **47**:1 **60**:19 **61**:4

**PATTILLO** [47] 1:19 2:3,9 3:7,8,10 5:9 6:9 7:1,13 8:17 9:17 **11**:3,17,22 **12**:10, 15,22 **13**:14 **15**:1,14 **16**:15, 17 **17**:3,10 **18**:8,20 **19**:16 **20**:2,12,21,23 **21**:16 **22**:6,7, 23 **25**:2 **26**:18 **27**:20 **28**:21, 22 **41**:19 **55**:14,21 **59**:12, 13,15

**payday** [1] **28**:8

**paying** [1] **13**:2

**people** [7] **36**:13 **38**:9,13 **39**:13 **40**:15 **42**:24 **50**:2

**perceived** [1] **45**:12

**perfect** [1] **10**:18

**perfectly** [1] **11**:15

**perhaps** [5] **12**:14 **14**:11 **15**:1 **22**:17 **39**:2

**period** [3] **61**:1,7,16

**permanent** [22] 3:14,15 7:14 8:19,22 9:1,1 **15**:11 **16**:9,12 **17**:6,8,9,16,25 **28**:23, 24 **29**:16 **32**:25 **44**:16 **54**:5 **59**:1

**person** [2] **14**:20 **34**:17

**personam** [1] **14**:20

**perspective** [3] **35**:25 **43**:6 **47**:4

**Petitioners** [5] 1:5,20 2:4, 10 3:9 **30**:7 **55**:25 **59**:14

**phrase** [1] 8:22

**pick** [1] **52**:19

**picking** [1] **26**:5

**piggyback** [1] **44**:15

**place** [2] **48**:20 **57**:11

**placed** [1] **29**:23

**plaintiff** [4] 9:24 **56**:25,25 **57**:1

**plaintiffs** [1] **57**:4

**please** [2] 3:11 **30**:6

**plus** [3] **26**:7,16,16

**point** [11] **20**:6,6 **21**:14 **26**:12,13,17 **33**:21 **38**:20 **39**:7, 8 **57**:9

**pointed** [3] **28**:9 **43**:9 **61**:7

**pointless** [1] 4:5

**policy** [3] **41**:8,8 **53**:9

**pool** [1] **13**:17

**Porter** [28] 8:15 **20**:14,15, 16,18 **21**:8,18,18,22 **24**:11, 17,23 **25**:3,7,14,20 **26**:3,7, 15 **31**:1 **33**:18 **52**:22 **59**:7, 22 **60**:1,1,6,7

**Porter's** [1] 7:25

**position** [5] **27**:16 **33**:24 **41**:24 **46**:13 **56**:25

**possibility** [2] **22**:3 **40**:13

**possibly** [1] **39**:20

**power** [11] **21**:3 **30**:23,25 **32**:10,19 **34**:3 **37**:10 **47**:11 **53**:15 **58**:17 **59**:2

**powers** [8] **31**:10,23 **32**:8 **33**:25 **34**:4 **53**:2,22 **54**:10

**practicalities** [1] **51**:20

**practice** [2] **38**:14 **48**:8

**practices** [5] **37**:13 **47**:13, 15 **50**:9 **51**:21

**precedent** [1] **52**:22

**precedents** [2] **19**:15 **32**:1

**precisely** [5] **28**:12 **60**:11, 13,16 **62**:5

**precluded** [1] **21**:23

**precludes** [1] **60**:4

**preferred** [1] **50**:7

**premise** [1] **20**:8

**prescriptions** [1] **61**:19

**present** [1] **34**:21

**presume** [1] **25**:12

**presumption** [3] **4**:14 **12**:6 **45**:20

**pretty** [8] 5:16 **10**:13,21 **21**:14 **24**:3 **35**:22 **41**:24 **46**:21

**prevent** [2] **53**:7,13

**preventing** [1] **34**:21

**Price** [2] **21**:25 **33**:18

**primary** [4] 4:24 **17**:21 **18**:17 **28**:15

**principle** [7] **11**:19 **23**:4 **30**:14 **53**:21 **58**:19,22,23

**principles** [2] **39**:18 **54**:21

**prior** [2] **23**:11 **45**:8

**problem** [3] **22**:14 **52**:25 **53**:14

**procedural** [1] **47**:18

**proceed** [2] **31**:11 **60**:22

**proceeded** [2] **44**:20,21

**proceedings** [2] **40**:2 **46**:8

**process** [5] **14**:19 **18**:2,6 **39**:18 **49**:11

**processes** [6] 4:24 **16**:22 **17**:21 **29**:12,20 **46**:3 **47**:21 **61**:24

**profit** [1] **30**:16

**profoundly** [1] **30**:17

**program** [1] **42**:3

**progressive** [1] **37**:11

**prohibited** [4] 5:1 **17**:15 **29**:13 **62**:8

**prohibitions** [3] 4:22 **17**:20 **28**:13

**prohibitory** [1] **31**:18

**pronounce** [1] **17**:13

**proof** [2] 4:10 **60**:24

**properly** [1] **35**:7

**property** [8] 8:25 9:14 **23**:3, 3,13 **35**:9

**prospective** [2] **62**:6,7

**prospectively** [2] **28**:16 **29**:13

**protection** [5] **37**:25 **42**:3 **49**:8,23,25

**protections** [8] **25**:23 **46**:15 **47**:19,24 **50**:13,18 **61**:4 **62**:14

**proven** [1] **27**:22

**proves** [1] **51**:25

**provide** [7] 5:8 **15**:25 **22**:15 **31**:7 **32**:3 **40**:21 **61**:4

**provided** [4] 4:21 **25**:21 **61**:19 **62**:14

**provides** [1] 4:9

**providing** [2] **60**:8 **62**:6

**provision** [13] 4:7 **14**:10 **16**:20 **22**:1 **25**:22 **33**:13 **34**:18,20 **38**:6 **41**:20 **51**:5 **60**:8,11

**provisions** [4] 7:7 **44**:3 **47**:20 **51**:3

**proviso** [1] **29**:15

**punish** [1] **53**:7

**purpose** [2] 3:13 4:21

**pursue** [2] **16**:12 **18**:5

**pushes** [1] **53**:11

**put** [6] **10**:16 **19**:2,3,4 **51**:7 **52**:21

**puts** [1] **33**:3

**Q**

**question** [25] 6:10 **11**:10, 11 **12**:12 **13**:8 **14**:7 **16**:6 **19**:11 **21**:5 **27**:23 **28**:22 **35**:17 **40**:6,7 **42**:18 **45**:2 **49**:9 **50**:16 **51**:8 **52**:20 **53**:25 **54**:3,3,17 **55**:20

**questioning** [1] **43**:9

**questions** [5] **18**:22 **26**:6 **30**:20 **41**:20 **62**:16

**quicker** [1] **17**:17

**quickly** [2] 5:5 **16**:25

**quite** [3] **41**:14 **45**:8 **57**:9

**R**

**race** [1] **58**:8

**racking** [1] **62**:13

**radically** [1] **30**:13

**rampant** [1] **39**:12

**range** [1] **33**:25

**rather** [3] **16**:13 **36**:3 **47**:24

**ratification** [2] **26**:9,16

**RCRA** [1] **25**:5

**rea** [1] **46**:17

**reaching** [1] **28**:11

**read** [4] **14**:23 **38**:5 **52**:21

**reading** [4] 5:10 6:4 **18**:1 **32**:7

**real** [1] **54**:3

**really** [5] **45**:23 **47**:5 **50**:3 **53**:1 **57**:6

**reason** [5] 5:7 **12**:5 **15**:24 **23**:15 **29**:21 **34**:16

**reasonable** [2] 8:12 **27**:12

**reasoning** [1] **6**:24

**REBUTTAL** [3] 2:8 **59**:12, 13

**recent** [1] **14**:17

**recognize** [1] **50**:24

**recognized** [3] **30**:15,21, 22

**recognizing** [1] **50**:8

**reconcile** [1] **34**:24

**reconciled** [1] 7:22

**recover** [1] **18**:1

**recovery** [1] **31**:3

**Red** [1] **10**:9

**redress** [5] 9:10 **18**:12,15 **44**:25 **56**:12

**Reed** [1] **24**:12

**reference** [2] 9:3 **28**:23

**referred** [1] 6:15

**referring** [1] **39**:24

**refers** [1] 8:22

**reflect** [1] **44**:3

**reflects** [3] **31**:15 **49**:15,21

**refrain** [1] **14**:21

**regarding** [1] **47**:20

**regime** [1] **50**:22

**regular** [1] **38**:7

**regulatory** [1] **50**:22

**reiterate** [1] **58**:16

**rejected** [2] 6:11 **12**:1

**relationship** [1] **13**:7

**relief** [55] 3:17,18,24 4:1,4, 6,8,15,16,19 7:15,21,24 8:20 9:7,15,20,22,24 **12**:2 **15**:22:16 **25**:6,11,13,19,21 **26**:1 **28**:18,25 **29**:19 **31**:5 **32**:4 **33**:16 **35**:8,21 **41**:18 **42**:9 **43**:21,23,24,25 **44**:12 **47**:20 **54**:23 **60**:4,13,15,17 **61**:3,9

**relies** [3] **21**:7,8,8

**rely** [1] **44**:14

**remains** [1] **51**:19

**remedial** [1] **35**:8

**remedies** [17] 5:6 6:17 **15**:25 **16**:10 **17**:8 **18**:24 **24**:19 **29**:9 **30**:18 **31**:7,19 **32**:21 **34**:7 **36**:22 **39**:15 **44**:9,10, 15 **45**:25 **46**:2,7 **51**:4,6 **54**:8,15 **56**:24 **59**:24

**remedy** [22] **17**:18 **18**:11 **21**:19,21,24 **22**:4 **23**:15 **24**:18 **27**:15 **35**:14 **39**:22 **40**:21,23 **41**:1,2,13 **45**:12 **56**:2 **57**:10 **60**:8,10 **61**:25

**remedying** [1] **57**:16

**remind** [1] **50**:4

**render** [1] **62**:12

**rendered** [1] **25**:24

**rendering** [1] **50**:17

**repay** [1] **12**:25

**repeal** [1] **38**:3

**repeated** [1] **46**:16

**require** [1] **48**:17

**required** [4] **12**:20 **13**:11 **39**:21 **59**:7

**requirement** [4] 4:11 **29**:10 **41**:17 **60**:25

**requires** [3] **35**:4 **41**:16 **52**:4

**requiring** [2] **14**:20 **22**:17

Heritage Reporting Corporation

Official - Subject to Final Review

reservoir [1] 13:2
resolve [1] 11:5
resolved [1] 55:1
resolves [1] 54:9
resources [1] 13:18
respect [2] 12:19 25:1
respects [1] 36:7
Respondent [4] 1:8,22 2:7 30:4
response [1] 61:2
responses [2] 6:10 54:1
responsibilities [2] 5:8 13:21
responsibility [2] 18:18 28:15
rest [1] 55:17
restitution [13] 21:3,11,23 22:17 23:6,12,24,25 24:19 40:21,23 56:2 57:6
restore [3] 56:24 57:11 59:2
result [1] 12:24
results [1] 53:14
resume [1] 40:17
resumed [1] 40:13
retrospective [6] 3:24 4:19 9:6,7 28:18 61:9
return [4] 12:20 13:11 29:22 30:25
returned [1] 23:4
reversed [1] 62:18
Rights [2] 6:14 18:24
ripped [1] 57:12
rise [2] 31:4 59:5
ROBERTS [30] 3:3 5:9 6:25 7:2 8:2 10:5 12:9 15:18, 21 18:19 22:10 24:5 27:1 28:20 29:25 32:5 33:5,20 34:10 37:5 40:4 43:15 46:10 49:12,16 52:14 55:8 58:13 59:10 62:19
role [2] 5:23 31:14
Root [1] 35:10
roughly [1] 5:11
route [6] 49:1,2,6,8 50:7,7
routine [1] 17:11
rule [6] 12:3,18 23:9 30:7 37:21,23
ruled [1] 46:5
rulemaking [3] 37:1 43:2,5
rules [5] 16:3 43:2 50:5 51:20 52:10
ruling [2] 12:4 30:13
run [1] 48:19
running [1] 28:17
Rutledge [3] 24:12,16,16

**S**

safeguards [4] 4:9 27:11 60:18
safekeeping [1] 57:24
same [15] 7:18 8:10 14:7 19:23 21:5 25:21 26:1 33:8 37:24 43:12,19 60:10,13,

16 61:3
Sandoval [4] 6:12,24 7:12 19:2
sat [1] 61:16
savings [2] 31:13 50:25
saw [1] 45:4
saying [1] 29:7 33:1
says [4] 4:2 15:9 31:12 32:24 33:12 34:15 37:16 38:1 41:25
scams [1] 48:19
scheme [3] 12:14 21:21 26:4
school [1] 14:13
Scott [1] 36:13
SEC [1] 43:12
Second [3] 4:1 20:25 21:7
second-level [1] 29:15
Section [3] 13:4:2,7,20 5:2 7:21 15:25 18:16 19:5 24 21:24 25:22 27:11,22 30:20 31:12,13,15,21 32: 23,23 33:13,14 34:15 36:1, 3,3,6,7,18,22,23 37:22 42: 5 43:8,18,19,23 44:1,4,13 45:6,9,11,24,25 46:4,14,14, 15,20 50:9,13 51:1,9,17 60: 17,22,23 62:15
Sections [5] 8:9 31:6,25 32:1 59:4
sectors [1] 43:3
Securities [1] 41:15
see [8] 10:11,14 20:21 21: 19,20 38:20 39:5 51:2
seek [17] 3:14 9:19 14:16 16:8 17:9 18:15 21:3,5 23: 23 28:18 32:24 33:6,16 35: 13 39:15 53:20 54:5
seeks [1] 23:22
seem [3] 46:19 50:24 57:6
seems [11] 10:15 16:10 34: 19,22 35:25 46:11,25 47: 22 52:24 56:23 57:4
seized [1] 58:9
self-defining [1] 50:10
sense [7] 3:23 4:21 9:5 16: 2 18:7 48:25 53:1
sentence [1] 29:15
separate [1] 25:22
separately [3] 43:19 56:1, 12
separation [3] 53:1,21 54: 10
serves [1] 31:13
service [1] 16:21
set [1] 50:5
settle [1] 40:3
settled [1] 56:1
settlements [1] 39:25
Seventh [1] 10:22
several [1] 49:6
Sherman [1] 50:12
shouldn't [1] 5:24
shows [1] 62:5

side [8] 6:3 10:16 11:23,25 33:21 49:23,25 50:1
significant [2] 5:13 47:1
similar [2] 6:11 24:10
simple [1] 22:24
simply [9] 9:20 10:18 12:3
since [4] 4:23 6:19 30:22
single [4] 16:20 28:11 29: 14 61:2
sits [1] 58:17
situation [1] 9:18
situations [1] 16:22
six [1] 39:5
Skechers [2] 38:10 39:3
slightly [1] 45:2
smoothly [1] 32:17
society [1] 11:21
somebody [1] 11:14
somehow [2] 7:14,22
someone [3] 3:21 23:11 27:18
sometimes [6] 16:3,17 18: 8,10 53:8 60:19
somewhat [1] 36:22
sorry [5] 16:18 20:23 27:20 32:23 35:12
sort [5] 5:18 6:6 25:16 32: 11
Sotomayor [10] 15:22,23 16:16 17:1,4,24 43:16,17 45:1,18
Southern [2] 13:9,19
specific [4] 4:15 5:17 9:2 32:21
specify [1] 31:19
spent [1] 58:5
squarely [1] 33:3
stability [1] 26:14
stake [1] 55:11
standard [4] 27:13 35:2 59: 6 60:5
standards [1] 50:2
started [2] 37:8 43:8
starts [1] 40:15
state [1] 36:24
STATES [5] 1:1,16 13:3,5 33:22
statute [21] 4:10 5:11,14, 24 16:11 19:17,18 20:19 21:4 22:2 25:8,15,20,24 26:20,20,23 29:17 60:3 61: 8,10
statutes [1] 5:14
statutory [6] 6:20 17:13 21: 21 26:4 53:8,12
step [3] 11:5 29:7 50:20
stick [1] 53:22
still [6] 8:10 11:11,12 26:20 40:22 41:14
stolen [2] 30:12 57:19
stood [1] 57:1
stop [8] 5:4 16:24 18:4,4 30:10 40:16 43:24 61:22
stopping [2] 18:10,17

Stores [1] 54:18
Story [2] 22:25 23:17
stretches [1] 53:12
striking [2] 29:11 61:8
strikingly [1] 24:10
strong [3] 39:3 46:13
struck [2] 39:11,14
structure [2] 3:12 62:10
stuff [3] 36:20 49:22
subject [6] 14:4 21:12 25: 23 27:8 31:2 61:16
submitted [2] 62:20,22
substance [1] 50:11
substantial [1] 27:23
substantiation [1] 38:12
succeed [1] 42:11
successful [1] 42:12
sue [1] 36:23
sued [1] 35:16
sufficient [2] 18:11 60:9
suggest [4] 19:12 21:13 27:21 34:19
suggested [1] 27:10
suggesting [1] 45:5
suggests [1] 60:5
suit [1] 31:2
suited [1] 5:23
summed [1] 31:1
superfluous [1] 50:18
supersedes [1] 22:3
supplement [2] 5:3 16:19
support [1] 32:6
suppose [2] 13:3 14:14
supposed [3] 18:22 19:13 20:10
SUPREME [3] 1:1,15 21: 11
surprise [1] 42:11
surprised [1] 12:23
suspicious [1] 37:10
sweep [1] 28:10
sworn [1] 6:19

**T**

tangential [1] 26:8
tells [1] 37:16
temporary [2] 17:5 18:3
tens [1] 56:20
term [4] 29:4 30:15 50:8 59: 23
test [2] 8:18 15:5,9 23:5 36:14 45:14 47:14
test [1] 3:12
text [3] 42:7 52:25 53:23
textual [1] 44:2
theoretical [1] 19:6
theory [1] 7:13
there'd [1] 6:2
there's [12] 5:12 10:21 12: 2,5 17:11 22:25 23:1 27: 17 48:15 49:9 50:18 56:10
therefore [4] 31:18 35:12 38:16 47:18
thinks [3] 19:10,11 52:1

Third [1] 4:7
Thomas [8] 8:4,5 9:12 10: 4 34:12,13 35:2,23
Thomas's [2] 40:6,7
though [5] 21:22 35:25 39: 24 46:20 47:22
threatened [5] 5:3 16:23 25:15
Three [3] 3:19 4:17 7:16 10: 2 25:8 28:2 29:2
throughout [2] 33:23 62:2
time's [1] 58:12
time-consuming [1] 42:5
Title [1] 6:13
today [5] 5:21 6:8 51:9
Together [1] 31:25
toning [1] 38:17
took [2] 11:8 58:21
toothless [1] 39:13
totally [1] 25:17
traceable [2] 57:2,15
TRADE [3] 1:7 3:5 51:21
tradition [1] 59:1
traditional [7] 31:10,22 35: 20 44:9,15 54:15,21
traditionally [3] 3:16 8:18, 19 15:10,11 29:5 41:4
transfer [1] 53:15
Treasury [1] 55:17
treatise [2] 7:9 23:18
triggered [2] 35:18 45:9
true [1] 14:10
truly [1] 61:8
trust [1] 58:10
try [1] 7:5
trying [7] 19:20 20:13 24:1 28:17 60:12,13,16
Tucker [7] 13:17,25 36:13 55:24,24 58:6 61:15
Tucker's [2] 13:10 55:13
turn [2] 8:25 14:6
turned [1] 56:4
two [8] 6:9 11:22,25 20:24 44:3 46:22 47:1 61:3
type [2] 4:15 23:18
types [1] 34:7
typically [2] 35:4 40:14

**U**

U.S [1] 36:12
ultimately [2] 54:24 56:13
Unburn [2] 38:11 39:3
uncertain [1] 52:3
under [32] 4:13 5:23 11:1 15:25 16:1,10,12 18:2 19: 19 20:13 23:25 26:1 27:15, 22 29:14 33:13 36:1,18 37: 13,19 38:6,7 47:13 50:11 59:7 60:1,14,17,22 61:3 62:13,14
underlying [1] 23:20
understand [4] 13:11 27:5 39:21 53:4
understandably [1] 47:17

Official - Subject to Final Review

| | |
|---|---|
| **understanding** [8] 12:15 13:15,18 16:11 27:13 30: 18 31:22 55:4 | **Wednesday** [1] 1:12 |
| | **well-established** [1] 38: 21 |
| **understood** [13] 3:16 7:6 8:18 15:10 20:7,14 21:15 29:5 41:21 42:19,20 45:6 55:2 | **whatever** [3] 32:19 33:9 58:8 |
| | **whatsoever** [2] 18:15 38:1 |
| | **whenever** [2] 33:24 34:16 |
| **undo** [1] 11:13 | **Whereupon** [1] 62:21 |
| **unfair** [3] 38:14 47:16 51: 21 | **Whether** [15] 6:22 9:10,22 13:4 17:14,15 19:20 21:19 23:3 28:23,25 44:20,22 53: 16 57:21 |
| **uniform** [2] 10:21 11:13 | |
| **unimportant** [1] 45:3 | **Whittaker** [1] 24:14 |
| **UNITED** [5] 1:1,16 13:3,5 33:22 | **whole** [1] 19:9 |
| | **whom** [1] 14:20 |
| **unlawful** [1] 30:25 | **widespread** [1] 62:2 |
| **unlawfully** [1] 58:21 | **wife** [2] 38:15 55:13 |
| **unmistakable** [2] 31:9 59: 5 | **will** [11] 3:3 12:19,20 16:5 37:17,18,18 38:1 39:21 55: 20 58:1 |
| **until** [1] 18:16 | |
| **up** [18] 13:4,20 26:5 28:21 31:1 36:20,20,21 38:25 45: 2 48:14 50:5 51:20 52:5, 19 56:13 58:14 62:13 | **wind** [1] 56:13 |
| | **wins** [1] 12:5 |
| | **wished** [1] 24:20 |
| | **wishes** [2] 48:8 51:13 |
| **uphold** [1] 58:25 | **within** [1] 33:3 |
| **uses** [3] 49:1,5,7 | **without** [5] 9:3 29:19 31: 23 60:17 62:13 |
| **using** [2] 19:7 34:23 | |
| | **Wonder** [1] 39:4 |
| **V** | **wondering** [1] 47:4 |
| **valid** [1] 54:25 | **word** [4] 4:5 7:23 14:12 59: 20 |
| **value** [1] 22:19 | |
| **various** [1] 25:23 | **words** [5] 19:17,18 24:25 55:2 59:19 |
| **version** [2] 12:4 45:9 | |
| **versus** [4] 3:5 6:24 10:25 54:18 | **work** [1] 32:1 |
| | **workaround** [1] 42:6 |
| **VI** [1] 6:13 | **worked** [1] 53:3 |
| **victim** [1] 59:2 | **works** [1] 31:17 |
| **victimization** [1] 44:25 | **worry** [1] 38:1 |
| **victimized** [1] 32:4 | **worth** [1] 13:22 |
| **victims** [8] 4:11 12:13 55: 15 57:11,13,15,18 58:2 | **worthy** [1] 9:9 |
| | **wrap** [2] 28:21 58:14 |
| **view** [3] 6:7 27:17 29:14 | **write** [1] 24:25 |
| **vigorously** [1] 43:7 | **written** [1] 24:13 |
| **violate** [2] 3:22 34:18 | **wrongdoers** [2] 30:15 58: 20 |
| **violated** [1] 27:19 | |
| **violating** [2] 3:21 34:18 | **wrongdoing** [2] 14:3 30: 16 |
| **violation** [5] 31:20 37:20, 23 46:16 62:3 | |
| | **wrongfully** [1] 59:3 |
| **violations** [3] 3:23 25:16 30:11 | **Y** |
| **violator** [1] 30:11 | **year** [1] 49:7 |
| **virtually** [1] 29:16 | **years** [10] 5:11,12 10:20 11: 13 20:24 26:10 38:4,5 43: 10 53:4 |
| **W** | |
| | **York** [1] 13:9 |
| **wait** [1] 11:9 | |
| **wandered** [1] 50:15 | |
| **wanted** [6] 22:7 31:19 37:2 42:6 44:10,19 | |
| **wants** [1] 29:19 | |
| **war** [1] 53:9 | |
| **Washington** [2] 1:11,21 | |
| **water** [1] 11:1 | |
| **way** [6] 10:14 18:5 27:17 38:23 51:8 59:18 | |
| **ways** [2] 39:4,5 | |

Heritage Reporting Corporation