# Government's Opposition to

# Defendant's Motion to Dismiss Under Double Jeopardy

## *Exhibit Appendix*

| Exhibit | Description | Date | Description |
|---------|-------------|------|-------------|
| A | United States v. Brown, Case No. 1:20-cr-00524 (S.D. N.Y October 1, 2020) Dkt. 86 | 08/21/23 | Transcript from Oral Argument for Motion to Dismiss under Double Jeopardy |
| B | United States v. Brown, Case No. 1:20-cr-00524 (S.D. N.Y October 1, 2020) Dkt. 104 | 11/07/23 | Transcript from Oral Decision to Deny Motion to Dismiss Under Double Jeopardy |
| C | United States v. Brown, Case No. 1:20-cr-00524 (S.D. N.Y, October 1, 2020) Dkt. 108 | 11/15/23 | Order Denying Motion to Dismiss Under Double Jeopardy |
| D | FTC v. Cardiff, et al. Case No. 5:18-cv-02104 (C.D. Cal. 2018) Dkt. 72 | 11/20/18 | Transcript of Preliminary Injunction Hearing |
| E | FTC v. Cardiff, et al. Case No. 5:18-cv-02104 (C.D. Cal. 2018) Dkt. 627 | 06/29/21 | Minute Order in Chambers re: Remedies in Plaintiff's Motion for Summary Judgement 423 and Jason and Eunjung Cardiff's Motion for Summary Judgement |

# EXHIBIT A

N88DBROC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          20 Cr. 524 (KPF)

5   MICHAEL BROWN,

6                                          Conference
               Defendant.
7   ------------------------------x

8
                                           New York, N.Y.
9                                          August 8, 2023
                                           11:00 a.m.
10

11  Before:

12                HON. KATHERINE POLK FAILLA,

13                                         U.S. District Judge

14                      APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    SARAH Y. LAI
17  SAGAR KANANUR RAVI
         Assistant United States Attorney
18
    STEPHEN R. COCHELL
19       Attorney for the defendant.

20

21

22

23

24

25

N88DBROC

```
 1          (Case called)
 2          MS. LAI:  Good morning.  Sarah Lai for the government,
 3   your Honor.  On the phone is Sagar Ravi.
 4          THE COURT:  Good morning, both of you.
 5          Just so that I understand, I should be directing my
 6   questions to you in the first instance, and Mr. Ravi will
 7   participate as you hand off to him?
 8          MS. LAI:  That's correct, your Honor.
 9          THE COURT:  Thank you.
10          Mr. Cochell, good morning to you, sir.
11          MR. COCHELL:  Good morning, your Honor.  It's good to
12   be here again.  Steven Cochell appearing on behalf of the
13   defendant, Michael Brown.
14          THE COURT:  Mr. Brown, good morning.
15          THE DEFENDANT:  Good morning.
16          THE COURT:  Mr. Brown, I believe you have family
17   members here to support you today.
18          THE DEFENDANT:  Yes.
19          THE COURT:  Thank you very much.
20          We are here for oral argument on two separate motions,
21   one dealing with issues of double jeopardy, and the other
22   dealing with issues of discovery.  It is my plan this morning
23   to have oral argument on both of them.  I don't expect to have
24   a decision today.  I hope to have a decision in the near term.
25   Let me not hem myself in.
```

N88DBROC

1    What I will ask, and these are very basic requests,

2    but I'll ask them nonetheless, is to please answer the question

3    that I'm asking, rather than the question you think I should be

4    asking.  I hope to address the issues raised in the parties'

5    submissions, but I'm not trying to lead either of you down a

6    path.  There's no ulterior motive to my questions, other than

7    my wanting to understand these arguments a little better.

8    So, Mr.Cochell, I'll begin with you, sir.  Is it your

9    preference to be at the podium or at the table?

10   MR. COCHELL:  I would rather sit down, because I have

11   some papers, and as you ask questions, I may want to refer to

12   them.  And the prospect of dropping papers and scrambling for

13   them while I'm in the middle of answering your question is kind

14   of daunting.

15   THE COURT:  Well, we don't want you to be concerned in

16   that regard.  That is acceptable.  I also want to make sure

17   that we can hear you in this courtroom.

18   I'll begin, please, sir, with the double jeopardy

19   motion, and just as a background to it, as I read your

20   submission, I don't think that it cites any cases in which a

21   Court has found that a particular type of civil or regulatory

22   penalty amounted to jeopardy for purposes of double jeopardy,

23   but you'll please tell me if I'm wrong.  I thought I understood

24   what you were saying is given the particular constellation of

25   facts here, that, if not here, where would it be.

1          But perhaps let me back up then and ask, in your
2     travels, sir, have you seen a decision in which a district or
3     circuit court has found that a particular civil penalty amounts
4     to a quasi criminal matter such that double jeopardy would
5     attach?
6          MR. COCHELL:  I have not seen it in the context of the
7     Court applying the *Hudson* test.
8          THE COURT:  Yes.
9          MR. COCHELL:  There are some earlier cases pre *Hudson*
10    where they seem to have been applying different standards.
11    There is a case I think -- let me see.  There are forfeiture
12    cases where they have found double jeopardy, particularly in
13    tax matters.  I don't --
14          THE COURT:  Before *Hudson*, sir?
15          MR. COCHELL:  I can't answer that truthfully.
16          THE COURT:  Or after *Hudson*?
17          MR. COCHELL:  Yeah.
18          THE COURT:  Tell me, which case would that have been?
19    Do you recall?
20          MR. COCHELL:  I don't have a specific case in mind.
21          THE COURT:  Okay.
22          MR. COCHELL:  I just recall generally that I saw it.
23    But, you know, they were so far divorced from the facts here
24    that I just kind of assumed that in the constellation of facts
25    under *Hudson*, I have not seen anything that would be close to

1    the implied or express, you know, sort of conduct that would

2    take it within *Hudson*.  I think we are writing on a clean slate

3    in the context certainly of FTC cases, and SEC cases, which are

4    the closest analog.

5           THE COURT:  You'll excuse me.  Once in a while I'm

6    going to want to take notes of what you're saying, so there

7    might be a delay.

8           Sir, if the conduct at issue, if the penalty -- at

9    least that's how I understand the Northern District of Illinois

10   judge at this time has characterized that money now, as a

11   penalty.  If that's upheld by the Seventh Circuit, is there

12   still a double jeopardy claim?

13          MR. COCHELL:  There is an issue that's live before the

14   Seventh Circuit, and that is the fact that the amended judgment

15   purports to impose a penalty under section 19, which, as the

16   statutory history clearly indicates, was a limited remedy,

17   limited only to situations where it was necessary to redress

18   injury to consumers.  And that is an individualized standard.

19          And under both the *Figgie* case out of the Ninth

20   Circuit, and the *Noland* case in the District of Arizona, a case

21   in which I'm counsel of record, the Court found that in the

22   absence of a damages methodology, while -- in *Noland*, in the

23   absence of a damages methodology, disclosed during discovery,

24   they could not try to impose a remedy under section 19, because

25   it requires more.  It requires evaluation of the inherent value

```
 1   of the product.  It requires people who will say, I've been
 2   injured.  And it's well within -- what we argue to the Seventh
 3   Circuit is that it's well within the ambit of discovery for the
 4   FTC to do surveys or to determine who's been injured and who
 5   actually wants to make a claim, because in this case, the
 6   record was also very clear that there were people willing, who
 7   wanted to keep the monitoring service.  They called customer
 8   service, and had a discussion about possibly discontinuing, and
 9   when they learned that there was a credit monitoring service,
10   that they wanted to keep it and did keep it.  And the credit
11   monitoring service was actually disclosed in -- and in the
12   scheme of things, for that case, where there's not a statutory
13   remedy, but a generic wire fraud claim, there is a requirement
14   that they prove fraud.
15            And in this case, there was a disclosure that there
16   was a credit monitoring service, and people were given seven
17   days from the date of signing up to cancel their service.  And
18   thousands of them did.  I mean, 90 percent of anybody -- I
19   think it was higher, 95 percent of anybody requesting a refund
20   got it.  And then those that didn't get it were people who had
21   used the credit monitoring service, and, you know, had gotten a
22   benefit of their bargain.
23            So that's kind of a lengthy answer.  I think I've
24   answered your Honor's narrow question though.
25            THE COURT:  You have, sir, because my question was, do
```

1    I need to wait for the Seventh Circuit, and I believe what

2    you're saying is there are still some arguments that they may

3    or may not address, and that still depend -- or inform the

4    motion that you're making today.

5              Let me ask a different set of questions that deals

6    with --

7              MR. COCHELL:  Could I have one addition then?

8              THE COURT:  Yes.  Yes.

9              MR. COCHELL:  Because it goes right into something

10   else.  This goes into the issue of tainted and untainted funds,

11   and whether the FTC has taken the statute in a direction that

12   the courts have condemned.  Both in the *Liu* and *Kokesh*, the

13   courts said that the sine qua non of equitable restitution is

14   to obtain ill-gotten gains.  So when you have a provision or a

15   process, like the preliminary injunction in this case, where

16   you're grabbing tainted versus -- and untainted assets, that's

17   a problem.  That's a punishment, because it exceeds the balance

18   of equitable restitution.  It exceeds the balance of what the

19   Court should be awarding at the end of the day.

20             And then you have --

21             THE COURT:  Sir, I'll ask you to pause for a moment,

22   because I want to explore that a little more.  I know the asset

23   forfeiture context there is this concept of substitute assets.

24             MR. COCHELL:  Of what?

25             THE COURT:  Substitute assets, sir.

1          MR. COCHELL:  Yes.

2          THE COURT:  In some cases, the fraud, or whatever has

3     happened, the victim's money is gone, and they can't have the

4     exact money that they deposited, but it's enough that they get

5     something else.  When you talk to me about seizing tainted and

6     untainted funds, that is interesting, and I know about it from

7     the asset forfeiture context, and am aware of cases like

8     *Monsanto*, where it's discussed, but my question here is in some

9     circumstances I thought that the government is permitted to

10    seize untainted funds, if it turns out those are going to be

11    used to make restitution or to make whole people whose funds

12    and assets have been dissipated.

13          Is that not the case?

14          MR. COCHELL:  We don't believe it is.

15          THE COURT:  Okay.

16          MR. COCHELL:  Because if you have untainted funds,

17    then those are funds that are unrelated to the underlying

18    offense, and that would certainly -- and in this case, like

19    statute, you know, Title 18, 371, the mail fraud statute, I

20    think I've got the right cite --

21          THE COURT:  No.  That's the conspiracy statute, sir.

22          MR. COCHELL:  Okay.  Under the mail fraud statute --

23          THE COURT:  Yes.  Perhaps 1341, sir.

24          MR. COCHELL:  Yes.  You can only get funds that are

25    derived from the underlying fraud, which at least in the

N88DBROC

1     criminal law indicates a real decision that untainted funds

2     should not be forfeited.

3            Now, in the context of the civil cases, I cannot

4     report to you that there are any decisions under the FTC Act

5     where the Court has excluded untainted funds, but the day is

6     still young following the *Liu* decision, which was only decided

7     in I think August of 2021.  So there hasn't been a lot of time

8     for these cases to wind up on appeal, assuming that people even

9     raise the issue.

10           And then of course there were no funds -- there were

11    limited funds allowed to counsel for untainted, you know,

12    assets, and, as you know from our discovery motion, and from

13    this motion, there were funds that were not allowed for living

14    expenses that were untainted.

15           THE COURT:  But I thought I understood with respect to

16    that seizure of funds, and the idea of -- the need to request

17    permission, I thought I understood from the government that

18    there was an opportunity for your client to seek additional

19    funds that he did not avail himself of; is that correct?

20           MR. COCHELL:  No.  You have to show that there are

21    other -- that there are no other funds available.  And we --

22           THE COURT:  You're not answering my question.

23           MR. COCHELL:  I'm sorry.

24           THE COURT:  Was there, in fact, a way of going back to

25    the receiver or to the FTC to get additional funds to the ones

```
 1    that were supplied on a monthly basis to your client?

 2              MR. COCHELL:  Okay.  There was, and --

 3              THE COURT:  Did he attempt to make use of that other

 4    opportunity?

 5              MR. COCHELL:  We made inquiries and requests of the

 6    receiver for untainted funds, but not of living expenses.  We

 7    did request the FTC, because the Court appointed the FTC to

 8    screen or to supervise frozen funds that had to do with it.

 9    And that obviously was a conflict of interest, and we've raised

10    issues about that in our pleadings, because it's like the fox

11    guarding the hen house, with the FTC dictating what the -- what

12    the defendant can get.  And so --

13              THE COURT:  But was there not a receiver, sir, who was

14    appointed?

15              MR. COCHELL:  No, there was no receivership appointed

16    over the defendant.  It was a very odd case.  And I have to

17    admit that when I came into that case, there was about four

18    months left of discovery, and so we didn't have a whole lot of

19    time to be writing briefs.  It was basically --

20              THE COURT:  That's not an acceptable answer, sir.

21              MR. COCHELL:  I know, but the bottom line is --

22              THE COURT:  But that's not an acceptable answer.

23              MR. COCHELL:  Okay.

24              THE COURT:  Let's go with the arguments that might

25    work.
```

1          MR. COCHELL:  Yes, your Honor.

2          THE COURT:  Not the ones that won't.

3          MR. COCHELL:  Yes, your Honor.

4          If you're wondering why I didn't litigate the heck out

5     of it, it's because there was limited time, and only one of me.

6          THE COURT:  Also not acceptable.

7          Let me move on to something for which I'd like a

8     little more understanding.

9          MR. COCHELL:  Sure.

10         THE COURT:  The theme of your open end reply briefs is

11    that there were a confluence of actions by the FTC, that they

12    were acting in bad faith.  The government responds by saying

13    it's not bad faith to rely on precedence that's been in

14    existence for 30 years, until suddenly it wasn't.  But I think

15    I understand you to be saying that the FTC lied to the courts

16    in order to get that precedent, and then exploited it, used it

17    until they could use it no more.

18         But I want to understand, do I need to find that the

19    FTC was acting in bad faith?  You can first tell me whether

20    I've misstated your position or overstated your position,

21    because I don't want to confuse it, but a lot of what you're

22    saying is the FTC has engaged in affirmative misconduct.  And

23    that is why the conduct, vis-a-vis your client, is punitive,

24    and amounts to jeopardy.

25         My question to you is do I need to find that, and if

1   not, what is it that I need to find in order to find that this

2   amounts to jeopardy?

3        MR. COCHELL:  The narrow answer is yes, I think you do

4   need to find it.  It was not an issue addressed by the Supreme

5   Court.  They said everything but.  And if you listen to the

6   oral argument, you'll hear Justice Breyer skewering the FTC for

7   their total disregard of the legislative compromise reached by

8   Congress when it rejected the idea of a grant of general, broad

9   authority, monetary relief authority to be given to the FTC.

10       They had section 13(b) strictly for injunctions, as a

11  stopgap measure, and then Congress allowed for this jurist --

12  they granted jurisdiction, the statute says jurisdiction, they

13  grant jurisdiction, so that if it's necessary to grant consumer

14  redress, the courts can do it, but under the narrow

15  jurisdictional grant of Congress.  So when you get to the issue

16  of their disregard, they had one of their own appellate lawyers

17  post, you know, and give speeches about this, post it on the

18  FTC website, basically bragging about how they took advantage

19  of --

20       THE COURT:  I didn't read Mr. Fitzgerald's article to

21  say anything like that.

22       MR. COCHELL:  Sure.

23       THE COURT:  I thought what he was saying was, we took

24  this position.  It was accepted by the courts.  I was there

25  when it was done.  I didn't see him clicking his heels or

N88DBROC

```
1   twirling his mustache and saying, aha, I've convinced courts to

2   accept this ridiculous position.  So my point is one can be

3   wrong -- according to the Second Circuit, I am occasionally

4   wrong.  I get reversed.  It doesn't mean I'm acting in bad

5   faith.  I want to understand how it is that I can find not

6   merely that the FTC was wrong in its interpretation --

7            MR. COCHELL:  Right.

8            THE COURT:  -- but how I can find it was acting in bad

9   faith.

10           MR. COCHELL:  Oh, he blatantly came out and said --

11           THE COURT:  He who?

12           MR. COCHELL:  Mr. Fitzgerald blatantly came out and

13  said, we knew there was no legislative history or text that

14  gave us a right to seek monetary relief under section 13(b) --

15           THE COURT:  He cited page 4 of his article for that.

16  I don't think I saw it on page 4 of the article.  It has to be

17  somewhere else in the article.

18           MR. COCHELL:  It definitely is.  I'll find it for your

19  Honor.

20           THE COURT:  I'll read the article again.  That's fine.

21           MR. COCHELL:  And then there are a couple of other

22  things, and they came up with this theory of implied authority.

23  And that is the hat that the FTC hangs its hat on by saying,

24  oh, we acted in good faith; but the problem is when you get to

25  the Supreme Court level, and the Supreme Court is looking at
```

1    this, they're saying, bah humbug, Congress never could have

2    intended that this be the remedy.  So the bottom line is the

3    Court I believe, respectfully, has to look at this.  This is

4    one of the worst nightmares of the average citizen.  An agency

5    going out and creating its own version of what the statute

6    should be, and then going out and closing down businesses, and

7    pursuing people based on authority that was never granted nor

8    intended by Congress.

9          THE COURT:  But what about that the Seventh Circuit

10   thought they had that authority until they didn't?  It's not as

11   though -- your argument has greater force if immediately the

12   first court who looked at it said, this is ridiculous, bah

13   humbug, as it were; but it turns out for 30 years they thought

14   it was okay, and that's the problem.

15         Am I to assume that the Seventh Circuit was just hood

16   winked all this time?

17         MR. COCHELL:  Judge Sykes basically said the circuit

18   courts uncritically looked at what the court in *Singer* did in

19   1982, and basically giving them an out.  But she was very

20   pleasantly saying, you were dead wrong.

21         THE COURT:  But, again, dead wrong doesn't mean bad

22   faith.

23         MR. COCHELL:  Well, the courts weren't acting in bad

24   faith.  They were not given --

25         THE COURT:  I'm sorry?  The courts were acting in bad

N88DBROC

1    faith?

2              MR. COCHELL:  The Ninth Circuit was not acting in bad

3    faith.  They were misguided and misled by the FTC, who had then

4    come forward with Mr. Fitzgerald in an affidavit saying, we

5    knew we didn't have the text or legislative history, but we'd

6    like you to imply a remedy for that.  The Court would have

7    laughed them out of the courtroom, and possibly even sanctioned

8    them for it, because it's sort of a nonsensical redefinition of

9    how administrative agencies are tasked to carry out their

10   authority.

11             So we would respectfully submit that in the context of

12   double jeopardy, *Hudson* talks about statutes that are used as

13   intended, and if they are so excessive or severe, that, you

14   know, in practice, then you can have double jeopardy.  And so

15   we have a statute that wasn't even used the way it was supposed

16   to be used and intended by Congress.  That's what the Supreme

17   Court found.

18             And then we also have this range of conduct that --

19   you know, and I outlined it in gory detail, but basically what

20   I would ask the Court to look at is, look at the preliminary

21   injunction, and then look at the final injunction.  And in the

22   final injunction, there were some broad, you know, things about

23   you can't do negative options, you can't do various sorts of

24   marketing techniques, okay.  All well and good, but in the

25   preliminary injunction, this was like big brother, you know, in

1    the courtroom, where they're authorizing Draconian

2    circumstances that they never even dreamed of impose -- this

3    was the FTC's imposed judgment.  The Court never even dreamed

4    of saying you can't have a bank account.  You can't have a

5    merchant account.  You can't start a business unless you ask

6    permission, which is okay.  But when you ask for permission and

7    you provide the documents, then the FTC can go out and harass,

8    by subpoenaing people for documents.  And these are the same

9    documents that they got when Brown submitted it before the

10   subpoenas were issued.

11        And we pointed this out to the FTC, and they basically

12   submarined a potentially profitable business that complied

13   fully with the preliminary injunction.  And so, you know, he

14   couldn't pay credit cards.  He couldn't make money.  He

15   couldn't keep the money that he made.  You know, they limited

16   him to $4,000, and castigated him for spending money trying to

17   keep his credit rating.  And when you're -- and this Court

18   knows from people who have been on probation, when you're on

19   probation, you're trying to -- if you're trying to start a

20   business, you need a credit rating.  You have to have credit.

21   You have to have a car in most localites.  They didn't allow

22   him a car.  And so those are the sorts of things that are so

23   excessive and severe in the civil context that they would

24   necessarily be criminal punishments.

25        And there's no fencing in, and injunctions, the FTC

N88DBROC

1    has the right to fence in, to go somewhere that's logically and

2    rationally connected.  But bank accounts, not allowing people

3    to pay bills, seeing their salaries, or whatever they make in

4    excess of a -- of a FTC dictated amount, that goes way too far,

5    and it amounts to a debtor's prison basically.  And a concept

6    that was, you know, castigated and condemned, you know, over a

7    century ago.

8           Yes, ma'am.

9           THE COURT:  At page 6 of your opening brief -- you

10   don't need to turn to it -- you indicate that the pretrial

11   confiscation of lawfully obtained funds was not imposed as a

12   final remedy in the FTC case, nor could it be imposed by this

13   Court.  I think that was something you were speaking about a

14   few moments ago.

15          You're asking me, I believe, to compare the pretrial

16   injunctive request and the post trial, the final remedy

17   injunctive request.  Am I correct?  If so, what is it you want

18   me to find out?  That the things didn't appear in the final,

19   that there is significance to the fact they didn't appear in

20   the final, and that they either collectively or perhaps

21   individually amounted to such severe punishments and so beyond

22   the realm of the FTC that they are criminal?

23          MR. COCHELL:  I think it's an indicator.  I think it's

24   an indicator that the FTC knew that this was nonsense, and if

25   -- you know, if the judge had seen that, he probably would have

1     said, what's this all about, and whereas in the preliminary

2     injunction context, you know, I think the judge gave them a lot

3     more latitude.  And it turned out to have a horrific effect on

4     this guy's ability to make a living, and to recover from this,

5     so that he could try and pay an ultimate judgment or support

6     himself.

7          THE COURT:  Another argument that you make, sir, and

8     you're alluding to it in one of your most recent answers to me

9     --

10          MR. COCHELL:  Sure.

11          THE COURT:  -- is that the conditions imposed by FTC

12    effectively amounted to house arrest.  What I'd like to

13    understand is, is that a separate argument you're making in

14    favor of double jeopardy, or is that part of the general

15    argument that you're making that the FTC's use of enabling

16    statute and regulations was so beyond what those statutes could

17    have supported that that's why I could find jeopardy in that

18    instance?

19          MR. COCHELL:  Both, your Honor.

20          THE COURT:  I'd like to do that now, because house

21    arrest, those are fighting words, sir, so I want to make sure I

22    understand the argument.

23          MR. COCHELL:  Then let's not fight over it then.

24          THE COURT:  Okay.

25          MR. COCHELL:  I mean, it's a form of arrest where

```
 1   people are so impoverished that they have limited funds, they

 2   have to choose between paying a landlord and paying a credit

 3   card.  And I don't think Congress intended that.  I don't think

 4   it's allowed under the law.

 5          And Mr. Brown's affidavit, it caused incredible

 6   stress, in addition to the stress of being sued by the Federal

 7   Government, which is not insignificant.

 8          THE COURT:  All right.  I'll hear from you on anything

 9   else you think I might not be understanding from these

10   arguments.  Then I would like to turn to the government --

11          MR. COCHELL:  Sure.

12          THE COURT:  -- ask them questions as I've asked you.

13          MR. COCHELL:  Of course.

14          THE COURT:  Thank you.

15          So, sir, is there anything else you'd like -- I will

16   retry to say it again a little more coherently.  I've asked you

17   the questions that I wanted to ask you in the first instance

18   with respect to the double jeopardy argument.  If there are

19   things that you want to highlight to me as I begin to ask the

20   government questions about this, now is your chance, otherwise

21   you can come back and reply and talk to me about these other

22   issues.

23          MR. COCHELL:  Right.  I would say the nature of

24   disgorgement, and the issue of funds going to the Treasury, the

25   payment of untainted funds to the Treasury is -- we think it's
```

N88DBROC

```
1    not rationally related to redress for consumers.  So if the
2    government waits until there's some sort of attempt to
3    distribute funds, funds, you know, funds that go back 8 -- 7 or
4    8 years to consumers, there's going to be funds left, just by
5    the nature of surveys.  And so those funds shouldn't be
6    forfeited.  They should have come back to Mr. Brown, and under
7    the orders, and I think it raises the issue from being a civil
8    type of remedy, to where it's not an in rem, but it's an in
9    personam type of remedy that elevated this to an excessive
10   fine.
11           And there is -- I believe we cited a -- like a
12   forfeiture case in the context of taxes, where the Court may or
13   may not have found -- I don't think the Court found double
14   jeopardy, but they analyzed it.  And that might be of some
15   assistance to the judge in reviewing this matter.  And that's
16   it.
17           THE COURT:  I'm sorry, sir.
18           MR. COCHELL:  And that would be it for the issues that
19   I think we should look at.
20           Alternative purposes, you know, they raised it.
21   Protecting consumers, I don't see how it protects consumers to
22   forfeit funds that are left over from a disgorgement type
23   remedy.
24           THE COURT:  Let me explore this with you a little bit
25   more, sir.  A moment ago what you were saying was that
```

1    disgorgement, or perhaps as it was implemented in this case was

2    not rationally related to protecting consumers, because one had

3    to wait, and because it wasn't clear at the outset what funds

4    would actually be necessary to make restitution for victims.

5    If I understand that correctly --

6            MR. COCHELL:  Right.  There's still discovery --

7            THE COURT:  Well, I understand that.  What concerns me

8    is what is the logical extension of that particular argument?

9    It sort of says that since you don't know at the outset how

10   many consumers are going to come forward and seek restitution

11   or something -- or damage of some other sort, or how many are

12   going to think that it's fine to have this credit monitoring

13   service, or to have it at a different price, that you can't

14   seize any funds.  Maybe that's what you're saying.  Maybe the

15   answer is there can be no seizures of funds by the FTC until

16   you know exactly how many consumers are going to ask for their

17   money to be returned.

18           MR. COCHELL:  It's a procedural logic.  If the FTC

19   wanted to bring a class action, they should have litigated it

20   like a class action where they go in and conduct discovery of

21   discovery -- not discovery of discovery.  Discovery of damages.

22   And they set that amount before there's a final judgment

23   entered in the case.

24           And there is a case I would invite the Court's

25   attention to.  I became recently acquainted with it.  It's

|    |                                                                  |
|----|------------------------------------------------------------------|
| 1  | called *All Point Global*.  It's a case out of the Southern      |
| 2  | District of Florida where the Court actually, before it filed    |
| 3  | -- it determined summary judgment damages would be 102 million,  |
| 4  | and then they continued discovery in that case until there was   |
| 5  | a final judgment entered of I believe 17 million.  And so at     |
| 6  | that point, you know, it was very clear that it was a segmented  |
| 7  | kind of case.                                                    |
| 8  | So, in *Figgie*, for example, that was a case out of the         |
| 9  | Ninth Circuit.  *Figgie* had a section where there was an        |
| 10 | agreement to conduct discovery of damages after the case was     |
| 11 | resolved on liability, and so then they -- the FTC did a         |
| 12 | survey, they got responses, and an amount was set.  And so none  |
| 13 | of that was done here, and so it's way too late.  Discovery      |
| 14 | ended years ago.  And they could have done a number -- well,     |
| 15 | they were well aware of the *Figgie* case.  They could have      |
| 16 | claimed section 19 damages, and they didn't.  They could have    |
| 17 | done the discovery for it, but they didn't.  It's a deliberate   |
| 18 | choice.  And my client shouldn't pay the price.                  |
| 19 | THE COURT:  Sir, I'm sure, because you prepared for              |
| 20 | this argument, you saw that a few weeks ago the Third Circuit    |
| 21 | found that SEC disgorgement followed by a criminal wire fraud    |
| 22 | conviction was not double jeopardy.  I presume you don't         |
| 23 | disagree with that case, or it doesn't affect the analysis       |
| 24 | here, because what you're saying is that the FTC so abused the   |
| 25 | authority it had and engaged in such misconduct that it's not    |

N88DBROC

1    relevant; is that correct?

2              MR. COCHELL:  Right.  I would have to agree, although

3    I have to admit that I haven't seen the Third Circuit case.

4              THE COURT:  All right.

5              MR. COCHELL:  Okay.

6              THE COURT:  It was issued July 14.

7              MR. COCHELL:  What was the name of it, your Honor?

8              THE COURT:  *United States v. Jumper*, 2023 Westlaw

9    4537718.

10             MR. COCHELL:  Thank you.

11             THE COURT:  Ms. Lai, I'll hear from you at this time.

12             I saw that you were taking notes, and, as a result, I

13   thought perhaps you want to start responding straight off the

14   bat to some of the arguments.  If not, I have questions for

15   you.  But except one thing -- Mr. Cochell is dying to tell me

16   something else.

17             Sir?

18             MR. COCHELL:  No.  No.  We're -- just having a little

19   sidebar with my client.

20             THE COURT:  That's fine.  Thank you.

21             Ms. Lai.

22             MS. LAI:  Your Honor, defense counsel said a lot, but

23   let me try to answer the two questions that the Court posed.  I

24   believe the first was if an equitable remedy -- I forget the

25   exact term the Court used -- was held to be a penalty by the

26

1    Seventh Circuit --

2                THE COURT:  The question was easier than that.

3    They've appealed to the Seventh Circuit now.  It's kind of

4    related to this case.  If the Seventh Circuit upholds what the

5    district court did there with respect to the five million or so

6    that was seized, does that matter to this inquiry?  Because, in

7    a sense, it suggests that the conduct of the FTC was not

8    inappropriate, or maybe it doesn't.  The real question is do I

9    need to wait to hear from the Seventh Circuit, who has been

10   apparently taking its sweet time in deciding this issue, or do

11   I not?

12               MS. LAI:  I don't think the Court needs to wait for

13   the Seventh Circuit.  If the Seventh Circuit decided what the

14   FTC did was appropriate, then obviously that disposes of this

15   case immediately.

16               THE COURT:  Why?

17               MS. LAI:  Because, as the Court said, it would suggest

18   the FTC acted properly, and what it did was not intended as a

19   penalty.

20               THE COURT:  Yes, although I think that Mr. Cochell's

21   suggesting that what happened here is not merely the seizure of

22   the funds, but the rather extreme measures, he would argue,

23   that were taken to keep them from Mr. Brown is also

24   problematic.

25               I could see the Seventh Circuit saying the seizure at

N88DBROC

        the preliminary stage was fine, and not addressing, because I'm

        not sure it was presented to them, all of the stuff that was

        presented to me now, so what Mr.Cochell is saying is that I

        need to look at everything.  I need to look at what the FTC

        thought its authority was, what they told the world about their

        authority, and then how specifically they engaged with Mr.

        Brown in this matter.

                He's saying, add those all up, that was so punitive it

        amounts to jeopardy, and if you want to address it as a group,

        if you want to disentangle it, it's fine by me.  Just tell me

        why it's wrong if you believe it is wrong.

                MS. LAI:  I would agree that that is the essence of

        Mr. Brown's argument, but if the Seventh Circuit were to find

        that the imposition of -- and just to back up, I understand Mr.

        Brown's motion to be basically challenging the remedy of

        disgorgement.  Throughout the brief, he talks about

        disgorgement, disgorgement, not so much restitution.

                I think he concedes that the FTC has authority under

        section 19 to seek restitution.  That is, redress to customers,

        and the costs of administering redress to customers.  So I

        understand his entire motion to be a challenge to disgorgement

        as a remedy, and that that particular remedy acts as a criminal

        punishment to Mr. Brown.

                THE COURT:  I hear you, and I do think that you two

        are sort of speaking past each other in your briefs, because I

```
1    think Mr. Cochell speaks at length about disgorgement, but also
2    about the pretrial seizure of funds from Mr. Brown.  Now, just
3    because you are perhaps more familiar with what was going on in
4    the FTC matter, when they seized those funds, what were they
5    doing?  Was it for restitution?  Was it for disgorgement?  Do
6    they tell you?  Is it something that they believe they have a
7    right to do?  Will the Seventh Circuit someday tell them
8    they're wrong?  Because you very much in your brief, and that
9    is one of my questions, you speak a lot about disgorgement
10   versus restitution, and I think the defendant is talking more
11   about the seizure, and what it was for, and what it could be
12   for.
13            MS. LAI:  I believe, and I have not read that closely,
14   to be honest, the original preliminary -- the temporary -- the
15   TRO, and then the preliminary injunction.  I was focusing
16   primarily on the remedy, which is what is at issue now, which
17   is the remedy under section 19 as implemented by the FTC Act.
18   So if the -- so if we were to focus on the issue of
19   disgorgement, if the Seventh Circuit held that disgorgement is
20   not allowed under section 19, and, therefore, not allowed under
21   the FTC Act, then I think that disposes of -- that that --
22            THE COURT:  Could you just say that again?  If the
23   Seventh Circuit finds what, please?
24            MS. LAI:  That disgorgement is not allowed under
25   section 19.
```

1           THE COURT:  Okay.

2           MS. LAI:  Because I think that's the key issue before

3      the Seventh Circuit, whether restitution and disgorgement are

4      not available under section 13 of the FTC Act, can it be

5      available under section 19.

6           THE COURT:  Thank you.

7           MS. LAI:  So if the Seventh Circuit were to find that

8      engorgement is not available under section 19, but -- then I

9      believe that disposes of the motion, because the FTC would no

10     longer be able to seek disgorgement against Mr. Brown.  But the

11     whole problem with the motion is it is so hypothetical.  The

12     FTC has seized approximately 20 percent of the total amount of

13     money that it had calculated, and that the district court in

14     Illinois has accepted as the proper calculation of damages of

15     loss to consumers.  So, to base an entire motion on the idea

16     that there may be money left over to disgorge to the FTC, when

17     consumers are not likely to get close to 50 percent of their

18     loss, seems to be totally speculative.

19          THE COURT:  Except Mr.Cochell wants to add to your

20     speculative argument with one of his own, which is that to some

21     of the victims in this case, or the putative victims in this

22     case, they have decided to accept the credit monitoring

23     services.  So they are not out -- in theory, they're either not

24     out anything or they're not out nearly what the FTC thinks they

25     are.

1          You say this repeatedly in your opposition, and it's

2     another area where I feel you and the defense are talking past

3     each other.  You've really emphasized the fact they've only

4     recovered 20 percent of the $5 million figure.  I believe,

5     according to Mr. Cochell, he's looking at it in terms of the

6     amount of money his client got, versus the amount of money his

7     client has seized from him.  You're looking at it broader, and

8     in a perhaps more conspiracy-focused way:  How much did the

9     victims lose.  So I think you saw that difference.

10         Could you help me understand whether I should care

11    about the degree to which the money seized from Mr. Brown was

12    outside, when compared to what he actually got, and then

13    whether I should instead be focusing on how much the victims

14    lost as a result of a scheme which he participated in.

15         MS. LAI:  So I think the Court should not be concerned

16    with what Mr. Brown personally got.  Section 19 is clear that

17    it is redress to victims that the FTC is authorized.  So

18    section 19, which states under (b) that the Court in the next

19    action under (a) shall have jurisdiction to grant such relief

20    as the Court finds necessary to redress injury to consumers or

21    other persons, such as corporations.  So it is consumer redress

22    that the statute authorizes, not forfeiture in the criminal --

23    in the criminal context, it would be -- forfeiture would be

24    measured by what the defendant personally got, but under

25    section 19, it is clear that --

N88DBROC

1           THE COURT:  It's closer to restitution.

2           MS. LAI:  It's closer to restitution, yes, exactly.

3      So it is, and I -- I apologize, but I can't cite to the exact

4      case.  But there is case law that says when there is joint

5      action, the Court can look to the loss to consumers as a whole

6      without apportioning the amount of money that each participant

7      or each defendant received.  And seen in the -- he also

8      addressed the issue of tainted versus untainted funds.

9           THE COURT:  Yes.

10          MS. LAI:  If I can address that for a minute.

11          THE COURT:  Please.

12          MS. LAI:  In *Liu*, and also in another case that the

13     defendant cited, which I think was *Noland* --

14          THE COURT:  *Noland*, yes.

15          MS. LAI:  The Court specifically said that there are

16     cases, in the appropriate case, deduction of -- oh, this is a

17     slightly different point, but deduction of expenses is not

18     necessary where the fraud was in the inducement.  So the fraud

19     was in -- the method used to get consumers to pay up as a --

20          THE COURT:  Yeah, I don't think that's helping your

21     argument.  Let me understand whether you believe the FTC had

22     the right to seize both tainted and untainted funds.  And I

23     guess perhaps we all should step back and figure out what we

24     mean by that.  I'm understanding tainted funds to be ones that

25     are directly tied to the conduct, and untainted being funds

1    that are not directly tied to the conduct.

2           My question to Mr.Cochell was, does it matter if -- if

3    it turns out that the funds that were seized from or taken from

4    victims were then spent and dissipated?  Does the FTC's arsenal

5    of remedies include the remedy to take what are being described

6    as untainted funds, what I might in an asset forfeiture context

7    consider substitute assets?

8           MS. LAI:  Right.  So if the remedy is consumer

9    redress, then it should not matter whether the money came from

10   tainted versus untainted funds.  I think that's the answer.

11          THE COURT:  Could you speak, please, to the house

12   arrest issue?  I want to make sure I don't misunderstand

13   things.

14          Again, I thought that Mr. Brown had the ability to ask

15   the FTC for additional funds to those he was receiving on a

16   monthly basis.  I do appreciate Mr. Cochell's point, which is

17   the fox-hen house point, that there was a conflict there, but I

18   guess I'd like to understand, I think you were raising the fact

19   that he never bothered to ask for anything else.

20          Could you speak to that issue, please?

21          MS. LAI:  That's correct.  There were emails included

22   in the defendant's appendix that showed some correspondence

23   between the FTC attorney and Mr. Brown's attorney at the time,

24   as a result of which I think the FTC, with the permission of

25   the Court, allowed a certain amount.  I believe this was

N88DBROC

1    $15,000, for him to use his funds or to unfreeze his funds for

2    the purposes of retaining counsel.

3            My understanding, from speaking with the FTC lawyer,

4    Mr. Ward, that the entire process was supervised by the Court.

5    At any time, the defendant could have gone to the Court for --

6    and sought the Court's intervention if he felt that the FTC's

7    limitations were unreasonable.  My understanding is that he did

8    not do so.  So to the extent he was limited to $4,000, to the

9    extent there was a delay in whether he was allowed to sell his

10   car, and what the proceeds of the car could be used for, he

11   could have gone to the Court, but he did not.

12           THE COURT:  I believe in your opposition, or in your

13   colleague's submission, there was some reference to conduct

14   while the civil matter was going on that might have amounted to

15   a violation of the preliminary order, some conduct that may or

16   may not have been suggested or sanctioned by prior counsel.

17           Does it matter to this double jeopardy analysis?

18           MS. LAI:  It does if -- since the defendant's point is

19   that the FTC acted unreasonably, with punitive intent, the fact

20   that he violated -- he was held in contempt of court for

21   violating a restriction, I think it was within the FTC's right

22   and responsibility even to make sure that he was spend -- he

23   was not spending money in a way that undercut the remedy of

24   consumer redress.

25           So in this case, the Court found that he was

1  continuing to collect funds from the -- collect money from

2  consumers; he was continuing to use the consume -- the lists of

3  consumer names and addresses, whatever other personal

4  identifying information, for use in a similar venture.  The FTC

5  acted responsibly, in my view, to ensure that they monitored

6  everything he did appropriately.

7         And it's -- and I don't want to belabor this point,

8  because I know it's in the brief, but it is -- to say that

9  living on $48,000 a year -- 12 times 4, $48,000 a year amounts

10  to house arrest, when he's living overseas in Mexico and

11  whatever other jurisdictions he was living in --

12         THE COURT:  Puerto Rico.

13         MS. LAI:  Puerto Rico, right, seems absurd.

14         THE COURT:  But I think his point is, here is trying

15  to -- he wishes to live.  He wishes to build a business.  This

16  was not pretrial release in a criminal case.  It was a this

17  civil case.  When he tried to build a business, the FTC came in

18  with a subpoena that had the effect of preventing that

19  particular business opportunity from going forward.

20         Now, whether they did so because they were very

21  concerned because of the prior concept, whether they did so

22  because they were feeling especially vindictive, I don't know,

23  but that's really the argument.  It's not just -- in the City

24  of New York, $4,000 a month may be very difficult to live.  In

25  other parts of the country, $4,000 a month may be absolutely

N88DBROC

1    fine for someone to live.  I don't think it's the quantum of

2    money.  I think the point is there was situations, there were

3    things that he needed.  He needed a car.  He needed business

4    opportunities.  Whenever he got close to them, somehow the FTC

5    got involved, at least that's the argument that's being made.

6         Now, that may not ultimately amount to some form of

7    house arrest, but that's the argument I wish you to engage

8    with, please.

9         MS. LAI:  I think the answer is, when you look at the

10   totality of the restrictions that were placed on him, was it

11   reasonable under the circumstances, or was it excessive, given

12   the conduct, and the loss amount, and the role of the defendant

13   at issue, and what he did after the preliminary injunction was

14   imposed.

15        THE COURT:  If I find that it was excessive, am I then

16   finding jeopardy, and, hence, double jeopardy by the instant

17   prosecution?

18        MS. LAI:  I think if the Court found that it was so

19   excessive that it amounted to a criminal penalty, then I think

20   he would -- he could win on the double jeopardy motion.  But,

21   again, it would have to amount to what would be a criminal

22   punishment, not simply that he was inconvenienced, he wished to

23   live better than he did.

24        And the Court would also I think need to find whether

25   he took -- whether there were remedies he had that he did not

 1    seek, such as going to the Court to apply for additional funds.

 2              THE COURT:  Well, okay, you nicely tried to dig out of

 3    that hole, and I appreciate that, but you're suggesting that

 4    there is a world, a constellation of factors, where the

 5    restrictions in a civil case are so severe that they could

 6    amount to criminal punishment.  You're telling me that's not

 7    happening here.  I don't know if I can go as far as to say that

 8    one has to take advantage of opportunities before -- you know,

 9    opportunities that perhaps he thought were not going to work

10    before it can be found to be punitive, but I guess I do

11    understand the argument.

12              I'd like to go back, please, to something we talked

13    about in the beginning.  I want to make sure I understand this.

14    I think I understand this, but I don't want to misstate it.

15    What you're asking me to do is to look very critically at the

16    defense's arguments about disgorgement, because what we're

17    actually talking about is a bunch of money that was seized at

18    the outset that, in your estimation, by you I mean the

19    government, is, therefore, for consumers, for consumer redress,

20    and that as a consequence of that, I don't have to worry as

21    much as Mr. Cochell is suggesting I should.

22              But I do want to make sure I understand it, because

23    he's talking about disgorgement.  You're talking about consumer

24    redress.  I'm back behind both of you wondering whether the

25    initial seizure at the preliminary injunction stage was

N88DBROC

1   appropriate.

2           Could you speak to that last issue?  What if I find

3   that they didn't have the right to seize funds in that quantity

4   at that time?

5           MS. LAI:  So, and I apologize for this, your Honor,

6   because I don't know exactly at which point the five point --

7   the five point something -- the determination of $6 million

8   plus was -- thank you, the determination of the $6 million plus

9   I think was determined at the -- in CBC one.

10          THE COURT:  Okay.

11          MS. LAI:  Which was after the preliminary injunction.

12  I don't know the exact amount, whether there was an exact

13  amount that was included in the preliminary injunction, and I

14  don't believe I have a copy of that with me.

15          THE COURT:  Okay.

16          MS. LAI:  But, as it turns out, the amount that is

17  seized is less than the amount that would be going toward

18  consumer redress, so in some ways it doesn't matter why it was

19  seized.

20          THE COURT:  But Mr. Cochell tells me that may not be

21  the case.  He says, we are many years later, who knows, and

22  maybe someday there'll be something left.  I guess my question

23  to both of you is, is the FTC precluded from seizing assets ex

24  ante, unless they know exactly how much or close enough to how

25  much is going to ultimately be distributed back to be

N88DBROC

1    consumers?

2         His argument to me is you can't seize $100 million if

3    you know at the outset that only 1 million is going to go back

4    to victims.  The problem here is we don't know at the outset.

5    I don't think we knew at the outset.  I don't think the FTC

6    knew how much they were going to need.  Did they have to either

7    engage in some sort of process to set -- to affix a number to

8    the amount they could seize, or something else?  Or did they

9    just have to wait and see who all came in asking for money.

10        MS. LAI:  So I think what the district court held --

11   and I don't think this is an issue that should be re-litigated.

12   This was an issue that was decided in the district court in

13   Illinois -- is that the consumers are entitled to their refund,

14   because they were tricked into signing up for this service, and

15   so they were never told when -- you know, to -- these consumers

16   who agreed to continue the credit monitoring service were never

17   told that they were referred to the credit monitoring service

18   through this fraudulent scheme.

19        THE COURT:  But even if they're told and they're like,

20   well, that's really bad, but we'll stay, are they still

21   entitled to something?  Do they get it?  I mean, that's the

22   question.

23        Mr. Cochell is saying it may have come through an

24   unfortunate beginning, but, at the end of the day, they got a

25   service they wanted.  Are they entitled to money from the FTC?

1    MS. LAI:  But the Court had already taken into

2    consideration people who wanted a refund, who request requested

3    a refund, which is in the amount of $414,860.  So that is a

4    reasonable measurement of the consumers who saw this.

5        THE COURT:  May I have that number again, please?

6        MS. LAI:  Sure.  It is $414,860.77.

7        THE COURT:  Thank you.

8        MS. LAI:  So that's the amount of refunds the Credit

9    Bureau Center paid consumers, and, in addition, the Court

10   subtracted from the total loss amount charge backs that the

11   consumer successfully obtained, and that amount was

12   $394,903.68.  So that is a reasonable estimate of the universe

13   of consumers, who saw a charge on their credit card report that

14   they have not expected, as well as others who decided that the

15   service wasn't useful to them and requested a refund.

16       THE COURT:  Okay.  Just one moment.  Let me see if I

17   have additional questions.  Thank you.

18       MS. LAI:  I think the second question was do you have

19   to find that the FTC acted in bad faith.

20       THE COURT:  Yes.  Thank you.

21       MS. LAI:  The Court absolutely has to find that it

22   acted in bad faith to find that it acted with punitive intent.

23   The FTC applied the law as existed in the Seventh Circuit and

24   in multiple other circuits for the last 30 years, sought the

25   remedies that had been approved for the last 30 years, and that

1       -- as part of a civil case, and as part of civil remedies.  And

2       without finding bad faith, I'm not sure how we can reach the

3       conclusion that the FTC intended to criminally punish Mr.

4       Brown.

5               THE COURT:  Mr. Cochell suggests that reading

6       Mr. Fitzgerald's article, I can find just that.  When he

7       mentioned that he looked up -- I presume you looked at this

8       article.  If you haven't, I won't --

9               MS. LAI:  I have looked at it, but on page 4, it

10      definitely does not say what the defendant says it says.  I

11      believe what Mr. Fitzgerald's point was, if the statute itself

12      was not explicit as to a particular remedy, what the FTC can do

13      is to look to comparable statutes that govern other regulatory

14      agencies, and analogize to those situations in order to come up

15      with a remedy that would completely -- that would be in the

16      best interest of defrauding consumers, and that's what it did

17      in this case.

18              So it's not acting in bad faith.  It is simply looking

19      for an interpretation of the statute that is plausible and

20      ultimately accepted by multiple circuits around the country.

21      And that's not bath faith.  That's simply, you know, good

22      lawyers in the Supreme Court overturned those decisions.

23              THE COURT:  All right.  Thank you very much.

24              Mr. Cochell, I'll hear you in brief reply on this

25      issue, and then let me speak to my counsel on this matter.  We

1    have another motion, your discovery motion, and I want to give

2    you the attention it deserves.

3           I have folks here in the back for which I think

4    there's a five-minute proceeding I'll need to do.

5           MR. COCHELL:  Okay.  Sure.

6           THE COURT:  Maybe ten minutes.  But with your

7    permission, I'd like to take a break between those motions,

8    have the other matter take place in my robing room, although

9    I'll leave the door open if folks want to make sure it's a

10   public proceeding, and then allow the parties to take a break

11   and get ready for the discovery component.

12          Does that work for you, Mr. Cochell?

13          MR. COCHELL:  Yes, your Honor.

14          THE COURT:  Thank you.

15          Ms. Lai?

16          MS. LAI:  Yes, your Honor.

17          THE COURT:  Thank you.  I appreciate it.

18          Mr. Cochell, I'll hear you in brief reply.

19          MR. COCHELL:  Yes, your Honor.

20          I don't know if the Department of Justice case *Jumper*

21   is decided under the SEC, but the SEC statute is far broader

22   than the FTC statute.

23          THE COURT:  It is.

24          MR. COCHELL:  Judge Kennelly in the amended judgment,

25   I believe he said that he considered the remedy to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    disgorgement as to citing the statute under which he was

2    granting judgment.  A refund is a direct payment to a person,

3    not to the FTC.  The FTC can't get a refund.  And the statute,

4    the way it's worded, doesn't say that the FTC should get a

5    judgment, nor a refund.  That should be directly to a consumer.

6        My fourth point is the preliminary injunction predated

7    the contempt pleading before Judge Kennelly, so all those

8    measures were already in place.  They were not taken in

9    response to a contempt finding.

10       My next point is that the amounts here are excessive

11   and unreasonable, because section 13(b) authorized only

12   injunctions, nothing else, so any amount would be excessive

13   when decided under that provision.  And the standard for

14   conduct by agencies is not whether we can get away with doing

15   something plausible or whether we think a judge will accept it

16   if we word it in just the right way and opposing counsel

17   doesn't do the research necessary to oppose it.  The standard

18   is, apply the law faithfully and ethically.

19       And we have all sorts of agencies, and if they are

20   allowed to, willy nilly, just go off on a tangent because they

21   think Congress didn't do the right thing when there was

22   proposed and it was rejected, legislation it asked for, then

23   we're going to have continuing problems with agencies such as

24   the FTC.

25       And then, finally, with respect to part of the

N88DBROC

| | |
|---|---|
| 1 | argument, the *Noland* case is helpful -- |
| 2 | THE COURT:  What argument, sir? |
| 3 | MR. COCHELL:  The *Noland* case. |
| 4 | THE COURT:  Finally, with respect to what argument? |
| 5 | MR. COCHELL:  To the point that they were making about |
| 6 | the funds and disposition of the funds.  In the *Noland* case, |
| 7 | the Judge goes to some length to talk about how Congress did |
| 8 | not authorize windfalls, quote, unquote.  And Congress and the |
| 9 | law abhors a windfall.  And so we respectfully submit that the |
| 10 | FTC really did overstep, way overstep its bounds, not just on |
| 11 | the legislation and getting courts to, you know, apply its |
| 12 | version of the FTC Act, but in the way that they treated this |
| 13 | individual.  Part of what he was -- he did ask for money to pay |
| 14 | for his medical insurance, because he needed cancer insurance. |
| 15 | What was the FTC's response?  Their response was to negotiate |
| 16 | and say, well, we'll wrap this up, and if you want to settle, |
| 17 | we'll pay you 10,000 more for your fees, if you agree with |
| 18 | this, you know, we'll -- it's a lot of horse trading over what |
| 19 | should have been an objective, dispassionate review of this |
| 20 | guy's finances, and not punishing him by withholding money for |
| 21 | his medical treatment. |
| 22 | Thank you. |
| 23 | THE COURT:  Thank you very much. |
| 24 | Let's take a ten-minute break. |
| 25 | (Recess) |

1       (In open court)

2           THE COURT:  Thank you for your patience.  Please be

3   seated.

4           So let us turn to the other motion in this matter,

5   which concerns the requests for discovery.  Once again, I'm

6   going to --

7           Ms. Lai, yes.

8           MS. LAI:  I'm sorry.  If I may just add one last point

9   in direct response to the Court's question on the double

10  jeopardy motion.

11          THE COURT:  Yes, please.

12          MS. LAI:  I located a copy of the preliminary

13  injunction, and one of the findings is that there is reasonable

14  basis to believe that immediate and irreparable damage to the

15  Court's ability to grant effective final relief for consumers,

16  including monetary restitution, recision --

17          THE COURT:  Slow down, please, for the Court and the

18  reporter.  Thank you so much.

19          MS. LAI:  I apologize.  Including monetary

20  restitution, recision, disgorgement, or refunds will occur from

21  the sale, transfer or disposition of the CBD -- the defendant's

22  assets.

23          So it appears from that paragraph that the district

24  court was primarily concerned with consumer redress.  And then

25  it listed a list of the items which the Court considered to be

1    consumer redress, and disgorgement was one of those items,

2    which I think may have confused matters a little bit, because

3    in the criminal context, anyways, disgorgement and restitution

4    are two separate concepts.  Here we got mixed up a little bit,

5    but it's clear that --

6              THE COURT:  Did he?  I mean, isn't that a question?

7    Maybe he didn't.  You're saying that I need to harmonize or

8    reconcile the concerns about consumer protection that are

9    outlined at other points of this agreement, and the actual

10   choice of the word "disgorgement" rather than "restitution,"

11   yes?

12             MS. LAI:  Well, it says "final relief for consumer,"

13   so relief for consumers --

14             THE COURT:  Okay.

15             MS. LAI:  -- suggests that the Court is primarily

16   concerned with consumer redress, which is making consumers

17   whole.

18             THE COURT:  Yes, but to Mr. Cochell's point, how much

19   is enough for consumer redress?  How much were they entitled to

20   seize and to keep from Mr. Brown in the name of consumer

21   redress, and, if so, should there have been different

22   procedures installed in order to ensure a proper balance

23   between his rights in this civil proceeding, so that perhaps it

24   did not -- whatever penalties did not become excessive, and the

25   rights of consumers to be made whole.

N88DBROC

1          MS. LAI:  I think it would be hard to find that

2     seizure of 20 percent of what the consumers pay to CBC after

3     taking into account payments that had been made in the form of

4     requested refunds or charge backs is not excessive, and is less

5     than what should be available for consumer redress for

6     restitution.

7          THE COURT:  Thank you very much.

8          Mr. Cochell, I do think I understand your arguments,

9     but if you want to be heard on this limited point, I can.

10          MR. COCHELL:  No, ma'am.

11          THE COURT:  Okay.

12          MR. COCHELL:  I think we've spent enough time on that.

13          THE COURT:  Okay.  So let's talk, please, about the

14     discovery applications.

15          Mr. Cochell, I'm going to return to you, sir.  You saw

16     in the government's opposition, I believe it was in the

17     opposition, an affidavit from the other prosecutor in this

18     matter, detailing the involvement or not of the FTC, and the

19     charging decisions in this case.

20          Are you asking me to discredit that?  I think what you

21     were asking me to do was to probe it, but I'm not sure -- I'm

22     not sure how.  So let's talk about --

23          MR. COCHELL:  Sure.

24          THE COURT:  I believe Mr. Ravi's on the phone.  I can

25     of course ask him the question.

N88DBROC

1      MR. COCHELL:  Having served as an Assistant U.S.

2   Attorney and talked to Mr. Ravi on a number of occasions, I

3   don't doubt that he is responding in good faith.  I do think

4   that his declaration is extremely conclusory.  So while we

5   didn't have a discussion about that, and what I've put in my

6   brief, and I leave it to your Honor to weigh one way or the

7   other, is that there are circumstances here where it goes

8   against the grain to think that a prosecutor who has an

9   investigation is not getting more information about, you know,

10  the delays in that case, whether there's an appeal, what the

11  appeal is about, what the outcome was.  It seems to be -- it

12  strains my imagination as to how -- I'd be curious if I were

13  him on the other end.

14      So you have, for example, there's this procedure

15  sending packages to the FTC, but there's nothing written.  Now,

16  there's nothing in their process that requires a written

17  referral, but typically my understanding is that there would be

18  a written referral, not some sort of verbal one or two-minute

19  discussion with, hey, Joe, how are you doing; what do you think

20  of his case; you know, we have this little problem here; will

21  you take it.  That's not the way I see prosecution decisions

22  being made.  Typically, you get documents, and then you have a

23  dialogue with the agency about why this is a federal case, and

24  why shouldn't this case say civil, as opposed to criminal?

25  That's part of what I'm reacting to.  And then --

1          THE COURT:  Let me just say, sir, in this capacity,

2     having made a referral to the U.S. -- having made two referrals

3     to the U.S. Attorney's Office, both oral, I'm not writing up

4     anything.  Now, maybe this position allows me to do that.  So

5     it's not shocking to me that there is an oral referral, but I

6     think your larger point is, given the parallel agency

7     investigation, you would have expected there to be something in

8     writing.

9          MR. COCHELL:  Yeah, something to show this is a

10     federal case, this reaches the magnitude of a federal case.

11     And so it seems to me that -- I was concerned about that.  I

12     was concerned about, as you know, the timing of all of this,

13     that there's a discussion about settlement; they threaten a

14     lifetime ban; they get a response; they -- you know, they crank

15     up a prosecution, you know, that follows that.

16          Now, that's not a --

17          THE COURT:  Could we pause for a second here, sir?

18     That's one of your underlying points, the suggestion of

19     vindictiveness on the part of the FTC, or the suggestion of the

20     use of a cudgel on -- criminal prosecution to get something out

21     of them.  This is the part I don't understand, because at the

22     time the indictment was disclosed, was unsealed, and your

23     client was arrested, the deed was already done with respect to

24     the FTC matter.  Your argument to me has greater force if the

25     FTC had said, you know, you really ought to think about our

1    offer to settle this case, or you really ought to think about

2    this, because there is, right, waiting in the wings, a criminal

3    prosecution.

4          To accept your argument is to suggest that having won,

5    and you see me putting air quotes around the word "won," having

6    won everything, the FTC still decided that your client should

7    be criminally prosecuted.  Is that where you're going?

8          MR. COCHELL:  I think that the FTC kind of embarked on

9    this; they saw my client was going to resist them; they started

10   making threats, and then they referred --

11         THE COURT:  None of the threats were of criminal

12   prosecution?

13         MR. COCHELL:  No, none of them were.

14         THE COURT:  Okay.  So I don't know why this matters,

15   why this is related to those threats.

16         MR. COCHELL:  Understood.  Okay.  It matters because I

17   think that the FTC was using the referral, and then it was

18   timed so that, you know, the --

19         THE COURT:  Using the referral for what, sir?  They

20   never disclosed it until after the matter was done.

21         MR. COCHELL:  Right.  Understood.  I think they used

22   it in a way -- well, they used it, the DOJ, in a way to kind of

23   hedge their bets.  This was their plan B, you know, and they --

24   if they had won, and there was no appeal, I'm not sure that

25   this case would have ever been pursued, because what's the

1    point.  You know, you've already gotten lifetime bans.  You've
2    already gotten a money judgment.  If we had known that the FTC
3    was referring this case, we would have -- I would have been
4    very strident about, you don't want to go there; you don't want
5    to go to that room in New York or wherever in a criminal court;
6    you need to settle this case, and take your licks.

7           THE COURT:  Well, of course, although, sir -- and by
8    the way, if there's a question I should not be asking, you'll
9    tell me I can't ask it.

10          MR. COCHELL:  Okay.  I'm sorry.

11          THE COURT:  No.  No.  Did you ever ask the commission
12   whether there was a parallel criminal investigation?

13          MR. COCHELL:  No, I didn't.

14          THE COURT:  Okay.  I might have, but okay.

15          You said that this case would not have been pursued if
16   the FTC won, but so far, other than the penalty, I thought they
17   got everything else.  They got the finding of liability.  Don't
18   they have the ban?

19          MR. COCHELL:  They had an appeal that threatened their
20   major enforcement tool.

21          THE COURT:  Okay.

22          MR. COCHELL:  Section 13(b).

23          THE COURT:  Okay.

24          MR. COCHELL:  And I think that really drove a lot of
25   this when it went to the Seventh Circuit.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  So when Mr. Ravi says to me, the

2     government played no rule in the FTC's charging decision,

3     discovery, interrogatory requests, its deposition of Brown or

4     any other individual, or in the FTC discovery or litigation

5     strategies in the FTC action, and also says the FTC played no

6     role in the government's timing decisions, the timing of those

7     decisions or the development of the government's prosecutorial

8     strategy, I must discredit them?  You're saying they're

9     conclusory.  I think they're pretty definitive, and so that's

10    why I want to understand -- I mean, to me, you may have some

11    stronger arguments as to why you need certain materials.

12          MR. COCHELL:  Right.

13          THE COURT:  Where I need help from you --

14          MR. COCHELL:  Understood.

15          THE COURT:  -- in understanding this foundational

16    argument that --

17          MR. COCHELL:  Right.

18          THE COURT:  -- sort of a prosecutorial vindictiveness,

19    and whether it matters.

20          MR. COCHELL:  I guess from the standpoint of being a

21    lawyer and being out there, it's really kind of hard to believe

22    that this thing sat around for 3 years plus gathering dust.

23    The Seventh Circuit rules, and then all of a sudden we're

24    getting activity from the federal prosecutor, and it looks like

25    it was because my client won before the Seventh Circuit.

N88DBROC

```
1              THE COURT:  He won on the money.  He didn't win on the
2    liability.  He didn't win on the ban.
3              MR. COCHELL:  He won a major issue on the money, and
4    he won a major landmark decision that went up to the Supreme
5    Court who unanimously affirmed it.
6              So the FTC had a $2 billion collection program going,
7    and when they went to the Supreme Court, they lost on
8    everything, including their argument that this was their major
9    enforcement tool.  And they argued that strenuously, and the
10   Court said, too bad, go back to Congress.  So that's really
11   kind of -- so they --
12             THE COURT:  But, sir, just to probe that a little bit,
13   one could argue that the writing was on the wall after *Liu*.
14   One could argue the writing was on the wall after *Kokesh*.  So
15   I'm not sure why your client, as distinguished from -- I wonder
16   if there are or might be --
17             MR. COCHELL:  Right.
18             THE COURT:  -- fairly directed to the Supreme Court --
19             MR. COCHELL:  Sure.
20             THE COURT:  -- overturning decades of precedence --
21             MR. COCHELL:  Right.
22             THE COURT:  But why it should be directed to your
23   client.  That's the part I'm having difficulty understanding.
24   And I get it with respect to Mr. Brown, but I just wonder why
25   they would be so fixated on this one man that they would bring
```

 1    a criminal prosecution that they would not otherwise bring.

 2              MR. COCHELL:  Because they're human beings, and --

 3              THE COURT:  But the Southern District of New York

 4    doesn't care about the human beings at the FTC, do they?

 5              MR. COCHELL:  No, but they're human beings, and they

 6    don't like being beaten in the Supreme Court or the Seventh

 7    Circuit.

 8              THE COURT:  You're not understanding my point, sir.

 9              MR. COCHELL:  Okay.  I'm not.  I'm sorry.

10              THE COURT:  No.  No.  The FTC can be as mad as can be

11    about --

12              MR. COCHELL:  Sure.

13              THE COURT:  -- losing to your client in the Supreme

14    Court, but the Southern District of New York prosecutors, they

15    didn't lose at the Supreme Court.  Their rights, their arsenal

16    of remedies has not been impacted by decisions like *Liu*, so

17    that's the dots -- those are the dots I'm not able to connect.

18              MR. COCHELL:  And so the timing -- it's like any form

19    of retaliation.  You look at the timing.  What is the timing

20    here?  The timing is that this case, nothing is happening for

21    several years.  The Seventh Circuit rules, and two months later

22    we're having FBI interviews, we're having a computer being

23    imaged for Danny Pierce, and that's really when it looked like

24    a federal prosecution, or an investigation that was undertaken

25    without pressure from the FTC.

1          So the bottom line is, I'm looking to find out, were

2     there communications?  What did the Department of Justice know

3     at the time of the -- of the appeal?  What discussions did they

4     have with the FTC?  Did they just say here's the decision?  I

5     think there was more to it.

6          THE COURT:  But let's say -- let's hypothesize, which

7     I know Ms. Lai is going to tell me I should not do.

8          MR. COCHELL:  Sure.

9          THE COURT:  Let's hypothesize a worst case scenario

10     where the FTC says, well, we lost at the Supreme Court.  The

11     only way to get these funds is to bring the criminal

12     prosecution, and have them brought in through asset forfeiture

13     restitution, something like that.  Let's say this case did come

14     about, despite what Mr. Ravi has told me under oath, because of

15     a concern about what happened at the Seventh Circuit.

16     Therefore, what?  I mean, what's the argument?

17          I don't think that gets you a prosecutorial

18     vindictiveness motion.  I don't think that's outrageous

19     government conduct.  Even if they agree with you that there was

20     a causal connection, what do you get from that?

21          I don't think you get the case dismissed on that

22     basis, or do you?

23          MR. COCHELL:  Well, I've raised it, you know, because

24     my client feels very strongly about it, and I also feel like

25     this should be a full explanation of what happened.  And then

N88DBROC

1    once I know the facts in a case, I can at least take another

2    look at the law, and say, this should be dismissed, because of

3    vindictive prosecution, or retaliation for exercising

4    legitimate rights on appeal.  I mean, because it -- you know,

5    when you -- like if there were an EEO case, for example, the

6    Court would be looking at the timing of a decision, whether

7    it's a termination decision, another decision.

8         THE COURT:  Oh, sure.  But if we're going down that

9    route, the government, in your -- if we're going to analogize

10    that the government gets to present a protected characteristic

11    neutral explanation, they've just said to me there's no tie,

12    you haven't proven pretext.

13         MR. COCHELL:  Okay.  That's what I am suggesting, that

14    the circumstances -- timing alone in EEO cases is sufficient to

15    take a case to the jury.  I'm suggesting to the Court that

16    timing alone is sufficient to warrant discovery of this portion

17    of the requested discovery, greater detail from Mr. Ravi about

18    what happened, who he had discussions with.  It's like the

19    referral, they had a discussion with who?  There's no

20    identification of who, where it happened, when it happened.

21    That's what I call conclusory.  And it seems that there could

22    be more detail about some of the stuff.

23         THE COURT:  My difficulty, sir, is you're asking me to

24    look behind a statement, "played no role."  He just said

25    "played no role."  So I don't know -- unless you're telling me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  he's lying, I have difficulty looking behind that.  But let me

2  please change topics.

3      Do you believe that the FTC or that any civil agency

4  is obligated to tell you --

5      MR. COCHELL:  Is what?

6      THE COURT:  Do you believe that an agency is obligated

7  to let the party in a civil matter be -- do they have to make

8  them aware of the criminal matter?  I don't think that's the

9  case.  I don't think the FTC had to tell your client about the

10 criminal matter, but you tell me why you believe that they do.

11     MR. COCHELL:  It seems to me that they do.  If they

12 are contemplating a criminal prosecution, and they've referred

13 the matter, and it's under investigation, it seems to me that

14 there are Fifth Amendment rights here that my client is totally

15 unaware of.  And, you know, when we go into a deposition, and

16 the SEC cases, they typically read a warning to people, or if

17 they want to meet with somebody, they give them a warning.  And

18 it's just fair play.  It goes to the idea that if you're going

19 to go after somebody, at least tell them what you're going

20 after them for.  If it's just a civil case, that's one thing.

21 If it's a criminal case, it's a whole different ball of wax.

22     THE COURT:  But you're not suggesting they

23 affirmatively lied to you?  You're suggesting the FTC omitted

24 material information?

25     MR. COCHELL:  I'm not -- it never occurred to me that

1    a civil enforcement proceeding would go that way, because if it

2    was a criminal referral, why are they pursuing a civil case?

3    Why not just file the civil action, get a stay, which they

4    would get, and pursue the criminal case?

5            That's what regular agency behavior looks to like to

6    me from my perspective, as someone who's practiced law, and it

7    may not be your perspective as a judge sitting in this matter,

8    I recognize that, but I just find it really odd and kind of

9    grossly unfair.  It just sets up parallel prosecutions that

10   cost the people time and money.  It is a continually stressful

11   --

12           THE COURT:  But are you suggesting that the moment the

13   referral takes place, that the civil folks should stand down

14   and only the criminal case should go forward?

15           MR. COCHELL:  I'm saying it should be probably close

16   to that time.  I mean, the whole point of a criminal

17   prosecution is to get someone held responsible criminally, and

18   then there's plenty of arsenal -- you know, there's plenty of

19   tools to work with restitution or other means.  And it just

20   suggests to me that they were -- that the FTC was being

21   vindictive and trying to get as many admissions from my client

22   as possible, get his cooperation, maybe get a settlement

23   agreement, and then come back and try to crank, what -- that

24   just doesn't happen in real life, unless it's this new kind of

25   FTC tactic that I haven't seen before.  I don't know of any

N88DBROC

1     other cases where they criminally prosecute and then civilly

2     sue.  They don't do that.  So at least that's my experience.

3               THE COURT:  You've asked for information about

4     Mr. Pearce and Mr. Lloyd, and you've suggested to me that it's

5     exculpatory information.  I want to be very, very clear here.

6     For literal years I have tried to understand better the

7     interplay between exculpatory and impeachment evidence.  To me,

8     there may be information about Mr. Pearce or about Mr. Lloyd

9     that very much goes to their credibility or goes to their

10    involvement.  But I just want to make sure I understand how

11    it's exculpatory.

12              Did the FTC suggest that your client was the

13    mastermind, and this would disprove that, or -- I thought the

14    FTC was suggesting that this came in the first instance from

15    Mr. Pearce, and your client joined on.

16              MR. COCHELL:  Well, the FTC kind of hedged its bets in

17    some of this litigation, and modified Lloyd's declaration to

18    make him look like a minor player, that he wasn't working

19    closely with Danny Pearce.  And so they tried to make, because

20    they had deals with Lloyd and Pearce, they tried to make my

21    client look worse, where Lloyd was actively signing people up

22    and sending them to Pearce, and there was a lot of cooperation.

23              THE COURT:  Yes.  I still wonder why Mr. Lloyd isn't

24    before me now, but that's for another day.

25              MR. COCHELL:  I'm sorry.

1          THE COURT:  I wonder why Mr. Lloyd -- I'm sorry.

2     Mr. Lloyd is before me now.  I don't know, someday maybe I'll

3     meet Mr. Pearce as well.

4          MR. COCHELL:  It's exculpatory.

5          THE COURT:  Why is it exculpatory?

6          MR. COCHELL:  Because I think it's an important

7     question.  I was looking at our discovery request at page 14 of

8     the court record, and page 14 of the request.  And there's --

9     there's three things what we're asking about co-counsel

10    discovery, or codefendant discovery, and it goes to how these

11    guys lured in other people as affiliates or as customers to

12    take advantage of them.  And it was very similar to the method

13    that they used to pull in my client, that they had other credit

14    monitoring agencies that they lured in.  And so we would want

15    to find out who they were actually working with to do that,

16    because it goes to how sophisticated Pearce and possibly Lloyd

17    were in going about their tasks.

18         So you see, Exhibits 53 and 54 were the -- and 52,

19    that were identified, and it talks about Pearce talking to

20    Lloyd about realtor stuff and Craig's List, and then there's a

21    discussion about Zillow, as well as Trulia, and discussing how

22    listings go up on Zillow, Hotpads, and Trulia.  And then you

23    have the Oncarrot.com program, where peers signed up for an

24    affiliate network, and it's a real estate platform that

25    provides services.  And so these are all very -- this is like

1  similar means and methods that would come in to show that it

2  was no accident for them, but it was certainly done without

3  people knowing about it.

4      And so we would want to be able to get some discovery,

5  and find out if there are other people that were actually

6  mislead by Pearce and Lloyd the same way that my client was.

7      THE COURT:  All right.  Because that's the point I'm

8  not quite understanding.  Your client can make the argument

9  from the -- I imagine from the discovery he has and from the

10  knowledge that he has of this case that he was misled by these

11  two individuals, and did not have the requisite intent.  I'm

12  not sure why someone else's intent matters.  It's a strange MO

13  argument -- or 404(b) argument that you're making, and that I'm

14  trying to understand better than I currently do.

15      MR. COCHELL:  Sure.  I mean, even sophisticated

16  businessmen can be misled would be the point I would make to a

17  jury.  So I understand your Honor's point, and I understand the

18  government's point.  We have -- also, we have -- and maybe you

19  have additional questions that you want me to answer first,

20  your Honor.

21      THE COURT:  I'll let you go forward, sir.  Thank you.

22      MR. COCHELL:  I think it's -- you know, the good faith

23  of government agencies, I don't think you can divorce one

24  government agency from another just because the DOJ steps in as

25  the prosecution.  We have a government agency that knew it was

1    referring Mr. Brown for criminal prosecution, and yet they

2    instructed Lloyd to destroy everything, and he did.

3          They come up with an explanation in a footnote near

4    the end of their response, and I appreciate the government's

5    dilemma.  They've come up with their idea of what possibly

6    happened.  They have no affidavit to support it.  But the

7    bottom line is that we have an affidavit from Lloyd's attorney,

8    because he -- you know, maybe it was a misunderstanding on my

9    part, but I thought he said that they had imaged the hard

10   drive; and that he gave it to the prosecutor; and the

11   prosecutor then -- you know, they gave it to the FTC; and then

12   the prosecutor gave him a copy of Lloyd's hard drive.

13         It turns out that Lloyd had apparently copied some

14   stuff from his hard drive, and gave it to the FTC, and the FTC

15   -- and the FTC gave it to the DOJ, and the DOJ made it

16   available in discovery.  So there was a bit of a

17   misunderstanding, but the bottom line in Mr. Tulman's

18   declaration is that his client no longer has that hard drive.

19         THE COURT:  But I thought the point was, and this was

20   the thing you elided over in your submission to me, is what

21   Mr. Lloyd was being asked to do is destroy the personal

22   identifying information of the victims in this case.  So you

23   actually -- and this is something that I hope you end up being

24   right, because, at the moment, I'm very much disagreeing with

25   your argument, so --

N88DBROC

1          MR. COCHELL:  Right.

2          THE COURT:  You made it sound like spoliation when, in

3     fact, they were telling Lloyd to destroy personal identifying

4     information, contraband he shouldn't have.  That's very

5     different than spoliation.

6          MR. COCHELL:  There's not a shred of evidence to

7     support that theory raised by the DOJ.

8          THE COURT:  Okay.  Somebody's going to be right.

9          MR. COCHELL:  Yes.  Somebody has to step up to the

10    plate and do it under oath, because I don't believe a thing the

11    FTC says, and I've had a lot of experience with them.  When it

12    comes to telling people to do something, they know that they

13    should be telling them pre certain -- we know this is under

14    criminal prosecution.  The FTC has a duty to tell them, you

15    need to preserve your hard drive; and, oh, by the way, the

16    receiver was supposed to image your hard drive, so we want that

17    done.  But they didn't get that done.  They didn't want it

18    done, because they already had Pearce and Lloyd, and they

19    didn't want any exculpatory information with Lloyd asking

20    questions and Pearce giving him instructions.  And so we have

21    that, and then we have this idea --

22         THE COURT:  Does Mr. Lloyd's attorney -- I see the

23    edits.  I see that they were done.

24         MR. COCHELL:  Fifth Amendment.

25         THE COURT:  Okay.

N88DBROC

1                  MR. COCHELL:  I can't compel a lawyer to say anything.

2                  THE COURT:  You have to let me ask my question before

3      you tell me you can't answer it, sir.  Thank you.

4                  MR. COCHELL:  Oh, I'm sorry.

5                  THE COURT:  Mr. Lloyd's counsel is the gentleman from

6      whom you have the declaration?

7                  MR. COCHELL:  Right.

8                  THE COURT:  Does he believe the edited declaration was

9      false?

10                 MR. COCHELL:  Did he edit --

11                 THE COURT:  Your belief is that Mr. Lloyd submitted a

12     draft declaration, and the FTC suggested edits to it.  Am I

13     correct so far?

14                 MR. COCHELL:  No.

15                 THE COURT:  Okay.  Who --

16                 MR. COCHELL:  Different declaration.

17                 THE COURT:  Okay.

18                 MR. COCHELL:  That was a declaration Lloyd filed in

19     the FTC case.

20                 THE COURT:  I understand.  Let me try it again then.

21                 MR. COCHELL:  Right.

22                 THE COURT:  Lloyd or his counsel submitted a draft

23     declaration to the FTC, correct?

24                 MR. COCHELL:  Not what we're discussing here, your

25     Honor.

1          THE COURT:  Okay.

2          MR. COCHELL:  Can I clarify?

3          THE COURT:  Please.

4          MR. COCHELL:  And I apologize for any

5    misunderstanding.  Mr. Tulman filed document number 80 before

6    this Court, and he is the counsel for Mr. Lloyd.  And I'd had a

7    discussion with Mr. Tulman, where he said that there'd been a

8    hard drive.  Remember, I just told you about that.

9          THE COURT:  Yes, sir.

10          MR. COCHELL:  And I was mistaken about what he said.

11    So he filed his declaration, because I had put in my

12    declaration they had a hard drive that was disclosed with

13    DOJ -- it made the DOJ look bad, and so I think he was

14    concerned about that.  And he filed his declaration, and on the

15    third page of the declaration, he says that the hard drive is

16    no longer available.

17          Now, in the post-arrest interview, I think it's pretty

18    clear that Mr. -- three times Mr. Lloyd said, I destroyed

19    everything, all the data.  And he, you know, had affiliates, he

20    had other things that might be discoverable information, and he

21    did it at the instruction of the FTC.  And the FTC is just like

22    a police department or the FBI.  If they -- in this case, if

23    they go out and destroy something, they should be held to

24    account.

25          THE COURT:  One moment, please.

1    Thank you.  Please continue, sir.  Thank you.  I just

2    wanted to reacquaint myself with Mr. Tulman's declaration.

3    MR. COCHELL:  Okay.  Do you want me to go on to

4    another subject, your Honor?

5    THE COURT:  Yes.  I think we should move to the issue

6    of the abduction arguments, the kidnapping arguments, please.

7    MR. COCHELL:  Right.  I understand the case law is

8    against us, but the Department of Justice has not conceded that

9    maybe there was a violation of the immunity statute that Mexico

10    had.  I don't think that he went before a magistrate or did

11    anything in Mexico.  They just hauled him off.  It's a

12    kidnapping.  But I understand the case law is against us, and

13    we've made the argument for the Court's consideration.

14    It does undermine, you know, faith that the government

15    will follow extradition procedures or some sort of memorandum

16    of understanding between countries before they kidnap somebody.

17    How does it translate into this case?  It's part of a pattern,

18    not knowing that he was in Mexico, and that whole thing could

19    have been handled very differently.  But we covered that at the

20    bail hearing -- I don't want to waste the Court's time -- that

21    they knew and FTC knew and DOJ must have known where Mr. Brown

22    was.  He was complying fully with the order, and so on, and so

23    forth.  It's all stuff that I don't think is worth going over

24    at this point.

25    There is one other point that I did want to raise with

1    the court. Pearce's laptop, they had an order in the district
2    court indicating the receivers should image the laptops of all
3    three defendants, and that was not done. And Pearce's laptop
4    was not imaged until three years, two years after -- until
5    after this indictment. And there's a report that the
6    government did give me, and I appreciate that they gave me a
7    report from their forensic examiner, but the forensic
8    examiner -- what's absent here is that there's no indication of
9    how much Danny Pearce deleted from his computer after this case
10   was over. It doesn't acknowledge the fact that every time that
11   you use a computer after an event, like three years ago, you
12   are basically changing the evidence.
13          Most forensic evidence -- you know, examiners will say
14   you need to get this controlled and done, you know, as soon as
15   possible to preserve the integrity of the evidence. And so I
16   do think that there's a real serious problem, because how can
17   the FT -- how can the government review a computer for words
18   when they have absolutely no clue as to what was deleted?
19          So we do think that there's a problem here, and we do
20   think that the hard drive should be handed over to us, and that
21   we should be allowed to do word searches. And if there's
22   something that we think is relevant based on whatever the Court
23   rules as being relevant or outside the scope, we won't search.
24   But we want to find, if there's communications between Lloyd
25   and Pearce, or Pearce and other people about this particular

1    case, and have that available for trial.

2           We're missing an affiliate database, you know, that

3    Pearce had.  He had 200 to 300 affiliates.  The affiliate

4    communications between them and Pearce would also potentially

5    reveal how they were supposed to deal with my client.

6           And then we have one more issue that I've raised, and

7    I -- I think it's important.  There was a huge emphasis on

8    recording customer interviews, or client interviews at CBC, and

9    there were about 35,000 voice mail interviews of customers

10   complaining, about customers asking for refunds, customers

11   getting refunds, customers saying, well, we'd like to keep the

12   service, and customers indicating satisfaction with the

13   service.  So those are the sorts of things that we think are

14   exculpatory, and it wasn't produced to us during the FTC

15   proceedings, and the DOJ apparently wasn't provided that, but

16   it was seized.

17          THE COURT:  Do you have it now, sir?

18          MR. COCHELL:  I'm sorry?

19          THE COURT:  Do you have it now?  Do you have access to

20   it from these FTC proceedings?

21          MR. COCHELL:  I don't.

22          THE COURT:  Okay.  And it is a database of customer

23   interviews, recorded customers interviews?

24          MR. COCHELL:  Yes, ma'am, voice mails, and there is a

25   missing affiliate database for Pearce, which would have a lot

1   of information on it, including information about the

2   affiliates' relationship with CBC, and how it should be

3   handled.  I believe that many of these affiliates, without

4   seeing their affiliate agreements, but I think a lot of these

5   affiliates were actually co-conspirators with Pearce and Lloyd,

6   but it's -- I wouldn't know that until I could see it.

7           THE COURT:  Thank you.  Just one moment, please.

8           Off the record.

9           (Discussion off the record)

10          THE COURT:  Ms. Lai, let me hear from you, please, and

11  why don't you -- I'd be interested in these Pearce materials

12  that apparently the FTC has and you do not.

13          MS. LAI:  So as to those items, I'm going to have to

14  defer to Mr. Ravi.

15          THE COURT:  Is he still on the phone?  Mr. Ravi?

16          MR. RAVI:  Yes, I'm still here, your Honor.

17          THE COURT:  Bless your heart, sir.  What about this

18  affiliate database?  What about the image, the customer

19  interviews?  Do you have them?

20          MR. RAVI:  We do not, your Honor.  We have requested

21  basically everything from the FTC, absent its -- and total

22  correspondence, and that was not produced to us.  I'm not aware

23  of any missing affiliate database that the FTC has that is

24  associated with Mr. Pearce, and I'm not certain if Mr. Cochell

25  specified how he's aware the FTC had such an affiliate database

N88DBROC

1     from Mr. Pearce.

2              THE COURT:  Sir, I believe he tells me that he

3     received it, or at least saw it during the civil action.  Now,

4     my recollection, Mr. Ravi, is that I asked you to ask people at

5     the FTC whether they'd given you everything, and I thought

6     there was some sort of understanding that they'd given all that

7     they had, or told you all that they had.  I think you need to

8     find out if these databases exist.

9              Can you do that?

10             MR. RAVI:  We can do that, your Honor.

11             THE COURT:  All right.  And if you need to speak with

12    Mr. Cochell about the specifics of them, because that would aid

13    you in speaking with the FTC, then let's do so.

14             Ms. Lai, what about the laptops here?  Were they

15    imaged, Mr. Pearce's, Mr. Lloyd's, Mr. Brown's?

16             MS. LAI:  Mr. Pearce's computer was imaged.  Again,

17    Mr. Ravi can speak to whether he knows exactly when they were

18    imaged.  We do have a copy of the image.  We've represented to

19    Mr. Brown that we will do -- we've produced basically what the

20    FTC pulled from Mr. -- screen shots of what they pulled, and

21    documents of what they pulled of Mr. Pearce's computer.

22             We are in the process of reviewing the whole computer

23    again to see whether there is anything else that is responsive

24    and relevant to this case, as well as anything that's

25    potentially exculpatory.  That process is going on this week,

1    and we expect it to be completed by the end of the week.

2              THE COURT:  But do you have the image of Mr. Pearce's

3    laptop, the image of Mr. Lloyd's?  Are those contemporaneous

4    with the FTC's investigation, or were those imagines taken

5    later in time?

6              MS. LAI:  That is something that Mr. Ravi may be able

7    to address.

8              MR. RAVI:  Yes.

9              MS. LAI:  We do not have a full image of Mr. Lloyd's

10   computer I understand.

11             THE COURT:  That's fine.

12             Mr. Ravi.

13             MR. RAVI:  Yes, your Honor.  That's correct.  We

14   seized a -- well, we took a, with respect to Mr. Pearce, image

15   of his laptop, and this was I believe approximately 2019.  So

16   it's not contemporaneously with the FTC.  This is something we

17   did on our own, where we imaged the laptop.  And Ms. Lai

18   indicated we're now reviewing that.  We have already produced

19   to Mr. Brown various text messages and Skype messages and

20   screen shots that we extracted from Mr. Pearce's laptop that we

21   believe are relevant to this matter.  And we will review the

22   entire laptop to determine whether there is anything else there

23   that's relevant to this matter, and produce it to Mr. Brown.

24             Now, with respect to Mr. Lloyd, we have never imaged

25   his laptop, and I don't -- the FTC also did not produce any

1    such image.

2            THE COURT:  All right.  The concern I have, and I'm

3    directing this to the prosecutors involved in this proceeding,

4    is that while I appreciate that you think you know all that is

5    relevant in this case, my concern is that you may be wrong; and

6    while I can understand, and I am understanding the arguments

7    about not wanting to turn over the image of Mr. Pearce's

8    computer, with the strictures that Mr. Cochell is suggesting

9    regarding attorney's eyes only, I'm not sure what's the harm

10   there.

11           You might say the harm is early access to impeachment

12   material, but I suspect there's abundant impeachment material

13   that you've produced and will be producing regarding

14   Mr. Pearce.  My fear, and this is what I was trying to get at

15   with Mr. Cochell, is what you consider impeachment, defense

16   counsel, and perhaps the Court may consider exculpatory, and I

17   don't want to be in the situation where something is produced

18   very late, because you didn't appreciate its significance.

19           I'm not, in this moment, making that decision, but I

20   guess I was asking Ms. Lai, what is the harm in producing the

21   entire image that you have of Mr. Pearce's hard drive?

22           MR. RAVI:  Your Honor, I can take this one.

23           THE COURT:  Okay.  Mr. Ravi, she welcomes the assist.

24   Thank you.

25           MR. RAVI:  You can stay with me until the 1:30 cut off

N88DBROC

1    on discovery issues, just because I'm more familiar with them.

2    I'm happy to take that.  Thank you.

3         THE COURT:  Okay.

4         MR. RAVI:  So with respect to the -- you know, the

5    government obviously seizes lots of devices from individuals,

6    and those devices contain information of a personal nature.

7    That's why we conduct responsiveness reviews, and it proves

8    what we believe is responsive to the defendant.

9         I understand the Court's concern and the defendant's

10   concern about something that we may have missed, you know,

11   should there be a trial in this matter.  You know, I think at

12   that point in time, once we actually have a schedule for a

13   trial, the government would be amenable to producing the entire

14   image of the laptop to Mr. Cochell on an attorney's eyes only

15   basis for his review, which is something we do when cases are

16   heading to trial.  But what happens then -- I don't believe

17   Mr. Cochell showed any basis for getting an entire image of a

18   co-conspirator's laptop that may contain logs of their personal

19   information about that codefendant.

20        THE COURT:  I should note at this point that,

21   Mr. Cochell, there were certain images that I did not need to

22   see regarding the cam girls that -- you could have kept them

23   out, and I would have been fine, really.

24        MR. COCHELL:  Yes, your Honor.

25        THE COURT:  I'm not sure why I needed to see them

N88DBROC

1    twice.

2         All right.  Ms. Lai, should I be talking to you --

3    well, actually, I think I have all that I need on the

4    kidnapping arguments.  I guess, Ms. Lai, what I'd ask you or

5    Mr. Ravi, if you want to hand off to him to address, is this

6    idea of the prosecution team, this does seem to be a situation

7    in which the lion's share of the work may have been done by the

8    FTC and given to you.  And does that change the analysis of the

9    prosecution team, and if perhaps you could link that to the

10   arguments that Mr. Cochell was making about divorcing -- or

11   being unable to divorce the good faith or not of the FTC from

12   that of the U.S. Attorney's Office.

13        MS. LAI:  So, your Honor, I think the issue -- and

14   Mr. Ravi can jump in any time.  I think the issue is whether

15   the defendant is entitled to discovery as to alleged government

16   misconduct, and the case law is fairly clear that he has to

17   make a substantial showing of improper -- of government

18   impropriety.  And his basis for claiming -- looking at the time

19   line, there's no basis for assuming vindictiveness.  The case

20   was referred, the matter was referred to the U.S. Attorney's

21   Office in April 2017, four months before the FTC's deadline for

22   accepting the settlement offer.  I'm not even sure at this

23   point whether in April 2017 a settlement offer had been made.

24        And then we have Mr. Rave's definitive statement

25   saying that there was no coordination as to strategy or

1    charging decisions.  As the Court probably knows, in order to

2    avoid duplicative requests to potential witnesses or subpoena

3    recipients, we do share information, but the case law is pretty

4    clear that unless the sharing is done -- that anything that the

5    civil investigation obtains is purely for the purpose of

6    assisting the criminal investigation.  There's no impropriety

7    in terms of sharing, because we want to avoid overburdening

8    people who make -- have relevant evidence.

9            The indictment was filed more than a year after the

10   Seventh Circuit reversed the monetary judgment, so there's no

11   -- I think it's hard to infer from that that somehow the FTC

12   was looking in the sidelines waiting -- you know, persuaded the

13   U.S. Attorney's office to jump in as soon as they lost the

14   monetary judgment in the Seventh Circuit.

15           THE COURT:  Please pause for just a second now.

16           MS. LAI:  Sure.

17           THE COURT:  I just want to say this to you and your

18   colleague, because I don't want anybody to be burned at some

19   later proceeding.  I'm taking very seriously the clause or the

20   construction, "played no role."  This is a very -- Mr. Cochell

21   says conclusory.  I say definitive.  You've made a definitive

22   statement about the FTC playing no role, and the government

23   playing no role.  I hope that you're right, because, again,

24   you've -- this is your sworn statement, Mr. Ravi, so I'm just

25   saying that you've bitten off a lot there, and if you're wrong,

1    there will be consequences.  So I'm hoping that you're right.

2            So I appreciate you're back on your timeline, other

3    things I should know.  I'm not stopping you in the timeline.  I

4    just think you have told me -- do you want to talk?  Because

5    perhaps I'm misremembering things.  There is maybe some

6    significance to the FTC's edits to Mr. Lloyd's declaration.  I

7    think I have that correct, that there were edits to Mr. Lloyd's

8    declaration.  And it matters to me, because in the *Ahuja* case

9    which I had, which is securities fraud, but at trial, there

10   were issues about the government editing an allocution.  I

11   wasn't necessarily opposed to it.  I just needed to know about

12   it.

13           So did the FTC, in fact, edit Mr. Lloyd's declaration,

14   and should I be concerned about it?

15           MS. LAI:  I have to defer to Mr. Ravi on this.  I'm

16   sorry.

17           THE COURT:  Okay.  Mr. Ravi, am I saying something

18   that you are familiar with, sir?

19           MR. RAVI:  I'm familiar with it only so far as I've

20   learned in Mr. Brown's filings.  He did produce some

21   correspondence related to an investigation, but, again, that

22   was made entirely without our knowledge at the U.S. Attorney's

23   Office.

24           THE COURT:  All right.  Mr. Ravi, while I have your

25   attention, is there anything you want me to know about these

N88DBROC

1    discovery issues before I turn to Mr. Cochell?

2              MR. RAVI:  One moment, your Honor?

3              THE COURT:  Yes.

4              MR. RAVI:  Your Honor, I just want to make one point

5    that I think colors the argument about the potential

6    vindictiveness of the government going after Mr. Brown.  I also

7    note that there's also a co-defendant that was charged,

8    Mr. Lloyd, who, in fact, cooperated fully with the FTC,

9    according to the FTC's view on the case, and that in and of

10   itself in some ways showed that the government here is not

11   looking to, you know, prosecute Mr. Brown solely because he won

12   in the Seventh Circuit, which is what the argument is, that

13   there was a larger case, and it wasn't just Mr. Brown who was

14   referred by the FTC to the U.S. Attorney's Office right --

15   early in their case.  It was all three defendants.  All three

16   co-conspirators.

17             THE COURT:  All right.  Thank you, sir.

18             Mr. Cochell, last thoughts.

19             MR. COCHELL:  Yes, your Honor.  I'm not trying to open

20   up anymore discussion about it, but the FTC has this announced

21   policy that they package up and they train prosecutors.

22             THE COURT:  The FTC?

23             MR. COCHELL:  I'm sorry?

24             THE COURT:  The FTC has the policy?

25             MR. COCHELL:  The FTC has the policy.

Case 1:20-cr-00524-KPF   Document 53   Filed 12/08/21   Page 77 of 185   Page 75.857   Page ID 5

1          THE COURT:  About training prosecutors?

2          MR. COCHELL:  About training prosecutors, which I

3     thought was interesting.  They undoubtedly trained them in the

4     details of FTC law, which, you know, maybe that was part of the

5     discussion; but, you know, it's -- I'm just speculating here.

6     I really don't know.  But with respect to --

7          THE COURT:  Sir, just to be clear, the fact that they

8     have a policy, and the fact that in their life sometimes they

9     have trained prosecutors, what do I take from that for this

10    case?

11         I don't think Mr. Ravi's going to tell me --

12         MR. COCHELL:  It suggests to me that there's a process

13    where they package up the prosecution, and they give it to this

14    committee, and then they have a discussion about it.

15         THE COURT:  I see.

16         MR. COCHELL:  And it doesn't look like they did it on

17    this particular occasion, because it was just sort of a verbal

18    discussion, there was nothing packaged, and if there was

19    training that Mr. Ravi at some point or his co-counsel

20    attended, perhaps that's relevant, because it's something that

21    would be important to note what it was and when it happened.

22    It would be useful to us, may or may not be discoverable from

23    the Court's perspective.

24         I understand these distinctions, and we are simply

25    making sure that, you know, if the FTC played no role, then

N88DBROC

1  they played no role.  So if there was training involved, I

2  don't know, but that would be something I'd be interested in.

3  And other than that, I think that the Court understands our

4  concerns, and I just want to be sure, because sometimes, in the

5  heat of argument, I don't understand something or I

6  miscommunicate.

7           The issue that we raised in our brief on the

8  modification by the FTC of Mr. Lloyd's declaration was

9  something that was done during the FTC case, and not after.

10          THE COURT:  No.  I understand.  What do you want me to

11 do with that, though?

12          MR. COCHELL:  Well, I think it -- I think it goes to

13 the fact that they are out there telling people what to say,

14 and it goes to the overall lack of ethics by this agency.

15 They'll tell people what to say.  They'll tell people to

16 destroy things, and it's up -- you know, if it's not clearly

17 communicated or it's not in writing, there's no way to know.

18          So we're going off of Pearce's -- you know, Lloyd's

19 testimony saying, they told me to destroy everything, and, you

20 know, now his computer's not there.  So unless there's

21 something that says otherwise, I think the FTC really did

22 something wrong here.

23          THE COURT:  You think they engaged in spoliation of

24 evidence.

25          MR. COCHELL:  I definitely believe it.

1          THE COURT:  All right.  Thank you very much.

2          MR. COCHELL:  Thank you, ma'am.

3          THE COURT:  You've all given me much to think about.

4     I'm expecting the government to order a copy of this

5     transcript.  I don't need it tonight, but I also don't really

6     want to wait 30 days.  So I'll let you figure out with our

7     intrepid court reporter when is an appropriate time.

8          I need to think about this, and you will hear from me

9     when you hear from me.  For now, thank you for great arguments,

10    and for really making me think through these issues.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

NAK1BROD

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        20 Cr. 524 (KPF)

 5   MICHAEL BROWN,

 6              Defendant.                Conference/Decision
                                          (Remote)
 7   ------------------------------x

 8                                        October 20, 2023
                                          10:04 a.m.
 9

10   Before:

11                   HON. KATHERINE POLK FAILLA,

12                                        District Judge

13
                              APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  SAGAR K. RAVI, ESQ.
          SARAH Y. LAI, ESQ.
17        Assistant United States Attorneys

18   THE COCHELL LAW FIRM
          Attorneys for Defendant
19   BY:  STEPHEN R. COCHELL, ESQ.
          JONATHAN SLOTTER, ESQ.
20

21

22

23

24

25
```

NAK1BROD

```
1              (Case called)

2              THE LAW CLERK:  Counsel, please state your names for

3    the record, beginning with counsel for the government.

4              MR. RAVI:  Good morning, your Honor.  This is AUSA

5    Sagar Ravi, and I'm also joined by AUSA Sarah Lai.

6              THE COURT:  Good morning to both of you, and thank you

7    very much.

8              MS. LAI:  Good morning.

9              THE COURT:  And representing Mr. Brown this morning?

10             MR. COCHELL:  Good morning, your Honor.  This is

11   Stephen Cochell, along with Jonathan Slotter.

12             THE COURT:  Good morning to both of you.

13             And is Mr. Brown on the line this morning?

14             MR. COCHELL:  He is, your Honor.

15             THE DEFENDANT:  Yes, I'm here.  Good morning, your

16   Honor.

17             THE COURT:  Sir, good morning.  And thank you very

18   much.

19             All right.  Mr. Cochell, as I'm looking at Federal

20   Rule of Criminal Procedure 43, it is not obvious to me that

21   this is a conference at which Mr. Brown's appearance is

22   necessary in person, but in case it is, is it acceptable to you

23   and to your client that we hold this proceeding today by

24   telephone?

25             MR. COCHELL:  It is, your Honor.
```

NAK1BROD

```
1         THE COURT:  All right.  I thank you all for that.  I
2    didn't know at the time I was setting this conference, but in
3    the interim I've managed to break a bone in my foot, so I'd be
4    hobbling around anyway, so thank you.
5         What I'm going to do——and I'll just set the ground
6    rules for the parties——is, I have an oral decision on
7    Mr. Brown's motion to dismiss on double jeopardy grounds.  It
8    is quite lengthy.  I also have an oral decision on Mr. Brown's
9    motion to compel and for the issuance of Rule 17(c) subpoenas.
10   It is less lengthy.  I am going to read both of these into the
11   record, and as the parties see fit, they can obtain a
12   transcript of this conference.  But I wanted to be sure that as
13   soon as I had something that I gave it to the parties.  And I
14   do appreciate your patience, given that you last heard from me
15   in or about August, when we had the oral argument.
16        So I'm going to ask those of you who are participating
17   in this conference this morning to please, if it's possible, to
18   mute your phone lines so that there aren't any interruptions.
19   I'll give you a moment to do that, and then I will begin with
20   the motion to dismiss opinion.  Thank you.
21        All right.  I'll begin now.  And as I was suggesting
22   in my opening comments, I do want to thank the parties for
23   their oral and written submissions and for their patience.
24   After the oral argument, I decided that I thought there were
25   issues that I thought required more thought and more research,
```

1    and I also wanted to see how they had been analyzed by other

2    courts.  And then in the midst of all of this, the Seventh

3    Circuit issued its decision in the FTC civil case against

4    Mr. Brown and CBC.

5           For the reasons that I'm about to set forth, although

6    it's going to take me quite awhile to do so, I am denying

7    Mr. Brown's motion to dismiss.

8           What I'll do is I'll begin by discussing relevant

9    procedural history of the civil case brought by the FTC, the

10   Federal Trade Commission, and that informs the majority of the

11   defendant's arguments for dismissal.  I'll then set out the

12   relevant law, and I'll consider the parties' arguments.

13          I'll give very brief discussion to the offense conduct

14   that is alleged here.  There is a suggestion that Mr. Brown, as

15   owner, director, and employee of Credit Bureau Center,

16   defrauded consumers because of websites that had a "negative

17   option feature."  I'm fully aware that there's a whole lot more

18   to it than that, but I'm just going to use that to sort of set

19   the table.

20          In or about January of 2017, there was an action

21   brought by the Federal Trade Commission in the Northern

22   District of Illinois.  It was captioned *FTC v. Credit Bureau*

23   *Center*, and given Docket No. 17 Civ. 194.  At first there was

24   an entry of a temporary restraining order and, later, after a

25   two-day hearing, an order for preliminary injunctive relief.

NAK1BROD

1   As I understand it, the FTC brought suit under Section 13(b) of

2   the Federal Trade Commission Act, Section 5 of the Restore

3   Online Shoppers' Confidence Act ("ROSCA"), and another statute

4   not relevant to this motion.  In obtaining the preliminary

5   injunction, what I understand that injunction to do is it

6   prohibited the CBC defendants from making misrepresentations

7   and engaging in further acts in violation of the FTCA——the

8   Federal Trade Commission Act——or ROSCA; it imposed an asset

9   freeze; it enjoined the defendants from opening commercial

10  mailboxes without giving the FTC prior notice and an

11  opportunity to inspect; barred them from incurring charges or

12  cash advances on credit cards in their name; and it appointed a

13  permanent receiver for CBC.

14          And in his motion to dismiss papers, the defendant

15  speaks a lot about how this injunctive relief affected him

16  personally, noting, among other things, that he had difficulty

17  in obtaining funds for living expenses, even after providing

18  financial disclosure; that at times he had to work for cash

19  payments or for others to pay down his credit card debts.

20          The government responds that there were exceptions to

21  the asset freeze——for example, the allowance of living expenses

22  if certain forms were completed——and that as well, there was

23  the ability to obtain additional funds if stipulated to by the

24  parties or directed by the District Court in Illinois.

25  According to the FTC, Mr. Brown didn't seek intervention from

NAK1BROD

1    the court regarding the limits on his spending other than with

2    respect to attorney's fees.

3         In or about June of 2017, Mr. Brown began a business

4    relationship with an entity that I know by the capital letters

5    CERV, and Mr. Brown believes that the issuance of the subpoena

6    by the FTC killed that business opportunity.

7         The next month, in July 2017, the District Court

8    issued an order finding civil contempt against Mr. Brown after

9    an evidentiary hearing.  There is some discussion about him

10   continuing to use negative option features or handling cash or

11   checks of customer victims or disclosing or selling personal

12   identifying information, or transacting CBC business.

13   Mr. Brown has admitted to me that he may have violated the

14   assets freeze by wiring funds to counsel and by resuming

15   certain business activities for which he believes he had the

16   advice of counsel that he could continue.

17        In August of 2017, according to the plaintiff, there

18   was a deadline in or about August 3rd to settle or the FTC

19   indicated it would proceed to seek a lifetime ban.

20        In his papers, Mr. Brown explains to me how he

21   considered the settlement offer and the efforts that he made to

22   explore it, with the reasons why he felt he couldn't, in my

23   term, pull the trigger on that offer.

24        By the fall, Mr. Brown was at a point where he, as he

25   says, was picking and choosing the expenses to pay.  He found

1    that the FTC did not unfreeze or give him money for living

2    expenses, and what he was given was underfunded and his credit

3    history was destroyed.

4            There was a release of income in or about November of

5    2017.

6            Mr. Brown's deposition was in December of 2017.

7            And then skipping ahead to June of 2018, the District

8    Court in Illinois granted summary judgment in favor of the FTC

9    and ordered equitable monetary relief in the amount of

10   $5,260,671.36, for which Mr. Brown and co-defendants Danny

11   Pierce and Andrew Lloyd were jointly and severally liable.  I

12   understand that that figure comes from a finding of the

13   District Court that the defendants' net sales to consumers,

14   which are described as total sales minus refunds and

15   charge-backs, amounted to at least $6,022,671.36 from the

16   conduct alleged in the Commission's complaint and that the

17   Commission had recovered to that date $762,000 from Mr. Pierce

18   and Mr. Lloyd.  In his moving papers, Mr. Brown repeatedly

19   refers to this money as "disgorgement," but I don't believe it

20   is.  Throughout the judgment, even before it was amended in

21   later years, it was referred to as "equitable monetary relief"

22   for consumers.  And only once, to my understanding, does the

23   term "disgorgement" appear in that judgment, and that is in

24   reference to the funds that are not used for equitable relief

25   being deposited in the U.S. Treasury as disgorgement.

1     In that same judgment, there is injunctive relief,

2  including the prohibition against misrepresentations,

3  requirements for affiliate program activities, a prohibition

4  against misrepresentations relating to negative option

5  features, and requiring certain disclosures regarding the same,

6  and requiring informed consent, and other disclosures.

7     Later on, in or about 2021, the judgment was modified

8  pursuant to Federal Rule of Civil Procedure 59, and citing

9  Section 19(b) of the Federal Trade Commission Act and Section 5

10  of ROSCA, the District Court provided that that money was

11  entered in as equitable monetary relief and that it was, again,

12  to be used for equitable relief, including consumer redress and

13  any attendant expenses for the administration of any redress

14  fund.

15     As I will note, it was later modified by the Seventh

16  Circuit this year.

17     There are a number of decisions in the civil case

18  brought against CBC and Mr. Brown.  I won't give all of the

19  cites.  I know the parties are aware of them.  I'll simply give

20  the dates.  There are decisions on February 21st of 2017,

21  January 14th of 2018, June 26th of 2018, August 21st of 2019,

22  April 22nd of 2021, September 13th of 2021, and most recently,

23  the Seventh Circuit decision in or about August 30th of 2023.

24  That decision upholds, as modified, the District Court decision

25  to recast the judgment or the equitable monetary relief under

NAK1BROD

 1    Section 19.  It agreed with the FTC that the mandate rule and

 2    the concept of law of the case did not foreclose relief since

 3    the prior Seventh Circuit decision had only addressed

 4    restitution under Section 13(b) and not Section 19.  It also

 5    agreed that there was an intervening change of the law, which

 6    was a proper basis for a motion under Rule 59(e)——specifically,

 7    a decision in *Amy Travel* that had been controlling law in the

 8    Seventh Circuit for 30 years, and that had been effectively

 9    overturned by the Supreme Court's later decision in a case

10    called *AMG Cap. Mgmt. v. FTC*.  And I should note, when I refer

11    to a decision of April 22, 2021, that is in fact not in this

12    case or in the CBC case, it is the *AMG Cap. Mgmt.* case, which

13    was related to this case.

14            But the Seventh Circuit, in the August 2023 decision,

15    also rejected the concept that the FTC had waived this

16    argument; it rejected the defense argument that the Commission

17    should be penalized by circumventing congressional limits on

18    its authority by originally seeking restitution under

19    Section 13(b); and then finally, it addressed the defense

20    argument that after the Supreme Court's decision in *Liu* that

21    monetary awards under ROSCA and under Section 19 must be

22    limited to net profits that can be traced to the underlying

23    fraud.  It found that Section 19 was not so limited, and

24    instead it found that because the monetary award in this case

25    consisted of direct consumer redress in the form of refund, a

NAK1BROD

1  form of relief expressly permitted by the statute, it need not

2  be measured by net profits and tracing is not required.

3          Related to these discussions is a time line of the

4  involvement of the United States Attorney's Office for the

5  Southern District of New York in this matter.  I'm focusing on

6  this issue a little bit less in this setting because as I

7  understand it, the misconduct, if any, is on the part of the

8  FTC, but there are some dates that may have some relevance to

9  certain of the arguments made and so I'll list them here.

10          It is my understanding that in or about April of 2017,

11  there was an oral referral by the FTC of the conduct in this

12  case to the S.D.N.Y. U.S. Attorney's Office.

13          I understand as well there was a letter for access to

14  information that was issued on or about April 24th of 2017.

15          There was a referral by the U.S. Attorney's Office to

16  the FBI for an official investigation on or about August 11th

17  of 2017.

18          There were the production of documents by the FTC to

19  the S.D.N.Y. on dates that included July 7th of 2017,

20  August 4th of 2017, February 1st of 2018, October 29th of 2019,

21  January 17th of 2020.

22          In or about March of 2020, the S.D.N.Y. obtained a pen

23  trap.

24          In or about May of 2020, there was a request for

25  authorization to the FTC to disclose certain information to the

1    grand jury.

2            And on or about October 1st of 2020, the grand jury

3    returned a sealed indictment.

4            So let me speak now about what I consider to be the

5    applicable law in this case, and then I'll discuss the parties'

6    arguments.

7            To begin, the Court notes that a person can face both

8    civil and criminal liability for the same conduct.  That's

9    discussed in many cases, including, as relevant here, the

10   Supreme Court's decision in *Hudson v. United States*, 522 U.S.

11   93 (1997).  There are also several cases that discuss

12   situations in which conduct or sanctions, despite being

13   denominated as civil, may in fact be so punitive as to be

14   criminal.  It's been discussed recently in several District

15   Court cases.  Ones on which I relied include:

16           *Tsinberg v. City New York*, from Judge Engelmayer in

17   this district, reported at 2021 WL 1146942, from March of 2021.

18           From Judge Bianco, then a district judge, in *Dubin v.*

19   *Cnty. of Nassau*, 277 F.Supp.3d 366, from 2017.

20           So as relevant here, in *United States v. Ursery*,

21   518 U.S. 267, the Supreme Court articulated a two-part test to

22   determine whether a sanction is civil or criminal:

23           First, the court must consider whether the legislative

24   "intent underlying the enactment of, or the end served by" the

25   law.  And that's discussed in the Second Circuit's decision in

NAK1BROD

1  *Doe v. Pataki*, 120 F.3d 1273 (1997).  "[I]f a disability is

2  imposed 'not to punish, but to accomplish some other legitimate

3  government purpose,' then it has been considered 'nonpenal.'"

4  That's from the *Doe* decision.  It, in turn, was quoting the

5  Supreme Court's decision in *Trop v. Dulles*, 356 U.S. 86 (1958).

6          Second, if the law was not designed to be punitive in

7  nature, courts must then determine whether, despite this, it is

8  "so punitive either in purpose or in effect" that it is

9  "transform[ed] into a criminal penalty. . ."  I'm quoting here

10 from *United States v. Ward*, 448 U.S. 242 (1980).  And while

11 "[t]he Supreme Court has not spelled out the precise nature of

12 the second-stage inquiry," and indeed has instead determined it

13 to be "a highly context-specific matter," the Court has set

14 forth a list of considerations to guide the inquiry, and these

15 considerations include:

16         "Whether the sanction involved an affirmative

17 disability or restraint, whether it has historically been

18 regarded as a punishment, whether it comes into play only on a

19 finding of scienter, whether its operation will promote the

20 traditional aims of punishment——retribution and deterrence,

21 whether the behavior to which it applies is already a crime,

22 whether an alternative purpose to which it may be rationally be

23 connected is assignable for it, and whether it appears

24 excessive in relation to alternative purpose assigned. . ."

25         I'm quoting here from Supreme Court's decision in

1   *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), and these

2   factors are often referred to as the *Mendoza-Martinez* factors.

3   It is just noted that the list is not exhaustive, nor is any

4   one particular factor dispositive.

5          The burden here rests on the party challenging the

6   sanction or the law to "show by 'the clearest proof' that the

7   sanctions imposed 'are so punitive in form and effect as to

8   render them criminal despite [the legislature's] intent to the

9   contrary.'"  I'm quoting here from the *Doe* decision, which in

10  turn is quoting from the *Ursery* decision.  And the Supreme

11  Court has described this burden as "heavy" and has found

12  certain punishments, including involuntary civil confinement,

13  to be civil in nature.  At the same time, the Court has

14  recognized that sanctions imposed in civil proceedings may

15  constitute punishment.  So as one example where they have,

16  there is *Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S.

17  767, where a tax imposed under Montana's Dangerous Drug Tax Act

18  was found to be a non-remedial civil penalty.  And on the other

19  side of the ledger, there is the *Hudson* case, which found that

20  OCC monetary penalties and occupational debarment were

21  insufficient to constitute criminal punishment.  And as a

22  potentially related case, earlier this year in the Third

23  Circuit, in *United States v. Jumper*, it was determined that an

24  SEC $5.7 million disgorgement order was insufficient to

25  constitute criminal punishment.

1          Now another case in which these issues are discussed

2     is the Second Circuit's 2013 decision in *Abuzaid v. Mattox*,

3     726 F.3d 311.

4          Let me now turn to the legal analysis, and I'm going

5     to begin with an overview of the arguments.

6          I'm going to begin first by discussing what I don't

7     understand to be argued as a basis for dismissal of the

8     indictment.  Mr. Brown is not arguing, as I understand it, that

9     the S.D.N.Y. U.S. Attorney's Office engaged in impermissible

10    conduct by not disclosing the existence of a parallel criminal

11    investigation or by obtaining from the FTC materials produced

12    in the civil matter and then using those materials in the

13    criminal investigation.

14         What I understand is that there are suggestions that

15    the criminal investigation could have been forestalled if

16    Mr. Brown had only acceded to the FTC's settlement demands in

17    August of 2017, and there are also suggestions that the timing

18    of the sealed indictment is suspicious because it followed the

19    Seventh Circuit's decision that restitution was not available

20    under Section 13(b).  However, in the absence of any

21    countervailing evidence——and there is none——this Court accepts

22    the sworn statements of Mr. Ravi, that (i) the criminal

23    referral to S.D.N.Y. was made in April 2017, months before the

24    deadline for accepting the FTC's settlement proposal; (ii) the

25    FTC played no role in the government's charging decision, the

NAK1BROD

1    timing of those decisions, or the development of the

2    government's prosecutorial strategy; and (iii) the government

3    played no role in the FTC's charging decision, its discovery

4    and/or interrogatory requests, its deposition of Brown or any

5    other individual, or the development of the FTC's discovery

6    and/or litigation strategy in the FTC action.

7         On the record before me, the manner in which the civil

8    and criminal investigations were conducted in a parallel

9    fashion also does not suffice as outrageous government conduct

10   worthy of a dismissal sanction.  Cases in which that has been

11   discussed include *United States v. Melvin*, 2015 WL 7116737,

12   from the Northern District of Georgia, which discusses several

13   other decisions; and then in this district, *United States v.*

14   *Stein*, 495 F.Supp.2d 390, from 2007.

15        Mr. Brown is also acknowledging that there are no true

16   analogous cases that support the relief he is seeking.  And I

17   just want to pause and express my appreciation for the

18   defense's candor on this point.  Instead, the defense is

19   arguing that the FTC's conduct, both in advocating in courts

20   across the country and in tying up Mr. Brown's assets in this

21   specific case, is so egregious, it is so beyond the conduct at

22   issue in these other cases, that it must be found to constitute

23   jeopardy under the Fifth Amendment.

24        Now at a macro level, and citing in part

25   Mr. Fitzgerald's article, Mr. Brown argues that the FTC

knowingly, deliberately, and fraudulently assumed a legal

position that was at odds with the text and the legislative

history of the FTCA——a position that arrogated for the agency

authority under Section 13(b) that it did not and could not

have——and then foisted that position on unsuspecting judges for

nearly three decades, until the position was finally rejected

by the Supreme Court in *AMG Capital*.  At the very least,

Mr. Brown argues, the FTC should have known, after *Kokesh* and

certainly after *Liu*, that it could not seek disgorgement in

excess of Mr. Brown's net profits.  From this, Mr. Brown argues

that the FTC went so far beyond the text of the FTCA and its

legislative history that its resulting *ultra vires* actions

against Mr. Brown must be regarded as punitive and indeed

criminal in nature.  Relatedly, Mr. Brown argues that the FTC

cannot absolve itself of liability under the Double Jeopardy

Clause by redesignating the penalty imposed originally under

Section 13(b) as one under Section 19.

         At a more micro level, Mr. Brown argues that the FTC,

lacking the authority to do so, obtained a preliminary

injunction order that allowed it to confiscate assets far

beyond that to which it was lawfully entitled, which, in

addition to being illegal, was done in a punitive manner that

choked Mr. Brown economically and amounted to house arrest.

Separately, he argues that imposition of penalties in excess of

his gains is not only contrary to the Supreme Court teachings

1    in *Kokesh* and *Liu* but disproportionate to the point of

2    implicating the Eighth Amendment's Excessive Fines Clause,

3    which is still further evidence of the punitive (and therefore

4    criminal) nature of the agency's actions.

5         I am going to discuss the *Hudson* test, or the *Ursery*

6    test, and the *Mendoza-Martinez* factors in greater detail in

7    just a moment, but I do want to begin with several general

8    observations.

9         Ultimately, while the FTC advocated legal positions

10   regarding its authority that were rejected in part, this Court

11   cannot say——and will not say——that the positions were taken in

12   such bad faith as to amount to punitive conduct.  Many of the

13   positions taken by the FTC had been accepted as settled law by

14   numerous circuits over a period of decades, and the backup

15   position that the agency has now adopted——sourcing its

16   authority to seize assets to Section 19 of the FTCA and

17   Section 5 of ROSCA——has been adopted by courts, including the

18   Seventh Circuit in the CBC civil case.

19        Defendants' arguments also suggest that the many

20   courts before whom the FTC made these arguments were unwitting

21   dupes and victims of the agency's naked power grab.  The fact

22   is, however, that these courts had the exact same access to the

23   statutory text and to the legislative history that the FTC did,

24   and after reviewing that information and considering competing

25   interpretive arguments, they came to the same conclusion as the

NAK1BROD

1   FTC.

2          Mr. Brown's arguments simultaneously overstate the

3   significance of *Kokesh* and *Liu* to the Court's double jeopardy

4   analysis, while minimizing the degree to which those decisions

5   upended settled law on available agency remedies.  Among other

6   things, those decisions focused on the disgorgement of gains

7   rather than restitution to customer victims, so it was far from

8   obvious that they would have an effect on longstanding judicial

9   interpretations of Section 13(b).  And indeed, it appears they

10  did not, because the Supreme Court in *AMG Capital* relied on the

11  text of the provision and on distinguishing the precedent cited

12  by the FTC.  Conversely, in the most recent decision in the FTC

13  civil matter against CBC and Mr. Brown, the Seventh Circuit

14  rejected his efforts to impose *Liu's* restrictions on Section 19

15  relief, noting that the statute "permits all forms of redress

16  to make consumers whole, including 'the refund of money.'"

17  This Court has reviewed cases issued after *Liu*, and none that

18  the court has found implicitly or explicitly undercuts the

19  Seventh Circuit's analysis.

20          This leads me to another general observation.  Many of

21  the arguments made to me in service of Mr. Brown's double

22  jeopardy arguments have been specifically rejected by the

23  District Court in the Northern District of Illinois and by the

24  Seventh Circuit.  For instance, these courts have permitted the

25  FTC to invoke Federal Rule of Civil Procedure 59 in light of

NAK1BROD

1    intervening changes in the law regarding the scope of

2    Section 13(b), and they've allowed imposition of the

3    $5.2 million equitable monetary fund against Mr. Brown and CBC,

4    pursuant to Section 19 of the FTCA and Section 5 of ROSCA.  And

5    because those courts have found the penalties sought by the FTC

6    to be permissive civil penalties as to Mr. Brown, it would, in

7    my estimation, undermine both of those decisions for this Court

8    to then conclude that the FTC acted in so *ultra vires* a manner

9    that the Double Jeopardy Clause is implicated.

10           Let me also echo a point made by the government in its

11   opposition submission, which is that there is some imprecision

12   as to precisely what conduct by the FTC Mr. Brown is alleging

13   to be punitive enough to implicate issues of double jeopardy.

14   At times, Mr. Brown refers to the injunctive relief imposed

15   during the pendency of the civil case, including the seizure of

16   new funds (by which I mean funds not traceable to the offense

17   conduct) and the court-approved restraint on his earning and

18   spending abilities.  However, later on in his submission,

19   Mr. Brown switches to challenging the inclusion of the

20   equitable monetary fund in the judgment, which he considers

21   impermissible disgorgement, and which he questions whether it

22   could be awarded as a legal, rather than an equitable, remedy.

23   And still later, Mr. Brown refers to Section 13(b) as the

24   "first penalizing mechanism," because it was used by the FTC to

25   seek the injunctive relief, and then to Section 19 as the

1   "second penalizing mechanism," because that statute, in his

2   estimation, only allowed repayment to consumers where redress

3   was necessary.  I'm quoting here from the defense brief.  I'm

4   looking in particular at pages 6 and 10, and then from pages 12

5   to 13 and onward, the defendant's arguments focus on

6   disgorgement, which he claims is not authorized under

7   Section 13(b) or Section 19.

8          This Court, responding to an argument that Mr. Brown

9   anticipated in his opening brief at page 12, finds that the

10  modified final judgment in the CBC case does in fact cure any

11  overreach under Section 13(b), because Section 19 authorizes

12  relief necessary to redress injuries to consumers.

13         Now let's turn now to the first prong of the *Hudson*

14  test, and that considers whether the legislative intent behind

15  the relevant statutory provisions——which here would include

16  Sections 13(b) and 19 of the FTCA and Section 5 of ROSCA——was

17  punitive or something else.  And as the government explains at

18  pages 10 through 13 of its opposition, Congress plainly

19  intended the sanctions available under the FTCA and ROSCA to be

20  civil, and not criminal penalties, in the service of consumer

21  protection.  In this regard, the Court is looking at cases such

22  as *SEC v. Palmisano*, 135 F.3d 860, from 1998, where the Second

23  Circuit indicated that Congress's designation of a penalty as

24  civil "will not be overborne unless the statute, considered on

25  its face and without reference to the level of sanction imposed

NAK1BROD

1    in the particular case. . . is clearly so punitive as to render

2    it criminal despite Congress' intent to the contrary."   There

3    is as well the Second Circuit's 2005 decision in *Porter v.*

4    *Coughlin*, 421 F.3d 141, which speaks to the same effect.

5            Now, Mr. Brown takes the converse approach.  He argues

6    that the focus must be on the FTC's intent, given its willful

7    perversion of congressional intent.  However, this Court has

8    always understood the first prong to be focused on the

9    legislative intent and not the intent of the agency.

10           And while I understand the defense's argument, which

11   is that the FTC created so much mischief as to merit a shift in

12   perspective, I have not seen any court adopt such an argument

13   in the context of analyzing the first prong of the *Hudson* test,

14   and I will therefore consider the FTC's conduct as appropriate,

15   in analyzing the second prong.  I turn to that now.

16           The second prong considers whether Mr. Brown has

17   "show[n] by 'the clearest proof' that the sanctions imposed

18   'are so punitive in form and effect as to render them criminal

19   despite [the legislature's] intent to the contrary.'"  While

20   recognizing that the *Mendoza-Martinez* factors are not

21   exclusive, this Court finds that they do not support such a

22   finding, nor do the additional factual arguments advanced by

23   the defense.

24           But before I get into the *Mendoza-Martinez* factors, I

25   do want to go back to something I mentioned in the overview

1    section——specifically, Mr. Brown's focus on disgorgement in his

2    discussion of the second prong of the punitive analysis.

3    Adopting the terminology of disgorgement to describe the

4    equitable monetary relief specified in the judgment and then

5    the modified judgment, it's understandable, given the recency

6    of the Supreme Court decision in *Kokesh* and *Liu*, and given the

7    then-existing provision of the judgment that allowed excess

8    funds to revert back to the U.S. Treasury.  The fact remains,

9    however, that, if ever it was appropriate to view even a

10   portion of the equitable monetary relief fund as disgorgement,

11   it is no longer so in light of the Seventh Circuit's decision

12   in CBC this summer.  That decision made clear that the monetary

13   relief fund was permissible as an order providing relief

14   necessary to redress injuries to consumers under Section 19(b),

15   and it excised the reversion provision.

16          This Court believes it appropriate to consider the

17   fund as it exists today, rather than the fund as it may have

18   been characterized in the past.  I say this because this is not

19   a situation in which the judgment figure ultimately sought by

20   the FTC was somehow grossly overstated, nor is this a situation

21   in which Mr. Brown paid more than the law required him.  A

22   judgment was entered; the equitable relief fund was then

23   sourced to a particular statutory provision in accordance with

24   then-prevailing law; and after decisions from the Seventh

25   Circuit and the Supreme Court, the fund was resourced to

NAK1BROD

1    different statutory provisions that were implicated by and

2    mentioned in the original complaint.  The District Court

3    approved the modification of the judgment, and the Seventh

4    Circuit upheld the modification and the characterization of the

5    fund.  So this is not a situation in which the FTC has somehow

6    gotten away with something nefarious.  The agency was correct

7    that judgment could be imposed; it was correct regarding the

8    amount of judgment that could be imposed; and it was slightly

9    off on the statutory provisions under which it could be

10   imposed.

11          By focusing on the disgorgement penalty, Mr. Brown is

12   by extension really not arguing that the pretrial restraint of

13   his assets or living expenses should be itself considered under

14   the *Mendoza-Martinez* factors.  Instead, the Court understands

15   this information to be in the vein of atmospherics, and

16   indicative of the punitive intent with which the FTC was

17   operating.  However, whether considered alone or in connection

18   with the relief fund set forth in the modified judgment, this

19   Court does not believe that Mr. Brown's allegations concerning

20   pretrial asset restraints suffice to implicate the Double

21   Jeopardy Clause.  In brief, the court was presented with

22   ongoing misconduct (indeed, the government here would argue

23   that it is criminal conduct), resulting in substantial harm to

24   consumers.  The District Court awarded emergent relief to the

25   FTC, after a two-day hearing.  There's no suggestion that the

NAK1BROD

1    FTC presented false or misleading evidence to the District

2    Court in Illinois to obtain that preliminary injunction, and

3    the District Court awarded injunctive relief that included an

4    asset freeze because of its overarching and often repeated

5    concern that funds for consumer redress were being or would be

6    dissipated.  The preliminary injunction order set forth a means

7    by which Mr. Brown could receive funds for living expenses.

8    And, as I understood it, and as the government noted, the

9    District Court always remained in the background, insofar as

10   Mr. Brown retained the ability to petition the court directly

11   if he believed that his living expenses were inadequate—an

12   opportunity he never took.  These choices cannot and will not

13   be transmuted into a double jeopardy violation.

14          So now the Court proceeds to consider the

15   *Mendoza–Martinez* factors.  And it begins with whether the

16   statute amounts to affirmative disability or restraint.

17          The question here, as the parties both have indicated,

18   is whether the monetary relief fund "approach[ed] the 'infamous

19   punishment' of imprisonment."  It did not.  The monetary relief

20   reflected the amount of consumer losses, and not Mr. Brown's

21   personal gains, and it was permitted to do so under Section 19.

22   The Third Circuit in *Jumper* noted similarly that disgorgement

23   in an SEC civil enforcement action "[did] not involve an

24   'affirmative disability or restraint' approaching that of

25   imprisonment."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NAK1BROD

1      In this regard, Mr. Brown begins by speaking of

2  disgorgement, but he then reverts to speaking about his

3  pretrial asset restraint.  For the reasons I stated a few

4  moments ago, this Court does not believe that that restraint

5  approaches the "house arrest" argued by Mr. Brown, particularly

6  since he could have petitioned the District Court for redress

7  if his discussions with the FTC were unsuccessful.  And as the

8  government noted, the restraints were not the product of the

9  relief order——the amended or modified judgment——but rather of

10  the separate preliminary injunction proceeding.

11      Similarly, the Court does not believe that the FTC

12  acted inappropriately in subpoenaing CERV, given the fact that

13  during the same time period, Mr. Brown was operating his

14  businesses in contempt of the preliminary injunction.

15      Turning now to the factor of whether the statute is

16  historically regarded as a civil penalty, the Court agrees with

17  the government at pages 16 and 17 of its opposition that in the

18  double jeopardy context, disgorgement has been historically

19  records as a civil penalty.  Two cases for that proposition are

20  *United States v. Williams*, 736 Fed. App'x 267, from 2018; and

21  *SEC v. Amerindo Inv. Advisors*, 639 Fed. App'x 752, both Second

22  Circuit decisions.  Even more so, relief under Section 19 of

23  the FTCA has traditionally been regarded as a civil penalty.

24      Now here, Mr. Brown argues that disgorgement in excess

25  of his own gains would be punitive.  This Court does not

NAK1BROD

believe that any of the decisions in *AMG Capital* or *Liu* or

Kokesh could be read to stand for the proposition that

disgorgement in excess of individual ill-gotten gains would

amount to criminal punishment for purposes of the Double

Jeopardy Clause. But what I'm sorry is sounding like a refrain

in this section, the equitable monetary fund approved by the

District Court under section 19 has been upheld against these

precise arguments by the District Court and by the Seventh

Circuit.

The next factor is whether the statute comes into play

only on a finding of scienter. And scienter is not in fact

required here. In *Federal Trade Commission v. LeadClick Media,*

*LLC*, 838 F.3d 158, from 2016, the Second Circuit found that

"The deception need not be made with intent to deceive; it is

enough that the representations or practices were likely to

mislead consumers acting reasonably."

In this regard, Mr. Brown focuses on certain language

in Section 19(b)(A)(2). But as the government notes, that is

ultimately an objective standard that does not implicate

scienter.

The next factor is whether the statute promotes

retribution and deterrence, the traditional aims of punishment.

Here, the relevant sections of the FTCA and ROSCA

promote both civil and criminal goals, and even if the monetary

fund were seen as serving a goal of criminal punishment such as

NAK1BROD

1   deterrence, the District Court made clear that it was being set
2   up to provide redress to consumers.

3          The next factor is whether the behavior to which it
4   applies is already a crime.  And here, Mr. Brown's conduct
5   subjected him to both civil and criminal liability.  But as I
6   noted earlier in this case, *Hudson* makes clear that a person
7   can face both civil and criminal liability for the same conduct
8   without running afoul of the Double Jeopardy Clause.

9          The next factor is whether the statute is rationally
10  connected to a purpose other than punishment; and here, it is.
11  The statutory provisions, and in particular, Section 19, allow
12  a court to "grant such relief as the court finds necessary to
13  redress injury to consumers."  So quite obviously, the statutes
14  at issue here have purposes other than punishment, including
15  consumer protection, and the protection of online commerce.

16         The next factor is whether the statutory sanction or
17  burden appears excessive in relation to the alternate purpose.
18  And as with the preceding factor, this Court doesn't find that
19  the sanction is excessive in relation to its alternate purpose.
20  To the contrary, the Seventh Circuit modified the judgment so
21  that the monetary fund would be limited to consumer redress,
22  and would not revert to the U.S. Treasury, which negates that
23  portion of the defendant's argument.

24         And as before, this Court rejects the defense argument
25  that the sanction is excessive, either for double jeopardy or

NAK1BROD

1    Eighth Amendment purposes, simply because it exceeds the

2    defendant's gains, or simply because there is no tracing or, by

3    extension, the including "untainted" funds, or because the

4    District Court rejected Mr. Brown's offer of a temporal

5    limitation.  As the Seventh Circuit noted, because the redress

6    is in the form of consumer refunds, it need not be measured by

7    net profits and it need not be traced.

8            So for all of these reasons, Mr. Brown's double

9    jeopardy arguments fail under both prong 1 and prong 2 of

10   *Hudson.*

11           The Court finds that the statutes at issue and the

12   sanctions allowed under them are neither intentionally punitive

13   nor punitive in their purpose or effect.

14           Mr. Brown argues that he as an individual, and the

15   judiciary and the public as a whole, have been harmed by FTC

16   arguments that were, he claims, knowingly false and misleading

17   when made.  Those arguments, it is claimed, led to years of

18   judicial misapprehension regarding the scope of remedies

19   available to the FTC.  They also had more acute effects in

20   Mr. Brown's case, as they emboldened the FTC to seize assets,

21   including incoming assets, that were not directly traceable to

22   and indeed were in excess of any of his gains.

23           At base, Mr. Brown is arguing that the FTC's conduct

24   on both fronts——what I've called macro and micro——was so

25   egregious that it entitles him to a pass——and, without meaning

1  to minimize the situation, I think of it as a "get out of jail

2  free" card——even if Mr. Brown's conduct also violated federal

3  criminal laws.  And on the facts of this case, this Court

4  simply disagrees.  As noted, to the extent that the FTC argued

5  positions about Section 13(b) of the FTCA that were ultimately

6  rejected, it is noteworthy that those positions were adopted by

7  multiple circuit courts and withstood repeated judicial

8  scrutiny for decades.  What is more, the FTC retains the

9  ability to seek redress for the nearly $5.2 million in

10  remaining consumer losses under Section 19 of the FTCA, and so

11  it is not as though the agency has been making indefensible

12  arguments.

13         As for the FTC's conduct in the civil proceeding, the

14  Court finds it to be appropriate under the law.  There is no

15  double jeopardy or Eighth Amendment issue here, particularly

16  now that the judgment has been modified by the Seventh Circuit

17  to remove the possibility that funds would revert to the

18  Treasury.  And while I will accept that the conditions of the

19  preliminary injunction resulted in significant hardship for

20  Mr. Brown, I also note that: (i) there was in fact a

21  $5.2 million loss to consumers for which the defendant was

22  ultimately found to be jointly and severally liable, and this

23  is a fact that the District Court properly kept front of mind,

24  (ii) Mr. Brown had opportunities under the preliminary

25  injunction order to obtain funds for living expenses; (iii)

NAK1BROD

1    while the FTC appears to have been slow in approving expenses,

2    it does not appear (with the exception of the legal fees issue)

3    that Mr. Brown appealed directly to the District Court to

4    increase or to obtain additional living expenses; and (iv)

5    Mr. Brown in fact engaged in conduct violating the preliminary

6    injunction order, to the point that civil contempt sanctions

7    were warranted.

8            So for all of these reasons, the Court is denying the

9    motion to dismiss.

10           And it turns now to the motion to compel.

11           On this issue, Mr. Brown is arguing that he is

12   entitled to a variety of materials needed to support his

13   motions to dismiss, including motions to dismiss based on

14   double jeopardy, on denial of due process, on abuse of

15   government power, a motion to suppress, and then, more broadly,

16   that he is entitled to these materials to prepare his defense.

17   And that defense includes the argument that he was duped by his

18   putative co-conspirators Danny Pierce and Andrew Lloyd.

19   Mr. Brown seeks both the production of materials held in the

20   possession of the U.S. Attorney's Office and the FTC and, to

21   the extent these entities don't have the materials, the ability

22   to issue Rule 17(c) subpoenas to obtain the materials from

23   third parties.

24           At several points in the life cycle of this case, this

25   Court asked the U.S. Attorney's Office to undertake a review of

1    the discovery it had received from the FTC and to ask the FTC

2    questions regarding the discovery it had obtained and had

3    transmitted to the U.S. Attorney's Office in the course of its

4    investigation.  The U.S. Attorney's Office has represented to

5    this Court several things:

6           In opposition to the motion to compel, it represented

7    that the FTC made its last production to the U.S. Attorney's

8    Office on May 4th of 2023, which was made in response to a

9    request by the U.S. Attorney's Office for any materials in the

10   FTC's case file that had not previously been produced,

11   excluding materials considered internal work product or

12   privileged by the FTC.

13          The government has also represented that it requested

14   basically everything from the FTC and its total

15   correspondence—absent its, I imagine, privileged materials.

16   And what was said to me at the August 8th conference was that

17   the prosecutor was not aware of any missing materials,

18   including a missing affiliate database that the FTC has.

19   Basically, in substance, the government told me that it got

20   everything that it asked for from the FTC.

21          So in terms of the completeness of the government's

22   production of responsive materials regarding Mr. Pierce and

23   Mr. Lloyd, the government then represents in an August 30,

24   2023, letter to the defense that, beyond the materials already

25   produced to Mr. Brown (including the "submit_bucks.sql"

1    database) it is "not in possession of any other databases

2    relating to affiliates of Mr. Pierce or Mr. Lloyd or any other

3    communications between the Receiver and Mr. Pierce or

4    Mr. Lloyd."  That particular representation appears to be

5    bolstered by statements made by Mr. Lloyd's counsel to the

6    Court in connection with this motion.

7            Let me turn then to the applicable law in this case.

8    And as the parties are aware, the government has a robust and

9    well-established duty to disclose certain types of information

10   to criminal defendants.  Under *Brady v. Maryland* and its

11   progeny, the government has a duty to disclose favorable

12   evidence where "the evidence is material either to guilt or to

13   punishment, irrespective of the good faith or bad faith of the

14   prosecution."  That's at 373 U.S. 83 from 1963.  Evidence is

15   material "if there is a reasonable probability that, had the

16   evidence been disclosed to the defense, the result of the

17   proceeding would have been different."  I quote here from the

18   Supreme Court's decision in *United States v. Bagley*,

19   473 U.S. 667; and as well, another case with that proposition

20   is the Supreme Court's decision in *Strickler v. Greene*,

21   527 U.S. 263.  The government's duty under *Brady* "covers not

22   only exculpatory material, but also information that could be

23   used to impeach a key government witness."  I quote here from

24   the Second Circuit's decision in *United States v. Coppa*,

25   267 F.3d 132, a decision from 2001, that is in turn quoting and

1  citing *Giglio v. United States*, 405 U.S. 150 (1972).

2          I want to pause here and note that certain of the

3  arguments made by the defense in the motion to compel

4  misperceives the relationship between the FTC and the USAO, and

5  in particular, this Court is not finding on this record that

6  the FTC is part of the prosecution team in this case.

7          As another court in this district recently observed,

8  "[t]he Second Circuit has not yet articulated a test to decide

9  when knowledge of *Brady* material may be imputed from one agency

10  to another."  And that case is *United States v. Velissaris*,

11  2022 WL 2392360, from 2022.  In the absence of this express

12  guidance, courts have tended to look at several factors.  They

13  are discussed in cases including *United States v. Alexandre*,

14  2023 WL 416405, from 2023; *United States v. Martoma*, 990

15  F.Supp.2d 458; *United States v. Middendorf*, 2018 WL 3956494;

16  *United States v. Blaszczak*, 308 F.Supp.3d 736.

17          But let me just give the factors.  And they include:

18  whether the other agency "(1) participated in the prosecution's

19  witness interviews, (2) was involved in presenting the case to

20  the grand jury, (3) reviewed documents gathered by or shared

21  documents with the prosecution, (4) played a role in the

22  development of prosecutorial strategy, or (5) accompanied the

23  prosecution to court proceedings."

24          On this record, the Court does not find that the FTC

25  was in fact part of the prosecution team.

1           Turning now, however, to the government's duty to

2     disclose information under Rule 16 of the Federal Rules of

3     Criminal Procedure, that duty extends to a broader range of

4     information than that required by *Brady*.  For instance, under

5     Rule 16, "[u]pon a defendant's request, the government must

6     disclose to the defendant. . . any relevant written or recorded

7     statement by the defendant" as long as "the statement is within

8     the government's possession, custody, or control."  It "must

9     permit the defendant to inspect and to copy or photograph"

10    documents or data, among other objects, "if the item is within

11    the government's possession, custody, or control," and the

12    document or data is "material to preparing the defense" or "the

13    government intends to use the item in its case-in-chief at

14    trial," or "the item is obtained from or belongs to the

15    defendant."  And I've been quoting here from Rule 16(a)(1)(B)

16    and 16(a)(1)(E).

17          Separately, under Rule 17(c) of the Federal Rules of

18    Criminal Procedure, "[a] subpoena may order the witness to

19    produce any books, papers, documents, data, or other objects

20    the subpoena designates."  Rule 17, however, "is not a method

21    of discovery that supplements Rule 16."  Instead, it "should be

22    used only as a mechanism for obtaining specific admissible

23    evidence."  This is discussed in the District Court decision in

24    *United States v. Skelos*, 2018 WL 2254538; or *United States v.*

25    *Avenatti*, 2020 WL 508682, which says subpoenas under Rule 17(c)

1    may "not be used as a fishing expedition to see what may turn

2    up."

3            So Rule 17(c) authorizes two types of subpoenas:

4    pretrial subpoenas and subpoenas returnable at trial.  But the

5    test announced in *United States v. Nixon*, 418 U.S. 683, covers

6    both types.

7            The party seeking the Rule 17(c) subpoena must show:

8    (i) that the documents are evidentiary and relevant; (ii) that

9    they are not otherwise procurable reasonably in advance of

10   trial by exercise of due diligence; (iii) that the party cannot

11   properly prepare for trial without such production and

12   inspection. . . and that the failure to obtain such inspection

13   may tend unreasonably to delay the trial; and (iv) that the

14   application is made in good faith and is not intended as a

15   general "fishing expedition."

16           Moreover, in order to avoid speculation that the

17   moving party is using Rule 17(c) to circumvent normal discovery

18   requirements, the party issuing the Rule 17(c) subpoena "must

19   be able to 'reasonably specify the information contained or

20   believed to be contained in the documents sought' rather than

21   'merely hop[e] that something useful will turn up.'"  And in

22   this regard, subpoenas seeking "any and all" materials, without

23   mention of "specific admissible evidence," justify the

24   inference that the defense is engaging in the type of "fishing

25   expedition" prohibited by *Nixon*.  That is, again, from the

NAK1BROD

1   *Avenatti* decision I mentioned earlier.  It was citing the case

2   of *United States v. Mendinueta-Ibarro*, 956 F.Supp.2d 511.

3           "[I]n this Circuit, the documents sought must at that

4   time meet the tests of relevancy and admissibility."

5   Impeachment evidence "does not become relevant until the

6   witness testifies."  That is discussed in the *Skelos* case and

7   as well in *Avenatti*.

8           So turning again to a big picture or overview of the

9   defendant's request for documents, I want to begin by noting

10  that I'm not, in this conversation, going to review every

11  factual assertion advanced by Mr. Brown for accuracy.  I will

12  note, however, that there were several, if not a number of

13  assertions in his motion papers that turned out not to be true,

14  including, as but one example, the recitation of the

15  conferences with Mr. Tulman, which prompted Mr. Tulman to give

16  me his own sworn statement.  There are also a number of factual

17  suppositions that were proven wrong.  For example, there was a

18  question about why there was no written referral in a case, but

19  that was because the case began with an oral referral; or there

20  was an argument that the referral to the United States

21  Attorney's Office had been made by the FTC to penalize

22  Mr. Brown for not settling, when in fact it had been made

23  months before the settlement deadline.  I'm not going to compel

24  discovery based on rumination or supposition, and there's

25  plenty of that in the moving papers.

1          Mr. Brown is also making allegations of spoliation by

2     or at the behest of the FTC that, on this record, are not

3     supported, and on this record do not warrant "broader discovery

4     in this case than this Court might ordinarily be inclined to

5     grant."  I'm quoting here from page 12 of the reply brief.  For

6     example, while the Court agrees it may have been a better

7     practice to obtain images of the various devices used by the

8     co-conspirators in this case, I'm not accepting either the

9     argument that the FTC "turned a blind eye to critical evidence

10    that it could have but did not secure," nor am I accepting the

11    argument that it "later instructed Mr. Lloyd to destroy

12    electronic evidence."  These are also on page 12 of the defense

13    reply.

14          I'll turn now to the defense's arguments.

15          The request category 1 is FTC evidence and

16    investigation documents, including correspondence between the

17    FTC and the USAO regarding Mr. Brown and various enforcement

18    actions and prosecutions.

19          Mr. Brown argues that these documents are material to

20    preparing his defense and would bear on his various motions;

21    they would also bear on his general arguments that his rights

22    were violated and that the criminal case was brought in

23    retaliation for his success in certain elements of the FTC

24    action.

25          The U.S. Attorney's Office responds that Mr. Brown has

1     not made a "substantial preliminary showing of bad faith"

2     sufficient to entitle him to communications between the FTC and

3     the U.S. Attorney's Office, nor has he demonstrated a "credible

4     showing of different treatment of similarly situated persons"

5     sufficient to be entitled to historical information about

6     referrals.

7          This Court agrees with the government insofar as there

8     has been no threshold showing made to warrant these categories

9     of documents.  The Second Circuit in fact requires "a

10    substantial preliminary showing of bad faith before an

11    evidentiary hearing or even limited discovery" on the issue of

12    bad faith is to be granted.  That's discussed by the Second

13    Circuit in its case of *United States v. Gel Spice Co.*,

14    773 F.2d 427; it's discussed more recently by Judge Furman in

15    *United States v. Rhodes*, 2019 WL 3162221; and by Judge Cronan

16    in the *Alexandre* case I mentioned earlier.

17          As this Court noted earlier in its discussion about

18    the motion to dismiss, one of the lead prosecutors in this

19    case, Mr. Ravi, has averred that the FTC had no impact in the

20    prosecutive decisions of the U.S. Attorney's Office, and the

21    U.S. Attorney's Office had no impact on the litigation

22    strategies of the FTC.  And so while Mr. Brown may be

23    ruminating about what he thinks might have happened, his

24    ruminations went into the buzz saw that is Mr. Ravi's

25    declaration.

NAK1BROD

1          Additionally, to the extent that defense counsel is

2    reasoning from personal experience that a sequence of events

3    "suggests coordination" between the FTC and the USAO (Def.

4    Reply 2, 5-6), this does not suffice to make the necessary

5    showing.  Beyond a passing reference at oral argument to having

6    served as an AUSA and a law firm biography representation that

7    Mr. Cochell was an AUSA in the Eastern District of Michigan,

8    this Court has no idea what specific experience the defense is

9    drawing these conclusions from, nor does the Court believe that

10   it would suffice as a basis either for an order to compel or a

11   Rule 17(c) subpoena.  And while I'm not sure it's even relevant

12   to the matter, this Court has had 13 years of experience at the

13   U.S. Attorney's Office and remains skeptical of any argument

14   that there's something "unusual"——or, indeed, usual——in the

15   timing or conduct of large-scale investigations of this type.

16         Similarly, while I appreciate Mr. Brown's concerns

17   about the manner in which the civil case was conducted, I do

18   not find that the FTC engaged in conduct warranting dismissal

19   of the indictment.  For this and similar reasons, I don't think

20   that Mr. Brown has made a sufficient showing to call the

21   entirety of the FTC or the U.S. Attorney's Office

22   investigations into question.  See *Kyles v. Whitley*,

23   514 U.S. 419; *United States v. Triumph Capital Grp. Inc.*,

24   544 F.3d 149.

25         As a final thought for this category of materials, to

1    the extent that the defense is framing the issue in terms of a

2    17(c) subpoena to the FTC, it is unlikely that this Court would

3    authorize one, given the overbreadth of the requests listed and

4    the record regarding productions made to date.

5          Request 2 concerns documents relating to co-defendants

6    Pierce and Lloyd.  And these materials, Mr. Brown argues, bear

7    on the credibility of these witnesses.  He notes that only

8    portions of Mr. Pierce's computer have been produced and

9    nothing from Mr. Lloyd's computer has been produced.  He seeks

10    images of Pierce's work computer, of Lloyd's computer, of

11    Lloyd's affiliate database, of affiliate records, and related

12    communications.  He seeks bank and phone records, and

13    information regarding other online scam activities by these

14    individuals.  And to the extent that the U.S. Attorney's Office

15    lacks this information, Mr. Brown requests leave to issue

16    subpoenas to Pierce, to Lloyd, to the company Revable LLC, and

17    to the FTC, which I discussed a moment ago.

18          The U.S. Attorney's Office responds that it has

19    produced all the FTC materials in its possession, other than

20    internal or privileged materials.  On the computer front, it

21    has imaged Pierce's hard drive and produced the relevant

22    materials under Rule 16 and what it understands to be its

23    disclosure obligations, and it has committed to producing

24    additional materials from Pierce's hard drive once a trial date

25    is set.

NAK1BROD

1          On this issue, this Court accepts the U.S. Attorney's

2     Office's representations that the relevant *Brady* and Rule 16

3     material that has been received (and is not privileged) has

4     been produced.  I also accept the representations concerning

5     the Pierce hard drive, though I want to talk about that more

6     specifically at the end of this opinion.  So to the extent that

7     Mr. Brown is asking me to compel the U.S. Attorney's Office to

8     produce additional information, the answer is no, because the

9     information appears not to exist.

10          To the extent that Mr. Brown is asking for leave to

11    issue Rule 17(c) subpoenas, the answer is not as currently

12    contemplated, but I'm not excluding the possibility.  Here's

13    what I mean by that.  The subpoenas that are described in the

14    motion papers are very overbroad and quite akin to a fishing

15    expedition.  And indeed, Mr. Brown acknowledges, at page 15 of

16    his original brief and page 18 of his reply, that he is using

17    the subpoenas in part to obtain impeachment evidence, which is

18    not a proper purpose.  If, however, Mr. Brown were to request a

19    more targeted subpoena——and I'm not making any judgments in

20    advance on this, but perhaps a subpoena seeking the affiliate

21    database or perhaps a subpoena seeking the call center

22    records——I can conceive of a situation in which I would grant

23    such a subpoena pretrial.

24          Request No. 3 is a request for documents related to

25    Mr. Brown's arrest.  He indicates these would show abuse of

NAK1BROD

1   power by the government, insofar as they would demonstrate that

2   he was in fact kidnapped from Mexico.

3          The U.S. Attorney's Office responds that he has been

4   given documents, both at the time of his deportation from

5   Mexico and in discovery in this case.  What he does not have

6   and what they will not produce, without me ordering them to do

7   so, is the "internal Government correspondence about the

8   Government's efforts to locate Brown in Mexico and coordinate

9   his deportation from Mexico and his arrest on the charges in

10  this case."

11         Here again, Mr. Brown is ruminating about what the

12  government must have known or must have intended, arguing that

13  it deliberately circumvented the final order, or deliberately

14  circumvented the Extradition Treaty with Mexico, and I find

15  that to be speculation.  Where the record makes clear——and here

16  it does make clear——that Mr. Brown went to Mexico, overstayed

17  his six-month visa, remained there for some two years, I do

18  think it is too much for him to expect the agents to know that

19  he intended to return "as his business grew."

20         More than that, I do agree with the government that

21  the information is legally irrelevant insofar as the Second

22  Circuit had found that abduction by the government officers

23  cannot support a jurisdictional challenge, as found in *United*

24  *States v. Umeh*, 646 Fed. App'x 96, from 2016.  It is also

25  discussed at some length in *United States v. Helbrans*,

1   547 F.Supp.3d 409, a Southern District decision from 2021.

2              So for all of these reasons, the Court is denying the

3   motion to compel the production of additional materials at this

4   time.  And it is denying the motion to issue Rule 17(c)

5   subpoenas.  But on that latter point, that denial is without

6   prejudice to a renewed, more surgical 17(c) subpoena request.

7   The Court is not going to require the government to answer

8   interrogatories which it doesn't believe are appropriate under

9   Rule 16, but again, there is the possibility of 17(c) subpoenas

10  in the future.

11             I want to return to something I was saying earlier,

12  and that's a discussion of the Pierce hard drive, which is a

13  really key point of contention between the parties.  I'm just

14  going to leave the parties—in particular, the government—with

15  several observations.  They are allowed to disregard these

16  observations as unduly risk-averse musings from a former

17  appellate lawyer, but I'm reminding the parties that this Court

18  takes the prosecutor's disclosure obligations seriously, and it

19  granted a motion for a new trial in another case after years of

20  hotly contested litigation and a six-week, scorched-earth trial

21  precisely because the government did not fully comply with its

22  disclosure obligations.  I am presuming that the prosecutors on

23  this case have carefully reviewed the defense's submissions and

24  have carefully considered what was argued at oral argument, and

25  that you are familiar with the nuances of Mr. Brown's

1   contemplated defense.  I also presume that you believe that you

2   have produced all of the Rule 16 material on Mr. Pierce's hard

3   drive and any *Brady* material that might be located on it.  And

4   if you're correct, I suppose you have nothing to worry about;

5   and if you're not correct, you might have something to worry

6   about.  So you might consider, in an abundance of caution,

7   producing additional material from the Pierce hard drive with

8   the material suggested by Mr. Brown, including making it

9   attorney's eyes only.  I'm not going to order you to do that

10  today; I'm simply here reminding you of the potential

11  consequences if your assessments of this evidence prove to be

12  wrong.

13          With that, I have completed my decisions on the motion

14  to dismiss and the motion to compel.

15          I've had the parties on the line for over an hour, and

16  you have my deepest thanks for allowing me to render these

17  decisions without coming into court.

18          Mr. Ravi, if you remain on the line, sir, I believe

19  the next step is the setting of the trial date.  But I'll hear

20  from you if you believe something else.

21          MR. RAVI:  Your Honor, that is fine to set a trial

22  date at this time.  I have not spoken with defense counsel as

23  to whether or not he wants some interim period of time to

24  assess the motions with his client and to potentially engage in

25  plea discussions——which have been ongoing, I can represent to

1    the Court——so I leave it to defense counsel whether or not he

2    wants some time to assess the motions before setting a trial

3    date or otherwise.  The government is also prepared at this

4    time to set one.

5          THE COURT:  All right.  And actually, you've reminded

6    me of something, and please excuse me.  In discussing the

7    motion to compel, there are references to potential forthcoming

8    motions, so Mr. Cochell, it may be the case, sir, that there

9    are still motions that you wish to make; it may be the case

10   that you want to rethink 17(c) subpoenas; it may be the case

11   you want to speak with the government.  I'll do whatever you

12   wish——well, within reason, sir, I'll do whatever you wish to do

13   today, whether that be looking for a trial date or instead

14   setting a conference a couple of weeks hence so that you and

15   the government can discuss open issues.  What is your

16   preference, sir?

17         MR. COCHELL:  Yes, your Honor.  I think for us, it

18   would be premature to set a trial date.  We do anticipate

19   focusing and targeting, as your Honor indicated in her opinion,

20   so that we would reapply for Rule 17 subpoenas that would

21   hopefully meet the standards set by this Court, and relying on

22   other decisions, of course.  Also, we do have a speedy trial

23   motion based on common law concepts of speedy trial, and I

24   think that that would also be something that we would be

25   working on, you know, following this Court's decision on

1    discovery.  We had hoped that discovery would help us on some

2    of those issues, and when we had talked about these particular

3    motions, we did, as your Honor just realized, we had pointed

4    out that we would have follow-on motions after that.

5              Also, your Honor, we do anticipate, you know,

6    Mr. Brown may——there is, as I understand from the case law, a

7    right to immediately appeal a double jeopardy finding, which is

8    separate from the issue of a stay, but I do anticipate that

9    Mr. Brown will be considering that option as well as

10   re-engaging with the Department of Justice and Mr. Ravi in

11   particular about potential resolutions to this case, which

12   might include a conditional plea, for example.

13             All that being said, that's pretty much what I see

14   having on our plate at this point, your Honor.  So perhaps a

15   pretrial conference or a scheduling conference in two to three

16   weeks might be appropriate.

17             THE COURT:  Okay.  I guess the question is:  If you're

18   contemplating motion practice, do you want instead to just give

19   me a proposed schedule of motions, or do you believe that

20   getting together in a couple of weeks would allow you to have

21   clarity as to whether you're proceeding by motion, by appeal,

22   or by something else?

23             MR. COCHELL:  I think a period for us to get some

24   clarity to——I would like to get a transcript of your Honor's

25   extensive decisions and be able to review that with my client,

1    so perhaps a scheduling conference in three weeks or so, or

2    four weeks would be helpful.

3            THE COURT:  Okay.  Right now I'm looking at Monday,

4    November 20th.  I happen to have a couple of hearings and

5    trials, so that's why my schedule is a little bit jammed up,

6    but I am available it looks to be all day on the 20th of

7    November.  And I can listen to the parties about what time

8    works better.

9            Mr. Ravi, are you and your colleague Ms. Lai available

10   throughout the day?

11           MR. RAVI:  Your Honor, I am not available that week in

12   particular.  I'm not sure if Ms. Lai is available, in which

13   case she certainly can cover the proceedings.

14           MS. LAI:  Yes, this is AUSA Lai.  The 20th works for

15   me, your Honor.

16           THE COURT:  Okay.  Terrific.  Thank you.

17           And Mr. Cochell, is that a date that works for you as

18   well, sir?

19           MR. COCHELL:  Yes, your Honor, it does.

20           THE COURT:  Okay.  Now, Mr. Cochell, I'm not normally

21   this nice, but given that this sounds like it's going to be a

22   scheduling conference, is it something you would want to do

23   remotely?

24           MR. COCHELL:  That would be wonderful, your Honor.

25           THE COURT:  Okay.  I will allow it.  Will 10 a.m. work

NAK1BROD

1    for you and your client, Mr. Cochell?

2              MR. COCHELL:  Yes.  10 Eastern is great.

3              THE COURT:  Okay.  Thank you so much.  And it will

4    likely be by video.  I know my deputy will have to send the

5    link.  I will indicate that it is remotely because I know

6    parties are coming from different places and I understand this

7    to be in the vein of scheduling.

8              All right.  Mr. Ravi, is there an application from the

9    government under the Speedy Trial Act?

10             MR. RAVI:  Yes, your Honor.  We do move to exclude

11   time under the Speedy Trial Act until the November 20th status

12   conference date.  We so move on the basis of allowing time for

13   the parties to continue plea discussions in light of the

14   Court's decisions in this matter, and for the defense to

15   consult and determine what motions and other defense steps they

16   might take in light of the Court's ruling.

17             THE COURT:  Okay.  And Mr. Cochell, is there a

18   position from your client?

19             MR. COCHELL:  I'm sorry, your Honor?

20             THE COURT:  I'm sorry.  What is your position on the

21   government's application, sir?

22             MR. COCHELL:  Oh, we don't oppose, your Honor.

23             THE COURT:  Okay.  Thank you very much.

24             All right.  Mr. Brown, this is directed to you, sir.

25   We've both heard the government's application.  We've also

NAK1BROD

1  heard your attorney explain to me the many options that you

2  have to consider at this time regarding additional motion

3  practice, regarding the possibility of an appeal, regarding the

4  possibility of further discussions with the government, and I

5  want you to have that time, because it took me time to get

6  through these motions; you should have a comparable amount of

7  time figuring out what to do in light of them.  So I'm going to

8  be excluding the period of time between today's date and the

9  20th of November, our next conference, and I'm doing so, making

10  the finding that the ends of justice served by excluding that

11  period of time outweigh the interests that you have, sir, in

12  going to trial more quickly and that the public has in you

13  getting to trial more quickly.  Mr. Brown, do you understand

14  what I've just said, sir?

15           THE DEFENDANT:  Yes, I do.  Thank you.

16           THE COURT:  Of course.  I thank you all again very

17  much for participating, and we are adjourned.  I'll see you in

18  November.  Take care, everyone.

19           ALL PARTICIPANTS:  Thank you, your Honor.

20                              o0o

21

22

23

24

25

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

MICHAEL BROWN,

                                    Defendant.

20 Cr. 524-1 (KPF)

**ORDER**

KATHERINE POLK FAILLA, District Judge:

For the reasons set forth in the Court's oral decision, delivered at the hearing held October 20, 2023, and reflected in the transcript thereof, Defendant's motion to dismiss on double jeopardy grounds is hereby DENIED. (*See* October 20, 2023 Minute Entry; Dkt. #104 (transcript of proceedings)).

The Clerk of Court is directed to terminate the pending motion at docket number 73.

SO ORDERED.

Dated:   November 15, 2023
         New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge

# EXHIBIT D



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE


| FEDERAL TRADE COMMISSION, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | ED5:18-cv-02104-SJO-PLA |
| | ) | |
| JASON CARDIFF, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


REPORTER'S TRANSCRIPT OF
PRELIMINARY INJUNCTION WITH RESPECT TO DEFENDANTS JASON CARDIFF
AND EUNJUNG CARDIFF
WEDNESDAY, NOVEMBER 7, 2018
4:22 P.M.
LOS ANGELES, CALIFORNIA


_____

CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4311
LOS ANGELES, CALIFORNIA 90012-4565
(213) 894-3539

1           **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        FEDERAL TRADE COMMISSION
         BY:  ELIZABETH JONES SANGER
5        BY:  EDWIN RODRIGUEZ
             Attorneys at Law
6        600 Pennsylvania Avenue, NW
         Washington, D.C.  20580
7        (202) 326-2757
         (202) 326-3147
8
     **FOR THE DEFENDANTS:**
9
         JASON CARDIFF and EUNJUNG CARDIFF
10       Pro Se
         700 West 25th Street
11       Upland, California 91784

12   **FOR THE RECEIVER:**

13       FRANDZEL ROBINS BLOOM & CSATO, L.C.
         BY:  MICHAEL GERARD FLETCHER
14           Attorney at Law
         1000 Wilshire Boulevard, 19th Floor
15       Los Angeles, California 90017
         (323) 852-1000

16

17

18

19

20

21

22

23

24

25

1            LOS ANGELES, CALIFORNIA; WEDNESDAY, NOVEMBER 7, 2018

2                            4:22 P.M.

3                            --oOo--

4            THE COURTROOM DEPUTY:  Calling Item No. 2:

5    Case number ED CV 18-02104 SJO; Federal Trade Commission versus

6    Jason Cardiff, et al.

7        Counsel, please state your appearances.

8            MS. SANGER:  Elizabeth Sanger for the Federal Trade

9    Commission.

10           MR. RODRIGUEZ:  Edwin Rodriguez for the Federal

11   Trade Commission.

12           MR. FLETCHER:  Good afternoon, Your Honor.  Mike

13   Fletcher, Frandzel, on behalf of the receiver.  Also present in

14   the courtroom is Kenton Johnson, one of the receiver's

15   deputies.

16           THE COURT:  And who else is present?

17           MR. CARDIFF:  Jason Cardiff.

18           MS. CARDIFF:  Eunjung Cardiff.

19           THE COURT:  Are you husband and wife?

20           MS. CARDIFF:  Yes, sir.

21           THE COURT:  Are you represented by counsel?

22           MS. CARDIFF:  We are not.

23           THE COURT:  Do you intend to have counsel represent

24   you in this matter?

25           MS. CARDIFF:  No, sir.

```
1              THE COURT:  Mr. Cardiff?

2              MR. CARDIFF:  We -- we intend to, but we do not have

3     asset -- we don't have funds for counsel.

4              THE COURT:  Okay.  The matter was last in court on

5     October 23rd.  The receiver or counsel for the receiver,

6     Mr. Fletcher, was present.  On that date the Court granted a

7     stipulated -- an order regarding stipulated preliminary

8     injunction as to the defendant Danielle Cardiff, and the Court

9     also granted the request for a permanent injunction with asset

10    freeze and other equitable relief as to the entity defendants,

11    and then the matter was placed on today's calendar for further

12    proceedings.

13         The Court issued an order on the 24th of October extending

14    the temporary restraining order and then granting that

15    continuance of the preliminary injunction and hearing for the

16    defendants, Jason Cardiff and then Eunjung Cardiff, and then

17    ordering them to return the assets.

18         So I'm not going to place on the record all of the

19    procedural history of the case.  That was discussed in detail

20    at the last hearing.

21         The receiver has filed an additional report.  The

22    additional report is entitled "Notice of Erratum re:  Report of

23    Receiver's Activities for the Time Period From October 10th,

24    2018 Through October 31st, 2018," and it was filed on November

25    1st, 2018.
```

1      So let me hear further from the FTC and counsel.

2           MS. SANGER:  Your Honor, we are here today on an

3  order to show cause why a preliminary injunction should not

4  issue against the defendants, Jason Cardiff and Eunjung

5  Cardiff.  To date, the defendants have not filed any responsive

6  pleadings in response to the FTC's application for temporary

7  restraining order and an eventual preliminary injunction.  And

8  we haven't heard any compelling reasons from defendants about

9  why that preliminary injunction should not issue.

10      To the contrary, the Cardiffs' noncompliance with the TRO

11  and additional evidence provided by the receiver of their

12  spoliation of evidence and the FTC's recent CID enforcement

13  action present even stronger justification for a preliminary

14  injunction, continuing the asset freeze, receivership and other

15  injunctive relief.

16      The FTC is prepared to submit a proposed preliminary

17  injunction after the hearing that is substantially similar to

18  the preliminary injunction entered against the corporate

19  defendants at the previous hearing, with three additions, which

20  are necessary in light of the Cardiffs' ongoing noncompliance

21  with the TRO and their failure to provide fulsome financial

22  disclosures.

23      Those additional provisions explicitly authorize the

24  receiver to enter all personal and business premises for the

25  purpose of inventorying and removing assets; and authorizes the

1    receiver to employ the assistance of law enforcement, if he

2    deems it necessary; requires the Cardiffs to provide bank

3    account information for any entities for which they were

4    owners, officers, or signatories during the past five years;

5    and requires the Cardiffs to turn over any home inventories of

6    their residences, whether owned or leased, including, but not

7    limited to, any inventories prepared for the purpose of

8    obtaining insurance.

9        And further, Your Honor, in light of the information

10    revealed in the receiver's report as well as to date, the

11    Cardiffs' failure to return the funds to the receivership and

12    failure to turn over any of the jewelry enumerated in the TRO,

13    the FTC is also prepared to and is currently preparing an

14    application to the Court to hold the Cardiffs in contempt and

15    will be moving the Court for an order to show cause why they

16    should not be held in contempt and coercively incarcerated for

17    their noncompliance.

18          THE COURT:  So on the 24th, after the hearing on the

19    23rd, the Court issued an order.  The order issued by the Court

20    required Mr. Jason Cardiff and Ms. Eunjung Cardiff to complete

21    the financial disclosures required in paragraph 9 of the TRO by

22    October 25th, 2019; required the Cardiffs to return to the

23    receiver sums withdrawn from an Arizona Bank and Trust on

24    October 15, 2018, and that sum was the sum of $5,000; and then

25    required Eunjung Cardiff to return to the receiver the sum of

1    $3,715 that she withdrew from Chaffey Federal Credit Union on

2    October 12th, 2018, in violation of the asset freeze and the

3    TRO.

4        In reference to the report, the subsequent report filed by

5    the receiver on the 1st and 2nd of November, the receiver has

6    indicated that, to date, the Cardiffs have not returned the

7    funds to the receiver, nor have they contacted the receiver

8    about returning the funds.

9        Apparently the receiver, on October 18th -- in the report

10    references that on October 18th the receiver went to a post

11    office and showed employees pictures of Eunjung Cardiff, and an

12    employee at the post office identified Ms. Cardiff as an

13    individual who picked up mail the previous day.  And then the

14    report indicates that that same day the receiver picked up

15    323 envelopes that contained $5,171.72 in cash and money

16    orders.  Since the initial recovery of the mail, the receiver

17    has taken possession of 1,444 envelopes, which contained

18    $20,831.02 in cash, checks, and money orders.

19        Apparently Ms. Cardiff went to the post office on October

20    17th and retrieved some mail, and apparently the mail

21    contained -- drawing reasonable inferences from the report from

22    the receiver, I conclude that the mail contained -- may have

23    contained money orders and checks that the Cardiffs were not

24    authorized to take possession of.

25        There's also in the report of the receiver an issue

8

1  regarding a diamond that may be in the possession of the

2  Cardiffs.

3      And let me hear further from the receiver regarding these

4  issues.

5          MR. FLETCHER:  Thank you, Your Honor.  May it please

6  the Court, Mike Fletcher, Frandzel, on behalf of the receiver.

7      Your Honor, with regard to the Court's most recent order

8  continuing this matter to today, the receiver has not received

9  any of the indicated funds, the $5,000 or the $3,715.  I'm

10  informed by the receiver that some minimal financial

11  disclosures were made, which the receiver has evaluated and

12  found them to be grossly inadequate.

13      With regard to the diamond, we still have no, for want of

14  a better word, coherent explanation.  The story that was told

15  to the receiver is that the diamond was liquidated in

16  Abu Dhabi, money was wired to the Cook Islands and then

17  supposedly wired back here, but there's been no paper trace

18  turned over, yet the diamond continues to be listed on an

19  express endorsement schedule of a current insurance policy for

20  which the annual premium is over $16,000, leading to the

21  supposition that no one insures something that no longer

22  exists.

23      So the receiver is operating under the assumption that the

24  diamond is in existence, otherwise it wouldn't be insured.

25  This is on top of the receiver's evaluation of the books and

1   records, which the receiver has taken possession of to date,

2   which appear to be incomplete and at odds with reality is the

3   only way to put it.  They don't make any sense that the

4   receiver has been able to figure out from the actual books and

5   records.

6          As matters stand today, the receiver is continuing its

7   investigation and will be in a position to update its report

8   when there's something more material to refer to in an updated

9   report.

10         I do have one additional request of the Court for a

11  preliminary injunction, should it issue today, as to the

12  Cardiffs, and that would be for the Court to order them to turn

13  over to the receiver any and all passports from any and all

14  jurisdictions.  Concerns have been raised to the receiver by

15  third-party potential claimants about the Cardiffs leaving the

16  jurisdiction of the Court, and we believe it would be

17  appropriate for the Court to then order them to turn over to

18  the receiver passports issued by any entity, any sovereign,

19  United States or anyone else.

20         If the Court has any other questions, I would be happy to

21  try to address them.

22              THE COURT:  So do you have any information that the

23  Cardiffs are in possession of passports that would have been

24  issued by other governments other than the United States?

25              MR. FLETCHER:  I do not, Your Honor.  I do know that

```
 1    reference has been made in a judgment debtor examination taken

 2    by a third-party creditor of an intention to relocate to

 3    Europe, and I don't know under what basis that would occur,

 4    whether it be under a United States passport, the passport from

 5    some other entity, and how someone could permanently relocate

 6    to the European Union, but I believe that there is in the

 7    possession of the Federal Trade Commission and the receiver the

 8    transcript of a judgment debtor examination taken in a state

 9    court proceeding that indicates an intent to leave the

10    jurisdiction.

11              THE COURT:  So the request today is for the Court to

12    extend to include the Cardiffs -- all of the orders that were

13    issued on October 24th, 2018, with the additional -- the added

14    order that they are to return all passports?

15              MR. FLETCHER:  That's correct, Your Honor.

16              THE COURT:  Mr. -- Ms. Cardiff, let me hear from you

17    first.  On the 24th of October 2018, this Court issued an order

18    requiring you to return to the receiver the sum of $3,715 that

19    you withdrew from Chaffey Federal Credit Union on October 12th,

20    2018, after you had been served with the asset freeze issued by

21    this Court.

22              MS. CARDIFF:  Your Honor, I believe that that

23    morning someone served me at the home, brought me a stack of

24    papers.  I didn't really know.  We were in a civil litigation

25    with someone else where they have a judgment, so I thought it
```

1 was part of that.

2          THE COURT:  Let's start with the stack of papers.

3 What do you recall receiving?

4          MS. CARDIFF:  About a stack of papers this tall.

5          THE COURT:  You mean a foot tall?

6          MS. CARDIFF:  Maybe two feet.

7          THE COURT:  Two feet tall?

8          MS. CARDIFF:  Yes, sir.

9          THE COURT:  Did that include the order issued by

10 this Court concerning the asset freeze?  Did you read it?

11          MS. CARDIFF:  I did not read it that morning, sir.

12          THE COURT:  Why not?

13          MS. CARDIFF:  Because I thought it was part of

14 another litigation, and they would serve us at our house on a

15 regular basis.

16          THE COURT:  When were you served?  What time were

17 you served?  And where were you served?

18          MS. CARDIFF:  I was served at my home.

19          THE COURT:  Where is your home located?

20          MS. CARDIFF:  700 West 25th Street, in Upland,

21 California.

22          THE COURT:  What time, approximately?

23          MS. CARDIFF:  Maybe noon, a little before then.

24          THE COURT:  Who served you, if you recall?

25          MS. CARDIFF:  No.  It was a woman.

```
 1              THE COURT:  And you recall receiving a stack of
 2   papers?
 3              MS. CARDIFF:  Yes.  And she gave it to me over my
 4   gate.
 5              THE COURT:  And what date were you served with the
 6   documents?
 7              MS. CARDIFF:  I believe it was that Friday.  Is that
 8   the 14th?  If that's the 14th, then that Friday.  I took the
 9   two feet stack of papers, and I put it in our home office.
10              THE COURT:  What caused you to withdraw money
11   from -- where is Chaffey Federal Credit Union located?
12              MS. CARDIFF:  In Upland.
13              THE COURT:  And what caused you to withdraw the sum
14   of $3,715 from the credit union on October 12th?
15              MS. CARDIFF:  My daughter's tuition was due.
16              THE COURT:  And where is your daughter -- what
17   school does she attend?
18              MS. CARDIFF:  Carden Arbor View.
19              THE COURT:  And her tuition is in what sum?
20              MS. CARDIFF:  Her tuition on an annual basis is, I
21   believe, $14,000, $14,500.
22              THE COURT:  So you withdrew on October 12th the sum
23   of $3,715.  And did you use that money to pay for her tuition?
24              MS. CARDIFF:  Yes, I did.
25              THE COURT:  Did you use it all?
```

Case 5:23-cv-00014-JGB-PLA Document 58-12 Filed 12/23/24 Page 145 of 185 Page ID #:3640

```
 1              MS. CARDIFF:  Yes.
 2              THE COURT:  Did you receive a receipt for that --
 3    from the school?
 4              MS. CARDIFF:  No, but I'm sure they can provide one.
 5              THE COURT:  And how was it paid?  Was it paid in
 6    currency, or did you cause a check to issue, or how was it
 7    paid?
 8              MS. CARDIFF:  It was a check.
 9              THE COURT:  In what sum?
10              MS. CARDIFF:  It was three months' tuition, so 30 --
11    I guess it was the $3700.
12              THE COURT:  So -- and your daughter has been at this
13    school for how long?
14              MS. CARDIFF:  Since September of this year.
15              THE COURT:  Is she still at the school?
16              MS. CARDIFF:  Yes, sir.
17              THE COURT:  Is tuition owed at the school at this
18    time?
19              MS. CARDIFF:  Not at this time.  It's -- it's -- I
20    think it's paid through December.
21              THE COURT:  Through December of this year?
22              MS. CARDIFF:  Yes, sir.
23              THE COURT:  Did you use any portion of that money
24    for any other purposes?
25              MS. CARDIFF:  No, sir.
```

**UNITED STATES DISTRICT COURT**

1    THE COURT:  And so let me just inquire from counsel

2  for the receiver when Ms. Cardiff was served with the asset

3  freeze.

4    MR. FLETCHER:  Thank you, Your Honor.

5    It's my understanding that Mrs. Cardiff was served with

6  the temporary restraining order and the asset freeze before she

7  went to the credit union.  I will tell the Court that we have

8  attached to the statement of noncompliance a copy of the check

9  that was then issued to what we believe to be the school that

10  Mrs. Cardiff has referenced.  At least that's the way it

11  appears to us.  The receiver's understanding, though, that she

12  went to the credit union and withdrew the money after being

13  served with the temporary restraining order and the asset

14  freeze.

15    THE COURT:  Okay.  And then Ms. Cardiff indicates

16  she received a -- what she described as a stack of documents

17  two feet high.  Do you know what she was served with.

18    MR. FLETCHER:  I do not, Your Honor.  I believe the

19  service was effectuated by the Federal Trade Commission, and

20  counsel for the FTC can speak to that issue.  I would imagine

21  that they served Mrs. Cardiff with everything.

22    THE COURT:  Mrs. Cardiff, why haven't you returned

23  the money?  Back at the lectern, please.

24    MS. CARDIFF:  I -- I used it for tuition.  I would

25  have to go back to the school and ask them to cut us a check

1   and then return it back to --

2         THE COURT:  How do you intend to pay for your

3   daughter's tuition after December?

4         MS. CARDIFF:  I don't know, sir.

5         THE COURT:  And where -- what school was your

6   daughter in prior to -- what school is she in now?  What's the

7   name of the school?

8         MS. CARDIFF:  Carden Arbor View.

9         THE COURT:  And what school did she attend prior to

10  that?

11        MS. CARDIFF:  She attended a preschool in Claremont

12  called The Seedling School.

13        THE COURT:  What's the tuition for the school again?

14  And what grade is she in?

15        MS. CARDIFF:  She is in first grade currently, and

16  tuition, I believe, is about $14,500 per year.

17        THE COURT:  It references that it's $11,850 per

18  year.  Does that sound right?

19        MS. CARDIFF:  I believe it's a little more with --

20  there was an initial -- because she's a new student, there was

21  an initial $2500 fee or maybe 3,000, so that would be her total

22  tuition for grade one.

23        THE COURT:  So 1,000 at enrollment, and then grades

24  K through 3, $11,850.

25        MS. CARDIFF:  I believe it was 2500 at enrollment.

```
 1              THE COURT:  I'm reading from --
 2              MS. CARDIFF:  Oh, I'm sorry.
 3              THE COURT:  -- their site, and this references
 4   tuition and fees for 2018 through 2019.
 5              MS. CARDIFF:  Okay.
 6              THE COURT:  So you are not really familiar with the
 7   precise amounts of her tuition.
 8              MS. CARDIFF:  I'm sorry, I estimated that.
 9              THE COURT:  How do you support yourself?  Where do
10   you live now?  Is this a house, or is it a condominium?  What
11   is it?
12              MS. CARDIFF:  It's a home, house.
13              THE COURT:  And would you describe it.
14              MS. CARDIFF:  It is a five-bedroom house, five-bath,
15   maybe on a third of an acre, in Upland, California.
16              THE COURT:  Do you rent, or have you purchased the
17   house?
18              MS. CARDIFF:  It was purchased prior to my marriage
19   with Mr. Cardiff.
20              THE COURT:  Did you purchase it?
21              MS. CARDIFF:  I did not.
22              THE COURT:  And who did?
23              MS. CARDIFF:  I believe my husband purchased it.
24              THE COURT:  And what is the monthly mortgage?
25              MS. CARDIFF:  It's about $12,000.
```

1              THE COURT: And how are you able to pay the monthly

2 mortgage?

3              MS. CARDIFF: We have not paid the mortgage this

4 month.

5              THE COURT: "This month" being November?

6              MS. CARDIFF: Yes, sir.

7              THE COURT: Did you pay the mortgage for October?

8              MS. CARDIFF: Yes, sir.

9              THE COURT: And when is the mortgage payment due?

10 What day of the month?

11              MS. CARDIFF: It's past due. It was due November

12 1st.

13              THE COURT: And how long have you resided there?

14              MS. CARDIFF: I resided there for five and a half

15 years, approximately.

16              THE COURT: Your estimated value of the home?

17              MS. CARDIFF: Maybe 1.9 million.

18              THE COURT: And the amount of mortgage that's owed?

19              MS. CARDIFF: I believe it's 1.45-.

20              THE COURT: Are you currently employed?

21              MS. CARDIFF: No, sir.

22              THE COURT: Any other outside sources of income?

23              MS. CARDIFF: No, sir.

24              THE COURT: So it's your statement today that prior

25 to withdrawing the money from the credit union, you did not

**UNITED STATES DISTRICT COURT**

```
 1   read the Court's order?

 2              MS. CARDIFF:  I did not, sir.

 3              THE COURT:  So are you prepared to have the Court

 4   place you under oath and to testify as to that?

 5              MS. CARDIFF:  Yes, sir.

 6              THE COURT:  Let me hear from Mr. Cardiff.

 7        Mr. Cardiff, you heard the allegations of service and the

 8   claim that you withdrew money also from an institution that was

 9   subject to the asset freeze.

10              MR. CARDIFF:  Yes, sir.

11              THE COURT:  Do you have any comments or response?

12              MR. CARDIFF:  Well, I -- I was -- I was aware of the

13   asset freeze.  I was aware that account wasn't currently

14   frozen.  I was instructed by counsel at that time, because I

15   was trying to send money to get an attorney, that it wasn't --

16   it wasn't frozen, so I wasn't totally aware if that was part of

17   the total asset freeze of everything or not, and that's what I

18   did.

19              THE COURT:  So on the 15th of October 2018, you

20   withdrew the sum of $5,000?

21              MR. CARDIFF:  Yes, I did.

22              THE COURT:  And where were you served with the

23   Court's order?  Where were you?

24              MR. CARDIFF:  At the -- at the office location in

25   Upland.
```

1    THE COURT:  And what date were you served?

2    MR. CARDIFF:  On Friday the -- I believe it was the

3 12th.

4    THE COURT:  And so Friday the 12th you were served.

5 And how did you accomplish the withdrawal from Arizona Bank and

6 Trust?

7    MR. CARDIFF:  I drove there.

8    THE COURT:  You drove there on what day?

9    MR. CARDIFF:  On Monday because the account was

10 still open.  So as we were trying to get counsel, that account

11 was still open, so I thought perhaps it wasn't a part of the

12 asset freeze.

13    THE COURT:  What made you think that?

14    MR. CARDIFF:  Poor thinking.

15    THE COURT:  So you were served with the Court's

16 order on Friday, and you, over the weekend, drive to Arizona to

17 make a withdrawal personally from the bank and trust?

18    MR. CARDIFF:  Yes, Your Honor, I did.

19    THE COURT:  And what happened to the $5,000?

20    MR. CARDIFF:  We've spent it on just general

21 expenses, and I've had our current counsel, who's working for

22 us for settlement, speaking with the FTC.  We are currently

23 working on trying to figure out how to get it repaid however we

24 need to do that.

25    THE COURT:  Who is your current counsel?

```
 1              MR. CARDIFF:  Jeff Richardson.

 2              THE COURT:  And is he representing you in this

 3    matter here?

 4              MR. CARDIFF:  Only for settlement purposes.

 5              THE COURT:  Well, the matter is not here for

 6    settlement purposes.

 7              MR. CARDIFF:  No, but not in this matter, no, sir,

 8    no, Your Honor.

 9              THE COURT:  Okay.  You've heard the request for the

10    Court to include you in the order regarding the injunction and

11    also to order you to turn over to the receiver any passports

12    that you and your wife currently hold or have.  Do you wish to

13    be heard regarding the request?

14              MR. CARDIFF:  Yes.

15              THE COURT:  Go ahead.

16              MR. CARDIFF:  I don't really understand why that

17    would be an issue in a civil matter.

18              THE COURT:  Have you read the allegations in the FTC

19    complaint?

20              MR. CARDIFF:  I have.

21              THE COURT:  And they're very serious.

22              MR. CARDIFF:  They are very serious.

23              THE COURT:  The allegations are serious.

24              MR. CARDIFF:  Yes.

25              THE COURT:  And so you do not think that they should
```

1    include -- that you should be included in the order?

2           MR. CARDIFF:  No, I'm fine to be included in the

3    order, absolutely.  We've agreed to that for sure, and we

4    understand that.

5           THE COURT:  Do you have a passport issued by the

6    United States?

7           MR. CARDIFF:  I do.

8           THE COURT:  And where is the passport?

9           MR. CARDIFF:  It's --

10          THE COURT:  At your home in Upland?

11          MR. CARDIFF:  At home, yes.

12          THE COURT:  Do you have a passport issued by any

13   other government?

14          MR. CARDIFF:  I do.

15          THE COURT:  And what other government?

16          MR. CARDIFF:  An Irish passport.

17          THE COURT:  So do you hold dual citizenship?

18          MR. CARDIFF:  Yes, Your Honor.

19          THE COURT:  And does your wife hold dual

20   citizenship?

21          MR. CARDIFF:  No, she does not.

22          THE COURT:  She is a U.S. citizen only?

23          MR. CARDIFF:  Yes.

24          THE COURT:  Is your Irish passport currently valid?

25          MR. CARDIFF:  Yes.

```
 1              THE COURT:  It's up to date?

 2              MR. CARDIFF:  Yes, Your Honor.

 3              THE COURT:  And also your U.S. passport?

 4              MR. CARDIFF:  Yes.

 5              THE COURT:  When was the last time you left the

 6   country?

 7              MR. CARDIFF:  In September.

 8              THE COURT:  Of this year?

 9              MR. CARDIFF:  Of this year.

10              THE COURT:  And where did you go?

11              MR. CARDIFF:  We were in Canada.

12              THE COURT:  So what was the purpose?

13              MR. CARDIFF:  Just vacation.

14              THE COURT:  And how long were you in Canada?

15              MR. CARDIFF:  We were in Canada roughly five or

16   seven days.  It was a -- it was a tour cruise.

17              THE COURT:  Do you have any other comments or any

18   other statements you would like to make regarding --

19              MR. CARDIFF:  No.  I feel -- we are working steadily

20   to return this $5,000.  I also believe we can put some light on

21   this issue of jewelry, and we are looking -- you know, I think

22   we know what we need to do to satisfy the FTC for that.

23              THE COURT:  I'm not sure what that means.

24              MR. CARDIFF:  There are some errors on that

25   insurance policy that I think I can get some backup
```

1    documentation for that would clear up some issues as to why

2    things are on that policy that shouldn't be.

3            THE COURT:  Well, have you reviewed the report of

4    the receiver that was filed on the 1st and then -- of November

5    and then also on the 2nd of November?

6            MR. CARDIFF:  Yes, I believe I have.

7            THE COURT:  And there's an exhibit that's attached

8    as Exhibit 2, and Exhibit 2 references what appears to be an

9    insurance policy, you being the insured, you and your wife

10   being the insured, referencing various changes to your

11   insurance policy to include and cover various -- looks like

12   various men's and looks like women's jewelry.

13           MR. CARDIFF:  Yes, Your Honor.

14           THE COURT:  And you indicate that you don't own this

15   property here?

16           MR. CARDIFF:  Correct.

17           THE COURT:  The policy period is from 2/11/2018 to

18   2/11/2019.

19           MR. CARDIFF:  I know.

20           THE COURT:  And it includes one ladies' 14-carat

21   gold diamond ring; another pendent, 14 carat; one pair of

22   ladies' diamond stud earrings.  And it looks like it's insured

23   for $34,000.  I'm not sure I'm reading this correctly.  One

24   ladies' diamond fancy ring containing, it looks like, a diamond

25   of some sort; one ladies' platinum diamond bracelet; one men's

```
 1   18-carat gold Rolex, 5-carat round diamond ring.  And it looks
 2   like the coverage on that is $104,000.  Number 9, one men's
 3   Rolex Yacht-Master 18-carat gold watch.  Something's amiss
 4   here.
 5            MR. CARDIFF:  Something is.  Even that watch, for
 6   example, was stolen in Rome roughly eight years ago, and that
 7   insurance company paid out on that.  It was a very big theft on
 8   camera, and they've kept it on there, and it's just something
 9   we've overlooked.
10            THE COURT:  You are the insured on this policy.
11            MR. CARDIFF:  Yes, I am.
12            THE COURT:  And you are paying insurance on a Rolex
13   ring -- Rolex watch valued at $14,000.  You're also apparently
14   paying insurance on a 5-carat diamond ring valued at $104,000.
15            MR. CARDIFF:  Correct.
16            THE COURT:  Why are you paying --
17            MR. CARDIFF:  We shouldn't be.  In fact, we
18   cancelled it today.  We shouldn't be paying on any of it.
19   The -- and several of those items on there -- I've got to get a
20   list.  I was just talking to the receiver.  Several of those
21   items on there --
22            THE COURT:  Sir, if this insurance policy is
23   yours --
24            MR. CARDIFF:  Yes.
25            THE COURT:  -- the premium on this policy is
```

```
 1    $16,000.

 2              MR. CARDIFF:  Yes.

 3              THE COURT:  There are 28 jewelry items that are

 4    listed here.  What you're informing the Court today doesn't

 5    ring true.

 6              MR. CARDIFF:  Okay.

 7              THE COURT:  I have some very serious concerns

 8    regarding your credibility.

 9              MR. CARDIFF:  Okay.

10              THE COURT:  So how do you explain an insurance

11    policy covering 28 items where the premium is $16,000?  It just

12    doesn't make sense.

13              MR. CARDIFF:  My explanation is simply oversight,

14    and I believe it's impounded, but I'm not sure, but I know that

15    we have liquidated items through the years, through the recent

16    times, just for cash flow issues.  I also know that a lot of

17    those items on there belonged to my ex-wife.  I know that watch

18    on there was stolen in Rome, and they paid out on it.  So I

19    would say it would be oversight on our part for sure.

20              THE COURT:  You expect the Court to believe that you

21    have insured 29 -- 28 items of jewelry covering the period from

22    February 11th, 2018 to February 11th, 2019, where the premium

23    is over $16,000, and it's simply oversight?

24              MR. CARDIFF:  I -- I know that sounds silly, but

25    yes.
```

1          THE COURT:  It sounds preposterous.

2          MR. CARDIFF:  Okay.

3          THE COURT:  So let me have counsel for the receiver

4    review -- if you just run me through the other attached

5    exhibits to the report here.

6        Please have a seat.

7          MR. FLETCHER:  Thank you, Your Honor.  Mike

8    Fletcher, Frandzel, on behalf of the receiver.

9          THE COURT:  So if you could just summarize the

10   report that was offered on the errata, which is the last

11   document which was filed on the 2nd of November.

12         MR. FLETCHER:  Yes, Your Honor.  It was filed as an

13   errata because the original document, the page 9, was

14   illegible.

15         THE COURT:  Yes.

16         MR. FLETCHER:  So this is the receiver's report with

17   a legible page 9.  It recounts, in general, the receiver's

18   contacts with the Cardiffs and the other receivership

19   defendants, interviews with various individuals at the

20   locations in an attempt to locate both assets and records.  It

21   indicates information obtained through those interviews that

22   records were instructed to be destroyed after receipt of the

23   FTC -- or an FTC document request, and various records using

24   keyword search terms were, in fact, destroyed at the direction

25   of Mr. Cardiff.

1    It goes on to discuss the receiver's evaluation of the

2    businesses, both from the perspective of whether they could be

3    lawfully operated and from the second -- the second perspective

4    of whether they could be financially operated.  The receiver

5    has concluded that neither prong of the test can be met, that

6    the activities can neither be lawfully undertaken or in a

7    financially sound manner.  The receiver has, therefore, taken

8    the steps of shutting down the business, is in the process of

9    rejecting the leases, and has taken steps to liquidate the

10   furniture, fixtures, and equipment in that location preparatory

11   to leaving the operations.

12       The receiver has undertaken a preliminary investigation of

13   the books and records.  And I will note for the Court that the

14   receiver's staff includes several forensic accountants who are

15   highly skilled in matters such as this.  They have gone through

16   the books and records in detail and don't believe that they're

17   accurate or have been prepared in accordance with generally

18   accepted accounting principles.

19       They are incomplete, and the receiver is in the process of

20   trying to determine exactly what these records mean.  For

21   instance, the receiver has recovered audited financial

22   statements by a third -party accountant and is comparing the

23   audited financial statements with the records on site, and they

24   don't match.

25       The receiver has attempted to locate and safeguard various

 1    records, including consumer information and books and records.

 2    The records are kept on a QuickBooks basis.  The receiver has

 3    taken possession of the QuickBooks.  The receiver has also

 4    taken possession of certain contact managers.

 5        The receiver has looked into statements that there is an

 6    entity that is a nonprofit entity apparently presenting itself

 7    to the public as a religious organization from which donations

 8    are being solicited.  In fact, when the receiver initially

 9    walked in to the main location, he was informed that this

10    was this religious organization and not subject to the

11    receivership order.  The receiver believes that not to be

12    accurate and that the religious donations are part and parcel

13    of the activities that have been undertaken that the FTC has

14    brought actions upon.

15        The receiver has reached out to a number of financial

16    institutions for whom accounts have been located, such as the

17    Arizona Bank and Trust account that is the subject of the -- or

18    accounts, rather, because there are multiple accounts at

19    Arizona Bank and Trust that are subject to the noncompliance

20    certificate, plus the corporate parent Heartland, the credit

21    union that's the subject of the withdrawal by Mrs. Cardiff, and

22    a host of other financial institutions.

23        Those include credit card merchant processing accounts for

24    which the receiver has been told that merchant account activity

25    ceased a couple months ago, but those accounts are, in general,

 1    holding reserves against chargebacks, and the receiver has

 2    taken steps to lock down and freeze those chargeback-type

 3    activity accounts.

 4        That, in general, is the sum and substance from the report

 5    of October 10 to October 31, Your Honor.  And all of those

 6    activities are continuing, including trying to piece together

 7    the financial records and the stories that the receiver is

 8    being told that just don't make any sense.

 9            THE COURT:  Thank you.

10            MR. FLETCHER:  I am informed by the FTC's counsel on

11    a question that the Court asked me earlier, that Mr. Cardiff,

12    in fact, holds an Irish passport, which he's testified to.  The

13    information from the Federal Trade Commission is that

14    Mrs. Cardiff holds a Korean passport.

15            MS. CARDIFF:  I don't, Your Honor.

16            MR. FLETCHER:  Thank you, Your Honor.

17            MS. CARDIFF:  May I respond to that, sir?

18            THE COURT:  You have indicated that you deny holding

19    a Korean passport.

20            MS. CARDIFF:  That's correct.

21            THE COURT:  That's correct?

22            MS. CARDIFF:  Yes.

23            THE COURT:  So let me, again, hear from the FTC as

24    to the requested order today.  I'm assuming you're requesting

25    that the Court issue, in reference to Mr. and Mrs. Cardiff, the

```
 1    preliminary injunction with an asset freeze and the other

 2    equitable relief that the Court included in the court order of

 3    October 24th, 2018.

 4              MS. SANGER:  Yes, Your Honor.  We would request and

 5    we're prepared to lodge a proposed order after this hearing

 6    with the three additional provisions that I stated earlier but

 7    can quickly summarize again for the Court.  One would be to

 8    give the receiver explicit authority to have access to personal

 9    and business premises; to inventory; and remove assets, if

10    appropriate.

11              THE COURT:  Are you requesting that the receiver

12    have access to their home located in Upland?

13              MS. SANGER:  Yes, Your Honor, as well as any other

14    business premises.

15              THE COURT:  Well, that's a -- I'm assuming that's

16    not a business premise; that's their home.

17              MS. SANGER:  Correct, Your Honor.  Yes, we would

18    include that in our request in light of --

19              THE COURT:  What's the necessity for that?

20              MS. SANGER:  In light of the changing stories about

21    the jewelry, as well as the Cardiffs' failure to turn over the

22    jewelry to the receiver, and in furtherance of the receiver's

23    duty to make a full accounting of the assets within the

24    receivership estate, we believe that temporary access to the

25    personal residence to inventory and remove, if necessary, any
```

1  of the items either enumerated in the TRO or covered in the

2  receivership property in the order would further that goal.

3          This would not be, Your Honor a permanent or exclusive

4  access to the personal residence, although in the language that

5  we're prepared to submit to the Court, we would propose that

6  the receiver be allowed to exclude anyone from any premises

7  where the receiver enters for the purpose of inventorying and

8  at least removing for that time.

9          THE COURT:  So the access would be for what period

10  of time?  What are you requesting?

11          MS. SANGER:  It would be a limited access just for

12  inventorying and removing, if appropriate, any assets found

13  onsite.

14          THE COURT:  Limited as to what range in time?

15          MS. SANGER:  Well, Your Honor, without having

16  consulted with the receiver about how long this would take, I

17  would envision just a single visit, probably.

18          And the Cardiffs have explained to you today that they

19  live in a five-bedroom, five-bathroom home.  We understood that

20  it was actually a six-bedroom, six-bathroom home, but just

21  enough time to go room by room, take a look at what's on the

22  walls, what else is contained within the residence that may be

23  of value, and to search for the items that the Cardiffs claim

24  that they no longer have in their possession.

25          THE COURT:  So you are requesting that the Court

1    also allow the receiver to have access to their residence.

2    What other additional orders?

3           MS. SANGER:  The other two requests that we have,

4    Your Honor, would be to require under the financial disclosure

5    section of the preliminary injunction a requirement that the

6    Cardiffs provide bank account information, meaning names and

7    account numbers for any entities for which they were owners,

8    officers or signatories during the past five years.

9        And the final request would be also in the financial

10   disclosures section of the preliminary injunction, requiring

11   the Cardiffs to turn over any home inventories of their

12   residences, and that could be their primary residence, or if

13   they maintain additional residences, whether owned or leased,

14   and this would be including, but not limited to, any

15   inventories that were prepared for the purpose of obtaining

16   insurance.  So, in other words, an inventory of the contents.

17   Those are the three additional requests that we --

18          THE COURT:  Do you have information that they have

19   additional residences that are owned or leased?

20          MS. SANGER:  Your Honor, the only residence that

21   we're aware of that they currently maintain is their house in

22   Upland that they have spoken to you about.  We did learn from

23   financial disclosure documents that they had previously rented

24   a property elsewhere in California, and we do not know at this

25   time if they have any additional residences.

1          THE COURT:  Okay.  So there's -- let me have counsel

2    for the receiver, the receiver, and then counsel for the FTC

3    discuss how this should be implemented if the Court issues

4    these orders, and then you can have some additional discussions

5    with the Cardiffs regarding compliance with the orders already

6    issued by the Court, and then I will call the case again.  I

7    have other matters to handle.

8          MS. SANGER:  Okay.  Your Honor, thank you.

9          MR. FLETCHER:  Very well, Your Honor.

10          THE COURT:  Mr. and Mrs. Cardiff, you're not to

11    leave the floor.  So you can consult with the lawyers in the

12    hallway.  We have an attorney room here, but you're to return

13    back to the Court when we resume with this case.

14          (Recess taken from 5:11 p.m. to 6:15 p.m.)

15          THE COURTROOM DEPUTY:  Recalling Item No. 2:

16    Case number ED CV 18-02104 SJO; Federal Trade Commission versus

17    Jason Cardiff, et al.

18       Counsel, please state your appearances.

19          THE COURT:  We are back on the record.

20       Let me just inquire whether the FTC and Mr. Fletcher and

21    Mr. and Mrs. Cardiff have had an opportunity to discuss the

22    issues in the case.

23          MR. FLETCHER:  Yes, Your Honor.  Mike Fletcher,

24    Frandzel, on behalf of the receiver.

25       We have had an opportunity to discuss the issues that the

1    Court indicated.  I believe all parties are in agreement that

2    the order to be submitted by the FTC will include provisions

3    for the inspection by the receiver of the Cardiffs' personal

4    residence during a reasonable time during the week, and we have

5    discussed the provision of that language by FTC counsel.

6        We have also discussed the issue of the surrender of

7    passports, and I will inform the Court that we have not been

8    able to reach an agreement or understanding about the Cardiffs

9    surrendering their passports to the receiver.  The receiver

10   would renew that request notwithstanding the inability of the

11   parties to come to an agreement on that basis.

12            THE COURT:  Okay.  And then there's an issue

13   regarding the financial disclosures to be provided by the

14   Cardiffs, yes, regarding bank accounts and other financial

15   information?

16            MS. SANGER:  Yes, Your Honor.  So while we were

17   discussing the additional provisions proposed by the FTC,

18   Mr. Cardiff did relay to us that he would have no problem

19   searching through his records to identify bank account

20   information for the entities with which he and his wife have

21   been associated for the past five years.

22            THE COURT:  And then there was a request to provide

23   the receiver with access to additional residences or property

24   that was rented by the Cardiffs.

25            MS. SANGER:  Let me clarify, Your Honor, that what

1  we're seeking with that proposed provision is simply if there

2  were any inventories of the contents of those residences, that

3  we are prepared, for example, for purposes of seeking

4  insurance, that they would seek their turnover as well.

5           THE COURT:  Do you have a proposed order that you

6  can file?

7           MS. SANGER:  Yes.  We can submit a proposed order to

8  this Court after the hearing.

9           THE COURT:  Mr. Cardiff, Mrs. Cardiff, do you have

10 any questions regarding the proposed order?  Do you understand

11 that you have agreed to provide the receiver with access or

12 reasonable access to your residence located in Upland so that

13 they can conduct an inventory of your home?

14          MS. CARDIFF:  Yes, we did discuss that, and we also

15 agreed that it would be during the time when my daughter is in

16 school.

17          THE COURT:  Yes, it should be.

18          MS. CARDIFF:  Yes.

19          THE COURT:  When your daughter is not in school, I

20 agree.

21          MS. CARDIFF:  No, in school.

22          THE COURT:  Well, I'm sorry, in school.  When your

23 daughter is not home is what I meant.

24          MS. CARDIFF:  Yes, yes.

25          THE COURT:  And so do you have a date for that?  We

1   should select a date today, a date and time.

2            MR. FLETCHER:  Your Honor, I've inquired of the

3   receiver with regard to a date.  The receiver's of the belief

4   and understanding that it will take the Court a day or two to

5   enter the order, and the receiver would be looking for a date

6   sometime next week, Monday through Friday, consistent with the

7   Cardiffs' daughter being in school.

8            THE COURT:  Okay.  And does -- Mrs. Cardiff, does

9   that work with your respective schedule next week?  It's going

10  to be a date next week, and it would be at a time when your

11  daughter is at school and not at home.

12           MS. CARDIFF:  Yes, I believe she is in school all

13  week next week.

14           THE COURT:  And what are her hours?

15           MS. CARDIFF:  We leave the house at around 7:45, and

16  then I pick her up at 2:55.

17           THE COURT:  7:45 to 2:55.

18      So the Court is also going to order, as part of the

19  request from the FTC, that you provide to the receiver your

20  passports, your United States passports and Mr. Cardiff's Irish

21  passport or European passport, and that should be accomplished

22  within 72 hours from today's date.  And the receiver will

23  retain possession of those passports.  If you need them for any

24  reason to leave the country, then you can seek leave of court

25  and seek permission of the Court.

```
 1              MS. CARDIFF:  Okay.
 2              THE COURT:  The Court finds good cause for that
 3    order to issue.
 4         And 72 hours, let me get a date from the clerk, three days
 5    from today's date.
 6              THE COURTROOM DEPUTY:  Are you including Saturdays,
 7    Your Honor?
 8              THE COURT:  Let's exclude the weekend, so --
 9              THE COURTROOM DEPUTY:  That would be Monday,
10    November the 12th.
11              THE COURT:  On or before Monday, November the 12th,
12    the passports are to be turned over by 12:00 noon.  Understood?
13              MS. CARDIFF:  Yes, sir.
14              THE COURT:  Mr. Cardiff, understood?
15              MR. CARDIFF:  Yes, understood.
16              THE COURT:  Now, Mr. and Mrs. Cardiff, the
17    allegations here are very serious.  There's -- the Court has
18    significant concerns that you have not been complying with the
19    prior order and notice issued by this Court.  So going forward,
20    make sure that you are diligent in compliance with the Court's
21    orders.  There are significant consequences that could be
22    imposed if you're in violation of the Court's orders.  And just
23    make sure that you make all reasonable efforts to comply.
24    Understood?  Yes?
25              MR. CARDIFF:  Yes.
```

```
 1                 THE COURT:  When can the order be filed with the
 2      Court?
 3                 MS. SANGER:  Your Honor, we can return to the office
 4      after this hearing and file it no later than 10:00 tomorrow
 5      morning.
 6                 THE COURT:  Okay.  And then make sure Mr. and
 7      Mrs. Cardiff are able to review the final proposed order.
 8           And do we need another date in this case, another event
 9      date?
10                 MS. SANGER:  No, Your Honor.  Currently there will
11      be nothing that we would need to put on the schedule today.
12                 THE COURT:  Okay.  Thank you.  Anything further?
13                 MS. SANGER:  No, thank you.
14                 THE COURT:  That's it.  We're adjourned.
15                 MR. FLETCHER:  Thank you, Your Honor.
16                 THE COURTROOM DEPUTY:  The court's in recess.
17                 (Proceedings concluded at 6:21 p.m.)
18                          ---oOo---
19
20
21
22
23
24
25
```

<pre>
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3   COUNTY OF LOS ANGELES   )
                            )
 4   STATE OF CALIFORNIA     )

 5

 6          I, CAROL JEAN ZURBORG, Federal Official Realtime

 7   Court Reporter, in and for the United States District Court for

 8   the Central District of California, do hereby certify that

 9   pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  November 13, 2018

17

18

19                         /s/ CAROL JEAN ZURBORG

20                  _____
                    CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
21                        Federal Official Court Reporter

22

23

24

25
</pre>

**UNITED STATES DISTRICT COURT**

# EXHIBIT E

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | June 29, 2021 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 1 of 13 |
|---|---|---|---|

Present: The Honorable    DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Appellant(s) | Attorneys Present for Appellee(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER RE REMEDIES IN PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [423] AND JASON AND EUNJUNG CARDIFF'S MOTION FOR SUMMARY JUDGMENT [441]**

## I.
## INTRODUCTION

On October 9, 2020, the Court granted summary judgment to Plaintiff the Federal Trade Commission ("FTC") on all 16 counts of the FTC's Complaint against Defendants Jason Cardiff and Eunjung Cardiff under the FTC Act, Restore Online Shoppers' Confidence Act ("ROSCA"), Electronic Fund Transfer Act ("EFTA"), and the Telemarketing Sales Rule ("TSR"). Motion for Summary Judgment ("MSJ") Order at 27-28 [Doc. # 511.][1]  The Court reserved ruling on the appropriate remedies until after the United States Supreme Court decided the consolidated appeals in *F.T.C. v. Credit Bureau Center*, 937 F.3d 764 (7th Cir. 2019), *cert. granted*, 2020 WL 3865251 (U.S. July 9, 2020), and *F.T.C. v. AMG Capital Management, LLC*, 910 F.3d 417 (9th Cir. 2018), *cert. granted*, 2020 WL 3865250 (U.S. July 9, 2020), and thus the remedies portions of both the FTC's and the Cardiffs' MSJs remain pending. *See* FTC MSJ [Doc. # 423]; Cardiff MSJ [Doc. # 441].  Also pending is the FTC's Motion for Default Judgment against Defendants Redwood Scientific Technologies Inc. (CA); Redwood Scientific Technologies (NV); Redwood Scientific Technologies (DE); Identify, LLC; Advanced Mens Institute Prolongz LLC; Run Away Products LLC; Carols Place Limited Partnership (the "Entity Defendants"), business entities controlled by the Cardiffs.  [Doc. # 422.]

On April 22, 2021, the Supreme Court issued its decision on the consolidated appeals in *AMG Capital Management v. F.T.C.* ("*AMG*"), 141 S. Ct. 1341 (2021), holding that the FTC cannot seek equitable monetary relief such as restitution or disgorgement under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). *See AMG*, 141 S. Ct. at 1352. But the Court in *AMG* also specified that "[n]othing" in its opinion "prohibits the Commission from using its authority under § 5 and §

---

[1] All page references herein are to page numbers inserted by the CM/ECF system.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | | Date | June 29, 2021 |
|---|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 2 of 13 |
|---|---|---|---|

19 [of the FTC Act] to obtain restitution on behalf of consumers." *Id.* And the FTC still "may use § 13(b) to obtain injunctive relief . . . when it seeks only injunctive relief." *Id.* at 1349.

In light of the *AMG* ruling, the FTC no longer seeks any monetary relief under Section 13(b). But the parties dispute whether the FTC may seek monetary relief under Section 19 of the FTC Act and what injunctive relief is still available. In accordance with the briefing schedule the Court set on May 4, 2021, the FTC filed its supplemental brief regarding remedies on May 21, 2021. [Doc. # 596.] The Cardiffs filed their response on June 8, 2021. [Doc. # 607.] Also responding to the FTC are non-parties True Pharmastrip, Inc. ("TPI") and Jacques Poujade [Doc. # 604] and Inter/Media Time Buying Corporation ("Inter/Media") [Doc. # 606]. The FTC filed its reply on June 21, 2021. [Doc. # 620.] The Court held a hearing on June 28, 2021.

For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** each side's MSJ with respect to remedies.

**II.**
**DISCUSSION**

**A.     ROSCA and Sections 18 and 19 of the FTC Act**

The FTC asserts that it may seek, and the Court may award, injunctive and monetary relief for the Cardiffs' violations of ROSCA. As the Court noted in its MSJ order, Congress passed ROSCA, 15 U.S.C. §§ 8401-05, to promote consumer confidence in online commerce. MSJ Order at 26 [Doc. # 511]. Section 4 of ROSCA generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, which is defined as "an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w); *see* 15 U.S.C. § 8403. A seller may only use a negative option feature if the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides a simple mechanism to stop recurring charges. 15 U.S.C. § 8403. The Court found no genuine dispute of material fact that the Cardiffs and their companies employed a negative option feature in which consumers were enrolled in a monthly autoship program that shipped the smoking cessation product TBX-FREE to them without consent. Consumers had to take an affirmative step to cancel the autoship program, and even when they took such a step, they

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | | Date | June 29, 2021 |
|---|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 3 of 13 |
|---|---|---|---|

were not always able to effectuate a cancellation. Accordingly, the Court granted summary judgment to the FTC on its cause of action for violation of ROSCA. MSJ Order at 26.

ROSCA authorizes the FTC to enforce ROSCA and to treat violations of the statute as a rule violation under Section 18 of the FTC Act, 15 U.S.C. § 57a, which authorizes the FTC to prescribe rules defining unfair or deceptive acts or practices. 15 U.S.C. § 8404(a). When consumers are injured by violations of rules prescribed by Rule 18, the FTC may pursue recovery for those consumers in a suit under Section 19 of the FTC Act, 15 U.S.C. § 57b.

Section 19, in turn, specifies when the FTC may bring suit against individuals or entities for unfair or deceptive acts or practices and what relief the FTC may seek. The FTC may commence a civil action against any person or entity that violates a *rule* respecting unfair or deceptive acts or practices prescribed by the FTC, without first issuing a cease-and-desist letter. 15 U.S.C. § 57b(a)(1). The FTC may also commence a civil action against a person or entity committing *any* unfair or deceptive act or practice, but only after first issuing a cease-and-desist letter. *Id.* § 57b(a)(2). Because Congress designated a violation of ROSCA as a rule violation under the FTC Act, it may be enforced via a direct suit under the language of Section 19, without the need for a final cease-and-desist letter. *Id.* at §§ 8404(a) and 57b(a)(1).

Section 19 provides that a court in an enforcement action may "grant such relief as the court finds necessary to redress injury to consumers . . . resulting from the rule violation." *Id.* § 57b(b). The available relief is broadly defined:

> Such relief may include, but shall not be limited to, *rescission or reformation of contracts, the refund of money or return of property, the payment of damages,* and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages.

*Id.* (emphasis added). This language plainly authorizes the FTC to seek equitable monetary relief to redress consumer injury resulting from ROSCA violations.

The key questions now are whether the FTC adequately pled or waived its request for equitable monetary relief under Section 19 for ROSCA violations, and whether it may rely on late-disclosed evidence at a trial on damages.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | June 29, 2021 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 4 of 13 |
|---|---|---|---|

**B.      Availability of ROSCA Remedies**

The Cardiffs argue that remedies for ROSCA violations are unavailable because the FTC (1) failed to specifically invoke Section 19 remedies in its Complaint; (2) failed to timely disclose its damages calculations and new witnesses under Federal Rule of Civil Procedure 26, thereby justifying sanctions under Rule 37; and (3) is judicially estopped from altering its position expressed in oral argument before the Ninth Circuit. Cardiff Br. at 10-22 [Doc. # 607]. The Court first determines whether the ROSCA remedies are adequately pled or judicially estopped before turning to the impact of the FTC's late disclosure of evidence.

**1.      Adequacy of Pleading**

The Complaint gave notice of the facts underlying the FTC's ROSCA claim and specifies that a ROSCA claim qualifies as a rule violation under Section 18 of the FTC Act. Compl. at ¶¶ 109, 111 [Doc. # 1]. Although the Complaint does not cite the portion of Section 18 that authorizes the FTC to file an action and seek relief under Section 19, the Prayer for Relief specifically mentions Section 5 of ROSCA, 15 U.S.C. § 8404, as authority for a permanent injunction to prevent future violations of ROSCA, as well as "rescission or reformation of contacts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies." *Id*. at 51 (Prayer for Relief). Because Section 19 merely provides for methods of enforcement and the nature of relief for violations under Section 18, the FTC did not need to specifically cross-reference Section 19 to put Defendants on notice of the factual basis for the ROSCA claim and the remedy sought thereunder. *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) (holding that notice pleading requires a plaintiff to set forth claims for relief, not to cite specific statutes or legal theories). The Complaint therefore sufficiently ties the FTC's factual allegations and claims for relief to the ROSCA violation, and invocation of Section 18 put Defendants on notice of the methods of enforcement and nature of relief available under Section 19. Moreover, Federal Rule of Civil Procedure 54 provides that "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c); *see Cabrera v. Martin*, 973 F.2d 735, 745 (9th Cir. 1992).

No pleading deficiency bars the FTC from seeking rescission of autoship and damages from the Cardiffs under Section 19 of the FTC Act.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 5 of 13 |

**2. Judicial Estoppel**

The Cardiffs argue that the FTC is judicially estopped from pursuing remedies under Section 19 due to statements made by its appellate counsel Mark Hegedus before the Ninth Circuit. During the oral argument of Jason Cardiff and Intervenor VPL Medical, Inc.'s ("VPL") appeal of the preliminary injunction against VPL, a member of the panel asked Hegedus if the FTC had invoked Section 19 in the case as a "safety net." *FTC v. Cardiff*, Recording of Oral Argument, No. 20-55858, at 20:00, (9th Cir. March 2, 2021) available at https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000018909 (last accessed June 25, 2021). He responded, "We have not invoked Section 19 in this, Your Honor." *Id.* at 20:10. Although the Cardiffs characterize Hegedus' statement as a "judicial admission," judicial admissions are generally conceded issues of fact, not of law. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) (*en banc*) ("[S]tatements of fact contained in a brief may be considered admissions of the party in the discretion of the district court.").

Hegedus' statement is more accurately analyzed under the doctrine of judicial estoppel, which prohibits a party from assuming a certain position in a legal proceeding, succeeding in maintaining that position, and then adopting a contrary position after his interests have changed. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The rule "generally prevents a party from *prevailing* in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n.8 (2000) (emphasis added). Courts have discretion to apply judicial estoppel and are generally guided by three factors: (1) the party's later position must be "clearly inconsistent" with its earlier position; (2) judicial acceptance of an inconsistent later position would "create the perception that either the first or the second court was misled"; and (3) the party asserting the inconsistent position would derive an "unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51 (citations omitted).

It is not clear that judicial estoppel applies in this context, where the FTC did not prevail in that appeal. In addition, ROSCA remedies were identified in the Complaint and, if anything, the appellate attorney's representation at oral argument was inconsistent with the Complaint. The FTC also argues that its new emphasis on Section 19 is in response to *AMG*'s change in law. The Ninth Circuit and numerous other courts permit a party to alter its theory of recovery or otherwise change its position in response to a change in law. *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1215 (9th Cir. 1984); *see also Longaberger Co. v. Kolt*, 586 F.3d 459, 470 (6th Cir. 2009), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136 (2016) (collecting cases).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 6 of 13 |

Absent a stronger showing of the usual factors supporting judicial estoppel, the Court's acceptance of the FTC's current position does not "undermin[e] the integrity of the judicial process" in any way. *New Hampshire*, 532 U.S. 742, 755 (2001).

### 3. The FTC's Failure to Timely Disclose Evidence

There is no question that the FTC relies on a late-disclosed witness and evidence to support its ROSCA damages calculation. The Cardiffs correctly note that the FTC cites only to Section 13(b) of the FTC Act, not Sections 18 or 19, in the parties' initial Joint Rule 26 Disclosure and the FTC's Supplemental Rule 26 Disclosure served on March 13, 2020. *See* Joint Rule 26 Report at 12 [Doc. # 101]; Cochell Decl., Ex. 1 (FTC Supp. Rule 26 Disclosure) at 13 [Doc. # 607-1] (computing the monetary relief for the FTC Act violations as "the total amount consumers paid for TBX-Free, Prolongz, Eupepsia Thin, and the Rengalife program"). The FTC did not offer a separate calculation of damages for violations of ROSCA or any other statutes or rules aside from the FTC Act. Furthermore, only in May 2021, long after the close of discovery, did the FTC request and then receive Defendant Redwood Scientific's customer relationship management ("CRM") database from Redwood Scientific's third-party CRM vendor, Limelight, even though such databases also appear relevant to the FTC's Section 13(b) damages calculation. Bernat Decl. at ¶¶ 2-3. Then, on May 21, 2021, the FTC disclosed for the first time its data analyst Elizabeth Miles as a witness for the ROSCA damages calculation, relying on the CRM database provided to the FTC by Limelight. *See* Sands Decl. at ¶¶ 2-7, Att. 1 [Doc. # 596-4]; Miles Decl. at ¶¶ 1-7 [Doc. # 96-5].

Under Rule 37(c), if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party cannot "use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). Rule 26(a) imposes a duty to disclose "a computation of *each category of damages* claimed by the disclosing party" and to "make available for inspection and copying . . . the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(A)(iii). Rule 26(e) requires a party to supplement or correct its disclosure in a timely manner if its disclosure is incomplete. Fed. R. Civ. P. 26(e)(1)(A). The burden is on the party facing sanctions for belated disclosure to prove that its failure to comply was substantially justified or harmless. *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). Some of the factors that courts consider to determine whether a violation of a discovery deadline is justified or harmless are: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 7 of 13 |

likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010).

The Court is not persuaded by the FTC's arguments that its late disclosure of the CRM database and Miles' calculations regarding ROSCA damages is substantially justified or harmless. First, the FTC asserts that the change in law with respect to Section 13(b) remedies announced in *AMG* substantially justifies their failure to provide a computation of the smaller amount of damages associated only with the ROSCA violation. FTC Reply at 17-19 [Doc. # 620]. It is true that in some situations, as a matter of fairness, "it would be unjust to allow [a party's] mistake about a previously unsettled point of law to be the *coup de grâce* to her case." *Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011). But the change in law regarding remedies under Section 13(b) had no effect on the availability of ROSCA Section 19 remedies in this case.

As discussed above, the FTC pled the ROSCA theory of liability and damages in its Complaint, and it obtained summary judgment on ROSCA liability. Under similar circumstances, Ninth Circuit has held that plaintiffs were not substantially justified in failing to disclose individualized computation of damages for their state-law causes of action, even though the law was unsettled regarding the need to disclose individualized computation of damages for their central federal cause of action. *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008), *as amended* (Sept. 16, 2008). The Ninth Circuit therefore affirmed the district court's exclusion of previously undisclosed individualized damages computations under Rule 37. *Id.* Analogizing to this case, the FTC was required to timely disclose computations of damages for all causes of action, including the ROSCA violation, notwithstanding that the law changed with respect to the computation of damages for equitable monetary relief under its wholly separate and distinct Section 13(b) cause of action. In other words, as the Cardiffs put it, the FTC should not have "put all its eggs in the Section 13(b) basket." Cardiff Br. at 18. The omission of the computation of ROSCA damages under Rule 26(a)(iii) may have been a tactical decision, but it was not substantially justified or harmless.

Second, the FTC argues that failing to disclose the CRM database to Defendants is harmless, since they are Defendants' own sales records. FTC Reply at 17. But Rule 26(a) does not relieve a party of its duty to disclose evidence or documents underlying its computation of damages merely because that evidence is or was once in the other side's possession. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii). In any event, under the terms of the 2018 TRO, the Receiver took physical possession of all documents related to the Cardiffs' businesses, and Jason Cardiff states that he

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | June 29, 2021 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 8 of 13 |
|---|---|---|---|

was not provided a copy of the CRM spreadsheets after the Receivership was imposed. Cardiff Decl. at ¶ 3 [Doc. # 607-3]. His counsel also attests that they never received copies of the CRM records. Cochell Decl. at ¶ 2 [D.oc. # 607-1]; White Decl. at ¶ 2 [Doc. # 607-2]. The FTC also fails to explain why relying on a previously undisclosed witness, who was never made available to the Cardiffs for discovery, is harmless.[2] In fact, the Cardiffs argue that additional document discovery and depositions are necessary to defend against the FTC's ROSCA damages calculation. Cardiff Br. at 14-15. Where late disclosure of damages would likely require the Court "to create a new briefing schedule and perhaps re-open discovery, rather than simply set a trial date," a failure to disclose is not harmless. *Hoffman*, 541 F.3d at 1180; *see also Yeti by Molly*, 259 F.3d at 1107 (finding harm to party that would have had to depose and prepare to question late-disclosed expert witness one month before trial). Thus, the FTC's late disclosure is not harmless.[3]

At the hearing, the FTC argued that the Court must also apply a five-factor test to determine whether the "drastic" Rule 37 sanction of excluding late-disclosed evidence is proper, citing to *Wendt v. Host Int'l, Inc.*, 125 F.3d 806 (9th Cir. 1997). *See id.* at 814 (holding that exclusion of expert testimony as a sanction for late disclosure of expert witnesses and damages calculations was not proper where "[l]ess drastic sanctions are available" and no prejudice ensued to the other party because the expert disclosure process had been reopened). *Wendt* relied on *Wanderer v.*

---

[2] It is true that Federal Rule of Evidence 1006 permits a government witness to summarize documents, but only if the opposing party has had an opportunity to examine or copy the original documents, "at a reasonable time and place." Fed. R. Evid. 1006; *see F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 608 (9th Cir. 1993). The FTC has not provided the CRM database to the Cardiffs for examination and copying, and it has not shown that the timing of introducing summary evidence at this late juncture is reasonable.

[3] In its July 7, 2020 Order, the Court noted that "[a]t that pre-discovery stage, the FTC provided sufficient notice of the basis of its equitable monetary relief, given the 'evidence necessary to determine Defendants' gross receipts for the purpose of assessing disgorgement was in the hands of Defendants.'" July 7, 2020 Order at 6 [Doc. # 388] (quoting *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1254 (10th Cir. 2020)). That finding applied *pre-discovery*. Now that one year has passed and discovery has closed without any indication that the FTC would rely on this ROSCA damages calculation, it is not harmless to require Defendants to reopen discovery and litigate this new theory of damages.

Furthermore, the Court disagrees with the FTC that *RaPower-3* stands for the proposition that Rule 26 is not applicable to the government's calculation of equitable remedies. As the Tenth Circuit noted, "the advisory committee note to the 1993 amendments to Rule 26 (addressing 26(a)(1)(C), which became 26(a)(1)(A)(iii) in the 2007 amendment restyling the Rule) says: 'A party claiming damages *or other monetary relief* must, in addition to disclosing the calculation of such damages, make available the supporting documents for inspection and copying . . . .'" *Id.* at 1253 (quoting Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment (emphasis added)). The court noted that Rule 26 therefore appeared to require disclosures of calculations of equitable monetary relief. *Id.*

---

**CIVIL MINUTES—GENERAL**                Initials of Deputy Clerk <u>KT</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 9 of 13 |

*Johnston*, 910 F.2d 652 (9th Cir. 1990), to set forth the five factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Wendt*, 125 F.3d at 814. Subsequent Ninth Circuit cases do not always apply these factors under similar circumstances. *See, e.g.*, *Yeti by Molly*, 259 F.3d at 1106 (noting that Rule 37(c)(1) sanctions are designed to be "harsh," and "[c]ourts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded."). But even if the factors apply here, all of them except perhaps the availability of less drastic sanctions weigh in favor of excluding the late damages evidence. The public's interest in expeditious resolution of this litigation and the Court's interest in managing its docket weigh decisively in favor of excluding the late-blooming ROSCA damages evidence. The Cardiffs would be prejudiced by reopening discovery at this late date, when the only remaining issue for trial should have been the amount of damages on the existing record. The public's interest in resolving this case on the merits has already been vindicated, as the Court has ruled in the FTC's favor on all 16 counts it brought against the Cardiffs. *See id.* While a lesser sanction, such as requiring the FTC to pay for reopened discovery, is theoretically available here, the Court finds, as a practical matter, that it would not be cost effective to require the expenditure of more money and time on litigating damages in a case where any actual monetary recovery for consumers will be substantially offset by the cost of the Receivership. Thus, even the *Wendt* factors weigh in favor of granting the Rule 37 sanctions.[4]

For the foregoing reasons, under Rule 37, the FTC cannot rely on the CRM database or the calculations based on that data by FTC analyst Miles in any briefing or at trial. The FTC may proceed to trial on damages for ROSCA violations based only on evidence and witnesses that have been properly disclosed. Because none of the FTC's prior disclosures described its computation of damages for ROSCA violations, however, it appears that the FTC has no evidence to present at trial to support its nascent theory of damages. In the absence of any other theory of monetary relief

---

[4] An argument the FTC did not raise, but the Court nonetheless addresses, is whether exclusion of ROSCA damages "amount[s] to dismissal of a claim," and therefore requires the Court to consider whether the FTC acted willfully, with fault, or in bad faith. *See R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1247 (9th Cir. 2012); *see also Yeti by Molly*, 259 F.3d at 1107 (noting that a district court must identify willfulness, fault, or bad faith before dismissing a case outright as a discovery sanction). The Court does not find that excluding evidence of ROSCA damages is equivalent to dismissing the case outright, where the FTC has already prevailed on liability and will obtain a broad permanent injunction against the Cardiffs in future to protect the public from their future unfair or deceptive practices. Regardless, as discussed above, the FTC is not blameless in failing to timely disclose its computations of damages and conducting relevant discovery within the ample period of time allotted for discovery.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | | Date | June 29, 2021 |
|---|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | | Page | 10 of 13 |
|---|---|---|---|---|

after *AMG*, the Court concludes that the FTC cannot recover damages for consumers in this action. No issues regarding monetary relief remain for trial.

## C.     Permanent Injunction

Lastly, the Cardiffs argue that the FTC cannot seek a permanent injunction against them or, at the least, that the proposed permanent injunction should be narrowed.

### 1.    Administrative Proceeding Requirement

The Cardiffs assert that Section 13(b) does not authorize a permanent injunction in this case because the FTC did not file an administrative complaint "within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction." 15 U.S.C. § 53(b)(2). But that subsection also provides "[t]hat in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." *Id.* And the Ninth Circuit has long held that Section 13(b)'s language "does not on its face condition the issuance of a permanent injunction upon the initiation of administrative proceedings." *F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107, 1110 (9th Cir. 1982).

The Supreme Court in *AMG* did not directly address this interpretation of the "permanent injunction" proviso. It merely stated, in *dicta*, that the "permanent injunction" proviso "might also be read, for example, as granting authority for the Commission to go one step beyond the provisional and ('in proper cases') *dispense with administrative proceedings to seek what the words literally say (namely, an injunction)*." *AMG*, 141 S. Ct. at 1348 (emphasis added). Indeed, although the *AMG* holding eliminated the use of Section 13(b) to obtain *monetary* relief without first initiating administrative proceedings, the Court affirmatively stated that "the Commission may use § 13(b) to obtain injunctive relief while administrative proceedings are foreseen or in progress, *or when it seeks only injunctive relief.*" *Id*. at 1349 (emphasis added); *see also id.* at 1357 ("Our task here is not to decide whether this substitution of § 13(b) for the administrative procedure contained in § 5 and the consumer redress available under § 19 is desirable."). In addition, after the *AMG* decision, a Ninth Circuit panel considering an FTC action for monetary and injunctive relief under Section 13(b) cited *Singer* approvingly for the proposition that the FTC can obtain injunctive relief without first initiating administrative proceedings. *F.T.C. v. Hoyal & Assocs.*, No. 19-35668/35669, -- F. App'x ---, 2021 U.S. App. LEXIS 17481 at *5-6 (9th Cir. June 9, 2021). The court affirmed the permanent injunction while vacating the monetary relief in light of *AMG*. *Id.*

---

**CIVIL MINUTES—GENERAL**     Initials of Deputy Clerk KT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | | Date | June 29, 2021 |
|---|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | | Page | 11 of 13 |
|---|---|---|---|---|

Because *Singer*'s holding is undisturbed, the FTC may still seek a permanent injunction against the Cardiffs under Section 13(b) without first initiating administrative proceedings.

### 2. Scope of Injunction

*Singer* also established that Section 13(b) gave the district court authority to grant a permanent injunction against "violations of any provisions of law enforced by the Commission." 668 F.2d at 1113; *see* 15 U.S.C. § 53(b)(1) (authorizing the FTC to seek a temporary restraining order or preliminary injunction whenever it has reason to believe that any person "is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission"). But injunctions under this section cannot be used to remedy past behavior and can only be granted where wrongdoing is ongoing or likely to recur. *F.T.C. v. Evans Prod. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985).

The Court's MSJ Order has already made the factual finding that the Cardiffs' unfair and deceptive acts relating to the sales of untested thinstrip products are likely to recur. *See* MSJ Order at 19-20. Indeed, the Cardiffs' plans to continue in the thinstrip manufacturing and distribution business are well documented, and they now argue that the permanent injunction should not bar them from engaging in the manufacture and distribution of thinstrip products to sophisticated business entities, in addition to barring the Cardiffs from direct retail sales and advertisement to consumers. They request that the Court permit them to work on the manufacturing and wholesale side of the thinstrip industry, so long as they perform proper testing of thinstrip products before distributing to retailers. Cardiff Br. at 26-27.

In response, the FTC argues that the Cardiffs' thinstrip retail business was wholly fraudulent, as evidenced by the judgment against them on 16 separate counts, and they "simply cannot be trusted" to make truthful claims about thinstrip products to any purchasers, sophisticated or not. FTC Reply at 27. The Court agrees that the Cardiffs' prior business practices and history of contempt in this litigation do not inspire much confidence in their future endeavors. But the FTC's proposed permanent injunction bans the Cardiffs from making any misrepresentations or unsubstantiated claims about any products and also requires the Cardiffs to engage in randomized, double-blind, and placebo-controlled testing by qualified researchers for any products they sell. These provisions, combined with a ban on the Cardiffs' participation in any direct-to-consumer sales of thinstrip products, appear sufficiently tailored to prevent unfair or deceptive acts or practices from recurring.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | | Date | June 29, 2021 |
|---|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | | Page | 12 of 13 |
|---|---|---|---|---|

Accordingly, the Court will slightly narrow the FTC's proposed preliminary injunction such that the Cardiffs' participation in the manufacture and distribution of thinstrip products is not categorically banned—only the unfair, deceptive, and fraudulent manufacture and distribution of thinstrip products without scientific substantiation.

**D.     Asset Freeze, Receivership, and Stays of Actions**

Finally, the Court turns to the contentious Asset Freeze, Receivership, and Stay of Actions provisions of the 2018 Preliminary Injunction.  [Doc. # 59.]  In light of the lack of available monetary relief, the Court must resolve the Poujade/TPI motion, determine whether any of the Poujade/TPI funds are part of the Receivership Estate, resolve the pending motion for default judgment against defaulting entities, and then order the Receiver to commence the claims process and wind up the Receivership prior to the entry of judgment.

Upon the entry of judgment and the permanent injunction, the Asset Freeze will be dissolved, and the Stay of Action will also be lifted, permitting movant Inter/Media to enforce its claims against Defendants.

In the interim, the Court **DENIES** the Cardiffs' request for the Receiver to pay their living expenses from the portion of Jason Cardiff's VPL salary held as part of the Receivership Estate. The language of the Court's November 20, 2020 Order assumes that the living expenses will be released from each monthly salary as it is paid by VPL (as stipulated to by the parties and the Receiver), not from the withheld portion.  [Doc. # 525.]  But because the Preliminary Injunction over VPL has been dissolved, any future salary Jason Cardiff receives from VPL will not be part of the Receivership Estate and can be used to pay the Cardiffs' living expenses.

**III.**
**CONCLUSION**

In light of the foregoing, the Court **ORDERS** the following:

1.  Under Rule 37(c), the FTC is barred from relying on its newly disclosed evidence and witness in support of monetary relief for the Cardiffs' ROSCA violation.  Finding no other evidence or grounds for monetary relief, the Court concludes that no triable issues remain as to monetary damages.  The Cardiffs' MSJ, stayed with respect to remedies, is **GRANTED in part** to the extent that the FTC cannot obtain a monetary award. [Doc. # 441.]  The FTC's MSJ is **DENIED in part** as to monetary relief.  [Doc. # 423.]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 13 of 13 |
|---|---|---|---|

2. Because the FTC has authority to pursue a permanent injunction and has shown the likelihood of recurrence of violations of the FTC Act, the Court **GRANTS in part** the FTC's MSJ to the extent it seeks a permanent injunction against future enumerated unfair and deceptive acts or practices by the Cardiffs. The Court also **GRANTS in part** the Cardiffs' MSJ to the extent it seeks to narrow the permanent injunction to permit them to engage in the manufacture and distribution of thinstrip products as wholesalers, provided they comply with other provisions of the permanent injunction.

3. The parties and the Receiver shall meet and confer forthwith about what personal effects of the Cardiffs currently held as part of the Receivership Estate, such as passports, personal papers, and costume jewelry, may be released by mutual agreement without need for briefing.

4. Because the FTC and the Cardiffs have not substantively responded to Poujade/TPI's contention in their motion for release of deposited funds [Doc. # 576] that the Poujade/TPI funds held by the Receiver were never controlled by or belonged to the Cardiffs, the Court orders the FTC and the Cardiffs to file supplemental responses on the merits of that argument by **July 7, 2021**. Poujade/TPI may file a supplemental reply, if any, by **July 14, 2021**. Thereafter, the Court will determine whether the Poujade/TPI funds are part of the Receivership Estate and issue its ruling on Poujade/TPI's motion. If the Court deems an evidentiary hearing necessary to resolve the issue, such a hearing will be scheduled.

5. After the Court issues its ruling on the Poujade/TPI motion, the Receiver shall commence the final claims process and shall file its final fee application and accounting, which shall take into account the Court's ruling on the Poujade/TPI's motion and delineate to whom various assets in the Receivership Estate shall be disbursed, and in what amounts. The Receiver may opine, if it wishes, on what party or parties should be responsible for paying its final fees and costs and whether prior fees paid solely by VPL should be allocated *pro rata* to any other funds determined to be available in the Receivership Estate. The Court will set a briefing schedule for that process at the time it issues its ruling on the Poujade/TPI motion.

6. The Court will rule on the pending Motion for Default Judgment against the Entity Defendants and enter Judgment and the Permanent Injunction, including dissolution of the Asset Freeze and Stay of Actions, after resolving the Receiver's final accounting.

**IT IS SO ORDERED.**