# EXHIBIT A

Stephen R. Cochell
Cochell Law Firm P.C.
5850 San Felipe Ste 500
Houston Texas 77057
(346)800-3500
srcochell@gmail.com
Admitted Pro Hac Vice

Allan Grant (SBN#213658)
Grant's Law Firm
17351 Greentree Drive
Riverside, California 92503-6762
Telephone (888)937-7555
Facsimile (866)858-6637

Attorneys for Defendant
Jason Edward Thomas Cardiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JASON EDWARD THOMAS CARDIFF<br><br>And<br><br>LILIA MURPHY and BRIAN KENNEDY<br><br>Sureties | Case No. 5:23-CR-00021-JGB |

**DECLARATION OF LILIA MURPHY COCHELL IN SUPPORT OF RESPONSE TO GOVERNMENT'S MOTION FOR ORDER FORFEITING BAIL AND FOR SUMMARY ADJUDICATION OF OBLIGATION**

I, Lilia Murphy Cochell, declare as follows:

1. I have personal knowledge of the facts set forth herein. If called as a

1

witness, I could and would competently testify to the matters stated herein. I make this declaration to address the Government's Motion for Order Forfeiting Bail and for Summary Adjudication.

2. I am married to Stephen Cochell, who represents Jason Cardiff in this criminal case and who is also General Counsel for Redwood Scientific Technologies, Inc. I have signed a waiver of conflict of interest to allow my husband to represent me in the Government's request to forfeit bond and to also represent Mr. Kennedy and Mr. Cardiff.

3. I am one of the bondholders who signed an affidavit of surety and pledged my home as security if Jason Cardiff did not comply with his bond conditions.

4. I have been a law-abiding citizen all my life working and always try to do the right thing the right way. I have always been a private person and do not disclose the details of my life to others.

5. As background, I was born in Mexico City in 1952 and grew up in San Diego, California and completed high school. My family was poor and had modest means. However, I worked very hard in the auto industry and mortgage industry to improve my life style and better the lives of my daughters. I also managed an optometry store. I was married to Dr. Robert Giarratano for over thirty years. After our divorce, I married Dr. Leo Murphy for ten years and managed his practice. In 2021, Leo and I relocated to Texas in 2021. We purchased a home in Houston Texas. We helped my grand son and daughter buy a home near our house. Leo passed away in 2022 and it was a devastating blow but I had my daughter and grandson near. A year after Leo's passing, my daughters and I were stricken with another devastating tragedy when my only grandson (age

2

23) passed away in a freak accident.

6. When my grandson passed, my daughter could not live in Texas anymore and moved to Oregon to live with my other daughter. This left me in Texas without friends or family. I had been dating Steve Cochell a few months before my grandson died. Steve saved me from falling into deep depression and feeling suicidal. We moved in together.

7. I was living with Steve Cochell when I first met Mr. Cardiff. I understood that Mr. Cardiff was in detention and would remain in jail until his trial unless he made bail. Steve told me that the Court was potentially open to having Jason released to his custody to live with us. The Government wanted $500,000. I felt compelled to help. I also understood that Jason Cardiff would have an ankle bracelet that electronically monitored him and an 8:00 a.m. to 8:00 p.m. curfew and other conditions of release including regular contact with Pretrial Service. On that basis, I felt confident to pledge my home that my husband and I would have control over the situation and could oversee Mr. Cardiff's bond conditions.

8. Mr. Cardiff arrived in December 2023. He lived upstairs in my home, shared meals with us and was a good house guest. Mr. Cardiff cooked and helped maintain the house and trained my three dogs. He is smart, talented and friendly. I also found him very trustworthy and was reliable in what he said and did around me and Steve. Steve and I were married on May 11, 2024. Jason Cardiff attended the wedding.

9. Mr. Cardiff stayed at our home and complied with the 8 to 8 curfew. He occasionally went on business trips. He kept us informed of his schedule and checked in with me or Steve while he was out of town. I understood

3

that each of these trips were coordinated and approved by the Court and Pretrial Services.

10. After he moved in, Mr. Cardiff was so grateful that I had helped bail him out that he offered to give me 900,000 shares of stock in Redwood. I told him that it was unnecessary because I did not expect anything in return for helping him. I thought it was kind of him, but I basically saw the shares as monopoly money and still do.

11. In or about October, 2024, Mr. Cardiff applied for and was granted permission by the Court to travel to Ireland for ten days after his wife suffered a heart attack. He returned on the deadline set by the Court.

12. In or about November, 2023, Mr. Cardiff applied for and was granted permission by the Court to travel back to Ireland to assist his wife and daughter and to visit his pulmonologist.

13. As I got to know Mr. Cardiff, I came to know more about his health and I found his health to be fragile. I believed that he was a potential candidate for a heart attack given his medical condition and all the stress he experienced over the years including chronic asthma. I noticed that Jason was coughing daily. I observed that he had problems going up and down the stairs and difficulty breathing. I witnessed on several occasions that he had uncontrolled coughing fits. He asked me to look out for him because he had prior episodes of uncontrollable coughing and passing out.

14. Mr. Cardiff was an early riser. On several occasions when he was not up early, I had my husband go upstairs to make sure he was alive.

15. Both of us had COVID in October, 2024, which seemed to increase Jason's coughing fits. It took Jason longer to get over COVID and he

was having even more difficulty going up and down the stairs. Sometime in November, 2024, after he tested negative for COVID, Jason applied to go back to Ireland and planned to see his pulmonologist.

16. When he got to Ireland in November, Jason told me that he got COVID again and told me that the second COVID illness was more difficult than the COVID episode in October.

17. After he saw his doctor in Ireland, he told me about the visit and told me about his medical problems. I asked "Are you coming back? He replied "Of course, I'm coming back. I would never do that to you. I would never want to be a fugitive" He then asked if he could have the downstairs bedroom when he came back. I believed and trusted him.

18. I understand that he made appointments with various doctors to get to the root cause of this problem. I also understand that his General Practitioner found that he was medically unfit to travel and submitted a treatment plan to the Court. I understand that this plan was rejected by the Court and that the Court ordered him to return on January 19, 2025.

19. I am not a doctor. All I know is that, before he left, Jason Cardiff's symptoms needed to be evaluated and treated by a doctor. I have not been in a position to observe Jason's current medical problems but the symptoms he says he has are consistent with what I witnessed all along while he was in Houston.

20. In January (before the January 19 deadline) and early February, I had discussions with Jason about his status in Ireland. I told him that although he had medical problems, he was putting my home at risk and that he needed to return to Houston to cure that problem. Jason told me that he wanted to return but that his doctors told him that he would suffer

5

even greater and irreversible damage to his health if he flew before they could treat him.

21. For me, my home is my refuge and security. I am a "home-body" with my husband and three dogs. I did sign the Affidavit of Surety and understood that my house might be at risk if there was a violation of the bond conditions. However, we did assure Jason's compliance with the bond conditions while he was under our control and living at our house in Houston. I do not think it would be fair to lose my home for actions taken by Jason that are beyond my control and which I do not support.

22. This is a summary of events. I reserve the right to supplement my testimony if called as a witness at hearing or trial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 10th day of February 2025, at Houston, Texas.

*Lilia Murphy Cochell*
Lilia Murphy Cochell